**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and | ) |
| | ) |
| STATE OF FLORIDA, OFFICE OF THE | ) |
| ATTORNEY GENERAL, DEPARTMENT | ) |
| OF LEGAL AFFAIRS, | ) |
| | ) Case No. 15cv5781 |
| Plaintiffs, | ) Judge Feinerman |
| | ) Magistrate Judge Gilbert |
| v. | ) |
| | ) |
| LIFEWATCH INC., a New York corporation, | ) |
| also d/b/a LIFEWATCH USA and MEDICAL | ) |
| ALARM SYSTEMS, and | ) |
| | ) |
| EVAN SIRLIN, individually and as an officer | ) |
| or manager of Lifewatch Inc., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.  Lifewatch's Deceptive Practices ............................................................................. 4

    A.  Lifewatch's Abusive Telemarketing Practices ....................................................... 5

    B.  Lifewatch's Deceptive Telemarketing Practices .................................................... 8

        1.  Lifewatch's Deceptive Robocalls ................................................................. 8

        2.  Lifewatch's Deceptive Live Telemarketing Calls ..................................... 11

    C.  Lifewatch's Relationship with Telemarketers ...................................................... 19

II. Argument .................................................................................................................. 25

    A.  This Court Has the Authority to Grant the Requested Relief ................................ 25

    B.  Plaintiffs Meet the Applicable Standard for Injunctive Relief ............................. 26

    C.  Plaintiffs Have Demonstrated a Likelihood of Success on the Merits ................. 27

        1.  Lifewatch's Deceptive Practices Violate the FTC Act, the TSR and the FDUPTA ..................................................................................................... 27

        2.  Lifewatch's Telemarketing Practices Violate the TSR ............................. 29

        3.  Lifewatch is Liable for the Conduct of Its Telemarketers ........................ 31

        4.  Lifewatch Has Assisted and Facilitated TSR Violations .......................... 34

    D.  Sirlin is Personally Liable .................................................................................... 35

    E.  The Balance of Equities Decidedly Favors Injunctive Relief ............................. 37

VI. Conclusion ............................................................................................................... 38

i

# TABLE OF AUTHORITIES

## Cases

### Opinions

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979) ...............................................................26

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989)............................................25, 35, 36

*FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627 (7th Cir. 2005) ...................................27, 35, 36

*FTC v. Chapman*, 714 F.3d 1211 (10th Cir. 2013) ......................................................35

*FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202 (D. Mass. 2009) ................................26

*FTC v. Direct Mktg. Concepts, Inc.*, No. 04-11136-GAO, 2004 WL 1399185
(D. Mass. June 23, 2004) ...............................................................................29

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) ..............................................................25

*FTC v. Five-Star Auto Club Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) .......................................32

*FTC v. Hes Merch. Servs. Co., Inc., et al.*, No. 6:12-cv-1618-ORl-22KRS, 2014 WL 6863506
(M.D. Fla. Nov. 18, 2014) ..............................................................................35

*FTC v. Inc21.com Corp.*, 688 F. Supp. 2d 927 (N.D. Cal. 2010) ............................................31-32

*FTC v. LeanSpa, LLC*, No. 3:11-CV-1715, 2015 WL 1004240 (D. Conn. March 5, 2015) ........31

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010) .......................................................32

*FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 2305 (D. Nev. 2010) ..................................31

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006) ..................................................27

*FTC v. SkyBiz.com, Inc.*, No. 01-CV-396-K(E), 2001 WL 1673645
(N.D. Okla. Aug. 31, 2001) ............................................................................32

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) .......................................................31, 33

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993 (N.D. Ind. 2000) ..................................28

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000) ................................26

*FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) ...........................28

ii

*FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981) ..........................................37

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) ...........................................27, 35, 36

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ............26, 27, 36, 37

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) .................................37

*Int'l Art Co. v. FTC*, 109 F.2d 393 (7th Cir. 1940) .......................................32

*Kalwajtys v. FTC*, 237 F.2d 654 (7th Cir. 1956) ................................................. 27-28

*Kraft, Inc. v. FTC,* 970 F.2d 311 (7th Cir. 1992) .......................................27

*Life Alert Emergency Response, Inc. v. Lifewatch, Inc.*, 601 Fed. Appx. 469, 2015 U.S. App. LEXIS 1760 (9th Cir. Feb. 4, 2015) ......................................................2, 25

*Standard Distribs., Inc. v. FTC*, 211 F.2d 7 (2nd Cir. 1954) ................................31, 32

*Sterling Drug, Inc. v. FTC*, 741 F.2d 1146 (9th Cir. 1984) ................................27

*U.S. v. Dish Network, LLC*, 667 F. Supp. 2d 952 (C.D. Ill. 2009) ................................32

*U.S. v. Dish Network, LLC*, No. 09-3073, 2014 U.S. Dist. LEXIS 172020 (C.D. Ill. Dec. 12, 2014) ....................................................................................33

*U.S. v. W.T. Grant Co.*, 345 U.S. 629 (1953) ..........................................26

### Filed Cases

*Abramson v. Lifewatch Inc.*, No. 2:13cv1495 (W.D. Penn. removed Oct. 15, 2013) ............... 2

*Aronson v. Lifewatch, Inc.*, No. 2:13cv1624 (W.D. Penn. filed Nov. 13, 2013) ...................... 2

*Bank v. Lifewatch, Inc., et al.*, No. 1:15-cv-02278-JG-VMS (E.D.N.Y. filed Apr. 22, 2015) ..... 2

*Connor v. Lifewatch, Inc., et al.*, No. 2:13cv3507 (D.S.C. removed Dec. 17, 2013) ........... 2, 37

*Donaca v. Lifewatch, Inc.*, No. EDCV-13-2064-JGB (C.D. Cal. filed Nov. 8, 2013) .............. 2

*FTC v. Worldwide Info Servs., Inc.*, No. 6:14-cv-8-ORL-28-DAB (M.D. Fla. filed Jan. 6, 2014) ...................................................................... 3

*Fitzhenry v. Lifewatch, Inc., et al.*, No. 2:13cv3508 (D.S.C. removed Dec. 17, 2013)......... 2, 37

iii

*Guiley v. Lifewatch USA*, No. 5:14cv350 (N.D. Ohio removed Feb. 18, 2014) ................ 2, 37

*Life Alert Emergency Response, Inc. v. Lifewatch, Inc*., No. 2:13cv3455-JAK-SS
 (C.D. Cal. filed May 14, 2013) ………………………………………………………….. 2, 37

*Reynolds v. Lifewatch, Inc.*, No. 7:14cv3575 (S.D.N.Y. filed May 19, 2014) ................. 2, 37

*Salam v. Lifewatch, Inc.*, No. 13-cv-09305 (N.D. Ill. filed Dec. 30, 2013) ..........................2

*Shapiro v. Lifewatch*, *Inc.*, No. 2:13cv1496 (W.D. Penn. filed Oct. 16, 2013) ..................... 2

*State of Indiana v. Elite Information Solutions Inc.*, Cause No. 49D06-1208-MI-032415
 (Marion Sup. Ct. Ind., filed on August 16, 2012) ………………………………………… 2

*Todd v. Lifewatch, Inc.*, *et al,* No. 1:14cv509 (N.D. Ill. Filed Jan. 23, 2014) ..................... 2

*Whitman v. Lifewatch Corp.*, No. 4:12cv3765 (S.D. Tex. filed Dec. 31, 2012) .................... 2

**Statutes**

Federal Trade Commission Act, 15 U.S.C. § 45(a).........................................................25, 27, 28

Federal Trade Commission Act, 15 U.S.C. § 53(b)...............................................................25, 26

15 U.S.C. § 57b(a)(1) ...................................................................................................................26

15 U.S.C. § 57b(b) .......................................................................................................................26

15 U.S.C. § 6105(b) .....................................................................................................................26

Telemarketing Sales Rule, 16 C.F.R. Part 310 .......................................................................2, 25

16 C.F.R. § 310.2(dd) ..................................................................................................................33

16 C.F.R. § 310.3(a)(2) ................................................................................................................33

16 C.F.R. § 310.3(a)(2)(vii) .........................................................................................................28

16 C.F.R. § 310.3(a)(4) ............................................................................................................28, 33

16 C.F.R. § 310.3(b) ....................................................................................................................34

16 C.F.R. § 310.4(a)(8) ................................................................................................................30

16 C.F.R. § 310.4(b)(1) ...................................................................................................33

16 C.F.R. § 310.4(b)(1)(iii)(A) ......................................................................................29

16 C.F.R. § 310.4(b)(1)(iii)(B) ......................................................................................29

16 C.F.R. § 310.4(b)(1)(v)(A) ........................................................................................30

16 C.F.R. § 310.4(b)(1)(v)(B)(ii) ..............................................................................5, 30

16 C.F.R. § 310.4(d) ...............................................................................................30, 31

Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II,
Florida Statutes (2014) .............................................................................................25, 28

Florida Deceptive and Unfair Trade Practices Act, Section 501.204 ...........................25

Lifewatch, Inc., markets medical alert devices to elderly consumers throughout the country using third-party telemarketers that blast illegal robocalls and engage in deceptive telemarketing practices. Lifewatch is responsible for millions of prerecorded robocalls, which often make the completely false claim that consumers can receive a medical alert device for free because someone close to the consumer already purchased or recommended the device for them. Frequently, the robocalls describe the system as being endorsed by major organizations like the American Heart Association, American Diabetes Association, National Institute on Aging, AARP, American Red Cross, and a variety of other organizations – none of which actually endorse Lifewatch's products or services. Consumers who stay on the line are transferred to live telemarketers, who reiterate and expand upon these misrepresentations.

Eventually, consumers learn that they will be responsible for paying a monthly monitoring fee (usually by credit card), but the telemarketers assure consumers that they will not be charged anything until they receive the device and choose to activate it. Lifewatch charges consumers almost immediately, however, and continues to charge even if the device is never activated. Consumers also are told that they can cancel the service at any time without any further obligation or payment, only to find out when they try to cancel that they have to return the device at their own expense or pay a penalty of $400 or more.

Since 2012, tens of thousands of consumers have complained to the FTC about such robocall campaigns. That is not surprising given that just one of Lifewatch's telemarketers alone blasted nearly two million robocalls – resulting in at least 800,000 telephone

connections – daily. Every one of these connected calls violated one or more provisions of the Telemarketing Sales Rule, 16 C.F.R. Part 310, the FTC rule aimed at combating deceptive and abusive telemarketing practices. These violations are separate and apart from the deceptive claims or misrepresentations made in the prerecorded messages and subsequent telemarketing pitch.

This instant case is just the latest in a series of legal actions against Lifewatch related to its telemarketing practices, none of which have stopped the conduct.[1] Lifewatch was first sued in November 2012 by the Indiana Attorney General because of the illegal robocalling being done on its behalf. Lifewatch's response was that the telemarketers were independent contractors that Lifewatch could not control. Then in May 2013, Lifewatch was sued by one of its competitors, Life Alert Emergency Response, Inc., again because of the illegal robocalling, but also for alleged misrepresentations and trademark infringement claims made on Lifewatch's behalf by these telemarketers. Again, Lifewatch said it could not control its telemarketers, and further, it would be impossible for it to follow any court order requiring it

---

[1] *See, e.g., State of Indiana v. Elite Information Solutions Inc.*, Cause No. 49D06-1208-MI-032415 (Marion Sup. Ct. Ind., filed on August 16, 2012); *Whitman v. Lifewatch Corp.*, No. 4:12cv3765 (S.D. Tex. filed Dec. 31, 2012); *Life Alert Emergency Response, Inc. v. Lifewatch, Inc.*, No. 2:13cv3455-JAK-SS (C.D. Cal. filed May 14, 2013); *Abramson v. Lifewatch Inc.*, No. 2:13cv1495 (W.D. Penn. removed Oct. 15, 2013); *Shapiro v. Lifewatch, Inc.*, No. 2:13cv1496 (W.D. Penn. filed Oct. 16, 2013); *Donaca v. Lifewatch, Inc.*, No. EDCV-13-2064-JGB (C.D. Cal. filed Nov. 8, 2013); *Aronson v. Lifewatch, Inc.*, No. 2:13cv1624 (W.D. Penn. filed Nov. 13, 2013); *Connor v. Lifewatch, Inc., et al.*, No. 2:13cv3507 (D.S.C. removed Dec. 17, 2013); *Fitzhenry v. Lifewatch, Inc., et al.*, No. 2:13cv3508 (D.S.C. removed Dec. 17, 2013); *Salam v. Lifewatch, Inc.*, No. 13-cv-09305 (N.D. Ill. filed Dec. 30, 2013); *Todd v. Lifewatch, Inc., et al,* No. 1:14cv509 (N.D. Ill. Filed Jan. 23, 2014); *Guiley v. Lifewatch USA*, No. 5:14cv350 (N.D. Ohio removed Feb. 18, 2014); *Reynolds v. Lifewatch, Inc.*, No. 7:14cv3575 (S.D.N.Y. filed May 19, 2014); *Bank v. Lifewatch, Inc., et al.*, No. 1:15-cv-02278-JG-VMS (E.D.N.Y. filed Apr. 22, 2015); *see also* Plaintiffs' Exhibit ("PX") 1, Menjivar Dec. Att. K at 1 (Lifewatch response to Civil Investigative Demand by Vermont Attorney General) & 9-10 (Lifewatch providing list of pending cases and investigations relating to its telemarketing practices in which it was a target or defendant), Att. L at 2 (Lifewatch response to Investigative Demand by Connecticut Dept. of Consumer Protection).

to police its telemarketers.[2]  There, the Ninth Circuit explicitly rejected this argument, stating:

> At bottom, Lifewatch would have us believe that any infringement is traceable to actions by telemarketers for which it has no responsibility.  The district court did not buy this story of telemarketers-gone-rogue, and neither do we.

*Life Alert Emergency Response, Inc. v. Lifewatch, Inc*., 601 Fed. Appx. 469, 474, 2015 U.S. App. LEXIS 1760, at *8 (9th Cir. Feb. 4, 2015).  Yet even after this ruling, Lifewatch continues to rely upon this defense in a host of class actions and other private suits.

Plaintiffs themselves brought an action in January 2014 against the telemarketing enterprise responsible for the majority of Lifewatch's sales (the "Worldwide Telemarketers"), alleging the same misconduct at issue here.[3]  While the operation was eventually shut down, in conversations with Plaintiffs, Lifewatch again merely trotted out its "ostrich" defense, claiming that it had no idea that the telemarketers responsible for making such a large percentage of its sales were engaged in widespread illegalities.  And now, remarkably, eighteen months later and more than a year after it began discussions with the FTC about the conduct now challenged here, Lifewatch's illegal telemarketing continues.

The simple truth is that Lifewatch is well aware of, and responsible for, the illegal tactics employed by its telemarketers.  These tactics are not the unavoidable result of bad conduct by a few rogue telemarketers – these tactics are responsible for making Lifewatch

---

[2] *Life Alert Emergency Response, Inc. v. Lifewatch, Inc*., 601 Fed. Appx. 469, 472, 2015 U.S. App. LEXIS 1760, at *2 (9th Cir. Feb. 4, 2015).

