# PX 5

## DECLARATION OF ELIZA K. BRADLEY
**PURSUANT TO 28 U.S.C. §1746**

I, Eliza K. Bradley, hereby declare as follows:

1.      I am a Deputy Attorney General with the Indiana Office of the Attorney General, and am counsel for the State of Indiana in *State of Indiana v. Elite Information Solutions Inc., et al.*, Cause No. 49D06-1208-MI-032415 (Marion Sup. Ct. Ind., filed on August 16, 2012) ("Indiana Action").

2.      Attached hereto as **Bradley Attachment A** is a true and correct copy of the Findings of Fact, Conclusions Thereon, and Order Granting Plaintiff's Request for a Preliminary Injunction, which was entered in the Indiana Action on August 24, 2012.

3.      Attached hereto as **Bradley Attachment B** is a true and correct copy of the Amended Complaint that the State of Indiana filed in the Indiana Action on November 13, 2012.

4.      Attached hereto as **Bradley Attachment C** is a true and correct copy of Lifewatch, Inc.'s Designation of Evidence in Support of Its Cross Motion for Summary Judgment and Exhibits C through F attached thereto, which were filed in the Indiana Action on or about November 17, 2014.

5.      Attached hereto as **Bradley Attachments D** and **E**, respectively, are true and correct copies of the Declaration of Robert Braver and a letter from Robert Braver to Evan Sirlin, dated May 7, 2012, which were produced to Lifewatch, Inc. during the course of discovery in the Indiana Action.

1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>June 11</u>, 2015.

Eliza K. Bradley

# Attachment A

(                                                    (

| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | (208 |
| COUNTY OF MARION | ) | CAUSE NO. 49D06-MI-032415 |

STATE OF INDIANA,                    )
                                     )
    Plaintiff,                  )
                                     )
    v.                          )
                                     )
ELITE INFORMATION SOLUTIONS         )
INC. d/b/a SAFELINE ALERT, and       )
MICHAEL HILGAR, individually and     )
as owner/operator of ELITE           )
INFORMATION SOLUTIONS INC.          )
d/b/a SAFELINE ALERT                 )
                                     )
    Defendants.                 )

FILED

(91)   AUG 24 2012

CLERK of white
CLERK OF THE MARION CIRC. COURT

## FINDINGS OF FACT, CONCLUSIONS THEREON, AND ORDER GRANTING PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION

    This matter comes before the Court on the Plaintiff's, State of Indiana's Motion for a Temporary Restraining Order and Preliminary Injunction. On August 24, 2012 at 10:00 a.m., a hearing was held on Plaintiff's Motion for a Preliminary Injunction. Dennis Mullen, Deputy Attorney General, appeared on behalf of the Plaintiff, State of Indiana. The Court, having taken into consideration the testimony and evidence presented, hereby issues the following findings of fact, conclusions thereon, and order granting Plaintiff's request for a preliminary injunction:

### FINDINGS OF FACT

#### The Autodialer Law

    1.    The Regulation of Automatic Dialing Machines Act ("the Autodialer Law") provides, at Ind. Code § 24-5-14-5(b): "A caller may not use or connect to a telephone line an automatic dialing-announcing device unless: (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or (2) the message is

immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered."

## The Telephone Privacy Act

2.     The Telephone Solicitation of Consumers Act ("the Telephone Privacy Act") provides, at Ind. Code § 24-4.7-4-1 that "[a] telephone solicitor may not make or cause to be made a telephone sales call to a telephone number if that telephone number appears in the most current quarterly listing published by the division."

## The Parties

3.     The State of Indiana is a governmental organization.

4.     The Attorney General is empowered by Ind. Code § 24-5-14-13 and Ind. Code § 24-5-0.5-4 to enforce the Autodialer Act.

5.     The Attorney General is empowered by Ind. Code § 24-4.7-5-2 to enforce the Telephone Privacy Act.

6.     Defendant Elite Information Solutions, Inc., d/b/a Safeline Alert ("Safeline Alert"), is a for-profit corporation that was organized under the laws of the State of Florida with a registered address at 509 S. Chickasaw Trail, #393, Orlando, Florida 32825. Safeline Alert has a principal place of business at 495 E. Semoran Blvd., Casselberry, Florida 32707.

7.     Defendant Michael Hilgar ("Hilgar"), is a resident of Florida with an address of ▨▨▨▨▨▨▨▨▨ Winter Park, Florida ▨▨▨

8.     Reference in this Order to any act of Safeline Alert or Hilgar (collectively referred to as "Defendants"), shall mean the Defendants and/or their principals, agents, representatives, or employees did or authorized such acts to be done, while actively engaged in the management,

2

(                                                          (

direction, or control of Defendants' business affairs and while acting within the scope of their duties, employment, or agency.

### Procedural Background

9.      On August 16, 2012, Plaintiff filed its Complaint for Injunction, Civil Penalties, Reasonable Attorneys Fees and Costs in the above-captioned case, alleging that Defendants were making or causing to be made telephone calls into the state of Indiana in violation of Ind. Code § 24-5-14-1 and Ind. Code § 24-4.7.

10.     On August 16, 2012, Plaintiff filed its Verified Motion for Temporary Restraining Order and Preliminary Injunction, requesting that the Court enter an order restraining Defendants, Elite Information Solutions, Inc. d/b/a Safeline Alert, and Michael Hilgar, individually and as owner/operator of Elite Information Solutions, Inc. d/b/a Safeline Alert from the following: 1) making or causing to be made telephone calls via an automated dialing-announcing device, as defined by Ind. Code § 24-5-14-1, and disseminating a prerecorded message in violation of the Indiana Regulation of Automatic Dialing Machines Act, Ind. Code § 24-5-14; 2) making or causing to be made telephone sales calls to numbers on the Indiana Telephone Privacy List, in violation of the Indiana Solicitation of Consumers Act, Ind. Code § 24-4.7.

11.     Plaintiff gave notice to Defendants of these proceedings on August 15, 2012, by sending a copy of the Verified Motion for Temporary Restraining Order and the Complaint for Injunction, Civil Penalties, Reasonable Attorneys Fees and Costs by UPS Next Day Air delivery to Defendant Safeline Alert's registered address, principal place of business, and to Defendant Hilgar's last known residence. Plaintiff also left a voice message at Defendant Safeline Alert's

3

(                                                                        (

business phone line on August 15, 2012. Plaintiff was unable to find a working telephone number for Defendant Michael Hilgar.

12.     On August 16, 2012, Marion County Superior Court Judge, The Honorable Thomas J. Carroll, entered an order temporarily restraining Defendants from the activities identified in Paragraph 10.

13.     Defendants were served with Plaintiff's Motion for Preliminary Injunction by UPS overnight service on August 15, 2012.

14.     Defendants were served with Plaintiff's Motion for Preliminary Injunction and the Order setting a hearing on the Motion by certified mail on August 16, 2012.

15.     Plaintiff also employed a process server, April Karos of Hale Process, Inc., to personally serve Defendant Safeline Alert at its principal place of business and Defendant Michael Hilgar at his personal address.

16.     On August 20, 2012 at 11:14 a.m., April Karos successfully served Defendants with Plaintiff's Motion for Preliminary Injunction and the Order setting a hearing on the Motion. (See, April Karos' Affidavit of Service, attached hereto as Exhibit "A").

17.     Plaintiff is a governmental organization and is not required to offer security pursuant to Rule 65(C) of the Indiana Rules of Trial Procedure.

Facts

18.     Safeline Alert's telemarketing business is operating in an office building located at 495 E. Semoran Blvd., Casselberry, Florida 32707. (See, Declaration of Mirisasha A. Velez, attached hereto as Exhibit "B").

19.     As shown by the Declaration of George L. Hewitt, Defendants are making or causing to be made telephone calls in violation of two separate Indiana laws, specifically

4

Indiana's Regulation of Automatic Dialing Machines Act, Ind. Code § 24-5-14 and the Indiana Solicitation of Consumers Act, Ind. Code § 24-4.7 (See, Declaration of George Hewitt, attached hereto as Exhibit "C").

20. As shown by the Declaration of George L. Hewitt, the telephone calls that Indiana consumers received were made by Defendants. *Id.*

21. A preliminary injunction is necessary to prevent continued violation of Indiana law until the case can be decided on its merits.

22. Any item listed here as a Finding of Fact that is deemed to be a Conclusion of Law is hereby included and incorporated into the Conclusions of Law.

## CONCLUSIONS OF LAW

23. This court has subject matter jurisdiction to hear this case and personal jurisdiction over the parties.

24. A court may grant an injunction:

> (1) [W]hen it appears by the complaint that the plaintiff is entitled to the relief demanded, and the relief or any part of the relief consists in restraining the commission or continuance of some act, the commission or continuance of which, during the litigation, would produce great injury to the plaintiff;
>
> (2) [W]hen, during the litigation, it appears that the defendant is:
> (A) doing;
> (B) threatening;
> (C) about to do; or
> (D) procuring or suffering to be done;
>
> some act in violation of the plaintiff's rights, respecting the subject of the action, and tending to render the judgment ineffectual; or
>
> (3) [W]hen the relief or part of the relief demanded by the plaintiff consists in restraining proceedings upon any final order or judgment.

Ind. Code § 34-26-1-5(a).

5

27.    The party requesting injunctive relief has the burden of showing the following by a preponderance of the evidence:

> a.  The remedies at law for the party seeking a preliminary injunction are inadequate, thus causing irreparable harm pending resolution of the substantive action.
>
> b.  The party seeking a preliminary injunction has at least a reasonable likelihood of success at trial by establishing a *prima facie* case.
>
> c.  The threatened injury to the party seeking a preliminary injunction outweighs the potential harm to non-moving party resulting from the granting of an injunction.
>
> d.  The public interest would not be disserved by the granting of a preliminary injunction.

*Indiana Family and Social Services Administration v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind. 2002). *Union Township School Corporation v. State*, 706 N.E.2d 183, 189 (Ind. Ct. App. 1998) *trans. denied, rehearing denied.*

28.    Where an action to be enjoined is unlawful, the unlawful act constitutes *per se* "irreparable harm" for the purposes of preliminary injunction analysis. *Union Township School Corporation*, 706 N.E.2d at 192. In discussing the *per se* rule for preliminary injunction in *Union Township School Corporation,* the court stated:

> The *per se* rule drops two prongs from the usual four-prong test used to determine whether a preliminary injunction should issue. (Citation omitted).... When the *per se* rule is invoked, the court has determined that the defendant's actions have violated a statute and, thus, that the public interest is so great that the injunction should issue regardless of whether the plaintiff will suffer greater injury than the defendant....Accordingly, invocation of the [*per se*] rule is only proper when it is clear that the statute has been violated.

*Id.* at 192.

29.    The *per se* rule set out above applies in this case, and unless the Defendants are restrained immediately, Plaintiff and Indiana consumers will continue to suffer immediate and

6

irreparable injury. Specifically, the Defendants will continue to violate the Autodialer Law and the Telephone Privacy Act.

30.     To obtain an injunction against unlawful acts, a party need not make a showing of irreparable harm or a balance of hardship in its favor. *L.E. Services v. State Lottery Commission*, 646 N.E.2d 334, 349 (Ind. Ct. App. 1995). This relaxed standard, known as the "per se" rule, is only available when it is clear that a statute has been violated. See, *Indiana Family and Social Services Admin. v. Walgreen* at 162 (private party not entitled to use "per se" standard to enjoin the State's application of an allegedly invalid rule).

31.     It is unlawful for a caller to use or connect to a telephone line an automatic dialing-announcing device unless (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or (2) the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered. Ind. Code § 24-5-14-5(b).

32.     The Defendants used an automatic dialing-announcing device to connect to Indiana telephone lines without the subscriber's consent.

33.     The Defendants used an automatic dialing-announcing device to connect to Indiana telephones and disseminated messages that were not preceded by a live operator who obtained the subscriber's consent before the message was delivered.

34.     It is unlawful to make or cause to be made telephone sales calls to a telephone number if that telephone number appears on the Telephone Privacy List. Ind. Code § 24-4.7-4-1.

35.     Defendants made or caused to be made telephone sales calls to telephone numbers appearing on the Telephone Privacy List at the time of the telephone calls.

7

36.     The harm to Plaintiff and Indiana consumers if a preliminary injunction is not entered significantly outweighs the harm to Defendants if it is granted.  Specifically, the Defendants will continue to violate the Autodialer Law and the Telephone Privacy Act, intrude upon Indiana consumers' privacy, cause annoyance to Indiana consumers in their homes, and possibly cause financial harm to Indiana consumers by using up Indiana consumers' pre paid cell phone minutes.

37.     Plaintiff has no adequate remedy at law.  It is likely that Defendants will continue to violate the consumer protection laws if a preliminary injunction is not entered.

38.     The interest of the public will be served by granting a preliminary injunction. *Id.*

39.     Plaintiff, State of Indiana, is a governmental organization and is not required to offer a security pursuant to Rule 65(C) of the Indiana Rules of Trial Procedure.

**IT IS THEREFORE ORDERED** that Defendants, their agents, representatives, employees, successors and assigns be and hereby are preliminarily enjoined from:

1.     Making or causing to be made telephone calls via an automated dialing-announcing device, as defined by Ind. Code § 24-5-14-1, and disseminating a prerecorded message in violation of the Indiana Regulation of Automatic Dialing Machines Act, Ind. Code § 24-5-14; and

2. Making or causing to be made telephone sales calls to numbers on the Indiana Telephone Privacy List, in violation of the Indiana Solicitation of Consumers Act, Ind. Code § 24-4.7.

8

ALL OF WHICH IS ORDERED this ___24___ day of ___August___ 2012.

_____
The Honorable Thomas J. Carroll, Judge
Marion County Superior Court No. 6

9

**DISTRIBUTION TO:**

**Dennis E. Mullen**
Deputy Attorney General
302 W. Washington Street
IGCS 5th Floor
Indianapolis, Indiana 46204

**Elite Information Solutions, Inc.**
**d/ba Safeline Alert**
c/o Michael Hilgar, President
509 S. Chickasaw Trail, #393
Orlando, Florida 32825

**Elite Information Solutions, Inc.**
**d/ba Safeline Alert**
c/o Michael Hilgar, President
495 E. Semoran Blvd.
Casselberry, Florida 32707

**Michael Hilgar**
████████████
Winter Park, Florida ███

10

## AFFIDAVIT OF SERVICE

State of Indiana          County of Marion          Superior Court

Case Number: 49D06-1208-MI-032415   Court Date: 8/24/2012

Plaintiff:
STATE OF INDIANA

vs.

Defendant:
ELITE INFORMATION SOLUTIONS INC.;ETAL

For:
Dennis Mullen
OFFICE OF ATTY GENERAL INDIANA
302 W Washington St
Indianapolis IN 46204-2770

Received by Hate Process on the 17th day of August, 2012 at 11:14 am to be served on ELITE INFORMATION SOLUTIONS INC, C/O MICHAEL HILGAR PRESIDENT, 495 E SEMORAN BLVD, CASSELBERRY, FL 32707.

I, April Karos, being duly sworn, depose and say that on the 20th day of August, 2012 at 1:45 pm, I:

served a CORPORATION by delivering a true copy of the SUMMONS/APPEARANCE OF COUNSEL/COMPLAINT FOR INJUNCTION, RESTITUTION, CIVIL PENALTIES AND REASONABLE COSTS, NOTICE OF MOTION FOR TEMP RESTRAINING ORDER/MOTIONFOR TEMP RESTRAINING ORDER AND PRELIMINARY INJUNCTION/ TEMP RESTRAINING ORDER AND ORDER SETTING HEARING JON PRELIMINARY INJUNCTION with the date and hour of service endorsed thereon by me, to: MICHAEL HILGAR as PRESIDENT for ELITE INFORMATION SOLUTIONS INC, at the address of: 495 E SEMORAN BLVD, CASSELBERRY, FL 32707, and informed said person of the contents therein, in compliance with state statutes.

I do hereby certify that I am over the age of eighteen, and that I have no interest in the above action. Under Penalty of Perjury, I declare that I have read the foregoing document, and that the facts stated in it are true, per Florida Statue 92.525(2)

Subscribed and Sworn to before me on the 23rd day
of August, 2012 by the affiant who is personally known
to me.

NOTARY PUBLIC

April Karos
2011-0404.KAR

Hale Process
P.O. Box 720426
Orlando, FL 32872-0426
(407) 275-6969

Our Job Serial Number: HIS-2012001001



## AFFIDAVIT OF SERVICE

State of Indiana        County of Marion        Superior Court

Case Number: 49D06-1208-MI-032416   Court Date: 8/24/2012

Plaintiff:
STATE OF INDIANA

vs.

Defendant:
ELITE INFORMATION SOLUTIONS INC.;ETAL

For:
Dennis Mullen
OFFICE OF ATTY GENERAL INDIANA
302 W Washington St
Indianapolis, IN 46204-2770

Received by Hale Process on the 17th day of August, 2012 at 11:14 am to be served on MICHAEL HILGAR, ███████
██████████ WINTER PARK, FL ██████

I, April Karos, being duly sworn, depose and say that on the 20th day of August, 2012 at 1:45 pm, I:

INDIVIDUALLY/PERSONALLY served by delivering a true copy of the SUMMONS/APPEARANCE OF COUNSEL/COMPLAINT FOR INJUNCTION, RESTITUTION, CIVIL PENALTIES AND REASONABLE COSTS, NOTICE OF MOTION FOR TEMP RESTRAINING ORDER/MOTIONFOR TEMP RESTRAINING ORDER AND PRELIMINARY INJUNCTION/ TEMP RESTRAINING ORDER AND ORDER SETTING HEARING JON PRELIMINARY INJUNCTION with the date and hour of service endorsed thereon by me, to: MICHAEL HILGAR at the alternate address of: 495 E SEMORAN BLVD, CASSELBERRY, FL, and informed said person of the contents therein, in compliance with state statutes

I do hereby certify that I am over the age of eighteen, and that I have no interest in the above action. Under Penalty of Perjury, I declare that I have read the foregoing document, and that the facts stated in it are true, per Florida Statue 92.525(2)

April Karos
2011-0494 KAR

Hale Process
P.O. Box 720426
Orlando, FL 32872-0426
(407) 276-9989

Our Job Serial Number: HIS-2012001002

Subscribed and Sworn to before me on the 23rd day of August, 2012 by the affiant who is personally known to me.

NOTARY PUBLIC

RENEE HALE
MY COMMISSION EXPIRES
EE522 Apr 15 2016

| | |
|---|---|
| STATE OF INDIANA ) | IN THE MARION SUPERIOR/CIRCUIT COURT |
| ) SS: | |
| COUNTY OF MARION ) | CAUSE NO. _____ |
| STATE OF INDIANA, ) | |
| Plaintiff, | |
| v. | |
| ELITE INFORMATION SOLUTIONS INC. d/b/a SAFELINE ALERT, and MICHAELHILGAR, individually and as owner/operator of ELITE INFORMATION SOLUTIONS INC. d/b/a SAFELINE ALERT | |
| Defendants. | |

## DECLARATION OF MIRISASHA A. VELEZ

I, Mirisasha A. Velez, being over the age of eighteen years, do hereby affirm and state:

1. I have personal knowledge of the facts set forth herein.

2. At all times relevant to this affidavit, I was a Senior Financial Investigator with the Florida Department of Agriculture and Consumer Services – Regulatory Investigation Section.

3. On or about August 2, 2012, in the course of my employment, I came into possession of a telemarketing script relating to a business located at 495 E. Semoran Blvd., Casselberry, Florida 32707.

4. Upon information and belief, that office space is currently being rented by Elite Information Solutions, Inc., and Michael Hilgar, owner/operator of Elite Information Solutions, Inc.



5.    Exhibit "A" attached hereto is a true and accurate copy of the telemarketing script.

FURTHER DECLARANT SAYETH NOT.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE.

Date:  8/15/12

Mirisasha A. Velez
Senior Financial Investigator
Dept. of Agriculture & Consumer Services
Office of Agricultural Law Enforcement
Regulatory Investigation Section
PO Box 568365, Orlando, FL 32856-8365

# INBOUND SCRIPT 06-12-12 ($34.95)

Senior Medical Benefits, *(Rep Name) speaking,* may I ask whom I am speaking with? *(Write down their name)* And in case we get disconnected, is this the best phone number to reach you back on?

Okay, Great, for responding today to our Senior Medical Benefits program, you've been selected to receive a FREE medical alert system package that has a value of over $400 dollars.

You are probably familiar with the medical alert system and how it works, you know the TV commercial "I'VE FALLEN AND I CAN'T GET UP!"? or maybe you've seen our medical alert system in NewsDay, The Washington Post or US News.

It's the same system as seen on TV and the way it works is simple. If you have a medical emergency , fire, burglary, or even something as simple as a fall that you have difficulty getting up from, you simply push the button on the lightweight waterproof necklace or bracelet and speak hands free from anywhere in your home to a live certified Emergency Medical Technician *(An E.M.T.)*. They will evaluate your situation, immediately get the help you need, notify family or 911 and comfort you until help arrives. Your alert button works anywhere in the house and it even works outside on your property. It has a 1500 foot range. That's over a quarter of a mile.

This device could really help you in a time of need and could even be life saving. This device will give you the peace of mind that you need, allow you to feel safe and make sure you never feel alone in the case of an emergency. Mr. / Ms. *(Their Last Name)*, You will never have to feel helpless, worried or by yourself in an emergency situation.

Our device has been recommended by the American Heart Association, the American Diabetes Association, and the National Institute of Aging and has been helping save the lives of America's senior citizens for over 30 years.



Your FREE Medical Alert System package includes:

- A Medical Alert Base Station with a speaker
- A Waterproof Wrist / necklace button
- A Medilock key lock box which prevents broken doors and windows
- Voice Remote, which is an easy to use device that allows you to answer and talk on the telephone by simply pressing your necklace button. So no more getting up to answer the phone and no more missed calls.
- An away from home "Protection Card" that gives emergency personnel 24 hour a day / 7 day a week access to your important medical information
- And last but not least, a VERY IMPORTANT part of this service, is a daily wellness check. Every day SafeLine will check with you to make sure that you are safe and everything is okay.

The system is COMPLETELY FREE and the shipping is also FREE. Normally all this would cost over $400 dollars, but today you pay ABSOLUTELY NOTHING for the system. The only thing you would be responsible for is the Emergency Medical Technician monthly monitoring fee of just *$34.95* per month and the billing cycle doesn't start until you receive the system and activate it. Everything else is FREE. Also, there is no contract whatsoever and you can cancel at any time with no cancellation fees.

Okay, Mr./Ms. *(Their last name)* so what address would you like your Emergency Medical Alert System shipped to? *(Type their address in the customer information form)*

And for the monthly Emergency Medical monitoring, which card would you like to use? VISA, Mastercard, Discover, or American Express? *(If they say they do not have a credit card; then say "Okay, do you have a debit card, we can go ahead and get you signed up with that instead?")*

*(If NO credit card or debit card, then ask for checking or savings acct.)*
Okay, we can get you signed up with your checking account instead, so go ahead and grab a check so we can get some information off of it. *(If no checking account, then say "Do you have a savings account?")* *(If yes, say "Okay, go ahead and grab a bank statement so we can get some information off of it.")*

Do you have a spouse or someone else in your home that you would also like to be protected? *(If Yes, then go on, IF No skip to "Fill out the customer information form",*

Bradley Att. A
Page 16 of 35

*below)* Okay we will also send you, for FREE, and additional wrist and necklace button for your spouse, the only thing you will need to pay is an additional $5.00 per month to cover the Emergency Medical Technician monitoring. So you and your spouse would be protected for just $39.95 per month and all of the equipment and shipping is still FREE.

(Fill out the customer information form on computer and then PITCH UPSELL)

UPSELL

Anywhere Alert 911 Pendant ($9.99 per month)

By the way, as a special offer for signing up today, we are able to offer you a free Anywhere Alert 911 Pendant. The pendant normally costs $125, but today it is free. This pendant can be worn anywhere in the United States and with just a push of a button you can get the help you need, immediately. The monitoring service for the Nationwide Anywhere Alert 911 Pendant is just an extra $9.99 per month. Would you be interested in adding this to your system today?

Last Step – Close Up and Transfer to Confirmation

Great, your equipment will be shipped to you at *(Repeat Shipping Address)* and will arrive within the next 7 to 10 business days. Don't forget to activate your system, as soon as you receive it, by plugging it into your phone line jack and pushing the button. This will make a test call and activate your system and immediately start protecting you.

Okay, I am going to transfer you to our confirmation department so they can give you your confirmation number and verify that I entered all of your information into the system correctly. They will also give you our customer service number in case you have any additional questions. Thank you very much and I hope you enjoy the safe feeling of having a medical alert system.

Please hold while I transfer you to the confirmation department. *(Wait for them to say okay to holding)*

Transfer Call to Confirmation

**1**     **(Customer Name)** I sincerely hope that you never need to use our service, but I can promise you this, if you do, we will be there for you at the simple push of a button and help will be on its way. This unit saves lives. You must agree with me that the peace of mind that this brings is most certainly worth a dollar a day, right? So let's get you registered. Would you rather use you Visa, MasterCard, American Express, Discover, Debit card or checking account?

