# PX 14

## DECLARATION OF MICHAEL HILGAR
## PURSUANT TO 28 U.S.C. § 1746

I, Michael Hilgar, hereby declare as follows:

1. My name is Michael Hilgar. I am over the age of eighteen, and I am a United States citizen.

2. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to the facts stated herein.

3. I am the same Michael Hilgar who was named as a defendant in *FTC, et al. v. Worldwide Info Services, Inc., et al.*, 6:14-cv-8-CEM-DAB (M.D. Fla.) ("FTC Action"). I entered into a final settlement with the plaintiffs in that matter on November 13, 2014.

4. I have worked in the telemarketing industry on and off since 2001. In 2011, my company, Worldwide Info Services, Inc. ("Worldwide"), began conducting medical alert device telemarketing for Lifewatch, Inc. ("Lifewatch"). I initially was connected to Lifewatch through Roderic Boling, a man I have known for many years through the industry. Boling brokered the deal between Worldwide and Lifewatch, and continued to serve as the go-between between Worldwide and Lifewatch during the course of the relationship. Besides taking a percentage of every sale made by Worldwide, my understanding is that Boling was also paid directly by Lifewatch. Neither Worldwide, nor any other company with which I was affiliated, ever did medical alert device telemarketing for any company other than Lifewatch.

5. From 2011 until fall of 2012, Worldwide conducted telemarketing for Lifewatch at a call center in Casselberry, Florida. I served as the operations manager of the call center. Worldwide did not do any outbound telemarketing for Lifewatch. Instead, the calls were all inbound, and the telemarketers would simply answer the calls and make the sales pitch to the

Page 1 of 4

Initials

consumer on the other end of the line. Worldwide did not obtain the consumers with whom the telemarketers spoke, but it was my understanding that the majority of the consumers had received a telephone call with a prerecorded message. If, after listening to the message, the consumer wanted more information, they could press a number on their telephone keypad and their call would be transferred to the call center. All calls were routed to Worldwide from a company owned by Joseph Settecase called Unique Information Services Inc. Both Settecase and Unique Information Services Inc. were co-defendants of mine in the FTC Action. Although I had known Settecase for several years, Boling arranged for us to work with each other for Lifewatch.

6. Boling or Lifewatch provided Worldwide with all of the scripts used during the telemarketing calls; I had no role in drafting them, nor did anybody else working for Worldwide. Periodically Boling or Lifewatch would provide me with a new script, which the call center was supposed to start using immediately. Nobody was allowed to make any changes to the provided scripts unless Lifewatch explicitly approved the changes in advance, and the telemarketers were expected to follow the scripts verbatim. The telemarketers also were not allowed to disclose Lifewatch's name during telemarketing calls. All of the telemarketing calls were recorded and accessible to Lifewatch. Multiple times a week, Lifewatch requested and received recordings of telemarketing calls to review.

7. If a consumer wanted to purchase a medical alert system during a telemarketing call, the telemarketer would confirm the consumer's information, including their payment information, and then immediately send the information to Lifewatch. Lifewatch would then immediately make the first charge to the consumer's credit card or bank account. Worldwide did not have a merchant account, so we never charged the consumer on our end.

Initials _____

8. At its peak, Worldwide's call center obtained approximately 600 new customers a day for Lifewatch. Of those 600, however, approximately 10-15% either would back out of the sale before the telemarketing call was over, or would have their payment method declined. I was aware of these failed sales because I had access to a Lifewatch website that kept track of customer information, and at the end of each day I would review our final customer numbers for the day. Another 10-15% of customers would cancel within the first few months. Worldwide was only paid for customers who kept the service for at least three months, so we were back-charged for any customers who cancelled within the first three months.

9. Sometime in 2012, Evan Sirlin, an officer of Lifewatch, visited Worldwide's call center in Casselberry. It was my understanding that his visit was intended to be a "meet and greet" so that he could see the call center and get a chance to meet me.

10. In the fall of 2012, the Indiana Attorney General's Office named me individually, as well as Worldwide and two of my other companies, in a lawsuit related to the telemarketing being done for Lifewatch. Soon afterwards, Worldwide's call center in Casselberry shut down. Boling set up another call center nearby to replace it. The new call center was run through a company owned by Gary Martin called Arcagen, Inc., both of which were also co-defendants of mine in the FTC Action. After other legal actions were filed relating to the telemarketing being done for Lifewatch, Boling set up additional companies to telemarket for Lifewatch, including American Innovative Concepts, Inc. and National Life Network Inc., both of which were owned by my wife, Yuluisa Nieves. American Innovative Concepts, Inc., National Life Network Inc., and my wife, individually, were also co-defendants of mine in the FTC Action.

