# PX 16

**DECLARATION OF BRICK KANE**
**PURSUANT TO 28 U.S.C. § 1746**

I, Brick Kane, hereby declare as follows:

1.      I am the President and Chief Operating Officer of Robb Evans & Associates LLC,

the Receiver ("Receiver") appointed in *FTC v. Worldwide Info Servs. Inc.*, Civ. No. 6:14-cv-8-

ORL-28DAB (M.D. Fla. filed on Jan. 6, 2014). Pursuant to the *ex parte* temporary restraining

order issued in that case, Robb Evans & Associates LLC was appointed Temporary Equity

Receiver over the following Receivership Defendants: Worldwide Info Service, Inc., Elite

Information Solutions, Inc., Absolute Solutions Group, Inc., Global Interactive Technologies,

Inc., Global Service Providers, Inc., The Credit Voice, Inc., Live Agent Response 1 LLC,

Arcagen, Inc., American Innovative Concepts, Inc., and Unique Information Services, Inc., their

successors, assigns, subsidiaries and affiliates. (*Id.* at Doc. 24.) The receivership was made

permanent by stipulation of the parties. (*Id.* at Doc. 33.) If called upon to testify as to the facts

set forth in this declaration, I could and would testify competently thereto as to the facts are

personally known to me to be true.

2.      I am one of the members of the Receiver who has been primarily responsible for

the supervision of the receivership in *FTC v. Worldwide Info Servs., Inc.* I have personally

participated in the entry into the premises of the Receivership Defendants' business on January

9, 2014 after the Receiver's appointment, in the meetings with employees that date, in the review

of business and banking records of the Receivership Defendants, and in the preparation of the

reports filed by the Receiver.

3.      Attached hereto as **Kane Att. A** is a true and correct copy of the Report of

Receiver's Activities for January 9, 2014 through January 30, 2014. In this first report to the

court, the Receiver reported that Lifewatch USA is "the medical and alert response service

1

provider and is the entity that processes charges to consumers after the consumers are solicited by the receivership defendants." (Kane Att. A at 6.) Between March 2012 and December 2013, Lifewatch USA paid $15,741,518.50 to the Receivership Defendants. (*Id.*)

4. During the Receiver's review of the Receivership's business and financial records, the Receiver did not discover any additional medical and alert response service providers that paid the Receivership Defendants. Lifewatch USA appears to have been the only such client of the Receivership Defendants.

I declare under penalty of perjury that the foregoing statement is true and correct. Executed on May 7, 2015.

Brick Kane

2

# Attachment A

# ROBB EVANS & ASSOCIATES LLC
## Receiver of
## Worldwide Info Services, Inc., et al.

## REPORT OF RECEIVER'S ACTIVITIES
### January 9, 2014 through January 30, 2014

This report covers the activities of the Receiver[1] since the inception of the receivership. This is the first Report to the Court on the progress of the receivership. It does not constitute an audit of financial condition and is intended only to provide information for use by the Court in assessing the progress of the receivership.

## Custody, Control and Possession

On January 9, 2014 the Receiver entered two of the receivership defendants' business premises located at 474 Northlake Blvd. and 435 Douglas Ave. in Altamonte Springs, FL. The Receiver interviewed and obtained employee questionnaires from many employees. Some employees refused to talk with or provide information to the Receiver. The Receiver took immediate steps to disable three computer servers that served as robo-dialers. The Receiver took steps to secure each location by changing the locks and took custody, control and possession of all assets and documents on the business premises. The Receiver also redirected the mail.

The receivership defendants were not the employers of any of the employees. All employees were leased from FrankCrum, a company located in Clearwater, FL. The Receiver obtained a December 29, 2013 payroll report that listed 239 hourly employees. On January 10, 2014 FrankCrum wrote to Mr. Gary Martin at Arcagen, Inc. terminating the employee lease agreement as of December 29, 2013[2]. On January 13, 2014 FrankCrum notified the Receiver that all active employees would receive a termination letter.

The Receiver does not have full details about current payroll liability.

## Individual Defendants

Mr. Gary Martin was on the premises at 474 Northlake Blvd., Altamonte Springs, Florida. Mr. Martin refused to cooperate or answer any substantive questions posed by the Receiver.

