# AMENDED

# DX 2

# DX 2

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and | Case No.: 15-cv-5781 |
| STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS | DECLARATION OF SARAI BAKER |
| Plaintiff, | |
| v. | |
| LIFEWATCH INC., a New York Corporation, also d/b/a LIFEWATCH USA and MEDICAL ALARM SYSTEMS, and | |
| EVAN SIRLIN, individually and as an officer or manager of LIFEWATCH, INC. | |
| Defendants. | |

I, Sarai Baker, declare as follows:

1. I am Lifewatch's Director of Operations. I am a New York resident. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct.

**Background**

2. Lifewatch is a decades-old New York company that is proud of its reputation for providing high-quality products and services to elderly, seriously ill, and disabled individuals. By simply pressing a button on a Lifewatch medical alert device, Lifewatch's customers have immediate access to emergency services.

3. Lifewatch does not telemarket.

4. Beginning in approximately 2012, Lifewatch began entering into Purchase Agreements with various outside sale companies. (Exhibit A, Sample Purchase Agreements).

5. Pursuant to these Purchase Agreements, the outside sellers originate customer accounts (through radio, television, internet, and print advertising, as well as telemarketing) and then offer to sell those accounts to Lifewatch--and others--on a non-exclusive basis.

6. The outside sellers that sign these Purchase Agreements warrant and covenant that they do not and will not violate any state or federal telemarketing laws, or any other laws in originating customer accounts.

7. In early 2014, Lifewatch learned that some outside sellers from which Lifewatch had purchased customer accounts pursuant to Purchase Agreements had been sued by the FTC.

8. In that lawsuit, the FTC alleged that these outside sellers attempted to sell products to consumers by making the following false statements:

    a. That a product or service had already been purchased by a friend, family member or other acquaintance;

    b. That products or services have been endorsed by the American Heart Association, the American Diabetes Association, and the National Institute on Aging;

    c. That consumers would not be charged the first monitoring fee until they received and activated the medical alert system.

9. Lifewatch stopped doing business with the companies sued by the FTC in Florida. Further, in order to protect our customers, we offered a full refund to any customer that was contacted by one of the FTC defendants and then purchased Lifewatch's products or services based on any of the above statements. (Exhibit B, Refund Letter)

10. Further, in order to ensure that there were no Lifewatch customers that were unaware that they had been charged for Lifewatch products and services, I began working with Lifewatch's customer service department to identify which of Lifewatch's customers obtained through defendants sued by the FTC in Florida had not:  a) tested their

Lifewatch medical device by pressing the button on the device; and b) otherwise indicated that they wanted to keep and continue paying for their Lifewatch medical device.

11. As part of this extensive process, Lifewatch initially contacted Lifewatch's monitoring centers throughout the United States and asked the monitoring centers to provide lists of the names of Lifewatch customers who had not tested their device by pressing the button on the device.

12. Lifewatch received the lists from the monitoring centers and compared those lists against the lists of Lifewatch's customers obtained through defendants sued by the FTC in Florida. Lifewatch determined that approximately 3,000 customers obtained through defendants sued by the FTC in Florida had not tested their device by pressing the button on the device.

13. Lifewatch also determined that out of those approximately 3,000 customers, approximately 2,200 customers had previously called in to our customer service call center and thus verified with our customer service department that they knew they had the Lifewatch device, were satisfied with the service and device, and had not indicated any desire to discontinue service.

14. Throughout the Summer and Autumn of 2014, Lifewatch attempted to contact the remaining 800 customers and to ask the customers if they: a) knew they had a Lifewatch device; and b) wanted to keep the Lifewatch device and continue paying for it.

15. Of the approximately 800 customers, only 38 customers indicated that they did not wish to keep their Lifewatch devices. We sent return labels so that these 38 customers could return the devices.

**Quality Control Program**

16. Beginning in approximately October 2014, Lifewatch revised and improved its existing quality control program relative to its outside sellers.

17. Lifewatch's quality control program dictates that the following steps are taken before Lifewatch enters into a Purchase Agreement with an outside seller:

   a. Lifewatch requires the prospective outside sellers to present valid business licenses where required by law;

   b. Lifewatch provides the prospective outside sellers with a copy of the Stipulated Permanent Injunction entered in the Central District of California in March 2015 in connection with a case entitled Life Alert Emergency Response v Lifewatch Inc., et al.

18. Lifewatch also insists that in conjunction with signing the Purchase Agreement -- wherein the outside seller warrants and covenants that they will not engage in unlawful activities, including violative telemarketing practices -- each outside seller signs an affidavit wherein the prospective outside seller affirms that, among other things, they understand and will comply with Lifewatch's requirement that outside sellers:

   a. properly recite the ACH or Credit Card Processing script;

   b. make no misrepresentations about, among other things, the products, services, or payments;

   c. ensure that they do not indicate that the product is "free";

   d. ensure that they do not indicate that the product was purchased for them by a friend or family member;

   e. ensure that they do not utter phrases trademarked by other companies; and

    f.  ensure that they do not indicate that the product is endorsed by any public or private entities.

(Exhibit C, Sample of Affidavits from Outside Sellers).

19. After an outside seller has received the Stipulated Permanent Injunction; signed and returned the Purchase Agreement; and signed, notarized, and returned the affidavit, then Lifewatch provides the outside seller with the following documents:

    a.  A Lifewatch product description document

    b.  A fact sheet relative to payment

    c.  A sheet that discusses the compatibility of phone lines with Lifewatch's medical alert devices

    d.  ACH and Credit Card Payment telephone authorization scripts

    e.  Lifewatch's internal do-not-call list

(Exhibit D, items a-d)

20. Thereafter, Lifewatch provides the outside seller with passwords so that the outside sellers can use a third party portal to enter information into a Customer Relationship Manager Database. To be clear, Lifewatch does not provide the outside seller with passwords until after Lifewatch has received a signed Purchase Agreement and a signed and notarized affidavit.

21. The Purchase Agreements require the outside sellers to maintain audio-recordings of telephone calls associated with customer accounts sold to Lifewatch. In accordance with the quality control program, every week, Lifewatch employee Lauren Vandewater -- who is under my supervision -- randomly selects between 25 and 40 customer accounts purchased by Lifewatch from outside sellers during the preceding week. She then directs

the outside sellers to provide her with audiotapes of calls associated with the randomly selected customer accounts.

22. Ms. Vandewater listens to the calls – which typically range in duration from 7 to 45 minutes – to determine if they are non-compliant with Lifewatch's guidelines.

23. If Ms. Vandewater determines that Lifewatch's guidelines are not followed or that the outside seller has engaged in violative practices, Ms. Vandewater immediately reports the information to me. Lifewatch then terminates the Purchase Agreement with the offending outside sales company.

24. Lifewatch has, in fact, terminated Purchase Agreements with multiple outside sellers.

25. Lifewatch is currently purchasing customer accounts – pursuant to Purchase Agreements – from seven outside sellers. Lifewatch considers the identities of its current outside sellers to be confidential and proprietary. (Exhibit E, Purchase Agreements and Affidavits relative to the seven outside sellers).

26. Lifewatch is not purchasing outside seller originated customer accounts from the entities set forth on the list attached as Exhibit F.

27. Beginning in June 2015, Lifewatch sought to get more detailed information about the marketing methods used by Lifewatch's outside sellers to originate customer accounts. To that end, Lifewatch began requiring its outside sellers to sign affidavits indicating, among other things, the percentage of the customer accounts sold to Lifewatch that originated through outbound telemarketing – as opposed to other means, including print advertising, web advertising, and television and radio advertising.

28. These affidavits indicate that the majority of customer accounts originated through means other than outbound telemarketing. (Exhibit E).

**Customer Relationship Management System (CRM)**

29. Lifewatch uses a third-party CRM database to track customer information.

30. The outside sellers are provided with passwords that enable them to log-in, on a restricted-access basis, to a third-party web portal within the CRM and then enter the information of potential Lifewatch customer accounts.

31. The outside sellers do not have general access to the CRM and have no ability to access any of Lifewatch's proprietary customer information.

32. When a potential customer is entered into the CRM, Lifewatch can either accept the customer (and fulfill the customer's order) or Lifewatch can decline to accept the customer.

33. There are a variety of reasons that Lifewatch declines to accept customer accounts from outside sellers. For instance, Lifewatch does not accept customers in particular regions and Lifewatch will not ship to PO boxes.

34. Once an individual's ACH or credit card has been charged and the 90 day credit card or ACH charge-back period elapses without a charge-back occurring, the individual's information is migrated from the portal into the CRM, and is no longer accessible to the outside sellers.

35. The CRM includes identifying information for each of Lifewatch's active customers. Further, the identifying information of the outside seller that sold the customer account to Lifewatch is contained within the CRM.

**Order Fulfillment**

36. Once Lifewatch accepts the customer account from the outside seller and fulfills the customer order, Lifewatch ships a medical alert product to the customer along with the

following documents:

    a.  Welcome Letter

    b.  Medical Alarm System Terms and Conditions

    c.  Medical Alarm System Instructions

    (Exhibit G, a-b attached)

37. Lifewatch's customers are not obligated to pay separately for Lifewatch's monitoring device products in order to access Lifewatch's services. If a customer orders a Lifewatch monitoring device product, the customer pays for the services associated with the device and is not required to purchase the device.

