UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION and STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, | ) ) ) | |
| | ) | 15 C 5781 |
| Plaintiffs, | ) | |
| | ) | Judge Feinerman |
| vs. | ) | |
| | ) | |
| LIFEWATCH INC., d/b/a LIFEWATCH USA, d/b/a MEDICAL ALARM SYSTEMS, and EVAN SIRLIN, | ) ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The Federal Trade Commission ("FTC" or "Commission") and the Attorney General of

Florida brought this suit against Lifewatch Inc. and its chief executive officer, Evan Sirlin,

alleging violations of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41 *et seq.*,

the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and the Florida Deceptive and Unfair

Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*, which prohibit the making of

material misrepresentations to consumers and engaging in deceptive and abusive telemarketing

practices. Doc. 1. Plaintiffs moved for a preliminary injunction, Doc. 9, and the court allowed

the parties to conduct discovery, Doc. 83. A hearing was held, Doc. 114; Defendants have

moved to strike certain of Plaintiffs' exhibits, Docs. 111, 117; and the parties filed summation

briefs, Docs. 122, 124. For the following reasons, Defendants' motions to strike are denied in

part and denied as moot in part, and Plaintiffs' motion for a preliminary injunction is granted.

**Preliminary Factual Findings**

Lifewatch is a company based in Lynbrook, New York, that provides personal medical

alert monitoring systems and services to elderly and disabled customers. Doc. 15-1 at 8; Doc.

87-1 at ¶ 2. The medical alert devices (typically a small pendant worn as a necklace or wristband) enable users to call emergency response services by simply pressing a button. Doc. 10 at 10-11; Doc. 87-1 at ¶ 4. Sirlin is Lifewatch's chief executive officer. Doc. 87-1 at ¶ 1. Over the last three years, Lifewatch has maintained business relationships with approximately 60,000 customers. *Id*. at ¶ 3. Lifewatch does not have its own sales personnel or marketing department; instead, it conducts sales through telemarketing companies. *Id*. at ¶¶ 8-9.

Plaintiffs allege that the telemarketing companies have violated several laws in selling Lifewatch's medical alert devices and that Defendants are liable for those violations. Plaintiffs claim that the telemarketers make misrepresentations by telling consumers that: (1) they will receive a free medical alert device, only to later learn that they must pay a monthly service fee and return the device if they discontinue service, Doc. 10 at 17-18; (2) a friend, family member, or doctor purchased the device for them or referred them for a special offer, *id*. at 18; (3) the device has been recommended by the American Diabetes Association, the American Heart Association, the American Red Cross, the National Institute on Aging, and/or the American Association of Retired Persons, *id*. at 18-19; (4) they will not be charged until they receive the device and activate it, *id*. at 20-21; and (5) if they are not satisfied with the device, Lifewatch will cover the cost of return shipping, *id*. at 23-24. Plaintiffs further allege that the telemarketers have engaged in illegal telemarketing practices by contacting individuals on the National Do Not Call ("DNC") Registry; using prerecorded messages when making outbound calls to potential customers (a practice known as "robocalling"); and transmitting phony caller identification information to mask the origins of the call (a practice known as "spoofing"). Doc. 10 at 11-13.

Defendants object to the reliability of Plaintiffs' evidence and assert that much of the alleged misconduct cannot be linked to Lifewatch. Defendants raise two principal defenses.

First, Defendants argue that they are not legally responsible for the telemarketers' conduct. According to Defendants, the telemarketers exist and operate wholly independently of Lifewatch and "develop and design their own marketing strategies." Doc. 87 at 14. Defendants add that the telemarketers sell medical alert devices on a generic basis and then, in turn, sell those customer accounts to medical alert companies like Lifewatch for fulfillment. *Id*. at 11. Defendants further assert that Lifewatch purchases those accounts on a non-exclusive basis— meaning that any medical alert company could theoretically fulfill those contracts. *Ibid*.

Plaintiffs paint a darker picture. They believe that Lifewatch intends for its telemarketers to employ illegal tactics or, at a minimum, turns a blind eye to them. In Plaintiffs' view, Lifewatch "has structured its relationships with telemarketers in such a way as to insulate itself from liability." Doc. 10 at 25. According to Plaintiffs, this is evidenced by the fact that "Defendants have employed a revolving door of outside telemarketers who have engaged in widespread abusive and deceptive sales tactics" and done little to rein them in. Doc. 94 at 7. Plaintiffs also submit that because Lifewatch has a principal-agent relationship with its telemarketers, it cannot evade liability for their actions. *Id*. at 20-21. (While acknowledging Defendants' position that the telemarketers are not their employees or agents, the court for ease of exposition will refer to them as "Lifewatch's telemarketers.")

Second, Defendants contend that even if they are liable for the telemarketers' *past* misconduct, Lifewatch's new quality control program ensures that their *current* telemarketers are legally compliant. Doc. 87 at 30-31. According to Defendants, this makes a preliminary injunction no longer necessary or warranted. *Ibid*. Plaintiffs respond by saying that Lifewatch's self-policing measures are a farce instituted only in the face of law enforcement scrutiny. Doc.

94 at 22.  Without an injunction, Plaintiffs fear that "Defendants could roll-back their current efforts" and revert to their bad habits once this litigation ends.  *Ibid.*

Before proceeding, the court addresses two global issues raised in Defendants' motions to strike.  First, Defendants argue Plaintiffs rely on inadmissible hearsay.  That argument is meritless.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Given its temporary nature, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Ibid.*  Settled law holds that these relaxed evidentiary standards permit a district court to consider hearsay at the preliminary injunction stage.  *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) ("[H]earsay can be considered in entering a preliminary injunction."); *Mullins v. City of New York*, 626 F.3d 47, 52 (2nd Cir. 2010) ("hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction"); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction."); *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) (holding that a court "may rely on otherwise inadmissible evidence, including hearsay evidence" at the preliminary injunction stage).

As the First Circuit explained: "Affidavits and other hearsay materials are often received in preliminary injunction proceedings.  The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding."  *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986).  The Second Circuit

likewise held: "The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage. To hold otherwise would be at odds with the summary nature of the remedy and would undermine the ability of courts to provide timely provisional relief." *Mullins*, 626 F.3d at 52. Indeed, at the preliminary injunction hearing in this case, Defendants conceded that hearsay evidence is proper at this stage. 12/14/2015 Tr. at 51 ("Can the Court accept hearsay? I can't tell you that the case law suggests that the Court cannot categorically accept hearsay; but it does, suggest, I think, that the Court evaluate the reliability of the information that it's accepting as part of the record."). In accordance with precedent and Defendants' concession, the court has assigned the appropriate weight to the evidence, including hearsay, and has considered only the hearsay that bears sufficient indicia of reliability. Accordingly, to the extent that Defendants have objected on hearsay grounds to any of the exhibits discussed or cited in this order, their motion to strike is denied.

Second, Defendants urge the court to disregard much of Plaintiffs' evidence because it lacks recency. Doc. 87 at 7 ("The vast majority of the evidence submitted by Plaintiffs is stale and relates to conduct by third-parties that have not transacted business [with Lifewatch] for at least two years."); *id*. at 23 ("A majority of the submissions offered by Plaintiffs in support of their Motion are predicated on actions undertaken, if at all, more than a year ago."). This argument is unpersuasive. Virtually all of the exhibits relate to conduct extending no further back than 2013, and many pertain to telemarketing sales calls made in 2015. This evidence is not so "stale" as to be irrelevant in deciding this motion.

## A.    The *Worldwide* Litigation

Plaintiffs learned of Lifewatch when they sued a telemarketing enterprise (referred to as the "Worldwide telemarketers" or "Worldwide defendants") in *FTC v. Worldwide Info Services,*

*Inc.*, No. 6:14-cv-8-ORL-28 DAB (M.D. Fla. filed Jan. 6, 2014), for violations of the FTC Act, the FDUTPA, and the TSR. The Worldwide telemarketers were accused of robocalling consumers on the National DNC Registry. Although the Worldwide enterprise was eventually shut down, the Receiver discovered that Lifewatch appeared to be the enterprise's sole medical alert client. Doc. 24-12 at ¶ 4. The Receiver also found that Lifewatch paid $15,741,518.50 to the Worldwide telemarketers between March 2012 and December 2013. *Id.* at ¶ 3.

Defendants do not deny that they purchased customer accounts from the Worldwide telemarketers, Doc. 87 at 25, but dispute that Lifewatch was the only medical alert company using Worldwide's telemarketing services, Doc. 100 at 19-20. Defendants assert that the Receiver's representative, Brick Kane, "could not even say [at his deposition] with any certainty that Lifewatch was the only company to which the Worldwide defendants sold … medical alert devices and monitoring services." *Id.* at 20. That mischaracterizes Kane's testimony. What Kane actually said was that there was no indication that the Worldwide telemarketers conducted business with any medical alert device company besides Lifewatch, Doc. 101-3 at 8-9, and that he arrived at that conclusion based on the names and banking statements of all the companies for which the telemarketers sold products, Doc. 100-5 at 6. One of the individual defendants in the Worldwide litigation, Joseph Settecase, confirmed the point, averring that his telemarketing company did not "participate[] in medical alert device telemarketing for any company other than Lifewatch." Doc. 24-11 at ¶ 5.

It matters that Lifewatch was the only medical alert company working with the Worldwide defendants because, in that litigation, the FTC discovered telemarketing scripts for medical alert devices that were riddled with misrepresentations. One such script reads:

> Senior Assistance Program, This is *(Rep Name)* ARI agent number *(say agent number)*, may I ask whom I am speaking with?

…

> Okay, Great, for responding today to our Senior Assistance Program, you've been selected to receive a FREE medical alert system package that has a value of over $400 dollars and you will also receive $3000 dollars in grocery discount coupons.
>
> You are probably familiar with the medical alert system and how it works, you know the TV commercial "I'VE FALLEN AND I CAN'T GET UP!"?
>
> …
>
> Our device has been recommended by the American Heart Association, the American Diabetes Association, the National Institute of Aging [sic] and … has been helping save the lives of America's senior citizens for over 30 years.

