# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, and | ) | |
| | ) | |
| STATE OF FLORIDA, OFFICE OF THE | ) | |
| ATTORNEY GENERAL, DEPARTMENT | ) | |
| OF LEGAL AFFAIRS, | ) | Case No. 15cv5781 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey T. Gilbert |
| | ) | |
| LIFEWATCH, INC., a New York corporation, | ) | [REDACTED] |
| also d/b/a LIFEWATCH USA and MEDICAL | ) | |
| ALARM SYSTEMS, | ) | |
| | ) | |
| SAFE HOME SECURITY, INC., a | ) | |
| Connecticut corporation, | ) | |
| | ) | |
| MEDGUARD ALERT, INC., a Connecticut | ) | |
| corporation, | ) | |
| | ) | |
| EVAN SIRLIN, individually and as an officer | ) | |
| or manager of Lifewatch Inc., | ) | |
| | ) | |
| MITCHEL MAY, individually and as an officer or | ) | |
| manager of Lifewatch Inc., and | ) | |
| | ) | |
| DAVID ROMAN, individually and as an officer | ) | |
| or manager of Lifewatch Inc., Safe Home Security, | ) | |
| Inc., and Medguard Alert, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.      BACKGROUND ........................................................................................................ 3

     A.     Defendants' Deceptive and Abusive Telemarketing Calls. ...................................4

     B.     Defendants' Knowledge of Their Telemarketers' Practices. ...................................5

     C.     Sirlin and Lifewatch Bring on New Partners. ...........................................................7

     D.     Defendants Expand Their Deceptive and Abusive Telemarketing Practices. .........9

II.     LEGAL STANDARD ............................................................................................ 11

III.    ARGUMENT ......................................................................................................... 11

     A.     Defendants Violated Section 5(a) of the FTC Act and the FDUTPA (Counts I and X)…..... ...........................................................................................................................12

     B.     Defendants Are Liable for the Conduct of Their Telemarketers. ..........................14

          1.     Defendants' Telemarketers Acted on Defendants' Behalf. ...................... 15

          2.     Defendants' Telemarketers Are Subject to Defendants' Control. ............ 18

          3.     Defendants' Ineffective Efforts to Police Their Telemarketers. .............. 18

     C.     Defendants' Violated the TSR (Counts II-IX). ......................................................20

          1.     Defendants Violated Section 310.3 of the TSR (Count II). ...................... 20

          2.     Defendants' Violated Multiple Sections of the TSR (Counts IV-VIII). .... 21

               a)     Defendants violated Section 310.4(a)(8) of the TSR (Count VI). 21

               b)     Defendants violated Section 310.4(b) of the TSR (Counts IV, V, VII, and VIII). ........................................................................................ 22

                    (1)     Defendants violated Section 310.4(b)(1)(iii)(A) of the TSR (Count V). .................................................................................. 23

                    (2)     Defendants violated Section 310.4(b)(1)(iii)(B) of the TSR (Count IV). ................................................................................. 23

                    (3)     Defendants violated Section 310.4(b)(1)(v)(A) of the TSR (Count VII)................................................................................ 24

(4)    Defendants violated Sections 310.4(b)(1)(v)(B)(ii) and (d) of the TSR (Count VIII)............................................................... 24

c)    Defendants violated Section 310.3(b) of the TSR (Counts III and IX)…… ................................................................................... 25

D.    Defendants Sirlin, May, and Roman are Individually Liable. ..............................27

1.    Sirlin is Individually Liable. .................................................... 28

2.    May is Individually Liable...................................................... 29

3.    Roman is Individually Liable................................................... 30

E.    Defendants Operated as a Common Enterprise. ....................................................31

F.    Defendants are Liable for Injunctive and Equitable Monetary Relief.................32

1.    The Court Should Enter a Permanent Injunction. ..................................... 33

2.    The Court Should Award Equitable Monetary Relief. ............................ 35

IV.    EACH OF DEFENDANTS' AFFIRMATIVE DEFENSES FAILS ............................... 36

V.    CONCLUSION.................................................................................. 38

# TABLE OF AUTHORITIES

## CASES

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013)...................................... 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 11

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979)........................................................................ 33, 34

*Felix v. Wis. DOT*, 828 F.3d 560 (7th Cir. 2016) ......................................................................... 36

*FTC v. 120194 Canada, Ltd.*, No. 04 C 7204, 2007 U.S. Dist. LEXIS 12657 (N.D. Ill. Feb. 12, 2007) .................................................................................................................................. 11, 31

*FTC v. Amy Travel*, 875 F.2d 564 (7th Cir. 1989)............................................................. 27, 33, 35

*FTC v. Asia Pac. Telecom, Inc.*, 802 F. Supp. 2d 925 (N.D. Ill. 2011) ........................................ 11

*FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627 (7th Cir. 2005)..................... 11, 12, 13, 27, 31

*FTC v. Bay Area Bus. Council, Inc.*, No. 02 C 5762, 2003 U.S. Dist. LEXIS 7261 (N.D. Ill. Apr. 30, 2003) ...................................................................................................................................... 38

*FTC v. Chapman*, 714 F.3d 1211 (10th Cir. 2013)................................................................. 25, 26

*FTC v. Cleverlink Trading Ltd.*, 519 F. Supp. 2d 784 (N.D. Ill. 2007) ....................................... 11

*FTC v. Consumer Alliance, Inc.*, No. 02 C 2429, 2003 U.S. Dist. LEXIS 17423 (N.D. Ill. Sep. 29, 2003) ...................................................................................................................................... 11

*FTC v. Credit Bureau Ctr., LLC*, 235 F. Supp. 3d 1054 (N.D. Ill. 2017)..................................... 15

*FTC v. Dalbey*, No. 11-cv-1396-RBJ-KLM, 2012 U.S. Dist. LEXIS 67393 (D. Colo. May 15, 2012) ...................................................................................................................................... 36

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997)....................................................................... 33, 35

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 200)........................................ 19

*FTC v. Free Commc'ns.*, Inc., 401 F.3d 1192 (10th Cir. 2005)..................................................... 13

*FTC v. Gem Merch. Corp.*, 87 F. 3d 466 (11th Cir. 1996) ......................................................... 27

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ............................................................................. 34

*FTC v. HES Merch. Servs. Co., Inc.,* No. 6:12-cv-1618-OR1-22KRS, 2014 U.S. Dist. LEXIS 171292 (M.D. Fla. Nov. 18, 2014) .......................................................................................... 25, 26

*FTC v. HES Merch. Servs. Co.*, No. 6:12-cv-1618-Orl-22KRS, 2015 U.S. Dist. LEXIS 28039 (M.D. Fla. Feb. 11, 2015) ................................................................................................. 35

*FTC v. Inc21.com Corp.*, 688 F. Supp. 2d 927 (N.D. Cal. 2010) ................................................ 15

*FTC v. Info. Mgmt. Forum, Inc.*, No. 6:12-cv-986-Orl-28KRS, 2013 U.S. Dist. LEXIS 91242 (M.D. Fla. June 28, 2013) ........................................................................................... 12

*FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM (GWF), 2011 U.S. Dist. LEXIS 65835 (D. Nev. Jun. 20, 2011) ................................................................................................................ 36

*FTC v. J. William Enterprises, LLC*, No. 6:16-cv-2123-Orl-31DCI, 2017 WL 4776669 (M.D. Fla. Oct. 23, 2017) ............................................................................................................... 37

*FTC v. Kutzner*, SA CV 16-00999-BRO (AFMx), 2017 U.S. Dist. LEXIS 174299 (C.D. Cal. Sep. 5, 2017) ............................................................................................................... 36

*FTC v. Lifewatch*, 176 F. Supp. 3d 757 (N.D. Ill. 2016) .......................... 10, 12, 15, 19, 21, 22, 38

*FTC v. Mortg. Relief Advocates LLC*, No. CV-14-5434-MWF (AGRx), 2015 U.S. Dist. LEXIS 186809 (C.D. Cal. Jul. 1, 2015) ..................................................................................... 32

*FTC v. NHS Sys.*, 936 F. Supp. 2d 520 (E.D. Pa. 2013) ............................................................ 35

*FTC v. Oks*, No. 05 C 5389, 2007 U.S. Dist. LEXIS 82170 (N.D. Ill. Nov. 2, 2007) ................ 11

*FTC v. Pac. First Benefit*, LLC, 472 F. Supp. 2d 974 (N.D. Ill. 2007) ...................................... 11

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ................................................................ 13

*FTC v. Partners in Health Care Ass'n*, 189 F. Supp. 3d 1356 (S.D. Fla. May 31, 2016) ...... 25, 26

*FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205 (D. Nev. 2010) ............................... 15

*FTC v. Seismic Entm't Prods., Inc.*, 441 F. Supp. 2d 349 (D.N.H. 2006) .................................. 27

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ....................................................................... 15

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000), aff'd, 312 F.3d 259 (7th Cir. 2002) .................................................................................................. 11, 13, 34

*FTC v. Trudeau*, 579 F.3d 754 (7th Cir. 2009) ........................................................................... 35

*FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) ..................... 13, 32

*FTC v. Windward Mktg.,* No. 1:96-CV-615-FHH, 1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Sept. 30, 1997) ................................................................................................................ 27

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) .......................................... 11, 12, 27

*FTC v. World Travel*, 861 F.2d 1020 (7th Cir. 1988) ............................................................ 13, 14

*FTC v. WV Universal Mgmt.*, LLC, No. 16-17727, 2017 U.S. App. LEXIS 25101 (11th Cir. 2017) ............................................................................................................................ 26

*FTC v. Worldwide Info Services, Inc.*, Case No. 6:14-CV-8-ORL 28DAB (M.D. Fla. Filed Jan. 6, 2014) ............................................................................................................................ 4, 34

*Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286 (7th Cir. 1989) .................................. 37

*Jones v. UPR Prods.*, No. 14 C 1248, 2015 U.S. LEXIS 69595 (N.D. Ill. May 29, 2015) .......... 37

*Kalwajtys v. FTC*, 237 F.2d 654 (7th Cir. 1956) .................................................................... 13

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ................................................................................ 37

*Kraft, Inc. v. FTC,* 970 F.2d 311 (7th Cir. 1992) ............................................................... 12, 13

*Life Alert Emergency Response, Inc. v. Lifewatch, Inc.*, 601 Fed Appx. 469, 2015 U.S. App. LEXIS 1760 (9th Cir. Feb. 4, 2015) .................................................................................. 6

*NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A&A Drug Co.*, 736 F.3d 1054 (7th Cir. 2013) ...................................................................................................... 15

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F. 3d 1016 (9th Cir. 2006) ............................................................................................................................ 37, 38

*Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034 (N.D. Ill. 2014)..................... 37

