**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS,<br><br>Plaintiffs,<br><br>v.<br><br>LIFEWATCH INC., a New York corporation, also d/b/a LIFEWATCH USA and MEDICAL ALARM SYSTEMS,<br><br>SAFE HOME SECURITY, INC., a Connecticut corporation,<br><br>MEDGUARD ALERT, INC., a Connecticut corporation,<br><br>EVAN SIRLIN, individually and as an officer or manager of Lifewatch Inc.,<br><br>MITCHEL MAY, individually and as an officer or manager of Lifewatch Inc., and<br><br>DAVID ROMAN, individually and as an officer or manager of Lifewatch Inc., Safe Home Security, Inc., and Medguard Alert, Inc.<br>Defendants. | Case No. 15cv5781<br><br>Judge Gary Feinerman |

## DEFENDANTS DAVID ROMAN, SAFE HOME SECURITY, INC., and MEDGUARD ALERT, INC.'s LOCAL RULE 56.1(a) STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants, their counsel, and David Roman, Safe Home Security, Inc. and MedGuard Alert, Inc., by and through their counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, for their Statement of Undisputed Material Facts, state as follows:

**LIFEWATCH**

1. Lifewatch, Inc. is a New York personal emergency response system business that was incorporated in 1996. (*See* Exhibit A, Baker Affidavit, ¶ 2; *see also* Exhibit B, NY Corporate Documents, p. 8; and Exhibit C, Sirlin Affidavit dated November 10, 2015, ¶ 11).

2. Lifewatch Inc. was and is headquartered at 266 Merrick Road, Suite 104, Lynbrook, New York. (*See* Ex. B, p. 8).

3. Since its inception, Lifewatch has provided emergency monitoring products and services to elderly, seriously ill, and disabled individuals. (*See* Ex. A, ¶ 2; Ex. C, ¶ 2).

4. By pressing a button on Lifewatch-provided equipment, Lifewatch's customers have immediate access to emergency services. (*See* Ex. A, ¶ 2; Ex. C, ¶ 4).

5. Lifewatch has provided free equipment to its customers to allow them access to Lifewatch's services. (*See* Exhibit D, Preliminary Injunction Hearing Transcript, 147:21-25; *see also* Exhibit S, Sirlin Affidavit; and Exhibit T, Sirlin Dep. 11:17-20).

6. In conjunction with providing the free equipment, Lifewatch engages third-party monitoring companies to respond to emergency signals sent by Lifewatch's customers. (*See* Ex. D, 83:8-11; *see also* Exhibit E, Monitoring Contracts, Ex. S).

7. Lifewatch actively sought ways to expand its customer base and entered into agreements with various independent sales companies, including WWIS ("WWIS"), beginning in approximately 2012. (*See* Exhibit F, contract between WWIS and Lifewatch).

8. Lifewatch also entered into a Marketing Alliance Agreement and an Amended Marketing Alliance Agreement with non-party Connect America.com LLC in 2012 and 2013. (*See* Exhibit G, Marketing Alliance Agreement; *see also* Exhibit H, Amended Marketing Alliance Agreement).

9. Pursuant to Lifewatch's purchase agreements with the independent sales companies, the independent sales companies originated customer accounts through radio, television, internet, and print advertising, as well as telemarketing. (*See* Ex. F, generally).

10. Pursuant to Lifewatch's purchase agreements, the independent sales companies offered to sell accounts to Lifewatch -- and other emergency monitoring companies -- on a non-exclusive basis. Lifewatch's agreements with these independent sales companies explicitly provided that the independent companies are contractually obligated to comply with all applicable state and federal telemarketing laws. (*See* Ex. F, ¶ 1(a)).

11. Furthermore, pursuant to Lifewatch's purchase agreements, the independent companies warrant and represent to Lifewatch that these laws are followed. (*See* Ex. F, §4.2, 6.6, 6.7 (a)-(n) inclusive).

12. Pursuant to the two Marketing Alliance Agreements between the companies, Lifewatch and non-party Connect America combined marketing efforts. Connect America provided Lifewatch with a non-transferable license to use its trademarks. (*See* Exhibit G, Marketing Alliance Agreement, § 6; *see also* Exhibit H, § 6).

13. In their combined customer welcome letter, Connect America and Lifewatch included both of their logos and acknowledged the companies' partnership and a joint customer service department. (*See* Exhibit I, Welcome Letter).

14. The customer accounts acquired by Lifewatch and Connect America under the Marketing Alliance Agreements originated from WWIS. (*See* Ex. C, ¶¶ 23-24).

15. Entities affiliated with WWIS included American Innovative Concepts, Inc., National Life Network, The Credit Voice, and Global Interactive Technologies. (*See* Exhibit J, Boling affidavit, ¶ 32; *see also* Exhibit K, Worldwide Permanent Injunction Order, ¶ 3(a), 3(f)).

16. As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch sustained at least $8.77 million in losses. (*See* Exhibit L, Flaherty Report, p. 16).

