UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS,<br><br>Plaintiffs,<br><br>v.<br><br>LIFEWATCH INC., a New York corporation, also d/b/a LIFEWATCH USA and MEDICAL ALARM SYSTEMS,<br><br>SAFE HOME SECURITY, INC., a Connecticut corporation,<br><br>MEDGUARD ALERT, INC., a Connecticut corporation,<br><br>EVAN SIRLIN, individually and as an officer or manager of Lifewatch Inc.,<br><br>MITCHEL MAY, individually and as an officer or manager of Lifewatch Inc., and<br><br>DAVID ROMAN, individually and as an officer or manager of Lifewatch Inc., Safe Home Security, Inc., and Medguard Alert, Inc.<br>Defendants. | Case No. 15cv5781<br><br>**AFFIDAVIT OF DAVID ROMAN** |

I, David Roman, of full age and being duly sworn, say:

1. I am a Connecticut resident and I am over the age of 18. I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify to the facts set forth herein.

2. I have been the president and majority shareholder in Safe Home Security, Inc., a Connecticut home security company, since its incorporation in 1988.

1

3. Since 1988, Safe Home Security, Inc. has been in the business of selling home and business alarm systems and services. The business was previously headquartered at 55 Sebethe Drive, Cromwell, Connecticut and is now headquartered at 1125 Middle Street in Middletown, Connecticut.

4. Safe Home Security has not sold personal emergency response systems, though a small percentage of its home alarm customers have been provided with personal pendants, which are attachments to their existing alarm systems.

5. None of the co-defendants in this litigation have ever held an ownership interest in Safe Home Security, Inc., nor have any of the co-defendants been officers or employees of Safe Home Security, Inc.

6. I have also been a majority shareholder in Medguard Alert, Inc., a Connecticut company, since its incorporation in 2011. Medguard Alert, Inc. provides personal emergency response equipment and services to customers.

7. Medguard Alert, Inc. had a pool of customers beginning in approximately January 2013, after having purchased those customer accounts, in bulk, from a non-party entity.

8. I met Evan Sirlin, the CEO of Lifewatch, Inc., in approximately 2012 after being made aware that Lifewatch was looking for investors. Lifewatch Inc. was and is a personal emergency response system company that has provided personal emergency response equipment and services. Lifewatch was and is headquartered at 266 Merrick Road, Suite 104, Lynbrook, New York.

9. After a review of Lifewatch's accounts receivable information and accounts-payments history and after I determined that Lifewatch already had a sizeable customer pool, I invested in Lifewatch, Inc.

10. On May 31, 2013, I entered into a Share Purchase Agreement in order to acquire an ownership interest in Lifewatch.

11. Pursuant to the Share Purchase Agreement, I acquired 72% of the outstanding shares in Lifewatch. Another shareholder in Medguard Alert Inc., Craig Cleasby, also acquired 8% of the outstanding shares in Lifewatch.

12. Pursuant to the Share Purchase Agreement, 125 shares (out of 1250) in MedGuard Alert Inc. were provided to the Sirlin Trust (of which Evan Sirlin was the executor, administrator, or trustee) and 125 shares (out of 1250) in Medguard Alert Inc. were provided to the May Trust (of which Mitchel May was executor, administrator, or trustee).

13. In conjunction with and after the Share Purchase Agreement, Medguard Alert, Inc. also obtained additional customers by buying bulk accounts from Lifewatch Inc.

14. After the Share Purchase Agreement, Medguard Alert, Inc. also purchased customer accounts in 2014 from non-party entities.

15. I understand that before the Share Purchase Agreement, Lifewatch sold accounts to non-parties including Connect America, Philips Lifeline, Valued Relationships Inc., First Street, and Security Partners.

16. Safe Home Security, Inc.'s office was located at 55 Sebethe Drive in Cromwell, Connecticut, and has recently moved to Middletown, Connecticut. Safe Home Security, Inc. did not share office space, officers, or personnel with Lifewatch at any time before May 31, 2013.

17. The employee listing documents disclosed to the FTC (MG001-6 and SH 0001-4) show that Safe Home Security Inc. and MedGuard Alert Inc. did not share personnel.

18. MedGuard Alert, Inc.'s offices have always been in Connecticut. Up until May 31, 2013, MedGuard Alert, Inc. did not share office space, officers, or personnel with Lifewatch.

19. Safe Home Security, Inc., Medguard Alert, Inc. and Lifewatch Inc. have not shared or co-mingled operating accounts and have always filed separate tax returns and maintained separate payrolls.

20. I was not involved in the formation of Lifewatch's relationship with Worldwide Info Services. Nor did I sign any of the agreements between Lifewatch and Worldwide Info Services, Inc. or any of the entities alleged by the FTC to be related to Worldwide Info Services, Inc. (i.e. the entities named in the FTC's suit against Worldwide and the related defendants).

