UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and <br><br> STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS <br><br> Plaintiff, <br><br> v. <br><br> LIFEWATCH INC., a New York Corporation, also d/b/a LIFEWATCH USA and MEDICAL ALARM SYSTEMS, and <br><br> EVAN SIRLIN, individually and as an officer or manager of LIFEWATCH, INC. <br><br> Defendants. | Case No.: 15-cv-5781 <br><br><br> DECLARATION OF EVAN SIRLIN |

I, EVAN SIRLIN, of full age, declare as follows:

1. I am Lifewatch, Inc.'s Chief Executive Officer. I have personal knowledge of the facts set forth herein, which are known to me to be true and correct.

2. Lifewatch is a duly registered New York Corporation that employs approximately 90 people and provides medical alert products and monitoring services to seriously ill, elderly, and disabled individuals.

3. Over the last 3 years, Lifewatch has had an ongoing business relationship with approximately 60,000 customers.

4. By simply pressing a button on a Lifewatch medical alert device, Lifewatch's customers have immediate access to emergency services that are provided by entities with whom Lifewatch contracts.

5. Lifewatch regularly receives communications from customers that rely on Lifewatch's products and services and who are thankful that Lifewatch's products and services have been life-saving.

6. Lifewatch has been in business for three decades and was founded by my father.

7. Lifewatch did not and does not make or initiate telephone telemarketing calls. Nor does Lifewatch create, generate, or circulate recorded telephonic marketing messages.

8. Lifewatch does not have its own sales or marketing staff.

9. Beginning in approximately 2012, Lifewatch began entering into Purchase Agreements with various outside sale companies. Pursuant to these Purchase Agreements, the outside companies develop and design their own marketing strategies, originate customer accounts, and then offer to sell those accounts to Lifewatch—and others—on a non-exclusive basis.

10. Within the Purchase Agreements, the outside companies warrant and covenant that they do not and will not violate any state or federal telemarketing laws, or any other laws in originating customer accounts.

11. Based on my company's 30-plus years of experience in the personal emergency response service industry and previous affiliations with industry groups, I know that Lifewatch has dozens of competitors and that some of the same outside sellers that sold customer accounts to Lifewatch also sold and continue to sell customer accounts to Lifewatch's competitors.

12. Further, I routinely receive communications from entities offering to originate customer accounts for Lifewatch. Those entities have provided me with information indicating that they originate customer accounts for Lifewatch's competitors.

13. In early 2014, Lifewatch learned that some outside sales companies from which Lifewatch had purchased customer accounts in 2012 and 2013 pursuant to Purchase Agreements had been sued by the FTC.

14. Those entities included National Life Network, The Credit Voice, American Innovative Concepts, Global Interactive Technologies, and Worldwide Info Services.

15. In that lawsuit, the FTC alleged that these outside sales companies made the following false statements:

    a. That a product or service had already been purchased by a friend, family member or other acquaintance;

    b. That products or services have been endorsed by the American Heart Association, the American Diabetes Association, and the National Institute on Aging;

    c. That consumers would not be charged the first monitoring fee until they received and activated the medical alert system.

16. I was unaware that the outside sale companies had engaged violative activities or that they made false statements.

17. As a result of the allegations in the suit brought by the FTC, Lifewatch voluntarily created a customer refund program to offer refunds to any customers allegedly deceived by the independent companies sued by the FTC. Lifewatch refunded customers who requested this refund.

18. Lifewatch stopped doing business in 2013 with the companies sued by the FTC in Florida.

19. Lifewatch has a quality control program relative to its purchase of medical alert customer accounts from outside sellers. That program has evolved and has been refined to address

the issues that we have identified. In accordance with that program, Lifewatch takes affirmative steps to evaluate compliance with applicable regulations by spot checking audio-recordings of outside sellers' phone calls. That quality control program is described in detail in Sarai Baker's declaration.