[3] *FTC v. Worldwide Info Servs., Inc*., No. 6:14-cv-8-ORL-28-DAB (M.D. Fla. filed Jan. 6, 2014).

the company it is today.[4]  Unfortunately, most if not all of its sales come from blatantly illegal tactics.

Plaintiffs have submitted overwhelming evidence demonstrating both Lifewatch's abusive telemarketing practices and its widespread deceptive telemarketing practices.  Either basis is sufficient to grant Plaintiffs' motion for a preliminary injunction, which seeks an immediate halt to the illegal telemarketing.  The requested relief is necessary to prevent ongoing injury to consumers throughout the country, but is narrowly tailored so as not to interfere with any of Lifewatch's legitimate business.

## I.  **LIFEWATCH'S DECEPTIVE PRACTICES**

Defendant **Lifewatch, Inc.**, also does business as Lifewatch USA and Medical Alarm Systems.  Lifewatch was incorporated in 1996 and is based in Lynbrook, New York.[5] According to its website, Lifewatch also has an office in Lauderhill, Florida, and has regional offices in Illinois, California, Pennsylvania, and Texas.[6]  Defendant **Evan Sirlin** is the President and CEO of Lifewatch, and, as Lifewatch itself explained in its response to one of the many state law enforcement Civil Investigative Demands of which it has been served in the past few years, "creates the corporation's overall vision, formulates the company's overall business plan, and oversees business operations."[7]

Lifewatch is one of many companies that offer medical alert monitoring systems. These systems generally consist of a small pendant, usually worn on a necklace or wristband,

---

[4] PX 16, Kane Dec. ¶ 3 & Att. A at 6 (Lifewatch paid Worldwide $15,741,518.50 between March 2012 and December 2013.

[5] PX 1, Menjivar Dec. Att. I at 2.

[6] *Id.* Att. III.

[7] PX 1, Menjivar Dec. Att. K at 2-3 (response to Vermont Attorney General CID); *see also* PX 77, Sirlin Aff. ¶ 12 (Sirlin testifies that his role is to "formulate the corporation's overall business plan, and create and spearhead opportunities for expansion and business development").

and a base unit about the size of an answering machine, connected to a telephone line. The systems are intended for the elderly and disabled, and marketed as a way to allow them to continue to live safely in their homes, instead of moving to a nursing home or other assisted living facility. In case of an emergency, the consumer can simply press a button on the pendant and be connected to a call center. The medical alert devices themselves are often provided at no cost, but require consumers to pay a monthly monitoring fee.

Lifewatch relies heavily on telemarketing to sell its medical alert device.[8] These telemarketing campaigns have two components – a robocall, followed by a live telemarketing call. All aspects of Lifewatch's campaigns are illegal.

### A. Lifewatch's Abusive Telemarketing Practices

Lifewatch is responsible for the transmission of <u>hundreds of millions</u> of robocalls.[9] In 2012 and 2013, just one of Lifewatch's telemarketers was itself responsible for sending out at least 800,000 robocalls that were answered by a person or answering machine <u>each day</u>.[10] These robocalls are *per se* violations of the TSR.

Lifewatch's telemarketing campaigns routinely violate other provisions of the TSR as well. For example, consumers complain that Lifewatch contacts them incessantly, regardless

---

[8] PX 16, Kane Dec. ¶ 3 & Att. A at 6 (Lifewatch paid Worldwide $15,741, 518.50 between March 2012 and December 2013); *see also* PX 14, Hilgar Dec. ¶ 11 (all of the telemarketing conducted by Worldwide and its related entities was on behalf of Lifewatch); PX 15, Settecase Dec. ¶ 6 (Worldwide telemarketing was exclusively outbound robocalls).

[9] Since the robocall messages never identify Lifewatch as the seller – an independent violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v)(B)(ii) – it is impossible to determine exactly how many consumers have complained to the FTC about Defendants' telemarketing calls. But from 2012 to present, more than 90,000 consumers have complained about "medical alert" robocalls. PX 1, Menjivar Dec. ¶ 53. Consumers specifically complained about Lifewatch 665 times. *Id.* ¶ 54; *see also id.* ¶ 41r, Att. XX at 20 (telemarketing manager states the "main PBX server that generates the call" makes around 10,000 calls a day) & 24.

[10] PX 15, Settecase Dec. ¶¶ 5 & 7 (Worldwide sent out nearly two millions calls each day).

of whether they are on the National Do Not Call Registry.[11] This includes a great number of

elderly consumers who complain of being harassed by Lifewatch's calls,[12] many of whom

signed up for the Do Not Call list specifically to avoid these types of scams.[13] Similarly,

consumers continue to be harassed by these calls even after pressing the number specified in

the robocall messages to be taken off of Lifewatch's calling list.[14] Consumers who stay on

---

[11] PX 7, Cuomo ¶ 5, Att. A at 16-17; PX 17, Bangasser Dec. ¶¶ 3-5; PX 21, Bliss Dec. ¶¶ 3-6; PX 27, Clawson Dec. ¶¶ 8-9 (consumer complained to Lifewatch directly but still received calls); PX 31, deLoca Dec. ¶ 3; PX 34, Felker Dec. ¶ 3; PX 35, Gates Dec. ¶ 4; PX 37, Gordon Dec. ¶ 3; PX 39, Grigorian Dec. ¶ 4; PX 41, James Dec. ¶ 3; PX 47, McCourt Dec. ¶ 10; PX 50, Mey Dec. ¶¶ 3-4; PX 52, Monaghan Dec. ¶¶ 3, 9-12; PX 53, Neilson Dec. ¶ 3; PX 55, Primm Dec. ¶ 4; PX 63, Whaley Dec. ¶ 3; *see also* PX 1, Menjivar Dec. ¶ 41r, Att. XX at 23 (regional manager of telemarketer calling on behalf of Lifewatch says he receives "enough" complaints about "people being called days and days and days and days and days and days and days and days and days and days in a row"); PX 15, Settecase Dec. ¶ 7 (never instructed to, and did not, scrub call lists against DNC Registry); PX 66, Lancaster Dec. ¶¶ 20-22, Ex. C (ex-employee of telemarketer told that company called repeatedly as "advertising strategy"); PX 67, Rowells Dec. ¶ 7; PX 68, Shultz Dec. ¶ 18, Ex. C (ex-employee of telemarketer states that 50% of callers on DNC Registry); PX 69, Stenger Dec. ¶ 15; PX 70, Stevens Dec. ¶¶ 23-25 & 27 (4-5 customers per hour complained about being called despite being on DNC Registry).

[12] PX 18, Barker Dec. ¶¶ 3-5; PX 20, Bird Dec. ¶¶ 3 & 9 (elderly wife received multiple calls); PX 21, Bliss Dec. ¶ 6 (72 years old, "I am offended by Senior Safe Alert's annoying, repeated calls to my house"); PX 22, Bourne Dec. ¶ 9 ("I am frustrated with these constant telephone calls"); PX 23, Bristow Dec. ¶¶ 3, 4, 7 (70 years old, received at least 7 calls); PX 24, Carson Dec. ¶¶ 3-5 (75 years old, contacted approximately 15 times); PX 25, Cattie Dec. ¶ 10 (82 years old); PX 28, Cummings Dec. ¶ 3-6 (elderly mother received multiple calls); PX 33, Featherston Dec. ¶ 3; PX 40, Haselbauer Dec. ¶¶ 3-4 (64 years old, received multiple calls); PX 42, Jensen Dec. ¶¶ 3 & 9 (60 years old, received same robocall more than 30 times); PX 43, Jones Dec. ¶¶ 3 & 6 (80 years old, "I am annoyed at the number of these telephone calls I get"); PX 45, Kulas Dec. ¶ 3; PX 48, McCraw Dec. ¶¶ 1, 3 & 9 (93 years old, received multiple calls); PX 51, Miller Dec. ¶ 5; PX 54, Pierce Dec. ¶¶ 3 & 10 (65 years old, "it seems impossible to get this company to stop calling us"); PX 58, Savagian Dec. ¶¶ 3-5 (elderly mother received multiple calls); PX 60, Veysey Dec. ¶ 3; PX 61, Wagler Dec. ¶ 5; *see also* PX 66, Lancaster Dec. ¶ 23 (80% of calls to senior citizens); PX 69, Stenger Dec. ¶ 12 (all callers she spoke with were senior citizens).

[13] PX 20, Bird Dec. ¶ 3; PX 25, Cattie Dec. ¶ 10; PX 28, Cummings Dec. ¶¶ 3, 6 & 10; PX 45, Kulas Dec. ¶ 3; PX 60, Veysey Dec. ¶¶ 3 & 11.

[14] PX 22, Bourne Dec. ¶ 3; PX 23, Bristow Dec. ¶ 5 (pressed number to stop calls but transferred to live operator instead); PX 27, Clawson Dec. ¶ 10 ("I am frustrated that I keep getting these telemarketing calls and frustrated that federal laws regarding telemarketing are being ignored. I have requested multiple times to be put on the Do Not Call lists to no avail, and even the company profiting from the calls now claims it cannot do anything to stop them."); PX 28, Cummings Dec. ¶ 5; PX 7, Cuomo Dec. ¶ 5, Att. A at 16-17; PX 43, Jones Dec. ¶ 4 (pressed "1" but continued to get calls); PX 54, Pierce Dec. ¶ 6; *see also* PX 67, Rowells Dec. ¶ 7 (telemarketer instructed to hang up with DNC requests were made); PX 68, Shultz Dec. ¶ 19 ("There were times when I would speak to the same customer again after requesting that they not be called."); PX 70, Stevens Dec. ¶¶ 23 & 27; Menjivar Dec. ¶ 41r, Att. XX at 22-23 (telemarketing manager admits he knows consumers continuing to get called despite requesting to be taken off call list).

the line and directly ask live operators to stop calling also continue receiving calls.[15] Nor can consumers screen these calls by looking at their Caller ID. Lifewatch's telemarketers transmit phony Caller ID information ("spoofing"), misrepresenting the caller and masking the origin of the call.[16] Defendants also never transmit or disclose their company name, instead using a slew of fake names that cannot be traced back to them.[17]

---

[15] PX 1, Menjivar Dec. ¶ 40b, Att. BB at 8 & 12 (makes request to Lifewatch employee to be put on telemarketing DNC list), ¶ 40c, Att. CC at 4, 7, 11 & 14 (continues receiving telemarketing calls), ¶ 40d, Att. DD (additional telemarketing call), ¶ 40e, Att. EE, ¶ 40f, Att. FF, ¶ 41i, Att. OO at 12 (asks to be taken off calling list), ¶ 41k, Att. QQ at 6 (asks to be taken off calling list), ¶ 41m, Att. SS at 5-6 (complains because keeps getting calls despite asking to be taken off calling list), ¶ 41o, Att. UU at 6 (same), ¶ 41r, Att. XX at 15 (same), 22-23, ¶ 41s, Att. YY at 7 (telling Lifewatch she does not want telemarketers calling her anymore), ¶ 41w, Att. CCC at 10-11 (complains because already asked to be put on DNC list); PX 7, Cuomo Dec. ¶ 5, Att. A at 16-17; PX 22, Bourne Dec. ¶¶ 4 & 8; PX 24, Carson Dec. ¶ 4; PX 43, Jones Dec. ¶ 4; PX 50, Mey Dec. ¶¶ 17& 18 (tells representative she's on Do Not Call list and has asked not to be called again) & ¶¶ 19-42 (additional telemarketing calls); PX 54, Pierce Dec. ¶¶ 6-10; PX 73, Gassman Dec. ¶ 2; *see also* PX 66, Lancaster Dec. ¶ 21 (ex-employee of telemarketer spoke to consumer who had previously requested not to be called); PX 68, Shultz Dec. ¶ 19 (ex-employee of telemarketer states, "There were times when I would speak to the same customer again after requesting that they not be called.").

[16] PX 1, Menjivar Dec. ¶ 40c, Att. CC at 9 (consumer called Caller ID number back and "the number is no good"); PX 65, Amberson Dec. ¶ 17 (consumers often complained of false caller ID information); PX 31, deLoca Dec. ¶ 5 (caller ID identified robocall displayed Katonah-Lewisboro School District name and telephone number); PX 39, Grigorian Dec. ¶ 7 (called number back, notified number not in service); PX 41, James Dec. ¶ 3; PX 43, Jones Dec. ¶ 6 (same); PX 51, Miller Dec. ¶ 3 (caller ID showed "FIA Card Serv"); PX 54, Pierce Dec. ¶¶ 8 & 9 ("Walmart"); PX 63, Whaley Dec. ¶ 3 ("Bank of America"). The numbers that show up on consumers' caller IDs often include in-state area codes, intended to convince consumers the call is coming from a trustworthy source. *See* PX 15, Settecase Dec. ¶ 8; PX 29, D'Addario Dec. ¶ 7 (consumer "thought she could trust the caller because she saw the telephone number that appeared on the caller ID, and it was a local number"); *see also* PX 5, Bradley Dec. ¶ 5, Att. E at 1 (Oklahoma resident's caller ID indicated local area code and the name "Oklahoma City OK"); PX 17, Bangasser Dec. ¶ 6 (appeared to be local number); PX 22, Bourne Dec. ¶ 4 (same); PX 24, Carson Dec. ¶ 3 (same); PX 37, Gordon Dec. ¶ 6 (same); PX 54, Pierce Dec. ¶¶ 4 & 8 (same); PX 6, Smith Dec. ¶¶ 4 & 14 (BBB complaints about robocalls from local numbers).

[17] PX 14, Hilgar Dec. ¶ 6 ("The telemarketers also were not allowed to disclose Lifewatch's name during telemarketing calls."); PX 2, France Dec. ¶¶ 7-9 & 13-15 ("Senior Life Support"); PX 3, Tyndall Dec. Att. A at 4, Att. B at 4 & Att. C at 4 ("Rapid Response Alert"); *id.* Att. F at 4, Att. G at 7, Att. H at 5 & Att. I at 4 ("Senior Life Support"); PX 5, Bradley Dec. ¶ 4 ("Medical Alert") & ¶ 5, Att. D at 3 & 6 ("Senior Benefits," "Safeline"); PX 6, Smith Dec. ¶¶ 5-6 ("Senior Medical Alarm," telemarketer hung up when pressed for more information); PX 31, deLoca Dec. ¶¶ 7, 13, 14 & 16 ("Life Alarm"); PX 33, Featherston Dec. ¶ 3 ("Senior Medical Benefits Program"); PX 50, Mey Dec. ¶ 4 ("Senior Life Alarm"), ¶ 9 ("Senior Life Support"); PX 51, Miller Dec. ¶ 4 ("Just for Seniors"); PX 54, Pierce Dec. ¶¶ 5 & 9 ("Emergency Medical Alert," "National Senior Assistance Program"); PX 37, Gordon Dec. ¶ 6 ("Senior Alert Care"); PX 43, Jones Dec. ¶ 4 ("LAR Medical Alert"); PX 49, Meehl Dec. ¶ 5 ("Senior Alert Care"); PX 66, Lancaster Dec. ¶ 4, Exs. A, B ("Senior Assistance Program," "Senior Alert Care"); PX 55, Primm Dec. ¶ 5 ("Senior Emergency Care," "Senior Safe Alert"); PX 68, Shultz Dec. ¶ 2 ("Senior Emergency Care"); PX 61, Wagler Dec. ¶ 4 ("Senior Safe Alert"); PX 69, Stenger Dec. ¶ 3 ("Senior Safe Alert"); *see also* PX 1, Menjivar Dec. ¶ 39a, Att. W at 4 ("Senior Assistance Program") & 11-23 (representative refuses to provide company's address, tells consumer only get information

## B.  Lifewatch's Deceptive Telemarketing Practices

Not only is the delivery mechanism of Lifewatch's calls illegal, but the substance of the telemarketing calls are also rife with misrepresentations designed to trick consumers into agreeing to monthly charges.  From robocalls that imply that friends or family already have purchased Lifewatch's service for the consumer, or that the service is endorsed by prominent national organizations, to live telemarketers that reinforce these misrepresentations and introduce others, many consumers are pressured to sign up for Lifewatch's service when they otherwise would not have.