**2**     *I need to speak with my Spouse/Family.*

I completely understand. However I don't think that any of your family would not understand that you want to protect yourself and ensure your safety in the event of an emergency. You never know when you may need help and are unable to contact someone at that moment. **SAFELINE** is with you *24/7,365* days a year for as little as about a dollar a day. So let's go ahead and get your equipment out to you. Remember, you are receiving the equipment worth over $400 dollars absolutely free. I can't guarantee that savings at any other time, **so** *let's get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*

**3**     *I can't make a decision without my Spouse or Family.*

I'm fairly confident that they would agree that saving $400 dollars on the equipment cost and protecting your health and safety for only $1 a day is a smart decision. And I also want you to know that you can actually add your spouse to this program if you would like for only an extra $4.99 per month. That brings the cost down to less than 60 cents each per day. Remember, you can cancel at any time with no obligation so even if you try it for a month or two and you find that it's not for you, simply call us to cancel with no questions asked and you are in the clear. So *let's get you signed up. Would you rather use your Credit Card, Debit Card, or Checking Account?*

**4**

### I still can't decide.

(Customer Name) I know that you are interested otherwise you would not still be on the line with me, and I understand that you are on the fence about this. Let me ask you; is your safety and health worth about a dollar a day to you? (Wait for the answer) Please remember that because of this special promotion that's only available to you today, we are actually sending you all the equipment absolutely free. That's a savings of over $400 dollars if you can accept the offer on this call. I can't guarantee that savings if you pass this up today; *What do we need to do to get you registered today?*

**5**

### Someone else makes my Healthcare decisions.

If you feel that you are unable to decide on this yourself but it's something that you really would be interested in, I would be happy to get that person on the line so I can explain it to them so they fully understand it and you can let them know that this is something that you want to do. Who makes these kinds of decisions for you? Would you like me to call them right now? What's their number?

**6**

### I can't afford it.

(Customer Name), I understand completely. In these tough economic times I can appreciate that things are tight. However, **SAFELINE** is only about a dollar a day and that covers you in the event of any emergency where you may not be able to contact a friend or family member. What happens if you have an emergency situation at 3 or 4 in the morning? **SAFELINE** will be there at the push of a button and will initiate emergency help within seconds. You can't afford to be without it, so *let's get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*

Bradley Att. A
Page 19 of 35



### How and why is this promotion possible?

*(Customer Name)* We can offer you this promotion at such a low cost because **SAFELINE** believes in customer loyalty. Instead of spending millions of dollars on advertisements such as TV, billboards, and radio, we have chosen to take those marketing dollars and invest them in you. We are hoping that by giving you all the equipment for free and asking for you to simply pay the monthly monitoring fee only, that you will tell friends and family all about us and hopefully refer some other people to us which in turn generates word of mouth advertising for us. That's the best form of advertising we can get and it makes for happier customers which is our number one goal. That makes sense to you, right? *Well, let's go ahead and get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*



### I don't want anything that needs my Credit Card or Checking Account Info.

I can appreciate your concerns about protecting your account information. Remember, you can cancel at any time with no questions asked if you find that this is not for you. Our main goal is to have you refer our company to other seniors so we may provide the same level of service to them as we will for you. They will thank you for that. This service saves lives. *So let's go ahead and get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*

Bradley Att. A
Page 20 of 35

# 9

## I am on a fixed income and can't afford it.

*(Customer Name),* is your health and safety, or maybe even your life not worth about a dollar a day to you or your family? Please remember that we are sending you over $400 dollars worth of equipment absolutely free. I'm sure that once you inform your family that you would like to do this and could use a little help with the ($29.95 or $34.95) monthly monitoring costs that they would be happy to help. So *let's get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*

# 10

## Can you just send me a bill every month?

*(Customer Name),* unfortunately no! We would need to have a billing method on file for the monthly monitoring cost of only ($29.95 or $34.95) in order to send you the actual monitoring equipment which is valued at over $400 dollars. Please remember we are giving that to you absolutely free, without even a charge for shipping it to you. We simply ask you to cover the monthly monitoring fees. *Let's go ahead and get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*

# 11

## I'll just send you a check.

*(Customer Name),* by doing an automated draft, it allows this process to be seamless. Besides, this is how banks do business. They don't write checks to each other, they use electronic wire services and that's why there's no extra charge to you. Not to mention, by mailing a check you would still be providing us with this information anyway, right? By enrolling with a credit card, debit card or your checking account on this call, we can send you over $400 dollars worth of equipment absolutely free. I can't guarantee that any other way. *Let's go ahead and get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*

## REBUTTALS

# 12

### How do I know that this is for real?

**(Customer Name)** SAFELINE has been in business for over 30 years and has thousands and thousands of satisfied customers. You can check us out online at **www.safelinealert.com** to learn more about our company and the services we provide. Please understand that our goal is to continue keeping seniors safe and healthy in their own home and delivering a quality service to every new customer as though you had been with us for years. We would not have earned our excellent reputation if we did not deliver and fulfill our services exactly as I have explained them to you. We are so confident with our services that we don't ask you to sign any long term contracts. That allows you to cancel at anytime with no penalty, so that forces us to be better than you expect. So *let's go ahead and get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*

# 13

### I have never heard of your company.

**(Customer Name)** If we were not who we say we are there's no way we would have lasted for over 30 years. We have maintained our relationships with all the banking and regulatory institutes since we came into existence and that would not happen if we did not deliver 100% customer satisfaction. We simply want to impress you and hope in return you will refer us to your friends and family. You or they can check us out anytime on the internet at **www.safelinealert.com** *So let's go ahead and get you registered. Would you rather use your Credit Card, Debit Card, or Checking Account?*

# 14   <u>What outcomes of senior citizen falls?</u>

Twenty to thirty percent of people who fall suffer moderate to severe injuries such as lacerations, hip fractures, or head traumas. These injuries can make it hard to get around or live independently, and increase the risk of early death.

Falls are the most common cause of traumatic brain injuries, traumatic brain injuries account for approximately 46% of fatal falls among older adults.

Most fractures among older adults are caused by falls.

In 2008, 82% of fall deaths were among people 65 and older.

# 15   <u>Pet Rebuttal</u>

(Mr. / Ms.) do you have any pets? *(If yes go on, if No then go to different rebuttal)*

Do you have a dog or a cat? *(Wait for answer)* Well keep in mind, this emergency medical alert system not only protects you, but it also protects your (dog(s) / cat(s)). Remember with the daily wellness check, you will get a call every day to make sure everything is okay. If SafeLine cannot reach you, they will call whoever you instructed them to call when you activated your system. They will tell them that they need to go to your home to make sure everything is okay. If you didn't give SafeLine a specific person to call, then they would send emergency personnel to your home. So, if something does happen to you, then your pet would have someone to take care of them. So this system may save both you and your (dog(s) / cat(s)) life some day. So let's go ahead and get you signed up so we can keep both you and your (dog(s) / cat(s)) safe.

## 16 Are you open 24 hours a day?

Yes. Care specialists and customer service associates are available to you 24 hours a day, 7 days a week to handle your emergencies or just answer your questions.

## 17 How long have you been in business?

SAFELINE has been in business since 1977. We have provided life safety services and peace of mind to tens of thousands of people for over 30 years and are among the leaders in our field.

## 18 If I call for emergency help, where does my call get answered, locally or out of State?

All calls go to the SAFELINE monitoring center to ensure the greatest level of service. We store all your local authority phone numbers in your record. In the event that you require assistance, we will notify parties responsible to go to your home. This information is verified by our data entry group before the system is sent to you.

## 19 Can I change who is contacted on the weekends?

Again, the choices are all yours. We will do whatever you instructions you provide. It's no problem at all.

## 20 How much or what information goes into your computer?

It's entirely up to you. We will input whatever information you wish to provide in terms of medical records, who to contact, when and in what particular order.

Bradley Att. A
Page 24 of 35

07/31/2012  01:04    4073590029              FIAA                        PAGE  02

# 21 If it's free why do you need my Credit card/Checking Account. Information?

In order to ship out your equipment we need to know that you will
use it for at least 1 month.  Please understand that even though we
provide you the equipment for free, which is valued at over $400
dollars, we would need to have a billing method on file for the
monthly monitoring fee of only ($29.95 or $34.95)per month.
*(Customer Name), as I have already mentioned, that breaks down
to actually less than $1 per day and for that we guarantee that
within seconds of you pushing your button at any time, day or night,
365 days a year, we will be there for you. Surely the peace of mind
that provides for you and your family is well worth the low cost of
less than $1 a day. So let's get you registered. Would you rather
use your Credit Card, Debit Card, or Checking Account?*

# 22 I'm not Interested # 1

(Customer Name), what's holding you back? *(Isolate the concern,
repeat it back to the customer, and address it with the correlating
rebuttal.)*  (Customer Name) Doctors refer to the first hour after an
accident or a heart attack or a stroke as the golden hour. If they can
get to that patient within that first hour the odds of survival are as
high as 80%. As time goes on those odds go down by the minute.
Wouldn't you want to give yourself the peace of mind of knowing
that if anything at all happens to you that we will be there for you at
the push of a button and that help is on its way immediately?
Surely that's worth a dollar a day to you, so let's get you registered.
Would you rather use you Visa, MasterCard, American Express,
Discover, Debit card or checking account?

## 23 Do I have to program it when it arrives?

No, we take care of all that. You simply need to plug it in the same way you would an answering machine and push the button to test it. It's that simple.

## 24 Does this work with Voice over IP phones?

Yes, absolutely. So long as I make a note of that we can send you a unit that is completely compatible with VOIP phone systems.

## 25 Do I talk to you through the necklace, watch bracelet or belt clip?

The button that you wear on the necklace, watch bracelet or belt clip activates our hands free voice console which is what we speak to you through.

## 26 Where are you located? Do you operate your own monitoring center?

**SAFELINE** owns its own UL listed monitoring center, staffed with highly trained care specialists at our secure facility in New York. From there we monitor customers from all across the US.

## 27 Are your operators fully trained and qualified?

All of our people complete 180 hours of classroom training before they ever take a phone call. All **SAFELINE** care specialists CSAA (Central Station Alarm Association) certified. Our specialists exceed the highest standard for monitoring center personnel, plus supervisors are always present to ensure that calls are handled properly.

07/31/2012  01:04    4073590829          FIAA                              PAGE  04

## 28 Once the button is pressed, does the call go directly to 911?

That's a great question. We can contact 911 immediately if that's what you want. You may also choose a different set of instructions it's up to you. When you receive the system, you will set up instructions for us to follow and that's what we will do if you do press the button. The choices are all yours.

## 29 What if I'm in a different room from the system?

The speaker is extremely loud and the microphone on the button is very sensitive. When you first receive the system we will test it with you so you will know exactly where it works best. The system receives the signal from the help button from up to 1500 feet away. That's more than the length of 4 football fields. It is over a quarter of a mile!

## 30 What happens if I can't speak or can't be heard?

If we can't hear you, we will follow the instructions you give us when you set up your system. We will call friends, family, loved ones, or 911. You will tell us who to contact first in the event that you are unable to speak or we can't hear you. Again, the choices are yours.

## 31 Is the system automatically tested or do I have to test it?

Yes to both questions. The console test's itself every week by sending us a signal. Additionally we recommend that you push your help button at least once a month and talk to us a further reassurance.

## 32 Can I call because maybe I'm feeling faint but don't want 911 called; I just want someone called from my contact list instead?

Of course! That's why we're here. We will contact whomever you wish and in whatever order you desire.

07/31/2012  01:04   4073598829                FIAA                          PAGE  05

# 33

## Customer Objection:

*I don't give out my credit card over the phone.*

*How do I know that this is not a scam?*

*What if I don't receive what you said I am going to receive?*

## Rebuttal (Answer):

Mr./ Mrs. _____Have you ever heard of the federal credit card
protection act? _____Well, it is a federal law that was passed in
the United States to protect credit card holders. It says that anyone that uses
their credit card over the phone or the internet is not liable for any charges
unless they receive exactly what was promised to them. So there is absolutely
no risk to whatsoever. Over 70% of all Americans use their credit cards over the
phone or the internet. Phone and internet transactions would have never grown
to a massive multi-billion dollar industry without the federal law protecting the
credit card holders. So you have nothing to worry about. I would never ask you
to use your credit card over the phone if you were not 100% protected by the
federal credit card protection act. It's simple, you either get exactly what you
were promised or you don't have to pay. Also, if someone uses your credit card
without your authorization, then you are not liable for any of the charges
whatsoever. All it takes is one call to the bank and the law says they must
reverse the charges and handle it right there while you are on the phone. So
there is absolutely no risk to you whatsoever.  A credit or debit card is the safest
way to do anything over the phone because of this federal law.

So let's go ahead and get your FREE Medical Alert System sent out to you, would
you like to use your VISA, Mastercard, Discover or American Express for the
monthly Emergency Medical monitoring?

## 34 My son / daughter wanted me to get a medical alert system but I don't think I need one.

I know you have been independent all your life and are probably struggling with the thought of losing some of that independence due to aging, but the reason your (son / daughter) wants you to get a medical alert system is because (he / she) probably knows the real statistics about senior citizen medical emergencies. (He / She) may not have wanted to scare you by telling you the facts, but let me tell you some of the things that your (son / daughter) probably already knows. *(Go to "How Big is the Problem")*

## 35 I don't think I need a medical alert system

I know you have been independent all your life and are probably struggling with the thought of losing some of that independence due to aging, and I know you don't think you need a medical alert system but let me tell you some of the scary facts about senior citizen falls, and these facts don't even include any other medical issues *(Go to "How Big is the Problem")*

## Miscellaneous Rebuttals

Let's get you signed up, Let's Keep you safe.

**36** *If they say they can't afford it,*

"Do any other bills matter if you're not safe?, This is the most important bill. If you don't survive a medical emergency then you won't be around to pay any of those other bills. So let's get you signed up and start keeping you safe"

**37** *If they are afraid to give out their information,*

Don't worry, everything is going to be okay, we are in the business of protecting Senior Citizens. Let's get you signed up, Let's Keep you safe.

We've been protecting Senior Citizens for over 30 years.

You will never have to feel alone again in a medical emergency.

We're going to take care of you, we're going to keep you safe.

# 38     <u>How Big is the Problem?</u>

Each year, one in every three adults age 65 and older experiences a serious fall. Falls can cause moderate to severe injuries, such as hip fractures and head traumas, and can increase the risk of early death.

Even though one out of three adults age 65 and older falls each year, less than half of them get the medical advice they should.

Among older adults (those 65 or older), falls are the leading cause of injury death. They are also the most common cause of nonfatal injuries and hospital admissions for trauma

Each year, there are approximately 20,000 senior citizens that die from unintentional fall injuries

The death rates from falls, among senior citizens, have risen significantly over the past decade.

Each year, over 2.2 million nonfatal fall injuries among older adults were treated in emergency departments and more than 580,000 of these patients are hospitalized.

07/31/2012  01:04    4073598829              FIAA                      PAGE  09

## *They just won't do It without talking to their (Son/daughter/husband/kids)*

Mr. / Mrs. (_____), I agree with you, I don't want you to make a decision without your (Son/daughter/husband/kids).  I have a great idea, so just hear me out for a second, okay?  We'll send you out the system, we'll pay for the shipping, there will be no contract, there will be no cancellations fees, Try It out TOGETHER  with your (Son/daughter/husband/kids) and then make a decision TOGETHER on whether or not you want to keep it. But if you and your (Son/daughter/husband/kids) decide you don't want to keep it, then there is no contract, no cancellation fees, and we will pay to ship it back to us.

This way you can try it with your (Son/daughter/husband/kids) and then make a decision TOGETHER on whether or not you want to keep the system.

Now, let's go ahead and get you signed up so you can give it a try together with your ( Son/daughter/husband/kids).

## *A reminder of what decision they are making...*

Remember, the only thing you are doing today is agreeing to try the system with your (Son/daughter/husband/kids) so you can make a decision together on whether you think the system Is right for you.

07/31/2012  01:04    4073590029          FIAA                    PAGE  10

# Where did you get my number?

## or

## They are complaining about getting a call.

(Mam / Sir), you are receiving this call because you opted-in
somewhere to receive special offers. You would have opted-in
either by having a check box checked while purchasing
something on the internet or it may have been through a
sweepstake or an order you did by mail or catalog. If you
would like to be taken off of our opt-in special offers list, I will
be more than happy to remove you right now and I apologize
for any inconvenience.

STATE OF INDIANA ) IN THE MARION SUPERIOR/CIRCUIT
) COURT
) SS:
COUNTY OF MARION ) CAUSE NO. _____
)
STATE OF INDIANA, )
)
        Plaintiff, )
)
    v. )
)
ELITE INFORMATION SOLUTIONS )
INC. d/b/a SAFELINE ALERT, and )
MICHAELHILGAR, individually and )
as owner/operator of ELITE )
INFORMATION SOLUTIONS INC. )
d/b/a SAFELINE ALERT )
)
        Defendants. )

## DECLARATION OF GEORGE HEWITT

I, George Hewitt, being over the age of eighteen years, do hereby affirm and state:

1.    I have personal knowledge of the facts set forth herein.

2.    At all times relevant to this affidavit, I was a Telephone Privacy Investigator for the Office of the Indiana Attorney General.

3.    My primary duties include investigating consumer complaints regarding telephone sales calls and telephone calls made via an automated dialing-announcing device and disseminating a prerecorded message ("robocalls"), maintaining our office's records of said complaints, and investigating the companies and individuals against which our office has received complaints.

4.    On June 23, 2012, I received the first complaint in which an Indiana resident complained of receiving a prerecorded telephone sales call on his telephone from a caller later identified as Safeline Alert.



5.  In the course of my investigation, I identified 683 other complaints received between June and August, 2012, where Indiana residents received similar telephone sales calls, often prerecorded calls, advertising the sale of medical alert devices and monitoring services.

6.  According to many of the complaints, a live operator provided the solicitor name Safeline Alert and the website safelinalert.com to consumers that requested additional information.

7.  Our office continues to receive complaints regarding telephone sales calls and prerecorded calls made by Safeline Alert.

FURTHER DECLARANT SAYETH NOT.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE.

Date: 8/16/2012

George Hewitt, Investigator
Office of the Indiana Attorney General
302 West Washington St., 5th Floor
Indianapolis, IN 46204

# Attachment B

| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO. 49D06-1208-MI-032415 |

| STATE OF INDIANA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ELITE INFORMATION SOLUTIONS | ) |
| INC., ABSOLUTE SOLUTIONS GROUP, INC., | ) |
| WORLDWIDE INFO SERVICES, INC., | ) |
| LIFEWATCH, INC., and MICHAEL HILGAR, | ) |
| | ) |
| Defendants. | ) |

**FILED**

(91) NOV 1 3 2012

*Elizabeth of White*
CLERK OF THE MARION CIRCUIT COURT

## AMENDED COMPLAINT FOR INJUNCTION, RESTITUTION, CIVIL PENALTIES AND REASONABLE COSTS

The State of Indiana, by Attorney General Gregory F. Zoeller and Deputy Attorney General Dennis E. Mullen, petitions the Court pursuant to the Indiana Telephone Solicitation of Consumers Act, Ind. Code 24-4.7 (the "TSCA"), the Indiana Regulation of Automatic Dialing Machines Act, Ind. Code 24-5-14 (the "Auto-Dialer Act"), and Ind. Code § 23-1-49-2, for injunctive relief, restitution, civil penalties, investigative costs, and other relief.

## PARTIES

1.    The Plaintiff, State of Indiana, is authorized to bring this action and to seek injunctive and other statutory relief in Marion County, Indiana pursuant to Ind. Code § 24-5-0.5-4(c).

2.    Defendant, Elite Information Solutions, Inc., is a for-profit corporation that was organized under the laws of the State of Florida with a registered address at a UPS Store located at 509 S. Chickasaw Trail, Box #393, Orlando, Florida 32825 and a principle place of business at 495 E. Semoran Blvd., Casselberry, Florida 32707.

3.    At all times relevant to the allegations herein, Elite Information Solutions, Inc. was doing business in Indiana, specifically, using telemarketing to sell medical alert devices and monitoring services to Indiana consumers.

4.    Defendant, Absolute Solutions Group, Inc., is a for-profit corporation that was organized under the laws of the State of Florida with a registered address at a UPS Store located at 5703 Red Bug Lake Road, Winter Springs, Florida 32708 and a principle place of business at 495 E. Semoran Blvd., Casselberry, Florida 32707.

5.    At all times relevant to the allegations herein, Absolute Solutions Group, Inc. was doing business in Indiana, specifically, using telemarketing to sell medical alert devices and monitoring services to Indiana consumers.

6.    Defendant, Worldwide Info Services, Inc., is a for-profit corporation that was organized under the laws of the State of Florida with a registered address at a UPS Store located at 478 E Altamonte Dr, Box #400, Altamonte Springs, Florida 32701 and a principle place of business at 495 E. Semoran Blvd., Casselberry, Florida 32707.

7.    At all times relevant to the allegations herein, Worldwide Info Services, Inc. was doing business in Indiana, specifically, using telemarketing to sell medical alert devices and monitoring services to Indiana consumers.

8.    Defendant, Michael R. Hilgar ("Hilgar"), is a resident of Florida with an address of ███████████████ Winter Garden, Florida ████.

9.    At all times relevant to the allegations herein, Hilgar was doing business in Indiana, specifically, using telemarketing to sell medical alert devices and monitoring services to Indiana consumers.

10.    At all times relevant to the allegations herein, Hilgar directed, operated and controlled Absolute Solutions Group, Inc., Elite Information Solutions, Inc., and Worldwide Info Services, Inc. (hereinafter, Absolute Solutions Group, Inc., Elite Information Solutions, Inc., and Worldwide Info Services, Inc. will be collectively referred to as "Hilgar's Corporations").

11.    Hilgar is the named president and registered agent of Hilgar's Corporations.

12.    Safeline Alert is an unincorporated business or assumed business name.

13.    Upon information and belief, Hilgar and Hilgar's Corporations jointly or severally do or have done business as Safeline Alert.

14.    Hilgar and Hilgar's Corporations operate a telemarketing call center located at 495 E. Semoran Blvd., Casselberry, Florida 32707.

15.    Defendant, Lifewatch, Inc., is a for-profit corporation that was organized under the laws of the State of New York with a registered address at 266 Merrick Road Lynbrook, New York 11563.

16.    At all times relevant to the allegations herein, Lifewatch, Inc. was doing business in Indiana, specifically, by hiring Worldwide Info Services, Inc. to conduct telemarketing on Lifewatch, Inc.'s behalf to Indiana consumers, and by supplying the medical alert devices and providing monitoring services sold to Indiana consumers.

17.    Reference in this Complaint to any act of Hilgar's Corporations, Hilgar, Lifewatch Inc., or any other Defendant (collectively referred to as "Defendants"), shall mean the Defendants and/or their principals, agents, representatives, or employees did or authorized such acts to be done, while actively engaged in the management, direction, or control of Defendants' business affairs and while acting within the scope of their duties, employment, or agency.

Bradley Att. B
Page 3 of 12

## FACTS APPLICABLE TO ALL COUNTS

18.     Since at least June of 2012, Defendants have marketed and sold medical alert devices and monitoring services to Indiana consumers.

19.     Defendants have solicited Indiana consumers using cold calls. Some of these cold calls were made via an auto-dialing device and played a prerecorded message (hereinafter referred to as "robocalls").

20.     In addition, some of these cold calls were made to consumers whose telephone numbers were registered on the Indiana Telephone Privacy List, created pursuant to Ind. Code § 24-4.7-3-1 (hereinafter referred to as the "Indiana No Call List").

21.     The recipients of said calls were persons throughout Indiana.

## FACTS APPLICABLE TO INDIANA'S
## REGULATION OF AUTOMATIC DIALING MACHINES ACT

22.     Defendants transact or have transacted business in Indiana, specifically, by using telemarketing to sell medical alert devices and monitoring services to Indiana consumers and/or by supplying medical alert devices and monitoring service to Indiana consumers.

23.     From June 23, 2012 through August 16, 2012, Defendants made or caused to be made at least 582 telephone calls to certain telephone numbers in Indiana.

24.     Said telephone calls were automatically dialed robocalls which disseminated a prerecorded message.

25.     The recipients of the robocalls did not knowingly or voluntarily request, consent, permit or authorize receipt of said messages.

26.     The prerecorded messages disseminated by Defendants were not preceded by a live operator who obtained the recipient's consent before the message was delivered.

## FACTS APPLICABLE TO INDIANA'S
## TELEPHONE SOLICITATION OF CONSUMERS ACT

27.     Pursuant to Ind. Code § 24-4.7-3-1, the Office of the Attorney General quarterly publishes the Indiana No Call List, a listing of Indiana consumers who request not to be solicited by telephone.

28.     From June 23, 2012 through August 16, 2012, Defendants made or caused to be made at least 723 telephone calls to certain telephone numbers which, at the time of the calls, were on the most recently published Indiana No Call List.

29.     Said telephone calls were made for the purpose of selling medical alert devices and monitoring services to Indiana consumers.

30.     The recipients of said telephone calls did not knowingly or voluntarily request, consent, permit or authorize receipt of said calls.

## COUNT I
## DEFENDANTS VIOLATED INDIANA'S
## REGULATION OF AUTOMATIC DIALING MACHINES ACT

31.     Plaintiff realleges and incorporates by reference the allegations contained in all paragraphs above.

32.     The recipients of the prerecorded message described in paragraph 23 were "subscribers," as the term is defined in Ind. Code § 24-5-14-4.