11. I helped with operations at the new call centers, including training the new telemarketers. The new call centers operated in the same manner as Worldwide's had: all of the

telemarketing was done on behalf of Lifewatch; all of the scripts were provided by Boling or Lifewatch; all of the calls were recorded and available to Lifewatch for review; all consumer information, including payment information, was immediately sent to Lifewatch; and Lifewatch processed all the credit card and bank account charges.

12. I am the same Michael Hilgar who signed an earlier declaration dated March 5, 2015, a true and correct copy of which is attached hereto at **Hilgar Attachment A**. I signed the declaration with the understanding that it would be used to help settle the Indiana Attorney General's lawsuit. I did not closely review the declaration at the time that I signed it. Since signing the declaration, I have had an opportunity to more carefully review it, and have found that it contains several inaccuracies. Specifically, despite what the March 5, 2015 declaration states in Paragraphs 4 and 10, Worldwide *only* used telemarketing to obtain customer accounts, and despite what it states in paragraph 5, Worldwide did *not* use its own telemarketing sales scripts. Worldwide only used scripts it received from Boling or Lifewatch. Additionally, despite what is stated in Paragraph 6, Lifewatch *did* review and approve all of Worldwide's scripts. Finally, despite what is written in Paragraph 9, Lifewatch *did* control, oversee, and supervise Worldwide in its efforts to obtain customer accounts for Lifewatch.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 6-4-15, 2015.

Michael Hilgar

# Attachment A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFE ALERT EMERGENCY RESPONSE, INC., a California corporation,<br><br>    Plaintiff,<br>v.<br><br>CONNECT AMERICA.COM, LLC, a Delaware limited liability company, KENNETH GROSS, an individual, LIFEWATCH, INC., a New York corporation, EVAN SIRLIN, an individual, LIVE AGENT RESPONSE, 1 LLC, a Florida limited liability company, GREG SMALL, an individual, TRILOGY INVESTMENT, LLC, Florida limited liability company, and DOES 1 to 10, inclusive,<br><br>    Defendants. | Case No.: CV-13-03455 JAK(SSX)<br><br>Hon. John A. Kronstadt<br><br>**Declaration of Michael Hilgar**<br><br>Amended Complaint filed: August 28, 2013 |

I, Michael Hilgar, declare as follows:

1. I, Michael Hilgar, served as President for Worldwide Info Services, Inc. from 2012 until 2014.

2. I have personal knowledge of the facts set forth herein, which are known to me to be true and correct.

3. Worldwide Info Services entered into agreements with Lifewatch Inc. in approximately 2012. Pursuant to those agreements, Worldwide Info Services warranted and covenanted to Lifewatch that Worldwide Info Services would strictly comply with all telemarketing laws and all intellectual property laws.

4. Pursuant to those agreements, Worldwide Info Services used various methods-including telemarketing- to obtain customer accounts for

1


EXHIBIT B

Lifewatch, Inc.

5. Worldwide Info Services used its own telemarketing sales scripts and did not seek the guidance, approval, direction, or advice of Lifewatch relative to creating those telemarketing sales scripts.

6. Lifewatch did not review, approve, dictate, draft, authorize, or control Worldwide Info Services' telemarketing sales scripts. In fact, during the pendency of any relevant agreement, Worldwide Info Services would not allow Lifewatch to review the telemarketing sales scripts, which Worldwide Info Services considered to be proprietary.

7. Worldwide Info Services never received a sales script from Lifewatch Inc., or any of its employees.

8. Lifewatch never told Worldwide Info Services what to say to the customers or potential customers during the course of telemarketing calls.

9. Lifewatch did not control, oversee, or supervise Worldwide Info Services relative to its efforts to obtain customer accounts for, among others, Lifewatch.

10. In addition to obtaining customer accounts by engaging in outbound telemarketing calls, Worldwide Info Services also obtained customer accounts through print, internet, radio, and television advertising.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: 3/5/15 [signature]

[Notary stamp: YULUISA NIEVES, MY COMMISSION # EE 085219, EXPIRES: February 18, 2016, Bonded Thru Notary Public Underwriters]

[signature] 3/5/15

3