Mr. Joseph Settecase was on the premises at 435 Douglas Avenue, Suite 2305, Altamonte Springs, Florida. Mr. Settecase refused to cooperate or answer any substantive questions

---

1 Reference to the Receiver in this report means the Receiver, the Receiver's deputies, its staff, and its counsel. The Receiver was appointed as Temporary Receiver in the Temporary Restraining Order issued January 7, 2014. The Receiver was appointed as Permanent Receiver in the Preliminary Injunction issued January 24, 2014.
2 This included terminating Workers' Compensation Insurance for all of the leased employees.



EXHIBIT

A

KANE ATT. A

posed by the Receiver. In addition, Mr. Settecase instructed the employees at that location not to talk to the Receiver.

Mr. Michael Hilgar was not present at either location.

## Business Operations

The Receiver tried to conduct interviews of the individual defendants and senior management in an attempt to gain an understanding of the business operations. As mentioned, the individual defendants that were present refused to cooperate with the Receiver and on at least two separate instances, instructed other employees not to cooperate with the Receiver.

The Receiver reviewed documents, financial data and electronic data in determining the business operations of each location and was able to confirm that the receivership defendants acted as a common enterprise. The business operations conducted at each location will be described under a heading for each location.

### 474 Northlake Boulevard, Altamonte Springs, FL

When the Receiver entered the business premises on Northlake Avenue there were about 40 employees talking on telephones in many of the approximately 98 telemarketing cubicles, and another eight employees were present including floor managers, compliance managers, and human resource supervisors. Employees present reported that because of computer repairs in progress, many telemarketing employees were not on-site. The Receiver stopped the telemarketing operations and collected employee questionnaires. The Receiver determined this location housed the three robo-dialer servers and the telemarketing activities selling the medical alert device were conducted in two shifts.

After stopping the telemarketing operations and collecting questionnaires, the Receiver studied the telemarketing materials affixed to most of the cubicles and determined all cubicles were organized and outfitted nearly identically.

Each cubicle had a four-page inbound script affixed to the desk. Attached to the three walls of each cubicle were 40 rebuttals to consumer objections, including two answers to frequently asked questions. Close by, often attached directly in front of the telemarketer, was a rebuttal guide directing the telemarketer to one or more specific rebuttal statements depending on a statement or objection from a consumer.

The telemarketers were responding to incoming calls from consumers who received an outbound robo calling (automated message) script. The robo calling script and the responses by the telemarketers present the company as the Senior Assistance Program, and also as Emergency Alert. As discussed below, the confirmation department uses a confirmation script also identifying the company as Emergency Alert.

KANE ATT. A

The outbound robo calling script located by the Receiver states the emergency medical alert system is "recommended by thousands of hospitals and medical professionals," and twice mentions the consumers will receive $3,000 in grocery discount and dining certificates. The inbound script discusses the Senior Assistance Program, states four times that the consumer will receive $3,000 in grocery discount coupons (not disclosing $1,500 of the $3,000 is for dining or restaurant discounts), and states the device has been "recommended by the American Heart Association, American Diabetes Association, the National Institute of Aging, and is trusted by thousands of hospitals and more than 65,000 healthcare professionals".

The Receiver confirmed with several employees that they did not deviate from the outbound script and the training instructors and materials directed them to not deviate from the script and to complete the entire script while on the phone with the telephone prospect.

The 40 rebuttals to objections with the two answers to frequently asked questions mostly restate the details of the sales pitch offered in the initial script, provide additional information about the actual operation of the alert devices, and continuously ask the consumer to get started and furnish a shipping address and payment information.

If the consumer agrees to have the alert equipment shipped and provides a credit card number or bank account routing number, the telemarketer then transfers the consumer to the confirmation department, which is located in the Douglas Avenue facility. The confirmation and customer service department had 47 employees working in two shifts completing sales, answering questions, and overcoming after sale objections and efforts to cancel. Additional operational details are described below.