38. Lifewatch's customers are offered a variety of payment plans, including monthly payment plans. Customers are not obligated to purchase Lifewatch's services for any set period of time and, depending on the payment plan chosen, may cancel at any time. If a customer cancels, the customer is required to return the device to avoid being charged for the cost of the device, which ranges from between $100 to $300.

**Internal Do Not Call**

39. From time to time, Lifewatch's customer service department has received phone calls from individuals asking not to be called or contacted by Lifewatch.

40. When an individual makes this request, Lifewatch does the following:

    a.  Lifewatch's customer service representative obtains the individual's name and telephone number;

    b.  Lifewatch's customer service representative provides the information to Lauren Vandewater, who adds the telephone number to an organic, excel spreadsheet that Lifewatch refers to as its "internal DNC list."

41. Lauren Vandewater regularly (i.e. at least monthly) provides the latest iteration of Lifewatch's internal DNC list to each of its outside sellers so that the outside sellers will know that they are prohibited from making contact with those individuals.

42. Moreover, Lifewatch checks its CRM to see if the person who called the customer service department -- and asked not to be contacted -- is an existing Lifewatch customer or a prospective Lifewatch customer. If the person is in the CRM, and the person has told our customer service department that they were telemarketed despite being on the National Do Not Call Registry, Lifewatch will warn or terminate the seller, depending on the circumstances.

43. If Lifewatch finds that a sale was made to a consumer on Lifewatch's internal Do Not Call list, Lifewatch will raise the issue with the outside seller. However, Lifewatch cannot determine for itself whether outside sellers contact consumers on the national Do Not Call registry where the consumer does not make a purchase because, under those circumstances, Lifewatch would not be able to determine the identity of the outside seller who made such contact, if, in fact, the contact was made.

**BBB Complaints**

44. Lifewatch employee Pam Cohen -- who is under my supervision -- is charged with responding to all Better Business Bureau ("BBB") complaints.

45. In accordance with Lifewatch's quality control program, upon receipt of a complaint, Ms. Cohen promptly identifies the customer within the CRM and reaches out to the customer in an effort to resolve the complaint. Thereafter, she reports back to the BBB with information about her efforts to resolve the complaint.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: __11/10/15__

_____
Sara Baker

# EXHIBIT A

# PURCHASE AGREEMENT

This Purchase Agreement (the "Agreement") is entered into as of this ▮▮▮▮▮▮▮▮ ▮▮▮ by and between LifeWatch Inc. d/b/a LifeWatch USA (the "Company"), a New York corporation, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and its affiliates and subsidiaries (the "Seller"), a Florida limited liability company.

## WITNESSETH:

WHEREAS, the Company is engaged in the business of selling a medical alert system consisting of various medical alarm plans and related safety products (the "Products");

WHEREAS, the Seller is engaged in the business of entering into contracts for its own account with customers for a wide variety of products and services, including selling medical alert systems and related plans (the "Contracts") and selling such Contracts for its own account to various purchasers, including but not limited to the Company; and

WHEREAS, the Company and the Seller wish to define the terms and conditions governing all of the Contracts, if any, that the Company may purchase from the Seller.

NOW, THEREFORE, in consideration of the premises and mutual covenants, contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    DESCRIPTION OF THE PURCHASE ARRANGEMENTS. Throughout the Term of this Agreement (as defined below), the Seller shall operate in accordance with the following:

(a)    Seller shall use its best efforts to originate Contracts for its own account and to offer to sell Contracts for the Products to the Company and to others on a non-exclusive basis at a prices and terms to be mutually agreed upon from time-to-time;

(b)    Seller shall not contact any current or future customers of the Company or any other person listed on any local, federal or state "do not call" registry in accordance with Section 6.2 herein;

(c)    In originating Contracts for its own account, the Seller's telemarketing activities (as hereinafter defined) shall be conducted in accordance with all applicable federal, state and local laws, rules and regulations ( collectively "Telemarketing Laws"). As used in this Agreement, "Telemarketing", shall have the meaning ascribed to it in subsections 310.2 (cc) and (dd) of the federal Telemarketing Sales Rule, 16 C.F.R. Part 310; direct mail solicitation via the

U.S. Postal Service, facsimile transmission, electronic mail, text messages accessed by mobile phone or sent directly to mobile phones, television and radio; and internet marketing; and

(d)     The Seller shall record, or cause the recording of, all sales calls made by its employees, agents or representatives and retain all recordings (i) for not less than twenty four (24) months from the date each recording is made, and (ii) shall make all such recordings available to the Company for its review at any time; and

(e)     The Seller shall comply, or cause the compliance, with all local, state and federal regulations, including 47 U.S.C.A. § 227, which prohibits the use of automatic telephone dialing systems.

      1.1     <u>Verification of Acceptance and Payment for the Products</u>.  If a consumer enters into a Contract that Seller intends to offer to Company for the consumer's use of the Products, among other things, the Seller shall obtain the consumer's express verifiable authorization prior to causing billing information to be submitted for payment, or collecting the consumer's payment information for the Products, except when the method of payment used is a credit card subject to the protections of the Truth in Lending Act (15 U.S.C. § 1601 et seq.) and Regulation Z (12 C.F.R. part 226), or a debit card subject to the protections of the Electronic Fund Transfer Act (15 U.S.C.§ 1693 et seq.) and Regulation E (12 C.F.R. part 205).  Whatever Contracts the Seller decides to offer to sell to the Company shall be submitted to the Company's principal executive office for acceptance or rejection by the Company. A consumer's authorization to purchase the Product shall be deemed verifiable if any of the following means is employed:

(a)     express written authorization by the consumer, which includes the consumer's signature;

(b)     express oral authorization which is audio-recorded and made available upon request to the consumer and the consumer's bank or other billing entity, and which evidences clearly both the consumer's authorization for payment and the consumer's receipt of all of the following information:

        i.     The number of debits, charges, or payments (if more than one);
        ii.     The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;
        iii.     The amount of the debit(s), charge(s), or payment(s);
        iv.     The consumer's name;
        v.     The consumer's billing information, identified with sufficient specificity so that the consumer understands what account will be used to collect payment for the goods or services that are the subject of the telemarketing transaction;

      vi.    A telephone number for consumer inquiry that is answered during normal business hours; and

      vii.   The date of the consumer's oral authorization; or

    (c)    Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the consumer via first class mail prior to the submission for payment of the consumer's billing information, and that includes all of the information set forth above in subparagraphs 1.2(b) i-vii and a clear and conspicuous statement of the procedures by which the consumer can obtain a refund from the Company in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which the Products are offered in a transaction involving a free-to-pay conversion and pre-acquired account information.

    1.2.   <u>Transfer of Consumer Information to the Company</u>.  Upon obtaining a consumer's acceptance and/or express verifiable authorization, such information shall be contained within the package of materials to be submitted by the Seller to the Company under this Agreement.

    1.3.   <u>Costs of Performance</u>.  The Seller shall be solely responsible for all costs and expenses directly associated with performing its obligations under this Agreement, including compensation of its employees or independent contractors, advertising, office expenses, taxes and applicable governmental licensing.

    1.4.   <u>Seller's Obligation to Replace Contracts</u>.  If there is a default within the first ninety (90) days of any of the Contract that is sold to the Company, the Seller shall replace such Contract with a similar Contract at no additional cost to the Company, or the Company may at its discretion deduct the amount paid for the contract from the seller's next payment.  Any sales that cancel within the first 90 days after initial payment and that doesn't generate a fourth payment (Monthly deals) or a second payment (Quarterly deals) will have the commission reversed.

2.    <u>TERM</u>.  The Term of this Agreement shall be effective as of <u>July 22, 2015</u> for a period of three (3) years from and after the execution of this agreement and shall be automatically renewed for consecutive one (I) year terms (the "Renewal Term") unless earlier terminated pursuant to this Agreement.

3.    <u>TERMINATION</u>.  Notwithstanding the Term or any Renewal Term, this Agreement may be terminated by either party effective immediately upon written notice to the other party if any of the following occurs:

    (a)    a material breach of this Agreement by one party if the breaching party does not cure such breach within ten (10) days of receipt of written notice thereof;

    (b)    in the event that a party: (i) commences a voluntary case or other proceeding

seeking liquidation, reorganization or other relief of its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, that authorizes the reorganization or liquidation of such party or its debt or the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property; (ii) consents to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; or (iii) makes a general assignment for the benefit of creditors, or becomes insolvent, or takes any corporate action to authorize any of the foregoing; or

      (c)    in the event that any regulatory authority alleges that this Agreement or any aspect of it is in violation of any applicable law, rule or regulation, or in the event that a party is served with a notice from a federal or state governmental or regulatory authority that it has become the subject of an investigation by such authority.

4.    <u>SELLER'S COVENANTS</u>.