Doc. 14-2 at 2. Aside from the fact that Lifewatch likely was the only medical alert device company that used the Worldwide telemarketers, there are other indications that this script was used to sell Lifewatch products. "ARI" is the fictitious name of Arcagen, Inc., a telemarketing company that registered with the Florida Department of Agriculture and Consumer Services ("FDACS") in 2013 to sell Lifewatch products. Doc. 22-1 at ¶ 80; Doc. 23-1 at 268, 275-77. The slogan "I've fallen and I can't get up" is the registered trademark of Life Alert Emergency Response, Inc., one of Lifewatch's competitors. Life Alert successfully obtained a preliminary injunction against Lifewatch for trademark infringement after discovering that Lifewatch's telemarketers were improperly using that slogan. *See Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469 (9th Cir. 2015). And, like the company referenced in the script, Lifewatch has been in business for over thirty years. Doc. 87-1 at ¶ 11.

Plaintiffs found other medical alert scripts while conducting searches of the Worldwide defendants' headquarters. Doc. 14-1 at ¶ 13. One script addresses how to respond to customers who do not want their credit card charged that same day—it directs the telemarketer to say that they "charge your card or acct TODAY for your first month's emergency medical monitoring fee, but your billing cycle does not start until you receive the system and activate it." Doc. 14-3

at 8. Another rebuttal script reassures consumers by telling them "you were referred to us by either a friend, a family member or maybe someone you know." *Id.* at 10. Still another titled "Who exactly referred me?" says "for security and privacy reasons my screen does not say who referred you, the only information I have is that you were referred to us either by a friend, a family member or maybe someone you know, and because you were referred, the system is completely free to you." *Ibid.* And another guarantees consumers that if they "don't want to keep it, then there is no contract, no cancellation fees, and we will pay to ship it back." *Id.* at 9.

The weight of the evidence strongly suggests that the medical alert scripts found at the Worldwide telemarketers' headquarters were used to sell Lifewatch's products and services. And, as applied to Lifewatch, these scripts contain numerous misrepresentations. None of the organizations listed in the script actually endorsed Lifewatch's medical alert device. Doc. 60 at ¶ 20 ("Defendants admit that the American Heart Association, the American Diabetes Association, the National Institute on Aging, the AARP, the American Red Cross [sic] have not specifically endorsed the Lifewatch medical alert system.") (internal quotation marks omitted). Lifewatch started the billing cycle ten days after an order is placed regardless of whether the consumer had activated the device. 12/14/15 Tr. at 114, 147. It is also false that doctors, friends, or family members referred new customers to Lifewatch. *Id.* at 115. And, as a matter of policy, Lifewatch did not cover return shipping. *Id.* at 113, 175.

Defendants assert that, even if these scripts were used to sell Lifewatch devices, they did not know that the Worldwide telemarketers were misrepresenting their product and services or engaging in abusive telemarketing practices. Doc. 87 at 25-26. Sirlin avers in his declaration that he "was unaware that the outside sale companies had engaged [in] violative activities or that they made false statements." Doc. 87-1 at ¶ 16. And when Lifewatch Director of Operations

Sarai Baker was asked if Lifewatch ever represented "that its products have already been purchased for the consumer by a friend or family member, that its products are endorsed by the American Heart Association, the American Diabetes Association, and the National Institute on Aging, and that consumers will not be charged the first monitoring fee until they've already received the product," she responded that "Lifewatch has never authorized outside sellers to make [those] representations." 12/14/15 Tr. at 87.

But there is strong and persuasive evidence establishing that Lifewatch was aware of, and responsible for, the Worldwide telemarketers' illegal conduct. Ken Gross, the chairman of Connect America, a former partner and current competitor of Lifewatch, avers that Sirlin told him in May 2013 that "Lifewatch was using telemarketers who were engaging in robocalling," but that "robocalling was legal if done right and that he had an expert legal opinion which stated that he could do it." Doc. 24-9 at ¶¶ 3, 19. Although Sirlin denies making those statements, Doc. 87-1 at ¶ 22; 12/14/15 Tr. at 153, the court is unpersuaded. Gross also persuasively avers that Lifewatch monitored and controlled its telemarketers. Doc. 24-9 at ¶¶ 9-11. Leslie Steinmetz, an outside broker who helped develop Lifewatch's telemarketing strategy from 2009 through 2012, likewise avers, also persuasively, that "Sirlin knew … that robo-calls were being used by its telemarketers to sell LifeWatch's medical alert systems" and that "Sirlin indicated to [him] that LifeWatch would continue to employ telemarketers that were using robo-calls as long as it could do so." Doc. 26-12 at ¶¶ 3, 8. Steinmetz further avers that Lifewatch "control[led] and monitor[ed] the telemarketers that it worked with, including Worldwide," and that Lifewatch reviewed and approved scripts used by its telemarketers. *Id*. at ¶ 6.

Defendants respond that, "when pressed" at his deposition, Steinmetz conceded that "Sirlin did not say that he would use robo-callers." Doc. 100 at 18. That distorts Steinmetz's

testimony. Steinmetz actually said that he did not "recall specifically *the time* that [Sirlin] said

he would use robo-callers," and that he did not know if his declaration directly quoted Sirlin or

merely paraphrased what Sirlin had said. Doc. 100-4 at 84-86 (emphasis added). Even Sirlin's

own words suggest that he knew some of his telemarketers had adopted illegal telemarketing

practices. In 2013, after the Better Business Bureau ("BBB") emailed Sirlin to complain about

what the BBB believed to be Lifewatch's robocalling in St. Louis, Missouri, Sirlin responded

that "[w]e do not make automated messages *in your area*"—an implied admission that Lifewatch

*does* robocall consumers in *other* areas. Doc. 24-2 at 10 (emphasis added). Sirlin testified that

he did not intend to suggest that Lifewatch uses outbound automated calling in some regions but

not in others, 12/14/15 Tr. at 202, but the court does not find that testimony credible.

Other evidence confirms that the scripts in question originated with Lifewatch. In

September 2012, Lifewatch filed a Commercial Telephone Seller Business License Application

with the FDACS. Doc. 22-1 at ¶ 9. The application indicated that Lifewatch provided "copies of

all sales information or literature" to its salespeople, "including, but not limited to, scripts,

outlines, instructions and information regarding how to conduct telephonic sales, sample

introductions, sample closing, [and] product information …." Doc. 22-2 at 6. Appended to

Lifewatch's application was a Call Center Welcome Package, Doc. 22-1 at ¶ 10, which described

Lifewatch's product as having "been recommended by the American Diabetes Association and

the National Institute of Aging [sic]." Doc. 22-2 at 11. The sales script ultimately approved as

part of the application process stated that the system's "billing cycle doesn't start until you

receive the system and activate it." *Id*. at 37. That welcome package and script was attached to

Lifewatch's license renewal application in 2013 and 2015, each of which Sirlin signed. Doc. 22-

1 at ¶¶ 12-13.

In his declaration, Sirlin avers that "Lifewatch did not draft, revise, or approve the scripts annexed to th[is] application. Upon information and belief, those scripts were drafted by Worldwide Info Services, Inc." Doc. 87-1 at ¶ 26. At the preliminary injunction hearing, Sirlin testified that Steinmetz (the outside marketing broker) wrote the scripts, but essentially conceded that Lifewatch was responsible for misrepresentations in the script:

> Q. Does that indicate to you that a Call Center Welcome Package was attached to this license application?
>
> A. It does indicate that, in September 2012?
>
> Q. Yes.
>
> A. Yes.
>
> Q. And there was a Call Center Welcome Package at that time?
>
> A. It was developed by outside people.
>
> Q. What do you mean by outside people?
>
> A. Les Steinmetz, Aaron, and Rene.
>
> Q. So, this Call Center Welcome Package was something that you gave to outside sellers in 2012?
>
> A. I believe they gave. I did not, and I don't know if Lifewatch did. But the brokers, I'm sure, did.
>
> Q. So, this Call Center Welcome Package isn't a Lifewatch Call Center Welcome Package; it's a Les Steinmetz package?
>
> A. Again, if I'm responsible, I'll take responsibility, but I did not do it personally. If Lifewatch is responsible, yes. But Les Steinmetz, there are people that will tell you Les Steinmetz—and I could get it in. This is an injunction, not a trial, so there are people who will tell you that Les Steinmetz represented himself as a CEO for certain things, including—and he wound up working for Life Alert, and he wound up being with Connect America, correct?
>
> Q. The Call Center Welcome Package that's here is represented as being from Lifewatch. Are you saying it's not really from Lifewatch?
>
> A. It looks like it could be.

Q. The similar Call Center Welcome Packages that were attached to licenses from a variety of other telemarketers in Florida that they said came from Lifewatch, they didn't come from Lifewatch? What I'm asking you is: Did Lifewatch provide a Call Center Welcome Package to its outside sellers?

A. The brokers did.

Q. The brokers did. On behalf of Lifewatch?

A. I don't know.

Q. Who else were they working for besides Lifewatch?

A. I have pictures of Les talking to Ken Gross and driving around in their car. I have Life Alert meeting with Les Steinmetz. I have Life One, who used to work for Connect America. So, how do I know they're just for us only?

…

Q. And the last one [referring to the 2015 renewal application] says, "Call Center Welcome Package.pdf"?

A. Yes.

Q. That indicates that a Call Center Welcome Package was attached to this application, too, is that correct?

A. I don't know. If it does, it does.

Q. Is it your testimony that Lifewatch doesn't attach the Call Center Welcome Package to their—didn't attach the Call Center Welcome Package to the license in 2015?

A. I don't know.

12/14/15 Tr. at 216-220.