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ......................................................................... 38

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) .................................................................... 33

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)............................................ 33

*Standard Distribs., Inc. v. FTC*, 211 F.2d 7 (2nd Cir. 1954).............................................. 15, 19

*State of Indiana v. Elite Information Solutions, Inc.*, Cause No. 49D06-1208-MI-032415 (Marion Sup. Ct. Ind.)................................................................................................................... 6

*Sterling Drug, Inc. v. FTC*, 741 F.2d 1146 (9th Cir. 1984) ..................................................... 13

*U.S. v. Dish Network, LLC*, No. 09-3073, 2017 U.S. Dist. LEXIS 85543 (C.D. Ill. Jun. 5, 2017) ............................................................................................................................ 33, 34

*U.S. v. Dish Network, LLC*, 75 F. Supp. 3d 942 (C.D. Ill. 2014) ............................................ 36

*U.S. v. Dish Network, LLC*, No. 09-3073, 2014 U.S. Dist. LEXIS 172020 (C.D. Ill. Dec. 12, 2014) ............................................................................................................................ 22

*U.S. v. Dish Network, LLC*, 667 F. Supp. 2d 952 (C.D. Ill 2009) ................................................ 22

*U.S. ex rel. Perez v. Stericycle, Inc.*, No. 08 C 2390, 2014 U.S. Dist. LEXIS 32480 (N.D. Ill. Mar. 12, 2014) ..................................................................................................................... 37

## <u>STATUTES</u>

15 U.S.C. § 45(a) ............................................................................................................................ 12

15 U.S.C. § 45(a)(1) ....................................................................................................................... 12

15 U.S.C. § 53(b) ..................................................................................................................... 33, 36

15 U.S.C. § 6102(c) ........................................................................................................................ 12

28 U.S.C. § 2462 ............................................................................................................................. 37

Fla. Stat. § 95.11(3)(f) .................................................................................................................... 36

Fla. Stat. § 501.204 ........................................................................................................................ 12

Fla. Stat. § 501.204(1) .................................................................................................................... 12

Fla. Stat. § 501.204(2) .................................................................................................................... 12

Fla. Stat. § 501.207 ........................................................................................................................ 36

Fla. Stat. § 501.207(1)(b)-(c) ......................................................................................................... 33

Fla. Stat. § 501.207(3) .................................................................................................................... 33

## <u>OTHER AUTHORITIES</u>

*Restatement (Third) of Agency* (2006) ..................................................................................... 15, 17

## <u>RULES</u>

Fed. R. Civ. P. 56(c) ....................................................................................................................... 11

## <u>REGULATIONS</u>

16 C.F.R. § 310.1 ............................................................................................................................ 12

16 C.F.R. § 310.2(dd) ..................................................................................................................... 20

16 C.F.R. § 310.2(ff) ...................................................................................................................... 20

16 C.F.R. § 310.2(gg) ..................................................................................................................... 20

16 C.F.R. § 310.3(a)(2)(iv) ................................................................................. 20

16 C.F.R. § 310.3(a)(2)(vii) ................................................................................ 20

16 C.F.R. § 310.3(a)(4) ....................................................................................... 20

16 C.F.R. § 310.3(b) ........................................................................................... 25

16 C.F.R. § 310.4(a)(8) ....................................................................................... 21

16 C.F.R. § 310.4(b) ........................................................................................... 22

16 C.F.R. § 310.4(b)(1)(iii)(A) ........................................................................... 23

16 C.F.R. § 310.4(b)(1)(iii)(B) ........................................................................... 23

16 C.F.R. § 310.4(b)(1)(v)(A) ............................................................................ 24

16 C.F.R. § 310.4(b)(1)(v)(B)(ii) ....................................................................... 24

16 C.F.R. § 310.4(b)(3) ....................................................................................... 38

16 C.F.R. § 310.4(d) ........................................................................................... 25

The overwhelming and undisputed facts demonstrate that Defendants organized, controlled, and participated in a deceptive and abusive telemarketing campaign designed to convince elderly and disabled consumers to buy their medical alert devices and services.  In just five years, consumers paid more than $█████████ because of Defendants' illegal telemarketing.  After allowing expedited discovery and conducting an evidentiary hearing at which Defendants' President and Director of Operations testified, the Court found that Plaintiffs had established a likelihood of success on the merits and entered a preliminary injunction.  Since that time, Plaintiffs' case has only gotten stronger.  As demonstrated below, there are no disputed issues of material fact and Plaintiffs are entitled to judgment as a matter of law.  The Federal Trade Commission and State of Florida therefore now ask that the Court enter summary judgment in their favor on all claims in their Amended Complaint.

The undisputed facts show that Defendants for many years engaged in both illegal and deceptive telemarketing practices.  The overwhelming and undisputed evidence demonstrates that Defendants are responsible for blasting millions of illegal robocalls every day containing blatant misrepresentations.  In addition, the evidence shows that Defendants illegally masked their caller IDs to make it appear the calls were coming from a local or trusted source and ignored whether the numbers they called were on the National Do Not Call Registry or were to consumers who had already asked to be put on an internal Do Not Call list.

Defendants' illegal robocalls also contained a series of blatant lies.  The robocalls indicated, for example, that Defendants' medical alert device and monitoring service were free because the consumer's friend, family member, or health care professional ordered it for them and that the consumer only needed to respond to the message to arrange delivery.  The messages also claimed that well-known health organizations like the American Heart Association,

American Diabetes Association, or National Institute of Aging have specifically endorsed Defendants' product. Defendants now acknowledge that was false.

When consumers pressed one to speak to someone about the robocall's offer, Defendants' telemarketers reiterated the false claims in the robocall and made additional misrepresentations. Although consumers sometimes learned from the telemarketers that Defendants' monitoring service required the payment of a monthly fee, they were told that they could test the device first and that they would not be billed until the monitoring service was activated. That, too, was false because Defendants charged consumers' credit cards almost immediately. The telemarketers also represented that consumers could cancel the service at any time without any further financial obligation, but that was false because canceling consumers had to either ship the medical alert device back to Defendants at substantial cost or pay a $400 fee.

The undisputed facts further establish that Defendants not only knew that their telemarketers were engaging in this illegal conduct, but that Defendants directed the activities of the telemarketers and were involved in every aspect of the deceptive and abusive practices. Defendants instructed the telemarketers to make the deceptive claims, drafting and editing scripts they provided to the telemarketers that contained all of the misrepresentations alleged in this case. Moreover, the telemarketers' abusive and deceptive conduct was made possible only by the substantial assistance and support Defendants provided, even in the face of lawsuits and government actions brought against both Defendants and their telemarketers. Indeed, Defendants' substantial assistance to their telemarketers, by itself, is sufficient to hold Defendants jointly and severally liable for the entire amount consumers paid Defendants because of their illegal telemarketing.

Given the widespread nature of Defendants' practices, and their persistence despite

knowing that the conduct was illegal, this Court should grant Plaintiffs' motion for summary judgment and enter a permanent injunction that, among other things, bans Defendants from telemarketing, and from selling medical alert devices or services in any manner. The Court should also impose a monetary judgment of $███,███,███, the minimum amount consumers lost because of Defendants' unlawful practices.

## I.    BACKGROUND

Lifewatch, Inc., also doing business as Lifewatch USA and Medical Alarm Systems, provides medical alert devices and services to the elderly and disabled. These services typically include a medical alert device, which is a wearable pendant or bracelet, that sends an alert to a monitoring service when activated by the consumer. The monitoring service then dispatches help to the consumer's home.

Defendant Evan Sirlin is the President of Lifewatch and in late 2011, he embarked on a plan to increase Lifewatch's revenue through telemarketing. To that end, Lifewatch engaged hundreds of call centers to market its medical alert devices and monitoring services. From the beginning, Lifewatch worked hand in glove with the telemarketers to implement its scheme. Lifewatch provided the call centers with misleading scripts, financial assistance, verification and activation support, and customer service. (Plaintiffs' Statement of Material Facts ("PSMF") 49, 53, 54, 59, 63, 64.)

The largest and most prominent telemarketer Lifewatch hired was Worldwide Info Services, Inc., and its related companies ("Worldwide"). (PSMF 8.) By early 2012, Worldwide was blasting millions of deceptive and illegal robocalls every day on Lifewatch's behalf, often to seniors who were in poor health, suffered from memory loss or dementia, or relied on family members, friends, or health professionals to manage their finances and make health-related

decisions for them.  (PSMF 33.)  But Worldwide was far from the only telemarketer Lifewatch

employed.  In fact, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████[1]  The FTC and State of Florida sued and ultimately shut down Worldwide in a separate

proceeding commenced in January 2014,[2] but Lifewatch's illegal practices continued through

other telemarketers.

### A.      Defendants' Deceptive and Abusive Telemarketing Calls.

When consumers answered a call from one of Defendants' telemarketers, they heard a

prerecorded message, often sounding as if it were a live person.  They frequently only answered

the call in the first place because their caller identification displayed a local number or other

familiar entity.  (PSMF 31.)  Consumers received Defendants' telemarketing calls even though

they were on the National Do Not Call Registry, and even after they had asked to be removed

from the call list after answering a previous call.  (PSMF 27, 29.)  The robocalls never identified

who was making the call, that Defendants were trying to sell something to consumers, or

anything about how much consumers would end up paying for Defendants' offer.

The robocall messages consumers heard included a series of misrepresentations.

Consumers were told that a medical alert system had been purchased for them by a friend, family

member, or doctor, or that the system was available to senior citizens for "free" or at "no cost."

(PSMF 9.)  In fact, no one had purchased anything for these consumers, and they would be billed

$34.95 or more per month if they accepted Defendants' offer.  (PSMF 10.)  In numerous

instances, the prerecorded message also stated that the American Heart Association, American

Diabetes Association, and/or some other nonprofit organization or healthcare providers were

---

[1] PX 97, Declaration of Nathaniel Al-Najjar, Att. E (FTC-LW16-78-119; FTC-LW16-994-1019).
[2] *FTC v. Worldwide Info Services, Inc.,* Case No. 6:14-CV-8-ORL 28DAB (M.D. Fla. Filed Jan. 6, 2014).

urging senior citizens to obtain Defendants' medical alert systems (PSMF 13), which Defendants acknowledge was not true. (PSMF 10.) At the end of the message, the consumer was instructed to press "1" if they were interested in the offer or to press another number to be removed from the telemarketer's call list. If consumers pressed "1," they were connected to a live telemarketer. If they pressed another number, they were, at most, removed temporarily from the list used by that particular call center but not any call lists maintained by Lifewatch or any of its other telemarketers. (PSMF 29.)