17. As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch refunded $2,999,628 dollars to customers. (*See* Ex. L, p. 16).

18. As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch "gave away" to customers medical alert equipment that Lifewatch paid for and which had a retail value totaling $14 million. (*See* Ex. L, p. 4; *see also* Exhibit T).

19. Before May 31, 2013, Lifewatch sold accounts to non-parties including Philips Lifeline, Valued Relationships Inc., First Street, and Security Partners. (*See* Exhibit M, Roman Affidavit, ¶ 15).

20. In April 2014, as a result of the allegations made by the FTC and the Florida Attorney General in the Florida enforcement proceedings filed against WWIS voluntarily created a customer refund program to address WWIS's alleged violations to the extent they impacted existing Lifewatch customers. (*See* Ex. C, ¶ 17; Ex. A, ¶ 9; Ex. D, 78:14-21).

21. As part of this refund program, Lifewatch provided its customers with information about the Florida litigation and offered and provided full refunds to customers who had purchased Lifewatch's products or services based on, *inter alia*, any of the allegedly false

and misleading statements of the independent companies cited by the FTC and the Florida Attorney General in their legal action. (*See* Ex. C, ¶ 17; Ex. A, ¶ 9; Ex. D, 78:14-21).

22. Through this Lifewatch refund program, Lifewatch sent letters to its customers, and those who responded were issued a refund. (*See* Ex. C, ¶ 17; Ex. A, ¶ 9; Ex. D, 78:14-21).

**DAVID ROMAN**

23. David Roman has been the president and majority shareholder in Safe Home Security, Inc., a Connecticut home security company, since its incorporation in 1988. (*See* Ex. M, ¶ 2).

24. Roman has been a majority shareholder in Medguard Alert, Inc., a Connecticut company, since its incorporation in 2011. Medguard Alert, Inc. provides personal emergency response equipment and services to customers. (*See* Ex. M, ¶ 6; Exhibit N, MedGuard Corporate Documents, generally).

25. Roman met Evan Sirlin, the CEO of Lifewatch, Inc., in approximately 2012 after being made aware that Lifewatch was looking for investors. (*See* Exhibit O, Roman Dep., 36:10-20).

26. After reviewing Lifewatch's accounts receivable information and accounts-payments history and determining that Lifewatch already had a sizeable customer pool, Roman invested in Lifewatch, Inc. (*See* Ex. M, ¶ 9; Ex. O, 48:19-49:3).

27. On May 31, 2013, Roman entered into a Share Purchase Agreement in order to acquire an ownership interest in Lifewatch. (*See* Exhibit P, Share Purchase Agreement; Ex. M, ¶ 10).

28. Pursuant to the Share Purchase Agreement, Roman acquired 72% of the outstanding shares in Lifewatch. Another shareholder in Medguard Alert Inc., Craig Cleasby, also acquired 8% of the outstanding shares in Lifewatch. Pursuant to the Share Purchase Agreement, 125 shares (out of 1250) in MedGuard Alert Inc. were provided to the Sirlin Trust (of which Evan Sirlin was the executor, administrator, or trustee) and 125 shares (out of 1250) in Medguard Alert Inc. were provided to the May Trust (of which Mitchel May was executor, administrator, or trustee). (*See* Ex. P, generally; Ex. M, ¶¶ 11-12).

29. Roman was not involved in the formation of Lifewatch's relationship with WWIS which was selling customer accounts to Lifewatch since the beginning of 2012. (*See* Ex. M, ¶ 20).

30. Roman did not sign the agreements between Lifewatch and WWIS or any of the entities alleged by the FTC to be related to WWIS (i.e. the entities named in the FTC's suit against WWIS and the related defendants). (*See* Ex. F, Ex. M, ¶ 20).

31. Roman did not provide call lists to telemarketers, create sales scripts, or otherwise assisted third parties in engaging in violative conduct as alleged in the Amended Complaint. (*See* Ex. M, ¶ 22).

32. In his June 5, 2017 affidavit, Roderic Boling indicated that Messrs. May and Sirlin were aware that WWIS was engaged in using pre-recorded messages and that Messrs. May and Sirlin and WWIS personnel actively concealed information from Roman. (*See* Ex. J, ¶ 37; *see also* Ex. M, ¶ 24).

33. In July 2013, Roman asked May and Sirlin about whether Mr. Boling's failure to provide recordings was indicative of potential violations of Lifewatch's Purchase Agreements. (*See* Ex. M, ¶ 25).

34. Mr. Boling claims Messrs. May and Sirlin were aware Worldwide was manipulating recordings that he would send so that Roman would not know about underlying violative pre-recordings. (*See* Ex. J, ¶ 47).

35. Mr. Boling claims predictive dialers were acquired and concealed from Roman. (*See* Ex. J, ¶ 47).

36. Mr. Boling claims that "overpayments" were made to Worldwide so that cash payments approximating $1.2 million could be provided to May and Sirlin and concealed from Roman. (*See* Ex. J, ¶ 48).