21. While I assumed a director's role within Lifewatch, Inc. upon acquisition of the shares on May 31, 2013, I did not have knowledge or awareness as to Lifewatch engaging in dishonest, fraudulent, unfair, deceptive, or violative conduct as alleged in the Amended Complaint and I believed that Lifewatch's third party sellers were generally adhering to the terms of the purchase agreements and that they were following the law.

22. Moreover, I did not provide call lists to telemarketers, create sales scripts, or otherwise assisted third parties in engaging in violative conduct as alleged in the Amended Complaint.

23. Lifewatch customer lists provided to the FTC (FTC 0278-04285) show that after May 24, 2013, only one customer was acquired from Worldwide Info Services, Inc. (on July 12, 2013), but the customer cancelled within 30 days, thus necessitating a refund.

24. I understand Mr. Boling (who is apparently the same person I knew as "Rick") indicated in his June 5, 2017 affidavit that Messrs. May and Sirlin were aware that Worldwide was

engaged in using pre-recorded messages and that Messrs. May and Sirlin and Worldwide personnel actively concealed information from me.

25. In July 2013, I specifically asked May and Sirlin about whether Rick's failure to provide recordings was indicative of potential violations of Lifewatch's Purchase Agreements. I now understand that Mr. Boling claims Messrs. May and Sirlin were aware Worldwide was manipulating recordings that he would send so that I wouldn't know about any underlying violative pre-recordings.

26. I understand Mr. Boling claims predictive dialers were acquired and concealed from me and that "overpayments" were made to Worldwide so that cash payments approximating $1.2 million could be provided to May and Sirlin and concealed from me.

27. Assuming Mr. Boling's account of what occurred is accurate, I was not aware of this conduct, which amounts -- in my view -- to stealing from the company, undermining the company, and breaching duties to the company.

28. I understand the FTC has alleged the following statements were made by third-party sellers in connection with selling Lifewatch's services:

- A friend, family member, health care provider, or other acquaintance of the consumer referred the consumer to Defendants, or purchased the medical alert system for the consumer;

- Defendants' medical alert system is endorsed by reputable organizations, including, but not limited to, the American Heart Association, the American Diabetes Association, the National Institute on Aging, the AARP, the American Red Cross, and/or health care providers;

- Consumers will not be charged the first monitoring fee until they have received and activated the medical alert system;
- Consumers may cancel the monitoring service at any time without any further financial obligation

29. While I am unaware of those specific statements having been made in connection with selling Lifewatch's services, it has been my belief and understanding that:

a) Medical alert systems have indeed been endorsed by reputable organizations and health care providers, including but not limited to AARP and the Red Cross. In fact, I understand that the Red Cross and PERS company, Philips Lifeline (which purchased accounts from Lifewatch) entered into a PERS partnership; b) Lifewatch's consumers can cancel without further financial obligation, and c) Lifewatch's consumers are charged in conjunction with receiving medical alert systems, which are already active and ready to be used because Lifewatch engages monitoring centers for each customer before the devices are even sent; and, d) The customer is not charged for the device. Rather, the customer is charged for services associated with use of the device and, therefore, the device can be considered "free" to the customer.

30. I am unaware of those specific statements or the practices of the third-party sellers having caused harm to consumers given that Lifewatch has provided a product and service that unquestionably works and given that unsatisfied consumers already obtained full refunds or had the ability to obtain full refunds.

6

31. After acquiring an interest in Lifewatch on May 31, 2013, I began to learn about the customer cancellation rates associated with customers acquired through third-party sellers.

32. As I testified in my deposition, I didn't know what was typical with respect to PERS cancellation rates, but I felt that the cancellation rates were, in any event, unacceptable from a business standpoint. I conferred with Mr. Sirlin and it was decided that Medguard Alert, Inc. would begin handling verification for third party seller calls in order to reduce cancellation rates.

33. In 2014, after the FTC filed suit against the *Worldwide* defendants, we implemented a quality control program, which included:

    a) Arranging for a refund program to customers who believed they were induced to purchase products and services based on misrepresentations by the Worldwide defendants;

    b) Requiring third-party sellers to present valid business licenses;

    c) Insisting that outside sellers sign affidavits affirming they will follow Lifewatch's guidelines and will not make the statements at issue in this case (i.e. those set forth in the Amended Complaint) to prospective customers;

    d) Designating a Lifewatch employee to request and receive audio-recordings and conduct spot checks to ensure compliance with Lifewatch's guidelines and purchase agreements.

34. This quality control program was part of my effort to decrease customer attrition and encourage compliance with Lifewatch's purchase agreements.

35. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: December 26, 2017

David Roman