20. Lifewatch strives to be a good corporate citizen and to ensure that its business practices do not run afoul of any state or federal laws. Further, Lifewatch has a strong business incentive to ensure that it does not enter into Purchase Agreements with entities that ultimately engage in violative telemarketing practices or make misrepresentations to prospective customers. Specifically, Lifewatch accepts credit card and ACH payments from its customers through third party processors. If a high volume of customers who paid for a Lifewatch product via credit card or ACH believe that they have been defrauded or taken advantage of and then contest the credit card or ACH charges, third party processors will terminate their relationship with Lifewatch and no longer process payments for Lifewatch.

21. Given that Lifewatch wants to prevent customers from contesting credit card or ACH charges, and given that outside sellers sell to Lifewatch as well as its competitors, Lifewatch uses the d/b/a "Medical Alarms 516-374-5433 NY," the d/b/a "Purchase Medical Alarms (516-374-5433 NY)", and the d/b/a "Medical Alarms, Hewlett, NY" for credit card and ACH charges. Accordingly, customers who receive a credit card or ACH charge in connection with a Lifewatch product or service see these d/b/a/ names on their statements. The use of these d/b/a names is designed to ensure that outside sellers can refer generically to "medical alarms" in their advertising and then sell the customer accounts they originated to Lifewatch or any other company within the personal

emergency response system industry. The use of the d/b/a names was also designed to ensure that customers are not confused about the nature of the charge appearing on their bank or credit card statement, and thus they are less likely to dispute the charge with their bank or credit card company.

22. The FTC has relied upon an affidavit by Ken Gross, the CEO of Lifewatch's direct competitor, Connect America. Within that affidavit, Mr. Gross indicates that I made certain statements to him in March 2013 and May 2013. I deny that I ever made those statements to Mr. Gross or anyone else. Rather, I simply told Mr. Gross that I understood the telemarketing practices of our outside sellers to be compliant with state and federal law.

23. I mentioned this to Mr. Gross within the context of talking about the business relationship between Lifewatch and Connect America. Specifically, in 2012 and 2013, Lifewatch and Connect America entered into a Marketing Alliance Agreement. In connection with that Marketing Alliance Agreement, Lifewatch brokered "pass-through" customer accounts to Connect America. Lifewatch does not currently have a business relationship with Connect America.

24. Pass-through accounts involved transactions in which Lifewatch passed accounts through to Connect America. In those instances, Lifewatch received no money. This is because of the manner in which Lifewatch structured the pass-throughs. To illustrate, when Lifewatch purchased a bulk of, for instance, 23 customer accounts from Worldwide Info Services to be passed along to Connect America, Lifewatch would: a) use Connect America's funds to purchase accounts for Connect America; and, b) as compensation for facilitating the transaction (through our established business relationship with

Worldwide), Lifewatch would take 3 customers for its own customer pool, to whom Lifewatch would supply emergency equipment and bill directly. The other 20 customers would be passed on to Connect America, who would be responsible for providing emergency equipment and billing to those customers.

25. The FTC has submitted documents indicating that Lifewatch submitted a Commercial Telephone Seller Business License Application in 2012, and that scripts were annexed thereto. Given that, at the time, Lifewatch was receiving inbound calls in connection with its television and radio advertising, and in an abundance of caution, Lifewatch's counsel submitted this application in Florida.

26. Lifewatch never made telemarketing calls. Further, Lifewatch did not draft, revise, or approve the scripts annexed to the application. Upon information and belief, those scripts were drafted by Worldwide Info Services, Inc.

27. The FTC has also submitted documents indicating that I was listed as a director of Senior Medical Alert Systems, LLC., which applied for a telemarketing license in Florida. I was never a director or officer of Senior Medical Alert Systems, LLC and I never gave anyone authorization to list me as a director or for Senior Medical Alert Systems, LLC. to apply for a telemarketing license.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: 11/10/2015

EVAN SIRLIN