### 1.  Lifewatch's Deceptive Robocalls

Lifewatch's recorded messages are crafted to appeal to the vulnerabilities of their target market, the elderly and disabled.[18]  Many prey on the fears of older consumers,

---

after providing payment information), ¶ 39b, Att. X at 4 ("Senior Assistance Program"), 22 ("Senior Alert Care") & 12-22 (representative refuses to provide company's address, tells consumer only get information after providing payment information), ¶ 39c, Att. Y at 4 ("Senior Medical Alert Systems"), ¶ 39d, Att. Z at 4 ("Senior Life Support Assistance Program"), ¶ 40a, Att. AA at 4 ("Life Alert System"), ¶ 40d, Att. DD at 14 ("Medical Alarms USA"), ¶ 40e, Att. EE at 5 ("Senior Life Support"), ¶ 40f, Att. FF at 15 ("Endless Medical Alert"), ¶ 41a, Att. GG at 11 ("Senior Life Support"), ¶ 41b, Att. HH at 4 ("Senior Life Support"), ¶ 41d, Att. JJ at 10-11 ("Medical Alert," "Senior Life Support Assistance Program"), ¶ 41g, Att. MM at 4 ("Senior Life Support") & 6 ("Med Alert"), ¶ 41k, Att. QQ at 4 ("Senior Life Support") & 5 ("Senior Life Support Assistance Program"), ¶ 41l, Att. RR at 8 ("Senior Life Savings") & 16 ("Senior Life Savers"), ¶ 41m, Att. SS at 6 (representative admits company recently changed name from "Senior Life Support" to "Senior Life Savers"), ¶ 41n, Att. TT at 7 ("Senior Life Savers"), ¶ 41q, Att. WW at 4 ("Senior Life Saver assistance program"), ¶ 41r, Att. XX at 7, 9 & 11 ("Senior Life Savers," but manager eventually admits company used to be called Lifewatch), ¶ 41t, Att. ZZ at 5, 8 ("Nationwide Life Response") & 13 ("Nationwide Ventures"), ¶ 41u, Att. AAA at 9 ("Senior Life Support"), ¶ 41w, Att. CCC at 5 ("Senior Life Support Assistant Program").

[18] *See* PX 1, Menjivar Dec. ¶ 41r, Att. XX at 21-22 (telemarketing manager admits company buys lead lists and "we only contact generally senior communities or persons that have medical or physical ailments"); PX 66, Lancaster Dec. ¶ 23; PX 67, Rowells Dec. ¶ 16 ("During my week at Senior Life Support, I spoke to approximately seventy-five people each dat.  Based on their voices and our conversations, I believe all of them were senior, many of whom seemed confused, highly impressionable, or otherwise vulnerable during the call.  This vulnerability troubled me, especially given the high pressure, aggressive sales tactics that we were expected to use."); PX 69, Stenger Dec. ¶ 17 (former employee believes "this company is preying on a group of vulnerable consumers"); *see also* PX 7, Cuomo Dec. ¶ 5, Att. A at 28 ("preying on the elderly"); PX 17, Bangasser Dec. ¶¶ 4 & 7; PX 19, Beyer Dec. ¶ 7 ("It angers me that companies like Lifewatch are preying on the elderly."); PX 21, Bliss Dec. ¶ 3 ("I was not interested in ordering this device, but I was concerned because the message seemed very personalized, which may confuse other senior citizens into believing that John was a

warning of "a significant rise in the number of senior citizens suffering death and serious

life-threatening injuries from a delay in response times for medical emergencies, fires,

burglaries or even a simply fall," or claiming that "[e]very year, it is estimated that over 30

percent of the senior population accidentally falls."[19]  Others are recorded to sound like a live

person is on the line, supposedly from "the shipping department," complete with the

inclusion of "uhs," pauses, and shuffling of papers.[20]  In fact, many consumers never realize

they are listening to a recording, or only realize it after getting the same call several times.[21]

---

real person, not a telemarketer, calling from a legitimate business ready to deliver a pre-purchased device."); PX 22, Bourne Dec. ¶ 5; PX 26, Cavic Dec. ¶ 10 ("I find it appalling that a company would solicit a woman in her 80s over the phone, with no knowledge of her medical or mental condition.  It gives me great concern to think that many seniors who have absolutely no family to watch over them could be taken advantage of in such a way."); PX 39, Grigorian Dec. ¶¶ 4 & 8 (calls target vulnerable elderly consumers); PX 40, Haselbauer Dec, ¶ 9 (targeting seniors); PX 43, Jones Dec. ¶ 5 ("it is clear to me that the company is targeting elderly consumers who may be suffering from memory loss or confusion"); PX 47, McCourt Dec. ¶ 10; PX 49, Meehl Dec. ¶ 6 (foresees elderly citizens believing misrepresentations); Savagian ¶ 7 (calls try to take advantage of the elderly); PX 59, Thill Dec. ¶ 1 (consumer thought telemarketing call was about a medical alert bracelet she already has).

[19] PX 1, Menjivar Dec. ¶ 41a, Att. GG at 4, ¶ 41j, Att. PP at 4, ¶ 41n, Att. TT at 4, ¶ 41q, Att. WW at 4; PX 5, Bradley Dec. ¶ 5, Att D at 3; *see also* PX 7, Cuomo Dec. ¶ 5, Att. A at 11 (father with dementia "is very confused by such offers and sales calls and likely motivated by fear to purchase this product"); PX 22, Bourne Dec. ¶ 3; PX 28, Cummings Dec. ¶ 4; PX 35, Gates Dec. ¶ 4; PX 43, Jones Dec. ¶ 4; PX 48, McGraw Dec. ¶ 3 (risk of burglaries); PX 50, Mey Dec. ¶¶ 4 & 5 ("alarmist message"); PX 66, Lancaster Dec. ¶ 10 (customers told telemarketer that statistics cited in robocall recording were "scary"); PX 1, Menjivar Dec. ¶ 41d, Att. JJ  at 4 ("Recently, there were 281,000 hospital admissions for hip fractures among people age 65 and older and one out of five hip fracture patients die within a year of their injury"), ¶ 41h, Att. NN at 4 (same), ¶ 41l, Att. RR at 4 ("Don't be another victim lying helplessly on the floor"); PX 3, Tyndall Dec. Att. H at 4 (robocall recording describing "victim lying helplessly on the floor").

[20] *See* PX 1, Menjivar Dec. ¶ 41t, Att. ZZ at 4 ("This is Paul in the shipping department for medical alerts."); PX 3, Tyndall Dec. Att. B at 4; PX 49, Meehl Dec. ¶ 4 (voice sounded informal, "the sound of moving papers in the background, which implied John was actually finding or looking at my paperwork"); PX 31, deLoca Dec. ¶ 18 ("Brian from the shipping department."); PX 42, Jensen Dec. ¶ 6, Att. A at 3 (transcript); PX 54, Pierce Dec. ¶¶ 4-5 (transcript); *see also* PX 69, Stenger Dec. ¶ 12 (ex-employee of telemarketer recalls consumer convinced by robocall that call was from doctor's office).

[21] PX 17, Bangasser Dec. ¶ 3 ("[W]hen I asked him to stop calling, he just kept talking . . . ."); PX 21, Bliss Dec. ¶¶ 3 & 6; PX 37, Gordon Dec. ¶ 4; PX 38, Green Dec. ¶ 12 ("it is unclear if John is a real person … because he did not stop speaking when I repeatedly asked him to remove me from any call list"); PX 39, Grigorian Dec. ¶ 4; PX 42, Jensen Dec. ¶ 6, Att. A at 3 (transcript); PX 48, McCraw Dec. ¶ 9 ("I kept telling him I did not want the product, but he just spoke over me"); PX 52, Monaghan Dec. ¶¶ 4-7 (only realized recording after receiving same message on her voicemail, transcript); PX 54, Pierce Dec. ¶¶ 4-5 (transcript); PX 58, Savagian Dec. ¶ 4.

Lifewatch's prerecorded messages are also replete with false statements.[22] Many of the robocalls claim that the consumer is getting the call because the consumer was referred by a doctor, friend, or family member, or even that the system has already been paid for.[23] In reality, nobody has truly referred the consumers to Lifewatch.[24] Other robocalls falsely claim that the American Heart Association, American Diabetes Association, or other health care organizations are urging senior citizens to get medical alert systems.[25] And still others claim that "[d]ue to new health care regulations, you are now eligible to receive a personal medical alert system at no cost to you."[26] Of course, no new regulations exist.

Several of the robocalls attempt to lure in senior citizens by promising them valuable bonuses for "taking advantage today."[27] One such recording, which sounds like a public service announcement, claims that a nonexistent new national senior assistance program or health care regulation is now available to the consumer which provides $1000 or $3000 in

---

[22]PX 1, Menjivar Dec. ¶ 40a, Att. AA at 4 (robocall claims to be from "Life Alert," but telemarketers say they are from "Senior Life Support").

[23] PX 1, Menjivar Dec. ¶ 39c, Att. Y at 4, ¶ 40d, Att. DD at 4, ¶ 40e, Att. EE at 4, ¶ 40f, Att. FF at 4, ¶ 41t, Att. ZZ at 4, ¶ 41u, Att. AAA at 4; PX 3, Tyndall Dec. Att. B at 4; PX 6, Smith Dec. ¶ 4; PX 7, Cuomo Dec. ¶ 5, Att. A at 28 (elderly father told "a family member wanted him to have this alarm unit"); PX 23, Bristow Dec. ¶ 4; PX 27, Clawson Dec. ¶ 3; PX 31, deLoca Dec. ¶¶ 12 & 18-20; PX 37, Gordon Dec. ¶ 4; PX 39, Grigorian Dec. ¶ 3; PX 42, Jensen Dec. ¶¶ 5-6; PX 43, Jones Dec. ¶ 5; PX 50, Mey Dec. ¶¶ 36-42; PX 52, Monaghan Dec. ¶¶ 5 & 7; PX 54, Pierce Dec. ¶ 5; PX 58, Savagian Dec. ¶ 4;  see also PX 66, Lancaster Dec. ¶ 10 (ex-employee of telemarketer stating that many consumers believed device was already paid for).

[24] PX 65, Amberson Dec. ¶18 ("We were instructed by our supervisors to simply tell the consumers that this information was confidential and that we did not have access to it, but that it could have been their doctor, or a family member, friend, or acquaintance.");  see also PX 15, Settecase Dec. ¶ 7 (telephone numbers called "all appeared to have been purchased from lead brokers").

[25] PX 5, Bradley Dec. ¶ 5, Att. D at 4; PX 42, Jensen Dec. ¶ 6, Att. A at 3; PX 43, Jones Dec. at 3; PX 55, Primm Dec. ¶¶ 3,-4; PX 52, Monaghan Dec. ¶¶ 5, 7 ("recommended by thousands of hospitals and medical professionals").

[26] PX 1, Menjivar Dec. ¶ 39d, Att. Z at 4 ("The Federal Government is shipping you a free medical alert system."), ¶40d, Att. DD at 4, ¶ 40e, Att. EE at 4, ¶ 40f, Att. FF at 4 & ¶ 41u, Att. AAA at 4; see also PX 31, deLoca Dec. ¶ 18 ("Due to new health care regulations, we have the system waiting to be shipped out to you.") & ¶¶ 19-20; PX 50, Mey Dec. ¶¶ 36-42.

[27] PX 1, Menjivar Dec. ¶ 40e, Att. EE at 4, ¶ 41t, Att. ZZ at 4 & ¶ 41u, Att. AAA at 4; PX 3, Tyndall Dec. Att. A at 4 & Att.C at 4; PX 31, deLoca Dec. ¶¶ 12 & 18-20 ($1000 in "grocery saving coupons"); PX 50, Mey Dec. ¶¶ 36-42.

free grocery coupons.[28]  Other messages also offer 75% prescription discount cards.[29]  Often

the robocalls focus on these other benefits and portray the free medical alert device as if it is

an added bonus rather than the focus of the call.[30]  In reality, these coupons and discount

cards offer little or no benefit to most consumers.[31]

The recordings all ultimately tell consumers to "press one" to get more information or

to have the medical alert device shipped out to them.

### 2.     Lifewatch's Deceptive Live Telemarketing Calls

Consumers who press one are transferred to one of Lifewatch's telemarketers.

Plaintiffs know of more than fifty telemarketers that Lifewatch has used over the years,[32] but

no matter which telemarketer handles the call, consumers' experiences are similar.  After

introducing themselves, Lifewatch's telemarketers immediately tell consumers that they will

receive "a FREE medical alert system package that has a value of over $400."[33]  The

---

[28] PX 1, Menjivar Dec. ¶ 39b, Att. X at 4 & ¶41u, Att. AAA at 4; PX 3, Tyndall Dec. Att. B at 4 ($1000 in grocery savings coupons, plus a 75% prescription card) & Att C. at 4 (same); PX 17, Bangasser Dec. ¶ 4; PX 31, deLoca Dec. ¶¶ 4, 8; PX 40, Haselbauer Dec. ¶¶ 3-4; PX 46, Lifshitz Dec. ¶ 3; PX 50, Mey Dec. ¶¶ 36-42; PX 54, Pierce Dec. ¶ 9; PX 74, Holley Dec. ¶ 4 ($3000 grocery voucher).

[29] PX 1, Menjivar Dec.¶ 40e, Att. EE at 4 & ¶41u, Att. AAA at 4; PX 31, deLoca Dec. ¶¶ 10-12 & 18-20; PX 50, Mey Dec. ¶¶ 4, 36-42.