33.     By contacting or attempting to contact telephone subscribers in Indiana using a telephone or telephone line, Defendants are "callers" as the term is defined in Ind. Code § 24-5-14-2.

34.     By using or connecting an automatic dialing-announcing device to at least 582 telephone lines in Indiana, Defendants violated Ind. Code § 24-5-14-5(b).

35.     Violations of Ind. Code § 24-5-14-5(b), constitute deceptive acts under Ind. Code § 24-5-14-13.

## COUNT II
## DEFENDANTS VIOLATED INDIANA'S
## TELEPHONE SOLICITATION OF CONSUMERS ACT

36.     Plaintiff realleges and incorporates by reference the allegations contained in all paragraphs above.

37.     Said telephone calls described in paragraph 28 were "Telephone sales calls," as the term is defined by Ind. Code § 24-4.7-2-9.

38.     By making or causing to be made telephone sales calls, Defendants are "Telephone solicitors," as the term is defined by Ind. Code § 24-4.7-2-10.

39.     At all relevant times, Defendants were "doing business in Indiana," as the term is defined by Ind. Code § 24-4.7-2-5.

40.     The Office of the Attorney General has received at least 723 complaints from Indiana consumers regarding Defendants' telephone sales calls to telephone numbers that were registered on the Indiana No Call List at the time of the calls.

41.     By making or causing to be made telephone sales calls to telephone numbers on the Indiana No Call List, Defendants committed at least 723 violations of Ind. Code § 24-4.7-4-1.

42.     Violations of Ind. Code § 24-4.7-4-1, constitute deceptive acts under Ind. Code § 24-4.7-5-1.

43.     The Attorney General, pursuant to Ind. Code § 24-4.7-5-2 has authority to seek an injunction, civil penalties, all monies Defendants obtained through violation of Ind. Code § 24-4.7-4, and costs for violations of the TSCA.

44.     Under Indiana Trial Rule 65(C), Plaintiff the State of Indiana, as a government entity, need not post security to obtain injunctive relief.

**COUNT III**
**PIERCING THE CORPORATE VEIL TO HOLD HILGAR**
**LIABLE FOR THE ACTS OF HILGAR'S CORPORATIONS**

45.     Plaintiff realleges and incorporates by reference the allegations contained in all paragraphs above.

46.     Hilgar's Corporations are merely the alter ego of Hilgar.

47.     Hilgar is the named president and registered agent of Hilgar's Corporations.

48.     Hilgar's Corporations are so organized and controlled, and their affairs so conducted, that the three corporations are the mere instrumentality of Hilgar.

49.     Hilgar has misused and abused the corporate form of Hilgar's Corporations.

50.     Upon information and belief, the telemarketing call center located at 495 E. Semoran Blvd., Casselberry, Florida 32707 is leased by Elite Information Solutions, Inc., one of Hilgar's Corporations.

51.     Upon information and belief, the employees working at the telemarketing call center located at 495 E. Semoran Blvd., Casselberry, Florida 32707 were compensated by Absolute Solutions Group, Inc., one of Hilgar's Corporations.

52.     On June 1, 2012, Lifewatch, Inc. contracted Worldwide Info Services, Inc., one of Hilgar's Corporations, to conduct telemarketing on Lifewatch, Inc.'s behalf, including telemarketing to Indiana consumers.

53.     Lifewatch, Inc. supplied the medical alert devices and provided the monitoring services sold to Indiana consumers by Hilgar and Hilgar's Corporations.

54.     Hilgar created the corporate structure of Hilgar's Corporations, in part, as a scheme to avoid personal liability for the robocalls and cold call solicitations made by Hilgar's Corporations.

7

55. Hilgar formulated, directed, controlled, had knowledge and approved the marketing and sales practices of Hilgar's Corporations.

56. Hilgar and Hilgar's Corporations intentionally disregarded Indiana's Regulation of Automatic Dialing Machines Act and Indiana's Telephone Solicitation of Consumers Act.

57. Hilgar and Hilgar's Corporations, jointly or severally doing business as Safeline Alert, solicited at least 749 Indiana consumers using cold calls in violation of Indiana's Regulation of Automatic Dialing Machines Act and Indiana's Telephone Solicitation of Consumers Act.

58. In the interests of justice, and to prevent the fraud and abuses to Indiana consumers described herein, the corporate veil should be pierced and Hilgar should be held personally and jointly and severally liable for all violations of Indiana law described herein.

## COUNT IV
## VIOLATIONS OF IND. CODE § 23-1-49-1
## FOR TRANSACTING BUSINESS WITHOUT AUTHORITY

59. Plaintiff realleges and incorporates by reference the allegations contained in all paragraphs above.

60. Pursuant to Ind. Code § 23-1-49-1, a foreign corporation may not transact business in Indiana until it obtains a Certificate of Authority from the Indiana Secretary of State.

61. Absolute Solutions Group, Inc. is a "foreign corporation," as the term is defined by Ind. Code § 23-1-20-11.

62. By making or causing to be made telephone sales calls into the state of Indiana, and by doing other acts, Absolute Solutions Group, Inc. was transacting business in Indiana.

63. To date, Absolute Solutions Group, Inc. has not obtained a Certificate of Authority from the Indiana Secretary of State to transact business in Indiana.

8

64. By transacting business in Indiana without a Certificate of Authority from the Indiana Secretary of State, Absolute Solutions Group, Inc. violated and continues to violate Ind. Code § 23-1-49-1(a).

65. Elite Information Solutions, Inc. is a "foreign corporation," as the term is defined by Ind. Code § 23-1-20-11.

66. By making or causing to be made telephone sales calls into the state of Indiana, and by doing other acts, Elite Information Solutions, Inc. was transacting business in Indiana.

67. To date, Elite Information Solutions, Inc. has not obtained a Certificate of Authority from the Indiana Secretary of State to transact business in Indiana.

68. By transacting business in Indiana without a Certificate of Authority from the Indiana Secretary of State, Elite Information Solutions, Inc. violated and continues to violate Ind. Code § 23-1-49-1(a).

69. Worldwide Info Services, Inc. is a "foreign corporation," as the term is defined by Ind. Code § 23-1-20-11.

70. By making or causing to be made telephone sales calls into the state of Indiana, and by doing other acts, Worldwide Info Services, Inc. was transacting business in Indiana.

71. To date, Worldwide Info Services, Inc. has not obtained a Certificate of Authority from the Indiana Secretary of State to transact business in Indiana.

72. By transacting business in Indiana without a Certificate of Authority from the Indiana Secretary of State, Worldwide Info Services, Inc. violated and continues to violate Ind. Code § 23-1-49-1(a).

73. Lifewatch, Inc. is a "foreign corporation," as the term is defined by Ind. Code § 23-1-20-11.

74. By making or causing to be made telephone sales calls into the state of Indiana, and by doing other acts, Lifewatch, Inc. was transacting business in Indiana.

75. To date, Lifewatch, Inc. has not obtained a Certificate of Authority from the Indiana Secretary of State to transact business in Indiana.

76. By transacting business in Indiana without a Certificate of Authority from the Indiana Secretary of State, Lifewatch, Inc. violated and continues to violate Ind. Code § 23-1-49-1(a).

## RELIEF SOUGHT

WHEREFORE, the Plaintiff, State of Indiana, requests that the Court enter Judgment against the Defendants, as follows:

a. Permanently enjoining Defendants, their agents, representatives, employees, successors, assigns and any other person acting on behalf of Defendants from engaging in deceptive acts, specifically, making or causing to be made telephone sales calls in violation of Ind. Code § 24-4.7-4, pursuant to Ind. Code § 24-4.7-5(1);

b. Permanently enjoining Defendants, their agents, representatives, employees, successors, assigns and any other person acting on behalf of Defendants, from engaging in deceptive acts, specifically, making or causing to be made telephone sales calls in violation of Ind. Code § 24-5-14-5, pursuant to Ind. Code § 24-5-14-13;

c. Imposing upon Defendants a civil penalty up to $10,000 for the first violation of Ind. Code § 24-4.7-4, and up to $25,000 for at least 722 subsequent violations, pursuant to Ind. Code § 24-4.7-5-2(2);

d. Imposing upon Defendants a civil penalty up to $5,000 for at least 582 violations of Ind. Code § 24-5-14-5;

e. Ordering Defendants to pay to the Attorney General any and all money Defendants obtained through violation of Ind. Code 24-4.7-4, pursuant to Ind. Code § 24-4.7-5-2(3);

f. Ordering that any and all contracts obtained by Defendants resulting from deceptive acts are voidable pursuant to Ind. Code § 24-4.7-5-3;

g.    Piercing the corporate veil of Absolute Solutions Group, Inc., Elite Information Solutions, Inc. and Worldwide Info Services, Inc. to hold their president, registered agent and operator, Defendant Michael R. Hilgar, personally liable for the acts of the corporations;

h.    Awarding the Office of the Attorney General a civil penalty of up to $10,000 for each violation of Ind. Code § 23-1-49-1, pursuant to Ind. Code § 23-1-49-2(d);

i.    Awarding the Office of Attorney General its reasonable costs and attorney fees incurred in the investigation and prosecution of this matter pursuant to Ind. Code §§ 24-4.7-5-2(4)-(6); 24-5-14-13; and 24-5-0.5-4(c)(3); and

j.    For all other just and proper relief.

Respectfully submitted,

GREGORY F. ZOELLER
Attorney General of Indiana
Atty. No. 1958-98

By:    _Dennis Mullen_

Dennis E. Mullen
Deputy Attorney General
Atty. No. 30049-49

OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street
Government Center South, 5th Floor
Indianapolis, Indiana  46204
E-mail: Dennis.Mullen@atg.in.gov
Telephone: (317) 234-2265
Facsimile: (317) 232-7979

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing is being served by first-class United States mail, postage prepaid, this _15th_ day of _November_____, 2012, upon:

Aaron Grant
Ice Miller, LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200


Courtesy Copy:
Andrew Cove
Cove & Associates, P.A.
225 South 21st Avenue
Hollywood, Florida 33020-5009

_Dennis E. Mullen_
Dennis E. Mullen


OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street
IGCS, 5th Floor
Indianapolis, Indiana   46204
Telephone:  (317) 234-2265
Facsimile:  (317) 232-7979

# Attachment C

STATE OF INDIANA         )        IN THE MARION SUPERIOR COURT
                                 ) SS:
COUNTY OF MARION        )        CAUSE NO. 49D06-1208-MI-032415

STATE OF INDIANA,            )
                               )
        *Plaintiff,*        )
                               )
    v.                        )
                               )
ELITE INFORMATION SOLUTIONS   )
INC., ABSOLUTE SOLUTIONS GROUP, INC.,  )
WORLDWIDE INFO SERVICES, INC.,   )
LIFEWATCH, INC., and MICHAEL HILGAR,  )
                               )
        *Defendants.*     )

## LIFEWATCH, INC.'S DESIGNATION OF EVIDENCE IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT

Defendant Lifewatch, Inc. ("Lifewatch"), through its counsel, pursuant to Ind. R. Trial P. 56,

hereby designates the following as evidence in support of its Cross Motion for Summary

Judgment:

| | |
|---|---|
| Exhibit A | Plaintiff's Amended Complaint for Injunction, Restitution, Civil Penalties and Reasonable Costs |
| Exhibit B | Defendant Lifewatch, Inc.'s Answer and Affirmative Defenses to Amended Complaint for Injunction, Restitution, Civil Penalties and Reasonable Costs |
| Exhibit C | Affidavit of Evan Sirlin |
| Exhibit C-1 | Lifewatch, Inc. Medical Alarm Lease and Monitoring Service Agreement |
| Exhibit D | Agreements with Worldwide Info Services, Inc. |
| Exhibit E | Agreements with The Consumer Voice, LLC |
| Exhibit F | Agreements with TMI Management Group Inc. |

Respectfully submitted,

Jeanine Kerridge (#27721-29)
Mark Stuaan (#16562-29)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Tel: (317) 236-1313
Fax: (317) 231-7433

*Attorneys for Defendant, Lifewatch, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served via U.S.

Mail, postage prepaid, this 17th day of November, 2014 upon the following counsel of record:

Eliza Bradley
Deputy Attorney General
Office of the Attorney General
302 West Washington Street
Government Center South, 5th Floor
Indianapolis, IN 46204

Patrick F. Mastrian III
Brown Tompkins Lory & Mastrian
608 East Market Street
Indianapolis, IN 46202

Jeanine Kerridge

INDS02 1347244v1

-2-

# EXHIBIT C

I, Evan Sirlin, of full age, declare as follows:

1. I am CEO of Lifewatch, Inc., a duly registered New York Corporation that employs approximately 90 people and provides medical alert products and monitoring services to seriously ill, elderly, and disabled individuals. I have personal knowledge of the facts set forth herein, which are known to me to be true and correct.

2. Lifewatch did not and does not make or initiate telephone sales calls or telemarketing calls.

3. Lifewatch did not and does not employ telephone solicitors or telemarketers, or otherwise engage in telephone sales calls or telemarketing of any kind.

4. Like many businesses, Lifewatch actively sought ways to expand its customer base. Lifewatch does not purport to have expertise in marketing, advertising, and customer origination, and so it entered into agreements with various independent, outside companies that Lifewatch believed to be capable of expanding Lifewatch's customer base.

5. Pursuant to these agreements and in practice, the independent, outside companies originated potential customer accounts (through radio, television, internet, and print advertising, as well as telemarketing[1]) and then offered to sell those customer accounts to Lifewatch -- and others -- on a non-exclusive basis. Accordingly, Lifewatch did not cause others to make telephone sales calls on Lifewatch's behalf.

6. Lifewatch's office in New York accepted or rejected prospective customer accounts from the outside sales companies. The prospective customer accounts became actual customer contracts only after Lifewatch accepted the prospective customer accounts by way of

---

[1] The radio, television, internet, and print advertising sometimes led to inbound calls (i.e. prospective customers initiating calls to the outside companies).

entering into a Medical Alarm System Lease and Monitoring Service Agreement with the customer and by way of shipping the requested medical alert products from its New York office.

7. Annexed to this affidavit is a true and accurate copy of Lifewatch's standard Medical Alarm System Lease and Monitoring Service Agreement sent out to prospective customers.

8. Lifewatch did not and does not own or operate an office or warehouse in Indiana. Lifewatch did not and does not employ Indiana residents.

9. Telephone sales calls made by outside companies to prospective customers would have occurred irrespective of: a) whether Lifewatch had entered into agreements with the outside companies; and/or, b) whether Lifewatch was purchasing the customer accounts and fulfilling orders. This is because, in part, Lifewatch's competitors in the personal emergency response system market -- including, by way of example, Connect America and Philips Lifeline -- also purchased customer accounts from outside companies including Worldwide Info Services.

10. Lifewatch specified in its agreements with the outside companies that the outside companies were responsible for complying with all applicable state and federal laws, including all telemarketing laws. Lifewatch relied on the representations and assurances of the outside companies that they would comply with all applicable laws.

11. Because Lifewatch did not make calls, and did not provide prospective customers for the outside companies to call, Lifewatch did not and could not monitor or control the outside companies relative to the means or methods by which they obtained customer accounts.

12. Further, Lifewatch did not and could not dictate what the outside sellers said to customers or prospective customers during inbound calls from prospective customers or outbound calls from the outside companies.

13. Lifewatch did not and does not dictate, draft, or control scripts, if any, that may have been used by outside companies relative to their communications with prospective customers.

14. Lifewatch requested that the outside sales companies keep audio recordings of telephone calls for quality control purposes, fraud prevention purposes, and to ensure compliance with electronic fund transfer laws as well as NACHA operating rules.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: Nov. 14, 2014

_____

Evan Sirlin

# EXHIBIT C - 1



**LIFE***Watch*USA

800.716.1433
www.lifewatch-usa.com

LIFEWATCH INC
WWW.LIFEWATCH-USA.COM

**MEDICAL ALARM SYSTEM LEASE AND MONITORING SERVICE AGREEMENT**

Agreement dated _____, by and between Lifewatch Inc (hereinafter referred to as "Lifewatch" or "ALARM COMPANY")

and _____ (hereinafter referred to as "Subscriber," "You" or "Purchaser") Phone: _____

The parties hereto agree that:

1. MEDICAL ALARM SYSTEM IS LEASED AND REMAINS PERSONAL PROPERTY OF ALARM COMPANY: ALARM COMPANY shall lease, instruct the Subscriber in the proper use of the Medical Alarm System (hereinafter referred to as "System" or "Equipment"), provide uniform labor/instructions for the Subscriber to self-install the System at Subscriber's location including all necessary devices and equipment, for the duration of this agreement, with the understanding that the entire System is and shall always remain the sole personal property of ALARM COMPANY and shall not be considered a fixture or a part of the realty, or an addition to, alteration, convention, improvement, modernization, remodeling, repair or replacement of any part of the realty, and Subscriber shall not permit the attachment thereto of any apparatus not furnished by ALARM COMPANY.

2. MEDICAL ALARM MONITORING SERVICES /DOCUMENTATION/COMMENCEMENT OF SERVICES: Medical Alarm Monitoring services shall commence upon LifeWatch's receipt of this Agreement signed by Subscriber. Commencement of monitoring services shall constitute LifeWatch's acceptance of this Agreement. This Agreement includes other documents which are to be signed and returned to LifeWatch by Subscriber. These documents include: LifeWatch Financial Form, LifeWatch Subscriber Information and Responder Form and Primary Responder Directive. Subscriber acknowledges receiving LifeWatch's Welcome Notice, instructions how to test and use the LifeWatch System and Installation instructions.

3. CANCELLATION: Subscriber may cancel this agreement and all services on 30 days notice to ALARM COMPANY. If Subscriber cancels this agreement pursuant to any statutory voluntary ALARM COMPANY will, within 10 days or which such time as such statute specified, upon such cancellation and return of equipment refund to Subscriber any amount paid for the equipment and any advance payment for services not yet rendered. Your statutory right to cancel may vary from state to state and LifeWatch will comply with your state's requirements.

4. LEASE, MONITORING, AND SERVICE CHARGES: Subscriber agrees to pay ALARM COMPANY as provided in the Lifewatch Financial Form, plus tax, if any, payable in advance for the lease, monitoring, and service of the System for the term of this agreement commencing on the day Subscriber receives the System, and continuing monthly thereafter until Subscriber cancels Lifewatch's system.

This contract will automatically renew every month after the initial term, unless either party gives written notice of its intent to cancel. Failure to return all equipment in satisfactory condition will result in a charge $150 for base unit, $125 for pendant. If you receive this package but do not activate this system for any reason, you are still responsible for a $50 restock fee. In addition, your account will continue to be billed at the monthly monitoring fee as indicated on the Lifewatch Financial Form until our equipment is returned in good working order to: ALARM COMPANY at 268 Merrick Road, Suite 104 Lynbrook, NY 11563

5. TERM OF AGREEMENT/RENEWALS: The term of this agreement shall be for a period of 30 DAYS. This agreement shall renew itself month to month thereafter under the same terms and conditions unless either party gives written notice to the other by fax, email or written correspondence of their intention not to renew the contract at least 30 days prior to the expiration of any term.

6. INCREASES OF MONTHLY CHARGE: ALARM COMPANY shall be permitted to increase the charges provided for herein at any time or times after the expiration of one year from the date hereof and Subscriber agrees to pay such increase.

7. MEDICAL ALARM SYSTEM CENTRAL OFFICE MONITORING: Upon receipt of a signal, ALARM COMPANY or its designated central office, shall make every reasonable effort to notify Subscriber and the appropriate municipal police or fire department or emergency personal response service designated by Subscriber. Subscriber acknowledges that signals which are transmitted over telephone lines, internet, VOIP, or other modes of communication pass through communication networks beyond the control of ALARM COMPANY and are not owned or maintained by ALARM COMPANY, may own the radio network, and therefore ALARM COMPANY shall not be responsible for any equipment failure which prevents transmission of signals from reaching the central office monitoring center or damages arising as a result thereof or for this corruption, theft or viruses to Subscriber's computers if connected to the PERS communication equipment. Subscriber agrees to furnish ALARM COMPANY with a written list of names and telephone numbers of those persons Subscriber wishes to receive notification of emergency conditions together with a list of all medication, allergies and medical conditions Subscriber wishes to be available to all PERS personnel and medical personnel. All changes and revisions shall be supplied to ALARM COMPANY in writing. Subscriber acknowledges that ALARM COMPANY provides no response to a System signal except notification to the appropriate party, and that the provisions of this agreement concluding and limiting ALARM COMPANY's liability are fully applicable to the Medical Alarm System service. Subscriber acknowledges that in the event of failure of any kind of Subscriber's electrical or telephone communication equipment utility's equipment or of the agreement or in event designated central office faculty or communication network is nonoperational or Subscriber's system is sending accurate communication, ALARM COMPANY is authorized to record all telephone conversations and shall own such recordings.

8. SUBSCRIBER'S CARE OF EQUIPMENT REPAIRS AND ADDITIONS: Subscriber agrees not to tamper with, remove or otherwise interfere with the System. Subscriber agrees to bear the cost of repairs or replacement to the System made necessary as a result of any damage, including damage caused by unauthorized intrusion to the premises, lightning or electrical surge, except for ordinary wear and tear, in which event repair or replacement shall be made by ALARM COMPANY without additional charge. Batteries, electrical surges, lightning damage, obsolete components and components exceeding manufacturer's useful life are not included in service and will be required or replaced at Subscriber's expense.

9. TELEPHONE LINES IS NECESSARY AND SUBSCRIBER'S RESPONSIBILITY: Subscriber acknowledges that the MEDICAL ALARM SYSTEM transmitting plugs into a standard telephone Jack and communicates over standard telephone lines using two way voice communication. The transmitter may not work with VOIP Internet cross cable.

10. SUBSCRIBER'S DUTY TO SUPPLY ELECTRIC AND TELEPHONE SERVICE: Subscriber agrees to furnish, at Subscriber's expense, all 110 Volt AC power and electrical outlet and receptacles, telephone hook-up, RJ31x Block or equivalent, as deemed necessary by ALARM COMPANY or MEDICAL ALARM equipment manufacturer.

11. DELAY IN INSTALLATION: ALARM COMPANY shall not be liable for any damage or loss sustained by Subscriber as a result of delay in installation of equipment failures, or for interruption of service due to electric failure, transmission failure, acts of God, or other causes, including ALARM COMPANY negligence in the performance of this agreement, and Subscriber shall not be relieved from payments due under this agreement for such period.

12. TESTING AND SERVICE OF MEDICAL ALARM SYSTEM: The parties hereto agree that the SYSTEM, once installed, is in the exclusive possession and control of the Subscriber, and it is Subscriber's sole responsibility to test the operation of the SYSTEM and to notify ALARM COMPANY if it is in need of repair or replacement. During the contract period and so long as Subscriber is current in payment, ALARM COMPANY shall service or replace the System if returned by the Subscriber to ALARM COMPANY at ALARM COMPANY's address. ALARM COMPANY will repair or replace with open Subscriber's request wrongs pick up and delivery, at Subscriber's expense by UPS or US Postal Service. If ALARM COMPANY fails to repair or replace the SYSTEM within 7 days after receipt if all written notice, Subscriber shall not be obligated to pay any monies for service from date said written notice is given, until the SYSTEM is restored to working order unless ALARM COMPANY determines that the equipment is operational and the system failure was electrical or telephone service related at Subscriber's premises, in which event Subscriber shall pay ALARM COMPANY's cost of shipping and inspection charge of $75.00 or if Alarm Company determines that the equipment was damaged by other than ordinary wear and tear, in which event Subscriber shall be charged $150 for a replacement System.

13. SUBSCRIBER TO INSURE ALARM COMPANY'S EQUIPMENT: Subscriber shall insure ALARM COMPANY's equipment against fire and casualty and Subscriber agrees to name ALARM COMPANY in said insurance policy as "loss payee" to the extent of the value of the equipment as set forth hereinabove. Subscriber shall be responsible for any loss occasioned by fire or casualty and the cost of replacing or restoring the Medical Alarm System.

14. AUDIO LISTEN IN AND TROUBLE UNIT: The system includes two-way voice is and meant to be heard under optimal conditions throughout most of the house. In the event that the two way audio is not clear, or the central station does not hear audio, subscriber authorizes company and central station to follow emergency response procedures. Company will notify 911 first, unless otherwise told in writing. Subscriber authorizes the Company in its sole discretion to authorize further entry to gain access to Subscriber's premises in the event the System emits a signal to the Central Station and the Subscriber cannot be heard throughout the unit's microphone nor does the Subscriber answer the telephone. Subscriber does hereby release the Company and Central Station from any and all liability whatsoever as a result of said forcible entry.

15. LIFEWATCH 911 UNIT: If Subscriber chooses to add an Alert 911 unit, it is understood that this product calls 911 direct and subscribers must be able to give their name and location to the 911 operator. There is no GPS locator. All other Terms and Conditions below apply.