The receivership defendants appear to recruit heavily for telemarketing representatives. A large box on the premises contained thousands of announcement cards stating phone reps needed for an awesome job signing up senior citizens for a free medical alert system. "Make $15-$20 per hour." After the Receiver suspended operations, about 10 to 12 persons came to the office door stating they were keeping appointments for an interview for employment or for initial training.

As stated above, the Receiver located the December 29, 2013 payroll records at the premises showing that all employees are leased employees of the FrankCrum company, but are designated as working for the receivership defendant Arcagen, Inc., regardless of presenting the company to the public as Emergency Alert.

The employment application and employment package located on the premises require a detailed application and include Employment Eligibility Verification and a completed application to apply for a Florida commercial telephone sales person's license, with the $50 fee collected in two installments from the applicant's paychecks. A sheet labeled Important Information details shift times, lunch breaks, dress codes, paydays, and pay structure.

KANE ATT. A

The basic pay is $8.00 an hour, plus $5.00 for each sale if the employee averages two sales per day for the week. There is increased pay for sales beyond two sales per day. The example state that employees completing two sales per day working six days a week will earn $10 an hour, increased from the $8.00 per hour basic pay rate.

From reviewing employee counseling and employee termination records, the Receiver learned that employees are required to complete two sales per shift per day. It is not clear how much time new employees have to reach that sales rate. Several termination records stated "not meeting daily requirement of two deals per shift," or "not meeting two deal requirement," or "only made three deals in four days."

The Receiver also viewed the compliance monitoring station where four employees were equipped to monitor ongoing telephone solicitation calls. Compliance employees and counseling records confirmed the employees were monitored to verify they were delivering the entire outbound script to consumers.

The Receiver listened to a number of recorded sales calls. Those evaluated calls confirmed that telemarketers frequently describe the $3,000 grocery coupons (not disclosing $1,500 of the $3,000 is for dining or restaurant discounts) as a great benefit and a way to help pay for the cost of monthly monitoring. The consumers on the reviewed calls appeared very interested in the free coupons for the grocery discounts. The calls also confirmed that the telemarketers completed, or attempted to complete presenting the entire outbound script to the telephone prospect, including the claims that hospitals, medical professionals, and health organizations recommend the promoted emergency medical alert system.

### 435 Douglas Avenue, Altamonte Springs, FL

The receivership defendants occupied three separate suites at 435 Douglas, namely, Suite 2105, 2205 and 2305. Unique Information Services Inc. (Unique) operated out of Suite 2305. When the Receiver entered Suite 2305 Mr. Settecase was present with two employees. Documents located on an unoccupied desk in 2305 suggest that Eric Babcock, the Chief Technology Officer, also worked from this location.

A review of computer equipment and interviews with employees in other suites indicate that Mr. Settecase was one of the "owners" and managed Unique and provided technical assistance to the other receivership defendants. Documents located in Suite 2305 reveal that Unique provided assistance in obtaining telephone services and provided the backup support when a new marketing launch required use of the robo-dialers located at the Northlake location. A past due bill with TW Telecom had a balance owing of $270,234.65 dated November 10, 2013. Two Master Service Agreements were also located seeking the service of other telecommunication providers. Both were executed by Eric Babcock.

KANE ATT. A

The Receiver reviewed an email from Scott Eggiman, an analyst in the Fraud Control Department of Windstream.com containing a complaint titled "Spoofed Calls From Your Customer." The email complains that one of Windstream.com customers were receiving numerous complaints from people that captured a spoofed Caller ID which was reportedly being used by the defendants. The email went on to warn that the defendant should "ensure that they are only sending out an accurate and truthful Caller ID." The Receiver did not have the opportunity to question Mr. Settecase about this complaint or whether or not it was the receivership defendants' practice to use false caller IDs.

Suite 2105 was not occupied when the Receiver entered the premises. This office was reportedly used by Michael Hilgar, Gary Martin and Rick Boling. The offices were well furnished and appeared to have been used regularly.

Suite 2205 contained a call center that served as the customer service division of Worldwide Info Services, Inc. This department was responsible for saves, confirmations, activations, and validation of sales. This department worked in two shifts with a total staff of approximately 45 employees and two shift managers. The second shift was scheduled from 5:00 p.m. to midnight, five days a week. Mr. Settecase's niece was the second shift manager and was described as the "eyes and ears for Settecase."