      4.1    <u>Duty to Notify the Company of Complaints by Consumers.</u>  Seller shall promptly provide written notice to the Company of any request it receives from a consumer for a refund, cancellation or chargeback. In addition, Seller shall promptly provide to the Company copies of any written complaints that it receives from consumers, Better Business Bureaus or governmental or law enforcement agencies.

      4.2    <u>Compliance with Applicable Law</u>.  The Seller shall at all times perform its obligations under this agreement in strict compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

      4.3    <u>Record Retention</u>. The Seller shall retain records establishing compliance with 16 C.F.R. 310.4(b)(4)(i)-(iii) and Seller shall maintain, for a minimum period of 24 months from the date the record is produced, the following records relating to its performance under this Agreement:

      (a)    All substantially different advertising, brochures, telemarketing or text message scripts, and promotional materials;

      (b)    The name and last known address of each prize recipient and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

      (c)    The name and last known address of each customer, the goods or services purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;

(d)     The name, any fictitious name used, the last known home address and telephone number, and the job title(s) for all current and former employees directly involved in telephone sales or solicitations; and

(e)     All verifiable authorizations or records of express informed consent or express agreement required to be provided or received under the Telemarketing Sales Rule promulgated by the Federal Trade Commission.

4.4     Seller Clients.  The Seller shall have the right to sell or offer to sell Contracts for the Products to any other purchaser and the Company shall have the right to purchase contracts for the Products from other sources and/or to originate such contracts by itself.

4.5     Covenant Not to Solicit.  During the Term of this Agreement and for a period of two (2) years following the termination of this Agreement, the Seller shall not contact any customer that is a party to any Contract sold by the Seller to the Company for purposes of selling any products that compete with the Company to the customer.  A breach of this section shall be deemed material and result in liquidated damages to company in the amount of one million dollars.

5.     COVENANTS OF THE COMPANY.

5.1     Fulfillment of Orders for Products.  The Company, or such third party as it may designate, shall be responsible for Fulfillment of each Contract that it purchases from the Seller. "Fulfillment" means the process of delivering the goods and services to the consumer along with any written agreement reflecting the terms of the transaction.

5.2     Customer Service.  The Company, or such third party as it may designate in writing, shall be responsible for providing Customer Service to consumers who are parties to the Contracts that the Company purchases from the Seller. "Customer Service" means answering telephone calls from consumers and processing any legitimate requests for refund or cancellation.

5.3     Processing of Payment for the Products.  The Company shall be responsible for processing payments from consumers after receiving consumers' billing information from the Seller.

5.4     Purchase Price.  The Company and the Seller shall agree from time-to-time on the purchase price for Contracts.

5.5     Compliance with Applicable Law.  The Company shall at all times perform its obligations concerning Contracts that it purchases in substantial compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

6.     **LEGAL COMPLIANCE REQUIREMENTS.**

    6.1     <u>Privacy Protection</u>. The Seller shall not use any information that contains personal contact or other information that violates applicable law.

    6.2     <u>Scrubbing of Leads</u>. All Contracts originated or otherwise acquired or used by the Seller when originating a Contract must be "scrubbed" against the most current Federal Trade Commission ("FTC") "do-not-call" registry, any applicable state "do- not-call" list or registry The Seller will not contact any person included on any such list or registry.

    6.3     <u>E-mail and Text Messages</u>. The Seller shall consult the official list of wireless domain names published by the Federal Communications Commission (the "FCC") before sending e-mail and other electronic advertising to consumers. If an address on the Seller's mailing list includes a wireless Internet domain name on the FCC's official list, the advertiser cannot send ads to that address without getting the recipient's express prior consent.

    6.4     <u>Use of Pre-Recorded Messages. The Seller</u>. The Seller shall not initiate any outbound telephone call that delivers a prerecorded message unless it strictly complies with subsection 16 C.F.R. 310.4(b)(I)(v) of the Federal Telemarketing Sales Rule, which makes it an abusive telemarketing act or practice for the any person engaging in telemarketing activities, or engage in, the following conduct:

    (a)     Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in 16 C.F.R. 310.4(b)(4)(iii), unless:

        i.     in any such call to induce the purchase of any Products, the caller has obtained from the recipient of the call an express agreement, in writing, that:

            (a)     the caller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the caller to place prerecorded calls to such person;

            (b)     the caller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any Products;

            (c)     evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the caller; and

            (d)     includes such person's telephone number and signature, which "signature" may include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

        ii.     In any such call, to induce the purchase of any Product being sold by the Seller:

(a)    The telephone is allowed to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

(b)    Within two (2) seconds after the completed greeting of the person called, a prerecorded message is played that promptly provides the disclosures required by 16 C.F.R. 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

    (1)    In the case of a call that could be answered in person by a consumer, that the person called can use m1 automated interactive voice; m1d/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)( 1)(iii)(A), at any time during the message. The mechanism must (a) automatically add the number called to the Company's entity-specific Do Not Call list, (b) once invoked, immediately disconnect the call, and (c) be available for use at any time during the message;

    (2)    In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to 16 C.F.R. 310.4(b)(l)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that automatically adds the number called to the caller's entity-specific Do Not Call list (b) immediately thereafter disconnects the call; and (c) is accessible at any time throughout the duration of the telemarketing campaign; and complies with all other requirements of this part and other applicable federal and state laws.

        (a)    Paragraph (a) above shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

        (b)    In addition, the Seller must comply with any state law applicable to prerecorded messages.

        (c)    The Seller shall adopt and comply with compliance policies which comply in all respects with applicable law, and shall cause all suppliers, vendors and subcontractors of Seller to adopt and comply with compliance policies which comply in all respects with applicable law. The Company shall have the right to inspect such compliance policies and verify such compliance by the Seller.

6.5     Call Abandonment Safe Harbor. The Call Abandonment Safe Harbor, subsection 310.4(b)(4)(iii) of the TSR, provides that any caller will not be liable for violating 16 C.F.R. 310.4(b)(1)(iv); provided, that (i) the caller employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues, (ii) the caller, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call, (iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the caller promptly plays a recorded message that states the name and telephone number of the entity on whose behalf the call was placed. This provision does not affect any of the Seller's obligations to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

6.6     Compliance with State and Local Laws. Each party shall comply with any applicable state telemarketing, telephone solicitation or consumer protection laws as well as with any applicable state registration and licensing requirements in any state in which it transacts business and/or renders services pursuant to this Agreement, as same may be amended from time to time.

6.7     Compliance with Federal Laws. Each party shall comply with any applicable Federal statutes, rules and regulations while rendering services pursuant to this Agreement, including, but not limited to:

(a)     The Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53(b) and 57b;

(b)     The Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. §6101;

(c)     The Telemarketing Sales Rule, 16 C.F.R 310;

(d)     The Telephone Consumer Protection Act, 47 U.S.C. § 227, and 47 C.P.R. part 64.1200;

(e)     If a party engages in an electronic marketing campaign, the Controlling The Assault of Non-solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act");

(f)     The provisions of Title 18, section 1037 of the United States Code relating to criminal fraud and related activity in connection with electronic mail;

(g)     The Children's Online Privacy Protection Act ("COPPA"), Title 15, §§ 6501-6506 of the United States Code;

(h)    The Computer Fraud and Abuse Act ("CFAA"), Title 18, section 1030 of the United States Code;

(i)    The federal laws protecting intellectual property (Copyrights are protected by Title 17 of the United States Code, which provides civil remedies for infringement, and Title 18 of the United States Code, which imposes criminal penalties for copyright infringement. Patents and Trademarks are protected by Titles 35 and 15, respectively, of the United States Code, which provide civil remedies for infringement.);

(j)    The Electronic Communications Privacy Act (Title 18, sections 2510, 2511 and 2701 of the United States Code, which prohibits the interception, use and disclosure of wire, oral or electronic communications and provide civil remedies and criminal penalties for violations.);

(k)    The Electronic Signatures in Global and National Commerce Act (the "E- Sign Act"), which seeks to promote the use of electronic signatures in interstate and foreign commerce by declaring that a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form or an electronic signature or record was used in its formation. The Act also requires certain consumer disclosures and the retention of business records;

(l)    The Fair Labor Standards Act of 1938 (Title 29, sections 201-219 of the United States Code) establishes minimum wages and maximum hours for employees and provides remedies and protections to aggrieved employees. Title 29, sections 541.300 and 541.400 of the Code of Federal Regulations define the exemptions from the minimum wage and maximum hour requirements for executive, administrative, professional, computer and outside sales employees;

(m)    The Fair Housing Act (42 U.S.C. § 3601 et seq.), which prohibits certain forms of discrimination on the basis of race, color, religion, sex, familial status, or national origin;

(n)    The Restore Online Shoppers' Confidence Act (15 U.S.C. §§ 8401-8405), which Prohibits "any post-transaction third party seller" from charging or attempting to charge "any consumer's credit card, debit card, bank account or other financial account for any good or service sold in a transaction effected on the Internet, unless" the third party seller, before getting the consumer's billing information, "clearly and conspicuously" discloses to the consumer "all material terms of the transaction" and gets the consumer's "express informed consent for the charge." "All material terms of the transaction" must include, in addition to basics already required by existing law like "a description of the goods or services being offered" and "the cost of such goods or services," that the "third party seller is not affiliated with the initial merchant" by disclosing the third party seller's name "in a manner that clearly differentiates the post-transaction third party seller from the initial merchant." In order to obtain "express informed consent," the third party seller must get from the consumer "the full account number of the account to be charged," "the consumer's name and address and a means to contact the consumer,"

and require the consumer "to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed." In addition to imposing new disclosure requirements on post-transaction third party sellers, the Act prohibits the initial merchant from disclosing "a credit card, debit card, bank account, or other financial account number, or to disclose other billing information that is used to charge a customer of the initial merchant, to any post transaction third party seller for use in an Internet- based sale of any goods or services from that post-transaction third party seller." Finally, the Act prohibits "any person" from charging or attempting to charge "any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature" as defined by the Telemarketing Sales Rule unless the person "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information obtains a consumer's express informed consent before charging the consumer's [account] and provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's [account]." The Act does not apply unless the company is a (1) a "post-transaction third party seller," (2) discloses billing information to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller, or (3) sells goods or services using a negative option feature.