From 2012 through 2014, other telemarketers that sold Lifewatch's medical alert system submitted similar scripts to the FDACS as part of the telemarketing licensing process. Doc. 22-1 at ¶¶ 14-83. Those scripts contain many of the misrepresentations already discussed. Doc. 22-2 at 68, 75, 77 (U.S. Digest LLC application, with Lifewatch USA Call Center Welcome Package attached, stating that the product is recommended by the American Diabetes Association); *id.* at 88, 90, 94 (same); Doc. 23-1 at 24, 36 (same script attached to a Personal Security Shopper Inc.

license application); *id*. at 152, 158 (same script provided by Live Response Agent Inc.); Doc. 22-3 at 10, 22, 26 (Direct Agent Response, Inc. attaching Lifewatch subscriber form and sales script claiming that the device is recommended by AARP, the American Red Cross, and the National Institute on Aging); Doc. 23-1 at 9 (rebuttal script attached to Miranda Money Group LLC application telling customers that the company would pay for return shipping); *id*. at 91, 139 (same script discovered during on-site compliance inspection at Alertlink's offices); *id*. at 185, 215 (rebuttal script seized during on-site compliance inspection of Absolute Solutions Group, Inc.'s offices identifying the company as Lifewatch USA and stating that a consumer's credit card would get charged today but that his "billing cycle does not start until you receive the system and activate it"); *id*. at 226, 234 (sales script attached to The Credit Voice, Inc. telemarketing application saying that the company was calling "on behalf of Lifewatch USA" and that their medical alert devices were recommended by "the American Heart Association and the American Diabetics Association [sic]"); *id*. at 253, 262 (Live Agent Response 1, LLC script identical to the one attached to Lifewatch's telemarketing application); *id*. at 279, 286 (same script submitted by American Innovative Concepts, Inc.). Some of these telemarketers sold exclusively for Lifewatch; others worked for Lifewatch and other medical alert system companies. *Compare* Doc. 22-1 at ¶ 32 ("TMI notified the FDACS by letter that it would be conducting telemarketing for three medical alert providers, including Lifewatch.") *with* Doc. 22-3 at 169 (Miranda Money Group application stating that "[a]ll fulfillments are done by Life watch, Inc. which sends customers the information on the product").

This evidence provides an extremely strong basis to believe that, at a minimum, Lifewatch knew the Worldwide telemarketers (and other telemarketers it retained) were engaged in its deceptive conduct. The court further finds that Lifewatch more than likely directed these

telemarketers to engage in abusive telemarketing practices by providing them with scripts containing the above-referenced misrepresentations.

**B.      The FTC Investigation**

Based on what was discovered during the *Worldwide* litigation, the FTC issued a civil investigative demand ("CID") to Lifewatch on March 12, 2014.  Doc. 14-1 at ¶ 23.  Lifewatch disclosed that over the years it had purchased customer accounts from over fifty telemarketers, Doc. 15-1 at 10-11, at least one of which has been sanctioned or shut down by Florida regulators, Doc. 22-1 at ¶ 18.  Other documents showed that Lifewatch was the subject of investigations by the Vermont Attorney General and the Connecticut Department of Consumer Protection and has been a defendant in many lawsuits.  Doc. 15-1 at 26-36; Doc. 15-2 at 2-9.  Lifewatch also supplied what appears to be a transcript between a Lifewatch seller and consumer in which the seller says "if you feel like you're tired of it and you just don't want it no more, you can ship it back with no problem and no cost."  Doc. 15-2 at 14.

The FTC dug further.  The agency maintains access to a "honeypot"—a group of phone lines set up to receive inbound calls—that it uses to catch illegal telemarketing activity.  Doc. 21-2 at ¶ 2.  In September 2014, an FTC undercover investigator named Reeve Tyndall received a call on one of those lines.  *Id*. at ¶ 3.  When Tyndall answered, a recorded message prompted him to press "1" to receive a medical alert system.  *Ibid*.  A representative for Rapid Response Alert came on the line and employed aggressive sales tactics in trying to sell him a medical alert device.  *Ibid*.  When Tyndall said that he was too scared to give out his financial information over the phone and did not want to place the order until speaking with his caregiver, the telemarketer responded that if he did not complete the transaction, Tyndall would have to pay $400 for the device later.  *Id*. at p. 32.  The telemarketer then said "I'm not going to get off the

phone with you until you've given me your card information … because I don't want another senior citizen to fall and hurt themself. … If you're by yourself and you hurt yourself, there's nobody around, what are we going to do? You'll lay there by yourself." *Id.* at pp. 32-33.

The call concluded without a purchase—but Rapid Response Alert called back the next day with the same prerecorded message. *Id.* at ¶ 4. This time Tyndall spoke to Nicole, who assured him that the service cost "only $34.95 a month," that "the billing cycle … doesn't start until you receive your equipment," and that if he changed his mind "[t]hey['d] pay for the [return] shipping." *Id.* at pp. 43-44. Tyndall purchased the medical alert system with the FTC's undercover credit card, and weeks later received a Lifewatch device in the mail. *Id.* at ¶¶ 4, 6. Tyndall never activated the device. *Id.* at ¶ 7. Nonetheless, the credit card was charged $34.95 every month from September 2014 through June 2015. *Id.* at ¶ 8; *id.* at p. 94. The charges were listed as "Medical Alarms," "Lifewatch USA," or "Med Guard Alert." *Id.* at ¶ 8. Another FTC undercover investigator, Laureen France, was contacted by Senior Life Support and eventually received a device from Lifewatch. Doc. 21-1 at ¶¶ 7, 17. During the sales call, the agent promised France that if "for whatever reason … you feel like it's not convenient for you or it just doesn't fit into your budget, you can … return the equipment at no cost to you." *Id.* at 18.

The FTC also investigated whether consumers were filing complaints against Lifewatch. The agency maintains a database, called the Consumer Sentinel database, of consumer complaints received by government agencies and other organizations. Doc. 14-1 at ¶ 51. In May 2015, an FTC investigator named Roberto Menjivar requested a Consumer Sentinel search for DNC complaints from January 1, 2012 through May 18, 2015 that included the term "medical alert." *Id.* at ¶ 53. The search yielded 91,581 complaints, most of which involved unwanted telemarketing calls or robocalls. *Id.* at ¶¶ 53-54. In June 2015, Menjivar ran another search of

Consumer Sentinel, this time for complaints specifically against "Lifewatch." *Id*. at ¶ 55. From January 1, 2012 through June 16, 2015, there were 433 DNC complaints and 232 general fraud complaints made against Lifewatch. *Ibid*. All 91,581 complaints certainly were not against Lifewatch alone; but the 665 complaints that name Lifewatch certainly understates the true number of complaints against Lifewatch's telemarketers, which often do not expressly say that they are telemarketing on Lifewatch's behalf.

Additionally, the Better Business Bureau ("BBB") has received 180 complaints specifically against Lifewatch since 2012. Doc. 24-3 at ¶ 4. One complaint submitted on February 17, 2015 alleges that the consumer had received calls from Lifewatch's telemarketers at least once a week for years despite being on the DNC registry. *Id*. at 20. Another indicates that her father had been falsely told that "a family member wanted him to have this alarm unit." *Id*. at 32. Many others complain that they (or their elderly parents) had unwittingly paid for months (or in some cases years) for Lifewatch's monitoring service despite never using the system. *Id*. at 5, 13, 15-16, 23, 35, 38, 42.

The BBB also noticed that consumers were filing similar complaints against a company called "Senior Medical Alarm." Doc. 24-2 at ¶ 4. A BBB investigator could not find any company in the United States named Senior Medical Alarm, so he decided to call the telephone number provided in the complaints. *Id*. at ¶ 5. The agent who answered said that Senior Medical Alarm was a New York-based company celebrating its 30th anniversary, and described the features and price of its medical alert system. *Id*. at ¶¶ 5-6. The BBB investigator determined that the only medical alert device company fitting that description was Lifewatch. *Id*. at ¶ 7.

Defendants have moved to strike the Consumer Sentinel complaints, the BBB complaints, and the BBB investigator's declaration. Doc. 45 at 11-18. They argue that: (1) the

BBB complaints' factual allegations are unverified; (2) many of those complaints are from an anonymous source; and (3) the complaints are unsworn. *Ibid.*; *see also* Doc. 87 at 19-20 (explaining that the Consumer Sentinel complaints raise "discoverable issues as to the[ir] merits (e.g. legitimacy)"); Doc. 100 at 10 ("[T]he BBB complaint process is not designed to investigate and evaluate whether there is a factual basis to complaints but to promote the resolution of claims."). The court recognizes that, by their nature, the BBB complaints are unverified and unsworn and that some are anonymous. But the court finds that they still have *some* probative value, and are reliable enough to consider at this preliminary stage despite their limitations. *Cf. FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 608-09 (9th Cir. 1993) (considering complaint letters); *FTC v. Instant Response Sys., LLC*, 2015 WL 1650914, at *4-5 (E.D.N.Y. April 14, 2015) (considering BBB complaints) (internal quotation marks omitted).

## C. Customer Experiences

Through declarations, telephone transcripts, and live testimony, Plaintiffs adduced statements from over fifty consumers chronicling their negative experiences with medical alert telemarketers. Defendants have moved to strike many of these declarations because, they claim, the consumers do not adequately link the conduct to Lifewatch. Doc. 45 at 7-31. The court will discuss, cite, and consider only those declarations that are sufficiently connected to Lifewatch—either because Lifewatch is expressly named as the responsible party in the declaration, or because other identifying information strongly links Lifewatch to the consumer interaction. Accordingly, as to the exhibits discussed below, Defendants' motion to strike is denied.

Susan Rivard credibly testified as to her parents' experience being scammed by a medical alert device company in 2013. 12/14/15 Tr. at 55-76. Rivard and her siblings had previously advised their parents to obtain a medical alert system. *Id.* at 60. Her father later received a

phone call telling him that a friend had signed him up for a medical alert device.  *Id*. at 63.  The telemarketer would not reveal the name of the company, stating "[w]e work for many medical alarm companies."  *Id*. at 65.  Believing that this "friend" was one of his children (the telemarketer would not reveal who had referred him), Rivard's father gave the telemarketer his credit card number.  *Id*. at 63.  The credit card was charged $34.95 from a "Medical Alarms" based in "Hewlett, New York."  *Id*. at 64, 75.  Although Rivard admitted that Lifewatch was never identified as the company, *id*. at 71, Sirlin admitted that "Lifewatch uses … the d/b/a 'Medical Alarms, Hewlett, NY' for credit card and ACH charges," Doc. 87-1 at ¶ 21.