Once connected with a live telemarketer, consumers received a high-pressure sales pitch that reinforced the statements made in the deceptive robocall message. In many cases, the consumers were told that although a doctor, friend, or family member had referred the consumer to Defendants, Defendants were not allowed to identify the individual "for privacy reasons." (PSMF 9, 12.) The telemarketers further reassured the consumers that they would not be charged until they received and activated the device (PSMF 17), but consumers were actually charged almost immediately. (PSMF 18.) Finally, the telemarketer told the consumers that they could cancel the service at any time without further financial obligation (PSMF 21), failing to mention that the consumers must either return the device to Defendants at their own expense, or pay $400 to avoid being charged every month. (PSMF 22.) Based on these representations, and the unscrupulous tactics of the telemarketers, many elderly and disabled consumers purchased Defendants' medical alert system. (PSMF 11, 15, 19, 23.)

### B.      Defendants' Knowledge of Their Telemarketers' Practices.

Almost immediately after Lifewatch began implementing its telemarketing scheme in early 2012, consumer complaints about Lifewatch's deceptive and abusive telemarketing practices began to pour in to local Better Business Bureaus, State Attorneys General, the media,

trade organizations, the FTC, Lifewatch's business partners, and Lifewatch itself. Consumers who actually purchased Lifewatch's medical alert services complained of the misleading statements and high-pressure sales tactics of the live telemarketers. (PSMF 11, 15, 19, 23.) Not surprisingly, Defendants' customers initiated chargebacks at astronomical rates. (PSMF 25.)

By the middle of 2012, both governmental and private entities had commenced legal actions against Lifewatch's telemarketers, as well as against Lifewatch itself, for their deceptive and abusive telemarketing practices. Many more actions followed. (PSMF 38.) Yet none of this deterred Lifewatch. Instead, despite providing its call centers with misleading scripts and other assistance, Lifewatch consistently responded to the lawsuits by blaming its telemarketers, asserting that they were independent contractors that were not under Lifewatch's control.[3] The Ninth Circuit explicitly rejected this spurious argument in a suit brought against Lifewatch by one of its competitors, stating:

> At bottom, Lifewatch would have us believe that any infringement is traceable to actions by telemarketers for which it has no responsibility. The district court did not buy this story of telemarketers-gone-rogue, and neither do we.

*Life Alert Emergency Response, Inc. v. Lifewatch, Inc.*, 601 Fed Appx. 469, 474, 2015 U.S. App. LEXIS 1760, at *9 (9th Cir. Feb. 4, 2015). Yet, Defendants have persisted in relying on this defense in a host of other lawsuits, including this one. Indeed, far from going "rogue," Defendants' telemarketers have continued their deceptive and abusive telemarketing practices precisely because Defendants have told them to do so. (PSMF 12, 16, 20, 24, 47-51, 59.)

By April 2013, consumer complaints became so numerous that the board of the Medical Alert Monitoring Association ("MAMA"), the professional trade association that represents the

---

[3] *See, e.g.,* Dkt. 24-1 at 57-58, PX 5, Bradley Dec. Att. C (Declaration of Evan Sirlin dated Nov. 14, 2014, filed in *State of Indiana v. Elite Information Solutions, Inc.*, Cause No. 49D06-1208-MI-032415 (Marion Sup. Ct. Ind.).

medical alert monitoring and personal emergency response services industry, began warning its members about robocalling, and, in particular, Lifewatch's role in the illegal activities.[4]  MAMA ultimately issued a consumer alert about illegal telemarketing of medical alert devices on May 7, 2013.[5]

Despite the constant consumer complaints and litigation, Lifewatch continued to work with the offending telemarketers.  (PSMF 65.)  Indeed, Sirlin knew from the beginning that Worldwide and other Lifewatch telemarketers were blatantly violating the law, yet he continued to use them to peddle Lifewatch's services.  (PSMF 50, 80-87.)  Lifewatch generated significant revenue from these telemarketers, increasing its revenue from less than $3.8 million in 2011 to more than $37 million in 2013.  (PSMF 106.)  Defendants even touted to potential buyers and investors Lifewatch's dominance in selling medical alert systems through telemarketing.  (PSMF 43-45.)

Lifewatch's telemarketing was so successful that it generated far more customer accounts than Defendants could handle themselves.  They, therefore, began to sell customer accounts in bulk to competitors such as Connect America and Phillips Lifeline.  (PSMF 57.)  Defendants sold nearly 40,000 customer accounts obtained through its telemarketing network to Connect America before Connect America terminated the sales because chargebacks were exceeding new sales, and because it had become aware of Defendants' pervasive illegal conduct.[6]

## C.  Sirlin and Lifewatch Bring on New Partners.

In late 2012, Sirlin began looking to either sell Lifewatch, or to attract new investors. Sirlin brought in Defendant Mitchel May to help in this effort, and to help manage Lifewatch.

---

[4] *See* Dkt. 24-9 at 70, PX 13 Gross Dec. Att. D.
[5] PX 97, Al-Najjar Dec. Att. C (FTC-LW09-1526).
[6] PX 97, Al-Najjar Dec. Att. E (FTC-LW16-2499-2500 (4/1/13 email from Connect America to Sirlin, May, and Roman, forwarding email from Connect America controller to Lifewatch)).

(PSMF 88-89.)  Ultimately, Defendant David Roman agreed to purchase the majority of Lifewatch's stock, and Lifewatch's business operations were thereafter integrated with two of Roman's companies, Safe Home Security, Inc., and MedGuard Alert, Inc.  (PSMF 67, 94-103.) From the beginning, Roman and May were well aware that Lifewatch's telemarketers were engaged in deceptive and abusive telemarketing practices, as Sirlin had long known.  (PSMF 75, 90.)  Yet none of the three individuals stopped these practices.  Indeed, the exact opposite occurred – all three participated in ensuring that the illegal telemarketing practices continued, as they brought on scores of new telemarketers that engaged in the same or similar conduct. (PSMF 69, 81, 88.)

        Sirlin continued to focus on expanding Defendants' telemarketing network and was in constant contact with the telemarketers.  (PSMF 82.)  Sirlin also acted as the interface between the telemarketers and the third parties buying medical alert contracts from Defendants.  (PSMF 83.)  May worked directly with the telemarketers and oversaw the day-to-day functions of Lifewatch's operations to ensure that the sales continued, including communicating directly with telemarketers.  (PSMF 89.)  Roman exercised complete authority over every financial decision (PSMF 73, 74), and oversaw every aspect of Defendants' business activities, including telemarketing.  (PSMF 69, 70.)  He directed Safe Home, MedGuard, and Lifewatch employees on how to interact with the telemarketers and directed every aspect of Defendants' marketing, customer service, fulfillment, and back-office operations.  (PSMF 67, 68, 71, 72.)  All three individuals met with Worldwide's principal, Roderic Boling, on more than one occasion and toured Worldwide's facility.[7]

        Safe Home and MedGuard also began to participate directly in Lifewatch's illegal conduct.  (PSMF 98.)  Employees were swapped back and forth between and among the

─────────────

[7] PX 93, Declaration of Roderic Boling ¶¶ 49, 51-52.

companies at a dizzying pace and frequently were treated as if they worked for two – or even all three – of the companies at once.  (PSMF 95-96.)  Safe Home provided the funds necessary to keep Lifewatch operating, including paying, or providing the funds to allow Lifewatch to pay, millions of dollars to the telemarketers.  (PSMF 103.)  Safe Home also charged any consumers who agreed with a telemarketer to purchase Defendants' services, and Safe Home also typically handled consumers' calls to customer service.  (PSMF 99.)   For its part, MedGuard provided customer service, billed customers, and managed collections.  (PSMF 99, 100.)  It also handled the "verification" of consumers' purchases by receiving live transfers from the telemarketers of calls from consumers who agreed to purchase Defendants' services.[8]  MedGuard also "purchased" customer accounts from Lifewatch – albeit at far below market rates.  (PSMF 105.) MedGuard's name and address have now been substituted for Lifewatch on Lifewatch's website.[9]

### D.      Defendants Expand Their Deceptive and Abusive Telemarketing Practices.

As noted, Plaintiffs sued Worldwide in January 2014, which had the effect of halting Worldwide's operations.  Worldwide worked exclusively for Lifewatch and was its largest telemarketer by volume.   (PSMF 8, 56.)  Once Worldwide ceased to operate, Defendants were less concerned about Worldwide's illegal conduct than about how to make up for Worldwide's lost sales volume.[10]

Defendants hired new telemarketers, most of whom reported to state licensing authorities that they telemarketed medical alert systems only for Defendants, or that they used Defendants' scripts and followed procedures Defendants mandated.  (PSMF 58.)  Naturally, the new

---

[8] Prior to MedGuard's involvement, the telemarketers had conducted the "verifications" themselves using a script that Defendants provided.

[9] *See* http://www.lifewatch-usa.com (last visited Dec. 22, 2017).

[10] PX 97, Al-Najjar Dec. Att. E (FTC-LW16-4280 (███████████████████████████████████████ ███████████████████████████████████████ )).

telemarketers engaged in the same deceptive and abusive practices. (PSMF 39.) Consumer complaints and lawsuits continued, and Defendants failed to take any steps to ensure that the telemarketers did not engage in deceptive and abusive telemarketing practices. On the contrary, Defendants continued to affirmatively assist the telemarketers by providing them with misleading scripts, financial assistance, verification, and activation support. (PSMF 59, 63-65.)

As a result, Plaintiffs filed suit against Sirlin and Lifewatch in June 2015. After allowing expedited discovery and conducting an evidentiary hearing, this Court ruled that Plaintiffs were entitled to a preliminary injunction because the evidence showed that Plaintiffs were likely to succeed on the merits of their claims that Defendants had engaged in deceptive and abusive telemarketing practices in violation of the FTC Act, the TSR, and the FDUTPA. *FTC v. Lifewatch*, 176 F. Supp. 3d 757 (N.D. Ill. 2016). Plaintiffs thereafter amended their Complaint in June 2016, to include Roman, Safe Home, MedGuard, and May.[11]

Evidence adduced during the intervening eighteen months of discovery has strengthened Plaintiffs' case and further revealed that Defendants' knew exactly what their telemarketers were up to, and indeed, that Defendants themselves were orchestrating the scheme. Hundreds of thousands of Defendants' own emails - only a fraction of which have been included as evidence in support of Plaintiffs' motion - demonstrate that the Defendants drafted, edited, and disseminated the telemarketing scripts and "Call Center Welcome Packages" used by their telemarketers. (PSMF 59.) Plaintiffs also located thousands of additional emails between Defendants and their telemarketers showing that Defendants were well aware that their telemarketers were engaged in rampant illegal conduct, and in most cases, that Defendants were orchestrating the conduct. (PSMF 11, 12, 15, 16, 19, 20, 23, 24, 48-50.) These, combined with declarations and documents from third parties, including emails from one of Defendants'

---

[11] Dkt. No. 165 (July 14, 2016).

brokers, and deposition testimony from Defendants and one of their key employees, demonstrate that the deceptive and abusive telemarketing practices were far from the work of a rare rogue telemarketer or call center, but depended on Defendants' active participation, encouragement, and coordination.