## SAFE HOME SECURITY, INC.

37. Since 1988, Safe Home Security, Inc. has been in the business of selling home and business alarm systems and services. The business was previously headquartered at 55 Sebethe Drive, Cromwell, Connecticut and is now headquartered at 1125 Middle Street in Middletown, Connecticut. (*See* Ex. M, ¶ 3).

38. Safe Home Security has not sold personal emergency response systems, though a small percentage of its home alarm customers have been provided with personal pendants, which are attachments to their existing alarm systems. (*See* Ex. M, ¶ 3).

39. None of Roman's co-defendants in this litigation have ever held an ownership interest in Safe Home Security, Inc., nor have any of the co-defendants been officers or employees of Safe Home Security, Inc. (*See* Ex. M, ¶ 5; *see also* Exhibit R, Med Guard Alert and Safe Home Security employee lists).

40. Safe Home Security, Inc.'s office was located at 55 Sebethe Drive in Cromwell, Connecticut, and has recently moved to Middletown, Connecticut. (*See* Ex. M, ¶ 3).

41. Safe Home Security, Inc. did not share office space, officers, or personnel with Lifewatch at any time before May 31, 2013. (*See* Ex. M, ¶ 16).

42. Safe Home Security, Inc. and Lifewatch Inc. have not shared or co-mingled operating accounts. (*See* Ex. M, ¶ 19).

43. Safe Home Security, Inc. and Lifewatch Inc. have always filed separate tax returns. (*See* Ex. M, ¶ 19).

44. Safe Home Security, Inc. and Lifewatch Inc. have always maintained separate payrolls. (*See* Ex. M, ¶ 19).

45. Safe Home Security Inc. and MedGuard Alert Inc. did not share personnel between 2013 and 2016. (*See* Ex. R, generally).

**MEDGUARD ALERT, INC.**

46. Medguard Alert, Inc., a Connecticut company, incorporated in 2011 provides personal emergency response equipment and services to customers. (*See* Ex. M, ¶ 6; *see also* Exhibit N, MedGuard Corporate Documents).

47. Medguard Alert, Inc. had a pool of customers beginning in approximately January 2013, after having purchased those customer accounts, in bulk, from a non-party entity. (*See* Ex. M, ¶ 7).

48. In conjunction with and after the Share Purchase Agreement, Medguard Alert, Inc. also obtained additional customers by buying bulk accounts from Lifewatch Inc. (*See* Ex. M, ¶ 7, 13; *see also* Ex. P, generally).

49. After the Share Purchase Agreement, Medguard Alert, Inc. also purchased customer accounts in 2014 from non-party entities. (*See* Ex. M, ¶ 14).

50. MedGuard Alert, Inc.'s offices have always been in Connecticut. (*See* Ex. M, ¶ 18).

51. Up until May 31, 2013, MedGuard Alert, Inc. did not share office space, officers, or personnel with Lifewatch. (*See* Ex. M, ¶¶ 18-19).

52. Medguard Alert, Inc. and Lifewatch Inc. have not shared or co-mingled operating accounts. (*See* Ex. M, ¶ 19).

53. Medguard Alert, Inc. and Lifewatch Inc. have always filed separate tax returns. (*See* Ex. M, ¶ 19).

54. Medguard Alert, Inc. and Lifewatch Inc. have maintained separate payrolls. (*See* Ex. M, ¶ 19).

## **THE LITIGATION**

55. The FTC has alleged the following statements were made by third-party sellers in connection with selling Lifewatch's services:

- A friend, family member, health care provider, or other acquaintance of the consumer referred the consumer to Defendants, or purchased the medical alert system for the consumer;

- Defendants' medical alert system is endorsed by reputable organizations, including, but not limited to, the American Heart Association, the American Diabetes Association, the National Institute on Aging, the AARP, the American Red Cross, and/or health care providers;

- Consumers will not be charged the first monitoring fee until they have received and activated the medical alert system;

- Consumers may cancel the monitoring service at any time without any further financial obligation

*See Dkt. #165.*

56. In fact medical alert systems have been endorsed by reputable organizations and health care providers.[1]

57. Lifewatch's consumers can cancel without further financial obligation. (*See* Ex. D, 88:14-24)

58. Lifewatch's consumers are charged in conjunction with receiving medical alert systems, which are already active and ready to be used because Lifewatch engages monitoring centers for each customer before the devices are even sent. (*See* Ex. D, 83:8-11).

59. The customer is not charged for use of the device, and, therefore the device is free to the customer. (*See* Ex. D, 147:21-25).

60. After May 24, 2013, a single customer was signed up on July 12, 2013. However, the customer canceled within thirty days, thus requiring a refund. (*See* Ex. M, ¶ 24; *see also* Exhibit Q, generally).

---

[1] https://www.aarp.org/health/doctors-hospitals/info-11-2010/medical_alert_systems.html ;
https://www.aarp.org/caregiving/home-care/info-2017/medic-alert-systems-options.html ;
https://www.nia.nih.gov/health/aging-place-growing-old-home ; https://www.redcrossstore.org/dp.aspx?pgid_609