[30] PX 1, Menjivar ¶ 39b, Att. X ("In addition to you $3,000 in saving certificates, you will receive a free emergency medical alert bracelet or necklace."); PX 17, Bangasser Dec. ¶ 4; PX 31, deLoca Dec. ¶¶ 4 & 8 ("In addition to your $3000 in savings certificates, you will receive a free emergency medical alert bracelet or necklace."); PX 40, Haselbauer Dec. ¶ 4; PX 54, Pierce Dec. ¶ 9.

[31] PX 46, Lifshitz Dec. ¶ 5 ("nothing special" about the $3000 in promised grocery savings).

[32] Lifewatch itself disclosed many of these telemarketers to Plaintiffs, (*see* PX 1, Menjivar Dec. Att. I at 4-5, 12 & 15-16), while others are registered telemarketers who disclosed to state authorities that they work for Lifewatch.  PX 4, Velez Dec. ¶¶ 16, 17, 19, 21-22, 27, 32-33, 36, 38, 40, 42, 45, 48, 51 & 55; *see also* PX 13, Gross Dec. ¶ 19 (Sirlin told medical alert executive that "Lifewatch was actively obtaining customers from 30 to 50 telemarketing call centers in the United States and offshore"); PX 1, Menjivar Dec, ¶ 41r, Att. XX at 23 (telemarketing manager indicates company has 17 calls centers in U.S. and 4 in Canada).  In addition, the various corporations which constituted the Worldwide Telemarketers worked exclusively for Lifewatch.  PX 14, Hilgar Dec. ¶ 4.

[33] PX 2, France Dec. Atts. A at 6, F at 5 (value over $400); PX 3, Tyndall Dec. Att. A at 22 & 25 (system will cost $400 plus monitoring charges if consumer does not sign up during call); PX 1, Menjivar Dec. Att. A at 1 (Arcagen inbound script); PX 4, Velez Dec. Att. N (Multi Level Marketing script), Att. Q (Direct Agent Response script), Att. T (Senior Medical Alert script), Att. GG (Oasis Money Group script), Att. MM (Miranda

monthly charge for the service, however, is not revealed until later in the call. Consumers also are often again told the system is free because a friend, family member, or acquaintance purchased it for them,[34] or because someone referred them.[35]

Consumers must frequently ask who exactly referred them for the device, however, because Lifewatch's telemarketers have a response at the ready: "[F]or security and privacy reasons my screen does not say who referred you, the only information I have is that you were referred to us either by a friend, family member or maybe someone you know, and because you were referred, the system is completely free to you."[36] Of course, the truth is that no one has referred consumers for the medical alert system.[37] This is simply a ruse to convince people to give up their billing information.

In a further effort to bolster its legitimacy, Lifewatch also repeats the false robocall claims that its device is endorsed by several prominent organizations. In a welcome package

---

Money Group script), Att. UU (Total Security Vision script), Att. CCC (Alertlink script), Att. HHH (Live Response Agent script), Att. NNN (Elite Information Systems script), Att. OOO (same), WWW (Live Agent Response script) & Att. BBBB (American Innovative Concepts script); PX 66, Lancaster Dec. ¶ 4, Ex. A; PX 69, Stenger Dec. ¶ 5, Att. A; *see also* PX 1, Menjivar Dec. ¶ 39a, Att. W at 5, ¶ 39b, Att. X at 5, ¶ 39c, Att. Y at 5 ("valued at over \$475" and free shipping/activation), ¶ 39d, Att. Z at 5, ¶ 40a, Att. AA at 5, ¶ 40e, Att. EE at 6, ¶ 40f, Att. FF at 5, ¶ 41a, Att. GG at 4, ¶ 41t, Att. ZZ at 5, ¶ 41u, Att. AAA at 5, & ¶ 41w, Att. CCC at 5; PX 5, Bradley Dec. ¶ 5, Att. D at 4; PX 35, Gates Dec. ¶ 4 (told shipping and equipment was free); PX 50, Mey Dec. ¶ 18; PX 68, Shultz Dec. ¶ 12, Ex. A at 1; PX 61, Wagler Dec. ¶ 4; PX 72, Levine Dec. ¶¶ 4-6, Exs. B at 1, C at 1 & D at 1.

[34] PX 22, Bourne Dec. ¶ 4; PX 24, Carson Dec. ¶ 4; PX 25, Cattie Dec. ¶ 3 ("I repeated that I did not want a medical alert device, but the man told me that the person giving the gift would lose their money if I did not accept . . . ."); PX 29, D'Addario Dec. ¶¶ 5-7; PX 30, Daniel Dec. ¶ 3 (thought it was a Mother's Day gift); PX 36, Girard Dec. ¶ 4 (mother assumed her daughter had signed her up); PX 47, McCourt Dec. ¶ 3; PX 56, Rench Dec. ¶ 3 (mother recently returned home post-hospice; told that somebody had purchased it, consumer assumed hospice purchased it); PX 57, Rivard Dec. ¶ 3 (dad assumed kids signed him up); PX 58, Savagian Dec. ¶ 5.

[35] PX 19, Beyer Dec. ¶ 4 (elderly consumer convinced to purchase device because Lifewatch claimed his doctor said he needed it); PX 37, Gordon Dec. ¶ 5; PX 60, Veysey Dec. ¶ 8 (claimed to have gotten consumer's name from family member or friend); PX 61, Wagler Dec. ¶ 4 (same); *see also* PX 68, Shultz Dec. ¶ 25, Exs. F-G; PX 69, Stenger Dec. ¶ 9, Att. E; PX 70, Stevens Dec. ¶ 32, Ex. C.

[36] PX 1, Menjivar Dec. Att. B at 22; *see also* PX 49, Meehl Dec. ¶ 6 (could not provide the name of friend or family member who referred consumer "for security purposes"); PX 56, Rench Dec. ¶ 3 (could not say who paid for device "because of privacy laws").

[37] *See, e.g.*, PX 22, Bourne Dec. ¶ 4 (when representative refused to provide name of referring friends of family, consumer "knew this was scam because my friends and family would not order such a device for me").

that Lifewatch distributes to its telemarketers, Lifewatch touts that its system has "been recommended by the American Diabetes Association, and the National Institute of Aging [sic] along with many hospitals and healthcare organizations."[38] Likewise, Lifewatch has claimed endorsements by the American Heart Association, the American Red Cross, and AARP.[39] Lifewatch's telemarketers, in addition to making the specific endorsements claim, also routinely brag that the "device is trusted by thousands of hospitals and more than 65,000 health care professionals."[40] In reality, Lifewatch has not been endorsed by the American Diabetes Association,[41] the American Heart Association,[42] the National Institute on Aging,[43]

---

[38] PX 4, Velez Dec. Att. B (script from Lifewatch USA Call Center Welcome Package provided to Florida Department of Agriculture and Consumer Services by Lifewatch), Att. L (script provided by U.S. Digest), Att. KK (script from Payless Solutions Enterprise) & Att. RR (script from Lifewatch USA Call Center Welcome Package provided by Personal Security Shopper).

[39] PX 47, McCourt ¶ 8 (telemarketer mentioned American Heart Association); PX 55, Primm ¶ 5 (American Heart Association); *see also* PX 1, Menjivar Dec. Att. A at 1 (Arcagen inbound script listing American Heart Association, American Diabetes Association, and National Institute of Aging); PX 4, Velez Dec. Att. K at 1 (US Digest script stating recommended by American Diabetes Association), Att. Q at 1 (Direct Agent Response script mentioning AARP, American Red Cross, National Institute of Aging), Att. GGG (Live Response Agent script listing American Diabetes Association), Att. HHH at 1 (Live Response Agent script listing American Heart Association, American Diabetes Association, and National Institute of Aging), Att. NNN at 1 (Worldwide Telemarketers' script listing American Heart Association, American Diabetes Association, and National Institute of Aging), Att. RRR at 1 (Worldwide Telemarketers' script listing American Heart Association and American diabetes Association) & Att. WWW at 1 (Live Agent Response Inbound script listing American Heart Association, American Diabetes Association, National Institute of Aging).

[40] PX 1, Menjivar Dec. Att. A at 1 (Arcagen inbound script); PX 4, Velez Dec. Att. Q at 1 (Direct Agent Response script), Att. T at 1 (Senior Medical Alert script), Att. GG at 1 (Oasis Money Group script), Att. II at 1 (Payless Solutions script), Att. KK at 1 (Payless Solutions Enterprise script), Att. MM at 1 (Miranda Money Group script), Att. UU at 1 (Total Security Vision script), Att. XX at 1 (Alertlink script), Att. CCC at 1 (Alertlink script), Att. OOO at 1 (Elite Information script), Att. WWW at 1 (Live Agent Response "Inbound" Script), Att. ZZZ at 1 (Arcagen script) & BBBB at 1 (American Innovative script); *see also* PX 67, Rowells Dec. Att. A at 1 ("Our device is trusted by thousands of hospitals and more than 65,000 healthcare professionals."); PX 72, Levine Dec. ¶¶ 4-5, Exs. B at 2, C at 2; PX 35, Gates Dec. ¶ 5; PX 66, Lancaster Dec. ¶ 4, Att. A; PX 68, Shultz Dec, ¶ 12 & Ex. A; PX 69, Stenger Dec. ¶ 5, Att. A.

      Transcripts of calls between Lifewatch's telemarketers and consumers (and Plaintiffs' investigators) are replete with this misrepresentation as well. *See* PX 2, France Dec. Att. A at 5 (trusted by more than 65,000 health care professionals); PX 3, Tyndall Dec. Att. A at 5 ("our device is actually trusted by thousands of hospitals and 65,000 health care professionals")& Att. B at 5 (recommended by 65,000 health care professionals); PX 5, Bradley Dec. ¶ 5, Att. D at 4; PX 1, Menjivar Dec. ¶ 39a, Att. W at 6, ¶ 39b, Att. X at 6, ¶ 40f, Att. FF at 6, ¶ 41l, Att. RR at 6, ¶ 41q, Att. WW at 6, ¶ 41t, Att. ZZ at 6, ¶ 41w, Att. CCC at 6.

[41] PX 8, Lees Dec. ¶ 3 ("The ADA does not endorse products or services.").

[42] PX 9, Kinard Dec. ¶ 3 ("The AHA does not endorse products.").

or AARP.[44]  Indeed, these organizations have received so many complaints about

Lifewatch's practices that some have had to publicly disclaim any affiliation with medical

alert companies.[45]

      After putting consumers at ease by lying about why they are being contacted,

Lifewatch's operators eventually tell consumers they will be responsible for paying a

monthly monitoring fee, typically $29.95 or $34.95.[46]  Many consumers are told that this fee

will not be charged immediately because "the billing cycle doesn't start until you receive the

system and activate it."[47]  Of course, Lifewatch charges consumers right away, which

---

[43] PX 10, Shirdon Dec. ¶ 3 ("Because the NIA is the name of a government agency, it cannot be used for endorsement purposes.").

[44] PX 11, Nettleford Dec. ¶ 4.  In fact, AARP has repeatedly told Lifewatch to stop using AARP's brand and logo.  *Id.* at ¶¶ 5-6.

[45] PX 9, Kinard Dec. ¶¶ 4-5, Att. A (AHA has received over 500 complaints and posted a fraud warning on its website); PX 11, Nettleford Dec. ¶ 7, Att. B (posted blog warning about medical alert robocalls on AARP website); PX 8, Lees Dec. ¶ 4; PX 10, Shirdon Dec. ¶¶ 4-5, Att. A.

[46] PX 1, Menjivar Dec. Att. A at 2 (Arcagen script); PX 72, Levine Dec. ¶¶ 4-6, Exs. B-D, pp. 7, 16, 25, FFFF p. 3; PX 4 Velez ¶¶ 11, 15 Atts. C, G (scripts); PX 50, Mey Dec. ¶ 18 ($29.95); PX 6, B. Smith Dec. ¶ 6 ($34.95); PX 57, Rivard Dec. ¶ 3; PX 58, Savagian Dec. ¶ 5 (had to ask multiple times before operator admitted to monthly fee); PX 1, Menjivar Dec. ¶ 39a, Att. W at 8 ($34.95), ¶ 39b, Att. X at 7 ($34.95), ¶ 41u, Att. AAA at 9 ($34.95) & 20 (reduced to $29.95); PX 5, Bradley ¶ 5, Att. D at 5; *see also* PX 69, Stenger Dec. ¶ 13, Att. A (found fee disclosure misleading).

[47] PX 66, Lancaster Dec. ¶ 4, Att. A ("The only thing you would be responsible for TODAY is the Emergency Medical Technician monthly monitoring fee of just $34.95 per month and the billing cycle doesn't start until you receive the system and activate it."); *see also* PX 1, Menjivar ¶ 39a, Att. W at 8, ¶ 41d, Att. JJ at 10 ("your billing cycle would start when you receive it and activate it"), ¶ 41t, Att. ZZ at 6-7 ("The … medical system is free.  The only thing we do is need to have your card on file so once you get it, you can talk to our representative and let you know, give you the confirmation number and tracking number and it will be right there."), ¶ 41u, Att. AAA at 18-19 ("The first month does not start until you receive [the device] and activate it."); *id.* Att. B at 7 ("We charge your card or account TODAY for your first month's emergency medical monitoring fee, but your billing cycle does not start until you receive the system and activate it, which means you don't start using the money until you actually activate the system.")PX 3, Tyndall Dec. Att. B at 6 ("the billing cycle, it doesn't start until you receive your equipment"); PX 4, Velez Dec. Att. Q (Direct Agent Response script), Att. MM (Miranda Money Group script), Att. HHH (Live Response Agent script), Att. NNN (Elite Information Systems script), Att. OOO (same), Att. WWW (Live Agent Response script) & Att. BBBB (American Innovative Concepts script); PX 5, Bradley Dec. ¶ 5, Att. D at 5; PX 7, Cuomo ¶ 5, Att. A at 9 (consumer complaint about being billed even though "[i]t has never been activated") & 19 (mother thought wouldn't be charged until she called to activate the device); PX 48, McCraw Dec. ¶ 5 (thought only charged after activation); PX 51, Miller ¶ 4 (told he would not be charged until receive and activate device); PX 68, Shultz Dec. ¶ Ex. A at 2; PX 69, Stenger Dec. ¶13 & Att. A (found script's description of billing confusing); PX 72, Levine Dec. ¶¶ 4-6, Exs. B at 2, C at 2, D at 2 & 4 ("[W]e just send out the system to you right now and

prompts consumers to complain.[48]  Lifewatch was aware of the false activation claim being

made by its telemarketers, and contemplated instructing those telemarketers to take this claim

out of their script.[49]  But, in just the last few months, Lifewatch itself submitted a script still

containing this language to the Florida agency responsible for licensing telemarketers.[50]

Lifewatch now claims it has refunded all consumers who have not plugged in and activated

their systems (and therefore are likely unaware that Lifewatch is charging them a monthly

---

then when you are financially ready to pay for it, ma'am, you can plug it in and that's when the activation fee starts to do [sic].").