16. MOBILE ALERT SYSTEM: If you have our Mobile Alert System, monitoring service will not begin and Company and the Central Station have no obligation to notify emergency personnel or other persons identified as emergency contacts until (i) Company has received your emergency contact information and (ii) you have called to activate system and sent a test signal from the system which was successfully received by the Central Station. Please note you must have adequate cellular coverage in the area where system is being used. You are responsible for testing your mobile device coverage and obtaining adequate cellular coverage in your area. In connection with providing the service that authorized caregivers may request your current location via our secure web portal. You hereby agree that the Company and the Central Station may provide the Responders and any other necessary third parties, as determined by us and the Central Station in our reasonable discretion, with access to your physical location. You hereby release the Company and the Central Station of any liability which may arise out of disclosure of such information to Responders and any other necessary third parties.

17. MEDICAL OR RELATED EXPENSES: In the event the Subscriber utilizes the System by giving the Central Station a signal, the Subscriber does hereby authorize the Company to seek to notify or obtain assistance. The Subscriber shall be obligated for and agrees to pay costs and expenses incurred including, but not limited to, ambulance, physician, or other medical assistance in obtaining assistance, or cost whatsoever incurred as a result of the Subscriber's use of the System.

18. OPTION TO UPDATE MEDICAL DATA INFORMATION: At the option of the Subscriber, the Subscriber shall communicate in writing with the Central Station for the purpose of verifying medical data information on file at the Central Station and updating said information, if necessary.

19. SELF-PROTECTION/SUBSCRIBER'S DUTIES: The Subscriber understands that the unit is used to help the Subscriber protect his or her person. If does not assure such protection. Available devices and techniques are the numerous in fact but include (a) basic health precautions and (b) adherence to physician's directions and recommendations.



**LIFE*Watch*USA**
FUNCTIONAL ALARM SERVICE SINCE 1980

**800.716.1433**
www.lifewatch-usa.com

20. SYSTEM USE/SUBSCRIBER'S DUTIES: The Subscriber understands that certain laws, rules, regulations and ordinances imposed by the governmental authorities, utilities, businesses, homeowners associations, and/or other entities may affect the Subscriber's rights in relation to the installation and service of the System. The Subscriber agrees to obtain and maintain in current status all licenses and permits or other authorizations necessary for the installation and use of the System.

21. PHYSICAL RESPONSE: The Subscriber is advised that certain areas in the country have in existence requirements that when an alarm monitoring service reports a medical alarm to a responding agency, that it must also report such alarm to an entity available twenty-four hours each day which is contractually obligated to respond to an emergency within one hour or within another designated time.

22. ASSIGNMENTS/WAIVER OF SUBROGATION RIGHTS: Subscriber shall not be permitted to assign this agreement without written consent of ALARM COMPANY. Any such assignment without prior approval shall be deemed a breach of this agreement. ALARM COMPANY shall have the right to assign this contract and shall be relieved of any obligations created herein upon such assignment. Subscriber on its behalf and any insurance carrier waives any right of subrogation Subscriber's insurance carrier may otherwise have against ALARM COMPANY or ALARM COMPANY'S subcontractors arising out of this agreement or the relation of the parties hereto.

23. INDEMNITY: Subscriber agrees to and shall indemnify and hold harmless ALARM COMPANY, its employees, agents and subcontractors, from and against all claims, lawsuits, including reasonable attorneys' fees, and losses asserted against and alleged to be caused by ALARM COMPANY'S performance, negligent performance or failure to perform its obligations under this agreement. Parties agree that there are no third party beneficiaries of this contract.

24. REMOVAL OF SYSTEM: Upon termination of this agreement ALARM COMPANY shall be permitted to discontinue all monitoring service and Subscriber shall at Subscriber's expense return, via UPS or US Postal Service, signature required, ALARM COMPANY equipment to ALARM COMPANY. If for any reason caused by Subscriber, or the owner of the premises if other than the Subscriber, said System is not delivered to ALARM COMPANY within 7 days of such termination, Subscriber shall be deemed to have purchased the equipment for the agreed value stated in this agreement.

25. LEGAL ACTION: In the event of a breach of this agreement ALARM COMPANY shall be permitted to terminate or suspend all its services under this agreement without relieving Subscriber of any obligation herein and may notify Authority Having Jurisdiction. Additionally, in the event of Subscriber's failure to return the System within 15 days of termination of this contract the System shall be deemed sold to Subscriber in as is condition for $259.00 which the parties agree is the value of the System. Any action by Subscriber against ALARM COMPANY must be commenced within one year of the accrual of the cause of action or shall be barred. All actions or proceedings against ALARM COMPANY must be based on the provisions of this agreement. Any other action that Subscriber may have or bring against ALARM COMPANY in respect to other services rendered in connection with this agreement shall be deemed to have merged in and be restricted to the terms and conditions of this agreement. ALARM COMPANY prevails in any litigation or arbitration between the parties. Subscriber shall pay ALARM COMPANY'S legal fees. Subscriber submits to the jurisdiction and laws of New York and agrees that any litigation or arbitration between the parties must be commenced and maintained in Nassau County, New York. Any dispute between the parties arising out of this contract, including issues of arbitrability, shall, at the option of any party, be determined by arbitration administered by Arbitration Services Inc. under its Commercial Arbitration Rules www.arsnb.com. Service of process or papers in any legal proceeding or arbitration between the parties may be made by First-Class Mail delivered by the U.S. Postal Service addressed to the party's address in this agreement or another address provided by the party in writing to the party making service.

SUBSCRIBER AND LifeWatch WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL IN ANY ACTION OR PROCEEDING INVOLVING LifeWatch. SUBSCRIBER ACKNOWLEDGES THAT SUBSCRIBER IS WAIVING RIGHT TO A JURY TRIAL VOLUNTARILY AND KNOWINGLY, AND FREE FROM DURESS OR COERCION, AND THAT SUBSCRIBER HAS A RIGHT TO CONSULT WITH A PERSON OF SUBSCRIBER'S CHOOSING, INCLUDING AN ATTORNEY, BEFORE SIGNING THIS DOCUMENT. THE PARTIES AGREE THAT THEY MAY BRING CLAIMS AGAINST THE OTHER ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A CLASS ACTION PLAINTIFF OR CLASS ACTION MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. SUBSCRIBER UNDERSTANDS THAT INSTEAD OF SUING OR BEING SUED IN COURT, THE PARTIES MAY HAVE THEIR DISPUTE DETERMINED BY ARBITRATION. SUBSCRIBER ACKNOWLEDGES THAT THE RULES IN ARBITRATION ARE DIFFERENT, AND THAT SUBSCRIBER HAS HAD THE OPPORTUNITY TO SEEK LEGAL OR OTHER ADVICE IN REGARD TO THIS CONTRACT AND IN PARTICULAR THIS ARBITRATION PROVISION. SUBSCRIBER AGREES THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS OF MORE THAN ONE PERSON'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. THE PARTIES AGREE THAT ANY DISPUTE BETWEEN THEM, INCLUDING BUT NOT LIMITED TO THE SCOPE OF THIS ARBITRATION CLAUSE AND ISSUES OF ARBITRABILITY, OR ANY DISPUTE RELATING TO THE AGREEMENT OR BASED ON A FEDERAL OR STATE STATUTE (EXCEPT WHERE PROHIBITED BY LAW), MAY, AT THE OPTION OF EITHER PARTY, BE DETERMINED BY ADMINISTERED BY ARBITRATION SERVICES, INC. UNDER ITS CONSUMER ARBITRATION RULES, WHICH ARE AVAILABLE AT WWW.ARBITRATIONSERVICESINC.COM, BY FAX AT 516-364-3456 OR BY TELEPHONE AT 516-364-1729 THIS CONTRACT EVIDENCES A TRANSACTION IN INTERSTATE COMMERCE, AND THUS THE FEDERAL ARBITRATION ACT GOVERNS THE INTERPRETATION AND ENFORCEMENT OF THIS PROVISION.

26. ADDITIONAL PAYMENTS: In addition to the payments set forth herein, Subscriber agrees to be liable for and pay to ALARM COMPANY any excise, sales, property, or other tax, inspection fees, charges, and any increases thereof, which may be imposed upon ALARM COMPANY because of this agreement. Should ALARM COMPANY be required by writing or have other assessed law to perform any service or furnish any material not specifically covered by the terms of this agreement Subscriber agrees to pay ALARM COMPANY for such service or material.

27. FALSE ALARMS/PERMIT FEES: Subscriber is responsible for all permits and permit fees, agrees to file for and maintain any permits required by applicable law and indemnify or reimburse ALARM COMPANY for any fines relating to permits or false alarms. ALARM COMPANY shall have no liability for permit fees, false alarms, false alarm fines, police or fire response, any damage to personal or real property or personal injury caused by EMS, police or fire department response to emergency conditions, whether false alarm or otherwise, or the refusal of the police or fire department to respond. In the event of termination of police or EMT dispatch service, which nevertheless remain in full force and Subscriber shall remain liable for all payments provided for herein. Should ALARM COMPANY be required by existing or hereinafter enacted law to perform any service or furnish any material not specifically covered by the terms of this agreement Subscriber agrees to pay ALARM COMPANY for such service or material. ALARM COMPANY shall have no liability for police, fire or EMT non-response, response, or any damage to person or property in connection with any emergency condition reported by ALARM COMPANY or its designated central station in response to a signal received from Subscriber's SYSTEM.

28. ALARM COMPANY'S RIGHT TO SUBCONTRACT/SPECIAL SERVICES: Subscriber agrees that ALARM COMPANY is authorized and permitted to subcontract any services to be provided by ALARM COMPANY to third parties who may be independent of ALARM COMPANY, and that ALARM COMPANY shall not be liable for any loss, damage or injury sustained by Subscriber by reason of any other cause whatsoever caused by the negligence of third parties. Subscriber acknowledges that this agreement, and particularly those paragraphs relating to ALARM COMPANY's disclaimer of warranties, exemption from liability, even for its negligence, limitation of liability and indemnification, inure to the benefit of and are applicable to any assignees, subcontractors and central offices of ALARM COMPANY.

29. NO WARRANTIES OR REPRESENTATIONS: SUBSCRIBER'S EXCLUSIVE REMEDY. ALARM COMPANY does not represent nor warrant that the System will prevent any loss, damage or injury, or that the System will in all cases provide the protection for which it is intended or installed. Subscriber acknowledges that ALARM COMPANY is not an insurer, and that Subscriber assumes all risk for loss or injury to Subscriber's property or System. ALARM COMPANY has made no representation or warranties, and hereby disclaims any warranty of merchantability or fitness for any particular use. Subscriber's exclusive remedy for ALARM COMPANY'S default hereunder is to require ALARM COMPANY to repair or replace, at its option, any equipment or part of the System which is non-operational. Except for services provided pursuant to this agreement, Subscriber agrees to look to manufacturer's warranty for any equipment warranty.

30. EXCULPATORY CLAUSE: The parties agree that ALARM COMPANY is not an insurer and no insurance coverage is offered herein. Subscriber's payments to ALARM COMPANY are for the installation, rental and service of a System designed to reduce certain risks of loss, though ALARM COMPANY does not guarantee that no loss will occur. ALARM COMPANY is not assuming liability and therefore shall not be liable to Subscriber for any loss or injury sustained by Subscriber as a result of any cause whatsoever, regardless of whether or not such loss or injury was caused by or contributed to by ALARM COMPANY'S negligent performance to any degree or failure to perform any obligation or strict products liability. Subscriber releases ALARM COMPANY from any claims for contribution, indemnity or subrogation.

31. LIMITATION OF LIABILITY: The parties agree that the System is not designed or guaranteed to prevent any loss or injury. If notwithstanding the terms of this agreement, there should arise any liability on the part of ALARM COMPANY as a result of any cause whatsoever, regardless of whether or not such loss, damage, or personal injury was caused by or contributed to by ALARM COMPANY'S negligence to any degree or failure to perform any obligation or strict products liability, such liability will be limited to an amount equal to six (6) times the monthly payment paid by the Subscriber to ALARM COMPANY at the time such liability is fixed, or to the sum of $250.00, whichever is greater. If Subscriber wishes to increase ALARM COMPANY'S maximum amount of such limitation of liability, Subscriber may, as a matter of right, at any time, by entering into a supplemental agreement, obtain from ALARM COMPANY a higher limit by paying an additional amount consonant with the increase of liability. This shall not be construed as insurance coverage.

32. PERSONAL MEDICAL DISCLOSURE AUTHORIZATION: Any medical or other personal information provided by Subscriber to ALARM COMPANY may be disclosed by ALARM COMPANY to any EMS personnel or medical personnel requesting same.

33. CONFLICTING DOCUMENTS: Should there arise any conflict between this agreement and Subscriber's purchase order or other document, this agreement will govern, whether such purchase order or document is prior to or subsequent to this agreement.

34. FULL AGREEMENT/SEVERABILITY: This agreement constitutes the full understanding of the parties and may not be amended, modified or canceled, except in writing signed by both parties, except ALARM COMPANY'S requirements regarding items of protection provided for in this agreement imposed by Authority Having Jurisdiction. Subscriber acknowledges and represents that Subscriber has not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set forth in this agreement and waives any claims in connection with same. Should any provision of this agreement be deemed void, all other provisions will remain in effect.

THIS AGREEMENT INCLUDES OTHER DOCUMENTS REFERRED TO IN PARAGRAPH 6, READ THEM BEFORE YOU SIGN THIS CONTRACT. SUBSCRIBER ACKNOWLEDGES THAT THIS CONTRACT AND UNDERSIGNED DOCUMENTS WERE DELIVERED TO SUBSCRIBER'S ADDRESS AT US POSTAL SERVICE OR OTHER MAIL CARRIER, AND THAT NO HOME SOLICITATION WAS MADE BY LIFEWATCH. THIS CONTRACT CONTAINS AN ARBITRATION PROVISION AND OTHER PROVISIONS IN PARAGRAPH 25 THAT AFFECT YOUR LEGAL RIGHTS.

SUBSCRIBER: _____

Signature (Name must be printed below)

Print Name _____

If someone other than Subscriber is signing this contract state relationship to Subscriber and by signing this Contract
such person represents that he or she has authority to bind Subscriber to this contract.

# EXHIBIT D

## PURCHASE AGREEMENT

This Purchase Agreement (the "Agreement") is entered into as of this 1st day of June, 2012 by and between LifeWatch, Inc, d/b/a LifeWatchUSA (the "Company"), a New York corporation, and World Wide Info Services Inc. (the "Seller"), a Florida corporation.

### WITNESSETH:

WHEREAS, the Company and the Seller entered into an agreement on or about June 1, 2012 entitled "Multimedia and Marketing Services Agreement" (the "Marketing Agreement"), which did not properly describe the relationship of the parties in that the Seller did not provide telemarketing services for the Company; rather as described below, the Seller enters into contracts with customers for various products and services for its own account (the "Contracts") and sells those Contracts to various purchasers, including the Company; and

WHEREAS, the Seller and the Company wish to replace and restate the Marketing Agreement in its entirety with this Purchase Agreement, effective as of June 1, 2012;

WHEREAS, the Company is engaged in the business of selling a medical alert system consisting of various medical alarm plans and related safety products (the "Products");

WHEREAS, the Seller is engaged in the business of entering into contracts for its own account with customers for a wide variety of products and services, including the Products (the "Contracts") and selling such Contracts for its own account to various purchasers, including the Company; and

WHEREAS, the Company and the Seller wish to define the terms and conditions governing all of the Contracts, if any, that the Company may purchase from the Seller.

NOW, THEREFORE, in consideration of the premises and mutual covenants, contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. **DESCRIPTION OF THE PURCHASE ARRANGEMENTS.** Throughout the Term of this Agreement (as defined below), the Seller shall operate in accordance with the following:

   (a)    Seller shall use its best efforts to originate Contracts for its own

2358-101 Purchase Agreement LW-WW .0002                                            Page 1

LW000009

account and to offer to sell Contracts for the Products to the Company and to others on a non-exclusive basis at a prices and terms to be mutually agreed upon from time-to-time;

(b)     Seller shall not contact any current customers of the Company or any other person listed on any local, federal or state "do not call" registry in accordance with Section 6.2 herein;

(c)     In originating Contracts for its own account, the Seller's telemarketing activities (as hereinafter defined) shall be conducted in accordance with all applicable federal, state and local laws, rules and regulations ( collectively "Telemarketing Laws"). As used in this Agreement, "Telemarketing", shall have the meaning ascribed to it in subsections 310.2 (cc) and (dd) of the federal Telemarketing Sales Rule, 16 C.F.R. Part 310; direct mail solicitation via the U.S. Postal Service, facsimile transmission, electronic mail, text messages accessed by mobile phone or sent directly to mobile phones, television and radio; and internet marketing; and

(d)     Without limiting the generality of the foregoing, any person or entity doing telemarketing for the Seller shall only use scripts identified by the Seller as approved;

(e)     The Seller shall record, or cause the recording of, all sales calls made by its employees, agents or representatives and retain all recordings (i) for not less than twenty four (24) months from the date each recording is made, and (ii) shall make all such recordings available to the Company for its review at any time; and

(f)     The Seller shall comply, or cause the compliance, with all local, state and federal regulations, including 47 U.S.C.A. § 227, which prohibits the use of automatic telephone dialing systems.

1   Verification of Acceptance and Payment for the Products. If a consumer enters into a Contract for the Products, among other things, the Seller shall obtain the consumer's express verifiable authorization prior to causing billing information to be submitted for payment, or collecting the consumer's payment information for the Products, except when the method of payment used is a credit card subject to the protections of the Truth in Lending Act (15 U.S.C. § 1601 et seq.) and Regulation Z (12 C.F.R. part 226), or a debit card subject to the protections of the Electronic Fund Transfer Act (15 U.S.C.§ 1693 et seq.) and Regulation E (12 C.F.R. part 205). Whatever Contracts the Seller decides to offer to sell to the Company shall be submitted to the Company's principal executive office for acceptance or rejection by the Company. A consumer's

LW000010

Bradley Att. C
Page 12 of 74

authorization to purchase the Product shall be deemed verifiable if any of the following means is employed:

(a)     express written authorization by the consumer, which includes the consumer's signature;

(b)     express oral authorization which is audio-recorded and made available upon request to the consumer and the consumer's bank or other billing entity, and which evidences clearly both the consumer's authorization for payment and the consumer's receipt of all of the following information:

     i.     The number of debits, charges, or payments (if more than one);
     n.     The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;
     iii.     The amount of the debit(s), charge(s), or payment(s);
     IV.     The consumer's name;
     v.     The consumer's billing information, identified with sufficient specificity so that the consumer understands what account will be used to collect payment for the goods or services that are the subject of the telemarketing transaction;
     vi.     A telephone number for consumer inquiry that is answered during normal business hours; and
     vii.     The date of the consumer's oral authorization; or

(c)     Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the consumer via first class mail prior to the submission for payment of the consumer's billing information, and that includes all of the information set forth above in subparagraphs 1.2(b) i-vii and a clear and conspicuous statement of the procedures by which the consumer can obtain a refund from the Company in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which the Products are offered in a transaction involving a free-to-pay conversion and pre-acquired account information.

1.3 Transfer of consumer information to the Company.  Upon obtaining a consumer's acceptance and/or express verifiable authorization, such information shall be contained within the package of materials to be submitted by the Seller to the Company under this Agreement.

1.4 Costs of performance.  The Seller shall be solely responsible for all costs and expenses directly associated with performing its obligations under this Agreement, including compensation of

2356-101  Purchase Agreement  LW-WW   .0002                                      Page 3

LW000011

Bradley Att. C
Page 13 of 74

its employees or independent contractors, advertising, office expenses, taxes and applicable governmental licensing.

1.5 <u>Seller's Obligation to Replace Contracts</u>. If there is a default within the first ninety (90) days of any of the Contract that is sold to the Company, the Seller shall replace such Contract with a similar Contract at no additional cost to the Company.

2. <u>TERM.</u> The Term of this Agreement shall be effective as of June 1, 2012 for a period of three (3) years from and after the execution of this agreement and shall be automatically renewed for consecutive one (I) year terms (the "Renewal Term") unless earlier terminated pursuant to this Agreement.

3. <u>TERMINATION.</u>  Notwithstanding the Term or any Renewal Term, this Agreement may be terminated by either party effective immediately upon written notice to the other party if any of the following occurs:

(a)　　　　a material breach of this Agreement by one party if the breaching party does not cure such breach within ten (10) days of receipt of written notice thereof;

(b)　　　　in the event that a party: (i) commences a voluntary case or other proceeding seeking liquidation, reorganization or other relief of its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, that authorizes the reorganization or liquidation of such party or its debt or the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property; (ii) consents to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; or (iii) makes a general assignment for the benefit of creditors, or becomes insolvent, or takes any corporate action to authorize any of the foregoing; or

(c)　　　　in the event that any regulatory authority alleges that this Agreement or any aspect of it is in violation of any applicable law, rule or regulation, or in the event that a party is served with a notice from a federal or state governmental or regulatory authority that it has become the subject of an investigation by such authority.

4. <u>SELLER'S COVENANTS.</u>

4.1　　<u>Duty to notify the Company of complaints by consumers.</u> Seller shall promptly provide written notice to the Company of any request it receives from a consumer for a refund, cancellation or chargeback. In addition, Seller shall promptly provide to the Company copies of any written complaints that it receives from consumers, Better Business Bureaus or governmental

LW000012

or law enforcement agencies.

4.2 <u>Compliance with applicable law.</u> The Seller shall at all times perform its obligations under this agreement in strict compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

4.3 <u>Record Retention.</u> The Seller shall retain records establishing compliance with 16 C.F.R. 310.4(b)(4)(i)-(iii) and Seller shall maintain, for a minimum period of 24 months from the date the record is produced, the following records relating to its performance under this Agreement:

(a)  All substantially different advertising, brochures, telemarketing or text message scripts, and promotional materials;

(b)  The name and last known address of each prize recipient and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(c)  The name and last known address of each customer, the goods or services purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;

(d)  The name, any fictitious name used, the last known home address and telephone number, and the job title(s) for all current and former employees directly involved in telephone sales or solicitations; and

(e)  All verifiable authorizations or records of express informed consent or express agreement required to be provided or received under the Telemarketing Sales Rule promulgated by the Federal Trade Commission.

4.4 <u>Seller Clients.</u> The Seller shall have the right to sell or offer to sell Contracts for the Products to any other purchaser and the Company shall have the right to purchase contracts for the Products from other sources and/or to originate such contracts by itself.

4.5 <u>Covenant Not to Solicit.</u> During the Term of this Agreement and for a period of two (2) years following the termination of this Agreement, the Seller shall not contact any customer that is a party to any Contract sold by the Seller to the Company.

LW000013

5.   ## COVENANTS OF THE COMPANY.

     5.1 Fulfillment of orders for Products. The Company, or such third party as it may designate, shall be responsible for Fulfillment of each Contract that it purchases from the Seller. "Fulfillment" means the process of delivering the goods and services to the consumer along with any written agreement reflecting the terms of the transaction.

     5.2 Customer Service. The Company, or such third party as it may designate in writing, shall be responsible for providing Customer Service to consumers who are parties to the Contracts that the Company purchases from the Seller. "Customer Service" means answering telephone calls from consumers and processing any legitimate requests for refund or cancellation.

     5.3 Processing of payment for the Products. The Company shall be responsible for processing payments from consumers after receiving consumers' billing information from the Seller.

     5.4 Purchase Price The Company and the Seller shall agree from time-to-time on the purchase price for Contracts.

     5.5 Compliance with Applicable Law. The Company shall at all times perform its obligations concerning Contracts that it purchases in substantial compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

6.   ## LEGAL COMPLIANCE REQUIREMENTS.

     6.1    Privacy Protection. The Seller shall no use any information that contain personal contact or other information that violates applicable law.

     6.2    Scrubbing of Leads. All Contracts originated or otherwise acquired or used by the Seller when originating a Contract must be "scrubbed" against the most current Federal Trade Commission ("FTC") "do-not-call" registry, any applicable state "do- not-call" list or registry The Seller will not contact any person included on any such list or registry.

     6.3    E-mail and text messages. The Seller shall consult the official list of wireless domain names published by the Federal Communications Commission (the "FCC") before sending e-mail and other electronic advertising to consumers. If an address on the Seller's mailing list includes a wireless Internet domain name on the FCC's official list, the advertiser cannot send ads to that address without getting the recipient's express prior consent.

     6.4    Use of Pre-Recorded Messages. The Seller. The Seller shall not initiate any

2358-101 Purchase Agreement  LW-WW  .0002             Page 6

LW000014

outbound telephone call that delivers a prerecorded message unless it strictly complies with subsection 16 C.F.R. 310.4(b)(l)(v) of the Federal Telemarketing Sales Rule, which makes it an abusive telemarketing act or practice for the any person engaging in telemarketing activities, or engage in, the following conduct:

(a) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in 16 C.F.R. 310.4(b)(4)(iii), unless:

(i) in any such call to induce the purchase of any Products, the caller has obtained from the recipient of the call an express agreement, m writing, that:

(A) the caller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the caller to place prerecorded calls to such person;

(B) the caller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any Products;

(C) evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the caller; and

(D) includes such person's telephone number and signature, which "signature" may include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

(ii) In any such call, to induce the purchase of any Product being sold by the Seller:

(A) The telephone is allowed to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

(B) Within two (2) seconds after the completed greeting of the person called, a prerecorded message is played that promptly provides the disclosures required by 16 C.F.R. 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

(1) In the case of a call that could be answered in person by a consumer, that the person called can use mI automated interactive voice mId/or keypress-activated opt-out mechmIism to assert a Do Not Call request pursumIt to 16 C.F.R. 310.4(b)(1)(iii)(A) at any time during the message. The mechanism must (a) automatically add the number called to the Compmly's entity-specific Do Not Call list, (b) once invoked,

2356-101 Purchase Agreement LW-WW .0002                                     Page 7

LW000015

Bradley Att. C
Page 17 of 74

immediately disconnect the call, and (c) be available for use at any time during the message;

(Z) In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)(I)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that automatically adds the number called to the caller's entity-specific Do Not Call list (b) immediately thereafter disconnects the call; and (c) is accessible at any time throughout the duration of the telemarketing campaign; and complies with all other requirements of this part and other applicable federal and state laws.