The call center in Suite 2205 reportedly handled several hundred calls each day. The hourly rate of pay ranged from $10 to $11 per hour. A customer service representative or manager that was able to retain a difficult customer, or save the customer that threatened to cancel an order, received a bonus of $5 per saved customer.

After examining each Customer Service Representative's ("CSR") work space, the Receiver noted multiple scripts posted across the back and sides of each cubicle. Initial product sales are conducted at the Northlake location. The telemarketers at the Northlake facility had the ability to forward live calls to the CSR at Douglas. Information about the consumer could be accessed through the use of a database in Google Drive called "Google Dump." This would allow the CSR to confirm or validate credit card or bank account information provided by the consumer. Consumer complaints or consumers with objections to the pending purchase would also be forwarded to the CSR to see if the sale could be saved.

The 40 "save" scripts, with rebuttals for various objections that could be raised by a consumer, were mostly the same rebuttal scripts the telemarketers used at the Northlake facility. Many of the scripts exhibited a sense of urgency suggesting that the customer would benefit by signing up immediately. The Receiver is troubled by representations in the rebuttal scripts that state "Emergency Alert has been in business since 1980 and we are the oldest and largest residential emergency medical alert company in the nation." The Receiver located scripts with changes to the name of the product and the company which were handwritten into several of the scripts. The Receiver believes Lifewatch USA, the medical device and alert response provider discussed below, promotes such claims and Emergency Alert is improperly promoting the same facts for itself.

KANE ATT. A

Only one person scheduled to work the night shift in Suite 2205 reported to work. She reported a belief that the company deliberately delayed dispatch of the emergency medical alert system because the delay ensured one or more months of charges to the consumer's credit card or bank account before the customer would be able to cancel.

## LifeWatch USA

Lifewatch USA (Lifewatch) is the medical device and alert response provider and is the entity that processes charges to consumers after the consumers are solicited by the receivership defendants. Lifewatch maintains a database that contains all consumer information. The Receiver contacted Lifewatch through its attorney and asked for consumer and financial information. Responding to the Receiver's requests, Lifewatch has furnished certain summary financial information. The Receiver is continuing to communicate with Lifewatch to complete arrangements to receive additional information.

The Receiver located several service agreements between the receivership defendants and Lifewatch. Information provided to the Receiver by Lifewatch states the receivership defendants were paid a total of $ 15,741,518.50 between March 2012 and December 2013. The table below provided by Lifewatch shows payments were made by Lifewatch to five of the receivership defendants.

| | |
|---|---|
| Worldwide Info Services, Inc. | Paid $8,269,193.50 from March 2012 through May 2013 |
| Global Interactive Technologies, Inc. | Paid $3,000,277.10 from May 2013 through December 2013 |
| The Credit Voice, Inc.[3] | Paid $290,437.00 |
| American Innovative Concepts, Inc. | Paid $3,797,405.90 from June 2013 through December 2013 |
| National Life Network | Paid $384,205.00 in December 2013 |

## Bank Accounts

The Receiver has served this Court's Temporary Restraining Order on all known financial institutions used by the receivership defendants and their affiliates. To date, approximately $170,000 has been frozen.

---

[3] Lifewatch was not able to locate records relating to The Credit Voice, Inc. This payment was made to The Consumer Voice, which Lifewatch believes is related to The Credit Voice, Inc.

KANE ATT. A

## Gold Purchases

The Receiver located documents that showed at least $268,585 was wire transferred from American Innovative Concepts, Inc. from July 2013 through November 2013 for purchases of gold. The Receiver informed counsel for the defendants of these transactions. According to the defendants, the gold was later sold and the proceeds were used for business operating expenses. The Receiver has asked for the details of the sales and is awaiting this information.

## Conclusion

Based on the scripts, recorded telemarketing calls and the requirement for each telemarketer to complete two sales per day or be terminated, the Receiver has determined that the receivership defendants were operating a high pressure sales force targeting seniors.

Respectfully submitted,

/s/

Robb Evans & Associates LLC
Receiver

Page 7 of 7

KANE ATT. A