7. __ACCOUNTING RECORDS.__  Each party shall maintain true and complete books and records in accordance with generally accepted accounting principles reasonably necessary to determine the amounts payable hereunder.

8. __REPRESENTATIONS AND WARRANTIES OF SELLER.__ Seller represents and warrants to the Company that:

(a) it is a corporation duly formed validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

(b) it has the corporate power to enter into this Agreement;

(c) the execution, delivery and performance of this Agreement by the Seller has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Seller enforceable in accordance with its terms; and

(d) the execution, delivery and performance by the Seller of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Seller is a party to or by which the Seller is bound.

9.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY.  The Company represents and covenants to the Seller that:

(a)    it is a corporation duly formed, validly existing and in good standing under the laws of the state of its incorporation, and has all necessary corporate power and authority to carry on its business as now being conducted, and possess all licenses, franchises, approvals, rights and privileges material to the conduct of its business;

(b)    it has the corporate power to enter into this Agreement;

(c)    the execution, delivery and performance of this Agreement by the Company has been duly authorized and, when executed and delivered, shall constitute the valid and binding obligation of the Company enforceable in accordance with its terms; and

(d)    the execution, delivery and performance by the Company of its obligations under this Agreement will not constitute a violation of, conflict with, result in any breach of or constitute a default under any other instrument to which the Company is a party to or by which the Company is bound.

10.    INDEMNIFICATION.

(a)    The parties shall indemnify, defend and hold each other and their directors, officers, shareholders, employees, agents, lenders and investors harmless from and against any and all actual or threatened claims, losses, proceedings, actions, liabilities, judgments, awards or costs, including reasonable attorney's fees and expenses and costs of investigations (collectively, "Losses") arising out of or related to: (a) the breach of any representations or warranties contained in this Agreement; (b) the failure to perform any obligations hereunder; or (c) the failure to comply with applicable law arising out of this Agreement or any investigation or allegation thereof.

(b)    In the event that any claim is made or asserted against a party entitled to indemnification under this Agreement (the "Indemnified Party"), the Indemnified Party shall with reasonable promptness notify the other party with an indemnification obligation (the "Indemnifying Party") of such claim (the "Claim Notice"), specifying the nature of such claim and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim); provided that, any failure to provide such notice shall not relieve the Indemnifying Party of any obligation hereunder, except to the extent that such Indemnifying Party is irrevocably prejudiced thereby.  The Indemnifying Party shall have fifteen (15) days from the receipt of the Claim Notice (the "Notice Period") to notify the Indemnified Party (i) whether or not the Indemnifying Party disputes liability to the Indemnified Party hereunder with respect to such claim and (ii) if the Indemnifying Party does not dispute such liability, whether or not the Indemnifying Party desires, at the sole cost and

expense of the Indemnifying Party, to defend against such claim; provided further, that, the Indemnified Party is hereby authorized (but not obligated) prior to and during the Notice Period to file any motion, answer or other pleading and to take any other action that the Indemnified Party shall deem necessary or appropriate to protect the Indemnified Party's interests. In the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party does not dispute the Indemnifying Party's obligation to indemnify hereunder and desires to defend against such claim, except as hereinafter provided, the Indemnifying Party shall have the right to defend by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the Indemnifying Party to a final conclusion; provided, further, that, unless the Indemnified Party otherwise agrees in writing, the Indemnifying Party may not settle any matter (in whole or in part) unless such settlement includes a complete and unconditional release of the Indemnified Party and provides solely for monetary damages. If the Indemnified Party desires to participate in, but not control, any such defense or settlement the Indemnified Party may do so at its sole cost and expense. If the Indemnifying Party (a) fails to timely notify the Indemnified Party it will not defend or (b) actually fails to defend the Indemnified Party against such Claim, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then, without waiving any rights or conflict of interest Claims against the Indemnifying Party, the Indemnified Party may settle or defend against any such claim or demand in the Indemnified Party's sole discretion at the cost of the Indemnifying Party and, if it is ultimately determined that the Indemnifying Party is responsible therefore under this Section, then the Indemnified Party shall be entitled to recover from the Indemnifying Party the amount of any settlement or judgment and all indemnifiable costs and expenses of the Indemnified Party with respect thereto, including, without limitation, interest from the date such costs and expenses were incurred.

(c)     This section shall survive the expiration or termination of this Agreement.

(d)     In the event that the Company has a claim for indemnification against the Seller under Section 10(a), the Company shall have the right to offset any amounts which it may owe to the Seller with any funds which the Company may possess on behalf of or owe to the Seller.

11.     TRADE SECRETS AND CONFIDENTIALITY.

11.1     Trade Secrets and Confidential Information. The Seller recognizes that the Company's trade secrets and confidential information were developed through considerable investment of time, effort and money, are proprietary, and their disclosure would be harmful and damaging to its business.

"Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or

potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Confidential Information" means information that would cause an unfair advantage to competitors by providing them information as to the commercial operations of the Company and includes, but is not limited to business lists; records and information of prospective and actual customer names and other personal information of consumers, including contacts, addresses, and lists, contracts, transactions, plans, designs, policies, reports, histories, information reports and information; customer leads and methods of generating customer leads; scripts, sales techniques, policies, methods and procedures for sales; pricing and marketing; prices and price lists; inventory and inventory lists; vendors' names and contact information, supplies, suppliers' names and addresses, and supplier and supply lists; manufacturer, distributor and supplier company names, contacts, addresses, lists, transactions, contracts, policies, reports, histories, products, rate books, comparisons, and information; advertising, advertising copy and programs; endorsers' names and addresses; sales reports, business reports, financial statements and reports, and operating statements; employees, agents, subagents, and independent contractor names, addresses, lists, commissions, productivity and information; computer programs, computer software, databases, and data; and know-how, discoveries, inventions, writings, conceptions, knowledge, information, plans, programs, and ideas and tangible expressions of ideas.

"Customer" or "Consumer" means anyone whose name appears on a database, lead list, customer list, or report of the Company; anyone to whom the Company has sold, rendered or exchanged any Products; anyone who has ordered any Products from the Company; and anyone solicited by the Company for the sale of any Products pursuant to this Agreement.

These lists are not exclusive; there may now and in the future be other types of information that constitute trade secrets and confidential information and which are included within the scope of this Agreement.

    11.3   Return of Tangible Information. The Seller agrees that all books, papers, records, lists, files, forms, reports, accounts, documents, supplies, equipment, photographs, cassettes, compact disks, videotapes, databases, disks, data, computers, peripherals, hardware, programs, software, floppy disks, hard drives, magnetic media, storage media, CD-ROMs, accessories, parts, components, manuals, documentation, research papers and information relating in any manner to the Company or its business, operations, prices, vendors, suppliers or customers, whether prepared by the parties hereto or anyone else, and whether or not containing a trade secret or confidential information, that were disclosed or turned over to the Seller, or turned over by the Seller to the Company with respect to Contracts purchased by the Company, pursuant to this Agreement are the exclusive property of the Company and that any such tangible documents

or information, whether electronic or hard copy shall immediately be returned to the Company within 10 days after termination of this Agreement or earlier at the Company's request at any time.

   11.4 <u>Confidentiality by the Seller</u>. The Seller agrees to keep secret and treat confidentially all of the Company's trade secrets and confidential information (whether or not copyrightable or patentable). Specifically, the Seller agrees not to do any of the following, directly or indirectly: use, publish, disclose or communicate any of the Company's Trade Secrets or Confidential Information to anyone; print, copy, publish, display, reproduce or allow anyone else to print, copy, publish, display or reproduce any information in tangible form containing a trade secret or Confidential Information; aid others in learning of or using or planning the use of any of the Company's Trade Secrets or Confidential Information; use the Company's Trade Secrets or Confidential Information for its own account or benefit; or aid, assist or plan for other persons to use the Company's Trade Secrets or Confidential Information for their own account or benefit. This obligation of confidentiality shall exist while the parties are engaged in discussions or negotiations to determine whether to enter into a business relationship and shall continue after the date of termination of such discussions or negotiations for the longer of ten (10) years or the date that all elements of the Trade Secrets and Confidential Information are public knowledge and no longer proprietary to the Company. This obligation of confidentiality shall not be released in case of the public availability of a part of the Company's Trade Secrets or Confidential Information, it being acknowledged that individual elements of the Company's Trade Secrets or Confidential Information may through no fault of its own become publicly available, but the availability of individual elements of Trade Secrets or Confidential Information does not result in appreciation of the use or value of those elements nor does it make publicly known the integrated package of information and know-how having value to the Company's business as useful information.