William James, a Mississippi resident, has been on the National DNC Registry since 2003.  Doc. 25-9 at ¶¶ 1, 3.  He frequently received harassing telemarketing calls, and resolved to catch the company responsible.  *Id*. at ¶ 3.  On November 25, 2014, he received a robocall saying: "You've been selected to receive a free Life Alert System with free equipment use, free shipping and free warranty. … Press one now to speak to our customer service department."  Doc. 17-2 at 5.  James did so and ordered a device with fake credit card information after speaking with representatives from both "Medical Alert" and "Senior Life Support."  *Id*. at 5-17.  The next day, Laverne from Lifewatch called to confirm James's information because his credit card payment did not process.  *Id*. at 23-24.  Two months later, he received another robocall from a company called "Medical Alarms"—one of the names Lifewatch uses for billing purposes.  *Id*. at 55, 65; Doc. 87-1 at ¶ 21.  James again placed an order and was transferred to Laverne at the confirmation department.  Doc. 17-2 at 72.

Hilda Daniel received a telephone call from a medical alert device company in May 2013.  Doc. 24-26 at ¶ 3.  The representative said "that a loved one had purchased [for Daniel] a medical alert device."  *Ibid*.  Because it was the day before Mother's Day, Daniel thought that

one of her friends or relatives had bought it for her as a gift. *Ibid*. As a result, Daniel agreed to pay the monthly monitoring fee of $34.95. *Ibid*. But after reaching out to her friends and family, she realized that nobody had purchased the device for her. *Id*. at ¶ 4. Daniel reviewed her checking account and saw a withdrawal for $34.95 made by "Medical Alarm 516-374-5433" (again, one of the billing descriptors Lifewatch admits to using). *Ibid*.; Doc. 87-1 at ¶ 21. Daniel tried to dispute the charge to no avail. Doc. 24-26 at ¶ 5. She had to close her bank account and open a new one, which was very inconvenient, as all of her bills were on autopay. *Id*. at ¶ 7.

Diana Mey lives in West Virginia and has two wireless telephone lines, both of which have been on the National DNC Registry since 2004. Doc. 25-18 at ¶¶ 1, 3. On October 23, 2013, Mey received a robocall that directed her to press "1" to receive a free medical alert device. *Id*. at ¶ 4. During the call, she learned that she would be charged by "Lifewatch, located at 266 Merrick Road, Lynbrook, NY 11563." *Ibid*. On September 9, 2014, she received another robocall, and this time she spoke with someone from Senior Life Support. *Id*. at ¶¶ 6-7. She ordered the device and nine days later received a medical alarm system from Lifewatch. *Id*. at ¶ 8. On October 3, 2014, she received another robocall directing her to a Senior Life Support representative. *Id*. at ¶ 15. As part of a follow-up call with the verification department, the representative explained that "all of the products are from Lifewatch" and that Senior Life Support sells only for Lifewatch. *Id*. at ¶ 16; Doc. 19-1 at 30-31. Again on October 27, 2014, Mey received a robocall asking her to press "1." Doc. 25-18 at ¶ 23. This time the representative told Mey, in response to her asking why Lifewatch appeared on her caller identification, that "our company is Senior Life Savers, but it's all the same—that's what's going to show up on your bank statement is Lifewatch." Doc. 19-1 at 74. The representative added

that Senior Life Savers was "just a small branch" of Lifewatch, and that a family member or a doctor had probably referred her. *Id*. at 74-75.

On January 5, 2015, Mey received a robocall saying: "Hello, seniors. Due to new health care regulations, you are now eligible to receive a personal medical alert system at no cost to you. Since you've already been referred to by a friend or family member, we have a system waiting to be shipped out to you." Doc. 20-1 at 32. She spoke to Randy from Senior Life Support, who confirmed that the product he was selling came from Lifewatch. *Id*. at 45. Mey ultimately did not place an order, but was contacted again on January 8, 2015 by Lifewatch to verify her shipping information. *Id*. at 55, 59.

In August 2015, Mey received a call from "Medical Alert—Source One" selling a medical alert bracelet. Doc. 77-1 at ¶¶ 4-7. It was eventually revealed that the fulfillment company was Lifewatch. Doc. 20-1 at 36. And yet again on September 10, 2015, Mey received a robocall saying that she qualified for a personal medical alert system because of new health care regulations and because she had been referred by a friend or family member. Doc. 77-1 at 41-42. The company was called Agent Med Alert, but later a representative said "[w]e're Lifewatch, yes, Medical Alarms Lifewatch … we are all the same company." *Id*. at 66-69. The next day May received a follow-up call from Wayne, who explained that they were not the same company but that they "get paid a little bit for sending them your business." *Id*. at 75. When Mey asked if Agent Med Alert sends their calls or sales to anyone other than Lifewatch, Wayne responded, "Nope. They're the only company we use." *Id*. at 80.

Cognizant of how damaging May's evidence is, Defendants disparage her as a "professional litigant" who "earns her living by selling things on eBay and by being a plaintiff in class action TCPA lawsuits." 12/14/15 Tr. at 41. (They neglect to mention that she is also

supported by her spouse.  Doc. 100-3 at 5-6.)  According to Defendants, Mey's statements should be ignored because she often misrepresented to telemarketers that the name "Lifewatch" appeared on her caller identification in order to elicit their connection to Lifewatch.  Doc. 100 at 16.  But the telemarketers' admissions are not rendered invalid just because Mey (successfully) tricked them into (truthfully) revealing that they sold products for Lifewatch.

Other consumers provided declarations explaining how they were taken advantage of by telemarketers selling Lifewatch's medical alert devices.  Doc. 24-15 at ¶ 4 (Roger Beyer averring that in August 2014, his father had been sold a Lifewatch medical alert device after being falsely told that his doctor said he needed it); Doc. 24-21 at ¶ 3 (Joan Cattie averring that she was told by Lifewatch telemarketer that she "was receiving a medical alert device as a gift" and that "the person giving the gift would lose their money if [she] did not" enroll); Doc. 24-22 at ¶ 4 (Vicki Cavic averring that she discovered in December 2014 that her mother was being charged monthly for Lifewatch services despite having no recollection of having ordered anything); Doc. 24-28 at ¶¶ 3, 7, 14-17 (David Eden averring that he was harassed by robocalls from Lifewatch telemarketers in December 2014 and January 2015 even though he was on National DNC Registry); Doc. 25-14 at ¶¶ 3-7 (Isaac Lifshitz averring that he purchased a Lifewatch device so he could receive $3000 of "special" grocery coupons, only to later discover that the coupons were already publicly available; he also was told that there would be no cost to returning device, but then had to pay for return shipping); Doc. 25-27 at ¶¶ 3-8 (Gail Thill averring that her  efforts to cancel her mother's Lifewatch service were thwarted in part because Lifewatch constantly changed its billing descriptor, making it impossible to block payments to them).

### D. Lifewatch's Quality Control and Refund Program

Defendants maintain that they recently adopted proactive measures to ensure that their telemarketers are legally compliant. Doc. 87-1 at ¶ 19. Beginning in 2012, Lifewatch required its telemarketers to enter into "purchase agreements" in which the telemarketer warrants and covenants that it will not engage in unlawful activities. Doc. 92 at ¶ 18; 12/14/15 Tr. at 77. Each telemarketer also must sign an affidavit affirming that, among other things, it will not: (1) make misrepresentations about Lifewatch's products or services; (2) indicate that the consumer was referred by a friend or family member; or (3) falsely state that the product is endorsed by an organization. Doc. 92 at ¶ 18.

Lifewatch claims that it enforces these restrictions by randomly auditing audiotapes of its telemarketers' sales calls. According to Baker's declaration, if an audit reveals any unlawfulness, "Lifewatch then terminates the Purchase Agreement with the offending outside sales company." *Id*. at ¶ 23. But Baker later testified that she only "initiate[s] the termination process when appropriate," and that the telemarketer may be given multiple chances "if the relationship with the [telemarketer] has been long-term and they have been providing customer accounts that have been valid and good accounts." 12/14/15 Tr. at 81, 89. Baker further testified that Lifewatch has terminated twenty-four telemarketers because of compliance issues. 12/14/15 Tr. at 80. But Defendants were unable to produce *any* written record of *any* single telemarketer being terminated. This is perplexing given that Lifewatch's purchase agreement provides that "this Agreement may be terminated by either party effective immediately upon *written notice* to the other party." Doc. 92 at 16 (emphasis added). Baker explained that "it's possible" that all terminations since May 2015 had been conducted solely by telephone. 12/14/15 Tr. at 116. The court finds Baker's averments and testimony lacking in credibility.

Lifewatch also instituted "a customer refund program to offer refunds to any customers allegedly deceived by the independent companies sued by the FTC" in the *Worldwide* litigation. Doc. 87-1 at ¶ 17. Through this program, Lifewatch sent letters to its customers, and those who responded were issued a refund. 12/14/15 Tr. at 98; Doc. 92 at 33. Lifewatch also spoke with approximately 3,000 customers obtained through the Worldwide defendants' telemarketing efforts but who had not yet run an initial test on their devices. Doc. 92 at ¶¶ 12-13. Of those, only 38 customers wanted to cancel, and Lifewatch ultimately issued refunds to 22. *Id*. at ¶ 15; 12/14/15 Tr. at 88. According to Defendants, the remainder "knew they had the Lifewatch device, were satisfied with the service and device, and had not indicated any desire to discontinue service" even though they had never used it. Doc. 92 at ¶ 13; *see also* 12/14/15 Tr. at 102 (Baker answered "Correct" when asked if 2,962 customers "were all happy to pay a monthly fee for a device they were not using or had never tested"). Defendants' submission lacks credibility and even plausibility.