## II.    LEGAL STANDARD

Summary judgment should be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).   The party moving for summary judgment bears the initial burden of proving there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "[A] genuine issue for trial only exists where there is sufficient evidence favoring the non-movant for a jury to return a verdict for that party."  *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 996 (7th Cir. 2000).  Courts in this Circuit have routinely entered summary judgment in favor of the FTC on claims identical to the ones asserted here.[12]

## III.    ARGUMENT

Plaintiffs are entitled to summary judgment on all of their claims because the undisputed facts demonstrate that Defendants engaged in deceptive and abusive telemarketing practices that

---

[12] *See also FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) (affirming summary judgment for Plaintiff FTC); *FTC v. World Media Brokers*, 415 F.3d 758, 763 (7th Cir. 2005) (same); *FTC v. Asia Pac. Telecom, Inc.*, 802 F. Supp. 2d 925, 928 (N.D. Ill. 2011) (MJ Denlow) (granting in part and denying in part FTC's motion for summary judgment); *FTC v. Oks*, No. 05 C 5389, 2007 U.S. Dist. LEXIS 82170, at *7 (N.D. Ill. Nov. 2, 2007) (J. Guzman) (same); *FTC v. Cleverlink Trading Ltd.*, 519 F. Supp. 2d 784, 792 (N.D. Ill. 2007) (J. Kendall) (granting FTC's motion for summary judgment); *FTC v. 120194 Canada, Ltd.*, No. 04 C 7204, 2007 U.S. Dist. LEXIS 12657, at *6-8 (N.D. Ill. Feb. 12, 2007) (J. Gottschall) (same); *FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974, 978 (N.D. Ill. 2007) (J. Norgle) (same); *FTC v. Consumer Alliance, Inc.*, No. 02 C 2429, 2003 U.S. Dist. LEXIS 17423, at *6-7 (N.D. Ill. Sep. 29, 2003) (J. Guzman) (granting in part and denying in part FTC's motion for summary judgment).

violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 501.204 of the FDUTPA,

Chapter 501, Part II, Florida Statutes (2017), and multiple provisions of the TSR, 16 C.F.R. Part

310.

**A.      Defendants Violated Section 5(a) of the FTC Act and the FDUTPA (Counts I and X).**

The uncontroverted evidence demonstrates that Defendants made material

misrepresentations to consumers in violation of Section 5(a) of the FTC Act and the FDUTPA.[13]

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting

commerce."  15 U.S.C. § 45(a)(1).  The FDUPTA similarly prohibits "unfair or deceptive acts or

practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  *See also* §

501.204(2) ("due consideration and great weight shall be given to the interpretations of the

Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade

Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017.");  *see also FTC v. Info. Mgmt. Forum,*

*Inc.*, No. 6:12-cv-986-Orl-28KRS, 2013 U.S. Dist. LEXIS 91242, at *5 (M.D. Fla. June 28,

2013) ("Conduct that constitutes a 'deceptive act or practice' or an 'unfair act or practice' under

the FTC Act is a violation of FDUTPA.").

An act or practice is deceptive if it involves a material misrepresentation or omission that

is likely to mislead consumers acting reasonably under the circumstances.  *FTC v. Bay Area Bus.*

*Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005); *see also FTC v. World Media Brokers*, 415 F.3d

758, 763 (7th Cir. 2005); *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992); *Lifewatch*, 176 F.

Supp. 3d at 779.  A representation is considered material if it involves information that is likely

to affect a consumer's choice of, or conduct regarding, a product or service.  *See Kraft, Inc.*, 970

---

[13] Further, any violation of the TSR is deemed a "deceptive act or practice" in violation of Section 5(a) of
the FTC Act.  15 U.S.C. § 6102(c); 16 C.F.R. § 310.1.  As discussed more fully below, the undisputed
facts demonstrate that Defendants violated multiple provisions of the TSR.  They are therefore liable
under the FTC Act for those violations.

F.2d at 322; *see also Kalwajtys v. FTC*, 237 F.2d 654, 656 (7th Cir. 1956). Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994).

In determining whether a practice is likely to mislead consumers acting reasonably, courts consider the likely effect of a representation on the mind of an ordinary consumer, *see Bay Area*, 423 F.3d at 635 (citing *FTC v. Free Commc'ns.*, Inc., 401 F.3d 1192, 1202 (10th Cir. 2005)), and the overall net impression the statement creates. *Kraft*, 970 F.2d at 322; *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984). The overall net impression is analyzed from the perspective of the target audience – in this case, elderly or disabled consumers. *See Kalwajtys*, 237 F.2d at 656; *FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012); *Think Achievement*, 144 F. Supp. 2d at 1010. Reliance on express claims, or deliberately made implied claims, is considered presumptively reasonable. *See FTC v. World Travel*, 861 F.2d 1020, 1029 (7th Cir. 1988). The FTC need not demonstrate that Defendants had an affirmative intent to deceive. *Id.*

The uncontroverted evidence shows that Defendants' telemarketers made several express misrepresentations that were material and likely to mislead elderly or disabled consumers in their decision to purchase Defendants' services. First, as evidenced by the scripts, transcripts of recorded robocalls and conversations with Defendants' telemarketers, as well as consumer declarations, Defendants falsely stated that the device was free because someone the consumer knows, typically her doctor, a friend, or a family member, either has already purchased the service for her or recommended that the consumer purchase the service. (PSMF 9.) Defendants know this is not true. (PSMF 10.) Second, Defendants scripts emphasize, and consumer declarations confirm, that Defendants represented that major health organizations and tens of

13

thousands of health care professionals endorsed Defendants' medical alert device. (PSMF 13.) Defendants now admit that no such endorsements exist. (PSMF 14.) Third, Defendants are aware that their telemarketers routinely told consumers that they would not be charged until they received and activated Defendants' device – a claim also contained in the scripts Defendants provided to their telemarketers. (PSMF 17, 20.) In fact, consumers were not only charged immediately, but thousands continued to be charged even though they never activated their devices. (PSMF 18.) Finally, Defendants' scripts emphasize that consumers could cancel Defendants' medical alert services at any time without further financial obligation. (PSMF 21.) Instead, consumers had to either return the device to Defendants at their own expense, or pay $400 to avoid further monthly charges. (PSMF 22.) Consumers reasonably relied on, and were misled by, these express claims. (PSMF 11, 15, 19, 23.)

Because Plaintiffs have established that a particular claim has been "widely disseminated," the burden shifts to Defendants to show that consumers did not rely on the claim. *World Travel*, 861 F.2d at 1029. Defendants have wholly failed to meet that burden here, as they did not produce anything in discovery from a single consumer who purchased Defendants' products and services but did not rely on the false claims. Nor have Defendants identified such a consumer in their disclosures pursuant to Fed. R. Civ. P. 26(a)(1).[14]

**B.     Defendants Are Liable for the Conduct of Their Telemarketers.**

The telemarketers that made the deceptive calls marketing Defendants' medical alert devices and services were Defendants' agents. Courts in FTC and Attorney General cases have consistently held that principals such as Defendants are liable for the deceptive acts and practices

---

[14] Other than vague, self-serving testimony such as Sirlin stating that Defendants did not want "bad business," *see* Transcript of December 14, 2015, Preliminary Injunction Hearing at 147, Defendants have not produced any evidence that any customer would have purchased their services but for the Defendants' illegal tactics and misrepresentations.

of their agents. *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) (defendant liable for misrepresentations of agent it hired to market wealth building program); *Standard Distribs., Inc. v. FTC*, 211 F.2d 7, 13 (2nd Cir. 1954) (defendant liable for sales agents' misrepresentations); *FTC v. Credit Bureau Ctr., LLC*, 235 F. Supp. 3d 1054, 1060 (N.D. Ill. 2017) (J. Kennelly); *Lifewatch*, 176 F. Supp. 3d at 773; *FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1223 (D. Nev. 2010) (principal liable for misrepresentations of agent within scope of agents' actual or apparent authority); *FTC v. Inc21.com Corp.*, 688 F. Supp. 2d 927, 939 (N.D. Cal. 2010) (defendants liable for misrepresentations made by foreign call centers).

In determining whether an agency relationship exists, courts look to the federal common law of agency, s*ee Lifewatch*, 176 F. Supp. 3d at 773 (citing *NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A&A Drug Co.*, 736 F.3d 1054, 1058 (7th Cir. 2013)), which follows the Restatement of Agency. *Id.* The Restatement defines agency as a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act." *Restatement (Third) of Agency* § 1.01 (2006). How the parties characterize their relationship is not controlling. *Id.* § 1.02. Thus, in deciding questions of agency, courts look to (1) whether the party acted on the principal's behalf, and (2) whether the agent was subject to the principal's control. *Lifewatch*, 176 F. Supp. at 773. In this case, the telemarketers acted on Defendants' behalf and were subject to their control.

### 1. Defendants' Telemarketers Acted on Defendants' Behalf.

The undisputed evidence—Defendants' contracts, exclusive arrangements, customer relations support, and collaboration—demonstrates that the telemarketers were acting on

Defendants' behalf when they engaged in deceptive telemarketing. First, Defendants entered into hundreds of Telemarketing, "Multi-Media," and Purchase Agreements with telemarketers that explicitly referenced outbound sales calls or were primarily focused on outbound sales calls. (PSMF 41.) Defendants have offered no credible evidence that these telemarketers solicited consumers in a way other than through telemarketing.[15] Instead, the undisputed facts show that over 96% of Defendants sales were from telemarketing. (PSMF 106.) Indeed, even the Purchase Agreement Sirlin and Lifewatch filed at the preliminary injunction stage ████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████[16] The Agreement clearly contemplates that the solicitations would be made through telemarketing, as opposed to any other form of marketing, such as mail, television or radio advertising, or door-to-door sales.

Second, Defendants' telemarketers sold exclusively for Defendants. In fact, the evidence shows that Worldwide telemarketed medical alert systems exclusively for Defendants *at Defendants' request*. (PSMF 56.) Numerous other telemarketers also reported that they worked exclusively for Defendants. (PSMF 58.) Indeed, every single call recording transcript and consumer declaration Plaintiffs have filed in this action can be directly connected to

---

[15] The only independent evidence Defendants have produced to suggest their agents used methods other than outbound telemarketing are several affidavits from their agents attesting to the percentage of their sales for Defendants that were by telemarketing. As Defendants admitted at the preliminary injunction hearing, however, these affidavits were all executed <u>before</u> the agents had made a single sale for Defendants, and that was by design. Defendants' policy was to refuse to work with any agent until they executed the affidavit. *See* Dkt. 87-2 at 6, DX 2, Baker Dec. ¶ 20; Transcript of Preliminary Injunction Hearing at 103-107. ████████████████████████

████████████████████████████████████████████████

[16] Earlier agreements Defendants entered into explicitly describe the parties as exclusively being engaged in outbound sales calls. PSMF 41.