[48] PX 65, Amberson Dec. ¶ 21 ("Almost every day we also heard from customers who would demand cancellations because of confusion over billing issues.  Specifically, customers would complain about being billed the monthly monitoring fee before they had received or activated the medical alert systems.  Based on what they had been told during the initial sales calls, they thought they would not be billed until they actually received and plugged in the system."); PX 7, Cuomo Dec. ¶ 5, Att. A at 1 (mom paid over $2000 for unused service), 9 (paid monthly fee for several months for unused service), 11-12 (father paid over $130 for unused service), 19 (mother paid monthly fee for over a year for unused service), 31 (sister paid for seven months of fees for unused service), 34 (father paid monthly fee for several months of unused service), 36 (mother billed over $400 for unused service), 38 (elderly parents paid approximately $700 for unused service); PX 1, Menjivar Dec. Att. B at 1 ("Agent told customer's daughter she could activate the system months down the road and would not be charged."), 2 ("was told I don't pay until I receive it"), 34 ("Customer was told by Rep that she did not have to pay anything until after she tried out the system."), & 35 ("Rep told consumer that she didn't have to pay today only when activated"); *see also* PX 5, Bradley Dec. ¶ 5, Att. D at 1 & 10 (billed same day as call); PX 1, Menjivar Dec. ¶ 41f, Att. LL at 7 (after being told in initial call billing cycle doesn't begin until activation, now being charged immediately).

[49] PX 1, Menjivar Dec. Att. O at 5 (Sirlin on an email exchange discussing the growing problem of customer being told that they would not be charged until a later time); & Att. C at 3 ("here is a dispute where customer was told she wouldn't have to pay until she activates it.  i have gotten others like this.  was rick told to remove this from his pitch?").  Lifewatch has been inconsistent about the import of "activating" the device and now responds to complaints by saying that the equipment is activated from the day it is shipped.  *See* PX 7, Cuomo Dec. ¶ 5, Att. A at 20, 32 & 39; PX 26, Cavic Dec. Att. B.

[50] PX 4, Velez Dec. ¶¶ 10 & 13, Atts. E & H.

-- 15 --

fee).[51] This is not true, however, as consumers continue to complain of Lifewatch's unexpected charges.[52]

Consumers who are reluctant to hand over their credit card or banking information are aggressively pressured to agree to the fee. Often, as with the robocall messages, the telemarketers promise consumers valuable bonuses such as free grocery coupons or prescription drug discounts which they claim will offset the cost of the monitoring services.[53] In addition, Lifewatch promises a generous cancellation policy. Consumers are frequently reassured, "[y]ou're not on a contract so you don't have to keep it at all. If you don't like it for any reason, that's fine. You can simply call the 1-800 number and cancel."[54] Should

---

[51] PX 77, Sirlin Aff. ¶¶ 9-10; PX 78, May Aff. ¶¶ 9-10. Determining which customers have not activated their devices is not difficult; third-party monitoring companies, which provide monitoring services for medical alert companies like Lifewatch, routinely provide their clients with customer status reports containing this information. *See* PX 12, Hendriksen Dec. ¶¶ 11-12; PX 13, Gross Dec. ¶ 8. In fact, other medical alert companies report that they do not charge customers until their monitoring facilities receive a signal from the subscriber's device. PX 79, Vere Aff. ¶ 5.

[52] PX 7, Cuomo Dec. ¶ 5, Att. A at 1-2, 4, 7, 9, 11, 19. 21-25, 31, 34, 36 & 38 (2015 BBB complaints about unexpected charges); PX 26, Cavic Dec. ¶ 8 (mother charged for unactivated device for nearly a year); PX 34, Felker Dec. ¶ 6 (charged monthly fees for a system that was never received).

[53] *See, e.g.,* PX 1, Menjivar Dec. Att. A at 2 (Arcagen script promising $3000 in grocery savings) & ¶ 39b, Att. X at 6-7 ("the $3,000 in grocery savings can actually save you more money than your first three years of fees for monitoring of your emergency medical alert system."); PX 2, France Dec. Att. A at 6 ($50 gift card every month), Att. F at 6 (same), Att. H at 6 ($50 restaurant card every month) & Att. I at 6 (same); PX 3, Tyndall Dec. Att. A at 6 ($3000 in grocery coupons), Att. B at 6 ($1000 in grocery savings), Att. F at 13 ($3000 in grocery vouchers), Att. H at 5 ("$3000 worth of grocery discount coupons…you can use at any grocery store to buy the exact same products you purchase every week") & Att. I at 6 ($3000 worth of coupons); PX 50, Mey Dec. ¶ 18 (monthly $50 restaurant card and $3000 in grocery coupons).

[54] PX 1, Menjivar Dec. ¶ 41a, Att. GG at 5; *see also id.* ¶ 39a, Att. W at 8 ("there is absolutely no contract whatsoever, and you can cancel at any time with no cancellation fee"), ¶ 39b, Att. X at 20 ("remember, you can cancel at any time with no – with no questions asked"), ¶ 39c, Att. Y at 5 ("You're not signing any contracts. There's no contracts to sign."), ¶ 39d, Att. Z at 8 ("there is no contract, and you can cancel at any time with no cancellation fee"), ¶ 40a, Att. AA at 5 ("there's no contract against you or cancellation fees"), ¶ 40e, Att. EE at 12 ("There are absolutely no contracts. You can cancel at any time with no cancellation fees and everything else is completely free."), ¶ 40f, Att. FF at 7 (same), ¶ 41d, Att. at 6 ("absolutely no contracts whatsoever"), ¶ 41j, Att. PP at 7 ("we're so confident with our services that we do not keep any contracts. This allows you to cancel at any time with no cancellation fees and with no penalties."), ¶ 41l, Att. RR at 7 ("there ain't no contracts and it can be canceled at any given time with no cancellation fees"); PX 2, France Dec. Att. A at 8 ("You can cancel at any time with no cancellation fees and no questions asked . . . because you're not under any contracts.") & Att. F at 7 ("You understand there's no contract. You can cancel at any time."); PX 5, Bradley ¶

they resist, they are implored to "just try out the system, at least for the first two months.  If

you feel like it's for you, you keep it.  If you don't, you're more than welcome to ship it back

to us with no problem, okay…All you do is put the label on there and ship it back to us."[55]

Disclosures that consumers will need to return the system to cancel are only made, if at all, at

the very end of the call, after the consumers have already agreed to order the device and

provided their payment information.[56]  And even then, they frequently are promised that

Lifewatch will pay for the return shipping.[57]  In fact, consumers must return the devices to

---

5, Att. D at 5; PX 6, Smith Dec. ¶ 6; PX 50, Mey Dec. ¶ 18 (told no contract); PX 67, Rowells Dec., Att. A at 2 ("There are absolutely NO contracts.  You can cancel at any time with no cancellation fees.").

[55] PX 1, Menjivar Dec. ¶ 41d, Att. JJ at 16; *see also*, PX 2, France Dec. Att. A at 8-9 ("the only thing that you will be agreeing to today is just to try out the system for a month") & Att. F at 7 ("if you choose after that first month that you don't want to use it anymore, you just simply put it all back in the box, send it back and you would no longer have any charge"); PX 1, Menjivar Dec. ¶ 40e, Att. EE at 12, ¶ 41h, Att. NN at 6, ¶ 41j, Att. PP at 8-9 ("Would you like to go ahead and test out this system for one month, and if you're not satisfied, send it back, completely free of charge."), ¶ 41t, Att. ZZ at 7-8 & ¶ 41w, Att. CCC at 7.

[56] PX 4, Velez Dec. Att. L at 7-8 (Lifewatch script); *see also* PX 34, Felker Dec. ¶ 8 ("I was not told during the initial sales call that I would have to pay to ship the devices back."); PX 62, Westerbrook Dec. ¶ 8 ("They never told me during the original sales call that I would have to pay to ship the equipment back to get the charges to stop."); PX 5, Bradley Dec. ¶ 5, Att. D at 5 (return policy never disclosed during call); PX 1, Menjivar Dec. ¶ 40a, Att. AA at 14, ¶ 40d, Att. DD at 17-19 (representative admits disclosure confuses people), ¶ 41f, Att. FF (never told about obligation to send back system during sales call), ¶ 41a, Att. GG at 5 (never told need to ship device back to cancel), ¶ 41b, Att. HH at 9 (same) & ¶ 41u, Att. AAA at 15 (representative begins to explain policy about mailing system back, but never finishes).

      Lifewatch does not make the return process easy in general.  One consumer had to battle with Lifewatch in order to have unauthorized charges stopped on his parents' account – charges for a device they never even received.  PX 44, Kirian Dec. ¶ 14; *see also* PX 62, Westerbrook Dec. ¶ 9 ("I am very upset with the company.  They sent me broken equipment, kept charging me even though the device didn't work, made it hard to find a phone number to cancel, and made me pay to send it back in order to cancel."); PX 64, Smith Dec. ¶¶ 9-13 (former Lifewatch employee was alarmed at the number of calls she received from elderly consumers distraught over trying to get refunds).

[57] PX 1, Menjivar Dec. Att. B at 8 (scripted rebuttal states "But if you and your (Son/daughter/husband/kids) decide you don't want to keep it, then there is no contract, no cancellation fees, and we will pay to ship it back to us."); *see also id.* ¶ 39a, Att. W at 23 ("[I]f you don't like the system you can always return it. …. And we'll pay for the shipping."), ¶39d, Att. Z at 8, 13, ¶ 41h, Att. NN at 6 ("We also send you out the return label") & ¶ 41j, Att. PP at 8 ("[I]f you're not satisfied … you call us up, we pay for shipping, we send you the shipping labels and the shipping box, and you simply send it back completely free of charge."); PX 2, France Dec. Att. A at 9 ("return the equipment at no cost to you"); PX 3, Tyndall Dec. Att. B at 7 ("They pay for the [return] shipping, don't worry.") & Att. G at 11 ("there's no shipping fee back"); PX 6, Smith Dec. ¶ 6; PX 46, Lifshitz Dec. ¶ 6 (was told during call "there would be no cost to returning the device").

Lifewatch at their own cost in order to cancel the service.[58]  Lifewatch is well aware that

these claims are being made on its behalf.[59]

     At the conclusion of the telemarketing call, consumers are walked through a

verification process, where the telemarketers quickly recite Lifewatch's terms and conditions

and prompt consumers to agree to the charges.[60]  Recently, perhaps in a last ditch attempt to

comply with the law, Lifewatch has begun a verification process by having its telemarketers

---

[58] PX 7, Cuomo Dec. ¶ 5, Att. A at 1-3 (Lifewatch refused to cancel account of woman with dementia because son cannot find device to return it; demanding $475 as alternative), 7 (consumer could not afford to pay return postage); 9 (consumer never received device, but told must return it or pay $475 to cancel service), 12 (father with dementia continued to be charged until son was able to visit and search for device), 21-25 (mother never agreed to service or received device, but told must return it or pay $475 to cancel service), 19 (POA for sister who sought refund told "she had the device for that time and it did not matter that she did not activate or sign a contract"), 34 (cannot find device supposedly sent to elderly father, but told must return it or pay $425 to stop monthly charges), & 39 (Lifewatch claimed it did not receive returned device, continued billing); *see also* PX 34, Felker Dec. ¶ 8 ("The representatives told me that I could only cancel our account with the company if I sent back the two devices at my own expense.  I was not told during the initial sales call that I would have to pay to ship the devices back."); PX 46, Lifshitz Dec. ¶ 6 ("He also said that [Lifewatch] would only cancel my account after I mailed the device back at my own expense.  I had previously been told that there would be no cost to returning the device."); PX 56, Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer threatened to "trash the device"); PX 1, Menjivar Dec. ¶ 41c, Att. II at 5-12 ("as long as you keep the equipment, you're continuously going to be charged"), ¶ 41i, Att. OO at 8 (if do not return device, charged $475) & ¶ 41s, Att. YY at 4-5.

[59] PX 7, Cuomo Dec. ¶¶ 3, 5 & Att. A (sampling of BBB complaints sent to Lifewatch, which include cancellation issues); PX 1, Menjivar Dec. Att. N at 2 (transcript produced by Lifewatch in which telemarketer promises consumer "but if you don't want it, you can ship it back at no cost . . . . you can ship it back with no problem and no cost") & Att. B at 26 (email from Lifewatch to its telemarketer noting a "large increase" in requests for pre-paid return labels and reminding the telemarketer that Lifewatch does not send out return labels); *see also id.* ¶ 41s, Att. YY at 5-6 (consumer telling Lifewatch employee she was told during telemarketing call the device was free).

[60] *See* PX 5, Bradley Dec. ¶ 5, Att. D at 8-9; *see also* PX 1, Menjivar Dec. ¶ 39d, Att. Z at 14-20, ¶ 40a, Att. AA at 13-16; ¶ 40d, Att. DD at 18-20, ¶ 40e, Att. EE at 20-25, ¶ 40f, Att. FF at 15-20, ¶ 41a, Att. GG at 9-13, ¶ 41b, Att. HH, ¶ 41d, Att. JJ at 14-19, ¶ 41e, Att. KK at 5-9, ¶ 41f, Att. LL at 4-7, ¶ 41g, Att. MM at 6-7. Telemarketers often times will record verifications to have a "clean" recording to provide to banks and other financial institutions should a consumer dispute the charge.  These verifications typically only capture the end of the telemarketing call.  *See, e.g.*, PX 65, Amberson Dec. ¶ 13 (explaining how the verification process worked for the Worldwide Telemarketers); *see also* PX 7, Cuomo Dec. ¶ 5, Att. A at 3, 13, 29, 32, 36 & 38 (Lifewatch using verifications to defend company against BBB complaints).

transfer the calls directly to Lifewatch itself, during which consumers are asked to repeat their billing information and agree to the monthly billing cycle.[61]

### C.       Lifewatch's Relationship with Telemarketers

Lifewatch has continued its practices, in the face of enforcement actions and civil lawsuits, apparently based on a misguided belief that it has structured its relationships with telemarketers in such a way as to insulate itself from liability.  Lifewatch has relied on more than fifty telemarketers to sell its medical alert device, including the Worldwide Telemarketers who were shut down by Plaintiffs in 2014, and other Lifewatch telemarketers which have been sanctioned by regulators because of their illegal conduct.[62]  Just last week, Plaintiffs sued yet another telemarketer who had worked for Lifewatch.[63]  No matter how its contracts between Lifewatch and its telemarketers are drafted, however, Lifewatch cannot escape responsibility for the abusive and deceptive practices of its telemarketers.

When Lifewatch first began using telemarketers, it maintained control over the outside companies by entering into contracts that required the telemarketers to "only use scripts identified by [Lifewatch] as approved…."[64]  Not coincidentally, at approximately the time Lifewatch was being sued by the Indiana Attorney General, the company restructured its

---

[61] PX 7, Cuomo ¶ 5, Att. A at 13, 17; PX 1, Menjivar ¶ 39d, Att. Z at 20-22, ¶ 40b, Att. BB at 4 (called back by Lifewatch to verify information), ¶ 40d, Att. DD at 13-14, ¶ 40e, Att. EE at 25-29 & ¶ 41v, Att. BBB at 4; PX 2, France Dec. Att. B at 10 (transferred to Medical Alarm Systems) & Att. G at 22 (same).