(a)  Paragraph (a) above shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(b)  In addition, the S e l l e r must comply with any state law applicable to prerecorded messages.

(c)  the Seller shall adopt and comply with compliance policies which comply in all respects with applicable law, and shall cause all suppliers, vendors and subcontractors of Seller to adopt and comply with compliance policies which comply in all respects with applicable law. The Company shall have the right to inspect such compliance policies and verify such compliance by the Seller.

6.5  Call Abandonment Safe Harbor. The Call Abandonment Safe Harbor, subsection 310.4(b)(4)(iii) of the TSR, provides that any c a l l e r will not be liable for violating 16 C.F.R. 310.4(b)(1)(iv); provided, that (i) the caller employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues, (ii) the caller, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call, (iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the c a l l e r promptly plays a recorded message that states the name and telephone number of the e n t i t y on whose behalf the call was placed. This provision does not affect any of the Seller's obligation to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

6.6  Compliance with State and Local Laws.  Each party shall comply with any

2356-101 Purchase Agreement  LW-WW  .0002                    Page 8

LW000016

applicable state telemarketing, telephone solicitation or consumer protection laws as well as with any applicable state registration and licensing requirements in any state in which it transacts business and/or renders services pursuant to this Agreement, as same may be amended from time to time.

    6.7   <u>Compliance with Federal Laws.</u>   Each party shall comply with any applicable federal statutes, rules and regulations while rendering services pursuant to this Agreement, including, but not limited to:

    (a)   The Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53(b) and 57b;

    (b)   The Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. §6101;

    (c)   The Telemarketing Sales Rule, 16 C.F.R 310;

    (d)   The Telephone Consumer Protection Act, 47 U.S.C. § 227, and 47 C.F.R. part 64.1200;

    (e)   If a party engages in an electronic marketing campaign, the Controlling The Assault of Non-solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act");

    (f)   The provisions of Title 18, section 1037 of the United States Code relating to criminal fraud and related activity in connection with electronic mail;

    (g)   The Children's Online Privacy Protection Act ("COPPA"), Title 15, §§ 6501-6506 of the United States Code;

    (h)   The Computer Fraud and Abuse Act ("CFAA"), Title 18, section 1030 of the United States Code;

    (i)   The federal laws protecting intellectual property (Copyrights are protected by Title 17 of the United States Code, which provides civil remedies for infringement, and Title 18 of the United States Code, which imposes criminal penalties for copyright infringement. Patents and Trademarks are protected by Titles 35 and 15, respectively, of the United States Code, which provide civil remedies for infringement.);

    (j)   the Electronic Communications Privacy Act (Title 18, sections 2510, 2511 and 2701 of the United States Code, which prohibits the interception, use and disclosure of wire, oral or electronic communications and provide civil remedies and criminal penalties for violations.);

LW000017

(k)    the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), which seeks to promote the use of electronic signatures in interstate and foreign commerce by declaring that a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form or an electronic signature or record was used in its formation. The Act also requires certain consumer disclosures and the retention of business records;

(l)    The Fair Labor Standards Act of 1938 (Title 29, sections 201-219 of the United States Code) establishes minimum wages and maximum hours for employees and provides remedies and protections to aggrieved employees. Title 29, sections 541.300 and 541.400 of the Code of Federal Regulations define the exemptions from the minimum wage and maximum hour requirements for executive, administrative, professional, computer and outside sales employees;

(m)    The Fair Housing Act (42 U.S.C. § 3601 et seq.), which prohibits certain forms of discrimination on the basis of race, color, religion, sex, familial status, or national origin;

(n) The Restore Online Shoppers' Confidence Act (15 U.S.C. §§ 8401-8405), which Prohibits "any post-transaction third party seller" from charging or attempting to charge "any consumer's credit card, debit card, bank account or other financial account for any good or service sold in a transaction effected on the Internet, unless" the third party seller, before getting the consumer's billing information, "clearly and conspicuously" discloses to the consumer "all material terms of the transaction" and gets the consumer's "express informed consent for the charge." "All material terms of the transaction" must include, in addition to basics already required by existing law like "a description of the goods or services being offered" and "the cost of such goods or services," that the "third party seller is not affiliated with the initial merchant" by disclosing the third party seller's name "in a manner that clearly differentiates the post-transaction third party seller from the initial merchant." In order to obtain "express informed consent," the third party seller must get from the consumer "the full account number of the account to be charged," "the consumer's name and address and a means to contact the consumer," and require the consumer "to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed." In addition to imposing new disclosure requirements on post-transaction third party sellers, the Act prohibits the initial merchant from disclosing "a credit card, debit card, bank account, or other financial account number, or to disclose other billing information that is used to charge a customer of the initial merchant, to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third

LW000018

party seller." Finally, the Act prohibits "any person" from charging or attempting to charge "any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature" as defined by the Telemarketing Sales Rule unless the person "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information ... obtains a consumer's express informed consent before charging the consumer's [account] ... and provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's [account]." The Act does not apply unless the company is a (1) a "post-transaction third party seller," (2) discloses billing information to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller, or (3) sells goods or services using a negative option feature.

7.    ACCOUNTING RECORDS. Each party shall maintain true and complete books and records in accordance with generally accepted accounting principles reasonably necessary to determine the amounts payable hereunder.

8.    REPRESENTATIONS AND WARRANTIES OF MARKETER.    Seller represents and warrants to the Company that:

(a)    it is a corporation duly formed, validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

(b)    it has the corporate power to enter into this Agreement;

(c)    the execution, delivery and performance of this Agreement by the Seller has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Seller enforceable in accordance with its terms; and

(d)    the execution, delivery and performance by the Seller of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Seller is a party to or by which the Seller is bound.

9.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY. The Company represents and covenants to the Seller that:

(a)    it is a corporation duly formed, validly existing and in good standing

2356-101  Purchase Agreement  LW-WW    .0002                                    Page 11

LW000019

Bradley Att. C
Page 21 of 74

under the laws of the state of its incorporation, and has all necessary corporate power and authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

(b)     it has the corporate power to enter into this Agreement;

(c)     the execution, delivery and performance of this Agreement by the Company has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Company enforceable in accordance with its terms; and

(d)     the execution, delivery and performance by the Company of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Company is a party to or by which the Company is bound.

10.     INDEMNIFICATION.

(a)     The parties shall indemnify, defend and hold each other and their directors, officers, shareholders, employees, agents, lenders and investors harmless from and against any and all actual or threatened claims, losses, proceedings, actions, liabilities, judgments, awards or costs, including reasonable attorney's fees and expenses and costs of investigations (collectively, "Losses") arising out of or related to: (a) the breach of any representations or warranties contained in this Agreement; (b) the failure to perform any obligations hereunder; or (c) the failure to comply with applicable law arising out of this Agreement or any investigation or allegation thereof.

(b)     In the event that any claim is made or asserted against a party entitled to indemnification under this Agreement (the "Indemnified Party"), the Indemnified Party shall with reasonable promptness notify the other party with an indemnification obligation (the "Indemnifying Party") of such claim (the "Claim Notice"), specifying the nature of such claim and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim); provided that, any failure to provide such notice shall not relieve the Indemnifying Party of any obligation hereunder, except to the extent that such Indemnifying Party is irrevocably prejudiced thereby. The Indemnifying Party shall have fifteen (15) days from the receipt of the Claim Notice (the "Notice Period") to notify the Indemnified Party (i) whether or not the Indemnifying Party disputes liability to the Indemnified Party hereunder with respect to such claim and (ii) if the Indemnifying Party does not dispute such liability, whether or not the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend against such claim; provided further, that, the Indemnified Party is hereby

LW000020

authorized (but not obligated) prior to and during the Notice Period to file any motion, answer or other pleading and to take any other action that the Indemnified Party shall deem necessary or appropriate to protect the Indemnified Party's interests. In the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party does not dispute the Indemnifying Party's obligation to indemnify hereunder and desires to defend against such claim, except as hereinafter provided, the Indemnifying Party shall have the right to defend by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the Indemnifying Party to a final conclusion; provided, further, that, unless the Indemnified Party otherwise agrees in writing, the Indemnifying Party may not settle any matter (in whole or in part) unless such settlement includes a complete and unconditional release of the Indemnified Party and provides solely for monetary damages. If the Indemnified Party desires to participate in, but not control, any such defense or settlement the Indemnified Party may do so at its sole cost and expense. If the Indemnifying Party (a) fails to timely notify the Indemnified Party it will not defend or (b) actually fails to defend the Indemnified Party against such Claim, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then, without waiving any rights or conflict of interest Claims against the Indemnifying Party, the Indemnified Party may settle or defend against any such claim or demand in the Indemnified Party's sole discretion at the cost of the Indemnifying Party and, if it is ultimately determined that the Indemnifying Party is responsible therefore under this Section, then the Indemnified Party shall be entitled to recover from the Indemnifying Party the amount of any settlement or judgment and all indemnifiable costs and expenses of the Indemnified Party with respect thereto, including, without limitation, interest from the date such costs and expenses were incurred.

(c)     This section shall survive the expiration or termination of this Agreement.

(d)     In the event that the Company has a claim for indemnification against the Seller under Section 10(a), the Company shall have the right to offset any amounts which it may owe to the Seller with any funds which the Company may possess on behalf of or owe to the Seller

11.     TRADE SECRETS AND CONFIDENTIALITY.

11.1     INTENTIONALLY DELETED

11.2     Trade Secrets and Confidential Information. The Seller recognizes that the Company's trade secrets and confidential information were developed through considerable investment of time, effort and money, are proprietary, and their disclosure would be harmful and damaging to its business.

LW000021

"Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Confidential Information" means information that would cause an unfair advantage to competitors by providing them information as to the commercial operations of the Company and includes, but is not limited to business lists; records and information of prospective and actual customer names and other personal information of consumers, including contacts, addresses, and lists, contracts, transactions, plans, designs, policies, reports, histories, information reports and information; customer leads and methods of generating customer leads; scripts, sales techniques, policies, methods and procedures for sales; pricing and marketing; prices and price lists; inventory and inventory lists; vendors' names and contact information, supplies, suppliers' names and addresses, and supplier and supply lists; manufacturer, distributor and supplier company names, contacts, addresses, lists, transactions, contracts, policies, reports, histories, products, rate books, comparisons; and information; advertising, advertising copy and programs; endorsers' names and addresses; sales reports, business reports, financial statements and reports, and operating statements; employees, agents, subagents, and independent contractor names, addresses, lists, commissions, productivity and information; computer programs, computer software, databases, and data; and know-how, discoveries, inventions, writings, conceptions, knowledge, information, plans, programs, and ideas and tangible expressions of ideas.

"Customer" or "Consumer" means anyone whose name appears on a database, lead list, customer list, or report of the Company; anyone to whom the Company has sold, rendered or exchanged any Products; anyone who has ordered any Products from the Company; and anyone solicited by the Company for the sale of any Products pursuant to this Agreement.

These lists are not exclusive; there may now and in the future be other types of information that constitute trade secrets and confidential information and which are included within the scope of this Agreement.

11.3    Return of Tangible Information. The Seller agrees that all books, papers, records, lists, files, forms, reports, accounts, documents, supplies, equipment, photographs, cassettes, compact disks, videotapes, databases, disks, data, computers, peripherals, hardware, programs, software, floppy disks, hard drives, magnetic media, storage media, CD-ROMs, accessories, parts, components, manuals, documentation, research papers and information relating in any manner to the Company or its business, operations, prices, vendors, suppliers or customers, whether prepared by the parties hereto or anyone else,

LW000022

Bradley Att. C
Page 24 of 74

and whether or not containing a trade secret or confidential information, that were disclosed or turned over to the Seller, or turned over by the Seller to the Company with respect to Contracts purchased by the Company, pursuant to this Agreement are the exclusive property of the Company and that any such tangible documents or information, whether electronic or hard copy shall immediately be returned to the Company within 10 days after termination of this Agreement or earlier at the Company's request at any time.

11.4 Confidentiality by the Seller. The Seller agrees to keep secret and treat confidentially all of the Company's trade secrets and confidential information (whether or not copyrightable or patentable). Specifically, the Seller agrees not to do any of the following, directly or indirectly: use, publish, disclose or communicate any of the Company's Trade Secrets or Confidential Information to anyone; print, copy, publish, display, reproduce or allow anyone else to print, copy, publish, display or reproduce any information in tangible form containing a trade secret or Confidential Information; aid others in learning of or using or planning the use of any of the Company's Trade Secrets or Confidential Information; use the Company's Trade Secrets or Confidential Information for its own account or benefit; or aid, assist or plan for other persons to use the Company's Trade Secrets or Confidential Information for their own account or benefit. This obligation of confidentiality shall exist while the parties are engaged in discussions or negotiations to determine whether to enter into a business relationship and shall continue after the date of termination of such discussions or negotiations for the longer of ten (10) years or the date that all elements of the Trade Secrets and Confidential Information are public knowledge and no longer proprietary to the Company. This obligation of confidentiality shall not be released in case of the public availability of a part of the Company's Trade Secrets or Confidential Information, it being acknowledged that individual elements of the Company's Trade Secrets or Confidential Information may through no fault of its own become publicly available, but the availability of individual elements of Trade Secrets or Confidential Information does not result in appreciation of the use or value of those elements nor does it make publicly known the integrated package of information and know-how having value to the Company's business as useful information.

12. REMEDIES. The Seller agrees that each of the above matters is important, material, confidential, and gravely affects the effective and successful conduct of the business of the Company and affects its value, reputation and goodwill. If the marketer breaches any provision of this Agreement, the Company shall be entitled to obtain temporary and permanent injunctions, specific performance, damages (to the extent, if at all, that they are ascertainable; including but not limited to compensatory, incidental, consequential, punitive, exemplary, and lost-profits damages), costs and reasonable attorneys' fees at all levels, including but not

LW000023

Bradley Att. C
Page 25 of 74

limited to appeals without any requirement to post a bond, security or other undertaking. The Marketer agrees that if it breaches any provision of this Agreement it shall be conclusively presumed that irreparable injury would result to the Company and there would be no adequate remedy at law. This Agreement does not limit the rights and remedies that the Company otherwise has by law, equity or statute.

13. NOTICES. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and will be deemed to have been given (i) when delivered if personally delivered by hand (with written confirmation of receipt), (ii) when received if sent by a nationally recognized overnight courier service (receipt requested), (iii) shall be mailed by registered or certified mail, postage prepaid, after five (5) days, or (iv) if sent via facsimile, upon confirmation of facsimile transmission, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (v) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day. Notices, demands and communications to the Company and Marketer will, unless another address is specified in writing, be sent to the address indicated below:

If to the company:

Lifewatch, Inc.
266 Merrick Road
Suite 104
Lynbrook, New York 11563
Attention: Evan Sirlin
Facsimile: (516) 599-3620 Email: evan@lifewatch-usa.com

With a copy (which shall not serve as notice) to:

Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara &Einiger, LLP
1111 Marcus Avenue – Suite 107 Lake Success, New York 11042
Attention: Neil Kaufman
Fax No.: (516) 328-6638 Email: nkaufman@abramslaw.com

If to the Seller:
World Wide Info Services Inc.
495 Semoran Blvd.
Casselberry, FL 32707
Facsimile: : – : –— — : —— : : —— Email: wwinfoservices@gmail.com

2355-101 Purchase Agreement LW-WW .0002                                    Page 16

LW000024

14.   ADDITIONAL PROVISIONS.

14.1    Governing Law.  This agreement shall be governed, interpreted, construed and enforced in accordance with the laws of the State of New York without regard to the conflict of laws principles thereof. The parties thereto do hereby consent and submit to the venue and jurisdiction of the state and federal courts sitting in the State of New York, County of Nassau, as the sole and exclusive forum for the enforcement of this Agreement, and further agree that, in the event of any action or suit as to any matters of dispute between the parties, service of any process may be made upon the other party in the same matter as the giving of notices under paragraph 13 of this Agreement.

14.2    Attorney's Fees and Costs. In any litigation arising out of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees and expenses and costs of litigation, at the trial and appellate levels.

14.3    Merger Clause. This Agreement and any attached Addenda constitute(s) the entire understanding between the parties with respect to the subject matter hereof and all prior or collateral negotiations, understandings or agreements are merged herein.

14.4    Modification.  This Agreement may be amended or modified only by a written instrument signed by each of the parties hereto.

14.5    Severability.  In the event any provision of this agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be fully severable and this agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this agreement, a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible (while maintaining the economic intent of the parties under this Agreement) and be legal, valid, and enforceable.

14.6    Assignment. Except as otherwise provided herein, Marketer may not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other party. Any attempted or purported assignment in violation of this provision shall be null and void.

14.7    Waiver.  The failure of either party to this Agreement to object to or to take

LW000025

Bradley Att. C
Page 27 of 74

affirmative action with respect to any conduct of the other which is in violation of the terms of this agreement, shall not be construed as a waiver of that conduct or any future breach or subsequent wrongful conduct.

14.8    Headings. The headings in this Agreement are inserted for convenience only and shall not affect the interpretation or construction of this agreement or any portion thereof.

14.9    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

14.10    Parties Bound. This Agreement shall be binding upon the parties, their successors in interest and assigns.

14.11    Restatement and Replacement of the Marketing Agreement. This Purchase Agreement is intended to replace and restate the Marketing Agreement in its entirety as of June 1, 2012; provided, however, that nothing herein shall operate to affect any rights or obligations either party under the Marketing Agreement.

### SIGNATURE PAGE TO FOLLOW

LW000026

Bradley Att. C
Page 28 of 74

WHEREFORE, the parties have executed this Agreement as of date set forth above.

The Company:                                    The Seller:

LifeWatch, Inc,                                 World Wide Info Services Inc.

By:

LW000027

## TELEMARKETING SERVICES AGREEMENT

This telemarketing services agreement (the "Agreement") is entered into on the 1st day of June, 2012 (the "Effective Date") by and between LifeWatch, Inc. d/b/a LifeWatchUSA (the "Company"), a New York corporation, and WORLDWIDE INFO SERVICES (the "Telemarketer"), a FLORIDA [State of incorporation or organization] CORPORATION [type of legal entity, i.e., limited liability company, corporation, etc.].

WITNESSETH:

WHEREAS, the Company is engaged in the business of selling a medical alert system consisting of various medical alarm plans and related safety products (the "Products");

WHEREAS, the Telemarketer is engaged in the business of "Telemarketing", as defined by subsections 310.2 (cc) and (dd) of the federal Telemarketing Sales Rule, 16 C.F.R. Part 310; and

WHEREAS, the Company desires to engage the Telemarketer to provide to the Company outbound telemarketing services (the "Services") pursuant to which the Telemarketer will conduct a plan, program, or campaign to offer to consumers the opportunity to purchase the Company's Products, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants, contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    DESCRIPTION OF SERVICES.    Throughout the Term (as defined below), Telemarketer shall perform the Services in accordance with the following:

        (a)    Telemarketer shall use its best efforts to offer to consumers the opportunity to purchase the Company's Products through Telemarketing;

        (b)    all contact between the Telemarketer and any person on behalf of the Company shall be primarily by outbound telemarketing;

        (c)    Telemarketer shall not contact any current customers of the Company or any other person listed on any local, federal or state "do not call" registry in accordance with Section 6.2 herein;

        (d)    All employees of the Telemarketer shall only use scripts identified by the Company as approved, which approval shall be in the Company's sole discretion;

(                                                          (

(e)    Telemarketer shall record all calls made by all Telemarketer's employees, agents or representatives and retain all recordings (i) for not less than twenty four (24) months from the date each recording is made, and (ii) shall make all such recordings available to the Company for its review at any time; and

(f)    Telemarketer and its employees shall comply with all local, state and federal regulations, including 47 U.S.C.A. § 227, which prohibits the use of automatic telephone dialing systems.

1.1.    <u>Leads</u>. The Telemarketer shall be responsible for obtaining its own Leads. "<u>Leads</u>" means the personal contact information of consumers to be solicited pursuant to this Agreement in accordance with Section 1.2(b).

1.2.    <u>Verification of Acceptance and Payment for the Products</u>. If a consumer orders the Company's Products, the Telemarketer shall obtain the consumer's express verifiable authorization prior to causing billing information to be submitted for payment, or collecting the consumer's payment information for the Products, except when the method of payment used is a credit card subject to the protections of the Truth in Lending Act (15 U.S.C. § 1601 et seq.) and Regulation Z (12 C.F.R. part 226), or a debit card subject to the protections of the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.) and Regulation E (12 C.F.R. part 205). The Telemarketer shall then submit the customer's order of the Company's Products to the Company's principal executive office for acceptance or rejection by the Company. A consumer's authorization to purchase the Product shall be deemed verifiable if any of the following means is employed:

(a)    express written authorization by the consumer, which includes the consumer's signature;

(b)    express oral authorization which is audio-recorded and made available upon request to the consumer and the consumer's bank or other billing entity, and which evidences clearly both the consumer's authorization for payment and the consumer's receipt of all of the following information:

i.     The number of debits, charges, or payments (if more than one);
ii.    The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;
iii.   The amount of the debit(s), charge(s), or payment(s);
iv.    The consumer's name;
v.     The consumer's billing information, identified with sufficient specificity so that the consumer understands what account will be used to collect payment for the goods or services that are the subject of the telemarketing transaction;

2

vi.    A telephone number for consumer inquiry that is answered during normal business hours; and

vii.   The date of the consumer's oral authorization; or

(c)    Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the consumer via first class mail prior to the submission for payment of the consumer's billing information, and that includes all of the information set forth above in subparagraphs 1.2(b) i-vii and a clear and conspicuous statement of the procedures by which the consumer can obtain a refund from the Company in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which the Products are offered in a transaction involving a free-to-pay conversion and pre-acquired account information.

1.3.  Transfer of consumer information to the Company.  Upon obtaining a consumer's acceptance and/or express verifiable authorization, Telemarketer shall transfer the consumer's contact information, the Products selected and billing information to the Company for processing of the payment.

1.4.  Equipment.  Telemarketer shall be responsible for providing, at its own expense, any equipment and supplies necessary to perform its obligations under this Agreement.

1.5.  Adherence to Script.  Telemarketer shall be responsible for ensuring that its employees, subcontractors, agents, etc. strictly adhere to any approved script provided by the Company pursuant to Section 2(d) herein.

1.6   Costs of performance.  Telemarketer shall be solely responsible for all costs and expenses directly associated with performing its obligations under this Agreement, including compensation of its employees or independent contractors, advertising, office expenses, taxes and applicable governmental licensing.

2.    TERM.  The Term of this Agreement shall be for a period of one (1) year from and after the execution of this agreement and shall be automatically renewed for consecutive one (1) year terms (the "Renewal Term") unless earlier terminated pursuant to this Agreement.

3.    TERMINATION.  Nothwithstanding the Term or any Renewal Term, this Agreement may be terminated by either party effective immediately upon written notice to the other party if any of the following occurs:

(a)    a material breach of this Agreement by one party if the breaching party does not cure such breach within ten (10) days of receipt of written notice thereof;

3

(b) in the event that a party: (i) commences a voluntary case or other proceeding seeking liquidation, reorganization or other relief of its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, that authorizes the reorganization or liquidation of such party or its debt or the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property; (ii) consents to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; or (iii) makes a general assignment for the benefit of creditors, or becomes insolvent, or takes any corporate action to authorize any of the foregoing; or

(c) in the event that any regulatory authority alleges that this Agreement or any aspect of the marketing campaign(s) used in connection with this Agreement is in violation of any applicable law, rule or regulation, or in the event that a party is served with a notice from a federal or state governmental or regulatory authority that it has become the subject of an investigation by such authority.

4. <u>COVENANTS OF TELEMARKETER.</u>

4.1 <u>Duty to notify the Company of complaints by consumers.</u> Telemarketer shall promptly provide written notice to the Company of any request it receives from a consumer for a refund, cancellation or chargeback. In addition, Telemarketer shall promptly provide to the Company copies of any written complaints that it receives from customers, Better Business Bureaus or governmental or law enforcement agencies.

4.2 <u>Compliance with applicable law.</u> The Telemarketer shall at all times perform its obligations under this agreement in strict compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

4.3 <u>Record Retention.</u> The Telemarketer shall retain records establishing compliance with 16 C.F.R. 310.4(b)(4)(i)-(iii) and Telemarketer shall maintain, for a minimum period of 24 months from the date the record is produced, the following records relating to its performance under this Agreement:

(a) All substantially different advertising, brochures, telemarketing or text message scripts, and promotional materials;

(b) The name and last known address of each prize recipient and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(c) The name and last known address of each customer, the goods or services purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;

4

(d)     The name, any fictitious name used, the last known home address and telephone number, and the job title(s) for all current and former employees directly involved in telephone sales or solicitations; and

(e)     All verifiable authorizations or records of express informed consent or express agreement required to be provided or received under the Telemarketing Sales Rule promulgated by the Federal Trade Commission.