12.  <u>REMEDIES</u>. The Seller agrees that each of the above matters is important, material, confidential, and gravely affects the effective and successful conduct of the business of the Company and affects its value, reputation and goodwill. If the Seller breaches any provision of this Agreement, the Company shall be entitled to obtain temporary and permanent injunctions, specific performance, damages (to the extent, if at all, that they are ascertainable; including but not limited to compensatory, incidental, consequential, punitive, exemplary, and lost-profits damages), costs and reasonable attorneys' fees at all levels, including but not limited to appeals without any requirement to post a bond, security or other undertaking. The Seller agrees that if it breaches any provision of this Agreement it shall be conclusively presumed that irreparable injury would result to the Company and there would be no adequate remedy at law. This Agreement does not limit the rights and remedies that the Company otherwise has by law, equity or statute.

13.     NOTICES.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and will be deemed to have been given (i) when delivered if personally delivered by hand (with written confirmation of receipt), (ii) when received if sent by a nationally recognized overnight courier service (receipt requested), (iii) shall be mailed by registered or certified mail, postage prepaid, after five (5) days, or (iv) if sent via facsimile, upon confirmation of facsimile transmission, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (v) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day. Notices, demands and communications to the Company and Seller will, unless another address is specified in writing, be sent to the address indicated below:

> If to the company:
> Lifewatch, Inc.
> 266 Merrick Road
> Suite 104
> Lynbrook, New York 11563
> Attention:  Evan Sirlin
> Facsimile:  (516) 599-3620
> Email: evan@lifewatch-usa.com
>
> With a copy (which shall not serve as notice) to:
> Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara &Einiger, LLP
> 1111 Marcus Avenue - Suite 107 Lake Success, New York 11042
> Attention: Neil Kaufman
> Fax No.: (516) 328-6638
> Email: nkaufman@abramslaw.com
>
> If to the Seller:



14.     ADDITIONAL PROVISIONS.

14.1     Governing Law.  This agreement shall be governed, interpreted, construed and enforced in accordance with the laws of the State of New York without regard to the conflict of laws principles thereof. The parties thereto do hereby consent and submit to the venue and jurisdiction of the state and federal courts sitting in the State of New York, County of Nassau, as the sole and exclusive forum for the enforcement of this Agreement, and further agree that, in the event of any action or suit as to any matters of dispute between the parties, service of any process may be made upon the other party in the same matter as the giving of notices under paragraph 13 of this Agreement.

14.2     Attorney's Fees and Costs.  In any litigation arising out of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees and expenses and costs of litigation, at the trial and appellate levels.

14.3     Merger Clause.  This Agreement and any attached Addenda constitute(s) the entire understanding between the parties with respect to the subject matter hereof and all prior or collateral negotiations, understandings or agreements are merged herein.

14.4     Modification.  This Agreement may be amended or modified only by a written instrument signed by each of the parties hereto.

14.5     Severability.  In the event any provision of this agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be fully severable and this agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this agreement, a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible (while maintaining the economic intent of the parties under this Agreement) and be legal, valid, and enforceable.

14.6     Assignment.  Except as otherwise provided herein, Seller may not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other party. Any attempted or purported assignment in violation of this provision shall be null and void.

14.7     Waiver.  The failure of either party to this Agreement to object to or to take affirmative action with respect to any conduct of the other which is in violation of the terms of this agreement, shall not be construed as a waiver of that conduct or any future breach or subsequent wrongful conduct.

14.8    Headings.  The headings in this Agreement are inserted for convenience only and shall not affect the interpretation or construction of this agreement or any portion thereof.

14.9    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

14.10    Parties Bound.  This Agreement shall be binding upon the parties, their successors in interest and assigns.

14.11    Restatement and Replacement of the Marketing Agreement.  This Purchase Agreement is intended to replace and restate the Marketing Agreement in its entirety as of June 1, 2012.

14.12    SIGNATURE PAGE TO FOLLOW

WHEREFORE, the parties have executed this Agreement as of date set forth above.

**The Company:**

LifeWatch Inc.

By: _____

**The Seller:**

# EXHIBIT B



LIFEWatch USA
266 Merrick Road, Suite 104
Lynbrook, NY 11563

Dear Valued Customer,
We care deeply about your safety, happiness, and peace of mind.  Since the beginning, we've focused on providing the highest quality personal emergency response services.  That is why our company has continued to thrive over the last 30 years.

We understand that you face challenges each and every day.  Today, our company is facing a challenge.  We recently learned that outside companies that sold Lifewatch products were named in a civil lawsuit in Florida.  Lifewatch is not named as a party in this lawsuit, which was brought by the Federal Trade Commission and the Florida Attorney General's Office.  The lawsuit alleges that the outside companies attempted to sell our products to consumers by making the following alleged false statements:

    a.  That a Lifewatch product or service had already been purchased by a friend, family member or other acquaintance;
    b.  That Lifewatch's products or services have been endorsed by the American Heart Association, the American Diabetes Association, and the National Institute on Aging;
    c.  That consumers would not be charged the first monitoring fee until they received and activated the Lifewatch medical alert system.

Lifewatch is still looking into the allegations against the outside companies.  Further, we are presently working with the Federal Trade Commission in an effort to determine what actually happened.  But, given the nature of the allegations, we feel obligated to reaffirm our commitment to our customers.
Accordingly, we are taking the following immediate actions:

- We are doing all we can to try to prevent any company we might do business with in the future from making any false statements about our products and services; and
- We are offering a refund to any customer that was contacted by one of the outside companies and then purchased Lifewatch's products or services based on any of the points set forth above in sections a through c. Simply call our customer service department at **800.716.1433**, and we will promptly provide you a refund. Please note that if you believe that such statements were made to you, but you would still like to continue using our services, we would like to hear from you.  Please call us so we can hear how you are doing and what experiences you had with these outside companies.

By doing this, we hope to eliminate any confusion and give you full confidence in our company and the services that we provide.  We are so appreciative of your trust in Lifewatch.  We thank you for the support you have given us over the years.
Sincerely,

The Lifewatch Family

FTC09201

# EXHIBIT C

1. I, ██████████ serve as the Managing Member/CEO for ██████████████████████

2. I have personal knowledge of the facts set forth herein, which are known to me to be true and correct.

3. ██████████████████████ entered into a Purchase Agreement with Lifewatch, Inc. on or about ██████████

4. Pursuant to the Purchase Agreement, ██████████████████████ uses a variety of methods, including but not limited to telemarketing, to obtain customer accounts. Thereafter, ██████████████████████ sells those customer accounts to Lifewatch on a non-exclusive basis.

5. Lifewatch does not prohibit us from doing business with other companies, and, we have done business with other companies.

6. Pursuant to the Purchase Agreement, ██████████████████ warrants and covenants to Lifewatch that ██████████████████ strictly complies with all state and federal laws, including telemarketing laws.

7. ██████████████████ received the following types of documents from Lifewatch: a) a technical overview of phone service providers and a description of which phone service providers are compatible with Lifewatch's personal emergency response services and products; b) pricing options relative to Lifewatch's personal emergency response services and products; c) general facts and information about Lifewatch's personal emergency response services and products; d) an ACH and Credit Card authorization script.

8. Lifewatch never directly or indirectly provided sales scripts to ██████████████████ ██████████████

9. Lifewatch does not review, approve, dictate, draft, authorize or control sales scripts used by ██████████████████████

10. Lifewatch does not and cannot control, oversee, or supervise ██████████████ ██████████ relative to its efforts to obtain customer accounts or its day to day activities.

11. Lifewatch does, however, require that we:

    a. properly recite the ACH or Credit Card Processing script;

    b.   make no misrepresentations about, among other things, the products, services, or payments;

    c.   do not indicate that Lifewatch's products are "free";

    d.   do not indicate that Lifewatch's products were purchased for the prospective customer by a friend or family member;

    e.   do not utter phrases trademarked by other companies; and

    f.   do not indicate that Lifewatch's products are or were endorsed by any public or private entities.

12. On a weekly basis, Lifewatch employee Lauren Vandewater requests recordings of customer telephone conversations. We understand that she does so – as part of Lifewatch's quality control program - to ensure that ███████████████████ is compliant with Lifewatch's requirements.

13. We understand that if ███████████████ fails to comply with Lifewatch's quality control requirements, Lifewatch will terminate the Purchase Agreement with ████████████████

14. We also understand that if ███████████████████ practices are non-compliant with state or federal law, Lifewatch will terminate the Purchase Agreement with ███████████

15. ███████████████ complies with Lifewatch's requirements.

16. ███████████████ does not use an auto-dialer or engage in "robo-calling" or "call spoofing," all of which we understand to be violative of various state and federal laws.