It is telling that, despite these supposed enforcement measures, Lifewatch does not currently provide sales scripts to its telemarketers and does not review or approve the scripts they use. Doc. 92 at 34 (affidavit from a current Lifewatch telemarketer averring that "Lifewatch never directly or indirectly provided sales scripts" and that "Lifewatch does not review, approve, dictate, draft, authorize or control sales scripts"). At the hearing, both Sirlin and Baker indicated that Lifewatch *could* provide or review scripts but has opted not to. 12/14/15 Tr. at 102-03; *id*. at 138 (Baker testifying: "We have thought about changing the policy [to review the scripts]; but we decided to defer to the outside sellers to actually create the sales scripts."); *id*. at 223 (Sirlin testifying: "I would still consider [reviewing scripts], if you guys say that's what we're supposed to do."). In fact, Lifewatch previously approved its telemarketers' scripts. Doc. 16-1 at 2, 4

(September 2012 services agreement with the telemarketer MD247.com providing that it must "strictly adhere" to "scripts identified by [Lifewatch] as approved, which approval shall be in [Lifewatch's] sole discretion"); 12/14/15 Tr. at 205. Sirlin believes that listening to recordings is a superior oversight method because it reveals what telemarketers actually say instead of what they are supposed to say. 12/14/15 Tr. at 223-224. That is unpersuasive—why not provide/review scripts and audit sales call recordings—and Lifewatch's ostrich-like approach to its telemarketers' compliance with the law is extremely troubling.

During this case, Defendants revealed the identities of their seven current telemarketers. Doc. 92 at ¶ 25; Doc. 93 at 13-168. Menjivar conducted a Consumer Sentinel search of complaints using the telemarketers' business names or known fictitious names. Doc. 94-2 at ¶ 14. The search revealed four, five, and nineteen DNC complaints against three of them. *Id*. at ¶ 15. From those results, Menjivar identified several telephone numbers associated with those three telemarketers, and then ran another search against those numbers. *Id*. at ¶ 16. There were 16,937 DNC and robocall complaints involving those numbers . Doc. 95 at 185.

Defendants object to this evidence as irrelevant because these complaints are not linked to Lifewatch. Doc. 111 at 5-6. But the court relies on that evidence not to show that Lifewatch is responsible for any of those particular calls, but rather to show that Defendants' supposed compliance efforts are inadequate. While Defendants submit that their new quality control program renders unnecessary a preliminary injunction, that evidence shows that Lifewatch's "current telemarketers are no more likely to follow the law than the ones shut down in past government actions." Doc. 101 at 19.

### E. Nature of the Relationship Between Lifewatch and its Telemarketers

A key dispute in this case concerns the nature of the relationship between Lifewatch and its telemarketers—specifically, whether the telemarketers are Lifewatch's agents, rendering it liable for their conduct. The question whether a principal-agent relationship exists is typically a question of fact. *See Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011). As the Seventh Circuit has explained, "the federal common law of agency, Illinois agency law, and the Restatement of Agency are all in accord on general agency principles, thereby obviating choice-of-law concerns." *NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1058 (7th Cir. 2013). The Restatement defines agency as a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). Therefore, in deciding this question, the court will look to (1) whether the telemarketers act on Lifewatch's behalf and (2) whether they are subject to its control.

### 1. Telemarketers Sell on Lifewatch's Behalf

The parties dispute whether Lifewatch's telemarketers sell medical alert devices exclusively for Lifewatch or if they also sell on behalf of other medical alert companies. According to Defendants, Lifewatch's telemarketers "offer customer accounts for sale to Lifewatch and provide Lifewatch the opportunity to acquire customer accounts … on a *non-exclusive* basis." Doc. 87 at 12 (emphasis added). It follows, say Defendants, that Lifewatch "has no obligation to purchase customer agreements that are offered to it [and] always retains discretion under its agreements … to decline to purchase customer accounts." *Ibid*. Plaintiffs admit that some of Lifewatch's telemarketers "have conducted telemarketing in other areas, such

as debt relief," Doc. 94 at 14 n.22, but insist that there "is no evidence that these telemarketers work for any medical alert company other than Lifewatch," *id*. at 14.

To support their position, Defendants first point to their purchase agreements, which Lifewatch's telemarketers are required to sign. Those agreements provide that the telemarketer "shall use its best efforts to originate Contracts for its own account and to offer to sell Contracts for [medical alarm plans] … on a non-exclusive basis … from time-to-time." Doc. 92 at 14. But contractual labels have little bearing on whether a principal-agent relationship exists. *See* Restatement (Third) of Agency § 1.02 (2006) ("Whether a relationship is characterized as agency in an agreement between parties … is not controlling."). Plaintiffs respond that, regardless of how their relationship is *contractually* defined, Lifewatch and its telemarketers are in a *de facto* exclusive relationship. Plaintiffs have the far better argument.

First, there is direct evidence that some telemarketers sold medical alert devices only for Lifewatch. As noted, the Receiver in the *Worldwide* litigation and Settecase both credibly aver that Lifewatch was the sole medical alert company purchasing accounts from the Worldwide defendants. Doc 24-11 at ¶ 5; Doc. 24-12 at ¶ 4. Moreover, some of the sales call transcripts reveal that the telemarketers were selling only on Lifewatch's behalf. Doc. 19-1 at 30-31 (telemarketer saying "all of the products are from Lifewatch"); Doc. 77-1 at 80 (telemarketer saying that Lifewatch is "the only company we use"). Other telemarketers told consumers that they are a subdivision of Lifewatch or the same company as Lifewatch. Doc. 19-1 at 74-75 (telemarketer saying that Senior Safe Savers is a branch of Lifewatch); Doc. 20-1 at 71 (same for Senior Life Support); Doc. 24-28 at ¶ 14 (telemarketer saying that Lifewatch was Senior Alert's "corporate office"); Doc. 77-1 at 66 (telemarketer saying that Medical Alarms and Lifewatch are the same company). Lifewatch as a corporate entity may technically be distinct from the

telemarketing companies, but that is irrelevant. What matters is that the telemarketing representatives *thought* their companies were the same as Lifewatch, which strongly suggests that those telemarketers sold exclusively or predominantly for Lifewatch.

Second, several of the telemarketing calls referenced above involved live transfers from the consumer directly to Lifewatch's verification department or company. Doc. 18-1 at 26-30; Doc. 21-1 at 37, 86; Doc. 77-1 at ¶ 9; *see also* Doc. 96-1 at 19 (email from telemarketer to Lifewatch stating: "We are no longer verifying on our end. We are entering the information into the system (CRM) and doing the live transfer."). Baker explained during her testimony how Lifewatch purchases accounts from its telemarketers. 12/14/15 Tr. at 81-82. The telemarketers enter a customer's information into a third-party system called CRM. *Ibid*. Lifewatch may access the CRM system and choose either to purchase the account and fulfill the order or to decline the account. *Ibid*. But during sales calls, the telemarketer will routinely transfer the consumer to a company that verifies the order for Lifewatch. *Ibid*.

So, if Lifewatch is not the only medical alert company purchasing those accounts, and if Lifewatch has to actively purchase the account through the CRM system, how is it that the telemarketers can transfer consumers directly to Lifewatch's verification company during the sales call? Defendants provide no satisfactory response to this question. Baker testified that the verification call process does not mean that the relationship is exclusive, but did not explain why that was. *Id*. at 82. And when Sirlin was asked "if they're not exclusive, how are these calls transferring over in realtime," he avoided the gist of the question and simply explained how a phone call is transferred. *Id*. at 146 ("I could transfer a call just by pressing a different button."); *see also id*. at 172 ("You could transfer a call on your telephone, call forward, call transfer. That's what I'm saying."); *id*. at 173 ("Yeah, I've seen phones, not from telemarketers, that you

can transfer and switch calls. Just in my office, we take calls in, and you can transfer it to other places. That's not a technological thing that I don't think exists.").

Third, the products described during the sales calls were often linked specifically to Lifewatch. For instance, telemarketers told consumers that the service charge is $34.95 a month and that the charge will appear as "Lifewatch" on their credit card statement. Doc. 25-18 at ¶ 4. Other times, the telemarketers described the company as being based in New York and celebrating its 30th anniversary. Doc. 24-2 at ¶¶ 5-6. Unless every medical alert company to which those telemarketers sold accounts has existed for three decades, is headquartered in New York, and charges $34.95 a month, it is difficult to see how those telemarketers could be selling medical alarm systems for a company other than Lifewatch.

Finally, Defendants have adduced no evidence of any other medical alert company that uses their telemarketers. In response to Plaintiffs' interrogatory seeking this information, Defendants merely said: "Lifewatch believes that [telemarketers] sell customer accounts to entities other than Lifewatch." Doc. 77-3 at 4. In his declaration, Sirlin avers without giving any detail: "I know that [these telemarketers] sell customer accounts to Lifewatch's competitors." Doc. 87-1 at ¶ 11. When Sirlin was asked if he could provide examples, he listed some of his competitors and then said "there is clear-cut evidence of that that I gave my lawyers." 12/14/15 Tr. at 145. Even if that were true, the evidence was never provided to the court.

The Consumer Sentinel complaints against three of Lifewatch's current telemarketers mention providers other than Lifewatch, such as "Med Alert," "First Alert," "Senior Care," "Senior Assist," and "Free Call Alert." Doc. 111 at 6 n.1. Defendants speculate that these may be the names of other medical alert companies, which, they argue, would prove that Lifewatch's current telemarketers also work for Lifewatch's competitors. *Ibid*.; *see also* Doc. 111-2. But

those company names could just as easily be the names of the telemarketers themselves—after all, many of Lifewatch's telemarketers went by similarly generic names.  Doc. 15-1 at 10-11 (listing Lifewatch's former telemarketers, including "Senior Care Alert," "Alarm Pros," "Live Response Agent," "Direct Agent Response," and "Security Alert Inc.").

There is *some* evidence suggesting that Lifewatch's relationships with *some* of its telemarketers are not exclusive.  During one sales call, a telemarketer explained to the consumer that "[t]here's three different alert systems.  We have ADP, Life Alert, and then this—our company does Medical Alert, which is medical alarm system."  Doc. 19-1 at 68-69; *see also* Doc. 22-1 at ¶ 32 (telemarketer reported to the FDACS that it sells for three medical alert providers); 12/14/15 Tr. at 65 (telemarketer told consumer that it sells for many medical alarm companies).  But on balance, the evidence shows that Lifewatch's telemarketers typically only sold medical alert systems for Lifewatch.