Defendants.[17]  Even when there is no contractual requirement of exclusivity, it is clear that the

telemarketers were selling on behalf of Defendants.  The telemarketers described the system in

the exact same terms and specifications used by Defendants themselves (PSMF 60-62), which

would not be the case if the telemarketers did not already know Defendants were going to

provide the systems.

      Third, the telemarketers had direct access to Defendants' customer relations management

software ("CRM").  Whenever a new telemarketer began selling for Defendants, Defendants

provided the telemarketer with logins and passwords to Defendants' CRM so the telemarketer

could enter consumer information during the telemarketing call.  (PSMF 52.)  Again, this clearly

indicates that the telemarketers knew they were acting on Defendants' behalf.

      Fourth, after entering the consumer's information into Defendants' CRM, the

telemarketers live-transferred the consumers to Defendants so that Defendants could complete

the sale.  (PSMF 54.)  The live-transfers were supposedly added as part of Defendants' "Quality

Control" program.[18]  When Lifewatch first began to employ telemarketers, the telemarketers

themselves typically conducted the "verifications," strictly adhering to a Lifewatch-specific

script and stating that the charge would be either in Lifewatch's name or its DBA, Medical

Alarms.  (PSMF 53.)  Both methods of confirmation, live-transfer to Lifewatch or strict

adherence to Lifewatch's verificaton script, clearly assumed the telemarketers were working

solely for Defendants.

      Fifth, Defendants worked closely with the telemarketers.  At times, Defendants

---

[17] Plaintiffs need not show that the telemarketers' relationship with Defendants was exclusive for the telemarketers to be considered Defendants' agents.  *See Lifewatch*, 176 F. Supp. 3d at 776 (citing *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1250 (10th Cir. 2013)) ("An agent can serve multiple principals at once, even principals that are competing with one another.")); *Restatement (Third) of Agency* § 3.14 cmt. b (2006).

[18] Defendants' testimony at the preliminary injunction hearing was that the "live transfers" were added as part of Defendants' supposed "quality control" plan.  *See* Transcript at 82.

abandoned any pretense of distancing themselves from the telemarketers and directly financed the call centers. (PSMF 63.) In fact, Defendants advanced them money[19] and encouraged brokers to set up new telemarketing companies and call centers when the current call centers got into legal or financial trouble. (PSMF 64.)

The overwhelming, undisputed evidence outlined here thus establishes that the telemarketers acted on Defendants' behalf.

### 2. Defendants' Telemarketers Are Subject to Defendants' Control.

The undisputed evidence, including the testimony of Defendants' telemarketers, telemarketing scripts, and Defendants' own emails, further shows that the Defendants exerted control over the telemarketers. Defendants drafted and edited the sales scripts for the call centers, and approved or rejected any changes in the sales scripts the call centers proposed. (PSMF 59.) Defendants also controlled every detail of the terms of the deals the telemarketers offered to consumers, including pricing, promotions, and upsells. (PSMF 48.) Moreover, Defendants controlled nearly every aspect of the internal operation of the call centers, including instructing the telemarketers who and where to call. (PSMF 50.) Defendants also forbid their call centers from disclosing to consumers that they were selling medical alert devices on Defendants' behalf.

### 3. Defendants' Ineffective Efforts to Police Their Telemarketers.

Finally, as this Court noted in its ruling on Plaintiffs' motion for a preliminary injunction, even if Defendants "made (half-hearted and largely ineffective) efforts to curb [their] telemarketers' unlawful conduct," they still would be liable for their telemarketers' conduct.

---

[19] Boling states that Worldwide "overpaid" Defendants by between $900,000 and $1.2 million, and returned the overpayment in cash as kickbacks to Defendants Sirlin and May. (PX 93, Boling Dec. ¶ 48). ████████████████████████████████████████████████████████, but it is undisputed that Defendants provided funds to help set up new call centers. (PSMF 63.)

*Lifewatch*, 176 F. Supp. 3d at 780; *see Standard Distribs.*, 211 F. 2d at 13 ("Unsuccessful efforts by the principal to prevent such misrepresentations by agents will not put the principal beyond the reach of the Federal Trade Commission Act."); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 527 (S.D.N.Y. 200) ("The law is clear that under the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with actual or apparent authority to make such representations) regardless of the unsuccessful efforts of the principal to prevent such misrepresentations.").

The Quality Control program Defendants emphasized at the preliminary injunction hearing has not prevented Defendants' telemarketers from continuing their illegal tactics on Defendants' behalf. (PSMF 66.) For example, even after describing at the preliminary injunction hearing how Defendants supposedly had talked to all of the 3000 then-current Worldwide customers who had never activated their devices,[20] ███████████████████████

███████████████████████████████████████████████████████

███████████████████████[21] Similarly, several months <u>after</u> this Court entered a preliminary injunction, Defendants' call center liaison reported, "hearing…more often lately" the claim that a friend had referred them for a medical alert device from Defendants.[22] And just before discovery closed in this matter, a consumer contacted Plaintiffs who had just (1) received a robocall, (2) from a spoofed caller ID, (3) on his cell phone, (4) which was on the National Do Not Call Registry -- from a telemarketer who reluctantly admitted he was working for Lifewatch.[23] When the consumer subsequently received a follow-up call from Defendants and

---

[20] Transcript of Preliminary Injunction Hearing at 100.
[21] PX 97, Al-Najjar Dec. Att. E (FTC-LW16-6602-3 ███████████████████████████
████████████.
[22] PX 97, Al-Najjar Dec. Att. E (FTC-LW16-8097 ██████████████████████.
[23] PX 95, Horne Dec. ¶ 5.

told them that he had made up a name and credit card number just to see who was responsible for the illegal call, Defendants' customer service representative told him to "get a life."[24]

### C. Defendants' Violated the TSR (Counts II-IX).

Summary judgment should be granted on Counts II through IX of the Amended Complaint because the uncontroverted facts show that Defendants violated the TSR.

### 1. Defendants Violated Section 310.3 of the TSR (Count II).

The undisputed evidence shows that Defendants made multiple misrepresentations to induce consumers to purchase their medical alert system. Section 310.3 of the TSR prohibits sellers and telemarketers from: (1) misrepresenting any material aspect of the seller's refund, cancellation, exchange, or repurchase policies; (2) misrepresenting a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or governmental entity, and (3) making a false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. §§ 310.3(a)(2)(iv), (a)(2)(vii), and (a)(4). A "seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). A "telemarketer" is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff). "Telemarketing" is defined as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

Defendants are "sellers" under the TSR[25] – in connection with telemarketing transactions,

---

[24] *Id.* at ¶ 8.
[25] This Court rejected Defendants' argument at the preliminary injunction stage that they are not "sellers" if no sale is completed, but noted that even if it accepted Defendants' argument, (1) there was evidence

they provided the medical alert device itself and the monthly monitoring service, in exchange for consumers' monthly payments. Defendants' telemarketers initiated hundreds of millions of intrastate and interstate telephone calls to elderly and disabled consumers to induce them to purchase Defendants' services. (PSMF 24.) During these telephone calls Defendants' telemarketers mispresented that someone had purchased the device for the consumer (PSMF 9), that various health organizations had endorsed Defendants' device (PSMF 13), that the consumer would not be charged until they received and activated the device (PSMF 17), and that consumers could cancel the monitoring service at any time without further financial obligation, (PSMF 21) all to induce consumers to purchase Defendants' medical alert device and service. These deceptive practices are a direct violation of Section 310.3 of the TSR.

### 2. Defendants' Violated Multiple Sections of the TSR (Counts IV-VIII).

Plaintiffs are entitled to summary judgment on Counts IV through VIII because there is no genuine issue of disputed fact that Defendants' telemarketing practices were abusive under the TSR.

### a) Defendants violated Section 310.4(a)(8) of the TSR (Count VI).

The uncontroverted evidence shows that Defendants' telemarketers failed to transmit the name and telephone number of the telemarketer, or of Defendants themselves, on consumers' caller identification in violation of Section 310.4(a)(8) of the TSR. 16 C.F.R. § 310.4(a)(8). As evidenced by the consumer declarations, Defendants' telemarketers not only failed to transmit the name and telephone number of the telemarketer or seller, but also affirmatively attempted to hide the identity of the telemarketer or seller by transmitting fake telephone numbers and names, also known as "spoofing," to consumers' caller identification. (PSMF 31.) Defendants' internal

---

that sales were completed, and (2) Defendants would still be held liable under Section 310(b) for providing "substantial assistance" to the telemarketers. *Lifewatch*, 176 F. Supp. 3d at 782.

emails also confirm that Defendants were fully aware of this spoofing, as Defendants frequently provided instructions to their telemarketers to change the spoofed numbers. (PSMF 32.)

>    b) **Defendants violated Section 310.4(b) of the TSR (Counts IV, V, VII, and VIII).**

Defendants are directly liable for the abusive telemarketing practices because they "caused" their telemarketers to engage in those practices. The undisputed facts show that Defendants caused their telemarketers to (1) initiate outbound sales calls to consumers whose telephone numbers were on the Do Not Call Registry; (2) initiate outbound sales calls to consumers who previously stated they did not wish to receive outbound sales calls from Defendants; (3) deliver hundreds of millions of prerecorded calls to consumers who did not provide express agreement, in writing, authorizing Defendants to place prerecorded calls to them; and (4) fail to disclose the identity of the seller, that the purpose of the call was to sell goods or services, and the nature of those goods and services. Under Section 310.4(b), "[i]t is an abusive telemarketing act or practice … for a seller to cause a telemarketer to engage in" any of the above practices. 16 C.F.R. § 310.4(b).

Although the uncontroverted facts show that Defendants were directly involved in the abusive telemarketing practices, Plaintiffs need not show direct involvement to establish a violation of Section 310.4(b); it is enough that Defendants retained the telemarketers to sell their medical alert systems and that the telemarketers violated the TSR. *See Lifewatch*, 176 F. Supp. 3d at 784 ("All that was required for Lifewatch to "cause" its telemarketers to engage in those practices is for Lifewatch to have hired them to sell its products and services."); *U.S. v. Dish Network, LLC*, 667 F. Supp. 2d 952 (C.D. Ill 2009) (finding that the TSR's use of the verb "cause" created strict liability for sellers for their telemarketers' conduct); *see also U.S. v. Dish Network, LLC*, No. 09-3073, 2014 U.S. Dist. LEXIS 172020, at *174 (C.D. Ill. Dec. 12, 2014)

(entering summary judgment against Defendants for nearly three million calls in violation of the TSR).