[62] PX 1, Menjivar Dec. Att. I at 4-5, 12 & 15-16; PX 4, Velez Dec. ¶ 8 (US Digest closed down by Florida authorities), ¶ 28 (Senior Medical Alert fined by Florida), ¶ 35 (Oasis Money Group fined and ordered to shut down) & ¶ 53 (Alertlink fined by Florida); PX 5, Bradley Dec. ¶¶ 2-3; PX 13, Gross Dec. ¶ 19 (Sirlin indicated Lifewatch "actively obtaining customers from 30 to 50 telemarketing call centers"); PX 14, Hilgar Dec. ¶¶ 3 & 10; PX 15, Settecase Dec. ¶ 3.

[63] *See* https://www.ftc.gov/news-events/press-releases/2015/06/ftc-florida-attorney-general-sue-stop-illegal-robocalls-pitching (press release announcing temporary restraining order entered against Orlando-based telemarketer engaged in robocalling); PX 80, Einikis Dec. ¶¶ 5-7 (describing documents indicating telemarketer was engaged in selling for Lifewatch).

[64] PX 5, Bradley Dec. ¶ 4, Att. C at 30 & 47; *see also* PX 1, Menjivar Dec. Att. Q at 1 (Telemarketing Services Agreement with MD247.com dated Sept. 24, 2012).

contracts.  In mid-2012, Lifewatch began entering into "Purchase Agreements," which are designed to make Lifewatch appear to have no role in the telemarketing.[65]  These Purchase Agreements, signed by Sirlin, purportedly allow third party "sellers" to independently market medical alert systems to consumers, and then subsequently offer live "contracts" to Lifewatch and other medical alert companies on a non-exclusive basis for purchase.[66]  The sellers are also required to record all sales calls and make them available to Lifewatch. Unlike some of the other contract terms, which telemarketers routinely ignore, it does appear that sales calls are recorded and that Lifewatch has periodically reviewed them.[67]

Regardless of the contract terms, the arm's length relationship that Lifewatch claims to have with its sellers is a sham.[68]  Lifewatch has claimed that it does not know which

---

[65] PX 7, Cuomo Dec. ¶ 5, Att. A at 17 (in response to BBB complaint: "We have never and do not make outbound Sales Calls.  There are, however, hundreds of Sales Agencies across the Country that sell the Medical Alarm Service.  It is an industry-wide practice whereby the Medical Alarm Companies purchase those accounts."), 29 ("we are not the Sales Agency; we are the Medical Alarm Company"), 32 (same) & 39 (Lifewatch refers to telemarketer as "Outside Seller"); PX 6, Smith Dec. ¶ 9 (Lifewatch COO tells BBB company merely buys leads from telemarketing companies); *see also* PX 1, Menjivar Dec. Att. R at 1 (Marketing Services Agreement with Platinum Marketing Group dated Oct. 25, 2012), Att. S at 1 (Purchase Agreement with Payless Solutions dated March 18, 2014), Att. T at 1 (Purchase Agreement with Life One Wireless dated May 1, 2013) & Att. U at 1 (Purchase Agreement with QCSS dated March 26, 2014); *id.* ¶ 40c, Att. CC at 10-11 (Lifewatch representative refers to use of third-party telemarketers); PX 5, Bradley Dec. ¶ 4, Att. C at 4-6, ¶ 11 & Att. E at 2.

[66] PX 5, Bradley Dec. ¶ 4, Att. C at 4-6 (Sirlin states in declaration that, pursuant to Purchase Agreements, "the independent, outside companies originated potential customer accounts … and then offered to sell those customer accounts to Lifewatch – and others – on a non-exclusive basis.") & 29; PX 1, Menjivar Dec. Ats. Q at 17, Att. R at 17, Att. S at 18, Att. T at 18 & Att. U at 18.

[67] PX 5, Bradley Dec. ¶ 4, Att. C at 6; PX 7, Cuomo Dec. ¶ 5, Att. A at 3, 13-14, 29, 32 & 39 (Lifewatch employee indicates in responses to BBB complaints that she has reviewed recordings of relevant sales call); PX 14, Hilgar Dec. ¶ 6 ("Multiple times a week, Lifewatch requested and received recordings of telemarketing calls to review."); PX 15, Settecase Dec. ¶ 11 ("Each week, in response to requests, we would send anywhere from 10 to 35 recordings of telemarketing calls to Lifewatch."); PX 13, Gross ¶ 11, Atts. A & B.

[68] Lifewatch has even directly financed certain telemarketers.  *See, e.g.*, PX 1, Menjivar Dec. Att. DDD at 10 (Lifewatch admits advancing money to telemarketer "to help ease their cash flow"); PX 4, Velez Dec. ¶ 51 (Alertlink "affiliated" with Lifewatch).

sellers are engaged in telemarketing,[69] yet its employees have been able to identify

Lifewatch's telemarketers when pressed by consumers.[70]  Indeed, the reverse is true too –

Lifewatch's telemarketers will sometimes reveal that they are working for Lifewatch when

pressured by consumers.[71]  Furthermore, overwhelming evidence demonstrates that

Lifewatch is not only keenly aware that its telemarketers are making misrepresentations and

violating the TSR, but in fact condones and directs these practices.[72]  For example, Lifewatch

provides its telemarketers with a "Call Center Welcome Package," which includes sample

scripts replete with misrepresentations about Lifewatch's product and services, as well as

explicit instructions that Lifewatch must review and approve all scripts and rebuttals.[73]  Sirlin

himself has also represented that Lifewatch monitors and controls its telemarketers, and

---

[69] There is no question that Lifewatch knows that at least some of its sellers are engaged in telemarketing, which is why it has had its own telemarketing license in Florida since 2012.  PX 4, Velez Dec. ¶¶ 9 & 12-13, Atts. A, F & H.

[70] PX 7, Cuomo Dec. ¶ 5, Att. A at 17 (in response to BBB complaint:  "As soon as we became aware of [consumer's] Complaint as to what this particular Sales Agency was doing…, we cut them off.  We will no longer do business with them."); PX 27, Clawson Dec. ¶ 8 (in response to a DNC complaint, Lifewatch acknowledges its affiliates make telemarketing calls); *see also* PX 1, Menjivar Dec. ¶ 41p, Att. VV at 5-6 (Lifewatch employee states company works with "a number of different … telemarketing companies.  Well, it's a full list.  There's Safe Alarm, there's Safeguard, there's Payless, there's Oasis, there's IPS, there's Instinctive, there's Senior Medical Alert, there's Answering Assistance."), ¶ 41v, Att. BBB at 4-5 ("The call center that placed your order was Nationwide Ventures"); PX 6, Smith Dec. ¶ 12 (Lifewatch COO tells BBB he has contacted all the telemarketing companies Lifewatch uses).

[71] *See*  PX 32, Eden Dec. ¶ 14 ("Senior Alert" telemarketer referring to Lifewatch as the company's "corporate office"); PX 35, Gates Dec. ¶ 6 (telemarketer initially said he was calling from Senior Life Watch, but admitted it was Lifewatch USA later in call); *see also* PX 65, Amberson Dec. ¶ 19 (former telemarketer employee instructed to identify herself as calling from Lifewatch).  And, even when not revealing Lifewatch's names, telemarketers are instructed to tell consumers that they are located in New York (like Lifewatch) and have been in business for over thirty years (also like Lifewatch).  *See* PX 67, Rowells Dec. ¶ 10 & Att. A at 12 (script instructs telemarketers to tell consumers "Senior Life Support has been in business since 1977"); PX 68, Shultz Dec. ¶ 23; *see also* PX 6, Smith Dec. ¶ 7 (BBB identified Lifewatch as company behind robocalls because it was the only company that matched the telemarketer's description).

[72] PX 14, Hilgar Dec. ¶¶ 6 & 11-12; PX 15, Settecase Dec. ¶ 4; PX 76, Steinmetz Dec. ¶ 8 (broker who helped develop Defendants' telemarketing strategy confirming that he and Sirlin frequently discussed that Lifewatch employed telemarketers using robocalls and that Sirlin said that "Lifewatch would continue to employ telemarketers that were using robo-calls as long as it could do so"); PX 5, Bradley Dec. ¶ 5, Att. E at 2-3; PX 13, Gross Dec. ¶¶ 9-11, 13 & 19.

[73] PX 4, Velez Dec. Att. B (provided by Lifewatch), Att. K (provided by US Digest), Att. L (same) & Att. RR (provided by Personal Security Shopper).  As recently as 2015, Lifewatch itself provided a deceptive telemarketing script to the Florida agency that licenses telemarketers.  *Id.* ¶ 13.

admitted that he is unapologetically aware of the robocalling done on Lifewatch's behalf.[74]

Furthermore, Lifewatch's frequent claim that its telemarketers are merely securing "leads" on

a non-exclusive basis is simply not true. In reality, the telemarketers work exclusively for

Lifewatch.[75] Moreover, when legal action has been taken against various Lifewatch

telemarketers, Lifewatch has simply continued to do business with the same people at the

same location but under the façade of a different corporate name.[76]

The Worldwide Telemarketers sued by Plaintiffs in 2014, and other third parties,

confirm that Lifewatch knew, and controlled, what the telemarketers were doing.[77] The

---

[74] PX 13, Gross Dec. ¶¶ 9-11 & 19 (Sirlin "claimed that bad public relations are the 'cost of doing business' in the telemarketing world and that Lifewatch was not going to get out of it."); *see also*, PX 6, Smith ¶ 10, Att. B (Sirlin states in email to BBB, "We do not make automated messages in your area.")

[75] PX 14, Hilgar Dec. ¶ 4; PX 15, Settecase Dec. ¶ 5; PX 16, Kane Dec. ¶ 4; *see also* PX 1, Menjivar Dec. ¶¶ 39d, Att. Z at 7 (representative identifies Lifewatch as company who makes the device), ¶ 41b, Att. HH at 9 (representative identifies Lifewatch location as "our corporate office"), ¶ 41g, Att. MM at 9 (representatives concedes company is out of Lynbrook, New York, where Lifewatch is located), ¶ 41i, Att. OO at 10-12 (representative states she is from telemarketing company, but "all of the products are from Lifewatch"), ¶ 41l, Att. RR at 16-17 (representative discloses Lifewatch will show up as merchant on bank statement, says her company is a "small branch" of Lifewatch), ¶ 41m, Att. SS at 5 ("we work under Lifewatch"), ¶ 41q, Att. WW at 13 (representative indicates company operates out of Lynbrook, New York, and that company used to be called Lifewatch), ¶ 41r, Att. XX at 12-13 (telemarketing manager indicates company was previously called Lifewatch and package consumer receives will say Lifewatch on it), 15, 19, 21 (robocalls generated from main office in Lynbrook) & 24, ¶ 41t, Att. ZZ at 13-14 (representative states Lifewatch is "our parent company"), ¶ 41u, Att. AAA at 17 (representative admits Lifewatch is "the name of the product that we sell") & ¶ 41w, Att. CCC at 10 (representative states Senior Life Support is a branch, "but the main company is Lifewatch"); PX 4, Velez Dec. ¶ 51 (Alertlink affiliated with Lifewatch), Att. J at 5 (Lifewatch only medical alert company listed by US Digest in telemarketing application), Att. M at 6 (same for Multi Level Marketing), Att. EE at 4 (same for TMI Marketing Group), Att. LL at 11 (Miranda Money Group states all fulfillments done by Lifewatch), Att. QQ at 5-6 (Lifewatch only medical alert company listed by Miranda), Att. TT at 2 (same by Total Security Vision), Att. FFF at 2 (Lifewatch identified as parent corporation by Live Response Agent); PX 50, Mey Dec. ¶ 4 (representative identifies Lifewatch as company charging credit card). And, certainly, Lifewatch treats its telemarketers as merely an extension of itself – in constant communication over consumers' accounts and other matters. *See, e.g.*, PX 65, Amberson Dec. ¶ 24 & Att. B.

[76] PX 14, Hilgar Dec. ¶¶ 10-11; PX 15, Settecase Dec. ¶¶ 4-5; *see also* PX 4, Velez Dec. ¶¶ 35, 38 & 40 (after cease and desist order entered against telemarketer for Lifewatch, another company began selling for Lifewatch at same location and suite number; two other corporations began selling for Lifewatch in same suite within 6 months).

[77] PX 14, Hilgar Dec. ¶¶ 6, 9 & 10-12; PX 15, Settecase Dec. ¶ 4; PX 75, Small Dec. ¶ 4 (Lifewatch business partner confirming that her understanding was that "Lifewatch would monitor and control – and did monitor and control – the telemarketers it used to obtain customers"); PX 76, Steinmetz Dec. ¶ 6 (broker who helped

Worldwide Telemarketers only used scripts provided, reviewed, and approved by Lifewatch, and their operations were directly controlled, overseen, and supervised by Lifewatch.[78] Sirlin even visited the Worldwide Telemarketers to see the operations himself.[79] A broker who worked with Defendants states that Lifewatch acted similarly with other telemarketers.[80] These witnesses also confirm that, every week, Lifewatch received and reviewed numerous recordings of telemarketing calls containing misrepresentations.[81]

In addition to supervising and directing its telemarketers, Lifewatch also participates directly in the sales process. In fact, as mentioned above, consumers who make purchases from Lifewatch's supposed independent telemarketers are actually transferred to Lifewatch during the telemarketing call to confirm the terms of the transactions.[82] Furthermore, the telemarketers do not process customers' intial charges; instead, Lifewatch (or the companies to which it assigns telemarketing clients)[83] are the only entities that ever bill consumers' credit cards or withdraw funds from consumers' bank accounts for their medical alert devices

---

develop Defendants' telemarketing strategy confirming that Lifewatch "did control and monitor the telemarketers that it worked with, including Worldwide").

[78] PX 14, Hilgar Dec. ¶¶ 6 & 12; *see also* PX 1, Menjivar Dec. Att. C at 9 (email from Lifewatch to Worldwide Telemarketers providing new script guidelines).

[79] PX 14, Hilgar Dec. ¶ 9.

[80] PX 76, Steinmetz Dec. ¶ 6 (broker who helped develop Defendants' telemarketing strategy confirming that "LifeWatch reviewed and approved scripts that were used by its telemarketers," and "Mr. Sirlin knew that … that robo-calls were being used by its telemarketers to sell LifeWatch's medical alert systems."); PX 75, Small Dec. ¶ 6, Ex. A (Lifewatch Account Manager stating that Lifewatch is "updating the script" for all its telemarketers).

[81] PX 14, Hilgar Dec. ¶ 6; PX 15, Settecase Dec. ¶ 11 (sent Lifewatch 10 to 35 recordings each week); PX 76, Steinmetz Dec. ¶ 6 & Ex. A (email including Sirlin requesting recording of call from telemarketer to Lifewatch customer); PX 1, Menjivar Att. B at 28-30, 32, Att. C at 3.