4.4     <u>Telemarketer's Clients</u>.     The Telemarketer shall not offer any products similar to or competitive with the Company's Products on behalf of any other client or customer of the Telemarketer.

4.5     <u>Covenant Not to Solicit</u>.     During the Term of this Agreement and for a period of two (2) years following the Termination of this Agreement, the Telemarketer shall not transact any business with any manufacturer or supplier of the Company.

5.     <u>COVENANTS OF THE COMPANY</u>.

5.1     <u>Fulfillment of orders for Products</u>.     The Company, or such third party as it may designate shall be responsible for Fulfillment of each telemarketing transaction that is the subject of this Agreement. "Fulfillment" means the process of delivering the goods and services to the consumer along with any written agreement reflecting the terms of the transaction.

5.2     <u>Customer Service</u>.     The Company, or such third party as it may designate in writing, shall be responsible for providing Customer Service to consumers who purchase its Products under this Agreement. "Customer Service" means answering telephone calls from consumers and processing any legitimate requests for refund or cancellation.

5.3     <u>Processing of payment for the Products</u>.     The Company shall be responsible for processing payments from consumers after receiving consumers' billing information from the Telemarketer.

5.4     <u>Compensation</u>.     The Company shall compensate the Telemarketer for services rendered under this Agreement as set forth on Addendum A attached hereto.

5.5     <u>Compliance with applicable law</u>.     The Company shall at all times perform its obligations under this Agreement in strict compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

6.     <u>LEGAL COMPLIANCE REQUIREMENTS</u>.

6.1     <u>Privacy Protection</u>.     The Telemarketer shall not utilize any Leads that contain personal contact or other information that violates applicable law.

5

(B)     Within two (2) seconds after the completed greeting of the person called, a prerecorded message is played that promptly provides the disclosures required by 16 C.F.R. 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

(1)     In the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)(1)(iii)(A) at any time during the message. The mechanism must (a) automatically add the number called to the Company's entity-specific Do Not Call list, (b) once invoked, immediately disconnect the call, and (c) be available for use at any time during the message;

(2)     In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)(1)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that (a) automatically adds the number called to the Company's entity-specific Do Not Call list, (b) immediately thereafter disconnects the call; and (c) is accessible at any time throughout the duration of the telemarketing campaign; and complies with all other requirements of this part and other applicable federal and state laws.

(b)     Paragraph (a) above shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(c)     In addition, the Telemarketer must comply with any state law applicable to prerecorded messages.

6.4     Call Abandonment Safe Harbor.     The Call Abandonment Safe Harbor, subsection 310.4(b)(4)(iii) of the TSR, provides that the Company or the Telemarketer will not be liable for violating 16 C.F.R. 310.4(b)(1)(iv); provided, that (i) the Telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues, (ii) the Telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call, (iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the Telemarketer promptly plays a recorded

7

message that states the name and telephone number of the Company on whose behalf the call was placed. This provision does not affect any of the Telemarketer's obligation to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

6.5    Compliance With State and Local Laws.    Each party shall comply with any applicable state telemarketing, telephone solicitation or consumer protection laws as well as with any applicable state registration and licensing requirements in any state in which it transacts business and/or renders services pursuant to this Agreement, as same may be amended from time to time.

6.6    Compliance With Federal Laws.    Each party shall comply with any applicable federal statutes, rules and regulations while rendering services pursuant to this Agreement, including, but not limited to:

(a)    The Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53(b) and 57b;

(b)    The Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. §6101;

(c)    The Telemarketing Sales Rule, 16 C.F.R. 310;

(d)    The Telephone Consumer Protection Act, 47 U.S.C. § 227, and 47 C.F.R. part 64.1200;

(e)    If a party engages in an electronic marketing campaign, the Controlling The Assault of Non-solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act");

(f)    The provisions of Title 18, section 1037 of the United States Code relating to criminal fraud and related activity in connection with electronic mail;

(g)    The Children's Online Privacy Protection Act ("COPPA"), Title 15, §§ 6501-6506 of the United States Code;

(h)    The Computer Fraud and Abuse Act ("CFAA"), Title 18, section 1030 of the United States Code;

(i)    The federal laws protecting intellectual property (Copyrights are protected by Title 17 of the United States Code, which provides civil remedies for infringement, and Title 18 of the United States Code, which imposes criminal penalties for copyright infringement. Patents and Trademarks are protected by Titles 35 and 15, respectively, of the United States Code, which provide civil remedies for infringement.);

8

(j)     the Electronic Communications Privacy Act (Title 18, sections 2510, 2511 and 2701 of the United States Code, which prohibits the interception, use and disclosure of wire, oral or electronic communications and provide civil remedies and criminal penalties for violations.);

(k)     the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), which seeks to promote the use of electronic signatures in interstate and foreign commerce by declaring that a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form or an electronic signature or record was used in its formation. The Act also requires certain consumer disclosures and the retention of business records;

(l)     The Fair Labor Standards Act of 1938 (Title 29, sections 201-219 of the United States Code) establishes minimum wages and maximum hours for employees and provides remedies and protections to aggrieved employees.  Title 29, sections 541.300 and 541.400 of the Code of Federal Regulations define the exemptions from the minimum wage and maximum hour requirements for executive, administrative, professional, computer and outside sales employees;

(m)     The Fair Housing Act (42 U.S.C. § 3601 et seq.), which prohibits certain forms of discrimination on the basis of race, color, religion, sex, familial status, or national origin;

(n)     The Restore Online Shoppers' Confidence Act (15 U.S.C. §§ 8401-8405), which Prohibits "any post-transaction third party seller" from charging or attempting to charge "any consumer's credit card, debit card, bank account or other financial account for any good or service sold in a transacton effected on the Internet, unless" the third party seller, before getting the consumer's billing information, "clearly and conspicuously" discloses to the consumer "all material terms of the transaction" and gets the consumer's "express informed consent for the charge."  "All material terms of the transaction" must include, in addition to basics already required by existing law like "a description of the goods or services being offered" and "the cost of such goods or services," that the "third party seller is not affiliated with the initial merchant" by disclosing the third party seller's name "in a manner that clearly differentiates the post-transaction third party seller from the initial merchant."  In order to obtain "express informed consent," the third party seller must get from the consumer "the full account number of the account to be charged," "the consumer's name and address and a means to contact the consumer," and require the consumer "to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed."  In addition to imposing new disclosure requirements on post-transaction third party sellers, the Act prohibits the initial merchant from disclosing "a credit card, debit card, bank account, or other financial account number, or to disclose other billing information that is used to charge a customer

9

of the initial merchant, to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller." Finally, the Act prohibits "any person" from charging or attempting to charge "any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature" as defined by the Telemarketing Sales Rule unless the person "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information ... obtains a consumer's express informed consent before charging the consumer's [account] ... and provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's [account]." The Act does not apply unless the company is a (1) a "post-transaction third party seller," (2) discloses billing information to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller, or (3) sells goods or services using a negative option feature.

7.    <u>ACCOUNTING RECORDS.</u> Each party shall maintain true and complete books and records in accordance with generally accepted accounting principles reasonably necessary to determine the amounts payable hereunder.

8.    <u>REPRESENTATIONS AND WARRANTIES OF TELEMARKETER.</u>    Telemarketer represents and warrants to the Company that:

    (a)    it is a corporation duly formed, validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

    (b)    it has the corporate power to enter into this Agreement;

    (c)    the execution, delivery and performance of this Agreement by the Telemarketer has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Telemarketer enforceable in accordance with its terms; and

    (d)    the execution, delivery and performance by the Telemarketer of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Telemarketer is a party to or by which the Telemarketer is bound.

9.    <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY.</u>    The Company represents and covenants to the Telemarketer that:

    (a)    it is a corporation duly formed, validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and

10

authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

      (b)    it has the corporate power to enter into this Agreement;

      (c)    the execution, delivery and performance of this Agreement by the Company has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Company enforceable in accordance with its terms; and

      (d)    the execution, delivery and performance by the Company of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Company is a party to or by which the Company is bound.

10.    INDEMNIFICATION.

      (a)    The parties shall indemnify, defend and hold each other and their directors, officers, employees and agents harmless from and against any and all actual or threatened claims, losses, proceedings, actions, liabilities, judgments, awards or costs, including reasonable attorney's fees and expenses and costs of investigations (collectively, "Losses") arising out of or related to: (a) the breach of any representations or warranties contained in this Agreement; (b) the failure to perform any obligations hereunder; or (c) the failure to comply with applicable law arising out of this Agreement.

      (b)    In the event that any claim is made or asserted against a party entitled to indemnification under this Agreement (the "Indemnified Party"), the Indemnified Party shall with reasonable promptness notify the other party with an indemnification obligation (the "Indemnifying Party") of such claim (the "Claim Notice"), specifying the nature of such claim and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim); provided that, any failure to provide such notice shall not relieve the Indemnifying Party of any obligation hereunder, except to the extent that such Indemnifying Party is irrevocably prejudiced thereby. The Indemnifying Party shall have fifteen (15) days from the receipt of the Claim Notice (the "Notice Period") to notify the Indemnified Party (i) whether or not the Indemnifying Party disputes liability to the Indemnified Party hereunder with respect to such claim and (ii) if the Indemnifying Party does not dispute such liability, whether or not the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend against such claim; provided further, that, the Indemnified Party is hereby authorized (but not obligated) prior to and during the Notice Period to file any motion, answer or other pleading and to take any other action that the Indemnified Party shall deem necessary or appropriate to protect the Indemnified Party's interests. In the event that the Indemnifying Party notifies the Indemnified Party within

11

the Notice Period that the Indemnifying Party does not dispute the Indemnifying Party's obligation to indemnify hereunder and desires to defend against such claim, except as hereinafter provided, the Indemnifying Party shall have the right to defend by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the Indemnifying Party to a final conclusion; provided, further, that, unless the Indemnified Party otherwise agrees in writing, the Indemnifying Party may not settle any matter (in whole or in part) unless such settlement includes a complete and unconditional release of the Indemnified Party and provides solely for monetary damages. If the Indemnified Party desires to participate in, but not control, any such defense or settlement the Indemnified Party may do so at its sole cost and expense. If the Indemnifying Party (a) fails to timely notify the Indemnified Party it will not defend or (b) actually fails to defend the Indemnified Party against such Claim, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then, without waiving any rights or conflict of interest Claims against the Indemnifying Party, the Indemnified Party may settle or defend against any such claim or demand in the Indemnified Party's sole discretion at the cost of the Indemnifying Party and, if it is ultimately determined that the Indemnifying Party is responsible therefore under this Section, then the Indemnified Party shall be entitled to recover from the Indemnifying Party the amount of any settlement or judgment and all indemnifiable costs and expenses of the Indemnified Party with respect thereto, including, without limitation, interest from the date such costs and expenses were incurred.

(c)     This section shall survive the expiration or termination of this Agreement.

## 11.   TRADE SECRETS AND CONFIDENTIALITY.

11.1     Covenant not to Compete. During the term of this Agreement, the Telemarketer covenants and agrees not to directly or indirectly offer for sale in the United States of America or Canada any goods or services that are substantially similar to the Company's Products.

11.2     Trade Secrets and Confidential Information. The Telemarketer recognizes that the Company's trade secrets and confidential information were developed through considerable investment of time, effort and money, are proprietary, and their disclosure would be harmful and damaging to it's business.

"Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:  (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Confidential Information" means information that would cause an unfair advantage to competitors by providing them information as to the commercial operations of the Company and

12

includes, but is not limited to business lists; records and information of prospective and actual customer names and other personal information of consumers, including contacts, addresses, and lists, contracts, transactions, plans, designs, policies, reports, histories, information reports and information; customer leads and methods of generating customer leads; scripts, sales techniques, policies, methods and procedures for sales; pricing and marketing; prices and price lists; inventory and inventory lists; vendors' names and contact information, supplies, suppliers' names and addresses, and supplier and supply lists; manufacturer, distributor and supplier company names, contacts, addresses, lists, transactions, contracts, policies, reports, histories, products, rate books, comparisons, and information; advertising, advertising copy and programs; endorsers' names and addresses; sales reports, business reports, financial statements and reports, and operating statements; employees, agents, subagents, and independent contractor names, addresses, lists, commissions, productivity and information; computer programs, computer software, databases, and data; and know-how, discoveries, inventions, writings, conceptions, knowledge, information, plans, programs, and ideas and tangible expressions of ideas.

"Customer" or "Consumer" means anyone whose name appears on a database, lead list, customer list, or report of the Company; anyone to whom the Company has sold, rendered or exchanged any Products; anyone who has ordered any Products from the Company; and anyone solicited by the Company for the sale of any Products pursuant to this Agreement.

These lists are not exclusive; there may now and in the future be other types of information that constitute trade secrets and confidential information and which are included within the scope of this Agreement.

    11.3   **Return of Tangible Information**. The Telemarketer agrees that all books, papers, records, lists, files, forms, reports, accounts, documents, supplies, equipment, photographs, cassettes, compact disks, videotapes, databases, disks, data, computers, peripherals, hardware, programs, software, floppy disks, hard drives, magnetic media, storage media, CD-ROMs, accessories, parts, components, manuals, documentation, research papers and information relating in any manner to the Company or its business, operations, prices, vendors, suppliers or customers, whether prepared by the parties hereto or anyone else, and whether or not containing a trade secret or confidential information, that were disclosed or turned over to the Telemarketer pursuant to this Agreement are the exclusive property of the Company and that any such tangible documents or information, whether electronic or hard copy shall immediately be returned to the Company within 10 days after termination of this Agreement or earlier at the Company's request at any time.

    11.4   **Confidentiality by the Telemarketer**. The Telemarketer agrees to keep secret and treat confidentially all of the Company's trade secrets and confidential information (whether or not copyrightable or patentable). Specifically, the Telemarketer agrees not to do any of the following, directly or indirectly: use, publish, disclose or communicate any of the Company's Trade Secrets or Confidential Information to anyone; print, copy, publish, display, reproduce or allow anyone else to print, copy, publish, display or reproduce any information in tangible form

13

containing a trade secret or Confidential Information; aid others in learning of or using or planning the use of any of the Company's Trade Secrets or Confidential Information; use the Company's Trade Secrets or Confidential Information for its own account or benefit; or aid, assist or plan for other persons to use the Company's Trade Secrets or Confidential Information for their own account or benefit. This obligation of confidentiality shall exist while the parties are engaged in discussions or negotiations to determine whether to enter into a business relationship and shall continue after the date of termination of such discussions or negotiations for the longer of ten (10) years or the date that all elements of the Trade Secrets and Confidential Information are public knowledge and no longer proprietary to the Company. This obligation of confidentiality shall not be released in case of the public availability of a part of the Company's Trade Secrets or Confidential Information, it being acknowledged that individual elements of the Company's Trade Secrets or Confidential Information may through no fault of its own become publicly available, but the availability of individual elements of Trade Secrets or Confidential Information does not result in appreciation of the use or value of those elements nor does it make publicly known the integrated package of information and know-how having value to the Company's business as useful information.

12.     REMEDIES.  The Telemarketer agrees that each of the above matters is important, material, confidential, and gravely affects the effective and successful conduct of the business of the Company and affects its value, reputation and goodwill. If the Telemarketer breaches any provision of this Agreement, the Company shall be entitled to obtain temporary and permanent injunctions, specific performance, damages (to the extent, if at all, that they are ascertainable; including but not limited to compensatory, incidental, consequential, punitive, exemplary, and lost-profits damages), costs and reasonable attorneys' fees at all levels, including but not limited to appeals without any requirement to post a bond, security or other undertaking. The Telemarketer agrees that if it breaches any provision of this Agreement it shall be conclusively presumed that irreparable injury would result to the Company and there would be no adequate remedy at law. This Agreement does not limit the rights and remedies that the Company otherwise has by law, equity or statute.

13.     NOTICES.    All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and will be deemed to have been given (i) when delivered if personally delivered by hand (with written confirmation of receipt), (ii) when received if sent by a nationally recognized overnight courier service (receipt requested), (iii) shall be mailed by registered or certified mail, postage prepaid, after five (5) days, or (iv) if sent via facsimile, upon confirmation of facsimile transmission, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (v) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.  Notices, demands and communications to the Company and Telemarketer will, unless another address is specified in writing, be sent to the address indicated below:

14

If to the Company:

Lifewatch, Inc.
1315B Broadway, suite 106
Hewlett, New York 11557
Attention: Evan Sirlin
Facsimile: (516)
Email: evan@lifewatch-usa.com

With a copy (which shall not serve as notice) to:

Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara &
Einiger, LLP
1111 Marcus Avenue - Suite 107
Lake Success, New York

11042

Attention: Neil Kaufman
Fax No.: (516) 328-6638
Email: nkaufman@abramslaw.com

If to the Telemarketer:

WORLD WIDE INFO SERVICES
4915 Semeran Blvd
CASSELBERRY FL 32707
Facsimile: _____
Email: WWINFOSERVICES@GMAIL.COM

14.   MISCELLANEOUS.

14.1   Governing Law.  This agreement shall be governed, interpreted, construed and enforced in accordance with the laws of the State of New York without regard to the conflict of laws principles thereof.  The parties thereto do hereby consent and submit to the venue and jurisdiction of the state and federal courts sitting in the State of New York, County of Nassau, as the sole and exclusive forum for the enforcement of this Agreement, and further agree that, in the event of any action or suit as to any matters of dispute between the parties, service of any process may be made upon the other party in the same matter as the giving of notices under paragraph 13 of this Agreement.

14.2   Attorney's Fees and Costs.  In any litigation arising out of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees and expenses and costs of litigation, at the trial and appellate levels.

15

14.3  Merger Clause.  This Agreement and any attached Addenda constitute(s) the entire understanding between the parties with respect to the subject matter hereof and all prior or collateral negotiations, understandings or agreements are merged herein.

14.4  Modification.  This Agreement may be amended or modified only by a written instrument signed by each of the parties hereto.

14.5  Severability.  In the event any provision of this agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be fully severable and this agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this agreement, a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible (while maintaining the economic intent of the parties under this Agreement) and be legal, valid, and enforceable.

14.6  Assignment.  Except as otherwise provided herein, Telemarketer may not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other party.  Any attempted or purported assignment in violation of this provision shall be null and void.

14.7  Waiver.  The failure of either party to this Agreement to object to or to take affirmative action with respect to any conduct of the other which is in violation of the terms of this agreement, shall not be construed as a waiver of that conduct or any future breach or subsequent wrongful conduct.

14.8  Headings.  The headings in this Agreement are inserted for convenience only and shall not affect the interpretation or construction of this agreement or any portion thereof.

14.9  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

14.10  Parties Bound.  This Agreement shall be binding upon the parties, their successors in interest and assigns.

(Signature page to follow.)

16

WHEREFORE, the parties have executed this Agreement as of the Effective Date set forth above.

The Company:

LIFEWATCH INC.

By: _____
    Evan Sirlin
    President

The Telemarketer:

*World Wide Info Services*

By: _____
    Name: Richard Goldstein
    Title: Director Of Sales

# EXHIBIT E

## TELEMARKETING SERVICES AGREEMENT

This telemarketing services agreement (the "Agreement") is entered into on the _____ day of June, 2012 (the "Effective Date") by and between LifeWatch, Inc. d/b/a LifeWatch USA (the "Company"), a New York corporation, and The Consumer Voice (the "Telemarketer"), a LLC _____ [State of incorporation or organization] Florida _____ [type of legal entity, i.e., limited liability company, corporation, etc.].

WITNESSETH:

WHEREAS, the Company is engaged in the business of selling a medical alert system consisting of various medical alarm plans and related safety products (the "Products");

WHEREAS, the Telemarketer is engaged in the business of "Telemarketing", as defined by subsections 310.2 (cc) and (dd) of the federal Telemarketing Sales Rule, 16 C.F.R. Part 310; and

WHEREAS, the Company desires to engage the Telemarketer to provide to the Company outbound telemarketing services (the "Services") pursuant to which the Telemarketer will conduct a plan, program, or campaign to offer to consumers the opportunity to purchase the Company's Products, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants, contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    DESCRIPTION OF SERVICES.    Throughout the Term (as defined below), Telemarketer shall perform the Services in accordance with the following:

      (a)    Telemarketer shall use its best efforts to offer to consumers the opportunity to purchase the Company's Products through Telemarketing;

      (b)    all contact between the Telemarketer and any person on behalf of the Company shall be primarily by outbound telemarketing;

      (c)    Telemarketer shall not contact any current customers of the Company or any other person listed on any local, federal or state "do not call" registry in accordance with Section 6.2 herein;

      (d)    All employees of the Telemarketer shall only use scripts identified by the Company as approved, which approval shall be in the Company's sole discretion;

(e)     Telemarketer shall record all calls made by all Telemarketer's employees, agents or representatives and retain all recordings (i) for not less than twenty four (24) months from the date each recording is made, and (ii) shall make all such recordings available to the Company for its review at any time; and

(f)     Telemarketer and its employees shall comply with all local, state and federal regulations, including 47 U.S.C.A. § 227, which prohibits the use of automatic telephone dialing systems.

1.1.     Leads. The Telemarketer shall be responsible for obtaining its own Leads. "Leads" means the personal contact information of consumers to be solicited pursuant to this Agreement in accordance with Section 1.2(b).

1.2.     Verification of Acceptance and Payment for the Products. If a consumer orders the Company's Products, the Telemarketer shall obtain the consumer's express verifiable authorization prior to causing billing information to be submitted for payment, or collecting the consumer's payment information for the Products, except when the method of payment used is a credit card subject to the protections of the Truth in Lending Act (15 U.S.C. § 1601 et seq.) and Regulation Z (12 C.F.R. part 226), or a debit card subject to the protections of the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.) and Regulation E (12 C.F.R. part 205). The Telemarketer shall then submit the customer's order of the Company's Products to the Company's principal executive office for acceptance or rejection by the Company. A consumer's authorization to purchase the Product shall be deemed verifiable if any of the following means is employed:

(a)     express written authorization by the consumer, which includes the consumer's signature;

(b)     express oral authorization which is audio-recorded and made available upon request to the consumer and the consumer's bank or other billing entity, and which evidences clearly both the consumer's authorization for payment and the consumer's receipt of all of the following information:

i.     The number of debits, charges, or payments (if more than one);
ii.     The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;
iii.     The amount of the debit(s), charge(s), or payment(s);
iv.     The consumer's name;
v.     The consumer's billing information, identified with sufficient specificity so that the consumer understands what account will be used to collect payment for the goods or services that are the subject of the telemarketing transaction;

2

vi.   A telephone number for consumer inquiry that is answered during normal business hours; and

vii.  The date of the consumer's oral authorization; or

(c)   Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the consumer via first class mail prior to the submission for payment of the consumer's billing information, and that includes all of the information set forth above in subparagraphs 1.2(b) i-vii and a clear and conspicuous statement of the procedures by which the consumer can obtain a refund from the Company in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which the Products are offered in a transaction involving a free-to-pay conversion and pre-acquired account information.

1.3.  Transfer of consumer information to the Company.  Upon obtaining a consumer's acceptance and/or express verifiable authorization, Telemarketer shall transfer the consumer's contact information, the Products selected and billing information to the Company for processing of the payment.

1.4.  Equipment.  Telemarketer shall be responsible for providing, at its own expense, any equipment and supplies necessary to perform its obligations under this Agreement.

1.5.  Adherence to Script.  Telemarketer shall be responsible for ensuring that its employees, subcontractors, agents, etc. strictly adhere to any approved script provided by the Company pursuant to Section 2(d) herein.

1.6   Costs of performance.  Telemarketer shall be solely responsible for all costs and expenses directly associated with performing its obligations under this Agreement, including compensation of its employees or independent contractors, advertising, office expenses, taxes and applicable governmental licensing.

2.    TERM.  The Term of this Agreement shall be for a period of one (1) year from and after the execution of this agreement and shall be automatically renewed for consecutive one (1) year terms (the "Renewal Term") unless earlier terminated pursuant to this Agreement.

3.    TERMINATION.  Notwithstanding the Term or any Renewal Term, this Agreement may be terminated by either party effective immediately upon written notice to the other party if any of the following occurs:

(a)   a material breach of this Agreement by one party if the breaching party does not cure such breach within ten (10) days of receipt of written notice thereof;

3

(b)     in the event that a party: (i) commences a voluntary case or other proceeding seeking liquidation, reorganization or other relief of its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, that authorizes the reorganization or liquidation of such party or its debt or the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property; (ii) consents to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; or (iii) makes a general assignment for the benefit of creditors, or becomes insolvent, or takes any corporate action to authorize any of the foregoing; or

(c)     in the event that any regulatory authority alleges that this Agreement or any aspect of the marketing campaign(s) used in connection with this Agreement is in violation of any applicable law, rule or regulation, or in the event that a party is served with a notice from a federal or state governmental or regulatory authority that it has become the subject of an investigation by such authority.