17. ███████████████ does not withhold caller identification.

18. ███████████████ provides prospective customers with seller identification, information about the purpose of the calls, and information as to the nature of the goods and services being sold.

19. ███████████████ does not call telephone consumers who have registered their telephone numbers on the "do not call registry."

20. ███████████████ complies with all state and federal laws.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated:



# EXHIBIT D

REDACTED EXHIBIT

FILED UNDER SEAL

# EXHIBIT E

REDACTED EXHIBIT

FILED UNDER SEAL

# EXHIBIT F

## Telemarketer Names

American Medical Alert
Connect America/Medialert
Emergency Medical Alert
Emergency Alert
Endless Medical Alert
FIA Card Service 209 676-3148
Just for Seniors
LAR Agent
LAR Medical Alert
Life Alarm Systems
Medical Alarm Systems
Medical Alarms USA
Med Alert
Medic Alert
Medical Alert (PC)
Med Alert Life Watch
Medical Alert Systems
Medical Alarm Systems
Medical Alarm Company
Mobile Help
Medical Alarms
Nationwide Ventures
Nationwide Life Response
Rapid Response Alert
Safe Home Security
Senior Alert
Senior Alert Care
Senior Assistant Program
Senior Care Alert
Senior Emergency Care
Senior Life Support
Senior Life Watch
Senior Life Alarm
Senior Life Savings
Senior Life Savers
Senior Life Support
Senior Medical Alert Systems
Senior Medical Alarms
Senior Safe Alert
Walmart

# EXHIBIT G

# Medical Alarm Systems

**800.716.1433**

266 Merrick Road, Suite 104, Lynbrook, NY 11563

**To our newest subscriber and family,**

**Welcome to Medical Alarm Systems!** Thank you for choosing us as your medical alarm company. Our goal is to provide prompt, courteous and caring attention, 24/7/365.

Enclosed you will find your **Medical Alarm system**, instructions on how to connect and use the equipment, and the **Medical Alarm Systems Monitoring Agreement**.

In order to properly respond in the case of an emergency, we must receive your signed paperwork back within 30 days of receiving the equipment. **If we do not hear from you within 30 days from receipt of equipment, you are agreeing to our terms and conditions.**

---

### IMPORTANT CONTACT INFORMATION:

Customer Service & Technical Support:
**800.716.1433**

Fax: **866.339.9120**

Email: **info@MedicalAlarmCustomerService.com**

---

*Once again thank you for joining Medical Alarm Systems. We hope you feel more safe, secure, and confident living an independent lifestyle.*

**Sincerely,**
**The Medical Alarm Systems Family**

**800.716.1433 | info@MedicalAlarmCustomerService.com**

**LIFEWATCH**USA
PERSONAL CARING SERVICE SINCE 1980

**800.716.1433**
www.lifewatch-usa.com

LIFEWatch, Inc. • 266 Merrick Road, Suite 104, Lynbrook, NY 11563 • 800.716.1433

## LIFEWATCH INC
## WWW.LIFEWATCH-USA.COM

### MEDICAL ALARM SYSTEM LEASE AND MONITORING SERVICE AGREEMENT

Agreement dated _____ , by and between Lifewatch Inc (hereinafter referred to as "Lifewatch" or "ALARM COMPANY")

and _____ (hereinafter referred to as "Subscriber", "You" or "Purchaser") Phone: _____

The parties hereto agree that:

**1. MEDICAL ALARM SYSTEM IS LEASED AND REMAINS PERSONAL PROPERTY OF ALARM COMPANY:** ALARM COMPANY shall lease, instruct the Subscriber in the proper use of the Medical Alarm System (hereinafter referred to as "System" or "equipment"), provide self installation instructions for the Subscriber to self install the System at Subscriber's location including all necessary devices and equipment, for the duration of this agreement, with the understanding that the entire System is and shall always remain the sole personal property of ALARM COMPANY and shall not be considered a fixture or a part of the realty, or an addition to, alteration, conversion, improvement, modernization, remodeling, repair or replacement of any part of the realty. Subscriber shall not permit the attachment thereof of any appurtenance not furnished by ALARM COMPANY.

**2. MEDICAL ALARM MONITORING SERVICES / DOCUMENTATION / COMMENCEMENT OF SERVICES:** Medical Alarm Monitoring services shall commence upon LifeWatch's receipt of this Agreement signed by Subscriber. Commencement of monitoring services shall constitute LifeWatch's acceptance of this Agreement. This Agreement includes other documents which are to be signed and returned to LifeWatch by Subscriber. These documents include: LifeWatch Financial Form, LifeWatch Subscriber Information and Responder Form and Primary Response Directive. Subscriber acknowledges receiving LifeWatch's Welcome Notice, instructions how to test and use the LifeWatch System and Installation instructions.

**3. CANCELLATION:** Subscriber may cancel this agreement and all services on 30 days notice to ALARM COMPANY. If Subscriber cancels this agreement pursuant to any statutory authority ALARM COMPANY will, within 10 days or within such time as such statute specifies, upon such cancellation and return of equipment refund to Subscriber any amount paid for the equipment and any advance payment for services not yet rendered. Your statutory right to cancel may vary from state to state and LifeWatch will comply with your state's requirements.

**4. LEASE, MONITORING, AND SERVICE CHARGES:** Subscriber agrees to pay ALARM COMPANY as provided in the Lifewatch Financial Form, plus tax if any, payable in advance for the lease, monitoring, and service of the System for the term of this agreement commencing on the day Subscriber receives the System, and continuing monthly thereafter until Subscriber returns Lifewatch's system.

This contract will automatically renew every month after the initial term, unless either party gives written notice of its intent to cancel. Failure to return all equipment in satisfactory condition will result in a charge ($350 for base unit, $125 for pendant). In addition, your account will continue to be billed at the monthly monitoring fee as indicated on the Lifewatch Financial Form until our equipment is returned in good working order. TO: ALARM COMPANY at 266 Merrick Road, Suite 104 Lynbrook, NY 11563

**5. TERM OF AGREEMENT/RENEWALS:** The term of this agreement shall be for a period of 30 DAYS. This agreement shall renew itself month to month thereafter under the same terms and conditions, unless either party gives written notice to the other by fax, email or written correspondence of their intention not to renew the contract at least 30 days prior to the expiration of any term.

**6. INCREASES OF MONTHLY CHARGE:** ALARM COMPANY shall be permitted to increase the charges provided for herein at any time or times after the expiration of one year from the date hereof and Subscriber agrees to pay such increase.

**7. ALARM SYSTEM CENTRAL OFFICE MONITORING:** Upon receipt of a signal, ALARM COMPANY or its designated central office, shall make every reasonable effort to notify Subscriber and the appropriate municipal police or fire department or emergency personal response service designated by Subscriber. Subscriber acknowledges that signals which are transmitted over telephone lines, internet, VOIP, or other modes of communication pass through communication networks beyond the control of ALARM COMPANY and are not maintained by ALARM COMPANY, except ALARM COMPANY may own the radio network, and therefore ALARM COMPANY shall not be responsible for any equipment failure which prevents transmission signals from reaching the central office monitoring center or damages arising as a result thereof, or for data corruption, theft or viruses to Subscriber's computers if connected to the PERS communication equipment. Subscriber agrees to furnish ALARM COMPANY with a written list of names and telephone numbers of those persons Subscriber wishes to receive notification of emergency conditions together with a list of all medication, allergies and medical conditions Subscriber wishes to be available to all PERS personnel and medical personnel. All changes and revisions shall be supplied to ALARM COMPANY in writing. Subscriber acknowledges that ALARM COMPANY provides no response to a System signal except notification to the appropriate party, and that the provisions of this agreement exculpating and limiting ALARM COMPANY's liability are fully applicable to the Medical Alarm System service. ALARM COMPANY may, without prior notice, suspend or terminate its services, in event of Subscriber's default in performance of this agreement or in event designated central office facility or communication network is nonoperational or Subscriber's system is sending excessive communication. ALARM COMPANY is authorized to record all telephone conversations and shall own such recordings.

**8. SUBSCRIBER'S CARE OF EQUIPMENT; REPAIRS AND ADDITIONS:** Subscriber agrees not to tamper with, remove or otherwise interfere with the System. Subscriber agrees to bear the cost of repairs or replacement to the System made necessary as a result of any damage, including damage caused by unauthorized intrusion to the premises, lightning or electrical surge, except for ordinary wear and tear, in which event repair or replacement shall be made by ALARM COMPANY without additional charge. Batteries, electrical surges, lightning damage, obsolete components and components exceeding manufacturer's useful life are not included in service and will be repaired or replaced at Subscriber's expense.

**9. TELEPHONE SERVICE IS NECESSARY AND SUBSCRIBER'S RESPONSIBILITY:** Subscriber acknowledges that the MEDICAL ALARM System Transmitter plugs into a standard telephone jack and communicates over standard telephone lines using two way voice communication. The transmitter may not work with VOIP internet connection.