In any event, even if those business relationships were not effectively exclusive, that does not mean Lifewatch is not responsible for its telemarketers' actions.  The telemarketers may simultaneously be the agents of multiple principals, of which Lifewatch is one.  *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1250 (10th Cir. 2013) ("An agent can serve multiple principals at once, even principals that are competing with one another."); Restatement (Third) of Agency § 3.14 cmt. b (2006).

### 2.      Lifewatch Controls its Telemarketers

The evidence provides a strong basis for concluding that Lifewatch exercises control over its telemarketers.  As noted, both Gross and Steinmetz aver, persuasively, that when they worked with Lifewatch, the company monitored and controlled its telemarketers.  Doc. 24-9 at ¶¶ 9-11;

Doc. 26-12 at ¶ 6.  There also are emails from Lauren Vandewater, a Lifewatch employee who implements the quality control program.

In a June 5, 2014 email, Vandewater directly revised a telemarketer's sale script, explaining: "I took that one line out about billing but I added a few things where they are saying its [sic] free (its [sic] free to use) so that avoids confusion with the customers and avoids compliance issues."  Doc. 96-1 at 46.  In a December 2014 email, a telemarketer wrote, "we are revising our sales script.  As soon as it's done, I will send it to you for your approval," to which Vandewater responded, "Not a problem, thank you."  *Id*. at 19.  In other emails, Vandewater instructed telemarketers on what they should say.  *Id*. at 4 ("The sales reps are NEVER allowed to say Lifewatch or that they work for Lifewatch, I have said this so many times already but yet it is still happening."); *id*. at 6 ("Please make sure that these numbers are not called and that you are not telling customers a friend or family or ANYBODY referred the unit for them because thats [sic] not true and misleading."); *id*. at 8 ("Please remember that you are a 3rd party seller. You are not affiliated with Lifewatch so if a customer asks the name of the company, you should be giving your name not ours."); *id*. at 9 ("I have heard on recordings reps telling customers that we will send a prepaid label to send the unit back, we will not be doing that even if you ask, so please do not offer it as an option."); *ibid*. ("A rep cannot tell a customer that 'billing starts once you activate the system.'"); *id*. at 10 ("[Y]ou know that a doctor or family member did not refer them to get the system, so you should not be telling customers that."); *id*. at 21 ("They said they are being told its Lifewatch which is what they are looking up and getting our #.  You should not have ANYTHING saying that you are Lifewatch."); *id*. at 27 ("I have been hearing lots of complaints lately from the customer service dept that customers are being told that 'the billing

does not start until you plug in and activate the unit.'"); *id*. at 51 ("We do not provide shipping labels to the customers, it is their responsibility to send the unit back.").

Vandewater told telemarketers that if they did not comply, "there is a good chance we will no longer purchase deals from you," *id*. at 4; other times, she threatened that the telemarketer "will lose commission on that deal" if Lifewatch discovered that misrepresentations were made, *id*. at 27. *See also id*. at 51 ("If any of the recordings come back as non compliant, we will be recalling those customer [sic] to be compliant but you will have a percentage of your commissions deducted."). Although at first blush these emails to suggest that Lifewatch took compliance issues seriously, other emails show that the reprimands were just for show. After a telemarketer responded to a compliance email concerning a script misrepresentation, Vandewater replied: "I just have to cover all bases so nobody can say that I never told them lol." *Id*. at 38.

Defendants contend that Lifewatch's quality control program "does not establish control" over its telemarketers, but rather simply gave it "notification of a breach of the purchase agreement." Doc. 100 at 27. But the above-referenced emails show more than that—they establish that Lifewatch directly oversees its telemarketers. When Lifewatch was sued for infringing Life Alert's "I've fallen and I can't get up" trademark, it trotted out the same ostrich defense as it does here. In response, the Ninth Circuit held: "At bottom, LifeWatch would have us believe that any infringement is traceable to actions by telemarketers for which it has no responsibility. The district court did not buy this story of telemarketers-gone-rogue, and neither do we." *Life Alert Emergency Response*, 601 F. App'x at 474.

The same holds true here. In light of the evidence, the court finds that Lifewatch exercises control over its telemarketers and that those telemarketers are principally acting on

Lifewatch's behalf.  Accordingly, Plaintiffs have shown that the telemarketers acted as Lifewatch's agents.

### F.      Remaining Evidentiary Issues

Plaintiffs submit a declaration from Michael Hilgar, one of the individual defendants in the *Worldwide* litigation who conducted telemarketing for Lifewatch.  Doc. 24-10.  As to the Worldwide scripts that contained misrepresentations, Hilgar avers:

> Lifewatch provided Worldwide with all of the scripts used during the telemarketing calls; I had no role in drafting them, nor did anybody else working for Worldwide.  Periodically … Lifewatch would provide me with a new script, which the call center was supposed to start using immediately.  Nobody was allowed to make any changes to the provided scripts unless Lifewatch explicitly approved the changes in advance, and the telemarketers were expected to follow the scripts verbatim.  The telemarketers also were not allowed to disclose Lifewatch's name during telemarketing calls.  All of the telemarketing calls were recorded and accessible to Lifewatch.  Multiple times a week, Lifewatch requested and received recordings of telemarketing calls to review.

*Id*. at ¶ 6.  Hilgar's statement would be very valuable to Plaintiffs—except for the fact that, in an earlier suit, he submitted a declaration averring the opposite:

> 5. Worldwide Info Services used its own telemarketing sales scripts and did not seek the guidance, approval, direction, or advice of Lifewatch relative to creating those telemarketing sales scripts.
>
> 6. Lifewatch did not review, approve, dictate, draft, authorize, or control Worldwide Info Services' telemarketing sales scripts.  In fact, during the pendency of any relevant agreement, Worldwide Info Services would not allow Lifewatch to review the telemarketing sales scripts, which Worldwide Info Services considered to be proprietary.
>
> 7. Worldwide Info Services never received a sales script from Lifewatch Inc., or any of its employees.
>
> 8. Lifewatch never told Worldwide Info Services what to say to the customers or potential customers during the course of telemarketing calls.
>
> 9. Lifewatch did not control, oversee, or supervise Worldwide Info Services relative to its efforts to obtain customers [sic] accounts for, among others, Lifewatch.

*Id.* at 8.  Hilgar now disavows that earlier declaration, claiming that he "did not closely review [it] at the time that [he] signed it."  *Id.* at ¶ 12.  Plaintiffs imply that the earlier declaration should be disregarded because Lifewatch paid Hilgar to sign it.  Doc. 97 at ¶ 9; Doc. 101 at 13.  Ultimately, Hilgar's declarations are a wash.  The fact that Hilgar once swore to the opposite of what he now asserts to be true severely undermines his credibility.  In reaching its decision on the present motion, the court has opted not to consider Hilgar's declarations.

Finally, to the extent that Defendants' motions to strike pertain to exhibits not discussed or cited in this order, the motions are denied as moot.

## Discussion

Injunctive relief is available under the FTC Act "[w]henever the Commission has reason to believe … that any person, partnership, or corporation is violating … any provision of law enforced by the Federal Trade Commission."  15 U.S.C. § 53(b).  The Commission is authorized to obtain a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."  *Ibid.*  In the Seventh Circuit, district courts applying this standard must "1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities."  *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028-29 (7th Cir. 1988).  This approach differs from the traditional four-pronged preliminary injunction standard.  *See ibid.*  A showing of irreparable injury is not required under the FTC Act.  *Ibid.*  Moreover, "in balancing th[e] equities, while private concerns may certainly be considered, public equities must receive far greater weight."  *Ibid.*; *see also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981) ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary

injunction ….").  This public interest test "works on a sliding scale so that the greater the plaintiff's success on the merits, the less harm she must show in relation to the harm defendant will suffer if the preliminary injunction is granted."  *Kinney ex rel. NLRB v. Int'l Union of Operating Eng'rs, Local 150*, 994 F.2d 1271, 1277 (7th Cir. 1993).  The FTC may also seek equitable relief under the TSR.  *See* 15 U.S.C. § 6105(b) ("The Commission shall prevent any person from violating a rule of the Commission under [15 U.S.C. § 6102] in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated into and made a part of this chapter.") (citations omitted).

## I.  Likelihood of Success on the Merits

Plaintiffs allege that Defendants' misrepresentations and abusive telemarketing practices have violated § 5 of the FTC Act, the FDUTPA, and the TSR.

### A.  Liability under the FTC Act and the FDUTPA

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  The FDUTPA likewise prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  The FDUTPA further provides that in construing the statute, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2015."  *Id.* § 501.204(2); *see also FTC v. Info. Mgmt. Forum, Inc.*, 2013 WL 3323635, at *5 (M.D. Fla. June 28, 2013) ("Conduct that constitutes a 'deceptive act or practice' or an 'unfair act or practice' under the FTC Act is a violation of FDUTPA.").

Corporate liability under the FTC Act may be established by "evidence that a corporation made material representations likely to mislead a reasonable consumer." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005); *see also FTC v. World Media Brokers*, 415 F.3d 758, 763 (7th Cir. 2005); *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992) ("[A]n advertisement is deceptive under the Act if it is likely to mislead consumers, acting reasonably under the circumstances, in a material respect."); *World Travel Vacation Brokers*, 861 F.2d at 1029. The omission of a material fact may also give rise to an FTC Act violation. *See Bay Area Bus. Council*, 423 F.3d at 635. "A claim is considered material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *Kraft*, 970 F.2d at 322 (internal quotation marks omitted); *see also Kalwajtys v. FTC*, 237 F.2d 654, 656 (7th Cir. 1956) ("The buying public does not weigh each word in an advertisement or a representation. It is important to ascertain the impression that is likely to be created upon the prospective purchaser."). "To be actionable under section 5, these misrepresentations or practices need not be made with an intent to deceive." *World Travel Vacation Brokers*, 861 F.2d at 1029. Similarly, under the FDUTPA, deception occurs if there is a representation, omission, or practice that is likely to mislead a consumer acting reasonably in the circumstances and "offends established public policy." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003); *see also Democratic Republic of the Congo v. Air Capital Grp., LLC*, 614 F. App'x 460, 470 (11th Cir. 2015) (listing examples where corporate practices were found to violate the FDUTPA, including "when a chewing gum company wrongly claimed that its product killed germs, when a manufacturer misrepresented that its vacuum cleaners were fit for use, and when a producer misstated that its products were wheat and gluten free") (citations omitted).