### (1)     Defendants violated Section 310.4(b)(1)(iii)(A) of the TSR (Count V).

The undisputed evidence shows that Defendants' telemarketers repeatedly called consumers who had previously stated that they did not wish to receive calls from, or on behalf of, Defendants. 16 C.F.R. § 310.4(b)(1)(iii)(A). Multiple consumers testified that they repeatedly asked Defendants and their telemarketers to remove them from their call lists, but that despite those requests, they continued to receive unwanted calls. (PSMF 29.) Defendants testified at the preliminary injunction hearing that they only belatedly created their own internal do-not-call list, but acknowledged that the list only included consumers who complained directly to Defendants, not to their telemarketers.[26] Because Defendants prohibited their telemarketers from revealing a relationship with Lifewatch, the telemarketers were far more likely than Lifewatch itself to receive do-not-call requests. Defendants did not attempt to collect and incorporate any do-not-call requests made directly to one of the hundreds of telemarketers they employed into Defendants' own internal do-not-call list, let alone in the lists sent to other telemarketers. (PSMF 30.)

### (2)     Defendants violated Section 310.4(b)(1)(iii)(B) of the TSR (Count IV).

Similarly, the undisputed evidence shows that Defendants' telemarketers made calls to consumers on the National Do Not Call Registry. 16 C.F.R. § 310.4(b)(1)(iii)(B). Multitudes of consumers complained that they received calls from Defendants' telemarketers even though their telephone numbers were on the National Do Not Call Registry. (PSMF 26.) Defendants admitted that they had "no ability to determine" whether their telemarketers initiated outbound

---

[26] Transcript of Preliminary Injunction Hearing at 116-117.

calls to consumers on the National Do Not Call Registry. [27]  In particular, Worldwide not only never had access to the National Do Not Call Registry, and never scrubbed any call lists to remove numbers that were on the National Do Not Call Registry, but Defendants never asked them to do so.  (PSMF 27, 28.)

### (3)    Defendants violated Section 310.4(b)(1)(v)(A) of the TSR (Count VII).

Defendants' consistent use of robocalls also violated the TSR.  The TSR bans prerecorded messages or "robocalls" unless the seller or marketer has consumers' express agreement, in writing, to receive such calls.  16 C.F.R. § 310.4(b)(1)(v)(A).  Defendants have produced nothing in discovery demonstrating that they ever attempted to obtain—let alone actually secured—such written permission from a single consumer.  Instead, Defendants' telemarketers made hundreds of millions of unwanted and illegal robocalls to sell Defendants' medical alert systems, (PSMF 33) with the express knowledge of Defendants.  (PSMF 34.)

### (4)    Defendants violated Sections 310.4(b)(1)(v)(B)(ii) and (d) of the TSR (Count VIII).

Finally, Defendants' robocalls violated the TSR by failing to disclose "truthfully, promptly, and in a clear and conspicuous manner" the identity of the seller, that the purpose of the call was to sell goods or services, and the nature of the goods or services.  16 C.F.R. § 310.4(b)(1)(v)(B)(ii).  With respect to the robocalls, the uncontroverted facts show that the recordings never identified the seller and did not disclose that the purpose of the call was to sell medical alert services.  (PSMF 35, 36.)  Instead, the robocalls purported to offer consumers a free medical alert device and otherwise focused on bogus offers to provide free grocery coupons, prescription cards, or restaurant vouchers.  (PSMF 37.)  Similarly, once the consumer was transferred to one of Defendants' live telemarketers, the telemarketers also failed to make the

---

[27] Dkt. 87-2 at 15 (Defendants' Response to Motion for Preliminary Injunction (filed Nov. 10, 2015).

same disclosures. 16 C.F.R. § 310.4(d). That is, in part, because Defendants specifically prohibited their telemarketers from using Lifewatch's name in marketing Defendants' goods and services. (PSMF 47.)

### c) Defendants violated Section 310.3(b) of the TSR (Counts III and IX).

Defendants also are liable under the TSR because they assisted and facilitated their telemarketers' TSR violations. It is a deceptive telemarketing act or practice and a violation of the TSR "for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice" that is deceptive or abusive under the TSR. 16 C.F.R. § 310.3(b). Courts have found substantial assistance and support where Defendants provided the goods and services even when they were not involved in the "marketing efforts," *see FTC v. Chapman*, 714 F.3d 1211, 1216-17 (10th Cir. 2013); where Defendants provided customer service support, responded to BBB complaints, and continued to provide support after they received numerous complaints about their marketers' misrepresentations, *see FTC v. Partners in Health Care Ass'n*, 189 F. Supp. 3d 1356, 1368-69 (S.D. Fla. May 31, 2016); and where Defendants merely processed credit card payments for the telemarketers. *See FTC v. HES Merch. Servs. Co., Inc.*, No. 6:12-cv-1618-OR1-22KRS, 2014 U.S. Dist. LEXIS 171292, at *22 (M.D. Fla. Nov. 18, 2014) (processing credit card transactions sufficient to constitute "substantial assistance") *aff'd in part, vacated in part, and remanded*, 652 Fed. Appx. 837 (11th Cir. Jun. 14, 2016).

The undisputed facts show that Defendants provided their telemarketers with substantial assistance and support. Under the terms of the agreements that Defendants entered into with numerous telemarketers, Defendants were obligated to deliver the goods and services to the

consumer, provide consumers with customer service, and process consumers' payments.[28]  This is more than enough to establish substantial assistance and support.  *See Chapman*, 714 F.3d at 1216-17; *Partners in Health Care Ass'n*, 189 F. Supp. 3d at 1368-69; *Hes Merch. Servs. Co., Inc.*, 2014 U.S. Dist. LEXIS 171292, at *22.  However, Defendants did much more.  They provided scripts to their telemarketers.  (PSMF 59.)  They provided their telemarketers with access to Defendants' CRM.  (PSMF 52.)  They provided their telemarketers with verification support.  (PSMF 53.)  Moreover, they advanced money to support their telemarketers' operations.  (PSMF 63.)  There can thus be no question that Defendants provided substantial assistance or support to their telemarketers.

It also is undisputed that Defendants knew, or consciously avoided knowing, of the telemarketers' deceptive and abusive practices.  Defendants' direct involvement in the illegal telemarketing (e.g., providing the misleading scripts, etc. (PSMF 59)), the number of consumer complaints about Defendants' practices (PSMF 11, 15, 19, 23, 25, 27, 32, 34), and the history of governmental and private litigation against Defendants and their telemarketers (PSMF 38), all illustrate that Defendants knew or certainly should have known about their telemarketers' illegal conduct.

Where, as here, the undisputed facts show that Defendants provided substantial assistance and that Defendants knew or should have known about their telemarketers' illegal conduct, Defendants are jointly and severally liable with their telemarketers for all of the consumer harm.  *See FTC v. WV Universal Mgmt.*, LLC, No. 16-17727, 2017 U.S. App. LEXIS 25101, at *10-11 (11th Cir. 2017).

---

[28] PX 97, Al-Najjar Dec. Att. C (FTC-LW09-1173, 1177, June 2012 Telemarketing Services Agreement).

### D. Defendants Sirlin, May, and Roman are Individually Liable.

Sirlin, May, and Roman are all individually liable for the Corporate Defendants'
deceptive and abusive telemarketing practices. Once corporate liability is established, an
individual defendant may be held jointly and severally liable under the FTC Act where (1) the
defendant participated directly in or had some measure of control over a corporation's deceptive
practices, and (2) the defendant had actual or constructive knowledge of the practices. *See
World Media Brokers*, 415 F.3d at 764; *Bay Area*, 423 F.3d at 636; *FTC v. Amy Travel*, 875 F.2d
564, 573-74 (7th Cir. 1989); *FTC v. Seismic Entm't Prods., Inc.*, 441 F. Supp. 2d 349, 354
(D.N.H. 2006) (citing *FTC v. World Media Brokers*, 415 F.3d 758, 765-766 (7th Cir. 2005))
("Individual and corporate defendants may be held jointly and severally liable for violations of
the FTC Act."). *See also FTC v. Gem Merch. Corp.*, 87 F. 3d 466, 470 (11th Cir. 1996) (quoting
*Amy Travel,* 875 F.2d at 573). Control may be evidenced by "active participation in the
corporate affairs, including assuming the duties of a corporate officer." *World Media Brokers*,
415 F.3d at 764 (citing *Amy Travel*, 875 F.2d at 573). "[A]n individual's status as a corporate
officer gives rise to a presumption of ability to control a small, closely-held corporation." *FTC
v. Windward Mktg.,* No. 1:96-CV-615-FHH, 1997 U.S. Dist. LEXIS 17114, at *15 (N.D. Ga.
Sept. 30, 1997) (holding that defendant need not be an officer or even an employee to control
corporate activities  and noting that courts consider "the control that a person actually exercises
over given activities."). Proof of subjective intent to defraud is not required to show knowledge.
*See id*. Instead, knowledge exists where defendants (1) had actual knowledge of the deceptive
acts or practices; (2) were recklessly indifferent to the truth or falsity of the representations; or
(3) had an awareness of a high probability of fraud coupled with an intentional avoidance of the
truth. *Id*.; *Bay Area*, 423 F.3d at 636; *Amy Travel*, 875 F.2d at 573. An individual's "degree of

27

participation in business affairs is probative of knowledge." *Id*. at 574.

### 1.    Sirlin is Individually Liable.

The uncontroverted facts demonstrate that Sirlin has control over, and knowledge of, Defendants' deceptive and abusive telemarketing practices.  Sirlin is President and Secretary of Lifewatch, and owns an interest in both Lifewatch and MedGuard.  (PSMF 4.)  Sirlin devised and implemented Lifewatch and MedGuard's telemarketing activities  (PSMF 80, 81), and directly supervised the telemarketers.  (PSMF 82.)  Sirlin managed every aspect of the Worldwide telemarketing that resulted in Lifewatch selling customer accounts to third parties, such as Connect America and Phillips Lifeline.  (PSMF 83.)  Sirlin knew that the telemarketers were making misrepresentations to consumers.  (PSMF 84.)  He also knew that the telemarketers were engaged in robocalling, and that they were calling consumers on the Do Not Call Registry and consumers who had previously asked to be removed from the call list.  (PSMF 85.)  Sirlin knew that the telemarketers were spoofing the telephone numbers on the consumers' caller identification, and knew that neither the robocalls nor the telemarketers were making the disclosures required by the TSR.  (PSMF 85.)  Indeed, in many instances, Sirlin directly instructed the telemarketers to engage in deceptive and abusive practices.  (PSMF 82.)