[82] PX 7, Cuomo Dec. ¶ 5, Att. A at 13 ("Before we ship our Medical Alarm Equipment, we contact the Subscriber to review and confirm their order again.") & 17 (same); PX 1, Menjivar Dec. ¶ 39d, Att. Z at 20-22, ¶ 40b, Att. BB at 4 (called back by Lifewatch to verify information), ¶ 40d, Att. DD at 13-14, ¶ 40e, Att. EE at 25-29, ¶ 41v, Att. BBB at 4; PX 2, France Dec. Att. B at 10 & Att. G at 22; PX 32, Eden Dec. ¶ 7.

[83] Lifewatch has sold customer accounts to other medical alert device providers. *See* PX 13, Gross Dec. ¶¶ 4-5 (sold to Connect America.com, LLC); PX 79, Vere Aff. ¶ 2, Ex. B (sold to Philips LifeLine).

and monitoring services. Significantly, those transactions take place almost immediately after the telemarketers hang up.[84]

Lifewatch is fully aware of its telemarketers' illegal practices. Lifewatch and Sirlin, individually, have been sued numerous times in connection with the company's telemarketing, including an August 2012 action by the Indiana Attorney General alleging violations of Indiana's Do Not Call law;[85] the Life Alert lawsuit described above, which alleged both trademark violations and illegal robocalling; and more than a dozen private lawsuits asserting violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227. Lifewatch also has received countless complaints from consumers about their marketing practices, both directly and from the Better Business Bureau.[86]

The Ninth Circuit has already squarely rejected Lifewatch's attempt to hide behind its telemarketers. In its trademark infringement case against Lifewatch, Life Alert sought a preliminary injunction to stop Lifewatch from continuing to use Life Alert's trademarks in telemarketing campaigns. After extensive discovery and an evidentiary hearing, the district court rejected Lifewatch's argument that it cannot control its telemarketers, finding that the

---

[84] PX 2, France Dec. Att. D; PX 3, Tyndall Dec. Att. J; PX 5, Bradley Dec. ¶ 5, Att. D at 10; PX 14, Hilgar Dec. ¶ 7; PX 16, Kane ¶ 3, Att. A at 6; PX 65, Amberson Dec. ¶ 15 (consumers immediately charged by Lifewatch after the telemarketing call concluded).

[85] PX 5, Bradley Dec. ¶ 3, Att. B.

[86] See e.g., PX 7, Cuomo Dec. ¶¶ 3-5 & Att. A (Lifewatch has received at least 180 complaints from BBB since 2012); PX 6, Smith Dec. ¶¶ 8-12, Atts. A-C (BBB investigator communicated with Lifewatch about complaints); PX 5, Bradley Dec., ¶ 5, Att. E (consumer letter to Sirlin); PX 1, Menjivar Dec. ¶ 40b, Att. BB at 7-12 (complaining to Lifewatch employee about illegal telemarketing) & ¶ 40e, Att. EE at 25-29 (complaining to Lifewatch employee when transferred during verification portion of sales call); see also, PX 11, Nettleford Dec. ¶¶ 5-6 (AARP has repeatedly told Lifewatch to stop using AARP's brand and logo); PX 13, Gross Dec. ¶¶ 18-19, Att. D (email to Lifewatch executives from another medical alert company discussing consumer complaints related to Lifewatch's telemarketing practices). If Lifewatch has any doubts about whether its telemarketers are using scripts full of misrepresentations, it could simply ask the telemarketers to hand over the scripts the telemarketer s themselves filed when they obtained telemarketing licenses, most of which include multiple lies.

Purchase Agreements still gave Lifewatch sufficient power to monitor and control what the telemarketers said, and to terminate the contracts if the telemarketers were violating the law.[87] The Ninth Circuit affirmed the district court's decision, succinctly concluding that "ample evidence supports the inference that LifeWatch directs, induces, is aware of, and can control the infringing telemarketing."[88]

## II. ARGUMENT

Defendants' business practices violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), multiple provisions of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes (2014). To prevent any further injury to innocent consumers, the FTC and State of Florida ask that the Court issue their proposed PI to enjoin Defendants' ongoing law violations.

### A. This Court Has the Authority to Grant the Requested Relief.

The FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). Once the Commission invokes the federal court's equitable powers, the full breadth of the court's authority is available, including the power to grant such ancillary final relief as rescission of contracts and restitution. *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 571-72 (7th Cir. 1989). The court may also enter a

---

[87] *Life Alert Emergency Response, Inc. v. Lifewatch, Inc.*, 601 Fed. Appx. at 472, 2015 U.S. App. LEXIS 1760, at *4 (9th Cir. Feb. 4, 2015); *see also*, PX 7, Cuomo Dec. ¶ 5, Att. A at 17 (in response to BBB complaint: "As soon as we became aware of [consumer's] Complaint as to what this particular Sales Agency was doing…, we cut them off. We will no longer do business with them."); PX 6, Smith ¶ 9 (Lifewatch COO indicates company stops working with telemarketers who act illegitimately).
[88] *Life Alert Emergency Response*, 601 Fed. Appx. at 472, 2015 U.S. App. LEXIS 1760, at *3.

temporary restraining order, a preliminary injunction, and whatever additional preliminary relief is necessary to preserve the possibility of providing effective final relief. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1026 (7th Cir. 1988); *see also Amy Travel*, 875 F.2d at 571. Injunctive relief is appropriate even if a defendant has ceased its illegal activities if there is "cognizable danger of recurrent violation," *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), and the commission of past illegal conduct is "highly suggestive of the likelihood of future violations." *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979); *see also FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 212 (D. Mass. 2009); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1017 (N.D. Ind. 2000).[89]

### B.    Plaintiffs Meet the Applicable Standard for Injunctive Relief.

Section 13(b) of the FTC Act authorizes a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). To grant preliminary injunctive relief in an FTC Act case, the district court must: (1) determine the likelihood that the Commission will ultimately succeed on the merits, and (2) balance the equities. *World Travel*, 861 F.2d at 1029. Under this "public interest" test, "it is not necessary for the FTC to demonstrate irreparable injury." *Id*. When the court balances the equities, the public interest "must receive far greater weight" than any private concerns. *Id*.

---

[89] The court's expansive equitable powers also are available under the TSR. *See* 15 U.S.C. § 6105(b). Courts may enter any relief necessary to redress injury to consumers caused by the TSR violation, including "rescission or reformation of contracts [and] the refund of money or return of property." 15 U.S.C. §§ 57b(a)(1) & (b).

**C.      Plaintiffs Have Demonstrated a Likelihood of Success on the Merits.**

Defendants' false and deceptive claims squarely violate federal and state consumer protection laws.  Defendants' telemarketing practices, including their use of robocalls and spoofed Caller ID information, also violate numerous TSR provisions.  In fact, these practices have continued despite other lawsuits aimed at ending them.

**1.      Lifewatch's Deceptive Practices Violate the FTC Act, the TSR and the FDUTPA.**

Defendants' activities are deceptive acts or practices under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005); *FTC v. World Media Brokers*, 415 F.3d 758, 763 (7th Cir. 2005); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 957 (N.D. Ill. 2006).  The materiality requirement is satisfied if the misrepresentation or omission involves information that is likely to affect a consumer's choice of, or conduct regarding, a product or service.  *See Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir. 1992), *cert. denied*, 507 U.S. 909 (1993).  Reliance on express claims is considered presumptively reasonable.  *See World Travel*, 861 F.2d at 1029.  Courts consider the likely effect of a statement on the mind of an ordinary consumer when evaluating its deceptiveness, *see Bay Area*, 423 F.3d at 635 (citing *FTC v. Freecom Commc'ns., Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005)), and evaluate the overall net impression created by the acts or practices.  *Kraft*, 970 F.2d at 322; *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984).  The overall net impression is analyzed from the perspective of the target audience – in this case, elderly consumers.  *See Kalwajtys v. FTC*, 237 F.2d 654, 656 (7th

Cir. 1956); *FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012); *FTC v. Think Achievement*, 144 F. Supp. 2d 993, 1010 (N.D. Ind. 2000).

Lifewatch's deceptive conduct similarly violates the TSR and FDUTPA. The TSR prohibits sellers and telemarketers from (1) misrepresenting a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity, and (2) making a false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. §§ 310.3(a)(2)(vii) and (a)(4). The FDUTPA declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Chapter 501, Part II, Florida Statutes (2012). In construing this Section, the Florida Legislature has declared that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), as of July 1, 2006." *Id.*

As described above, Lifewatch and its telemarketers make several false claims to induce consumers to part with their credit card or bank account information. First, Defendants falsely represent that somebody the consumers know has already purchased the medical alert system for them. Second, Defendants falsely claim that major health organizations and tens of thousands of health care professionals endorse Lifewatch's medical alert device. Third, they claim that consumers will not be charged until they receive and choose to activate the system. Finally, Defendants falsely claim that consumers may cancel Defendants' monitoring service at any time without any further financial obligation.

These claims are material because they explain why consumers pay money to Defendants.[90] There is no question that Defendants' false representations are likely to mislead consumers acting reasonably under the circumstances because, in fact, they do. Further, consumers have no obligation to doubt the veracity of Defendants' express claims, particularly since false claims are "inherently likely to mislead*." FTC v. Direct Mktg. Concepts, Inc.*, No. 04-11136-GAO, 2004 WL 1399185, at *5 (D. Mass. June 23, 2004).

## 2. Lifewatch's Telemarketing Practices Violate the TSR.

Defendants' conduct also violates a series of specific provisions in the TSR. In addition to prohibiting misrepresentations and material omissions, the TSR imposes requirements that apply to specified practices:

**TSR Sections 310.4(b)(1)(iii)(A) & (B)** prohibit telemarketers from initiating, or sellers from causing telemarketers to initiate, outbound telephone calls to: 1) a consumer who previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered; and 2) a consumer's telephone number on the National Do Not Call Registry. 16 C.F.R. § 310.4(b)(1)(iii)(A) & (B). Defendants' telephone calls are responsible for more than 90,000 Do Not Call complaints received by the FTC.[91] By indiscriminately dialing, or causing others to dial, countless consumers, Defendants pay no attention to the Registry, or to consumers' removal

---

[90] PX 7, Cuomo ¶ 5, Att. A at 28; PX 29, D'Addario Dec. ¶ 7; PX 30, Daniel Dec. ¶ 3 ("Because I believed that somebody I knew was concerned about me and had paid for the device, I gave the caller my banking information and agreed to pay a monthly monitoring fee of $34.95."); PX 47, McCourt Dec. ¶ 3; PX 48, McCraw Dec. ¶ 5; PX 56, Rench Dec. ¶¶ 4 & 6; PX 57, Rivard Dec. ¶¶ 3 & 7; PX 61, Wagler Dec. ¶ 4.
[91] PX 1, Menjivar Dec. ¶ 53; *see also id.* ¶ 41r, Att. XX at 22-23 (telemarketing manager admitting to getting lots of complaints from consumers who continued being called after previously asking to be taken off the calling list).

requests conveyed to Defendants or their telemarketers.[92] The Worldwide Telemarketers alone generated 800-900,000 such violations per day for the two years they called on behalf of Lifewatch.[93]

**TSR Section 310.4(a)(8)** requires sellers or telemarketers to transmit the telephone number and name of the telemarketer or seller to any caller identification service in use by a recipient of a telemarketing call. 16 C.F.R. § 310.4(a)(8). Defendants or their telemarketers transmit fake telephone numbers and names to consumers' Caller ID services, in clear violation of the TSR.[94]

**TSR Section 310.4(b)(1)(v)(A)** bans robocalls unless the seller or marketer has consumers' express agreement, in writing, to receive such calls. 16 C.F.R. § 310.4(b)(1) (v)(A). Defendants have no such permission and their robocalls are flatly prohibited.[95]

**TSR Sections 310.4(b)(1)(v)(B)(ii) & (d)** mandate that calls delivering prerecorded messages disclose "truthfully, promptly, and in a clear and conspicuous manner" the identity of the seller, that the purpose of the call is to sell goods or services, and the nature of the goods or services. 16 C.F.R. § 310.4(b)(1)(v)(B)(ii). Defendants' robocalls use fake

---

[92] *See supra* nn. 11 & 14-15.

[93] PX 15, Settecase Dec. ¶ 7.

[94] PX 31, deLoca Dec. ¶ 5 (caller ID identified robocall displayed Katonah-Lewisboro School District name and telephone number); PX 39, Grigorian Dec. ¶ 7 (called number back, notified number not in service); PX 41, James Dec. ¶ 3; PX 43, Jones Dec. ¶ 6 (called number back, notified number not in service); PX 51, Miller Dec. ¶ 3 (caller ID showed "FIA Card Serv"); PX 54, Pierce Dec. ¶¶ 8 & 9 ("Walmart"); PX 63, Whaley Dec. ¶ 3 ("Bank of America"); PX 1, Menjivar Dec. ¶ 40c, Att. CC at 9 (call number back and "the number is no good"). The numbers that show up on consumers' caller IDs intentionally include local area codes because "consumers are more likely to answer telephone calls made from a local number." PX 15, Settecase Dec. ¶ 8. Consumers are indeed fooled by such manipulations of the caller IDs. PX 29, D'Addario Dec. ¶ 7; *see also* PX 17, Bangasser Dec. ¶ 6 (appeared to be local number); PX 22, Bourne Dec. ¶ 4 (same); PX 24, Carson Dec. ¶ 3 (same); PX 37, Gordon Dec. ¶ 6 (same); PX 38, Green Dec. ¶ 4 (same); PX 54, Pierce Dec. ¶¶ 4 & 8 (same).