4.     COVENANTS OF TELEMARKETER.

4.1     Duty to notify the Company of complaints by consumers.     Telemarketer shall promptly provide written notice to the Company of any request it receives from a consumer for a refund, cancellation or chargeback.     In addition, Telemarketer shall promptly provide to the Company copies of any written complaints that it receives from customers, Better Business Bureaus or governmental or law enforcement agencies.

4.2     Compliance with applicable law.     The Telemarketer shall at all times perform its obligations under this agreement in strict compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

4.3     Record Retention.     The Telemarketer shall retain records establishing compliance with 16 C.F.R. 310.4(b)(4)(I)-(iii) and Telemarketer shall maintain, for a minimum period of 24 months from the date the record is produced, the following records relating to its performance under this Agreement:

(a)     All substantially different advertising, brochures, telemarketing or text message scripts, and promotional materials;

(b)     The name and last known address of each prize recipient and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(c)     The name and last known address of each customer, the goods or services purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;

4

(d)     The name, any fictitious name used, the last known home address and telephone number, and the job title(s) for all current and former employees directly involved in telephone sales or solicitations; and

(e)     All verifiable authorizations or records of express informed consent or express agreement required to be provided or received under the Telemarketing Sales Rule promulgated by the Federal Trade Commission.

4.4     <u>Telemarketer's Clients</u>.     The Telemarketer shall not offer any products similar to or competitive with the Company's Products on behalf of any other client or customer of the Telemarketer.

4.5     <u>Covenant Not to Solicit</u>.     During the Term of this Agreement and for a period of two (2) years following the Termination of this Agreement, the Telemarketer shall not transact any business with any manufacturer or supplier of the Company.

5.     <u>COVENANTS OF THE COMPANY</u>.

5.1     <u>Fulfillment of orders for Products</u>.  The Company, or such third party as it may designate shall be responsible for Fulfillment of each telemarketing transaction that is the subject of this Agreement.  "Fulfillment" means the process of delivering the goods and services to the consumer along with any written agreement reflecting the terms of the transaction.

5.2     <u>Customer Service</u>.  The Company, or such third party as it may designate in writing, shall be responsible for providing Customer Service to consumers who purchase its Products under this Agreement.  "Customer Service" means answering telephone calls from consumers and processing any legitimate requests for refund or cancellation.

5.3     <u>Processing of payment for the Products</u>.  The Company shall be responsible for processing payments from consumers after receiving consumers' billing information from the Telemarketer.

5.4     <u>Compensation</u>.  The Company shall compensate the Telemarketer for services rendered under this Agreement as set forth on Addendum A attached hereto.

5.5     <u>Compliance with applicable law</u>.  The Company shall at all times perform its obligations under this Agreement in strict compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

6.     <u>LEGAL COMPLIANCE REQUIREMENTS</u>.

6.1     <u>Privacy Protection</u>.  The Telemarketer shall not utilize any Leads that contain personal contact or other information that violates applicable law.

5

6.2     Scrubbing of Leads.  All Leads purchased or otherwise acquired or used by the Telemarketer while performing its obligations under this Agreement must be "scrubbed" against the most current Federal Trade Commission ("FTC") "do-not-call" registry, any applicable state "do-not-call" list or registry, as well as the Company's "do not call" list or registry.  Telemarketer will not contact any person included on any such list or registry.

6.3     Use of Pre-Recorded Messages. Telemarketer shall not initiate any outbound telephone call that delivers a prerecorded message unless it strictly complies with subsection 16 C.F.R. 310.4(b)(1)(v) of the Federal Telemarketing Sales Rule, which makes it an abusive telemarketing act or practice for the Telemarketer to engage in, or for the Company to cause the Telemarketer to engage in, the following conduct:

(a)     Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in 16 C.F.R. 310.4(b)(4)(iii), unless:

(i)     in any such call to induce the purchase of any Products, the Company has obtained from the recipient of the call an express agreement, in writing, that:

(A)     the Company obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the Company to place prerecorded calls to such person;

(B)     the Company obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any Products;

(C)     evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the Company; and

(D)     includes such person's telephone number and signature, which "signature" may include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

(ii) In any such call, to induce the purchase of any Product of the Company:

(A)     The telephone is allowed to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

6

(B)  Within two (2) seconds after the completed greeting of the person called, a prerecorded message is played that promptly provides the disclosures required by 16 C.F.R. 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

(1)  In the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)(1)(iii)(A) at any time during the message. The mechanism must (a) automatically add the number called to the Company's entity-specific Do Not Call list, (b) once invoked, immediately disconnect the call, and (c) be available for use at any time during the message;

(2) In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)(1)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that (a) automatically adds the number called to the Company's entity-specific Do Not Call list, (b) immediately thereafter disconnects the call; and (c) is accessible at any time throughout the duration of the telemarketing campaign; and complies with all other requirements of this part and other applicable federal and state laws.

(b)  Paragraph (a) above shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(c)  In addition, the Telemarketer must comply with any state law applicable to prerecorded messages.

6.4  Call Abandonment Safe Harbor.  The Call Abandonment Safe Harbor, subsection 310.4(b)(4)(iii) of the TSR, provides that the Company or the Telemarketer will not be liable for violating 16 C.F.R. 310.4(b)(1)(iv); provided, that (i) the Telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues, (ii) the Telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call, (iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the Telemarketer promptly plays a recorded

7

message that states the name and telephone number of the Company on whose behalf the call was placed. This provision does not affect any of the Telemarketer's obligation to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

6.5 <u>Compliance With State and Local Laws.</u>   Each party shall comply with any applicable state telemarketing, telephone solicitation or consumer protection laws as well as with any applicable state registration and licensing requirements in any state in which it transacts business and/or renders services pursuant to this Agreement, as same may be amended from time to time.

6.6 <u>Compliance With Federal Laws.</u>   Each party shall comply with any applicable federal statutes, rules and regulations while rendering services pursuant to this Agreement, including, but not limited to:

(a)   The Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53(b) and 57b;

(b)   The Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. §6101;

(c)   The Telemarketing Sales Rule, 16 C.F.R. 310;

(d)   The Telephone Consumer Protection Act, 47 U.S.C. § 227, and 47 C.F.R. part 64.1200;

(e)   If a party engages in an electronic marketing campaign, the Controlling The Assault of Non-solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act");

(f)   The provisions of Title 18, section 1037 of the United States Code relating to criminal fraud and related activity in connection with electronic mail;

(g)   The Children's Online Privacy Protection Act ("COPPA"), Title 15, §§ 6501-6506 of the United States Code;

(h)   The Computer Fraud and Abuse Act ("CFAA"), Title 18, section 1030 of the United States Code;

(i)   The federal laws protecting intellectual property (Copyrights are protected by Title 17 of the United States Code, which provides civil remedies for infringement, and Title 18 of the United States Code, which imposes criminal penalties for copyright infringement.  Patents and Trademarks are protected by Titles 35 and 15, respectively, of the United States Code, which provide civil remedies for infringement.);

8

(j)     the Electronic Communications Privacy Act (Title 18, sections 2510, 2511 and 2701 of the United States Code, which prohibits the interception, use and disclosure of wire, oral or electronic communications and provide civil remedies and criminal penalties for violations.);

(k)     the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), which seeks to promote the use of electronic signatures in interstate and foreign commerce by declaring that a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form or an electronic signature or record was used in its formation. The Act also requires certain consumer disclosures and the retention of business records;

(l)     The Fair Labor Standards Act of 1938 (Title 29, sections 201-219 of the United States Code) establishes minimum wages and maximum hours for employees and provides remedies and protections to aggrieved employees. Title 29, sections 541.300 and 541.400 of the Code of Federal Regulations define the exemptions from the minimum wage and maximum hour requirements for executive, administrative, professional, computer and outside sales employees;

(m)     The Fair Housing Act (42 U.S.C. § 3601 et seq.), which prohibits certain forms of discrimination on the basis of race, color, religion, sex, familial status, or national origin;

(n)     The Restore Online Shoppers' Confidence Act (15 U.S.C. §§ 8401-8405), which Prohibits "any post-transaction third party seller" from charging or attempting to charge "any consumer's credit card, debit card, bank account or other financial account for any good or service sold in a transaction effected on the Internet, unless" the third party seller, before getting the consumer's billing information, "clearly and conspicuously" discloses to the consumer "all material terms of the transaction" and gets the consumer's "express informed consent for the charge." "All material terms of the transaction" must include, in addition to basics already required by existing law like "a description of the goods or services being offered" and "the cost of such goods or services," that the "third party seller is not affiliated with the initial merchant" by disclosing the third party seller's name "in a manner that clearly differentiates the post-transaction third party seller from the initial merchant." In order to obtain "express informed consent," the third party seller must get from the consumer "the full account number of the account to be charged," "the consumer's name and address and a means to contact the consumer," and require the consumer "to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed." In addition to imposing new disclosure requirements on post-transaction third party sellers, the Act prohibits the initial merchant from disclosing "a credit card, debit card, bank account, or other financial account number, or to disclose other billing information that is used to charge a customer

9

of the initial merchant, to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller." Finally, the Act prohibits "any person" from charging or attempting to charge "any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature" as defined by the Telemarketing Sales Rule unless the person "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information ... obtains a consumer's express informed consent before charging the consumer's [account] ... and provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's [account]." The Act does not apply unless the company is a (1) a "post-transaction third party seller," (2) discloses billing information to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller, or (3) sells goods or services using a negative option feature.

7.     ACCOUNTING RECORDS. Each party shall maintain true and complete books and records in accordance with generally accepted accounting principles reasonably necessary to determine the amounts payable hereunder.

8.     REPRESENTATIONS AND WARRANTIES OF TELEMARKETER.   Telemarketer represents and warrants to the Company that:

          (a)     it is a corporation duly formed, validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

          (b)     it has the corporate power to enter into this Agreement;

          (c)     the execution, delivery and performance of this Agreement by the Telemarketer has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Telemarketer enforceable in accordance with its terms; and

          (d)     the execution, delivery and performance by the Telemarketer of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Telemarketer is a party to or by which the Telemarketer is bound.

9.     REPRESENTATIONS AND WARRANTIES OF THE COMPANY.     The Company represents and covenants to the Telemarketer that:

          (a)     it is a corporation duly formed, validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and

10

authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

     (b)    it has the corporate power to enter into this Agreement;

     (c)    the execution, delivery and performance of this Agreement by the Company has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Company enforceable in accordance with its terms; and

     (d)    the execution, delivery and performance by the Company of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Company is a party to or by which the Company is bound.

10.    INDEMNIFICATION.

     (a)    The parties shall indemnify, defend and hold each other and their directors, officers, employees and agents harmless from and against any and all actual or threatened claims, losses, proceedings, actions, liabilities, judgments, awards or costs, including reasonable attorney's fees and expenses and costs of investigations (collectively, "Losses") arising out of or related to: (a) the breach of any representations or warranties contained in this Agreement; (b) the failure to perform any obligations hereunder; or (c) the failure to comply with applicable law arising out of this Agreement.

     (b)    In the event that any claim is made or asserted against a party entitled to indemnification under this Agreement (the "Indemnified Party"), the Indemnified Party shall with reasonable promptness notify the other party with an indemnification obligation (the "Indemnifying Party") of such claim (the "Claim Notice"), specifying the nature of such claim and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim); provided that, any failure to provide such notice shall not relieve the Indemnifying Party of any obligation hereunder, except to the extent that such Indemnifying Party is irrevocably prejudiced thereby. The Indemnifying Party shall have fifteen (15) days from the receipt of the Claim Notice (the "Notice Period") to notify the Indemnified Party (i) whether or not the Indemnifying Party disputes liability to the Indemnified Party hereunder with respect to such claim and (ii) if the Indemnifying Party does not dispute such liability, whether or not the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend against such claim; provided further, that, the Indemnified Party is hereby authorized (but not obligated) prior to and during the Notice Period to file any motion, answer or other pleading and to take any other action that the Indemnified Party shall deem necessary or appropriate to protect the Indemnified Party's interests. In the event that the Indemnifying Party notifies the Indemnified Party within

11

the Notice Period that the Indemnifying Party does not dispute the Indemnifying Party's obligation to indemnify hereunder and desires to defend against such claim, except as hereinafter provided, the Indemnifying Party shall have the right to defend by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the Indemnifying Party to a final conclusion; provided, further, that, unless the Indemnified Party otherwise agrees in writing, the Indemnifying Party may not settle any matter (in whole or in part) unless such settlement includes a complete and unconditional release of the Indemnified Party and provides solely for monetary damages. If the Indemnified Party desires to participate in, but not control, any such defense or settlement the Indemnified Party may do so at its sole cost and expense. If the Indemnifying Party (a) fails to timely notify the Indemnified Party it will not defend or (b) actually fails to defend the Indemnified Party against such Claim, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then, without waiving any rights or conflict of interest Claims against the Indemnifying Party, the Indemnified Party may settle or defend against any such claim or demand in the Indemnified Party's sole discretion at the cost of the Indemnifying Party and, if it is ultimately determined that the Indemnifying Party is responsible therefore under this Section, then the Indemnified Party shall be entitled to recover from the Indemnifying Party the amount of any settlement or judgment and all indemnifiable costs and expenses of the Indemnified Party with respect thereto, including, without limitation, interest from the date such costs and expenses were incurred.

     (c)    This section shall survive the expiration or termination of this Agreement.

11.    <u>TRADE SECRETS AND CONFIDENTIALITY</u>.

    11.1   <u>Covenant not to Compete</u>. During the term of this Agreement, the Telemarketer covenants and agrees not to directly or indirectly offer for sale in the United States of America or Canada any goods or services that are substantially similar to the Company's Products.

    11.2   <u>Trade Secrets and Confidential Information</u>. The Telemarketer recognizes that the Company's trade secrets and confidential information were developed through considerable investment of time, effort and money, are proprietary, and their disclosure would be harmful and damaging to it's business.

"<u>Trade Secret</u>" means information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"<u>Confidential Information</u>" means information that would cause an unfair advantage to competitors by providing them information as to the commercial operations of the Company and

12

includes, but is not limited to business lists; records and information of prospective and actual customer names and other personal information of consumers, including contacts, addresses, and lists, contracts, transactions, plans, designs, policies, reports, histories, information reports and information; customer leads and methods of generating customer leads; scripts, sales techniques, policies, methods and procedures for sales; pricing and marketing; prices and price lists; inventory and inventory lists; vendors' names and contact information, supplies, suppliers' names and addresses, and supplier and supply lists; manufacturer, distributor and supplier company names, contacts, addresses, lists, transactions, contracts, policies, reports, histories, products, rate books, comparisons, and information; advertising, advertising copy and programs; endorsers' names and addresses; sales reports, business reports, financial statements and reports, and operating statements; employees, agents, subagents, and independent contractor names, addresses, lists, commissions, productivity and information; computer programs, computer software, databases, and data; and know-how, discoveries, inventions, writings, conceptions, knowledge, information, plans, programs, and ideas and tangible expressions of ideas.

"Customer" or "Consumer" means anyone whose name appears on a database, lead list, customer list, or report of the Company; anyone to whom the Company has sold, rendered or exchanged any Products; anyone who has ordered any Products from the Company; and anyone solicited by the Company for the sale of any Products pursuant to this Agreement.

These lists are not exclusive; there may now and in the future be other types of information that constitute trade secrets and confidential information and which are included within the scope of this Agreement.

11.3   <u>Return of Tangible Information</u>. The Telemarketer agrees that all books, papers, records, lists, files, forms, reports, accounts, documents, supplies, equipment, photographs, cassettes, compact disks, videotapes, databases, disks, data, computers, peripherals, hardware, programs, software, floppy disks, hard drives, magnetic media, storage media, CD-ROMs, accessories, parts, components, manuals, documentation, research papers and information relating in any manner to the Company or its business, operations, prices, vendors, suppliers or customers, whether prepared by the parties hereto or anyone else, and whether or not containing a trade secret or confidential information, that were disclosed or turned over to the Telemarketer pursuant to this Agreement are the exclusive property of the Company and that any such tangible documents or information, whether electronic or hard copy shall immediately be returned to the Company within 10 days after termination of this Agreement or earlier at the Company's request at any time.

11.4   <u>Confidentiality by the Telemarketer</u>. The Telemarketer agrees to keep secret and treat confidentially all of the Company's trade secrets and confidential information (whether or not copyrightable or patentable). Specifically, the Telemarketer agrees not to do any of the following, directly or indirectly: use, publish, disclose or communicate any of the Company's Trade Secrets or Confidential Information to anyone; print, copy, publish, display, reproduce or allow anyone else to print, copy, publish, display or reproduce any information in tangible form

13

containing a trade secret or Confidential Information; aid others in learning of or using or planning the use of any of the Company's Trade Secrets or Confidential Information; use the Company's Trade Secrets or Confidential Information for its own account or benefit; or aid, assist or plan for other persons to use the Company's Trade Secrets or Confidential Information for their own account or benefit. This obligation of confidentiality shall exist while the parties are engaged in discussions or negotiations to determine whether to enter into a business relationship and shall continue after the date of termination of such discussions or negotiations for the longer of ten (10) years or the date that all elements of the Trade Secrets and Confidential Information are public knowledge and no longer proprietary to the Company. This obligation of confidentiality shall not be released in case of the public availability of a part of the Company's Trade Secrets or Confidential Information, it being acknowledged that individual elements of the Company's Trade Secrets or Confidential Information may through no fault of its own become publicly available, but the availability of individual elements of Trade Secrets or Confidential Information does not result in appreciation of the use or value of those elements nor does it make publicly known the integrated package of information and know-how having value to the Company's business as useful information.

12.   REMEDIES.  The Telemarketer agrees that each of the above matters is important, material, confidential, and gravely affects the effective and successful conduct of the business of the Company and affects its value, reputation and goodwill. If the Telemarketer breaches any provision of this Agreement, the Company shall be entitled to obtain temporary and permanent injunctions, specific performance, damages (to the extent, if at all, that they are ascertainable; including but not limited to compensatory, incidental, consequential, punitive, exemplary, and lost-profits damages), costs and reasonable attorneys' fees at all levels, including but not limited to appeals without any requirement to post a bond, security or other undertaking. The Telemarketer agrees that if it breaches any provision of this Agreement it shall be conclusively presumed that irreparable injury would result to the Company and there would be no adequate remedy at law. This Agreement does not limit the rights and remedies that the Company otherwise has by law, equity or statute.

13.   NOTICES.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and will be deemed to have been given (i) when delivered if personally delivered by hand (with written confirmation of receipt), (ii) when received if sent by a nationally recognized overnight courier service (receipt requested), (iii) shall be mailed by registered or certified mail, postage prepaid, after five (5) days, or (iv) if sent via facsimile, upon confirmation of facsimile transmission, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (v) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day. Notices, demands and communications to the Company and Telemarketer will, unless another address is specified in writing, be sent to the address indicated below:

14

If to the Company:

Lifewatch, Inc.
1315B Broadway, suite 106
Hewlett, New York 11557
Attention: Evan Sirlin
Facsimile: (516)
Email: evan@lifewatch-usa.com

With a copy (which shall not serve as notice) to:

Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara &
Einiger, LLP
1111 Marcus Avenue - Suite 107
Lake Success, New York

11042

Attention: Neil Kaufman
Fax No.: (516) 328-6638
Email: nkaufman@abramslaw.com

If to the Telemarketer:
The Consumers Voice
18930 US 19 N. Suite 330
Clearwater, FL 33764
Facsimile: 722-499-6695
Email: DHeritage@TheCreditVoice.com

## 14. MISCELLANEOUS.

14.1 <u>Governing Law</u>. This agreement shall be governed, interpreted, construed and enforced in accordance with the laws of the State of New York without regard to the conflict of laws principles thereof. The parties thereto do hereby consent and submit to the venue and jurisdiction of the state and federal courts sitting in the State of New York, County of Nassau, as the sole and exclusive forum for the enforcement of this Agreement, and further agree that; in the event of any action or suit as to any matters of dispute between the parties, service of any process may be made upon the other party in the same matter as the giving of notices under paragraph 13 of this Agreement.

14.2 <u>Attorney's Fees and Costs</u>. In any litigation arising out of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees and expenses and costs of litigation, at the trial and appellate levels.

14.3    Merger Clause.    This Agreement and any attached Addenda constitute(s) the entire understanding between the parties with respect to the subject matter hereof and all prior or collateral negotiations, understandings or agreements are merged herein.

14.4    Modification.    This Agreement may be amended or modified only by a written instrument signed by each of the parties hereto.

14.5    Severability.    In the event any provision of this agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be fully severable and this agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this agreement, a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible (while maintaining the economic intent of the parties under this Agreement) and be legal, valid, and enforceable.

14.6    Assignment.    Except as otherwise provided herein, Telemarketer may not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other party.  Any attempted or purported assignment in violation of this provision shall be null and void.

14.7    Waiver.    The failure of either party to this Agreement to object to or to take affirmative action with respect to any conduct of the other which is in violation of the terms of this agreement, shall not be construed as a waiver of that conduct or any future breach or subsequent wrongful conduct.

14.8    Headings.    The headings in this Agreement are inserted for convenience only and shall not affect the interpretation or construction of this agreement or any portion thereof.

14.9    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

14.10    Parties Bound.    This Agreement shall be binding upon the parties, their successors in interest and assigns.

(Signature page to follow.)

16

WHEREFORE, the parties have executed this Agreement as of the Effective Date set forth above.

The Company:                                    The Telemarketer:

LIFEWATCH INC.

By: _____          By: _____
    Evan Sirlin                                    Name: RIOQM AOWMQN
    President                                      Title: President

17

# EXHIBIT F

## Marketing Services Agreement

DATE OF AGREEMENT: 6/8/2011

Dealer:     TMI Management Group Inc.

Address:    4410 W Hillsborough Ave, Suite H,

            Tampa, FL, 33614


Phone:    813-356-0611

Fax:      813-874-3003

State of Formation:

Federal EIN:   51-0496201

Dealer Contact:  David Reilly

Email Address:  David@tmimg.com

Office Phone:   813-356-0611

Mobile Phone:  813-817-6118


This Agreement is entered into as of the date written above between LifeWatch Inc. operating under the tradename Lifewatch USA located at 266 Merrick Rd Ste 104, Lynbrook, NY 11563 and the Dealer as written above.

Whereas, the Lifewatch name is associated with the highest quality personal response monitoring service (the "Lifewatch Medical Alarm System"); and

Whereas, Lifewatch desires to obtain referrals of potential clients from the Dealer and the Dealer wishes to make the Lifewatch Service and other Lifewatch products available to its customers and potential customers.

NOW, THEREFORE, in consideration of the above premises and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties, intending to be legally bound hereby, agree to the following:



• **Dealer Marketing.** The Dealer shall use diligent efforts to market and promote the Lifewatch Service to Dealer's customers and potential customers who reside in the Dealer's Service Area (as defined in Exhibit B of this Agreement) ("Customers"). The Dealer's Service Area is not exclusive to the Dealer and Lifewatch and other dealers shall be permitted to market, promote and sell Lifewatch Services and Lifewatch products in the Dealer's Service Area.

• **Quality Control.** Lifewatch, Inc., shall have the right to listen to the sales calls to make sure that all pitches meet the high standard of Lifewatch, Inc. Lifewatch, Inc., shall also have the right to visit the call center occassionally, upon notice.

• **Dealer Compensation.** Lifewatch shall pay a Marketing Fee to the Dealer for Customers referred exclusively by the Dealer that become Enrolled Clients of Lifewatch. The Marketing Fee is set forth in Exhibit A of this Agreement. "Enrolled Client" shall mean each Customer who (a) is a party to an unexpired and non-terminated Lifewatch Client Agreement which has been accepted by Lifewatch, (b) is using and has used the Lifewatch Service for more than thirty (30) days, and (c) is not in default of the Lifewatch Client Agreement.

• **Monthly Reports.** On or before the tenth (10th) day of each month, Lifewatch will provide the Dealer with a report on the Dealer's Enrolled Clients as of the last day of the preceding month.

• **Use of trademarks.** The Dealer acknowledges and agrees that the name "Lifewatch" (the "Mark") is the registered trademark of Lifewatch and that Lifewatch is the exclusive owner of all right, title and interest in the Mark. Lifewatch hereby grants a non-exclusive, non-assignable, non-delegable, royalty-free license to the Dealer to use the Mark solely in the marketing and promotion of the Lifewatch Service and Lifewatch products exclusively within the Dealer's Service Area prior to the expiration or termination of this Agreement. The Dealer acknowledges and agrees that the license to use the Mark terminates immediately upon the expiration or termination of this Agreement and, upon such termination, the Dealer shall immediately cease use of the Mark, return or destroy all use of the Mark in any media and in any format. The Dealer shall obtain Lifewatch's written approval of all materials using the Mark prior to its use, which approval shall be in Lifewatch's sole and absolute discretion. The Dealer acknowledges and agrees that its use of the name "Lifewatch" shall inure to the exclusive benefit of and be on behalf of Lifewatch only. The Dealer also acknowledges and agrees that neither this Agreement nor the use of the Mark shall give it any ownership, right, title or interest in or to the Mark. The Dealer further agrees to comply with all laws and not to do or fail to do anything that may (i) adversely affect the Mark



or Lifewatch's ownership and right, title and interest in the Mark, (ii) injure the reputation of Lifewatch, (iii) in any manner adversely affect Lifewatch or its goodwill, and (iv) use the Mark in any manner or in any format after expiration or termination of this Agreement. Lifewatch shall have the right to monitor the Dealer's use of the Mark.