**10. SUBSCRIBER'S DUTY TO SUPPLY ELECTRIC AND TELEPHONE SERVICE:** Subscriber agrees to furnish, at Subscriber's expense, all 110 Volt AC power and electrical outlets and receptacles, telephone hook-ups, RJ31x Block or equivalent, as deemed necessary by ALARM COMPANY or MEDICAL ALARM equipment manufacturer.

**11. DELAY IN INSTALLATION:** ALARM COMPANY shall not be liable for any damage or loss sustained by Subscriber as a result of delay in installation of equipment, equipment failure, or for interruption of service due to electric failure, transmission failure, acts of God, or other causes, including ALARM COMPANY's negligence in the performance of this agreement, and Subscriber shall not be relieved from payments due under this agreement for such period.

**12. TESTING AND SERVICE OF MEDICAL ALARM SYSTEM:** The parties hereto agree that the SYSTEM, once installed, is in the exclusive possession and control of the Subscriber, and it is Subscriber's sole responsibility to test the operation of the SYSTEM and to notify ALARM COMPANY if it is in need of repair or replacement. During the contract period and so long as Subscriber is current in payment, ALARM COMPANY shall service or replace the System if returned by the Subscriber to ALARM COMPANY at Subscriber's address. ALARM COMPANY will upon Subscriber's request arrange pick up and delivery, at Subscriber's expense by UPS or US Postal Service. To ALARM COMPANY fails to repair or replace the SYSTEM within 7 days after receipt of said written notice, Subscriber shall not be obligated to pay any amount for service from date said written notice is given, until the SYSTEM is restored to working order unless ALARM COMPANY determines that the equipment is operational and the System failure was electrical or telephone service related at Subscriber's premises, in which event Subscriber shall pay ALARM COMPANY's cost of shipping and inspection charge of $75.00 or if ALARM Company determines that the equipment was damaged by other than ordinary wear and tear, in which event Subscriber shall be charged $350 for a replacement system and $125 for a replacement pendant.

**13. SUBSCRIBER TO INSURE ALARM COMPANY'S EQUIPMENT:** Subscriber shall insure AI ARM COMPANY's equipment against fire and casualty and Subscriber agrees to name ALARM COMPANY in said insurance policy as "loss payee" to the extent of the value of the equipment as set forth hereinabove. Subscriber shall be responsible for any loss occasioned by fire or casualty and the cost of replacing or restoring the Medical Alarm System.

**14. AUDIO LISTEN IN AND FORCIBLE ENTRY:** The system includes two-way voice is amount to be heard under optimal conditions throughout most of the house. In the event that the two way audio is not clear, or the central station does not hear audio, subscriber authorizes company and central station to follow emergency response procedures. Company will notify 911 first, unless otherwise told in writing. Subscriber authorizes the Company in its sole discretion to authorize forcible entry to gain access to Subscriber's premises in the event the System emits a signal to the Central Station and the Subscriber cannot be heard throughout the unit's microphone nor does the Subscriber answer the telephone. Subscriber does hereby release the Company and Central Station from any and all liability whatsoever as a result of said forcible entry.

**15. LIFEWATCH 911 UNIT:** If Subscriber chooses to add an Alert 911 unit, it is understood that this product calls 911 direct and scrubscriber must be able to give their name and location to the 911 operator. There is no GPS locator. All other Terms and Conditions below apply.

**16. MOBILE ALERT SYSTEM:** If you have our Mobile Alert System, monitoring service will not begin and Company and the Central Station will have no obligation to notify emergency personnel or other persons identified as emergency contacts until (1) Company has received your emergency contact information and (2) you have called to activate system and send a test signal from the system which was successfully received by the Central Station. Please note you must have adequate cellular coverage in the area where system is being used. You are responsible for testing your mobile device everywhere you go. Subscriber also understands that their physical location will be used in connection with providing the service that authorized caregivers may request your current location via our secure web portal. You hereby agree that the Company and the Central Station may provide the Responders and any other necessary third parties, as determined by us and the Central Station in our reasonable discretion, with access to your physical location. You hereby release the Company and the Central Station of any liability which may arise out of disclosure of such information to Responders and any other necessary third parties. If the Central Station is unable to locate the mobile unit, the Company is not responsible for damages. The System and the services rely on the availability of the cellular network coverage and the availability of Global Positioning System ("GPS") data to operate properly. The 911 emergency services line is an alternative to the System and the services, controlled by Company. There is always a chance that the System may fail to operate properly. The 911 emergency services line is an alternative to the System and the services.

**17. MEDICAL OR RELATED EXPENSES:** In the event the Subscriber utilizes the System by giving the Central Station a signal, the Subscriber does hereby authorize the Company to seek to notify or obtain assistance. The Subscriber shall be obligated for and agrees to pay costs and expenses incurred including, but not limited to, ambulance, physician, or other medical assistance in obtaining assistance, or cost whatsoever incurred as a result of the Subscriber's use of the System.

**18. OPTION TO UPDATE MEDICAL DATA INFORMATION:** At the option of the Subscriber, the Subscriber shall periodically communicate in writing with the Central Station for the purpose of verifying medical data information on file at the Central Station and updating said information, if necessary.

**19. SELF-PROTECTION/SUBSCRIBER'S DUTIES:** The Subscriber understands that the unit is used to help the Subscriber protect his or her person. It does not assure such protection. Available devices and techniques are too numerous to list but include (a) basic health precaution; and (b) adherence to physician's directions and recommendations.

**LIFE***Watch*USA
PERSONAL CARING SERVICE SINCE 1980

**800.716.1433**
www.lifewatch-usa.com

LIFEWatch, Inc. • 266 Merrick Road, Suite 104, Lynbrook, NY 11563 • 800.716.1433

**20. SYSTEM USE/SUBSCRIBER'S DUTIES:** The Subscriber understands that certain laws, rules, regulations and ordinances imposed by the governmental authorities, utilities, businesses, homeowners associations, and/or other entities may affect the Subscriber's rights in relation to the installation and service of the system. The Subscriber agrees to obtain and maintain in current status all licenses and permits or other authorizations necessary for the installation and use of the System.

**21. PHYSICAL RESPONSE:** The Subscriber is advised that certain areas in the country have in existence requirements that when an alarm monitoring service reports a medical alarm to a responding agency, that it must also report such alarm to an entity available twenty-four hours each day which is contractually obligated to respond to an emergency within one hour or within another designated time.

**22. ASSIGNMENTS/WAIVER OF SUBROGATION RIGHTS:** Subscriber shall not be permitted to assign this agreement without written consent of ALARM COMPANY. Any such assignment without prior approval shall be deemed a breach of this agreement. ALARM COMPANY shall have the right to assign this contract and shall be relieved of any obligations created herein upon such assignment. Subscriber on its behalf and any insurance carrier waives any right of subrogation Subscriber's insurance carrier may otherwise have against ALARM COMPANY or ALARM COMPANY's subcontractors arising out of this agreement or the relation of the parties hereto.

**23. INDEMNITY:** Subscriber agrees to and shall indemnify and hold harmless ALARM COMPANY, its employees, agents and subcontractors, from and against all claims, lawsuits, including reasonable attorneys fees, and losses asserted against and alleged to be caused by ALARM COMPANY's performance, negligent performance or failure to perform its obligations under this agreement. Parties agree that there are no third party beneficiaries of this contract.

**24. REMOVAL OF SYSTEM:** Upon termination of this agreement ALARM COMPANY shall be permitted to discontinue all monitoring service and Subscriber shall at Subscriber's expense return, via UPS or US Postal Service, signature required, ALARM COMPANY equipment to ALARM COMPANY. If for any reason caused by Subscriber, or the owner of the premises if other than the Subscriber, said System is not delivered to ALARM COMPANY within 7 days of such termination, Subscriber shall be deemed to have purchased the equipment for the agreed value stated in this agreement.

**25. LEGAL ACTION.** In the event of Subscriber's default of this agreement ALARM COMPANY shall be permitted to terminate or suspend all its services under this agreement without relieving Subscriber of any obligation herein and may notify Authority Having Jurisdiction. Additionally, in the event of Subscriber's failure to return the System within 15 days of termination of this contract the System shall be deemed sold to Subscriber in as is condition for $350 for base unit, $125 for pendant, which the parties agree is the value of the System. Any action by Subscriber against ALARM COMPANY must be commenced within one year of the accrual of the cause of action or it shall be barred. All actions or proceedings against ALARM COMPANY must be based on the provisions of this agreement. Any other action that Subscriber may have or bring against ALARM COMPANY in respect to other services rendered in connection with this agreement shall be deemed to have merged in and be restricted to the terms and conditions of this agreement. If ALARM COMPANY prevails in any litigation or arbitration between the parties, Subscriber shall pay ALARM COMPANY's legal fees. Subscriber submits to the jurisdiction and laws of New York and agrees that any litigation or arbitration between the parties must be commenced and maintained in Nassau County, New York. Any dispute between the parties or arising out of this contract, including issues of arbitrability, shall, at the option of any party, be determined by arbitration by Arbitration Services Inc., under its Commercial Arbitration Rules www.natarb.com. Service of process or papers in any legal proceeding or arbitration between the parties may be made by First-Class Mail delivered by the U.S. Postal Service addressed to the party's address in this agreement or another address provided by the party in writing to the party making service.