Principals are liable for the misrepresentations of their agents under the FTC Act. *See World Travel Vacation Brokers*, 861 F.2d at 1029, 1031 (affirming the grant of a preliminary injunction under the FTC Act against principals who "directed and supervised the activities of the corporate defendants, including the [fraudulent] advertising campaign," and "instructed World Travel telephone operators to tell consumers that roundtrip airfare to Hawaii was only $29"); *FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) ("Under the FTC Act, a principal is liable for the misrepresentations of his agent acting within the scope of the agent's actual or apparent authority."); *Standard Distribs., Inc. v. FTC*, 211 F.2d 7, 13 (2nd Cir. 1954) (holding a principal liable for its sales agent's misrepresentations); *Int'l Art Co. v. FTC*, 109 F.2d 393, 396 (7th Cir. 1940) ("We know of no theory of law by which the company could hold out to the public these salesmen as its representatives, reap the fruits from their acts and doings without incurring such liabilities as attach thereto.").

As discussed above, Lifewatch's telemarketers often misrepresented the medical alert devices and systems they were trying to sell to consumers. The telemarketers claimed that the American Diabetes Association, the American Heart Association, the American Red Cross, the National Institute on Aging, and the American Association of Retired Persons had endorsed the device. They marketed the device as "free" even though consumers would have to return it if they cancelled. They told consumers they would not be charged until they received and activated the device. They falsely stated that the system had been recommended or paid for by a family member, friend, or doctor. And they promised consumers that if they were not satisfied, the device could be returned at no cost.

None of those statements were true. And the statements were material, as they likely affected a reasonable consumer's decision to buy the device. An endorsement by a national

organization, or a guarantee that customers could test a product with no financial risk, would certainly influence a reasonable consumer's decision to purchase that product. Moreover, the record reflects that some consumers were in fact induced to buy Lifewatch's medical alert device because of those misrepresentations. Doc. 24-15 at ¶ 4 (consumer enrolled because he was told that his doctor wanted him to have the service); Doc. 24-26 at ¶ 3 (consumer enrolled because she assumed it was a Mother's Day gift after being told a loved one had purchased the device for her); 12/14/15 Tr. at 65 (Rivard testifying that her father enrolled because he thought that his children had referred him).

Defendants' defense rests primarily on the argument that they are not responsible for any misconduct by their telemarketers. But as the court found above, the telemarketers were acting as Lifewatch's agents in making sales, and Lifewatch often was aware of its telemarketers' actions. Accordingly, Lifewatch is liable for their conduct under the settled principle that a principal is liable for the misconduct of its agent. This is true even though Lifewatch later made (half-hearted and largely ineffective) efforts to curb its telemarketers' unlawful conduct. *See Standard Distribs.*, 211 F.2d at 13 ("Unsuccessful efforts by the principal to prevent such misrepresentations by agents will not put the principal beyond the reach of the Federal Trade Commission Act."); *World Travel Vacation Brokers*, 861 F.2d at 1031 ("Although the defendants apparently changed some of the sales scripts to satisfy several state attorneys general, those actions do not ensure that consumers throughout the nation will be protected by the deceptive advertisements. A court can require that an individual defendant do 'everything in his power' to assure compliance with the law."); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 527 (S.D.N.Y. 2000) ("The law is clear that under the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with the actual or apparent authority to

make such representations) regardless of the unsuccessful efforts of the principal to prevent such misrepresentations.").

So Plaintiffs have established a likelihood of success against Lifewatch. As for Sirlin, he can be held individually liable if he "either participated directly in the deceptive acts or practices *or* had authority to control them." *Bay Area Bus. Council, Inc.*, 423 F.3d at 636 (emphasis added); *see also World Media*, 415 F.3d at 764. "Such authority may be demonstrated by active participation in the corporate affairs, including assuming duties as a corporate officer." *World Media*, 415 F.3d at 764; *see also FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989). Plaintiffs also must demonstrate that Sirlin either knew or should have known about the deceptive practices—though they do not have to prove subjective intent to defraud. *See Bay Area Bus. Council*, 423 F.3d at 636. Plaintiffs "may fulfill the knowledge requirement with evidence that the individuals had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Ibid.* (internal quotation marks omitted). Similarly, "to proceed against an individual using a FDUTPA violation theory an aggrieved party must allege that the individual was a direct participant in the improper dealings." *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. App. 2008).

Plaintiffs have established a strong likelihood that they will succeed in proving Sirlin individually liable under the FTC Act and the FDUTPA. As Lifewatch's chief executive officer, Sirlin had the authority to control Lifewatch's actions, including its supervision (or lack thereof) over its telemarketers. Indeed, in its 2014 response to the Vermont Attorney General's CID, Lifewatch stated that "Sirlin creates the corporation's overall vision, formulates the corporation's overall business plan, and oversees business operations." Doc. 15-1 at 27-28.

There is strong evidence that Sirlin knew that Lifewatch's telemarketers were making misrepresentations. Both Gross and Steinmetz aver that Lifewatch exercised control over the telemarketers and provided them with scripts that contained false statements about Lifewatch's products and services. Doc. 24-9 at ¶¶ 9-11; Doc. 26-12 at ¶ 6. More critically, on Lifewatch's telemarketing applications to the FDACS in 2012, 2013, and 2015—all of which Sirlin signed—Lifewatch stated that it provided copies of sales scripts to its telemarketers and attached the scripts containing the misrepresentations. Doc. 22-1 at ¶¶ 10-13; Doc 22-2 at 2-63. Although Sirlin testified that someone else had written those scripts, he conceded that Lifewatch may be responsible for them. 12/14/15 Tr. at 217. And when asked if he had attached the scripts to these applications, Sirlin responded, "I don't know." *Id*. at 220. Sirlin signed the applications, so his claims of ignorance are not credible. In light of this evidence, there is a strong case that Sirlin was directly involved in Lifewatch's relationship with its telemarketers and had actual knowledge of or, at a minimum, "an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Bay Area Bus. Council*, 423 F.3d at 636.

## B. Liability under the TSR for Deceptive Acts and Practices

The TSR makes it illegal for any seller or telemarketer to engage in deceptive telemarketing acts and practices, which include "[m]ispresenting, directly or by implication, … [a] seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity," 16 C.F.R. § 310.3(a)(2)(vii), and "[m]aking a false or misleading statement to induce any person to pay for goods or services," *id*. § 310.3(a)(4). A "telemarketer" is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." *Id*. § 310.2(ff). A "seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or

services to the customer in exchange for consideration." *Id*. § 310.2(dd). "Telemarketing" is "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." *Id*. § 310.2(gg).

Plaintiffs argue that Lifewatch is liable under the TSR as a seller. Doc. 94 at 27 n.58. Defendants dispute whether they can be considered a seller with respect to all of its telemarketers' calls, Doc. 87 at 21-23, arguing that the TSR's definition of "seller" applies only in the context of a "telemarketing *transaction*"—something that Defendants contend is more than just "telemarketing," Doc. 100 at 21-22 (emphasis added). The TSR does not define "transaction," but Defendants, citing a dictionary, say it means "an exchange of goods, services, or funds." *Id*. at 22. Defendants therefore believe they can be liable as "sellers" only if the consumer purchases a medical alert device and Lifewatch then fulfills that contract. Doc. 87 at 21; 12/14/15 Tr. at 45-47.

Defendants' position is unavailing. They essentially assert that when no sale is completed, there is no seller and thus no liability for Lifewatch. *Id*. at 47. But even if that were correct, it would be of no help given that the record contains numerous examples of consumers who were lied to and then ultimately purchased a Lifewatch system. Therefore, even if the court accepted Defendants' "no seller unless there is a sale" argument, Lifewatch would still be liable for misrepresentations in the many instances where a sale occurred. Moreover, the TSR also prohibits *any person*, regardless of whether that person is a seller or telemarketer, from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged" in a deceptive practice. *Id*. § 310.3(b). Plaintiffs argue, and the court agrees, that even if Lifewatch were not technically

a "seller," both Lifewatch and Sirlin would still be liable under this "substantial assistance or support" provision. *See FTC v. Chapman*, 714 F.3d 1211, 1216-17 (10th Cir. 2013) (affirming liability under the TSR's substantial assistance provision where the defendant "was the one who provided the services and products [that were] marketed to consumers in misleading ways").

Although the question is immaterial, the court rejects Defendants' narrow reading of the term "seller." The phrase "telemarketing transaction" means a sales call—not just a sales call where a sale ultimately is made. *See* Black's Law Dictionary 1726 (10th ed. 2014) (defining "transaction" most generally as "[t]he act or an instance of conducting business or other dealings" or as "[a]ny activity involving two or more persons"). It would severely undermine the purpose of the TSR if a seller could not be held liable for fraudulent conduct unless the consumer ultimately purchased the product or service.

For these reasons, Plaintiffs are likely to show that Defendants engaged in deceptive practices as defined by the TSR.

### C.     Liability under the TSR for Abusive Acts and Practices

The TSR also prohibits telemarketers from engaging in, and sellers from causing a telemarketer to engage in, certain abusive telemarketing practices. 16 C.F.R. § 310.4(b). These practices include: (1) initiating any outbound call to a person who has previously said he does not wish to be called, *id.* § 310.4(b)(1)(iii)(A); (2) initiating any outbound call to a person on the DNC registry, with certain exceptions not relevant here, *id.* § 310.4(b)(1)(iii)(B); and (3) initiating any outbound calls that deliver a prerecorded message—*i.e.*, robocalling—again, subject to exceptions not relevant here, *id.* § 310.4(b)(1)(v)(A). The TSR also requires sellers and telemarketers to transmit the name of the telemarketer or the name of the seller to any caller identification service used by the telephone call recipient. *Id.* § 310.4(a)(8). The regulations

further require telemarketers "to disclose truthfully, promptly, and in a clear and conspicuous manner" the identity of the seller, that the purpose of the call is to sell goods or services, and the nature of the goods or services. *Id.* § 310.4(d). And, as with deceptive practices, the TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged" in an abusive practice. *Id.* § 310.3(b).