Sirlin also knew about the private and regulatory actions taken against Defendants (which often named him personally) and against their telemarketers.  (PSMF 38.)  In fact, after the Indiana Attorney General's action was filed in Fall 2012, Sirlin explained in an email to May that it was important to continue working with Worldwide because none of Lifewatch's competitors would tolerate Worldwide's aggressive and illegal telemarketing tactics.  He emphasized that Boling was the industry expert on robocalling and would try to keep the focus of any regulatory authorities off Lifewatch.  In particular, Sirlin wrote that Boling is:



Sirlin clearly knew that Plaintiffs' lawsuit served to shut down Worldwide (PSMF 86), and he knew that the deceptive and abusive telemarketing practices continued long after. (PSMF 87.) Finally, although Sirlin managed Lifewatch and MedGuard's telemarketing activities, he gave only lip service to compliance but did not ensure that the telemarketers were not violating the law.

### 2. May is Individually Liable.

The undisputed facts show that May also had control over, and knowledge of, Defendants' deceptive practices. May was Vice-President of Lifewatch, and continues to own an interest in both Lifewatch and MedGuard. (PSMF 5.) May supervised the day-to-day activities of Lifewatch and MedGuard (PSMF 89), and knew about Lifewatch's legal problems involving deceptive and abusive telemarketing practices before even joining Lifewatch. (PSMF 90.) May knew that the telemarketers were making misrepresentations to consumers. (PSMF 91.) He also knew that the telemarketers were engaged in robocalling, and that they were calling consumers on the Do Not Call Registry, and consumers who had asked to be removed from the call list. (PSMF 92.) May knew that the telemarketers were spoofing the telephone numbers on consumers' caller identification, and knew that the telemarketers were not making the required disclosures under the TSR. (PSMF 92.) May was aware that Plaintiffs' lawsuit had shut down

---

[29] FTC-LW16-904-909 (███████████████████). *See* PX 94, Boling Dec. ¶ 40 (during multiple conversations about the Indiana action, "Sirlin expressed his view that Worldwide telemarketing on behalf of Lifewatch was structured to, in his words, "insulate" Lifewatch from any legal liability for the violations.").

Worldwide, and that the deceptive and abusive telemarketing practices continued. (PSMF 93.) Like Sirlin, there is no evidence that May ever took affirmative action to ensure the telemarketers' were not violating the law.

### 3. Roman is Individually Liable.

Roman is also individually liable because the uncontroverted facts show that Roman had control over, and knowledge of, Defendants' deceptive practices. Roman owns and is President and CEO of Safe Home and MedGuard, and is an officer of, and owns a majority interest in, Lifewatch. (PSMF 6.) Roman formulated the business strategies and set the agenda for Safe Home, MedGuard, and Lifewatch. (PSMF 67.) Roman supervised all aspects of the Corporate Defendants' business activities, including: marketing strategies (PSMF 69); customer service (PSMF 71); payments, collections, chargebacks, and refunds (PSMF 73); personnel (PSMF 68); equipment distribution and monitoring services (PSMF 72); and all financial decisions and reporting. (PSMF 74.) In addition, Roman closely monitored the call centers. (PSMF 70.)

Roman knew that Lifewatch had legal problems related to deceptive and abusive telemarketing practices even prior to his acquisition of a majority interest in Lifewatch. (PSMF 75.) Roman knew that the telemarketers were making misrepresentations to consumers (PSMF 76), and knew that the telemarketers were engaged in robocalling. (PSMF 77.) He also knew they were calling consumers on the Do Not Call Registry, and consumers who had asked to be removed from the call list. (PSMF 77.) ████████████████████

████████████████████████████

████████████████████████████████

███████████████████████████

██████████████████████████████

███  [30]  Roman knew that the telemarketers were spoofing the telephone numbers on the consumers' caller identification (PSMF 77), and knew that the telemarketers were not making the required disclosures under the TSR.  (PSMF 77.)  Roman also was aware of the various regulatory actions taken against Defendants and that Plaintiffs' lawsuit shut down Worldwide.  Indeed, Roman managed Defendants' response to Worldwide's closure.  (PSMF 78.)  Roman also was aware that the deceptive and abusive telemarketing practices continued long after Worldwide shut down.  (PSMF 79.)  And, despite the fact that Roman was involved in the everyday minutiae of the Corporate Defendants' business (PSMF 68-74), there is no evidence that Roman did anything to assure that the telemarketers complied with the law.

### E. Defendants Operated as a Common Enterprise.

Separate and apart from their liability for actively participating in Defendants' scheme, Safe Home and MedGuard also are liable with Lifewatch under the FTC Act and FDUTPA because the companies operated as a common enterprise.  It is well established that corporate defendants may be held jointly liable for the deceptive acts and practices of another corporation where the corporations operate as a common enterprise.  *Bay Area*, 423 F.3d at 635 (affirming summary judgment and common enterprise liability); *FTC v. 120194 Canada, Ltd.*, No. 04 C 7204, 2007 U.S. Dist. LEXIS 12657, at* 15 (N.D. Ill. 2007) (J. Gotschall) (finding a common enterprise and granting summary judgment).  Courts consider various factors in determining whether defendants are engaged in a common enterprise, including, but not limited to: "(1) common control; (2) sharing office space and offices; (3) whether business is transacted through a maze of interrelated companies; and (4) commingling of funds." *Id*.  Plaintiffs need not "prove any particular number of entity connections in order to establish a common enterprise," and "no

---

[30] PX 97, Al-Najjar Dec. Att. E (FTC-LW16-3387-88 (███████████████████████████
████████████████████████████).

one connection is dispositive." *FTC v. Mortg. Relief Advocates LLC*, No. CV-14-5434-MWF

(AGRx), 2015 U.S. Dist. LEXIS 186809, at *15 (C.D. Cal. Jul. 1, 2015) (granting FTC's motion

for summary judgment); *Wash. Data Res.,* 856 F. Supp. 2d at 1271.

The undisputed facts demonstrate that Safe Home, MedGuard, and Lifewatch operated as

a common enterprise. Roman owns and controls Safe Home, and Roman, Sirlin, and May are all

owners and together have controlled MedGuard and Lifewatch. (PSMF 94.) Safe Home,

MedGuard, and Lifewatch commingle funds, frequently reclassifying payments from one entity

to the other based on the possible tax consequences or how they would look to a bank. (PSMF

103.) Two Safe Home employees manage various activities of MedGuard and Lifewatch –

companies for which they purportedly do not work. (PSMF 95.) Safe Home, MedGuard, and

Lifewatch share office space. (PSMF 97.) Employees claim to work for two or all three of the

companies simultaneously, and they often identify themselves as being employed by one of the

companies, while working on behalf of another. (PSMF 96.) Safe Home, MedGuard, and

Lifewatch's business activities and operations are inextricably intertwined, using common

customer service telephone numbers, email servers, credit card processors, and accessing each

other's customer databases. (PSMF 98, 100, 102.) Consumers initially billed by Lifewatch have

been subsequently billed by MedGuard or Safe Home, without any notice whatsoever. (PSMF

99.) Marketing is done collectively by the companies. (PSMF 101.) MedGuard's name and

address have now been substituted for Lifewatch on Lifewatch's website.[31]

    **F.    Defendants are Liable for Injunctive and Equitable Monetary Relief.**

Pursuant to Section 13(b) of the FTC Act, this Court may enter permanent injunctive

relief to address violations of any provision of law enforced by the FTC. The Court also has

broad equitable authority "to order any ancillary relief necessary to effectuate the exercise of the

---

[31] *See* http://www.lifewatch-usa.com (last visited 12/22/17).

granted powers." *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997) quoting *Amy Travel*, 875 F.2d at 572. The Court therefore has the authority to enter equitable monetary relief such as restitution. *Id.* Similarly, under FDUTPA, the Florida Attorney General may bring "[a]n action to enjoin any person who has violated … [or] is otherwise likely to violate, this part," and obtain actual damages and equitable or other appropriate relief. §§ 501.207(1)(b)-(c) Fla. Stat. (2017).[32]

### 1. The Court Should Enter a Permanent Injunction.[33]

Section 13(b) of the FTC Act expressly authorizes the entry of a permanent injunction to prevent further violations of the FTC Act. 15 U.S.C. § 53(b); *Febre*, 128 F.3d at 534. Additionally, FDUTPA also authorizes the court to permanently ban Defendants from telemarketing. §§ 501.207(1)(b), 501.207(3), Fla. Stat. (2017). Such an injunction is justified where there is "a reasonable likelihood of future violations." *U.S. v. Dish Network, LLC*, No. 09-3073, 2017 U.S. Dist. LEXIS 85543, at *426 (C.D. Ill. Jun. 5, 2017). Courts consider several factors to determine the likelihood of future violations, including

> "the gravity of harm caused by the offense; the extent of the defendant's participation…; the isolation or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations."

*Id.* (quoting *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)). Past misconduct is "highly suggestive of the likelihood of future violations." *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (quoting *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975)). Courts also have considered "[e]vidence that the violator 'continued to maintain that his conduct was

---

[32] Florida Statutes § 501.207(3) also authorizes courts to "… make appropriate orders, including, but not limited to … reimburse consumers … found to have been damaged; … to impose reasonable restrictions upon the future activities of any defend to impede her or him from engaging in or establishing the same type of endeavor; … or to grant legal, equitable, or other appropriate relief."
[33] Plaintiffs intend to submit a Proposed Order upon the Court's ruling on this motion, but could submit one sooner upon the Court's request.

blameless' as indicative of the need for a permanent injunction relief." *Dish Network*, 2017 U.S. Dist. LEXIS 85543, at *426-27 (quoting *Hunt*, 591 F.2d at 1220).