[95] *See, e.g.*, PX 1, Menjivar ¶ 40b, Att. BB at 8 & 12 (makes request to Lifewatch employee to be put on telemarketing DNC list), ¶ 40c, Att. at 4, 7, 11 & 14 (continues receiving telemarketing calls; asks again to be put on DNC list), ¶ 40d, Att. DD (additional telemarketing call), ¶ 40e, Att. EE (additional telemarketing call); PX 5, Bradley Dec. ¶ 4, Att. D at 1; PX 27, Clawson Dec. ¶ 10; PX 32, Eden Dec. ¶ 3; PX 50, Mey Dec. ¶¶ 4, 6 & 18 (repeatedly requests no more calls).

company names and do not disclose that they are selling a medical alert system.[96]  Similarly,

Lifewatch's telemarketers universally violate 16 C.F.R. § 310.4(d), which requires

telemarketers to make the same disclosures during all outbound telephone solicitations.[97]

### 3. Lifewatch is Liable for the Conduct of Its Telemarketers.

As a legal matter, Lifewatch is directly liable for the deceptive claims made by, and

tactics of, the telemarketers it has employed.  The telemarketers are Lifewatch's agents, and

Lifewatch is therefore responsible for their deceptive acts and practices.  *See, e.g.*, *FTC v.*

*Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) (defendant liable for misrepresentations of

agent it hired to market wealth building program); *Standard Distribs., Inc. v. FTC*, 211 F.2d

7, 13 (2nd Cir. 1954) (defendant liable for sales agents' misrepresentations); *FTC v.*

*Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 2305, 1223 (D. Nev. 2010) (principal liable for

misrepresentations of its agents within scope of agents' actual or apparent authority); *FTC v.*

*LeanSpa, LLC*, No. 3:11-CV-1715, 2015 WL 1004240, at *11-13 (D. Conn. March 5, 2015)

(principal liable for misrepresentations of third-party affiliate marketers when principal's

employees knew affiliates were making misrepresentations, principal hired affiliates, and

principal had authority to review affiliates' tactics); *FTC v. Inc21.com Corp.*, 688 F. Supp. 2d

---

[96]PX 1, Menjivar ¶ 39a, Att. W at 4 (claim "no cost to you whatsoever"), ¶ 39b, Att. X at 4 (no name and offer "free emergency medical alert" device), ¶ 39c, Att. Y at 4 (offers free medical alert system), ¶ 39d, Att. Z at 4 (claims federal government providing free medical alert system), ¶ 40a, Att. AA at 4 ("the Life Alert System"), ¶ 40d, Att. DD at 4 (fail to disclose name during recording and indicate device is free), ¶ 40e, Att. EE at 4 (same), ¶ 40f, Att. FF at 4 (same), ¶ 41a, Att. GG at 4 (same), ¶ 41d, Att. JJ at 4 (same), ¶ 41h, Att. NN at 4 (same), ¶ 41l, Att. at 4 (same), ¶ 41n, Att. TT at 4 (same), ¶ 41q, Att. WW at 4 (same), ¶ 41t, Att. ZZ at 4 (same), ¶ 41u, Att. AAA at 4 (same); PX 5, Bradley Dec. ¶ 5, Att. D at 3 (fail to disclose name and indicate device is free); PX 31, deLoca Dec. ¶¶ 4, 8 (no name disclosed), ¶ 16 ("Life Alarm"), ¶¶ 18-20 (no name disclosed and indicate device is free); PX 50, Mey Dec. ¶¶ 36-42 (fail to disclose name during recording and indicate device is free).

[97] *See supra* nn. 17 & 33; *see also* PX 14, Hilgar Dec. ¶ 6 ("The telemarketers also were not allowed to disclose Lifewatch's name during telemarketing calls.").

927, 939 (N.D. Cal. 2010) (defendants liable for misrepresentations made by foreign call centers). Any unsuccessful efforts to prevent the misrepresentations of non-employees do not diminish Lifewatch's liability. *See, e.g.*, *Standard Distribs.*, 211 F.2d at 13 ("Unsuccessful efforts by the principal to prevent the misrepresentations by agents will not put the principal beyond the reach of the Federal Trade Commission Act."); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010) (defendant liable for marketing software that allowed creation of checks without proper verification even where it took steps to prevent third-parties from using software to draw checks on victims' accounts). "For purposes of liability under the FTC Act, it is of no consequence" whether Lifewatch's telemarketers "would be considered at law as employees of the company or independent contractors." *FTC v. SkyBiz.com, Inc.*, No. 01-CV-396-K(E), 2001 WL 1673645, at *9 (N.D. Okla. Aug. 31, 2001) (citing *Goodman v. FTC*, 244 F.2d 548, 591-92 (9th Cir. 1957)); *see also Int'l Art Co. v. FTC*, 109 F.2d 393, 396 (7th Cir. 1940) ("We know of no theory of law by which the company could hold out to the public these salesmen as its representatives, reap the fruits from their acts and doings without incurring such liabilities as attach thereto."); *FTC v. Five-Star Auto Club Inc.*, 97 F. Supp. 2d 502, 527 (S.D.N.Y. 2000) ("The law is clear that under the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with the actual or apparent authority to make such representations) regardless of the unsuccessful efforts of the principal to prevent such misrepresentations.").

Lifewatch also is liable for the deceptive and abusive practices of its telemarketers under the TSR. Because Lifewatch is a "seller" under the TSR, it is strictly liable for the

telemarketers' deceptive practices.[98]  *See Stefanchik*, 559 F.3d at 930.  Similarly, Lifewatch

is legally responsible for the abusive telemarketing practices because it caused its

telemarketers to engage in the prohibited conduct.[99]  *See, e.g., U.S. v. Dish Network, LLC*,

667 F. Supp. 2d 952, 958-59 (C.D. Ill. 2009) (unless a seller can demonstrate that it has

adopted written procedures and training for its telemarketers to ensure compliance with the

TSR, and that it monitors and enforces the guidelines, the seller is liable for any violations by

its telemarketers).  In *Dish*, the court held that "a seller 'causes' the telemarketing activity of

a telemarketer by retaining the telemarketer and authorizing the telemarketer to market the

seller's products and services."  *Id.* at 959.  The court recently reiterated this test in its

summary judgment ruling, finding Dish liable for nearly three million calls in violation of the

TSR.  *U.S. v. Dish Network, LLC*, No. 09-3073, 2014 U.S. Dist. LEXIS 172020, at *174

(C.D. Ill. Dec. 12, 2014).  Thus to establish Lifewatch's liability for its telemarketers'

abusive practices under the TSR, Plaintiffs only must show that: (1) Lifewatch retained the

outside sellers; (2) Lifewatch authorized the outside sellers to market its products and

services; and (3) the outside sellers violated the TSR.  *Id.*  Plaintiffs have clearly met that

standard.

Beyond that, it is clear that Lifewatch is well aware of the illegal tactics of its

telemarketers and failed to take action to correct them.  As noted, the Indiana Attorney

---

[98]  *See* 16 C.F.R. § 310.3(a)(2) & (4).  Under the TSR, a "Seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 CFR § 310.2(aa).  "Telemarketing" is defined by the TSR as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 CFR § 310.2(dd).

[99]  *See id.* at §310.4(b)(1).  It is an abusive telemarketing practice for a seller to cause a telemarketer to do a variety of things, including calling people on the DNC registry, calling people who have made specific opt-out or removal requests, and making most robocalls. 16 CFR § 310.4(b)(1).

General, dozens of private plaintiffs, and Life Alert have all sued Lifewatch over the robocalls initiated by its telemarketers. Moreover, Plaintiffs have submitted overwhelming evidence demonstrating that Defendants are not only keenly aware that its telemarketers are making misrepresentations and engaging in abusive telemarketing practices, but also that they exercise actual control over their telemarketers.[100]

Despite this knowledge, there is virtually no evidence that Lifewatch has made any serious effort to curb the illegal activities of its telemarketers. Instead, Lifewatch's reaction to any formal action being taken against its telemarketers appears to be nothing more than taking steps to further hide its own involvement.[101]

### 4. Lifewatch Has Assisted and Facilitated TSR Violations.

Alternatively, even if Lifewatch were not directly liable for the deceptive and abusive practices of its telemarketers, it is liable under the TSR's assisting and facilitating provision. Under § 310.3(b) of the TSR, it is a deceptive telemarketing act or practice and a violation of the TSR "for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice" that is deceptive or abusive under the TSR. 16 C.F.R. § 310.3(b).

Lifewatch has certainly provided its telemarketers with substantial assistance and support. Indeed, if Lifewatch did not offer and agree to pay the telemarketers, bill the

---

[100] *See supra* Section I.C, and accompanying notes.
[101] As discussed above, after Indiana filed its suit, Lifewatch simply restructured its contracts with telemarketers from "Telemarketing Agreements" to "Purchase Agreements." *See* PX 1, Menjivar Dec. Att. R at 1 (Marketing Services Agreement with Platinum Marketing Group dated Oct. 25, 2012), Att. S at 1 (Purchase Agreement with Payless Solutions dated March 18, 2014), Att. T at 1 (Purchase Agreement with Life One Wireless dated May 1, 2013) & Att. U at 1 (Purchase Agreement with QCSS dated March 26, 2014).

consumers, and provide the monitoring service to consumers, the telemarketers would not engage in any of the solicitations in the first place. *See FTC v. Chapman*, 714 F.3d 1211, 1216-17 (10th Cir. 2013) (no need to show "direct connection" between assistance and misrepresentations to constitute "substantial assistance" under the TSR; affirming liability for defendant who provided the services and products marketed to consumers but was not involved in "marketing efforts"); *FTC v. Hes Merch. Servs. Co., Inc., et al.*, No. 6:12-cv-1618-ORl-22KRS, 2014 WL 6863506, at *7-8 (M.D. Fla. Nov. 18, 2014) (processing credit card transactions sufficient to constitute "substantial assistance"). As described above, Lifewatch also provided scripts, supervised and controlled its telemarketers, and provided the medical devices themselves for every customer.[102] Given Lifewatch's involvement and the history of governmental and private litigation taken against it and its telemarketers, there also can be no question that Lifewatch knew or certainly should have known of its telemarketers' illegal conduct.[103]

### D.    Sirlin is Personally Liable.

Defendant Sirlin is personally liable for the illegal conduct engaged in by Lifewatch. An individual defendant may be held liable for injunctive relief and monetary restitution under the FTC Act if the Court finds (1) that the defendant participated directly in or had some measure of control over a corporation's deceptive practices, and (2) had actual or constructive knowledge of the practices. *See World Media Brokers*, 415 F.3d at 764; *Bay Area*, 423 F.3d at 636; *Amy Travel*, 875 F.2d at 573-74. Authority to control may be evidenced by "active involvement in the corporate affairs, including assuming the duties of a

---

[102] *See supra* nn. 73-74, 78 & 80-81, and accompanying text.
[103] *See supra* nn. 1 & 85-88, and accompanying text.

corporate officer." *World Media Brokers*, 415 F.3d at 764 (citing *Amy Travel*, 875 F.2d at

573). The knowledge requirement is satisfied by a showing that the defendant (1) had actual

knowledge of the deceptive acts or practices, (2) was recklessly indifferent to the truth or

falsity of the representations, or (3) had an awareness of a high probability of fraud coupled

with an intentional avoidance of the truth. *Id.*; *Bay Area*, 423 F.3d at 636; *Amy Travel*, 875

F.2d at 573. An individual's "degree of participation in business affairs is probative of

knowledge." *Id*. at 574. The Commission need not prove subjective intent to defraud. *See*

*id.* To avoid liability, an individual defendant must do "'everything in his power' to assure

compliance with the law." *World Travel*, 861 F.2d at 1031 (quoting *U.S. v. Johnson*, 542

F.2d 710, 712-13 (8th Cir. 1976)).

Sirlin easily satisfies the standard for individual liability. Besides being an officer of

Lifewatch,[104] Sirlin signed the Purchase Agreements Lifewatch entered into with the

telemarketers,[105] and signed Lifewatch's telemarketing license in Florida.[106] He also

admitted to an executive at another medical alert company that Lifewatch employs

companies engaged in robocalling but he has no intention of stopping.[107] Sirlin reassured the

same executive that Lifewatch monitors and controls its telemarketers.[108] Sirlin had a first-

hand view of the telemarketing operations as well, having visited the Worldwide

---

[104] PX 1, Menjivar Dec. Att. M; PX 77, Sirlin Aff. ¶ 3.
[105] PX 5, Bradley Dec. ¶ 4, Att. C at 29; PX 1, Menjivar Dec. Att. Q at 17, Att. R at 17, Att. S at 18, Att. T at 18 Att. U at 18.
[106] PX 4, Velez Dec. Atts. A, F & H.
[107] PX 13, Gross Dec. ¶ 19 (Sirlin "claimed that bad public relations are the 'cost of doing business' in the telemarketing world and that Lifewatch was not going to get out of it").
[108] PX 13, Gross Dec. ¶¶ 9-11; PX 76, Steinmetz Dec. ¶¶ 6 & 8 (broker who helped develop Defendants' telemarketing strategy confirming that "LifeWatch reviewed and approved scripts that were used by its telemarketers," and "Mr. Sirlin knew that … that robo-calls were being used by its telemarketers to sell LifeWatch's medical alert systems.").

Telemarketers.[109]  Finally, Sirlin was personally named in many of the governmental and private legal actions brought as a result of the illegal telemarketing.[110]

## E. The Balance of Equities Decidedly Favors Injunctive Relief.

Not only are Plaintiffs likely to succeed on the merits, but the balance of the equities also tips decidedly in Plaintiffs' favor.  In balancing the equities, the Court must assign greater weight to the public interest than to any of Defendants' private concerns.  *World Travel*, 861 F.2d at 1029; *see also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981) (private equities alone insufficient to justify denial of injunction).

The public equities in this case are compelling, as the public has a strong interest in immediately halting an abusive and deceptive scheme targeting vulnerable consumers, which has harmed millions of consumers and resulted in thousands of complaints.  Defendants, in contrast, have no legitimate interest in continuing to violate the law.  *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (upholding finding of "no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment").

---

[109] PX 14, Hilgar Dec. ¶ 9.

[110] *See, e.g.*, *Life Alert Emergency Response, Inc. v. Lifewatch, Inc.*, No. 2:13cv3455-JAK-SS (C.D. Cal. filed May 14, 2013); *Connor v. Lifewatch, Inc.*, No. 2:13cv3507 (D.S.C. removed Dec. 17, 2013); *Guiley v. Lifewatch USA*, No. 5:14cv350 (N.D. Ohio removed Feb. 18, 2014); *Fitzhenry v. Lifewatch, Inc.*, No. 2:13cv3508 (D.S.C. removed March 12, 2014); *Reynolds v. Lifewatch, Inc., et al.*, No. 7:14cv3575 (S.D.N.Y. filed May 19, 2014).

## III.    CONCLUSION

Plaintiffs have demonstrated that Defendants are engaged in widespread illegal

telemarketing campaigns, and ask that the Court enter the proposed Preliminary Injunction.

Respectfully Submitted,

JONATHAN E. NUECHTERLEIN
General Counsel

Dated: July 6, 2015                     s/David A. O'Toole
DAVID A. O'TOOLE
MARISSA J. REICH
ROZINA C. BHIMANI
Federal Trade Commission, Midwest Region
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
Telephone: (312) 960-5634
Facsimile: (312) 960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PAMELA JO BONDI
Attorney General
State of Florida

Dated: July 6, 2015                     s/Denise Beamer
DENISE BEAMER
Assistant Attorney General
Florida Bar # 69369
Office of the Attorney General
Consumer Protection Division
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone:  (407) 245-0833
Facsimile:  (407) 245-0365

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL

**<u>CERTIFICATE OF SERVICE</u>**

I, David A. O'Toole, hereby certify that on July 6, 2015, I electronically filed **PLAINTIFFS'MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION,** with the Court using the CM/ECF system, which will automatically send copies to any attorney of record in the case. In addition, I provided a courtesy copy by electronic mail to:

Patrick J. Cotter, Greensfelder, Hemker & Gale, P.C.
Jason Sulzer, The Sulzer Law Group
Joseph Lipari, The Sulzer Law Group

Attorneys for Defendants Lifewatch, Inc. and Evan Sirlin

Respectfully Submitted,

 s/ David A. O'Toole
DAVID A. O'TOOLE
Federal Trade Commission
55 W. Monroe Street, Ste. 1825
Chicago, Illinois 60603
Voice: (312) 960-5601; Fax: (312) 960-5600
email: dotoole@ftc.gov