- **Sole Source.** The Dealer agrees to market, promote, offer and sell the Lifewatch Service and Lifewatch products, only to any leads supplied by Lifewatch, or procured using the Lifewatch name.

- **Pricing, Services and Products.** Pricing of the Lifewatch Service and Lifewatch products are set forth on Exhibit A. Lifewatch may, in its sole and absolute discretion, (i) change the price of the Lifewatch Service and the Lifewatch products at any time and from time-to-time, and (ii) increase, decrease, modify, substitute, replace, and terminate from time-to-time the Lifewatch Service and the Lifewatch products.

- **Client Information.** All clients produced from this marketing agreement shall become and remain the property of Lifewatch, Inc, even if this agreement ceases to exist. Any contact with clients by dealer or its employees or ex-employees with the purpose of selling or steering to another company in the industry will be a violation of agreement and Lifewatch shall have cause to sue the parties for loss of business, etc. Lifewatch, Inc., agrees that all leads are the property of the marketing company.

- **Confidential Information.** Except as may be necessary under this Agreement, neither Lifewatch nor the Dealer shall use or disclose the terms, conditions and Marketing Fee of this Agreement or any confidential information concerning the other party's business. Lifewatch and the Dealer shall take reasonable precautions to prevent any such use or disclosure by it or any person or entity affiliated with or related to it including, without limitation, any employee, officer, director, manager, member, partner or representative of such party. "Confidential Information" shall mean client information, trade secrets and other proprietary information of a party.

- **Renewal and Termination.** This Agreement shall be effective on the date first written above and shall continue for an initial term of three (3) years. This Agreement shall automatically renew for successive one (1) year terms unless either party delivers to the other party, not less than thirty (30) days prior to the expiration date of the initial term or any subsequent term, written notice of termination of this Agreement effective as of the expiration date of the initial term or any subsequent term. Lifewatch and the Dealer understand, acknowledge and



agree that neither party shall be liable to the other party for any damages, losses, costs or expenses ("Damages") arising out of or from or related to any such termination of this Agreement, all of which Damages are hereby waived and released by each party. In the event no notice of termination is given, but the Agreement does not renew under the law, the parties agree that, except for the renewal provision, the terms and conditions of this Agreement shall continue to apply and be valid and enforceable on a month-to-month term which shall be terminable by either party on thirty (30) days written notice to the other party.

In addition, any of the following events shall be deemed to constitute good cause for the immediate termination of the Agreement by the other party.

- Proceedings are instituted by or against Lifewatch or the Dealer under insolvency laws, for reorganization, receivership, dissolution or liquidation and which proceedings are not terminated and dismissed within thirty (30) days from the date of filing.

- Lifewatch or Dealer makes an assignment of its assets for the benefit of creditors.

- Lifewatch, the Dealer or any partner of Lifewatch or the Dealer shall become insolvent or admit insolvency.

- Lifewatch or the Dealer, if an individual, dies, is disabled or fails to conduct business in the ordinary course, or, if an entity, fails to conduct business in the ordinary course.

- Dealer or any officer, stockholder, member, manager or partner is charged with any crime other than a summary offense.

- This agreement can be terminated without cause by either party upon 5 business days advance written notice to the other party.

- **Force Majeure.** Lifewatch shall not be liable for any Damages due to any delay in performance or nonperformance of this Agreement if such delay or failure is caused, in whole or in part, by circumstances beyond its reasonable control including, without limitation, acts of God, fire, flood, war, declared or undeclared, riot, terrorism, laws, government orders or regulations, delay of transportation carrier, accident, employment problems, shortage or inability to obtain material, equipment or transportation; or any other cause beyond its reasonable control.

- <u>**INDEMNIFICATION**</u>



- **By Lifewatch.** Lifewatch shall indemnify, defend and hold the Dealer harmless from Damages arising out of any third-party claim against the Dealer caused solely by Lifewatch's breach of this Agreement. This indemnity obligation is the exclusive indemnity obligation of Lifewatch under this Agreement or at law or in equity.

- **By The Dealer.** The Dealer shall indemnify, defend and hold Lifewatch harmless from Damages arising out of any third-party claim against Lifewatch caused solely by the Dealer's breach of this Agreement. This indemnity obligation is the exclusive indemnity obligation of the Dealer under this Agreement or at law or in equity.

- **Conditions for Indemnification.** The indemnifying party's obligations hereunder are conditioned upon the indemnified party (i) providing the indemnifying party prompt written notice of any third party claim that may be subject to indemnity, (ii) fully cooperating with the indemnifying party as requested by the indemnifying party in its reasonable discretion and without any compensation or expenses paid to the indemnified party, and (iii) agreeing in writing, without condition, to the indemnifying party's sole and absolute control of the investigation, defense and settlement of such claim.

- Neither party shall be responsible or liable to the other party, under this Agreement, at law or in equity, for any Damages due to loss of business revenue or profit, loss of data, loss of use, or for any consequential, special, incidental, punitive, exemplary, multiple or statutory damages, however incurred.

- **Relationship of the Parties.** Nothing in this Agreement shall be construed to constitute either party as a partner or agent of the other. Without limiting the foregoing, neither party shall have any authority to act for or to bind the other in any way, to alter any of the terms or conditions of any standard forms or other agreements with clients, to make representations or warranties or to execute agreements on behalf of the other party, or to represent that the one party is in any way responsible for acts or omissions of the other party. Each party shall indemnify, defend and hold the other party harmless from and for any claim, liability and Damages arising out of, related to or resulting from a violation of this Section.

- **Applicable Law, Jurisdiction, Venue and Waiver of Jury Trial.** Each party agrees that all suits, proceedings and actions arising out of, related to or in connection with this Agreement shall be brought exclusively in the courts located in the County of Nassau, NY and each party consents to the exclusive jurisdiction and venue of such courts. Each party consents to service of process in



accordance with the notice provisions of this Agreement. EACH PARTY
HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY SUIT,
PROCEEDING OR ACTION BROUGHT BY EITHER PARTY. If any part of
this Agreement is found by a court to be invalid or unenforceable, such invalidity
shall not invalidate or otherwise affect any other provision of this Agreement.

- **Notice.** Any notice required or permitted shall be in writing and
deemed given when delivered personally or by facsimile machine (where the
sending machine automatically confirms receipt of the transmission); one (1)
business day after delivery to a national overnight courier service, e.g., Federal
Express; or three (3) business days after being mailed, certified or registered mail,
return receipt requested, to the address set forth above or to such other address as
to which notice has been given in accordance with this Section.

- **Assignment.** This Agreement is assignable by Dealer or
Lifewatch with sixty (60) days prior written notice to the other party except for
any collateral assignment required by a banking relationship, which shall not
require notice.

- **Binding Agreement.** This Agreement may be executed in
counterparts, but shall not be binding on Lifewatch unless signed by an officer of
Lifewatch, Inc. This Agreement may not be supplemented or modified nor any
right or power waived in any way except by a document in writing signed by both
parties. Neither failure nor delay by either party in the exercise of any power or
right shall constitute a waiver of such power or right arising hereunder. Each
party agrees that this Agreement and the signatures affixed hereto may be
transmitted and delivered by facsimile machine or electronically by PDF and that
all such signatures and this Agreement shall be deemed to be originals for all
purposes.

Intending to be legally bound hereby, each party has caused this Agreement to be
executed and delivered by an authorized signatory as of the date first above written. Each
person signing on behalf of a party represents and affirms that each is a duly authorized
representative of that party and has the authority to execute this Agreement on behalf of
that party.

DEALER

By: _____

Name: David Reilly

Title: President


Lifewatch , INC., DBA  Lifewatch


By: _____

Name: _____

Title: _____



## EXHIBIT A

## DEALER COMPENSATION

### MARKETING SERVICES

Lifewatch shall pay the Dealer a one-time Marketing Fee for each Enrolled Client obtained by the Dealer as follows:

$190.00 per sale

### Payment Terms

Dealer shall submit properly documented invoices on a weekly basis for sales closed during the prior week based on a Monday – Sunday week. Lifewatch shall pay each Marketing Fee invoiced within 5 business days of the prior weekending Saturday.

Dealer shall return to Lifewatch the full Marketing Fee for any Enrolled Client that cancels within 30 days of becoming an Enrolled Client.

Lifewatch shall pay the dealer a monthly residual payment for each active enrolled client at the rate of $2.00 per month for the period of the time that the enrolled client remains in an active status. The payments will not be subject to charge-backs of any type. The residual payment shall become effective on Month 2 and payable on or after the 1st week of the following month.



**EXHIBIT B**

<u>**SERVICE AREA**</u>

Dealer's "Service Area" shall be limited to prospective customers in the United States and Canada that is called by Dealer's outbound call center representatives from Dealer's call center in Florida. Dealer represents and warrants that all calls are placed following all relevant laws, rules and regulations.



## ADDENDUM A

### Compensation

[TO BE PROVIDED]

18

# Attachment D

## DECLARATION OF ROBERT BRAVER

Robert Braver affirms and states as follows:

1.  I am an adult and competent to testify about the matters stated herein.

2.  At all times relevant to this declaration, I was a resident of Norman, Oklahoma.

3.  On or about April 27, 2012, I received a telephone call on my home telephone.

4.  The telephone call commenced with a prerecorded message. The message was not preceded by a live operator. The telephone call was made to solicit the sale of a medical alert device and monitoring service.

5.  I did not knowingly or voluntarily request, consent, permit or authorize receipt of the telephone call referenced in paragraphs 3 and 4.

6.  On or about July 23, 2012, I provided the Office of the Indiana Attorney General with an audio recording of the telephone call referenced in paragraphs 3 and 4.

7.  Exhibit "A" attached hereto is a true and accurate copy of the transcript of the prerecorded telemarketing telephone call referenced in paragraphs 3 and 4.

8.  On or about August 15, 2012, I provided the Office of the Indiana Attorney General a copy of a credit card statement reflecting my purchase of a medical alert device and monitoring service that was a result of the telephone call referenced in referenced in paragraphs 3 and 4.

9.  Exhibit "B" attached hereto is a true and accurate copy of a credit card statement reflecting my purchase of a medical alert device and monitoring service that was a result of the telephone call referenced in referenced in paragraphs 3 and 4.

10.  No additional information has been provided to the Office of the Indiana Attorney General.

1

FURTHER DECLARANT SAYETH NOT.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE.

Date: March 30, 2013

Robert Braver

2

Transcript of Safeline Call to Robert Braver, April 27, 2012

Braver:  Hello. Hello.

Recorded Male Voice: ...are a senior citizen, listen closely to the following information. Each year there's been a significant rise in the number of senior citizens suffering death and serious life-threatening injuries from a delay in response times for medical emergencies, fires, burglaries or even a simple fall...

Braver:  Hello.

Recorded Male Voice: ...American Heart Association and the American Diabetic Association are urging all senior citizens to get a personal life-saving emergency medical alert system for their home. For the first time [inaudible] senior benefits program is providing senior citizens with this life-saving emergency medical alert equipment at no charge to seniors. Press one now to find out how. Just one push of a button, you can have a live certified medical emergency technician on the line to help you in just seconds. Again press one now and you'll never have to feel helpless, worried or by yourself in an emergency situation...

Braver:  Hello.

Recorded Male Voice: ...Press five now to be removed from our senior benefits calling list.

Braver:  Hello.

Ringing

Music

Matthew:  Senior Benefits. This is Matthew speaking. Can I ask who I am speaking with?

Braver:  Oklahoma

Matthew:  Oklahoma?

Braver:  Yeah, isn't that where you're calling me from? Hello?

Matthew:  Is that your name?

Braver:  I'm sorry, what?

Matthew:  To whom am I speaking with?

Braver:  This is Mark Williams.



EXHIBIT
A001864
Bradley Att. D

Matthew:     Mr. Williams, in case we get disconnected, is [REDACTED] the best number to reach you back on?

Braver:     Uh yes.

Matthew:     Okay and you said this was your home phone?

Braver:     Yeah uh yes.

Matthew:     Okay um great. For responding today to our senior benefits program, you have been selected to receive a full free medical alert system package that has a value of over 400 dollars.

Braver:     Uh huh.

Matthew:     You're probably familiar with the medical alert system and how it works. You know that TV commercial "I've fallen and I can't get up"?

Braver:     Yes I was just thinking of that.

Matthew:     All right well it's the same system as seen on TV and the way it works is simple. If you have a medical emergency, fire, burglary, or even something as simple as a fall that you have difficulty getting up from, you simply push the button on the lightweight waterproof necklace or bracelet and speak hands-free from anywhere in your home to a live certified emergency medical technician. They will evaluate your situation and make sure that you get the help you need and notify family or 911 and comfort you until help arrives. And your alert button works anywhere in the house and it even works outside on your property. Has a fifteen hundred foot range which is over a quarter of a mile, you know, and this device could really help you in a time of need...

Braver:     Uh huh

Matthew:     ...and could even be life-saving. You know, device will give you the peace of mind you need, allow you to feel safe and make sure you never feel alone in that case of an emergency. And Mr. Williams, you nev...you will never have to feel helpless, worried or by yourself in an emergency situation. Plus, our device has been recommended by the American Heart Association, the American Diabetes Association, the National Institute of Aging, and has been helping save the lives of America's senior citizens for over thirty years. And your free medical alert system package is gonna include a medical alert base station with a speaker, a water-proof wrist and necklace button, a med-lock key lock box which prevents broken doors and windows, a voice remote, which is an easy to use device that allows you to answer and talk on the telephone by simply depressing the necklace button. So, no more getting up to answer the phone and no more missed calls. It also has an away from home protection card that gives emergency personnel twenty-four hour a day, seven day a week access to your important medical information. And last but not least, a very important part of this service is a daily wellness check. Every day at the same time we'll check with you to make sure that you are safe and

everything is okay. So, the system is completely free, and the shipping is also free. Normally all this would cost over four hundred dollars, but today you pay absolutely nothing for the system. The only thing you would be responsible for is the emergency medical technician monthly monitor fee which is thirty-four ninety five per month and the [inaudible] cycle doesn't start until you receive the system and activate it. Everything else is free. Also, there's no contract whatsoever and you can cancel at any time with no cancellation fees. Mr. Williams, what address would you like your emergency medical alert system sent to?

Braver:       Um [ADDRESS REDACTED].

Matthew:    You said [STREET NAME REDACTED]?

Braver:       Yep.

Matthew:    Okay.  Is that one word or two?

Braver:       One word.

Matthew:    Okay. And the city?

Braver:       Norman, like the man's name.

Matthew:    Okay.

Braver:       Oklahoma.

Matthew:    And your zip code?

Braver:       █████████████

Matthew:    Okay. And for the monthly emergency medical monitoring uh which card would you like to use?  Uh Visa, Master Card, Discover or American Express?

Braver:       Well, I don't give my credit card information out to someone who I don't know that just calls me on the phone.

Matthew:    Well, I understand. Um, Mr. Williams have you heard of the federal credit card protection act?

Braver:       Um, no.

Matthew:    Okay well it's a federal law that has been passed in the United States to protect credit card holders such as yourself.  Says that anyone who uses their credit card over the phone or on the internet is not liable for any charges unless they receive exactly what was promised to them.  You know, so there is absolutely no risk whatsoever and over seventy percent of all Americans use their credit cards over the phone and the internet. And phone and internet

transactions would never have grown to be a massive multi-billion dollar industry without the federal…

Braver: Right. Oh yeah, and I use my credit card on the internet and over the phone all the time. It's just they, of course they tell you, the attorney general, everybody knows that you don't give that out over the phone to someone who calls you out of the blue. You know what I mean?

Matthew: Uh huh. Well…

Braver: See, since you called me and I didn't call you, in fact, the only thing that comes up on my caller-ID is just a number, it has Oklahoma City. Uh, doesn't even have a name on the caller-ID. So, I don't even know who you are.

Matthew: Okay, well uh we're we're Safeline uh, Mr. Williams. We've been in business since nineteen seventy-seven, and we have provided life-saving life safety services…

Braver: Right.

Matthew: …to tens of thousands of people for over thirty years and are among the leaders in our field. And our name is Safeline. And we just provide that that safety, you know, like I said…[inaudible]

Braver: Okay. Where where are you located?

Matthew: Safeline owns its own U.L. listed monitoring center staffed with highly trained care specialists at our secure facility in New York. Uh from there we monitor customers all across the U.S.

Braver: Okay. All right. Well let me get…this will be a Visa card.

Matthew: We take Visa Master Card Discover or American Express.

Braver: Well that works, cause I'm holding a Visa card in my hand.

Matthew: Okay. When you're ready…[inaudible]

Braver: Okay. [NUMBER REDACTED]

Matthew: Okay, so you have [NUMBER REDACTED]

Braver: Yep.

Matthew: [NUMBER REDACTED]

Braver: Yep.

Matthew:      [NUMBER REDACTED]

Braver:      Yes.

Matthew:      Okay. And the expiration [inaudible]

Braver:      [DATE REDACTED]

Matthew:      Okay. And if you flip the card over you should see three numbers…[inaudible]

Braver:      Yep.  [NUMBER REDACTED]

Matthew:      Okay. All right. Okay, uh Mr. Williams, uh your equipment will be shipped to you at the address of  [ADDRESS REDACTED] in Norman Oklahoma ████████ ████ And you will receive…it will arrive in a few days. Don't forget to activate your system as soon as you receive it by plugging it into your phone line and pushing the button.  This will make a test call and activate your system and immediately start protecting you.

Braver:      Okay.

Matthew:      Okay.

Braver:      Okay.

Matthew:      I'm going to transfer you…I'm going to transfer you to our confirmation department so they can give you the confirmation number and verify that I have entered all your information into the system correctly. And they will also give you a customer service number in case you have any additional questions. Thank you very much and I hope you will enjoy the safe feeling of having a medical alert system.

Braver:      Okay.

Matthew:      …please hold. If you would please hold, I will transfer you to the confirmation department.

Braver:      Okay, well I've got to walk out the door in one minute.

Matthew:      Okay. I'm going to transfer you.

Braver:      Okay. Sir? Are you still there?

Matthew:      Mr. Williams, how is your name spelled on your credit card?

Braver:      [inaudible] I A M S.

Matthew:      I'm sorry I didn't quite catch that Mr. Willaims.

Braver:       [inaudible] W I L L I A M S.

Matthew:      And your first name?

Braver:       Hello?

Matthew:      Yeah I'm still here Mr. Williams.

Braver:       Uh yes, Mark.

Matthew:      Mark?

Braver:       Yep.

Matthew:      M A R K?

Braver:       Yep.

Matthew:      All right. I'll be transferring you in just a moment.

Braver:       Okay. I've got to leave basically now.

Matthew:      Okay. Only one more moment.

Braver:       Okay. Okay [inaudible] you need to get ready. [inaudible] We're leaving in fifteen minutes. [inaudible] Okay I hope you're ready now.

Music

Lloyd:        Hi this is Lloyd. I'm in the confirmation department. Take a quick minute to make sure that all your information has been entered into the system correctly.

Braver:       Okay. Needs to be quick because I am uh I got people waiting on me. I'm due out the door about two minutes ago.

Lloyd:        Uh okay, Mr. Williams. I'll run this as quick as I can. Okay can you keep up quick?

Braver:       Okay go.

Lloyd:        All right. I have your address as [ADDRESS REDACTED]. That's in Norman, Oklahoma. Zip code ██████████ with your phone number area code four oh five [NUMBER REDACTED].

Braver:       Uh huh.

Lloyd:      And I do show you got the medical alert system today. It is thirty-four dollars and ninety-five cents a month. You get everything, all the equipment is for free. And I do see that you'll be using your Visa card ending in [NUMBER REDACTED] and that's for the first payment of thirty-four dollars and ninety-five cents.

Braver:      Yep.

Lloyd:      And your system will get shipped out to you in the next couple of days. You'll receive it in five to seven days. When you get it don't forget to activate your system. You'll do that by plugging it into your phone jack and just simply hitting the red button…

Braver:      Yeah, the gentleman told me that so we can, yeah.

Lloyd:      Okay, do you want to take down our customer service number real quick?

Braver:      Um, yeah.

Lloyd:      Okay it's one eight hundred

Braver:      Uh huh.

Lloyd:      Seven one seven

Braver:      Uh huh.

Lloyd:      Nine two nine five.

Braver:      Okay.

Lloyd:      And that's Life Watch. And uh I'll get the rest of it done from here you're all set and I just want to thank you for joining the Safeline by Life Watch family and I hope you have a wonderful evening.

Braver:      Okay. Thank you.

Lloyd:      All right thank you, sir.

Braver:      Good-bye.



# slate

CREDIT CARD (...8663)

| | Trans Date | Post Date | Type | Description | Amount |
|---|---|---|---|---|---|
| ☐ | 04/27/2012 | 04/30/2012 | Sale | LIFEWATCH INC (MOTO) | $34.95 |
| | | | | 516-3745433, NY 115570000 US | |
| | | | | Online, Mail, or Telephone transaction | |



EXHIBIT

001874

Bradley Att. D
Page 10 of 10

# Attachment E



**Robert Braver**

Norman, Oklahoma

**Fax: (405)** ▇▇▇ · ▇▇▇

May 7, 2012

Mr. Evan Sirlin
Lifewatch, Inc.
1315B Broadway, Suite 106
Hewlett, NY 11557

**RE: Prerecorded telephone sales calls**

Dear Mr. Sirlin:

I am writing with regard to three nuisance telemarketing calls that I received last month. The three calls all rang my phone and transmitted Caller ID information indicating an Oklahoma City area telephone number with only the name "Oklahoma City OK".

The calls appear to be auto-dialed and initiated for the purpose of delivering a pre-recorded message. The prerecorded message purports to be on behalf of "The American Senior Benefits Program", and states that The American Heart Association and American Diabetic Association are urging all seniors to obtain an emergency medical alert system for their home.

No further identification or contact information is provided in the prerecorded message, and a Google search on *American Senior Benefits telemarketing* yields as the first hit a link to American Senior Benefits Association's home page, which prominently displays the following message:

> **It has been brought to our attention that many consumers are getting automated phone calls from "American Senior Benefits Program." We are <u>NOT</u> this company. We are working with several state and federal agencies to get these calls stopped as quickly as possible**

By playing along as a customer and pressing "1" after the conclusion of the prerecorded message, I was able to speak to a live operator who only identified himself as Matthew with dubious and ambiguous name "Senior Benefits".

Only after playing along and actually signing up for service under the fictitious name "Mark Williams" was I told that the company was Lifewatch, which, after previously being provided a different company name twice, I was only able to confirm when the charge appeared on my credit card.

Calling the 516-374-5433 number listed with the credit card transaction led me to J.R. in your customer service department and then Pam in the sales department. Both J.R. and Pam appeared to be fully aware of these prerecorded calls being made on behalf of Lifewatch.

I am concerned about these calls because they appear to constitute two separate criminal offenses under Oklahoma law:

21 O.S. § 1847a generally prohibits unsolicited prerecorded sales calls. Violations are punishable by a fine and up to one year in jail. **21 O.S. § 1847a(E) further allows me, as the telephone subscriber, the option to void any contract or agreement to purchase any goods or services as a result of the unlawful call. As I stated in my subsequent telephone call to Pam in your sales department, I am indeed exercising that option, and I expect a prompt refund of the $34.95 that was charged to my VISA card.**

21 O.S. § 1861 requires that the name and organizational or business affiliation be given to the person answering the telephone prior to any solicitation or sales presentation. Violations for a first or second offense are a misdemeanor punishable by a fine and up to one year in jail. A third offense is a felony punishable by a fine and up to two years in the state penitentiary.

I mention these offenses because they are enumerated as violations of The Oklahoma Consumer Protection Act, which provides for civil remedies including actual damages, (to include nominal damages), as well as attorney's fees. While I represent myself initially, I will retain counsel if it appears that a case will be headed to trial.

In addition, I believe these calls constitute numerous violations of the federal Telephone Consumer Protection Act of 1991 ("TCPA"), principally at 47 U.S.C. § 227, and the FCC regulations promulgated thereunder.

Specifically, I believe the separate and distinct violations include, but are not necessarily limited to:

- Initiation of a prerecorded message to a residential telephone subscriber without prior express permission or invitation;
- Failure to provide the identity of the calling party within the message;
- Failure to provide an address or telephone number within the message where the calling party can be reached;
- The call was accompanied by a Caller ID number answered either as being generally unavailable or mailbox full, and a Caller ID name that did not identify your legal business name.

Among other things, the TCPA provides for statutory damages for each violation as well as injunctive relief in a private civil action. Statutory damages under the TCPA are generally $500 per violation, and can reach up to $1,500 per violation for willful or knowing violations.

I do intend to pursue my available civil remedies. I have been bringing TCPA claims in the Oklahoma courts for over fifteen years and have a good track record.

According to Pam, the calls were made by a reseller. However, it is well settled that the party on whose behalf the calls were made is deemed to be the telemarketer and is ultimately responsible for violations. Further, in my conversations with your representatives, it seems that everyone is

aware of the prerecorded calls. Therefore, I am affording you this opportunity to let me know **within the next ten days** if you are interested in discussing settlement of my claims prior to my initiating a civil action in this matter. If so, please contact me in writing at the fax or email addresses above.


Sincerely,


Robert Braver