SUBSCRIBER AND LifeWatch WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL IN ANY ACTION OR PROCEEDING INVOLVING LifeWatch. SUBSCRIBER ACKNOWLEDGES THAT SUBSCRIBER IS WAIVING RIGHT TO A JURY TRIAL VOLUNTARILY AND KNOWINGLY, AND FREE FROM DURESS OR COERCION, AND THAT SUBSCRIBER HAS A RIGHT TO CONSULT WITH A PERSON OF SUBSCRIBERS CHOOSING, INCLUDING AN ATTORNEY, BEFORE SIGNING THIS DOCUMENT. THE PARTIES AGREE THAT THEY MAY BRING CLAIMS AGAINST THE OTHER ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A CLASS ACTION PLANTIFF OR CLASS ACTION MEMBER IN ANY PURPORTED CLASS OR REPRESENTITIVE PROCEEDING. SUBSCRIBER UNDERSTANDS THAT INSTEAD OF SUING OR BEING SUED IN COURT, THE PARTIES MAY HAVE DISPUTE DETERMINED BY ARBITRATION. SUBSCRIBER ACKNOWLEDGES THAT THE RULES IN ARBITRATION ARE DIFFERENT, AND THAT SUBSCRIBER HAS HAD THE OPPORTUNITY TO SEEK LEGAL OR OTHER ADVICE IN REGARD TO THIS CONTRACT AND IN PARTICULAR THIS ARBITRATION PROVISION. SUBSCRIBER AGREES THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS OR MORE THAN ONE PERSON'S CLAIM AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTITIVE OR CLASS PROCEEDING. THE PARTIES AGREE THAT ANY DISPUTE BETWEEN THEM, INCLUDING BUT NOT LIMITED TO THE SCOPE OF THIS ARBITRATION CLAUSE AND ISSUES OF ARBIRABILITY, OR ANY DISPUTE RELATING TO THIS AGREEMENT OR BASED ON A FEDERAL OR STATE STATUTE (EXCEPT WHERE PROHIBITED BY LAW). MAY, AT THE OPTION OF EITHER PARTY, BE DETERMINED BY ARBITRATION SERVICES, INC. UNDER ITS CONSUMER ARBITRATION RULES, WHICH ARE AVAILABLE AT WWW.ARBITRATIONSERVICESINC.COM, BY FAX AT 516-364-3456 OR BY TELEPHONE AT 516-364-1730 THIS CONTRACT EVIDENCES A TRANSACTION IN INTERSTATE COMMERCE, AND THUS THE FEDERAL ARBITRATION ACT GOVERNS THE INTERPETATION AND ENFORCEMENT OF THIS PROVISION

**26. ADDITIONAL PAYMENTS:** In addition to the payments set forth herein, Subscriber agrees to be liable for and pay to ALARM COMPANY any excise, sales, property, or other tax, telephone line charges, and any increases thereof, which may be imposed upon ALARM COMPANY because of this agreement. Should ALARM COMPANY be required by existing or here after enacted law to perform any service or furnish any material not specifically covered by the terms of this agreement Subscriber agrees to pay ALARM COMPANY for such service or material.

**27. FALSE ALARMS/PERMIT FEES.** Subscriber is responsible for all permits and permit fees, agrees to file for and maintain any permits required by applicable law and indemnify or reimburse Al ARM COMPANY for any fines relating to permits or false alarms. Al ARM COMPANY shall have no liability for permit fees, false alarms, false alarm fines, police or fire response, any damage to personal or real property or personal injury caused by EMT, police or fire department response to emergency conditions, whether false alarm or otherwise, or the refusal of the police or fire department to respond. In the event of termination of police or EMT this contract shall nevertheless remain in full force and Subscriber shall remain liable for all payments provided for herein. Should ALARM COMPANY be required by existing or hereinafter enacted law to perform any service or furnish any material not specifically covered by the terms of this agreement Subscriber agree to pay ALARM COMPANY for such service or material. ALARM COMPANY shall have no liability for police, fire or EMT non-response, response, or any damage to person or property in connection with any emergency condition reported by ALARM COMPANY or its designated central station in response to a signal received from Subscriber's SYSTEM.

**28. ALARM COMPANY'S RIGHT TO SUBCONTRACT SPECIAL SERVICES:** Subscriber agrees that ALARM COMPANY is authorized and permitted to subcontract any services to be provided by ALARM COMPANY to third parties who may be independent of ALARM COMPANY, and that ALARM COMPANY shall not be liable for any loss, damage or injury sustained by Subscriber by reason of any other cause whatsoever caused by the negligence of third parties. Subscriber acknowledges that this agreement, and particularly those paragraphs relating to ALARM COMPANY's disclaimer of warranties, exemption from liability, even for its negligence, limitation of liability and indemnification, inure to the benefit of and are applicable to any assignees, subcontractors and central offices of ALARM COMPANY.

**29. NO WARRANTIES OR REPRESENTATIONS: SUBSCRIBER'S EXCLUSIVE REMEDY:** ALARM COMPANY does not represent nor warrant that the System will prevent any loss, damage or injury, or that the System will in all cases provide the protection for which it is installed or intended. Subscriber acknowledges that ALARM COMPANY is not an insurer, and that Subscriber assumes all risk for loss or injury to Subscriber's property or System. ALARM COMPANY has made no representation or warranties, and hereby disclaims any warranty of merchantability or fitness for any particular use. Subscriber's exclusive remedy for ALARM COMPANY's default hereunder is to require ALARM COMPANY to repair or replace, at ALARM COMPANY's option, any equipment or part of the System which is non-operational. Except for services provided pursuant to this agreement, Subscriber agrees to look to manufacturer's warranty for any equipment warranty.

**30. EXCULPATORY CLAUSE:** The parties agree that ALARM COMPANY is not an insurer and no insurance coverage is offered herein. Subscriber's payments to ALARM COMPANY are for the installation, rental and service of a System designed to reduce certain risks of loss, though ALARM COMPANY does not guarantee that no loss will occur. ALARM COMPANY is not assuming liability and therefore shall not be liable to Subscriber for any loss or injury sustained by Subscriber as a result of any cause whatsoever, regardless of whether or not such loss or injury was caused by or contributed to by ALARM COMPANY's negligent performance to any degree or failure to perform any obligation or strict products liability. Subscriber releases ALARM COMPANY from any claims for contribution, indemnity or subrogation.

**31. LIMITATION OF LIABILITY.** The parties agree that the System is not designed or guaranteed to prevent any loss or injury. If, notwithstanding the terms of this agreement, there should arise any liability on the part of ALARM COMPANY as a result of any cause whatsoever, regardless of whether or not such loss, damage, or personal injury was caused by or contributed to by ALARM COMPANY's negligence to any degree or failure to perform any obligation or strict products liability, such liability will be limited to an amount equal to six (6) times the monthly payment paid by the Subscriber to ALARM COMPANY at the time such liability is fixed, or to the sum of $250.00, whichever is greater. If Subscriber wishes to increase ALARM COMPANY's maximum amount of such limitation of liability, Subscriber may, as a matter of right, at any time, by entering into a supplemental agreement, obtain from ALARM COMPANY a higher limit by paying an additional amount consonant with the increase of liability. This shall not be construed as insurance coverage.

**32. PERSONAL MEDICAL DISCLOSURE AUTHORIZATION:** Any medical or other personal information provided by Subscriber to ALARM COMPANY may be disclosed by ALARM COMPANY to any EMS personnel or medical personnel requesting same.

**33. CONFLICTING DOCUMENTS:** Should there arise any conflict between this agreement and Subscriber's purchase order or other document, this agreement will govern, whether such purchase order or document is prior to or subsequent to this agreement.

**34. FULL AGREEMENT/SEVERABILITY:** This agreement constitutes the full understanding of the parties and may not be amended, modified or canceled, except in writing signed by both parties, except ALARM COMPANY's requirements regarding items of protection provided for in this agreement imposed by Authority Having Jurisdiction. Subscriber acknowledges and represents that Subscriber has not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set forth in this agreement and waives any claims in connection with same. Should any provision of this agreement be deemed void, all other provisions will remain in effect.

THIS AGREEMENT INCLUDES OTHER DOCUMENTS REFERRED TO IN PARAGRAPH 2. READ THEM BEFORE YOU SIGN THIS CONTRACT. SUBSCRIBER ACKNOWLEDGES THAT THIS CONTRACT AND INCORPORATED DOCUMENTS WERE DELIVERED TO SUBSCRIBER'S ADDRESS BY US POSTAL SERVICE OR OTHER MAIL CARRIERS AND THAT NO HOME SOLICITATION WAS MADE BY LIFEWATCH. THIS CONTRACT CONTAINS AN ARBITRATION PROVISION AND OTHER PROVISIONS IN PARAGRAPH 25 THAT AFFECT YOUR LEGAL RIGHTS.

SUBSCRIBER: _____

Signature (Name must be printed below)

Print Name: _____

If someone other than Subscriber is signing this contract state relationship to Subscriber and by signing this Contract such person represents that he or she has authority to bind Subscriber to this contract.