The record is replete with instances of Lifewatch telemarketers (1) calling consumers on the DNC registry; (2) transmitting outbound prerecorded messages; and (3) not disclosing that Lifewatch is the company that will (or even likely will) fulfill the contract. As to the spoofing allegations, Settecase (the Worldwide employee) avers that when he telemarketed for Lifewatch, Worldwide "would manipulate the information that would appear on consumers' caller IDs" to intentionally display a local telephone number. Doc. 24-11 at ¶ 8. Some consumers complained that, when they try to call back the number on the caller identification, it either was not in service or belonged to a different business entirely. Doc. 24-27 at ¶ 6 (sales call for a medical alert device appeared on Caller ID as a phone number for a local school district); Doc. 25-7 at ¶ 7 (a consumer called back the number appearing on the Caller ID and heard a recording saying that the number was no longer in service); Doc. 25-22 at ¶¶ 8-9 (sales call for a medical alert device appeared as "Walmart" on caller identification).

True, it is difficult to attribute those *specific* consumer complaints to Lifewatch or its telemarketers. Regardless, Lifewatch's telemarketers certainly engaged in other abusive practices as defined by the TSR. Defendants contend that the DNC and robocall provisions do not apply to them because the provisions prohibit sellers only from *causing* a telemarketer to engage in any of these practices. *See* 16 C.F.R. § 310.4(b). Even if Lifewatch were a seller, the

argument goes, it did nothing to *cause* the telemarketers to engage in abusive practices. According to Defendants, Lifewatch's quality control program has done the opposite—it has sought to prevent telemarketers from violating the TSR. Doc. 87 at 22-23.

Plaintiffs respond by arguing that "cause" does not import an intent requirement into the regulation. In support, Plaintiffs cite *United States v. Dish Network, LLC*, 667 F. Supp. 2d 952 (C.D. Ill. 2009), where the district court encountered the same argument that Defendants make here. The *Dish Network* court held that the TSR's use of the verb "cause" created strict liability for sellers for their telemarketers' conduct:

> The verb "cause" means to bring about a consequence: for example, earth's gravity causes objects to fall. The verb "cause", standing alone, does not denote or connote the degree of connection between the action and the outcome. An action may cause an outcome directly, indirectly, immediately, proximately, remotely or otherwise. The verb "cause" also does not denote or connote intent or motive. A person may cause an outcome intentionally, unintentionally, recklessly, negligently, innocently, accidentally or otherwise. The relevant section of the TSR, § 310.4(b)(1), contains no additional language that would either limit the degree of connection between the action and the outcome, or add an intent or motive requirement.

*Id*. at 958-59. The court agrees. All that was required for Lifewatch to "cause" its telemarketers to engage in those practices is for Lifewatch to have hired them to sell its products and services. Moreover, as shown above in detail, both Lifewatch and Sirlin are liable for providing substantial assistance and support to telemarketers engaging in those practices.

Defendants briefly suggest that they may be eligible for an exemption under the TSR's safe harbor provision. Doc. 87 at 23. The TSR exempts sellers and telemarketers from DNC violations if, as a routine business practice, they have, among other requirements: (1) established and implemented written procedures to comply with the DNC rules; (2) trained their personnel in those procedures; and (3) maintained an internal DNC list. 16 C.F.R. § 310.4(b)(3). But

Defendants have provided no evidence that they have implemented *written* procedures to comply with the DNC rules, and as such the safe harbor provision thus has no application here.

In sum, Plaintiffs have established a high likelihood of success on the merits as to their claims under the FTC Act, the FDUTPA, and the TSR.

## II.     Balance of Equities

Defendants argue that the balance of equities cuts decidedly against injunctive relief. Doc. 87 at 26.  As to the private interest at stake, Defendants repeatedly maintain that granting a preliminary injunction would put "Lifewatch's viability in jeopardy." *Id.* at 7; *see also id.* at 6, 9, 24; Doc. 124 at 12 ("The injunction may put Lifewatch out of business before the merits of the case can be addressed at trial."); 12/14/15 Tr. at 52 (claiming that an injunction would "be very, very damaging to Lifewatch's business").  But in terms of business practices, Plaintiffs' proposed injunction would require only that Defendants cease "(1) misrepresenting, or assisting others in misrepresenting, material facts about Lifewatch's medical alert system; (2) violating, or assisting others in violating, the Telemarketing Sales Rule ("TSR"); and (3) collecting payments from customers who have never even plugged in the medical alert devices Lifewatch sold them." Doc. 94 at 9.  It is difficult to comprehend how requiring a business to comply with federal law would force it to shut down.

Sirlin testified that ever since the Commission focused its attention on Lifewatch, Lifewatch's main credit card processor has refused to work with it—although he later admitted that he did not know when this occurred, or who told him that the FTC's lawsuit caused this to happen, or if any documents existed to verify that this in fact took place.  12/14/15 Tr. at 143-144, 160-161; *see also* Doc. 124 at 8 ("Lifewatch anticipates that entry of an injunction, even one limited to simply requiring Lifewatch to do nothing more than comply with the applicable

statutory requirements, would be likely to disrupt—if not destroy—Lifewatch's relationships

with its processors."). To be sure, there may be a stigma associated with being the subject of a

government investigation. But even assuming the court should account in the balance of equities

for that reputational interest—which has already been implicated regardless of whether a

preliminary injunction is entered—it is outweighed by the need to curb the plainly deceptive and

abusive telemarketing practices at issue here.

What is more, Baker (Lifewatch's Director of Operations) conceded on the stand that no

harm would come to Lifewatch "if it were prohibited from making any misrepresentation to

potential customers" or "if it were prohibited from violating federal regulations." 12/14/15 Tr. at

119-120. Sirlin took it one step further—he testified that relying on telemarketers who engage in

illegal sales tactics "would not be good for our business" and that Lifewatch was financially

incentivized to ensure that customers received correct information. *Id*. at 156. By that logic, an

injunction could *benefit* Lifewatch's bottom line and provide assurances to Lifewatch's business

partners that appropriate measures have been taken to ensure compliance. Finally, Defendants

have maintained throughout this litigation that only a fraction of Lifewatch's business arises

from telemarketing. *Id*. at 124-125 (Baker testifying that only five to fifteen percent of

Lifewatch customers originated from outbound telemarketing); Doc. 92 at ¶¶ 27-28 (indicating

that "the majority of customer accounts originated through means other than outbound

telemarketing"). If that is true, then the risk of Lifewatch going out of business, even if it halted

*all* telemarketing activity, should be extremely low.

Plaintiffs characterize the public interest implicated here as the "strong interest in

immediately halting an abusive and deceptive scheme targeting vulnerable consumers, which has

harmed millions of consumers and resulted in thousands of complaints." Doc. 10 at 43.

Defendants believe that an injunction would harm the public interest for two reasons, both premised on the notion that Lifewatch will go out of business if an injunction is granted: (1) its quality control program makes it one of the few good actors in the industry, and thus removing it from the market would proportionally increase the number of customers deceived by their less scrupulous competitors; and (2) Lifewatch provides an essential service to its 60,000 customers who will be without their services should it cease operations. Doc. 87 at 24-25. These arguments are unpersuasive. Lifewatch has offered no comparative evidence that it is more legally compliant than its competitors. And although medical alert device companies can provide a valuable service, the court simply does not believe that Lifewatch will be unable to continue providing that service if a preliminary injunction is entered.

On balance, the court finds that the equities weigh heavily in favor of injunctive relief. The public's interest in not being defrauded or harassed is compelling and, as discussed above, the public interest is given far greater consideration under the FTC Act. And the consequences of requiring Defendants simply to follow the law are not so dire as to compel a different result. The court recognizes that Lifewatch may need to alter its business model to comply with this preliminary injunction. But as Plaintiffs put it: "If Lifewatch can remain a viable business only by using deceptive and abusive telemarketing practices, then [perhaps] the company does not deserve to be in business at all." Doc. 94 at 9.

Defendants insist that even if Plaintiffs have established a likelihood of success on the merits, a preliminary injunction may be entered only if Plaintiffs can demonstrate that violations are likely to recur. Doc. 87 at 25. "In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief." *United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir.

1987).  Because "Lifewatch believes that it is no longer transacting business with the telemarketers" responsible for the complaints identified in this litigation, and because they have voluntarily instituted a compliance program, Defendants contend that there is no reasonable likelihood of future violations.  Doc. 87 at 25-26.  But "[w]hile past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is highly suggestive of the likelihood of future violations," *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (internal quotation marks omitted).  Lifewatch did not simply conduct business with a single dishonest telemarketer years ago but otherwise maintained a spotless record of compliance.  The evidence reveals a disturbingly consistent pattern of unlawful behavior that continued through 2015.  Three of Lifewatch's current telemarketers have 16,937 DNC and robocall complaints associated with their telephone numbers.  Another of Lifewatch's current telemarketers robocalled a consumer on the DNC registry as recently as September 2015, telling her that she had been referred by a family or friend.  Doc. 77-1 at 42. And thousands of customers who were obtained by the Worldwide telemarketers who are not even using their medical alert devices continue to pay monthly monitoring fees to Lifewatch. Plaintiffs have satisfied their burden of showing a likelihood of future violations.

## Conclusion

Plaintiffs have established a likelihood of success on the merits of their FTC Act, FDUTPA, and TSR claims, and have shown that the balance of equities cuts decidedly in favor of injunctive relief.  The motion for a preliminary injunction accordingly is granted, and Defendants' motions to strike are denied in part and denied as moot in part.

March 31, 2016

_____
United States District Judge