In the instant case, all factors favor the entry of a permanent injunction. The harm caused by the offense is substantial. Defendants systematically targeted a vulnerable segment of the population – elderly and disabled consumers – and bombarded them with illegal and deceptive robocalls, repeatedly misleading them into purchasing Defendants' medical alert system. Defendants retained the telemarketers, instructed them on what to say, paid commissions on sales, confirmed the sale once the telemarketer was finished with the consumer, shipped the product to the consumers, billed the consumer for the product, provided customer service to the consumers, and arranged for the monitoring of the product. Defendants' illegal practices were not isolated incidents, but the systematic way Defendants conducted their business. Defendants' telemarketing activities were so lucrative that they expanded the use of those practices and ultimately made over ██% of their sales through telemarketing. (PSMF 46.) Indeed, Defendants persisted with their illegal telemarketing even after multiple lawsuits and the entry of a preliminary injunction. (PSMF 39.) Finally, Defendants have adamantly refused to take any responsibility for their own conduct, instead falsely insisting that they cannot control their telemarketers and that most of their sales are through other means. For all of these reasons, the Court should permanently ban Defendants from telemarketing and from any further involvement in the medical alert industry.[34]

---

[34] Worldwide has already been banned from robocalling, telemarketing, and marketing medical alert devices and services. *FTC v. Worldwide Info Services, Inc.*, 6:14-CV-8-ORL 28DAB (M.D. Fla. Jan. 6, 2014). Similarly, courts in this district, and throughout the nation, have permanently banned defendants from engaging in telemarketing and further involvement in an industry based on conduct like that of Defendants. *See, e.g., FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1018 (N.D. Ind. 2000), aff'd, 312 F.3d 259 (7th Cir. 2002) (granting summary judgment for FTC and imposing a ban on telemarketing and marketing of career advisory goods or services); *FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) (affirming summary judgment for FTC and permanent ban on Defendants' participation in any

## 2. The Court Should Award Equitable Monetary Relief.

The Court's permanent injunction should include an award of equitable monetary relief.
To support a claim for equitable monetary relief, Plaintiffs must demonstrate calculations that
"reasonably approximate[] the amount of consumers' net losses[.]" *Febre*, 128 F.3d at 535.
The proper measure of equitable monetary relief is the full amount lost by consumers, not
defendants' net profits. *Id.* at 536. *See also FTC v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009)
("consumer loss is a common measure for civil sanctions in … direct FTC actions); *Amy Travel*,
875 F.2d at 570 (affirming restitution award in the amount consumers paid for travel
certificates). Defendants' revenues from the sale of medical alert devices and services, less
chargebacks and refunds, from January 2012 through 2016, total at least $██,██,██. (PSMF
106.) Defendants' own data shows that the percentage of their revenue attributable to
telemarketing is at least ██%. (PSMF 46.) Accordingly, the undisputed facts show that a
reasonable and conservative approximation of the losses associated with Defendants' practices is
$██,██,██. The undisputed facts also show that Roman, May, Safe Home, and MedGuard
became involved in the illegal conduct no later than the beginning of 2013. The harm to
consumers during the period of their involvement is at least $██,██,██.

These conservative figures understate Defendants' actual liability because they do not
include amounts consumers paid in 2017, or any amounts Defendants' customers paid to
Connect America, Phillips Lifeline, Harmonious Enterprises/Medwatch, or any other third-party
that purchased customer accounts from Defendants.[35] If the case were to proceed to trial,

---

aspect of credit repair business); *FTC v. HES Merch. Servs. Co.*, No. 6:12-cv-1618-Orl-22KRS, 2015
U.S. Dist. LEXIS 28039 (M.D. Fla. Feb. 11, 2015) (granting summary judgment for FTC and imposing
ban on telemarketing and marketing of debt relief products or services); *FTC v. NHS Sys.*, 936 F. Supp.
2d 520 (E.D. Pa. 2013) (denying Defendants' motion to reconsider telemarketing ban).
[35] Moreover, these estimates almost certainly vastly understate the amount of consumer harm for which
Defendants are responsible. In fact, the harm caused by Worldwide alone likely exceeds these estimates.

Plaintiffs anticipate seeking a higher judgment amount.

## IV.   EACH OF DEFENDANTS' AFFIRMATIVE DEFENSES FAILS

There is no genuine dispute of fact underlying Defendants' affirmative defenses, each of which fails as a matter of law.  Defendants bear the burden of proving their affirmative defenses. *See Felix v. Wis. DOT*, 828 F.3d 560, 569 (7th Cir. 2016); *see also FTC v. Kutzner*, SA CV 16-00999-BRO (AFMx), 2017 U.S. Dist. LEXIS 174299, *27 (C.D. Cal. Sep. 5, 2017).  Yet, Defendants have produced nothing in discovery to support their affirmative defenses.  Nor could they, because Defendants' affirmative defenses are legally insufficient.  Accordingly, these defenses would not prevent the Court from entering summary judgment in Plaintiffs' favor.

Defendants' first affirmative defense, alleging that Plaintiffs' claims are "barred…to the extent" they are outside of the statute of limitations fails as a matter of law because Courts have consistently held that Section 13(b) of the FTC Act contains no statute of limitations.[36]  *See U.S. v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1004 (C.D. Ill. 2014); *FTC v. Dalbey*, No. 11-cv-1396-RBJ-KLM, 2012 U.S. Dist. LEXIS 67393, at *4 (D. Colo. May 15, 2012); *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM (GWF), 2011 U.S. Dist. LEXIS 65835, at *8 (D. Nev. Jun. 20, 2011).  With respect to FDUTPA, Florida Statutes Sections 501.207 and 95.11(3)(f) provides a four-year statute of limitations for "an action founded on statutory liability."  Plaintiffs' Complaint and Amended Complaint were filed on June 30, 2015, and July 14, 2016, respectively.  But the evidence clearly demonstrates that Defendants' deceptive and abusive acts

---

Worldwide provided Lifewatch with at least ██, █ customers, 39,501 customers Lifewatch sold to Connect America, and ████ customers Lifewatch sold to Phillips Lifeline. (PSMF 57.)  Even accounting for cancellations, the average medical alert customer account lasts for 42 months (*see* Dkt. 24-8 at 5, Hendricksen Dec. ¶ 13), meaning a fair estimate of the payments from these customers alone would have totaled more than $████████.

[36] Indeed, the express language of Section 13(b) states that the FTC may bring suit "whenever" it has reason to believe a violation has occurred.  15 U.S.C. § 53(b); *see also Ivy Capital, Inc.*, 2011 U.S. Dist. LEXIS 65835, at *8.

continued until at least August 2016 -- after the Amended Complaint was filed.[37] Accordingly, Plaintiffs' claims under FDUTPA are not barred by the statute of limitations, and Plaintiffs are entitled to summary judgment.[38]

Defendants' second affirmative defense, alleging that Plaintiffs' claims under the FTC Act and TSR are barred "inasmuch" as those statutes are unconstitutional fails because it is so vague as to be incomprehensible.[39] Regardless, Defendants have failed to produce in discovery any evidence as to the unconstitutionality of the FTC Act or the TSR or that their rights to due process were violated.

Defendants' third affirmative defense, alleging that Plaintiffs' claims constitute rulemaking in violation of the Administration [sic] Procedures Act fails because this action seeks to enforce the long-established law relating to deceptive telemarketing, not to establish a new rule. Moreover, the law is clear that the decision of whether to proceed through case-by-case enforcement or rulemaking is left to the "informed discretion of the administrative agency." *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F. 3d 1016, 1027 (9th Cir.

---

[37] Plaintiffs have submitted evidence of at least one call attributable to Defendants in September 2017, which violated various provisions of the TSR. PX 95, Horne Dec. ¶ 3; PX 96, Horne Supp. Dec. ¶ 4 (consumer's cellular telephone number listed on National Do Not Call Registry and consumer never consented to receive robocalls).

[38] The Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), which held that Securities and Exchange Commission actions seeking disgorgement are subject to the five-year statute of limitations imposed on penalties by 28 U.S.C. § 2462, has no bearing on FTC Act claims. *See FTC v. J. William Enterprises, LLC*, No. 6:16-cv-2123-Orl-31DCI, 2017 WL 4776669, at *2 (M.D. Fla. Oct. 23, 2017). But again, even if a five-year statute of limitations did apply, the statute of limitations in this case did not begin to run until *after* the case was filed, and all of the conduct took place since January 2012 - less than five years before the case was filed.

[39] While the district courts in this circuit are split as to what pleading standard affirmative defenses must meet post-*Twombly* and *Iqbal*, compare *Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1040 (N.D. Ill. 2014) (Lee) *with United States ex rel. Perez v. Stericycle, Inc.*, No. 08 C 2390, 2014 U.S. Dist. LEXIS 32480, at *1 (N.D. Ill. Mar. 12, 2014) (Marovich), they must at least give plaintiffs fair notice "by pleading some minimal statement of facts in support of the affirmative defense rather than mere 'bare bones' legal conclusions." *Jones v. UPR Prods.*, No. 14 C 1248, 2015 U.S. LEXIS 69595, at * (N.D. Ill. May 29, 2015) (Alonso) citing *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

2006) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) (internal quotation marks omitted).

Defendants' fourth affirmative defense, alleging that Plaintiffs' Do Not Call claims are barred by the TSR's "safe harbor" defense, is meritless and has already been rejected by this Court. As the Court noted, "[t]he TSR exempts sellers and telemarketers for Do Not Call violations if, as a routine business practice, they have: (1) established and implemented written procedures to comply with the DNC rules; (2) trained their personnel in those procedures; and (3) maintained an internal DNC list." *Lifewatch*, 176 F. Supp. 3d at 784; 16 C.F.R. § 310.4(b)(3). Yet Defendants have failed to produce in discovery anything demonstrating that they implemented written procedures or otherwise enforced these standards as a routine business practice.

Finally, Roman's fifth affirmative defense, alleging that the Court lacks personal jurisdiction over him, also fails as a matter of law. Section 53(b) of the FTC Act provides for nationwide service of process, and thus, the court has personal jurisdiction over Roman "if there is a nexus between [him] and the United States." *FTC v. Bay Area Bus. Council, Inc.*, No. 02 C 5762, 2003 U.S. Dist. LEXIS 7261, at *8 (N.D. Ill. Apr. 30, 2003). There is no dispute that Roman lives and works in the United States. Moreover, there is substantial evidence of Roman's substantial and continuing contacts with this district. (PSMF 7.) Therefore, personal jurisdiction exists.

## V.    CONCLUSION

There is no genuine dispute of material fact necessitating trial. Plaintiffs respectfully request that the Court enter summary judgment in Plaintiffs' favor on all counts of the amended complaint and enter a final judgment that includes a permanent injunction and equitable relief

including a monetary judgment in the amount of $██,███,██ against Defendants Sirlin and

Lifewatch, and $██,███,██ against Defendants Roman, May, Safe Home, and MedGuard.

Dated:  December 27, 2017

/s/Samantha Gordon
SAMANTHA GORDON
DAVID A. O'TOOLE
Federal Trade Commission, Midwest Region
230 South Dearborn Street, Suite 3030
Chicago, Illinois 60604
Telephone: (312) 960-5634
Facsimile: (312) 960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION
PAMELA JO BONDI
Attorney General
State of Florida

/s/Denise Beamer
DENISE BEAMER
Assistant Attorney General
Florida Bar # 69369
Office of the Attorney General
Consumer Protection Division
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone:  (407) 245-0833
Facsimile:  (407) 245-0365

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL