```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
   FEDERAL TRADE COMMISSION and   )
 4 STATE OF FLORIDA, OFFICE OF     )
   THE ATTORNEY GENERAL,           )
 5 DEPARTMENT OF LEGAL AFFAIRS,    )
                                   )
 6              Plaintiffs,        )
                                   )
 7 -vs-                           )   Case No. 15 C 5781
                                   )
 8 LIFEWATCH, INC., a New York     )
   corporation, doing business     )
 9 as LIFEWATCH USA, doing         )
   business as MEDICAL ALARM       )
10 SYSTEMS, and EVAN SIRLIN,       )
   individually and as an         )
11 officer or manager of           )
   Lifewatch, Inc.,               )   Chicago, Illinois
12                                 )   December 14, 2015
                Defendants.       )   10:00 a.m.
13

14     TRANSCRIPT OF PROCEEDINGS - Preliminary Injunction Hearing
              BEFORE THE HONORABLE GARY FEINERMAN
15

16 APPEARANCES:

17 For Plaintiff FTC:      FEDERAL TRADE COMMISSION
                           BY:  MR. DAVID A. O'TOOLE
18                              MS. ROZINA C. BHIMANI
                               MS. MARISSA J. REICH
19                         55 East Monroe Street
                           Suite 1860
20                         Chicago, Illinois  60603
                           (312) 960-5602
21

22 Court Reporter:

23             CHARLES R. ZANDI, CSR, RPR, FCRR
                    Official Court Reporter
24             United States District Court
        219 South Dearborn Street, Suite 2128
25             Chicago, Illinois  60604
               Telephone:  (312) 435-5387
        email:  Charles_zandi@ilnd.uscourts.gov
```

1    APPEARANCES:  (Continued)

2    For Plaintiff              FLORIDA OFFICE OF THE ATTORNEY
     State of Florida:          GENERAL
3                               BY:  MS. KRISTEN K. JOHNSON
                                135 West Central Boulevard
4                               Suite 670
                                Orlando, Florida  32801
5                               (407) 316-4840

6

7    For the Defendants:        GREENSFELDER, HEMKER & GALE, P.C.
                                BY:   MR. DAVID B. GOODMAN
8                                     MR. THADFORD A. FELTON
                                200 West Madison Street
9                               Suite 2700
                                Chicago, Illinois  60606
10                              (312) 419-9090

11                              THE SULTZER LAW GROUP
                                BY:  MR. JASON P. SULTZER
12                                   MR. JOSEPH LIPARI
                                85 Civic Center Plaza
13                              Suite 104
                                Poughkeepsie, New York  12601
14                              (774) 705-7747

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings heard in open court:)

2              THE CLERK:  15 C 5781, FTC versus Lifewatch.

3              MR. O'TOOLE:  Good morning, your Honor.  David

4       O'Toole, Marissa Reich, and Rozi Bhimani from the FTC.

5              MS. JOHNSON:  Good morning, your Honor.  Kristen

6       Johnson for the State of Florida, Office of the Attorney

7       General.

8              MR. GOODMAN:  Good morning, your Honor.  David

9       Goodman, Thadford Felton, Joseph Lipari, and Jason Sultzer on

10      behalf of the defendants.

11             THE COURT:  Good morning.  So, are both sides ready

12      to proceed with the hearing?

13             MR. O'TOOLE:  Yes, your Honor.

14             MR. GOODMAN:  Yes, your Honor.

15             THE COURT:  Okay.  So, we -- there are three motions

16      that have been filed.  Two were filed on Friday, and one was

17      filed this morning.  I would just like to take care of that

18      housekeeping for a moment.

19             So, docket 107 is the defendants' motion for leave to

20      file under seal.  Is there any objection to that from the

21      plaintiff?

22             MR. O'TOOLE:  No, your Honor.

23             THE COURT:  Okay.  So, I'll grant 107.

24             Docket 109 is the defendants' motion to strike

25      certain dockets from the docket -- docket entries from the

1  docket or place them under seal, and these are documents that

2  the defendants themselves placed on the docket.  Is there any

3  objection to those?

4          MR. O'TOOLE:  No, your Honor.

5          THE COURT:  Okay.  So, 109 is granted.  And what I'll

6  do is I'll just place them under seal, as opposed to strike

7  them.

8          And 111, which was filed this morning, is a motion to

9  strike Attachments D and E to Plaintiffs' Exhibit 87.  What's

10  the plaintiffs' view on that?

11          MR. O'TOOLE:  Your Honor, we've only had a chance to

12  glance over it.  I think it might make sense to argue this in

13  the context of the other evidence that we're going to be

14  discussing hopefully this afternoon.  So, when we go through

15  the plaintiffs' exhibits, I think it might make sense to --

16  it's a related argument to another motion they've made anyway,

17  so I think rather than doing the argument now and then again

18  later, it might make sense just to do it then.

19          THE COURT:  Do you agree?

20          MR. GOODMAN:  Yes.

21          THE COURT:  Okay.  So, we'll do 111 later.

22          Do you want to make an opening statement?

23          MR. O'TOOLE:  Yes, your Honor.

24          THE COURT:  Go ahead.  And do we have any witnesses

25  in the courtroom right now?

1          MR. O'TOOLE:  We do, your Honor.  We have --

2          THE COURT:  Is that okay with both sides?  Of course,

3    Mr. Sirlin can be here because he's a party, but any -- are

4    both sides okay with the non-party witnesses being in the

5    courtroom during opening statements and during other people's

6    testimony?

7          MR. GOODMAN:  We don't have any objection.

8          MR. O'TOOLE:  Neither do we, your Honor.

9          THE COURT:  Okay.  So, there's no motion to bar, and

10   that's fine.  If it's okay with you, it's okay with me.

11         Go ahead.

12         MR. O'TOOLE:  Okay.  Your Honor, I'll try to keep

13   this brief.  And I know you've read a mountain of paper about

14   this case.  We've argued numerous motions.  We've been talking

15   about this case for five months, so I'm not going to rehash

16   all the arguments we've made and all the evidence that we've

17   filed so far.

18         But as we said at the very beginning when we filed

19   this case, there really isn't going to be any dispute as to

20   the core facts.  The defendants do not dispute that there have

21   been rampant illegal robo-calls and other telemarketing calls

22   made for medical alert devices in the United States for the

23   last four years.  They don't dispute that most of these calls

24   are robo-calls, which are almost always *per se* illegal all on

25   their own.

1        They don't dispute that these calls are filled with

2   misrepresentations, both in the robo-call portion, but also in

3   the telemarketing portion after the consumers press the button

4   to go through with the call.  And they also don't dispute that

5   most of these people are people on the Do Not Call List.

6        What they dispute is they're not -- what they say is

7   they're not responsible for them because of a clever contract

8   term they've put into their contracts with telemarketers.

9        Remember, they also don't dispute that in

10  virtually -- in every case in which we've been able to

11  identify whose product was actually being sold through these

12  calls, it was a Lifewatch product.

13       Now, the defendants want to create a lot of noise

14  about the evidence that we've filed in this case.  They're

15  going to talk a lot about Consumer Sentinel, even though we

16  don't.  They're going to say the victims don't know that

17  they're dealing with Lifewatch, and that this is somehow very

18  important.

19       They're also going to say that some of our call

20  center employees, the people who we put declarations in from

21  the Worldwide and the Payless call centers didn't know they

22  were working for Lifewatch and that there's some legal

23  significance to that.

24       They're also going to tell you and they told you over

25  and over how the evidence is old.  They use the word "stale."

1  And by that they mean that many of the consumer declarations,

2  probably over half the consumer declarations we have come from

3  the time when Worldwide was doing telemarketing for them.

4  Now, they're not saying this is outside the statute

5  of limitations because there is no statute of limitations

6  under the Federal Trade Commission Act.  And the statute of

7  limitations under the Telemarketing Sales Rule, if we were

8  seeking civil penalties, would only be five years.  All of the

9  calls fall within that period anyway.  So they're not saying

10  it's outside of the statute, just that it's a little bit old.

11  But it also misstates the evidence.  The fact is that

12  we've submitted dozens of transcripts of calls that have taken

13  place after Worldwide was shut down in January of 2014, and

14  all of the transcripts somehow tie back to Lifewatch.  And

15  we've established that, and I suspect that we'll spend a lot

16  of the afternoon going through that evidence again and trying

17  to reestablish how we responded on their motion to strike a

18  couple of months ago.

19  The bottom line is the defendants think they've

20  structured their relationships with telemarketers in a way to

21  insulate them from liability for what the telemarketers do.

22  That is a complete misstatement of the law, both under the

23  Federal Trade Commission Act, the Telemarketing Sales Rule,

24  and the relevant Florida statutes.

25  Beyond that, the evidence shows that they were

1     intimately involved with the telemarketers. They drafted

2     scripts. They revised scripts. The telemarketers thought

3     they had to get Lifewatch's approval before they changed

4     scripts. They fund the call centers. They are in daily

5     communication with the call centers. And the recent evidence

6     that we submitted two or three weeks ago from the Payless

7     search warrants just further shows that that relationship

8     continues.

9        Finally, what the defendants say is that after years

10     of government and private actions being brought against them

11     and the telemarketers, they're finally now trying to do

12     something about it. They talk about their evolving quality

13     assurance program. But the fact is, and if you look at their

14     response to our Civil Investigative Demand and you look at

15     their response to the various lawsuits, they've been saying

16     that for years.

17        They've consistently said, "We don't know what our

18     telemarketers are doing. When we find out, we do something

19     about it." But all they've really done in the interim is

20     they've tried to restructure the relationship so they can have

21     even more deniability than before.

22        A little bit of background. In 2011, Lifewatch was a

23     tiny company. According to the financial statements they gave

24     us, they had less than $4 million in sales in 2011, and that's

25     when they started telemarketing big, at the end of 2011. By

1  2013, they had grown almost tenfold.  This is a company that

2  has built itself entirely by doing -- by hiring telemarketers.

3  Now, we don't know exactly what their financial

4  situation is since August 2014 because they've refused to

5  provide any documents about that for us, but we do know at

6  least through the first eight months of 2014 they were at

7  basically the same pace as 2013.

8  During the time that Worldwide was doing

9  telemarketing for Lifewatch, which is from beginning of 2012

10 to the first week in January of 2014, the evidence is

11 undisputed that they were blasting something like 2 million

12 robo-calls per day.  Of those robo-calls, 800 to 900,000 of

13 those were actually reaching a person or an answering machine,

14 and between 10 and 20,000 of those calls resulted in a

15 consumer actually pressing the button to talk to a live

16 telemarketer.

17 The evidence also from Worldwide shows that at their

18 peak, Worldwide was making 600 sales per day from their

19 telemarketing for Lifewatch.  And just to compare that from

20 the documents that the defendants have given us, before they

21 started engaging Worldwide, a good month for them was 400

22 sales; and they were doing 600 sales a day just at Worldwide,

23 that's six days a week, when Worldwide was doing telemarketing

24 for them.

25 The unrebutted evidence, uncontroverted evidence

1   during the Worldwide period is that Lifewatch drafted the

2   scripts.  They revised the scripts.  Worldwide couldn't use

3   the scripts until they'd gotten Lifewatch's approval.

4   Lifewatch knew they were doing robo-calls.  There are constant

5   communications between Worldwide and Lifewatch.  Lifewatch did

6   all the billing, did all the fulfillment, and all of the

7   Worldwide telemarketing was on behalf of Lifewatch.

8           Now, we produced -- as you know, your Honor, because

9   most of what we spent the last five months doing is fighting

10  about discovery, we produced all the documents that we got

11  from the Worldwide facility.  The defendants haven't put a

12  single page on their exhibit list from those documents.  If

13  there was anything to dispute the plaintiffs' conclusions and

14  the receiver's conclusions about what Worldwide was doing,

15  they have had plenty of opportunity to show you that evidence,

16  and they haven't.

17          The fact is that during the time that Worldwide was

18  operating and after, Lifewatch has simply ignored the warning

19  signs that their telemarketers were doing -- or conducting

20  illegal activity.

21          Indiana sued Worldwide in August 2012 and then added

22  Lifewatch to the lawsuit in November 2012.  The Indiana

23  lawsuit was based on illegal robo-calling into the State of

24  Indiana and Do Not Call violations into the State of Indiana.

25  As part of the Indiana complaint, they attached a script they

1    had gotten from one of the Worldwide call centers which was

2    full of misrepresentations as well.

3         Lifewatch's response is, "It's not our

4    responsibility.  We don't know what our telemarketers are

5    doing."  But the result of the Indiana lawsuit was that the

6    Worldwide -- what we've been calling the Worldwide entity,

7    which was really six or seven different companies, they

8    incorporated a new entity shortly thereafter, the same people

9    working at the same location, the same ownership.  The

10   employees simply got -- were now working for a new name, and

11   that happened after the Indiana lawsuit.

12        And that became the pattern of what happened over the

13   next two years, is when there was some legal action, Lifewatch

14   encouraged Worldwide to incorporate a new entity, and they

15   just kept on doing business as usual.

16        Toward the end of the Worldwide period, the last two

17   companies that Worldwide incorporated were actually -- the

18   nominal president of the company was the wife of Michael

19   Hilgar, who was the person that had been running the

20   operations up until then.

21        And that, by the way, from evidence that Lifewatch

22   provided to us late Friday afternoon, looks like a tactic

23   that's still going on with Lifewatch telemarketers, that a

24   wife is incorporating a company because the earlier company

25   that her husband owned was under scrutiny.

1      Started at the end of 2012, the class actions started

2   being filed against Lifewatch because of the Worldwide

3   calling.  In May 2015 -- or 2013, Life Alert sued Lifewatch

4   because of misrepresentations that the Lifewatch telemarketers

5   were using.  Life Alert's claim was based on the fact that

6   they were using a trademark, but that the robo-calling and the

7   telemarketing operations that Lifewatch was funding and

8   operating through Worldwide was killing their brand.  That was

9   the point of the lawsuit in Life Alert.

10      January 2014, we shut Worldwide down.  I've already

11   explained all of the evidence that we found -- and anything to

12   the contrary, defendants haven't provided yet -- shows that

13   Worldwide was working entirely for Lifewatch.  The testimony

14   is that all of the calls that Worldwide was making were

15   outbound, that all began with robo-calls.  There was no Do Not

16   Call scrubbing, and they all had spoofed Caller IDs.

17      Unfortunately, when Worldwide was shut down, things

18   didn't change.  So, we sent a CID to Lifewatch, a Civil

19   Investigative Demand, in April of 2014.  Lifewatch's response

20   again, "It's not our responsibility.  We don't know what's

21   going on."

22      In the CID, we asked them for any evidence to show

23   that they required some -- that they somehow -- the

24   telemarketers were somehow forced to follow the telemarketing

25   rules.  The only documents they provided, just as in the

1    discovery of this case, regarding any telemarketing compliance

2    were the contracts they had with telemarketers that said,

3    "You've got to follow the law." And that was their defense,

4    and that's been their defense all along, that if they put it

5    in a contract, then they don't have to worry about the

6    liability.

7           Life Alert got a preliminary injunction in May 2014,

8    and then the Ninth Circuit affirmed in February 2015. And I

9    think we've quoted the *Life Alert* opinion, the Ninth Circuit

10   opinion several times, but I'll quote it again. The court

11   said, "At bottom, Lifewatch would have us believe that any

12   infringement is traceable to actions by telemarketers for

13   which it has no responsibility. The district court did not

14   buy this story of telemarketers gone rogue, and neither do

15   we."

16          Unfortunately, the robo-calling and the illegal

17   telemarketing continued. We've submitted over 40 transcripts

18   of calls, some as recent as September of this year, that all

19   trace back to Lifewatch. Most of them have the same

20   misrepresentations that the Lifewatch telemarketers have been

21   making since the Worldwide days. They're often using the

22   exact same robo-calls, the same recordings as they did in the

23   Worldwide days. It's the same product description. They use

24   the same scripts, the same rebuttals, all the same claims that

25   were being done during the Worldwide time, and that continues

1    up until September of 2015, which is the most recent evidence
2    that we've provided.

3         Every transcript that we have put on our list either
4    resulted in a completed sale with Lifewatch, an attempted
5    charge, credit card charge or bank charge by Lifewatch.  The
6    call was transferred from a telemarketer to a Lifewatch
7    verifier, an actual Lifewatch employee during the phone call.
8    The telemarketer, in many cases, in some cases, at least,
9    knowing that the credit card statement is going to use the
10   Lifewatch name somehow or a Lifewatch identifier somehow, will
11   admit that Lifewatch is the company that's going to provide
12   the product.

13        They came from phone numbers that we can associate
14   with one of the above categories.  So, in many cases it's a
15   telemarketer that's using the same name, calling from the same
16   phone number that an earlier call or a later call resulted in
17   a Lifewatch sale.

18        And most commonly, they come from telemarketers that
19   filed licenses in the State of Florida in which they
20   identified Lifewatch as the company they were doing sales for.

21        It is true that sometimes the telemarketers don't
22   know the name Lifewatch or deny that they're involved in
23   Lifewatch, but in every transcript that we provided,
24   ultimately, we can tie the call to Lifewatch.

25        Now, the evidence also shows that Lifewatch knows

1    exactly what their telemarketers are doing.  Most of these

2    telemarketers that are subject to licensing in Florida at

3    least have filed nearly identical scripts.  In fact, the

4    rebuttals look to be exactly the same pages as were used in

5    Worldwide and as many of the other current telemarketers are

6    using.

7           Many of them file a Call Center Welcome Package that

8    Lifewatch provides to them.  Despite the fact that Lifewatch

9    has argued that they don't know anything about telemarketing

10   and what their telemarketers are doing, they actually give

11   them a call center package that has a script in it, that also

12   has a verification script in it, but it's got a product script

13   in it.  It's got rebuttals in it.

14          And Lifewatch filed that Call Center Welcome Package

15   with the license they applied for to do telemarketing in

16   Florida as recently as January of this year.

17          The evidence also shows that Lifewatch is involved

18   in -- supervises in great detail the actions of the

19   telemarketers.  And some of this comes from the very recent

20   e-mails that we provided from -- we're calling the Payless

21   e-mails that come from the search warrant on the Google

22   account that Payless operated.

23          But it shows that the telemarketers -- despite

24   Lifewatch's claims to the contrary, the telemarketers submit

25   scripts, sales scripts to Lifewatch for review.  Lifewatch

1  actually edits them, and that some telemarketers, at least,
2  think that they can't use the script until Lifewatch approves
3  it.

4      They also show that Lifewatch is well aware of the
5  fact that there is widespread misrepresentations being made
6  about their product and widespread Do Not Call violations.

7      Now what they've done in the last year is they've
8  required form affidavits from their telemarketers.  Despite
9  the fact that they've identified several hundred telemarketers
10 to us, they provided form affidavits for 15 or 20 of them, all
11 the same affidavit that says various things.  One of the
12 affidavits, one of the forms says that we're going to -- not
13 going to violate the law and that we haven't violated the law.

14     Now, in most cases, in fact, I think in every case,
15 the telemarketer has to actually provide that affidavit to
16 Lifewatch at the time they have a contract with Lifewatch.
17 So, as the relationship is beginning, the telemarketer
18 confirms that they haven't violated the law.

19     The form affidavits also say that -- at least one of
20 the form affidavits says that the telemarketers are working
21 for Lifewatch on a non-exclusive basis, that they can sell for
22 other companies.  But there's no evidence anywhere of them
23 doing so.  And none of the affidavits ever say that they sell
24 for any other company.

25     One of the arguments that Lifewatch has repeatedly

1   said in court so far is that their competitors are doing the

2   same thing that they're doing.  As a legal matter, it's

3   irrelevant.  The fact that Lifewatch is involved in illegal

4   activities isn't diminished by the fact that they claim that

5   their competitors are, too.

6           But they claim that their telemarketers are working

7   for their competitors as well, and they just say that.

8   Mr. Sirlin in his declaration just said that.  We asked for

9   evidence of that in our discovery in this case.  We asked for

10  evidence of that in the CID that we served on them last year.

11  And all they provided, again, are the contracts that say, "We

12  could work for somebody else."  We asked them specifically,

13  "Tell us one telemarketer that has sold for any of your

14  competitors," and they provided nothing.

15          Moreover, the recent evidence shows -- this is in the

16  Payless e-mails, but also from some of the recent

17  transcripts -- that during the telemarketing calls, the actual

18  telemarketing calls, they're transferred -- once the consumer

19  shows interest, they're transferred directly to a Lifewatch

20  employee.  If the theory that Lifewatch has is that their

21  telemarketers are selling contracts, offering them on the open

22  market, and Lifewatch just happens to be buying some, this is

23  an amazing fact that a telemarketer is able to press a couple

24  of numbers and transfer the call to Lifewatch, and that whole

25  negotiation seems to have taken place in the background.

1          Remember again that -- as to exclusivity that

2    regardless of what the affidavits say they can do, most of

3    these telemarketers have filed licenses in Florida in which

4    they only identify Lifewatch as a seller -- as who they're

5    selling for.  Now, you can draw one of two conclusions from

6    this.  One is that -- from their recent supposed compliance

7    activities.  One is that the telemarketers recognize that when

8    Lifewatch tells them to follow the law or when Lifewatch makes

9    threats, that they're not serious about that.

10          And there's an example of this being true in one of

11    the e-mails that was in the Payless documents, where Lauren

12    Vandewater writes to -- actually to Payless, saying, "I just

13    have to cover all my bases so no one can ever say I never told

14    them, LOL."

15          The other possibility is that Lifewatch is doing --

16    you can believe them.  Lifewatch is doing everything they can

17    to patrol their telemarketers and they just can't stop them.

18    But the important thing to remember is that there is nothing

19    in the U.S. Constitution about the right to telemarket.  If

20    telemarketers are *per se* going to be violating the law, then

21    there's nothing that says that Lifewatch gets to do it just

22    because they can't stop them.

23          And that may be -- frankly, some of the recent

24    Consumer Sentinel evidence that we provided might go to

25    exactly that point, that frankly you can't control this.

1  And this is one of the reasons why nobody in the industry

2  seems to telemarket, because you can't do it lawfully and

3  profitably.

4           A few things about the witnesses and the evidence

5  that we've provided here.  We've spent most of the last five

6  months talking about all the stuff that Lifewatch needed to

7  get from us so that they could properly defend themselves.

8  They wanted to depose at one point virtually everybody on our

9  list, and eventually, the Court allowed them to depose 14

10 people.  They actually ended up deposing only six of them.

11          They didn't depose Joseph Settecase from Worldwide.

12 They didn't depose Kathy Amberson, who was a longtime employee

13 at Worldwide.  They didn't depose any of those people.

14          Hilgar and Settecase were defendants in the *Worldwide*

15 case.  And Mr. Goodman has said repeatedly in court, hinted

16 that somehow we had induced Hilgar and Settecase to provide

17 affidavits in this case by some power we have over them.  Both

18 of them fully settled their cases with the FTC.  The only

19 action that the FTC can take against either one of them is if

20 it turns out they lied on their financial statements that they

21 gave us before we settled, which there's no evidence they did,

22 or if they violate the order.  All we can require them to do

23 is to provide us with evidence of what they're doing now to

24 comply with the law.  That's all we can require.

25          They freely did affidavits in this case, and unlike

1  Mr. Hilgar, who apparently was paid by defendants for one of

2  his form affidavits, we didn't offer any inducements to them;

3  and if we had, we've turned over all of the correspondence,

4  and defendants could have found that.

5          Consumer Sentinel, we've spent so much time talking

6  about Consumer Sentinel it's amazing, and I'm sure we're going

7  to spend a lot more time talking about Consumer Sentinel

8  tonight -- or this afternoon.

9          Our investigator's declaration, PX 1, I can't

10  remember the attachment, includes a Consumer Sentinel search

11  in which we found there were 90-some-thousand complaints using

12  the term "medical alert" in the Consumer Sentinel database

13  from January 2012 up until sometime in May 2015.  It's

14  probably several thousand more since then.

15          We do not say that we can say -- we can prove that

16  each of those calls has something to do with Lifewatch.  It

17  would be impossible to do that, for a number of reasons.  One

18  is that most consumers don't know who the call's from.

19  Lifewatch specifically instructs their telemarketers not to

20  say it.  Most of the calls -- or the complaints are about

21  robo-calls, and in almost no case does the robo-call identify

22  who the seller is.

23          Beyond that, most consumers don't care who's calling

24  when they make a complaint.  They provide the phone number

25  only, and that's what the database shows.

1        Now, is it a fair guess that a lot of those calls,

2   most of those calls are on behalf of Lifewatch?  Sure it is.

3   And why is that?  Because Joseph Settecase said that over a

4   two-year period, he connected with 800 to 900,000 phones a day

5   on behalf of Lifewatch, and that's what that evidence

6   establishes.

7        The recent evidence that Mr. Menjivar filed regarding

8   Sentinel and that we're going to talk about, I guess, later on

9   today, we don't try to tie -- we didn't try.  It was clear in

10  our brief, and it's clear in his declaration, we don't claim

11  that all of those 16,000 complaints were on behalf of

12  Lifewatch.  The reason we filed that evidence was in

13  Lifewatch's response to our motion for preliminary injunction,

14  they said, "We have this evolving quality assurance program.

15  We've got seven telemarketers.  And as far as we know, they

16  are all Do Not Call compliant."

17        These -- four of the seven telemarketers, we couldn't

18  find any information about anywhere, but three of them

19  generated 16,000 complaints during the time they were working

20  for Lifewatch.  They're not all about Lifewatch.  These

21  telemarketers certainly sell other products.

22        The point is, and the inference that we want the

23  Court to make, is that if they're rampantly violating the

24  Telemarketing Sales Rule on behalf of other clients, there's

25  reason to believe they would do the same thing for Lifewatch.

1             Finally, a word or two about the law.  There's three

2 kinds of violations that we're alleging in this case,

3 violations of the FTC Act, violations of the Telemarketing

4 Sales Rule, and violations of the Florida laws.

5             Under the FTC Act, no matter what the parties say in

6 a contract, a principal is liable for the misrepresentations

7 and the activities of their agents, their brokers, their

8 independent contractors, whatever term you want to use.  And

9 the law is uniform that you cannot reap the profits from

10 another person's sale of your product and then be able to

11 avoid the liability of it.

12             Under the Telemarketing Sales Rule robo-calling is

13 always illegal.  You don't need to be on the Do Not Call List

14 for a robo-call to be illegal.  The only way that a robo-call

15 involving a product or service is legal is if the person

16 that's making the call has an express written authorization

17 from that recipient saying they'll take robo-calls from that

18 telemarketer or that seller for that product.

19             Caller ID spoofing, which Joseph Settecase said he

20 did in every case, is always illegal.  You don't need to be on

21 the Do Not Call List for it.  It's always illegal.

22             Calling people on the National Do Not Call List is

23 always illegal unless you can show that they somehow agreed to

24 take your call and you've downloaded the most recent Do Not

25 Call List.  And there's no evidence to show that Lifewatch or

1    any of its telemarketers ever downloaded a Do Not Call List.

2              Now, defendants have made the argument, and at some

3    point, we'll actually argue the law, that they don't fall

4    under the Telemarketing Sales Rule as a seller because of a

5    dictionary definition of the word "transaction."  Besides the

6    fact that that would drive a hole in the Telemarketing Sales

7    Rule that is made clear from the statement of basis of purpose

8    and all of the congressional testimony regarding the Do Not

9    Call rule, it also would overturn all the cases that have held

10   exactly the opposite.

11             But it's also irrelevant because even if Lifewatch

12   isn't a seller under the Telemarketing Sales Rule, they

13   assisted and facilitated all of their telemarketers'

14   Telemarketing Sales Rule violations.  To be an assister and

15   facilitator, all you need to do is provide substantial

16   assistance or support and know or consciously avoid knowing

17   that the telemarketers are engaged in violations.

18             The cases are clear, providing a product, promising

19   to pay a commission, fulfilling anything to do with the

20   transaction is enough to satisfy the substantial assistance

21   prong.  The know or consciously avoid knowing is what we've

22   been talking about or I've been talking about for the last

23   20 minutes.

24             There were state actions against Lifewatch and its

25   telemarketers.  There were private actions against Lifewatch

1　and its telemarketers.  We sent them a CID in April 2014.  We

2　had consent negotiations with them for the next year after

3　that before we filed this case.  There are BBB complaints that

4　are all throughout the record.

5　　　　　　　And the FTC and State of Florida shut down Worldwide

6　and Payless, two of their telemarketers, all clearly providing

7　sufficient notice to Lifewatch that their telemarketers were

8　violating the Telemarketing Sales Rule.

9　　　　　　　THE COURT:  Okay.  Thank you.

10　　　　　　　Defendants?

11　　　　　　　MR. GOODMAN:  Good morning.  Listening to the summary

12　of what the plaintiffs have submitted just highlights the

13　extent and the nature of the exaggeration and

14　mischaracterization of the evidence, the -- what has to be

15　intentional exaggeration and mischaracterization of the

16　evidence, and I'll talk about that and how -- why I say that.

17　　　　　　　But I think if you'll look at the briefs -- and

18　you've got lots of briefs that have been submitted, if you

19　look at the materials that have been submitted, and today

20　you'll hear witnesses testify, I think that the evidence, I

21　think that the briefs, I think that the law, I think that they

22　all show that in the circumstances before the Court here, a

23　preliminary injunction -- the preliminary injunction that the

24　plaintiffs seek would be inappropriate.

25　　　　　　　It would be harmful, and you'll hear this, to

1   Lifewatch's business interests to enter into short-term

2   relationships with customers.  It's not looking to, you know,

3   pick up a customer and have quick turnover and have, you know,

4   people come in and out.  That's damaging and disruptive to its

5   business and would assure it of losing money.

6          You'll hear about the investment that is required in

7   connection with every transaction, the upfront costs,

8   including the purchase of the equipment, the monitoring

9   services that Lifewatch has to pay for, and the commission

10  that has to be paid in connection with the sale.

11         So, if telemarketers -- if outside sellers are

12  engaged in deceptive practices so that people are -- are

13  making quick purchases based on misinformation, the likelihood

14  of termination, of cancellation, the likelihood of having to

15  make refunds, the likelihood of having to try to recover

16  equipment that was paid for by Lifewatch and is unlikely to be

17  recovered, the likelihood of ever recouping the expenses in

18  the monitoring services is next to nil.

19         So, Lifewatch does, has, and continues to have an

20  interest in taking measures to ensure that the customer

21  accounts that it purchases are purchased by people who are

22  familiar with the product, want the product, received accurate

23  information about the product, and understand the terms under

24  which they're acquiring the product.  That's an important

25  thing, because otherwise, with respect to every single

1  transaction that Lifewatch is buying, it would be buying, in

2  effect, a likelihood of an early termination.

3  Dissatisfaction and confusion is likely to lead to

4  early termination, and you'll hear about the steps that

5  Lifewatch has taken and continues to take to ensure that its

6  customers, the customers for which it's providing fulfillment

7  services, understand the terms and actually do seek the

8  product that they are ordering and purchasing.

9  We heard a lot -- in fact, most of what Mr. O'Toole

10  is talking about and most of what's been addressed in the

11  briefs, most of what's been submitted to the Court in terms

12  of the documents relating to outside sellers with which

13  Lifewatch is not transacting business.  One of the things that

14  Mr. O'Toole mentioned is that currently -- I think he said

15  this accurately, currently, there -- Lifewatch is working with

16  seven different outside sellers, and they have been for I

17  think about a year.

18  And I'm not suggesting that the Consumer Sentinel is

19  a reliable database by any means.  In fact, if you look at it,

20  you know, they will concede -- they did concede when I deposed

21  Mr. Menjivar a week ago, a little more than a week ago, that

22  they don't do anything, actually, to verify the accuracy of

23  the information in the Consumer Sentinel.  In fact, if I call

24  the Consumer Sentinel and I say I bought -- I've been getting

25  calls from Lifewatch, if I'm a competitor of Lifewatch,

1  whoever can make and report calls.

2  If I have a complaint about a product that I've
3  purchased, the Consumer Sentinel also gets information from
4  the various Better Business Bureaus.  There's no verification
5  of the accuracy of the information submitted there.  The
6  Better Business Bureau is really a mechanism to facilitate the
7  resolution of consumer disputes.

8  So, there's information in the Consumer Sentinel that
9  is submitted for a variety of reasons, and nothing is done
10  actually to verify the accuracy of the information in it.
11  However, assuming, assuming that the Consumer Sentinel
12  database was reliable, the plaintiffs ran a search using the
13  outside sellers from which Lifewatch is currently purchasing,
14  has been purchasing for I think about the last year, I
15  believe, contracts.

16  And of those, contrary to what Mr. O'Toole said,
17  Mr. O'Toole just told you that there were 16,000, 16,000
18  complaints associated with those outside sellers.  That's not
19  true.  In fact, if you'll look at Plaintiffs' Exhibit 87 and
20  Attachment D, which was a document that was created by the --
21  it doesn't actually show the search that was done, but it's a
22  document that was created by the FTC, it shows that of those
23  outside sellers that Lifewatch is doing business with, of the
24  seven, there are zero complaints about four of them; and of
25  the remaining three, there have been a total of 28, not

1    16,000, 28.

2           Now, what they did, and you'll hear about this, what
3    they did is they then also tried to manipulate the evidence.
4    And I'll get back to that, showing why what they're doing is
5    clearly a knowing misrepresentation of the evidence.  I'll get
6    back to that, though.

7           The data suggests, though, in looking at the Consumer
8    Sentinel database documents, the data would suggest that the
9    injunction that they seek would not achieve the result that
10   they seek, because even if you look at the Consumer Sentinel
11   database information that they did provide, albeit in the
12   middle of last week with the searches, if you look at the
13   numbers and they were doing -- what they did is they refined
14   the outside seller search so that they're doing searches with
15   telephone numbers.  If you look at those, those telephone
16   numbers are associated with sales of a variety of products,
17   different services, debt reduction, insurance, pharmacy stuff,
18   vacation travel, a host of things.

19          They also relate to medical alert devices and show,
20   among other things, that these numbers are associated with the
21   attempts to sell products on behalf of Life Alert, Life Line,
22   Connect America.  There are a bunch of other companies that
23   are competitors that these particular numbers are associated
24   with.  The ones that they say -- and they're trying to hold
25   Lifewatch accountable are selling medical alert devices also

1   for a bunch of other companies.

2          At least that's what the information in the Consumer

3   Sentinel database would show had they chosen to look at it.

4   And when I say they manipulated the information and were

5   mischaracterizing it, the witness from the FTC chose not to

6   bother to look at that Consumer Sentinel database.  At least

7   the spreadsheet that he provided doesn't show that -- what the

8   other products that are associated with the sales and these

9   numbers are, what the other sellers are that are associated

10  with the information in these numbers.

11         In fact, the way they produced it to us, a

12  17,000-page .pdf, makes it very, very time-consuming and

13  difficult to go through and give you more granular information

14  about the information that they had given in their searches.

15  I can't really do that without going and looking at the

16  Consumer Sentinel database and running the searches.  And

17  there are apparently more refined searches that could be done.

18  Either they chose not to do them, or they have done them but

19  haven't produced them.

20         Because I did ask when I deposed Mr. Menjivar just

21  that question, "Did you do other searches?  What else did you

22  search?  What other search terms did you do?"  He wouldn't

23  answer those.  He was instructed not to answer those questions

24  and did not answer those questions.

25         So, it's very possible -- I can't tell you because I

1   don't know and I don't have access to the actual searches that

2   he did run, other than the one, the two -- the three, I guess,

3   that they gave us.  So, I can't tell you whether they actually

4   looked at the data and actually did make an attempt to

5   identify the products that were being sold in connection with

6   these numbers or these other companies that were involved in

7   the medical alert device sales that are associated with these

8   numbers in addition to Lifewatch.

9           I can't do that.  You know, we have in our motion --

10  we'll talk about it this afternoon.  The motion does -- we did

11  go and look through some of the 17,000.  That's how I know

12  that these things are actually there and we've identified

13  them.

14          But in any event, it's information that was

15  available, and it's information that was presented in a way

16  that is certainly, at a minimum, misleading.  It's presented

17  in a way that tries to exaggerate the existence of an issue or

18  problem.  In the past year, they've identified 28 that link to

19  these outside sellers that Lifewatch has -- purchases

20  agreements from.  If there are other ways of searching it, you

21  come up with other numbers.  This shows you that the

22  reliability of the search is, if anything, not reliable.

23          But Lifewatch has improved and continues to improve

24  its self-policing because it's essential, among other things,

25  to its success that it ensures that its customers are

1    purchasing the devices that they understand that they're

2    purchasing, that they understand the attributes of the

3    product, that they understand the terms under which they're

4    purchasing, because disappointment leads to loss.

5            And here, an injunction isn't warranted.  Now, we've

6    also heard about other litigation.  They've spent a lot of

7    time in their briefs, Mr. O'Toole spent a fair amount of time

8    this morning talking about a lawsuit by Life Alert against

9    Lifewatch, competitors fighting about competition in

10   California.  And they ignore again that the case, that case

11   was being fought about statements by telemarketers, not by

12   Lifewatch, again, statements made, at most, I guess at least

13   more than two years ago.

14           They ignore the fact that it's not Lifewatch -- and

15   it's not -- Lifewatch actually wasn't the only competitor that

16   was sued in that action.  Connect America was also sued in

17   that action, was a party to that action.

18           They ignore that there is an injunction in place.

19   So, that action certainly doesn't warrant or justify an

20   injunction here.  There is an injunction in place there.  And

21   furthermore, Lifewatch is not doing business with any of the

22   parties and the outside sellers that were involved in the

23   conduct that was at issue in that other lawsuit.

24           They also talked to you about the Indiana lawsuit, an

25   action that was filed against Lifewatch by the State of

1   Indiana that's pending in state court in Indiana.  And a fact

2   that they have neglected to mention to the Court is that the

3   State of Indiana actually pursued a motion for summary

4   judgment in state court in Indiana, and the Indiana court

5   denied the State's motion for summary judgment.  That's a

6   litigation where there are disputed facts, discovery is

7   pending, and it will eventually be decided on the merits by

8   the court in Indiana.

9           But to suggest somehow that there is other litigation

10  and, therefore, that suggests that there is a problem that

11  this court must address, A, presumes that there is merit to

12  their claims in Indiana, and that's a fact that the courts in

13  Indiana haven't yet -- haven't yet accepted in rejecting the

14  motion for summary judgment, among other things.  It also

15  ignores the issues that were presented in the litigation in

16  California and the resolution of those issues.

17          They talk about Mr. Hilgar and his declarations.

18  Mr. Hilgar worked for a company that was involved -- was one

19  of the owners, I guess, or principals of one of the Worldwide

20  defendants, and gave an affidavit in other litigation,

21  unrelated litigation.  They suggest -- in their brief, they're

22  pretty direct, suggesting that Mr. Hilgar's deposition -- that

23  Mr. Hilgar's declaration, excuse me, was bought, that we paid

24  for the declaration.  The suggestion is that Lifewatch has

25  paid for -- by asking and soliciting a declaration, it has

1    somehow paid for testimony.  Not so.  There's actually no

2    evidence of it at all, actually.

3            And the curious thing about this whole thing is if

4    you look at what Mr. Hilgar said in each of the declarations

5    that he has given in this case, they're actually inconsistent

6    with the notion that his testimony has in any way been bought

7    or purchased.

8            In fact, what Mr. Hilgar says in the -- and the

9    suggestion somehow that a government agency holding a sword

10   over your head isn't akin to exertion of pressure is sort of,

11   I think, disingenuous.  It's kind of like when they suggested

12   last week that Mr. Harmon out of nowhere volunteered to come

13   in and give a declaration -- or to come in at his own expense

14   to testify on behalf of the government, volunteering when they

15   hadn't heard from him in quite some time is what we were told.

16   I think that that's pretty disingenuous.

17           But if you look at the first declaration that

18   Mr. Hilgar gave in connection with the FTC -- on behalf of the

19   FTC in this action, he among other things doesn't say,

20   "Anybody bought my testimony, required that I answer something

21   a certain way, or did anything."  What he says in that

22   declaration, and it's Plaintiffs' Exhibit 14, is that he was

23   given a declaration.  He -- actually, I don't want to misstate

24   it at all.  I've got it here.

25           He says that he was given a declaration to sign, "and

1    I did not closely review the declaration at the time I signed
2    it.  Since signing the declaration, I've had an opportunity to
3    more carefully review it, and I've found that it contains
4    several inaccuracies."

5            But again, even if you look at that declaration --
6    and this is the one, by the way, where they're suggesting that
7    Lifewatch controlled the telemarketers.  He's actually
8    always -- each time when he talks about Lifewatch, he does it
9    in the context of it's Bolling or Lifewatch.  Bolling is his
10   partner.  Bolling or Lifewatch, Bolling or Lifewatch.

11           So, he's not saying that Lifewatch -- so, the
12   declaration doesn't even suggest what they say it does, that
13   there was control by Lifewatch.  It doesn't even -- it
14   actually doesn't suggest that he's even competent to do that.
15   What it does say, though, is that he was given a declaration.
16   Apparently, he didn't read it closely.  He apparently wouldn't
17   have signed it had he read it more closely because he now
18   disagrees with it.

19           They then submitted another declaration from
20   Mr. Hilgar, and in this one, Mr. Hilgar says that Mr. Bolling
21   and his partner offered him money.  He is assuming that the
22   money -- he says that Mr. Bolling may have told him that the
23   money came from Lifewatch.

24           We don't believe that that is true, and you'll hear
25   Mr. Sirlin testify about Mr. Hilgar and the relationship with

1    Mr. Hilgar and Mr. Bolling.  They'll address that.

2           But again, if you look at what Mr. Hilgar says in his

3    declaration, he doesn't say that he gave false -- that he

4    looked away because he was being paid.  It doesn't say that he

5    accepted something that he knew was untrue because he was

6    being paid.  What he says is the same thing that he said

7    before, that he was given a declaration, apparently he didn't

8    read it closely; and once he signed it, he says he was given a

9    thousand dollars by Mr. Bolling in cash.  I don't know whether

10   he did, whether Mr. Bolling paid him or not.  I don't know.

11   We aren't Mr. Bolling.  We have no connection with

12   Mr. Bolling.

13          And then he makes an assertion about Mr. -- what he

14   heard somewhere about Mr. Bolling being paid.  Again, it's

15   complete hearsay on hearsay.  And if you -- and one wonders

16   why on Earth are they even offering this?  It's incompetent on

17   a lot of levels, and what it's done, and the only purpose for

18   this is clearly to try to suggest that Lifewatch is bad.

19   Unfounded, but it's -- by besmirching them through suggesting

20   somehow that Lifewatch has paid for testimony.  And why again

21   do they do this?  Apparently, they're trying to link this with

22   declarations that Lifewatch does provide to outside sellers as

23   a condition of being able to sell contracts to Lifewatch.

24          And you'll hear from this, and Ms. Baker, I believe,

25   will testify about that.  But they do give declarations that

1  require certain things, that make clear to the outside sellers

2  that if they're engaged in certain types of conduct, we cannot

3  do business with you and will not do business with you.  So,

4  if an outside seller is not willing to sign or agree to those,

5  to acknowledge that these are the rules under which we would

6  be able to sell transactions to you, then we aren't willing --

7  we, at Lifewatch, aren't willing to do business with them.

8         So, the suggestion somehow that giving somebody a

9  declaration that requires them to make certain points, to

10  concede certain points, to acknowledge certain facts, there's

11  nothing improper about that.  It's one of the, not the only,

12  but one of the steps that Lifewatch has undertaken to ensure

13  that the contracts that it's purchasing are likely to be good

14  contracts, contracts that are not going to be early

15  terminated, that they were acquired properly.

16         We talk about the statistical evidence that the

17  plaintiffs offer to suggest that there's an emergency here

18  that somehow this injunction would address.  They talk about

19  the 90,000 complaints.  What they ignore again is that there

20  are many ways of refining the search so that you could find

21  out who -- who was actually associated or who has been

22  identified as being involved in the search -- excuse me, in

23  the transaction for which there's a complaint.

24         Now, when they did narrow it to Lifewatch, I think

25  that they got down to, of the 90,000, about 650 over a

1   three-year period.  Of the 650, I think about 430-ish, I think
2   33, I think, is the number, are associated with Do Not Call
3   complaints.

4           The others are what they call fraud, and under the
5   Consumer Sentinel database, that's just a consumer complaint.
6   It could be, "They didn't give me my refund quickly enough,"
7   or, "I'm not happy with whatever."  I mean, if you look at the
8   types of things that the Better Business Bureau has produced,
9   it's the gamut from, "They were rude to me on the phone and
10  weren't willing to accept their full refund."  It's a wide
11  range of things.

12          So, anyway, of the 650 over a three-year period, 433
13  tie out to Lifewatch, or at least Lifewatch is identified by
14  consumers in those complaints.  They don't talk about the
15  other companies, you know, Life Alert, Life Line, Connect
16  America, you know, Medical Alert, other companies that are
17  involved in selling these products, perhaps because those
18  would show that the number 433 is relatively low.

19          I don't know why they didn't do it.  I mean, they
20  could have done it.  They've just chosen not to do it.
21  They've entered evidence in a way that is engineered
22  to suggest a result that actually, when you look at it, it
23  doesn't bear out.  Because, in fact, if you look at the
24  evidence, it also ties to not only other companies that are
25  engaged in sales of these products, but it also identifies

1  mixed in with these are other products, other types of

2  products, including insurance, credit card debt reduction,

3  those types of things.

4        So, the suggestion that Lifewatch is this bad

5  corporate citizen engaged in corporate conduct is not actually

6  borne out by the evidence that they cite.

7        Actually, if you look at the documents that they

8  provided to us last week, what it does do is it emphasizes the

9  point that Mr. O'Toole was suggesting is an important point.

10  Lifewatch -- Lifewatch buys contracts -- they sell basically

11  what I would label, what I would call a generic device.  There

12  are different types of these devices.  They have different

13  attributes.  Some have a larger range.  Some have an 800-foot

14  range.  Some can be used outdoors, I believe.  Some can't.

15  But basically, it's the same types of devices.

16        The different monitoring companies, some probably

17  provide better service than others.  I'm not in a position to

18  talk about that, but I suppose that Ms. Baker and Mr. Sirlin

19  can probably address that.

20        But what Mr. O'Toole is suggesting is that it's --

21  that the fact that Lifewatch has not to this point identified

22  other companies that the outside sellers who sell to us also

23  sell to as probative that we are in control of these people,

24  that they are our agents, is, among other things, misleading.

25  And based on what I've seen, it's either sort of sloppy or

1    intentional.

2          Why do I say that?  Because if I look at the

3    documents that they're pointing to with respect to these

4    particular outside sellers that they're attributing to us, I

5    can also see that these outside sellers are also selling for

6    Life Alert, Life Line, Connect America, Medical Alert, a bunch

7    of other companies.  I can't tell you how many.  I can't tell

8    you what the relative sales are between them.  I can't do

9    that, among other things, because of the limitations of the

10   searches that I was able to do.  But the searches that they

11   could have done would have established that.  They just have

12   chosen not to do that.

13         So, when they suggest somehow to us that an outside

14   seller who flips a deal to us trying to get us to buy or

15   offers it to us is indicative that we somehow control them,

16   no, all that suggests, your Honor, is that we have set up

17   relationships with various outside sellers that when they find

18   accounts, customer accounts that would meet our requirements,

19   things that we require of them, we'll purchase them.  And if

20   they transfer them to us so that we can effect the sale,

21   that's great.

22         We don't know who else they offered to.  We don't

23   know how many they offered to us versus what they offered to

24   others.  We do know what they offered to us and what we buy.

25   We also know when we terminate -- when we don't buy, and we

1  also know that there have been instances where we -- because

2  when we buy a transaction, we have the right and do actually

3  exercise the right to periodically sample to make sure that

4  the outside sellers that are acquiring transactions that

5  they're going to sell to us aren't doing it by making

6  inaccurate statements about the products or the terms of

7  purchase.

8         We do that.  It's important to us, because again,

9  those types of transactions, among other things, are likely to

10 lead to early terminations, to losses.  We need to be in

11 business with the customer for a long time to recoup the

12 expenses that we pay up front, so it's incumbent on us and

13 we're careful and we've evolved and improved our process to

14 make sure that -- it's better to ensure that the relationship

15 isn't -- that the customer knows what he's getting, or he or

16 she is getting, and knows the terms and that they're getting

17 them and accepting those terms, because we want to have a

18 long-term and healthy relationship with customers who are

19 buying this product, a product that allows older adults to

20 live on their own.

21        But the documents that they've produced show

22 categorically that the same outside sellers from which we

23 purchase agreements also sell them to our competitors

24 directly.

25        They also offer some testimony, some statements

1   from -- some declarations and some transcripts from a

2   professional litigant, Diana Mey.  And I call her a

3   professional litigant because that's what she is.  She earns

4   her living by selling things on eBay and by being a plaintiff

5   in class action TCPA lawsuits.

6          She's currently -- she testified when we deposed her,

7   she's currently the basically lead plaintiff in 11 of those

8   lawsuits.  And we don't -- we don't -- we don't provide call

9   lists to the outside sellers who we work with.  We do -- if

10  we're aware of Do Not Call issues, if a customer tells us,

11  contacts us to convey information that they don't want to be

12  called, we do relay that to the outside sellers with which we

13  work.

14         In fact, in documents that were produced, documents

15  that Mr. O'Toole is suggesting somehow suggest improper

16  conduct by us, those documents actually show that we do, in

17  fact, circulate lists of Do Not Call lists, people who have

18  contacted us, told us, "Please don't call me."  We share that

19  with all of the outside sellers that we've been told by these

20  people that you can't call these people.

21         And, in fact, if we find out and when we find out

22  that people on that list have been contacted by outside

23  sellers that have been selling us transactions, we terminate

24  our relationship with those outside sellers.

25         I can't -- we can't say why it is --

1          THE COURT:  How many times has that happened?

2          MR. GOODMAN:  I believe in the last year -- I think

3    the number -- Ms. Baker is going to testify to the number.  I

4    think the number is 24 times.  Actually, Mr. Lipari is nodding

5    his head, so I think the number is 24 times.

6          So, action is taken.  We do follow up.  We don't

7    tolerate that.  It is a bad thing for the company.

8          I can't say why it is Ms. May is getting contacted.

9    She does have four phones.  She does have all the equipment

10   that one would have to have if you were trying to catch these

11   calls and use them in litigation.

12         What she did say when she was deposed is that she

13   never -- when she's given the option where she can opt out,

14   she never presses that button, ever.

15         Now, the fact that there are TCPA cases pending

16   against Lifewatch doesn't mean that there's merit to the cases

17   or that Lifewatch is responsible for those calls.

18         In fact, in the courtroom today, some of the

19   attorneys for some of these TCPA cases are here watching this.

20   It's an opportunistic thing.  They're here.  They're

21   observing.  They're trying to get information for use in their

22   lawsuits.  It's their business.  That's what they do.  Their

23   business is litigating and trying to get companies that are

24   somehow tied or that they can try to tie or they can suggest

25   that there's a tie to a telemarketing call.  They bring these

1  lawsuits.

2          The fact that there are these lawsuits doesn't mean

3  that there's any merit to them at all; and, in fact, we don't

4  believe that there's merit to them, and we fight them because

5  they're not meritorious.

6          Plaintiffs have asked that the Court enter an

7  injunction based on the actions of telemarketers, including

8  the Worldwide defendants, with which Lifewatch doesn't do

9  business at all.  Lifewatch has evolved, has improved, has

10  grown its quality control procedures in response to

11  information that it gets.  When it becomes aware of things, it

12  tries to adjust, so that they don't -- because the worst thing

13  for Lifewatch is to get saddled with a -- is to be providing a

14  device to somebody that doesn't want it, that isn't going to

15  pay for it, or they're paying for -- Lifewatch is paying for

16  monitoring services for which it's never going to recoup the

17  costs, and where it's going to have unhappy customers that are

18  going to complain about it, may complain about it on the

19  Internet.  That's the worst thing for Lifewatch.

20          Obviously, it cares about its consumers; but it

21  also -- it's a business, and it's trying to remain in

22  business.  So, it does take steps to ensure that what is being

23  done is done right, that when it's buying accounts from

24  outside sellers, that they're doing the right thing.

25          You'll hear what Lifewatch does do to confirm that

1    the information that is provided is not inaccurate, that the

2    information -- you know, that information that's disseminated

3    is appropriate.  Does Lifewatch -- has Lifewatch in the past

4    provided things like -- information about the products, the

5    attributes of the products, things you can't say, things you

6    shouldn't say?  Absolutely.  Why?  Because it would never and

7    will not knowingly purchase contracts from anybody that makes

8    misrepresentations to secure the sales.  It doesn't want to do

9    that and tries not to do that.

10          So, when it gets information, it responds.  It

11   doesn't provide -- they pointed to -- what they described as

12   the laugh out loud or a laugh out loud e-mail from

13   Ms. Vandewater, actually, what that e-mail says, the laugh out

14   loud was a response, she was aware -- and it's among the

15   documents that have been submitted.  It's a response to a

16   telemarketer saying, "We don't do this.  This is something we

17   don't do."  And she was just saying, "We don't know who is --

18   who, if anybody, is doing this.  We sent it to everybody.  We

19   let everybody know these are things you cannot do."

20          Why is Lifewatch not just targeted to a malfeasor?

21   Why?  Because Lifewatch doesn't know, wouldn't have any way of

22   knowing what an outside seller is doing in connection with

23   sales that are not achieved or transactions -- so, if you look

24   at the statute, if you look at the definition of a seller in

25   the statute, there's telemarketing and telemarketing

1    transaction, they use the term, otherwise it would be

2    redundant.

3           But Lifewatch wouldn't have the ability to know what

4    is being said in transactions that it doesn't acquire because

5    it wouldn't get a tape.  There would be no way of getting that

6    information.  It doesn't get that information.

7           It does get and does sample, does solicit, does

8    require telemarketers to provide it with recordings of calls

9    that are used in sales that are closed so that it can look at

10   and do -- engage in quality control with respect to the sales

11   that it purchases and the accounts that it purchases.

12          Now the case against Mr. Sirlin, the claims against

13   Mr. Sirlin himself --

14          THE COURT:  I need to ask a question.

15          MR. GOODMAN:  Sure.

16          THE COURT:  Are you saying that the telemarketers are

17   both telemarketers and sellers?

18          MR. GOODMAN:  I think they could be.  I think in some

19   instances, they are.

20          THE COURT:  Well, who -- if the seller is not the

21   telemarketer or Lifewatch, who is it?

22          MR. GOODMAN:  So -- I'm sorry?

23          THE COURT:  If the seller is not either the

24   telemarketer or Lifewatch, who is it?

25          MR. GOODMAN:  No, no.  So, I think that the

1    telemarketer -- so, I guess a transaction that I would use as

2    an example would be Telemarketer A makes a sale to a customer,

3    and then it is now -- so now it has this transaction.  It has

4    an obligation -- it basically has -- it's like a commodities

5    contract that it has to fulfill.  So now it's going to market

6    and sell the commodities contract.  Now, it may have a

7    relationship with a bunch of different companies, and it can

8    offer those to whomever it chooses.

9            THE COURT:  You've got to answer my question.  If the

10   seller is not either the telemarketer or Lifewatch, who is it?

11           MR. GOODMAN:  I think the seller could be the

12   telemarketer.  I think the seller --

13           THE COURT:  You're not answering my question.

14           MR. GOODMAN:  Okay.

15           THE COURT:  If the seller is neither the telemarketer

16   nor Lifewatch, who is it?

17           MR. GOODMAN:  The seller in a transaction -- the

18   seller is either the telemarketer, Lifewatch, or one of

19   Lifewatch's competitors.

20           THE COURT:  Okay.  So, you're acknowledging that

21   Lifewatch can be a seller?

22           MR. GOODMAN:  Oh, absolutely, Lifewatch can be a

23   seller.

24           THE COURT:  But I thought you were saying in your

25   briefs that Lifewatch is not the seller.

1        MR. GOODMAN:  In many of these situations where

2   there's a call where there isn't a transaction that's

3   completed, Lifewatch is not the seller.  Where there's no

4   transaction -- if a telemarketer calls and makes 15 calls and

5   for whatever reason, these may lead to 15 --

6        THE COURT:  Then nobody's the seller.

7        MR. GOODMAN:  Then nobody's the seller in that

8   transaction.  There's no transaction.  Nobody's the seller.

9        THE COURT:  So, if there's no transaction, there's no

10  seller.

11       MR. GOODMAN:  Correct.

12       THE COURT:  If there is a transaction, who's the

13  seller, Lifewatch or the telemarketer?

14       MR. GOODMAN:  I think if there is a transaction, I

15  think it's not real clear the way it's drafted.  I'd say that

16  whoever purchases -- whoever is providing fulfillment on that

17  contract is the seller in connection with that contract.

18       THE COURT:  So, it would be Lifewatch if the

19  product -- the service is provided by Lifewatch?

20       MR. GOODMAN:  I think that that's right.

21       THE COURT:  Okay.  All right.

22       MR. GOODMAN:  But the fact that in connection with --

23  so, there may be some sales where, you know, again, there may

24  be transactions where Lifewatch provides fulfillment and

25  Lifewatch does -- those are the ones where Lifewatch can

1    actually get the recording, you know, that led to the

2    transaction being completed.  On those, if Lifewatch listens

3    to those, and when Lifewatch finds that there has been

4    something done inappropriately, misstatement, whatever, those

5    are the ones where -- those are ones where Lifewatch can and

6    does follow up.

7            And again, among the e-mails that were produced are

8    follow-up, things you can't say.  For example, why is it that

9    a telemarketer shouldn't identify itself as Lifewatch?

10   Answer, it's not Lifewatch.  And, in fact, it could sell for

11   whomever -- and often does, apparently, sell transactions to

12   Lifewatch's competitors.  So, it isn't Lifewatch.

13           And, in fact, it would be -- it's supposed to

14   identify itself as to who it is and what it is.  One of the

15   complications is that it may not know -- when it makes a sale,

16   it has discretion -- and we're not hearing from any of these

17   outside sellers, but it would have discretion, I believe,

18   under the terms of our agreements and probably with the terms

19   of others, although I'm not familiar with what the contracts

20   that are entered between Life Alert and outside sellers or

21   Connect America and outside sellers say in particular

22   currently.

23           THE COURT:  So, the word "outside seller" is really a

24   misnomer?

25           MR. GOODMAN:  It's not.

1          THE COURT:  Because you're calling the telemarketer

2     an outside seller; but you're acknowledging that where there's

3     no transaction, there is no seller, and when there is a

4     transaction, the fulfiller is the seller.  So, there are no

5     circumstances under which the telemarketer is the seller.

6          MR. GOODMAN:  So, the reason I use "outside

7     seller" as opposed to telemarketer --

8          THE COURT:  Is a rhetorical point to get around the

9     regulations.

10          MR. GOODMAN:  No, because actually, these companies

11     don't just engage in telemarketing.  They engage in other

12     types of sales as well.

13          So, what do I call a company that may place an ad,

14     that posts something on TV that solicits calls?  Is that a

15     telemarketer?  What if it posts it in a catalogue?  What if it

16     pays for -- not all the sales are facilitated through

17     telemarketing.

18          So, that's why I call them outside sellers.  I don't

19     know that it's a perfect phrase, but I think it more

20     accurately describes it than calling them telemarketers.

21          THE COURT:  But for purposes of the telemarketing

22     rules, the telemarketer is never the seller because if there

23     is no transaction, there is no seller, and if there is a

24     transaction, the fulfiller is the seller.

25          MR. GOODMAN:  Correct.

1       THE COURT:  Okay.

2       MR. GOODMAN:  So, if we look at the other evidence

3  that they've submitted, the various consumer declarations, I

4  think Mr. O'Toole would suggest, excuse me, that I think half

5  of them are more than two years old.  I think that that's at

6  least true.  I think many of them are declarations that are at

7  best not really complaining about things that are actionable

8  under the Telemarketing Sales Rule.

9       For example, if an older adult purchases a device in

10  response to responding to an ad on television, for example, or

11  in response to a call that the older adult receives and has

12  made a decision to purchase that, that person's child, younger

13  offspring might question the propriety of that or contend that

14  the person didn't knowingly or appropriately make that

15  decision.  He's probably not competent -- it's probably not a

16  competent declaration, and, B, isn't fair.

17       The older adults, who are competent, who are living

18  on their own, who are purchasing devices, who may be

19  purchasing devices so that they can continue to live safely on

20  their own, that their kids may complain about it isn't

21  indicative of somebody preying on the vulnerable.  Actually,

22  what it shows is that there are people that are providing

23  services to people who want to live independently and who need

24  this type of service and this type of support in order to live

25  independently.

1        But again, if you look at the declarations, many of
2   them are from people that know nothing about what was actually
3   said on the call.  They say that, "My parent has dementia, and
4   she told me this is what was said on the call.  My parent, who
5   can't make decisions on her own because she has no memory,
6   this is what she told me was said on the call."  That is --
7   you know, that's ironic, but it's certainly not the type of
8   evidence that the Court should be relying upon in making
9   decisions in this case.

10        You know, you asked me the question last week, you
11  know, is the Court required to exclude -- can the Court -- I
12  think you asked me:  Can the Court accept hearsay?  I can't
13  tell you that the case law suggests that the Court cannot
14  categorically accept hearsay; but it does, suggest, I think,
15  that the Court evaluate the reliability of the information
16  that it's accepting as part of the record in evaluating that.

17        And again, much of what they have submitted is stuff
18  that isn't reliable and certainly doesn't indicate that
19  Lifewatch did anything inappropriate; and furthermore, much of
20  it is old.  It's not indicative of what's happening today at
21  Lifewatch.

22        Today, if you accept the information that the
23  government has submitted, this Consumer Sentinel database,
24  looking at the outside sellers from which Lifewatch is
25  purchasing contracts, of those seven, there are zero

1  complaints, zero Do Not Call complaints.  I don't know whether

2  there are any other -- I just can only go with what they've

3  produced, zero Do Not Call violations as to four, 28 spread

4  between -- I think there was 19 against one and five and four

5  against the other two.  That's what the evidence suggests.

6  So, that would suggest that Lifewatch's self-policing

7  is effective and is having the result that it is aiming for,

8  that -- which isn't to say that Lifewatch is going to say this

9  is it and we're not going to evolve our policing more in any

10  way.  It's -- this is the state today.

11  But it does suggest that they -- that the plaintiffs

12  have fallen short in presenting evidence of the -- that

13  injunction is necessary.  In fact, it's not.  It's

14  inappropriate.  And effectively, what it would do is be very,

15  very damaging to Lifewatch's business, because as you'll hear,

16  what it would do is it would cause the credit card companies

17  that Lifewatch works with to stop doing business with it.

18  Lifewatch has improved its processes.  It has an

19  interest in establishing and maintaining and protecting

20  long-term and positive relationships with customers.  There's

21  no reason to believe that Lifewatch is going to do something

22  other than try to continue that because otherwise, Lifewatch

23  will effectively drive itself out of business.

24  As we've argued here, as we'll show you in the

25  evidence that we'll submit, an injunction isn't appropriate.

1  We're prepared to proceed expeditiously to complete discovery,

2  and we're prepared to proceed with an early trial.  That

3  should address -- if there's a concern, that should address

4  the concerns that were raised.

5         But we don't believe that the evidence supports the

6  relief that is sought; and, in fact, to make its case, the

7  government has had to exaggerate, mischaracterize, and

8  misstate the evidence.

9         Thank you.

10         THE COURT:  Okay.  Thank you.  We could -- we've been

11  going for maybe an hour 20, so do you want to take a short,

12  five-minute break?

13         MR. O'TOOLE:  You know, your Honor -- sorry, your

14  Honor.  The witness that we're going to put on is probably

15  going to be pretty quick.  If you wanted to just go through

16  until lunch, we can do that.

17         THE COURT:  It's up to you.

18         MR. O'TOOLE:  It's up to -- obviously, if anybody

19  wants to take a break, I'm not going to say no.

20         THE COURT:  I'm fine going forward.

21         MR. GOODMAN:  Could we just take a couple of minutes?

22         THE COURT:  Okay.  Let's come back in five minutes.

23    (Recess had.)

24         THE COURT:  The FTC's motion references a proposed

25  preliminary injunction order.  Did the FTC ever submit --

opening - defendants

54

1          MR. O'TOOLE:  We submitted it through the -- by

2     e-mail.

3          THE COURT:  The electronic --

4          MS. BHIMANI:  Yes.  We have copies as well.

5          THE COURT:  Okay.  All right.

6          MR. O'TOOLE:  If you want, we can give you copies,

7     your Honor.

8          THE COURT:  Sure.  I just need to -- one, obviously,

9     I need to know what you're asking for before I can decide

10    whether you're entitled to anything.  So, I just looked in my

11    proposed order e-mail box, and I didn't see a copy.  It

12    doesn't mean that it was never there.

13      (Tendered.)

14         THE COURT:  Thanks.  Okay.  Do the plaintiffs want to

15    call their first witness?

16         MS. JOHNSON:  Yes, your Honor.  We'd like to call

17    Miss Susan Rivard.

18         THE COURT:  Okay.

19         MS. JOHNSON:  Where would you like the witness to

20    sit?

21         THE COURT:  She can sit up in the witness stand.  If

22    you could please step up, put your drink down, raise your

23    right hand, and state your name.

24         THE WITNESS:  Susan Rivard.

25      (Witness sworn.)

1          THE WITNESS:  I do.

2          THE COURT:  You've been sworn.  You may be seated.

3          MS. JOHNSON:  Your Honor, for the Court's benefit,

4    Ms. Rivard submitted a declaration which the plaintiffs used

5    in support of our motion.  It is marked as PX 57.

6          SUSAN RIVARD, PLAINTIFFS' WITNESS, DULY SWORN.

7                    DIRECT EXAMINATION

8    BY MS. JOHNSON:

9    Q.  Good morning, Ms. Rivard.

10   A.  Good morning.

11   Q.  Can you please state your name again.

12   A.  Susan Rivard.

13   Q.  And where do you live?

14   A.  Maple Grove, Minnesota, part of the Twin Cities.

15   Q.  Are you currently employed?

16   A.  No, I'm retired.  Yay.

17   Q.  What did you do before you were retired?

18   A.  I was executive director of a non-profit organization that

19   served people with disabilities.

20   Q.  Have you ever testified in court before?

21   A.  I did once.

22   Q.  Can you tell us a brief explanation of the circumstances?

23   A.  There was a complaint filed against our organization by a

24   former client, so I had to testify on behalf of the

25   organization.

1  Q.  Have you ever testified in a telemarketing case before?

2  A.  No.

3  Q.  Have you ever testified for the Federal Trade Commission

4  before?

5  A.  I didn't testify, but I was part of a press conference two

6  years ago.

7  Q.  Okay.  And I'm going to get to that in a little bit, but

8  you never testified in a court setting?

9  A.  No.

10  Q.  Have you ever testified for the State of Florida in a

11  court setting?

12  A.  No.

13  Q.  Are you getting paid for your testimony today?

14  A.  No.

15  Q.  What are you hoping to gain from coming here and telling

16  your story?

17  A.  Well, the experience that my parents had with a

18  telemarketing scam -- I would call it a scam, for sure -- was

19  very frustrating; and it kind of makes you want to set things

20  right, so I'm just trying to put in a little bit of a bid for

21  the good guys.

22  Q.  Are you seeking any financial gain?

23  A.  No.  I'm losing two days in December to do this, so --

24  Q.  And it is a busy month for everyone.

25        What did you do to prepare for your testimony today?

1  A.  I reread the declaration that I wrote with someone from

2  the FTC two years ago, two-and-a-half years ago.

3  Q.  And have you spoken with anyone from the FTC or the State

4  of Florida?

5  A.  I spoke with David O'Toole briefly.  He asked me if I

6  would consider coming to testify in court.  And from the

7  FTC -- just with the support personnel there.

8  Q.  Did you discuss the substance of your testimony?

9  A.  With them?  No.

10         THE COURT:  Miss Rivard, would you mind pulling the

11  microphone a little bit closer to you or moving a little

12  closer to the microphone?  It's directional, so if you speak

13  towards it, you should be fine.  You don't have to be right on

14  top of it.  So, let's make sure that you're lined up.

15         THE WITNESS:  Is this better?

16         THE COURT:  Much better.

17         MS. JOHNSON:  Your Honor, is it okay that I'm not

18  using the microphone?

19         THE COURT:  Yeah, that's fine.

20  BY MS. JOHNSON:

21  Q.  Have you spoken with anyone from the Florida Attorney

22  General's Office?

23  A.  Yes, you.

24  Q.  And what did we discuss briefly?

25  A.  We went over the kinds of questions that I would be likely

1   to be asked.

2   Q.  And did I give you any instructions about how to answer?

3   A.  Just to be sure that I was completely truthful.

4   Q.  So, let's start at the very beginning.  When did you first

5   find out that your parents had been contacted about a medical

6   alert device?

7   A.  It was, I think, in May of 2013.

8   Q.  And before we get into the call itself, can you tell me a

9   little bit about your parents; for example, how old are they,

10  where do you live, that sort of thing?

11  A.  Sure.  If my father was here, he would tell you what he

12  likes to tell strangers on the street, which is that he and my

13  mother are 93 years old.  They've known each other for

14  83 years, and they've been happily married for 73 years.

15          My dad was -- he has a doctorate in physical

16  education and recreation, and he was the department chair

17  for physical education and recreation at St. Cloud State

18  University.

19          They've lived in St. Cloud, Minnesota, for 67 years.

20  They've been pillars of the community.  A lot of people know

21  them, and probably because my father likes to write in to the

22  paper on Valentine's Day and talk about their relationship,

23  which resulted last year in a huge front page spread with

24  pictures about them and their marriage, which resulted in a

25  local news station doing a segment, an interview on them on

1    the 10:00 o'clock news.

2            So, you could say they were kind of minor

3    celebrities, but they've been a fixture in the community

4    forever.

5    Q.  And you might have answered this.  What are their ages?

6    A.  Right now, they're 93.  Then they were 91, when this

7    happened.

8    Q.  And would they have been able to travel here today to

9    testify?

10   A.  No.

11   Q.  Why not?

12   A.  Well, my mother physically couldn't do it, and my father

13   is not a traveler at this point, so no, it wouldn't have

14   been -- and he needs to help take care of her, so it wouldn't

15   have been feasible at all.

16   Q.  And tell me about your father's reputation in the

17   community.  You kind of just did, but is he considered a

18   truthful man in the community?

19           MR. GOODMAN:  Objection, your Honor.  Her father's

20   reputation in the community?

21           MS. JOHNSON:  I'd like to establish that her father

22   is known -- if this is the case, that her father is known as a

23   truthful, honorable person.

24           MR. GOODMAN:  I'm sure her father is a very nice man

25   and people like him, but I don't think her father's reputation

1   and his position in the community is relevant to this court

2   proceedings.

3           THE COURT:  Overruled.

4           THE WITNESS:  So, I can answer?

5   BY THE WITNESS:

6   A.  Very much so, a truthful and honest man.

7   BY MS. JOHNSON:

8   Q.  Now, before this call that we're going to discuss, had you

9   ever talked to your parents about medical alert devices?

10  A.  Since my mother -- right before this whole situation

11  happened, my mother broke her pelvis.  So, the back story is

12  at the time when this call came to my father, she was in a

13  rehab center.

14          What was your question again?

15  Q.  Before the call at question, had you ever talked to your

16  parents about medical alert --

17  A.  Yes.  So, she was in rehab for several weeks, and we then

18  started to talk to my parents, both of them, about how they

19  could -- how they could maybe use a medical alert kind of a

20  device.  And they were adamant that they didn't want to,

21  especially my mother.  "I don't need that.  I'm going to be

22  fine.  I'll heal.  I won't have to use that."

23          So, we weren't making any headway, but we had

24  recently brought it up because of her breaking her pelvis.

25  Q.  Now let's go back to the call at issue.  When did your

1  father tell you about that telephone call?

2  A.  Shortly after he got it, actually.  We were staying in

3  touch even more frequently than usual because he was going

4  back and forth to the rehab center.  So, he'd go in the

5  morning, spend most of the day, come home in the afternoon,

6  take a nap, have dinner, and then go back.

7        So, he got the call when he was home after his nap in

8  the afternoon.  And I happened to call him before he left

9  again.  He said, "Oh, you guys went ahead and did it, didn't

10 you?"

11        And I said, "Did what?"

12        And he said, "You signed us up for a medical alert

13 thing."

14        I said, "No, we didn't."

15 Q.  And I probably should have asked you this first.

16 According to your declaration, the call was made on May 17th,

17 2013?

18 A.  Yes.

19 Q.  Does that sound correct?

20 A.  That's correct.

21 Q.  Now, do you have any brothers and sisters?

22 A.  I have a brother and a sister.

23 Q.  Did you check with them and see if they had signed your

24 parents up?

25 A.  I did.  I told my dad, I said, "I didn't do it, and I

1  don't think they would have done it.  None of us would have
2  done it without talking to you first, even though we thought
3  it was a good idea to have one."
4       So, I called my brother and sister and confirmed that
5  they had not signed them up.  I told my father I was going to
6  check with them and get back to him.
7  Q.  At the time of the call, what was your father's mental
8  capacity?
9  A.  Well, I mean, my mom and dad are perfectly with it
10  cognitively, but this was a -- this was a stressful time
11  because he was worried about Mom.  Besides a broken pelvis,
12  being in a bed for an extended period of time caused terrible
13  back pain, so she was really not in a good place, and so he
14  was not in a good place.  And he was exhausted from going back
15  and forth and worried about her.
16       So, he was kind of -- normally I wouldn't call them
17  fragile, but I think at this particular time, he was pretty
18  vulnerable.
19  Q.  Did he suffer from dementia?
20  A.  No.
21  Q.  Was the call to a cell phone or a land line?
22  A.  Oh, it was to a land line.  We tried to get cell phones
23  for them.  We bought them cell phones.  That was -- actually,
24  my older daughter videotaped the whole training session.  It
25  did not go well.  He did not keep the cell phones for long.

1   So, it was a land line.

2   Q.  Now, did your father tell you that he believed -- that he

3   believed the telemarketer when the telemarketer said that

4   someone had referred him?

5   A.  He did.  That's the reason he went ahead and signed up for

6   it.  He said that they figured that it was us kids.  They did

7   say a friend.  They said either -- they said both a friend or

8   someone had signed you up.  And since he thought it was us, he

9   thought it was kosher, so he went ahead and signed up.

10  Q.  Did he ask the telemarketer who signed him up?

11  A.  He did.  It was a secret.  They wouldn't tell him.

12  Q.  And I believe you just said your father did, in fact, sign

13  up for the device?

14  A.  He did sign up.  They wanted his credit card number, which

15  he gave them even though we told him don't do it when you

16  don't initiate the call.  But he did.  He's a very trusting

17  soul.

18          So, he gave them the credit card number, and then

19  they asked him for his Social Security Number, which for me

20  was a huge red flag because people just don't do that anymore.

21          And he would have -- he would have actually given it

22  to them, except he didn't know it, so -- my mother's in charge

23  of all those kinds of things, so he did not give them his

24  Social Security Number, which did not halt the sale.  So, it

25  went --

1  Q.  But he did gave them a credit card number?

2  A.  He gave them a credit card number, yeah.

3  Q.  Was he given any contact numbers for a customer service

4  department?

5  A.  Yes, he got a customer service number.

6  Q.  And did your father tell you what phone number he was

7  given?

8  A.  He did.  I wrote it down because I wanted to follow up.

9  Q.  Is that something you could tell us today?

10  A.  Only if I read it in the declaration.

11  Q.  Do you have it in front of you?

12  A.  Yes.  It's 800/717-9295.

13  Q.  What did your father do after he told you about the

14  telephone call?

15  A.  Well, after he told me and I called him back and said that

16  we kids hadn't done it, I suggested that he call the credit

17  card company and see if a charge had gone through.  So, he did

18  that, and a charge had gone through for 34.95.  And I had told

19  him to dispute the charge if there was a charge.  So, he

20  disputed it.

21       And it was Discover credit card, so Discover said

22  that they would monitor the card to see if there were any

23  further charges.

24  Q.  Did Discover tell him the billing entity that charged him?

25  A.  No.  Actually, I called back and asked if I could get more

1    information about the charging company.  And they were only

2    able to tell me that it was Medical Alarms, which is a generic

3    kind of a term, not the name of the company, and that it was

4    from Hewlett, New York.

5    Q.  And the customer service number that your father was

6    given, did he ever call that number?

7    A.  Well, he called it, and I called it.  First I called it

8    because I was really not feeling good about this.  So, I

9    called it, and I asked what the name of the company was.

10        And again, that was a secret, too.  She said, "I

11   can't tell you the name of the company.  We work for many

12   medical alarm companies."

13        So, I said, "Where are you located?"

14        And she said, "In New York."

15        And I said, "I want to find out who signed my father

16   up for this medical alarm thing."  And she said that she

17   couldn't tell me that because I wasn't named on the account.

18        So, I said, "Well, how about if I get my dad to put

19   me on the account?  Then will you be able to disclose the name

20   of the person who signed him up?"

21        She said, yes, but oops, it was closing, and so we

22   wouldn't be able to call back on that day.  And that was a

23   Friday afternoon.

24   Q.  And then I believe you just said your father also called

25   the number?

1  A.  Yes.  He called the number on Monday because by then, we

2  had decided we were extremely uncomfortable with it.  Once my

3  mother heard the story, she said, "We're canceling the card."

4  Even though Discover had not insisted that she cancel, she

5  said, "We're canceling the card."  So, they canceled the card.

6           And then my dad called the alarm company -- even

7  though I really wanted to try to get the name of the person

8  who signed them up, he called the company on Monday and left a

9  message; and several hours later, someone called him back.

10          And he said -- he's a really easy-going fellow, but

11  he said, "This gal was rude.  She talked for 10 minutes.  She

12  talked over me.  She wouldn't let me speak.  Finally, I used

13  my old coaching voice, and I said, 'Now you listen to me for a

14  minute,'" and he canceled the account.

15  Q.  Did he ever get the device in the mail?

16  A.  No, he got nothing in the mail.

17  Q.  Did you ever make any complaints about this incident to

18  any government agencies?

19  A.  I did.  I was really angry.  Even though they weren't out

20  any money, it was sort of the principle for me that someone

21  would have to use a nefarious scheme to get their products

22  sold.  So, I did some checking and found out that the FTC was

23  the place to go with a complaint like this, so I called the

24  FTC.

25  Q.  Do you recall approximately when you did that?

1   A.  I think it was May or June.

2   Q.  Shortly after?

3   A.  Shortly after, yeah.

4   Q.  Now, the declaration that you're holding today, who

5   drafted that?

6   A.  I talked to Marissa at the FTC in Washington, I believe it

7   was, and we talked through the incident.  And then she took a

8   lot of notes, and she said she would write up our conversation

9   and then e-mail it to me to check for accuracy, and then it

10  would be printed out.

11          So, she e-mailed it to me.  I made some changes and

12  corrections, and then that's where this came from.

13  Q.  So, the version that you're holding and the version that

14  was filed with the court, obviously they're identical, does

15  that version reflect your input and revisions?

16  A.  Absolutely.

17  Q.  Did you read it in its entirety before you signed it?

18  A.  Yes.

19  Q.  And is everything in it truthful and complete?

20  A.  Yes.

21  Q.  And I believe at the beginning of your testimony, you

22  mentioned that you traveled to Florida --

23  A.  Yes.

24  Q.  -- for a press conference?

25          Was that with the Florida Attorney General's Office?

1   A.  It was with the FTC and the AG Office, I think, yeah.

2   Q.  And what did you testify about there?

3   A.  I didn't testify.  I just told my parents' story.  They

4   wanted a human interest angle to the announcement that they

5   were making.  They wanted to make it seem more real and

6   personal, so I came to tell the same story.

7   Q.  And that press conference, just to be clear, it was not --

8   your statements weren't under oath?  It wasn't in a courtroom

9   setting?

10  A.  Correct.

11          MS. JOHNSON:  I have no further questions.

12          THE COURT:  All right.  Thank you.

13          Defendants?

14          If you need to refill your water, there's a pitcher

15  right there to your left.

16          THE WITNESS:  Oh, thank you.  I'm good.

17                      CROSS-EXAMINATION

18  BY MR. GOODMAN:

19  Q.  So, Ms. Rivard, the declaration and your testimony here is

20  about a call that your father received back in May of 2013?

21  A.  Right.

22  Q.  And you weren't on that call, so your understanding of

23  what was said to your father is what your father told you?

24  A.  Exactly.

25  Q.  And it's at a time, you know, where you and your siblings

 1  were concerned about your parents' welfare, and you thought it

 2  was appropriate for them, a good idea, actually, for them to

 3  get a medical alert monitoring device?

 4  A.  We did.

 5  Q.  And you encouraged them to do that?

 6  A.  We did.

 7  Q.  Now, in terms of what the person actually said to your

 8  father on the call, you don't really know exactly what the

 9  person said, do you?

10  A.  I didn't hear it.  I trust his description of it.

11  Q.  It may have been, you know, "A friend suggested that you

12  get this," or, "A friend told you you should get this,"

13  correct?

14  A.  He said, "signed me up."  He specifically said, "signed

15  me up."

16  Q.  Right.  So, it may have been a friend who said -- signed

17  up -- the person said, "A friend signed you up."  It could

18  have been a variety of different things.  Precisely what was

19  said, you don't know?

20  A.  No, I do know.  Well, I mean, I know what he told me.

21  Q.  But again, you weren't on the call?

22  A.  No.

23  Q.  But your father did take notes of the number that -- from

24  which he was called?

25  A.  He asked for a customer service number, yes.

1  Q.  Well, I mean, you gave us a phone number today based on, I

2  assume, a note that you must have made back in, I don't know,

3  May or June of 2013?

4  A.  Yes.  He gave me the customer service number that he

5  requested from the caller.

6  Q.  And you called that number, correct?

7  A.  I did.

8  Q.  And the person who you spoke with at that number told you

9  that they do telemarketing for a bunch of different companies,

10  correct?

11  A.  That's right, yeah.

12  Q.  So, they were working -- the number for which -- that the

13  company was making the sales for, the person told you that

14  they were making sales for lots of different companies?

15  A.  I thought that was really odd, but yes, that's exactly

16  what I heard.

17  Q.  So, they were selling medical alert devices for other

18  companies, for a variety of companies, correct?

19  A.  Apparently, yes.

20  Q.  Well, that's what she told you?

21          THE COURT:  Miss Rivard, if you could speak up,

22  please.

23          THE WITNESS:  Usually my volume is not a problem.

24  I'm really loud.  But I'd be happy to.

25          THE COURT:  Thank you.

1    BY MR. GOODMAN:

2    Q.  So, she told you that they were telemarketing medical

3    alert devices for multiple companies, right?

4    A.  Yes.

5    Q.  And she didn't -- but she didn't identify any of the

6    different companies that they were telemarketing for?

7    A.  Correct.

8    Q.  And she didn't tell you that they were telemarketing for

9    Lifewatch, did she?

10   A.  Correct.

11   Q.  Now, looking at your declaration, at paragraph 3, you

12   understood that your father would be charged -- excuse me,

13   your father understood that he would be charged a monthly

14   monitoring fee of I guess it was 34.95 when he ordered the

15   device, correct?

16   A.  He was aware -- yes, he was aware that he was going to be

17   incurring a charge.  I don't think he thought in terms of a

18   monthly fee, but yes, he knew that there would be a charge.

19   Q.  And in your declaration, you made reference to, I believe,

20   to the amount that he was going to be charged, 34.95.  It's

21   paragraph 5, I guess, where you have it, where you have the

22   specific amount.

23         Your father isn't contending -- doesn't contend that

24   the amount that he was charged was different than the

25   number -- the amount that he was told in the call that he

1  would be charged, right?

2  A.  He wasn't told an amount.  He never told me that he was

3  told an amount.  He gave his credit card number, so he knew he

4  would incur a charge.  He did not know the amount.  He should

5  have asked, but he didn't.

6  Q.  Well, you don't know -- again, he may have been told an

7  amount, correct?

8  A.  It's unlikely he wouldn't have told me; but he may have

9  and didn't tell me, but that's unlikely.

10  Q.  So, again, you weren't on that call, but he was aware that

11  he was going to be charged on a monthly basis?

12  A.  Because he gave his -- yes, because he gave his credit

13  card, he knew he would incur a charge.

14  Q.  And your father gave them the credit card number so that

15  he could be charged, so that they could make the -- complete

16  the transaction, correct?

17  A.  Correct, because he thought we wanted him to do that.

18  Q.  I'm sorry.  I didn't hear you.

19  A.  Because he thought we were the instigators, the children.

20  Q.  Well, you thought that they should have a cell phone.  You

21  bought them a cell phone, correct?

22  A.  Yes.

23  Q.  And as far as you know, he may have been told that a

24  friend thought it was -- or had recommended that he do this?

25  At least that's what he told you the telemarketer said, right?

1    A.  He could have, absolutely.

2    Q.  And your father called the customer service number -- I

3    guess it was -- I guess when you spoke with the person at the

4    customer service number on Friday, it was, I guess, Friday

5    evening, late in the day?

6    A.  Afternoon, yeah.

7    Q.  And so they told you that -- well, that your father could

8    add you to the account on Monday so that you could find the

9    specific information, correct?

10   A.  She said she couldn't do anything for me on Friday.  If we

11   wanted to do something, we'd have to call back on Monday.

12   Q.  And your father did call back on Monday, correct?

13   A.  Yes.

14   Q.  And your father called on Monday to cancel the account,

15   correct?

16   A.  Yes.

17   Q.  And he was successful in canceling the account, right?

18   A.  Yes.

19   Q.  And in a belt-and-suspenders fashion, I guess, he also

20   canceled the credit card?

21   A.  Yes.

22   Q.  In any event, no device was ever sent, so the cancellation

23   was honored, right?

24   A.  Right.

25   Q.  And he didn't -- wasn't charged anything?  He ultimately

1  wasn't out anything in connection with the transaction,

2  correct?

3  A.  Correct.

4  Q.  And were you successful in prevailing upon him to acquire

5  a medical alert monitoring device after that?

6  A.  We were, but it -- they didn't keep it for long.  My

7  mother did not need it, she thought, so --

8  Q.  I understand, having older parents myself.

9        But even after this, you went, and you acquired --

10  you encouraged them to get --

11  A.  We did.  The difference was that I initiated that call.  I

12  researched online and did some checking, and I initiated that

13  call, so I felt comfortable doing it.

14  Q.  And ordering it for them?

15  A.  Yes.  Well, we did it with their permission at that point.

16  Q.  Well, when your father purchased the device, he did it on

17  his own, correct?

18  A.  You mean this call that we're talking about?

19  Q.  Yes, ma'am.

20  A.  Well, he would never have initiated it on his own.  He did

21  it because he got the call that implied that we children had

22  signed him up, so he went -- he's very easy-going.  He went

23  along with it.

24        But after that, he didn't initiate anything.  We kids

25  finally said, "We think you should do this."  They agreed.

1   And we said, "We'll do it all," so we did it.

2   Q.  He chose -- he made a decision.  He was a competent adult

3   who made a decision to purchase a medical alert monitoring

4   device in response to a call he received in May of 2013,

5   correct?

6   A.  Under strange circumstances, yes, correct.

7           MR. GOODMAN:  Nothing further.

8           THE COURT:  All right.  Thank you.

9           MS. JOHNSON:  Your Honor, I have very brief redirect.

10          THE COURT:  Okay.  Go ahead.

11                  REDIRECT EXAMINATION

12  BY MS. JOHNSON:

13  Q.  Miss Rivard, the entity that billed your father through

14  Discover was, quote, "Medical Alarms," end quote, is that

15  correct?

16  A.  Correct.

17  Q.  And they were out of Hewlett, New York, is that correct?

18  A.  Right.

19  Q.  One last question.  Do you have any reason whatsoever to

20  believe that your father would have lied to you about the

21  substance of this call?

22  A.  None.

23          MS. JOHNSON:  Thank you.

24          THE COURT:  Anything based on that?

25          MR. GOODMAN:  No.

1        THE COURT:  Okay.  Thank you, Ms. Rivard.  You can

2    step down.

3      (Witness excused.)

4        MR. O'TOOLE:  Your Honor, we don't have any other

5    witnesses.

6        THE COURT:  Okay.  So -- and I know you have -- you

7    have all your exhibits, and we'll talk about those later on.

8            So, do you want to get started with your witnesses?

9        MR. LIPARI:  Your Honor, we call Sarai Baker.

10       THE COURT:  Okay.  Please step up, raise your right

11   hand, state your name.

12       THE WITNESS:  Sarai Baker.

13     (Witness sworn.)

14       THE WITNESS:  I do.

15       THE COURT:  Okay.  You've been sworn.  You may be

16   seated.  If you'd like to pour yourself a glass of water,

17   there are some cups and a pitcher right there.

18       SARAI BAKER, DEFENDANTS' WITNESS, DULY SWORN.

19                    DIRECT EXAMINATION

20   BY MR. LIPARI:

21   Q.  Can you please state your full name for the record.

22   A.  Sarai Baker.

23   Q.  And, Miss Baker, are you currently employed?

24   A.  Yes.

25   Q.  And by whom are you employed?

1   A.   Lifewatch.

2   Q.   Can you just describe for us your role at Lifewatch.

3   A.   Sure.  I'm director of operations.  I oversee and

4   supervise the -- each department that Lifewatch has, customer

5   service, inventory, et cetera, as well as the outside seller

6   compliance program.

7   Q.   How long have you been employed by Lifewatch?

8   A.   I've been employed for eight years now and have been

9   director of operations for four of those years.

10  Q.   Just a moment ago, you referenced the outside seller

11  compliance program, right?

12  A.   Yes.

13  Q.   Can you explain what you mean by outside seller?

14  A.   Sure.  In approximately 2012, Lifewatch began entering

15  into purchase agreements with various sales companies; and

16  pursuant to those agreements, the outside sellers originate

17  customer accounts through radio, television, Internet, print

18  advertising, as well as telemarketing, and then offer to sell

19  those accounts to Lifewatch and others on a non-exclusive

20  basis.

21  Q.   Okay.  Now, why does Lifewatch work with these various

22  outside sellers?

23  A.   Lifewatch doesn't have a marketing department or any

24  marketing staff, so it relies on the outside sellers for

25  customer origination.

1  Q.  Okay.  And earlier, again, you referenced the outside

2  seller compliance program.

3  A.  Yes.

4  Q.  When did that outside seller compliance program first

5  begin?

6  A.  The compliance program has been in place ever since we

7  started working with the outside sellers, but it has continued

8  to evolve and improve.

9  Q.  Can you explain how it's evolved and improved?

10  A.  Well, the contracts themselves require the sellers to be

11  compliant with all applicable laws and regulations.  The

12  contracts require that audio recordings are kept in order to

13  ensure compliance with banking regulations.

14       After the FTC filed suit against the Worldwide

15  defendants, we improved the program to also include a refund

16  program to customers that believed they were induced into

17  purchasing our products and services based on

18  misrepresentations by the Worldwide defendants.

19  Q.  Let me just ask you, when was this refund program

20  implemented?

21  A.  It was implemented in 2014.

22  Q.  Okay.  What other measures does Lifewatch take currently

23  in accordance with its outside seller compliance program?

24  A.  Lifewatch does require that all outside sellers provide a

25  valid business license, that -- Lifewatch provides a copy to

1    the outside sellers of the permanent injunction that was

2    entered in the *Life Alert versus Lifewatch* case.

3          Lifewatch requires the outside sellers to sign

4    affidavits affirming that they will adhere to the regulations

5    and not make certain statements.

6    Q.  Are the certain statements, are they actually itemized and

7    referenced within that affidavit that's sent to the outside

8    seller?

9    A.  Yes, they are.

10   Q.  What -- what other measures does Lifewatch take?

11   A.  Lifewatch also circulates an internal Do Not Call List.

12   Lifewatch requests and receives -- has an employee that

13   requests and receives recordings and then spot-checks those

14   recordings to ensure compliance.

15         And Lifewatch also implemented a verification call

16   that's done by a company called Med Guard.

17   Q.  Okay.  Does Lifewatch provide sales scripts to its outside

18   sellers?

19   A.  No, we do not provide any sales scripts.  We do provide

20   information regarding what not to say, such as the

21   misrepresentations stated in the affidavits.  And we also

22   provide information on product descriptions, pricing sheet --

23   pricing, fact sheets, as well as information on phone service

24   compatibility with medical alert devices.

25   Q.  And approximately how long has Lifewatch been providing

1  these items?  When I say, "these items," I mean the items to

2  the outside sellers that you described for us.

3  A.  Yes, since about 2014.

4  Q.  And how many outside sellers is Lifewatch currently

5  purchasing accounts from?

6  A.  We're currently purchasing from seven outside sellers.

7  Q.  And within the last two years, has Lifewatch ever

8  terminated an outside seller as a result of that outside

9  seller's failure to comply with Lifewatch's policy?

10  A.  Yes.  We have terminated over 20 outside sellers.

11  Q.  Would the number be closer to 24?

12  A.  Yeah.  I do believe that 24 was the exact number.

13  Q.  Okay.  And can you just tell us generally, what are some

14  of the reasons that these 20 or 24 outside sellers had been

15  terminated by Lifewatch?

16  A.  Misstatements, not providing recordings to the employee,

17  Lauren Vandewater, and internal DNC violations.

18  Q.  Okay.  Can you describe for me exactly how the termination

19  process transpired just generally with these 24 outside

20  sellers?

21  A.  Lauren will notify me of a compliance issue.  I then

22  reach out to the CRM department and tell them to deactivate

23  that seller's log-in credentials; and then the seller is

24  notified sometimes via phone, sometimes via e-mail.

25  Q.  Okay.  But to be clear, in order to terminate, the process

1  simply involves deactivating the password, is that correct?

2  A.  Correct.

3  Q.  And does Lifewatch always terminate immediately, or are

4  there instances in which Lifewatch gives a non-compliant

5  outside seller another chance?

6  A.  There are some instances if -- that we might give them

7  another chance.  Especially if the relationship with the

8  seller has been long-term and they have been providing

9  customer accounts that have been valid and good accounts, then

10 that is something that we might give them another chance to

11 try and rectify the situation.

12 Q.  Are you aware of whether Lifewatch has received any

13 complaints about or had any compliance issues with the seven

14 current outside sellers?

15 A.  No, not that I'm aware of.

16 Q.  Okay.  Now, just a moment ago, we talked about

17 deactivating the CRM passwords, right?  Can you just give us a

18 general sense about how that CRM system works?

19 A.  Sure.  Lifewatch uses a third-party CRM database to track

20 customer information.  Outside sellers are provided with

21 log-in credentials and passwords to a third -party portal

22 within that CRM.  They do not have access to Lifewatch's

23 general database.  They only have access to what they enter

24 into -- into that portal.

25         It is my understanding that the outside sellers have

1    their own customer database that they enter account

2    information into, and then from there, they decide which

3    entity to sell that account to or to offer it to.

4    Q.  In the instances in which an outside seller enters

5    information into the CRM portal, is Lifewatch obligated at

6    that point to fulfill the contract?

7    A.  No, not at all.  Lifewatch can choose to purchase that

8    account and fulfill it or can deny it.

9    Q.  Okay.  Does Lifewatch presently have a verification call

10   process as part of its quality control program?

11   A.  Yes, it does.

12   Q.  Okay.  And just generally, what is a verification call

13   process?

14   A.  Basically, a -- the outside seller would switch --

15   basically switches over a customer to a company called Med

16   Guard, and an employee at Med Guard will verify the

17   information, customer's name, address, phone number, verified

18   payment information, as well as that the customer understands

19   they're going to be charged immediately.

20   Q.  Okay.  And does Lifewatch have an understanding that

21   because of this verification call process, the outside sellers

22   are selling exclusively to Lifewatch?

23   A.  No.

24   Q.  How is this verification call process part of a quality

25   control program?  In other words, how does it assure quality?

Baker - direct

83

1  A.  Well, it assures quality because it's -- it's assuring

2  that the customer is not confused about being charged

3  immediately.

4  Q.  Why is the customer charged immediately, as opposed to,

5  for instance, after the product has been shipped, after

6  there's been confirmation that the customer has received and

7  then plugged in and tested the product?

8  A.  We sign the customer up with the monitoring subcontractors

9  immediately, so we want to ensure that when the customer opens

10  the box and plugs in the unit, that they're protected right

11  away.

12  Q.  And does Lifewatch do anything presently to determine and

13  track whether or not the customer has actually received the

14  item?

15  A.  Yes.  We do have tracking information with USPS or

16  whatever carrier we use to fulfill that order.

17  Q.  And does Lifewatch reach out to the customer to see if

18  they've received their device?

19  A.  We do.  We do.  We have a new member services division

20  that does exactly that.

21  Q.  Can you describe the new member services division

22  generally?

23  A.  Um-hum.  We will -- we pull a report of all customers that

24  have been shipped equipment in the last five to seven days.

25  We track that -- we use the tracking number to make sure that

Baker - direct

84

1    the equipment was delivered.  We contact the customer and get

2    them to hook up and test the unit right then and there.

3    Q.  Ms. Baker, the FTC has alleged certain things against

4    Lifewatch in the complaint, and I'm going to reference some of

5    these allegations here.

6            Has Lifewatch made or caused others to make outbound

7    telephone calls delivering prerecorded messages where the

8    telemarketers have failed to disclose truthfully, promptly,

9    and in a clear and conspicuous manner the identity of the

10   seller, the purpose of the call, and the nature of the goods

11   or services?

12           MS. REICH:  Your Honor, I'm going to object to that's

13   asking her to make a legal conclusion.

14           MR. LIPARI:  Your Honor, I would just -- if I might.

15           THE COURT:  Go ahead.

16           MR. LIPARI:  I would just say that it specifically

17   goes to the current quality control process and addresses

18   these factual allegations.  There's nothing -- these are

19   not -- this is not calling for a legal conclusion.  This calls

20   for Miss Baker to address some of the factual averments within

21   the complaint.

22           THE COURT:  I'll overrule the objection.  You can

23   answer.

24   BY THE WITNESS:

25   A.  No.  Lifewatch explicitly prohibits the outside sellers

1   from using prerecorded messages that violate the law.

2   BY MR. LIPARI:

3   Q.  Now, if Lifewatch determines that outside sellers that

4   it's doing business with are using prerecorded messages that

5   violate the law, what does Lifewatch do?

6   A.  They would be immediately terminated.

7   Q.  Ms. Baker, has Lifewatch engaged or caused telemarketers

8   to engage in initiating outbound calls to individuals on the

9   Do Not Call registry?

10          MS. REICH:  Your Honor, again, I'm going to make the

11  same objection.

12          MR. LIPARI:  And, your Honor, my rationale for asking

13  the question is the same.

14          THE COURT:  How does that call for a legal

15  conclusion?  The question is:  Does Lifewatch engage or cause

16  telemarketers to engage outbound calls to individuals on the

17  Do Not Call registry?  What's legal about any of that?

18          MS. REICH:  That's actually language from the

19  Telemarketing Sales Rule clause.

20          THE COURT:  So?  Just because a question has words

21  that also appear in a regulation or a statute doesn't make it

22  a legal question.

23          MS. REICH:  Okay.

24          THE COURT:  Do you agree?

25          MS. REICH:  Oh, I certainly do agree.

1    THE COURT:  So, help me understand.  I don't

2    understand your objection, and I'm always concerned when I

3    don't understand something that a lawyer is saying because it

4    usually means I'm missing something.

5    MS. REICH:  No.  I just want to make clear that it's

6    being used in the typical way that the word "caused" is

7    usually used.

8    THE COURT:  Got it.  Okay.  I'll overrule the

9    objection.

10   BY THE WITNESS:

11   A.  Absolutely not.  Lifewatch prohibits sellers from that,

12   from this type of action.

13   BY MR. LIPARI:

14   Q.  So, let me ask you, my question pertained to Do Not Call.

15   What does Lifewatch do presently, if anything, to ensure that

16   its outside sellers are not making calls to individuals on the

17   Do Not Call List?

18   A.  Lifewatch does circulate the internal Do Not Call List,

19   compiled in part by information from the outside sellers, and

20   will immediately terminate any seller if it is determined that

21   they called someone on the DNC list.

22   Q.  Among those 20 to 24 outside sellers that have been

23   terminated over the last two years, have any been terminated

24   for Do Not Call-related issues?

25   A.  Yes.

1  Q.  And they -- why specifically were they terminated?

2  A.  Because it was determined that they were -- that they had

3  made at least some -- one call or so to someone who's on that

4  internal list.

5  Q.  Okay.  Are there any references to Do Not Call violations

6  within the affidavit that Lifewatch sends to its outside

7  sellers at the outset?

8  A.  Yes.

9  Q.  What happens if the outside seller refuses to sign the

10  affidavit?

11  A.  We do not do business with them.

12  Q.  Has that ever occurred?

13  A.  Yes.

14  Q.  Has Lifewatch represented, directly or indirectly, that

15  its products have already been purchased for the consumer by a

16  friend or family member, that its products are endorsed by the

17  American Heart Association, the American Diabetes Association,

18  and the National Institute on Aging, and that consumers will

19  not be charged the first monitoring fee until they've already

20  received the product?

21  A.  No.  Lifewatch has never authorized outside sellers to

22  make these representations.

23  Q.  Okay.  And does Lifewatch specifically itemize those

24  statements as misrepresentations in the affidavit that it

25  requires outside sellers to sign?

1   A.  Yes.

2   Q.  And when did Lifewatch start doing that?

3   A.  In 2014.  In late 2014, Lifewatch started requiring the

4   outside sellers to sign the affidavits stating that they will

5   not make these representations.

6   Q.  And was that in response to the *Worldwide* litigation?

7   A.  Yes.

8   Q.  Okay.  Was the refund program also a response to the

9   *Worldwide* litigation?

10  A.  Yes.  The refund program was put in place so that any

11  customer that felt that they made a purchase through the

12  Worldwide defendants under these misrepresentations were able

13  to receive a full refund from Lifewatch.

14  Q.  And what did Lifewatch do in order to implement that

15  refund program?  How did it work?

16  A.  We contacted customers that had not already either spoken

17  with us and confirmed that they wanted to keep the service, or

18  customers that had not yet tested their unit.

19          Out of those customers that we had not made contact

20  with, we reached out to them.  There was about 800 of them

21  that we reached out to.  And after actually speaking with all

22  of them except -- there were 38 that said that they wanted

23  to cancel; and out of those 38, we wound up giving refunds to

24  22 of them.

25  Q.  Ms. Baker, let me ask you, you referenced earlier some

1  spot-checking by a Lifewatch employee, and that employee's

2  name, is that Lauren Vandewater?

3  A.  Yes.

4  Q.  Can you describe generally what Lauren Vandewater does on

5  a daily basis with respect to audio recordings in accordance

6  with Lifewatch's quality control program?

7  A.  Sure.  She requests recordings, anywhere from 25 to 40

8  recordings per outside seller.  She then listens to those

9  recordings.  They can range anywhere from seven to 45 minutes.

10  But she will just do random checks to ensure that they are

11  complying with all the guidelines.

12  Q.  And when you say random checks to ensure they're complying

13  with all the guidelines, what does she do?  What does she do

14  to ensure that?

15  A.  She listens to the recordings.  She's going -- you know,

16  just listening for keywords, just making sure that, okay, yes,

17  you know, that they are telling the customer, you know,

18  correct information.

19  Q.  What, if anything, have you directed her to do if she

20  listens to the audio recordings and determines that there's

21  been non-compliance?

22  A.  She contacts me immediately.

23  Q.  And then you initiate the termination process when

24  appropriate?

25  A.  Yes, correct.

1  Q.  Okay.  Does Lauren review and edit scripts from outside

2  sellers?

3  A.  Generally, we do not.  It is not our policy to review or

4  edit sales scripts.

5  Q.  Have you ever seen any e-mails or communications where

6  Lauren discussed scripts?

7  A.  Yes.  We recently saw that Lauren did receive an e-mail

8  from a former outside seller asking if the -- if the generic

9  sales script was compliant with Lifewatch guidelines.

10  Q.  And what did Lauren say in response?

11  A.  Lauren did make some changes regarding -- to ensure that

12  there were no misrepresentations of the product.

13  Q.  So, she was enforcing Lifewatch's compliance program?

14  A.  Absolutely.

15  Q.  Why weren't those e-mails produced in the litigation?

16  A.  Those -- Lifewatch -- we have been searching for --

17  looking for e-mails in regards to sales scripts, and we -- we

18  haven't really found any that show that we have been reviewing

19  and editing scripts.

20          These e-mails between Lauren and Payless were an

21  oversight.

22  Q.  What has Lifewatch done since reviewing those Vandewater

23  e-mails to determine whether or not there are any other

24  similar e-mails where Lauren is discussing sales scripts with

25  outside sellers?

Baker - cross

1   A.  I have had my IT guy go through and do another more

2   thorough review of e-mails.

3   Q.  Okay.  And what did that thorough review yield?

4   A.  It -- there are no -- no e-mails regarding reviewing or

5   editing sales scripts.

6   Q.  What kind of scripts are provided to the outside sellers?

7   A.  ACH and credit card verification scripts.

8   Q.  And why does Lifewatch provide those?

9   A.  That is according to NACHA Guidelines.

10  Q.  And just generally, what do you mean by NACHA Guidelines?

11  A.  Just -- it's actually banking regulations.  They're not

12  set forth by us, *per se*.  It's just -- it's actually a

13  national organization.

14  Q.  So, those e-mails with Lauren Vandewater to the outside

15  seller Payless, they involved Lauren identifying certain

16  issues that may have been in violation of the compliance

17  program, correct?

18  A.  Yes, correct.

19  Q.  And has Payless been terminated as an outside seller?

20  A.  Yes.

21          MR. LIPARI:  I don't have anything further.  Thank

22  you very much.

23          THE COURT:  Thank you.

24                      CROSS-EXAMINATION

25  BY MS. REICH:

1  Q.  Good afternoon, Ms. Baker.

2  A.  Hello.

3  Q.  My name is Marissa Reich.  I'm an attorney with the

4  Federal Trade Commission.  I just have a few more questions

5  for you.

6       Now, in addition to the testimony that you're giving

7  today, you actually submitted a declaration in this case, is

8  that correct?

9  A.  Yes.

10  Q.  Were you paid anything in addition to your normal

11  compensation for providing that declaration?

12  A.  Not at all.

13  Q.  And are you a salaried employee of Lifewatch?

14  A.  Yes.

15  Q.  Do you receive any sort of bonus based on the sales that

16  Lifewatch makes?

17  A.  No.

18       THE COURT:  Can you move the -- thank you.

19       MS. REICH:  I'll just move myself.

20       THE COURT:  Thank you.

21  BY MS. REICH:

22  Q.  Now, Ms. Baker, are you aware that the FTC sent a Civil

23  Investigative Demand to Lifewatch in March of 2014?

24  A.  I'm not sure what that is.

25  Q.  Are you aware that in March of 2014, the FTC sent a

 1   request to Lifewatch requesting certain documents?

 2   A.  Yes.

 3   Q.  And did you participate in collecting documents to provide

 4   to the FTC?

 5   A.  Yes.

 6   Q.  And are you aware that the plaintiffs served Lifewatch

 7   with document requests in connection with the current case?

 8   A.  Yes.

 9   Q.  And did you assist in collecting documents to provide to

10   the FTC and the State of Florida in connection with that

11   document request?

12   A.  Yes.

13   Q.  And do you know what a document retention policy is?

14   A.  Yes.

15   Q.  Does Lifewatch have any sort of document retention policy?

16   A.  We do.

17   Q.  And can you explain what it is?

18   A.  All -- documents are kept on file for one year.

19   Q.  For one year?

20   A.  Yes.

21   Q.  And after that point, the documents are destroyed?

22   A.  It's -- the system will -- yeah, it will, I guess, delete

23   them or trash them.

24   Q.  And were you ever notified in connection with that initial

25   March 2014 request from the FTC that all documents needed to

1   be retained and could not be deleted?

2   A.  Yes.

3   Q.  So, ever since March 2014, you have held on to all of your

4   documents?

5   A.  Yes.

6   Q.  Now, you testified earlier that you were aware that in

7   early 2014, Lifewatch learned that some of its outside

8   sellers, which I think you referred to as the Worldwide

9   outside sellers, were sued by the FTC, right?

10  A.  Yes.

11  Q.  And after the FTC sued these Worldwide companies, you

12  state in your declaration that Lifewatch stopped working with

13  them, is that correct?

14  A.  Correct.

15  Q.  But didn't Lifewatch only stop working with them because

16  they were actually shut down by the court-appointed receiver

17  in that case?

18  A.  I do not know.

19  Q.  And are you aware that the Indiana Attorney General had

20  sued Lifewatch in November of 2012?

21  A.  I -- no, I'm not aware.

22  Q.  So, you're not aware that Lifewatch was sued by the

23  Indiana Attorney General's Office for violations of the

24  Indiana Do Not Call List and for sending out illegal

25  prerecorded messages?

Baker - cross

1  A.  No, I'm not aware of all of the -- whatever might be

2  happening legally.

3  Q.  So, it's your testimony that as director of operations who

4  oversees the outside sellers, you weren't aware that a lawsuit

5  was brought against Lifewatch regarding actions by those

6  outside sellers?

7  A.  Not at that time, no.

8  Q.  So, in your declaration, in Exhibit F, you provide a list

9  of telemarketer names, and you indicate that Lifewatch is not

10  currently purchasing customer accounts from those companies,

11  correct?  But that doesn't mean that Lifewatch never purchased

12  accounts from those companies, does it?

13  A.  The list is --

14  Q.  It's Exhibit F to your declaration.  It's a list of

15  probably about 30 names of various companies.

16          MR. LIPARI:  Your Honor, I'm just going to object.

17  To the extent that she wants to question Ms. Baker on a list

18  of 30 companies within an exhibit to an affidavit, I think it

19  would be appropriate to put the exhibit in front of the

20  witness.

21          THE COURT:  Is there -- do you have a problem with

22  that?

23          MS. REICH:  I'll just -- I'll move on.

24          THE COURT:  Well, why don't we just give her a copy

25  of the affidavit?

1            MS. REICH:  May I approach the witness?

2            THE COURT:  Sure.

3   BY MS. REICH:

4   Q.  Ms. Baker, do you recognize that document?

5   A.  Yes.

6   Q.  That document was attached to the declaration that you

7   filed on November 10th, 2015, correct?

8   A.  Yes.

9   Q.  And in -- regarding that exhibit, you state in your

10  declaration that Lifewatch is currently not purchasing

11  customer accounts from those companies, is that correct?

12  A.  Correct.

13  Q.  But that doesn't mean that Lifewatch never purchased

14  customer accounts from those telemarketers, is that correct?

15            MR. LIPARI:  Objection.  Argumentative.

16            THE COURT:  Overruled.

17  BY THE WITNESS:

18  A.  It doesn't mean that.

19  BY MS. REICH:

20  Q.  So, for instance, at one time, Lifewatch may have been

21  purchasing accounts from telemarketers that used the name

22  Senior Safe-Holder, correct?

23  A.  It may have, but most of these are not familiar.

24  Q.  Lifewatch did purchase accounts from telemarketers using

25  the name Just For Seniors, correct?

1   A.  No.

2   Q.  No?  Could Lifewatch have purchased customers from a

3   company that used the name Just For Seniors with customers

4   during telemarketing calls?

5   A.  It's possible, but I'm not aware of it.

6   Q.  So, is your testimony that it's possible that the outside

7   sellers may use company names with consumers during

8   telemarketing calls that you are not aware of?

9   A.  We --

10              MR. LIPARI:  Objection.  Calls for speculation.

11              THE COURT:  I'm sorry?

12              MR. LIPARI:  Calls for speculation.

13  BY THE WITNESS:

14  A.  We would hear --

15              THE COURT:  Hold on.

16              Overruled.  Go ahead.

17  BY THE WITNESS:

18  A.  That's something that we would hear on recordings when we

19  randomly -- you know, randomly listen to recordings, and I'm

20  not -- that's not something that I'm familiar with occurring.

21  BY MS. REICH:

22  Q.  But your testimony was that you only listen -- or

23  Ms. Vandewater only listens to a small sample of recordings,

24  correct?

25  A.  No, that's not what that means.  It does depend on how

1  many -- the recordings that are requested.  There are some of

2  the sellers that maybe only entered two or three deals a day.

3  Q.  Okay.

4  A.  So, in those cases, we would try to listen to all of the

5  recordings.

6  Q.  Okay.  After Lifewatch learned of the FTC's lawsuit in

7  2014 against the Worldwide outside sellers, and you spoke

8  about this earlier, Lifewatch began offering refunds to

9  consumers that had been affected by the practices that were

10  alleged in that complaint.  You didn't offer refunds to all of

11  Lifewatch's customers, did you?

12  A.  No.

13  Q.  And Lifewatch's refund program was simply sending a letter

14  out to all of those customers and telling them, "If you

15  respond, we will give you a refund," correct?

16  A.  Correct.

17  Q.  And as far as the refund processes, you stated -- you

18  identified that the number of consumers that had -- excuse me,

19  the number of customers who never activated their device,

20  correct?

21  A.  Correct.  That number would -- I'm sorry.  Say it one more

22  time.

23  Q.  You had identified that there were 3,000 customers that

24  had never activated or plugged in and turned on the device.

25  A.  Plugged in, correct.

1  Q.  So, you determined that there were 3,000 of these people,
2  correct?
3  A.  Correct.
4  Q.  And 3,000 of these people were being charged a monthly fee
5  but were not using the device, is that correct, or did not
6  have the device plugged in?
7  A.  Correct.
8  Q.  And Lifewatch didn't give an automatic refund to those
9  3,000 people, did it?
10 A.  Correct.  And I want to just back up real quick.  It's not
11 that the device wasn't plugged in.  It's that they hadn't
12 initiated a first test.  I just wanted to be clear about that.
13 Q.  Okay.  So -- thank you.  Lifewatch does encourage
14 customers as soon as they receive the device to plug it in and
15 push the button to be sure it's operating correctly, correct?
16 A.  Yes, that is correct.
17 Q.  So, you determined, though, that 2200 of these 3,000
18 non-activated customers were satisfied with the device and
19 were happy to be paying for it even though they had never
20 tested it to make sure it works, correct?
21 A.  Correct.  But then at that point, we also walked them
22 through the -- the setup process.
23 Q.  I'm talking about the 2200 consumers.  Are you talking
24 about the 800?  So, you actually contacted all 2200 of the --
25 you contacted all 3,000 customers that had never plugged the

1   device in?

2   A.  We spoke with them, absolutely.

3   Q.  Oh, interesting.  Okay.

4           So, Ms. Baker, according to your declaration -- and I

5   can provide you with a copy of it, if you'd like.

6           MS. REICH:  Your Honor, I'm handing Ms. Baker a copy

7   of the declaration that she signed November 10th, 2015, in

8   this case.

9           THE COURT:  Okay.

10  BY MS. REICH:

11  Q.  You indicated in paragraph 13 that you had determined that

12  out of these approximately 3,000 customers, the non-activated,

13  2200 had previously called in to the customer service call

14  center and thus verified with our customer service department

15  that they knew they had the Lifewatch device, were satisfied,

16  and had not indicated any desire to discontinue service.

17  A.  Um-hum.

18  Q.  Are you indicating now that in addition to that, you also

19  called all 2200 of these customers at this point to confirm

20  that they were satisfied?

21  A.  No, I'm sorry, not that we called them, but we made

22  contact with them.  There was some sort of -- either them

23  calling us, us calling them.  There was a contact made with

24  that customer that we were able to verify that they absolutely

25  wanted to continue the service.  They were happy with us.

1        We -- if they -- at that point, if they hadn't

2    already tested the device, we tested it with them.  That

3    was -- it was a complete just making sure that that customer

4    would remain a customer.

5    Q.  And this is just contacts that were made any time between

6    when they became a customer and when you started providing

7    this refund to these customers, correct?

8    A.  Yes, correct.

9    Q.  So, what you're indicating is there was some record that

10   they had contacted Lifewatch or Lifewatch had contacted them

11   at some point, correct?

12   A.  Correct.

13   Q.  So, when you determined that there were these 3,000

14   non-activated customers, did you go through the records of

15   each of those 2200 customers to make sure they said in it,

16   "We love this device and we are happy to be paying for it,

17   even though we're not using it"?

18   A.  Yes.

19   Q.  You actually walked through all 2200?

20   A.  Yes.

21   Q.  And now, you indicate in your declaration that there were

22   800 non-activated customers who hadn't previously contacted

23   Lifewatch, correct?

24   A.  Correct.

25   Q.  And so you followed up with these 800 customers?

1    A.  Correct.

2    Q.  And you say that only 38 or so didn't want to keep their

3    device?

4    A.  That's correct.

5    Q.  So, you're saying that 762 customers, in addition to the

6    2200 other customers that hadn't activated, were all happy to

7    pay a monthly fee for a device they were not using or had

8    never tested?

9    A.  Correct.  And that they wanted to continue service with

10   us, correct.

11   Q.  Now, you testified in your declaration that in October of

12   2014, Lifewatch revised and improved its existing quality

13   control program, correct?

14   A.  Yes.

15   Q.  And part of this change was starting to collect these

16   affidavits, is that correct?

17   A.  Yes.

18   Q.  And Lifewatch provides the affidavits to the outside

19   sellers to sign, is that correct?

20   A.  Correct.

21   Q.  You attached some of these affidavits to your declaration,

22   is that correct?  And these affidavits say things like

23   Lifewatch never provides sale scripts to its sellers, correct?

24   A.  Correct.

25   Q.  And that Lifewatch doesn't review or approve, dictate,

1  draft, authorize, correct, any of these scripts?

2  A.  Correct.

3  Q.  And you're saying that it's Lifewatch's policy to collect

4  these affidavits in conjunction with signing the purchase

5  agreement with the outside seller, is that correct?

6  A.  Correct.

7  Q.  So, your testimony is that the outside seller doesn't get

8  access to Lifewatch's customer relationship database until

9  they've received both the purchase agreement and the

10  affidavit, correct?

11  A.  Absolutely.

12  Q.  So, when the outside seller is required to sign this

13  affidavit about what Lifewatch does and doesn't do, it's

14  actually before the outside seller's started working with

15  Lifewatch, isn't that correct?

16  A.  Correct.

17  Q.  And you state in your declaration starting in June of

18  2015, Lifewatch required the outside sellers to fill out a

19  second affidavit, correct?

20  A.  Correct.

21  Q.  And in this affidavit, the outside seller is required to

22  indicate how many of the customer accounts it provides to

23  Lifewatch have originated from outbound telemarketing,

24  correct?

25  A.  Correct.

1  Q.  But again, this second affidavit is signed when the

2  relationship between Lifewatch and the outside seller is just

3  beginning, correct?

4  A.  Correct.

5  Q.  So, for instance, you attached a purchase agreement and

6  the two affidavits for one of your current outside sellers to

7  your declaration -- in fact, you provided it for all of your

8  current outside sellers.

9          And specifically, I'm going to be talking about one

10  who signed on July 22nd.  Let me provide you with the

11  documents that were attached to the declaration.

12  A.  Okay.

13          MS. REICH:  Your Honor, I'm providing Ms. Baker with

14  the two affidavits -- I'll wait until I get back.

15          I'm providing Ms. Baker with a portion of the

16  Exhibit E to her declaration.  It's the two affidavits and the

17  purchase agreement that were entered with Field Direct

18  Marketing Consultants.

19          THE COURT:  Okay.

20          MS. REICH:  This was filed under seal, so

21  unfortunately, it doesn't have a docket entry or page number.

22          THE COURT:  Okay.

23  BY MS. REICH:

24  Q.  So, Ms. Baker, looking at the purchase agreement, it looks

25  as though it was entered on July 22nd, 2015, is that correct?

1    A.  Yes.

2    Q.  And then as I mentioned, there's the two affidavits there

3    that Field Direct also signed, correct?

4    A.  Yes.

5              MR. LIPARI:  Your Honor --

6              THE COURT:  Sure.

7              MR. LIPARI:  These documents were filed under seal in

8    part because it's our position that these documents contain

9    some commercially sensitive and proprietary information, so I

10   would just ask that to the extent that any of the information

11   within those documents that's proprietary or commercially

12   sensitive is going to be disclosed or spoken about in open

13   court, it would be our request that this portion of the

14   hearing would not be public.

15             THE COURT:  Well, I don't know what part of the

16   purchase agreement you consider to be commercially sensitive.

17   It can't be the whole thing, because some of this is pretty

18   generic.

19             MR. LIPARI:  Absolutely.  I mean, most of it -- most

20   of those documents are simply form contracts.

21             And to answer your specific question, it is the

22   current identity of the outside sellers that Lifewatch is

23   doing business with.  And we've submitted affidavits in terms

24   of why we consider that to be proprietary and commercially

25   sensitive.

1          MS. REICH:  I'm happy not to refer to the actual name

2     of the seller at this point.

3          THE COURT:  Okay.

4          MR. LIPARI:  Then I'm satisfied.  Thank you.

5          THE COURT:  Okay.  Good.

6     BY MS. REICH:

7     Q.  So, going back, the two affidavits that I was just

8     referring to, one of those affidavits, again, is that first

9     one that you've been requiring since 2014, which says,

10    "Lifewatch doesn't review, approve, dictate, draft, authorize,

11    or control sales scripts," right?

12    A.  Um-hum, yes.

13    Q.  And you can see that the date on that is August 5th,

14    correct?  The date that it was signed.  It's on the second

15    page, I believe.

16    A.  Yes.

17    Q.  And then looking at that other affidavit, that was also

18    signed by the same company, that was also signed on

19    August 5th, correct?

20    A.  Correct.

21    Q.  And that states that the company says that between zero

22    and 50 percent of the customer accounts that have been sold to

23    Lifewatch originated through outbound telemarketing, correct?

24    A.  Yes, correct.

25    Q.  But at that point, the company hadn't done any sales for

1    Lifewatch, had it?

2    A.  Correct, it had not.

3    Q.  Now, going back again to that first affidavit that we've

4    been talking about now, in it, the outside seller said that

5    Lifewatch doesn't review its telemarketing scripts, correct?

6    A.  Correct.

7    Q.  And it's your testimony today that Lifewatch doesn't

8    review telemarketing scripts, correct?

9    A.  Correct.

10             MS. REICH:  May I approach?

11             THE COURT:  Sure.

12   BY MS. REICH:

13   Q.  I'm handing you what's been filed under seal as docket

14   entry No. 102, and it's also been marked by plaintiffs as

15   PX 987 on their witness list.  Do you recognize this document?

16             MS. REICH:  I have extra copies, your Honor, if you'd

17   like one.

18             THE COURT:  Actually, I'll take a copy.  I don't know

19   where it is in the exhibit binder.  Thank you.

20   BY MS. REICH:

21   Q.  This is an affidavit that an outside seller has signed

22   when it entered into a purchase agreement, correct?

23   A.  Yes.

24   Q.  And this affidavit is signed by Mark Nonsant, correct?

25   A.  Correct, yes.

1  Q.  And in this affidavit, he's identified as the director of

2  operations for Payless Solutions, isn't that correct?

3  A.  Yes.

4  Q.  And at one point, Payless was one of Lifewatch's outside

5  sellers, is that correct?

6  A.  Correct.

7  Q.  And this affidavit is dated April 4th, 2014, correct?

8  A.  Yes, correct.

9  Q.  And in paragraph 8 of it, Mr. Nonsant states that

10 Lifewatch doesn't review, approve, dictate, draft, authorize,

11 or control telemarketing scripts used by Payless Solutions,

12 correct?

13 A.  Correct.

14 Q.  And then the next paragraph says, "Nor does Lifewatch tell

15 Payless Solutions what to say to the customers or potential

16 customers during the course of the telemarketing calls," is

17 that correct?

18 A.  Correct.

19 Q.  I'm going to provide you with another document.  Now, this

20 document, I believe, was previously referenced in your direct

21 examination with Mr. Lipari.  I'm handing you a document

22 that's been publicly filed in this case.  It's docket entry

23 96-1, at pages 46 through 50.  It's part of Attachment A to

24 PX 89.  And defendants have actually also identified it as

25 DX 85.

Baker - cross

1    Now, you supervised Lifewatch employee Lauren
2  Vandewater, correct?
3  A.  Correct, yes.
4  Q.  And as her supervisor, you're aware of actions that
5  Ms. Vandewater takes pursuant to her position at Lifewatch,
6  correct?
7  A.  Yes.
8  Q.  And according to these e-mails, in this top one,
9  Ms. Vandewater is identified as the call center liaison, is
10  that correct?
11  A.  Yes.
12  Q.  This is an e-mail saying -- with the subject line,
13  "Script," correct?
14  A.  Um-hum.
15  Q.  Have you ever seen this e-mail?
16  A.  Yes.
17  Q.  And did you see this e-mail at the time it was sent?
18  A.  No.  I saw this e-mail last week.
19  Q.  Now, do you generally see e-mails that Ms. Vandewater
20  sends to outside sellers?
21  A.  From time to time, um-hum.
22  Q.  Now, taking a look at this e-mail, starting at the bottom,
23  it looks like it was originally sent from a woman named
24  Tiffany Ordiway, correct?
25  A.  Correct.

1   Q.  On June 6th, 2014.  And she states, "Here's the script.

2   Let me know what you need changed or just taken out

3   completely.  We will have it handled ASAP," correct?

4   A.  Yes.

5   Q.  And then Ms. Vandewater responds and says, "Here's the

6   revisions I made.  I took that one line out about the billing,

7   but I added a few things where they're saying it's free" --

8   and then she says in parentheses, "(It's free to use)" -- "so

9   that it avoids confusion with customers and avoids compliance

10  issues," correct?

11  A.  Correct.

12  Q.  And in the top e-mail, Ms. Vandewater is forwarding this

13  e-mail to somebody, and it's hard to read because of the

14  docket entry, but if you look closely, it looks as though it's

15  Mark Nonsant, correct?

16  A.  Correct.

17  Q.  And then if you look at what the attachment is, which you

18  can tell is right under the mail received, it's, "Product

19  Script-Payless," correct?  You can tell from the --

20  A.  On the first page?

21  Q.  On the first page.  It's what Ms. Vandewater is

22  forwarding.  You can see the filename.

23  A.  Oh, yes, yes.

24  Q.  And then let's turn to the attachment, if we can, which is

25  on page 3.

1  A.  Okay.

2  Q.  And this looks to be a -- it's entitled, "Product Script,"

3  correct?

4  A.  Yes.

5  Q.  And this looks to be a telemarketing script, correct?

6  A.  Some form of sales script.

7  Q.  Okay.  Thank you.  So now, despite Lifewatch's new quality

8  control program, Lifewatch's outside sellers have continued to

9  make misrepresentations, isn't that correct?

10  A.  If we do find out about it, it's something that is

11  addressed immediately.

12  Q.  Okay.  And you previously testified you supervise

13  Ms. Vandewater, correct?

14  A.  Yes.

15  Q.  And you state in paragraph 23 of your declaration that

16  Ms. Vandewater reports to you any information about outside

17  sellers who've engaged in violative practices, correct?

18  A.  Yes, correct.

19  Q.  And you state that Ms. Vandewater reports to you any

20  information about outside sellers who aren't following

21  Lifewatch's guidelines, correct?

22  A.  Correct.

23  Q.  So, you're aware when a telemarketer is participating in

24  a practice that violates their agreement with Lifewatch, is

25  that correct?

1  A.  Yes.

2  Q.  So then you would be aware that in May of 2015,

3  Ms. Vandewater determined that Lifewatch's outside sellers

4  were making several different misrepresentations, correct?

5  A.  Yes, I would be aware of that.

6  Q.  Okay.  So, specifically, you would be aware that in May of

7  2015, Ms. Vandewater determined that outside sellers were

8  saying that Lifewatch would provide prepaid shipping labels to

9  customers who wanted to send their equipment back, correct?

10  A.  If that was something that was happening at that time.  I

11  do know that she sends out e-mails that could contain issues

12  that are currently happening, but could also contain issues

13  that had previously happened.

14  Q.  I'm going to provide you with one more document, if I can

15  find it.

16          MS. REICH:  I'm providing the witness with a document

17  that was at docket entry 96-1, page 8 and 9 and 10 of 57.

18  It's also Attachment A to PX 89.  And defendants have also

19  identified it as DX 71.

20  BY MS. REICH:

21  Q.  Ms. Baker, this is an e-mail that was dated May 18th,

22  2015, correct?

23  A.  Yes.

24  Q.  And it was sent from Lauren Vandewater to an undisclosed

25  list of recipients, correct?

Baker - cross

1  A.  Correct.

2  Q.  Are you one of the people that received this e-mail?

3  A.  I am.

4  Q.  Okay.  So, you've seen this e-mail before?

5  A.  Yes.

6  Q.  So, at the top of this e-mail, Ms. Vandewater states,

7  "I just want to remind you about a few things that are still

8  happening after I addressed them, or it may be a new issue

9  that you were unaware of," correct?

10  A.  Yes.

11  Q.  And then going to the second page, if you look near the

12  bottom, there's a heading, "Shipping Labels," correct?

13  A.  Yes.

14  Q.  And there, Miss Vandewater writes, "I have heard on

15  recordings reps telling customers that we will send a prepaid

16  label to send the unit back.  We will not be doing that even

17  if you ask, so please do not offer it as an option," correct?

18  A.  Correct.

19  Q.  So, indicating to people that they would receive a prepaid

20  shipping label is a misrepresentation, correct?

21  A.  Yes.

22  Q.  And she heard it on recordings, so she could identify the

23  telemarketing company that made the misrepresentation,

24  correct?

25  A.  Correct.

1    Q.  So, that telemarketing company was immediately terminated,
2    correct?
3    A.  Not necessarily.  If it was -- if it was one time, one rep
4    happened to do that, that is something that we would give an
5    outside seller another opportunity.
6    Q.  And I'd like to go down further to the heading, "Billed
7    When Activated."
8            Now, there, Ms. Vandewater says, "A rep cannot tell a
9    customer that billing starts once you activate the system or
10   you won't be billed until you test the unit.  You will be
11   considered non-compliant and charged back for that deal for
12   misleading the customers.  This cannot happen, and we will not
13   tolerate misleading the customers," correct?
14   A.  Correct.
15   Q.  So, she's acknowledging that that's a misrepresentation,
16   correct?
17   A.  Correct.
18   Q.  And again, this is the type of thing that would cause a
19   termination of a telemarketer?
20   A.  Correct.
21   Q.  And was the telemarketer terminated for this
22   misrepresentation?
23   A.  For this specific e-mail, I'm not sure.  I don't recall.
24   Q.  And then if you can go to the third page, please, there,
25   there's a heading, "The system is referred for them."  And it

1  says, "You know that a doctor or family member did not refer

2  them to get the system, so you should not be telling customers

3  that," correct?

4  A.  Correct.

5  Q.  So, this is another misrepresentation, correct?

6  A.  Correct.

7  Q.  And this is the type of misrepresentation that would lead

8  to the termination of an outside seller?

9  A.  Correct.

10 Q.  And are you aware if an outside seller was terminated for

11 this misrepresentation?

12 A.  I am not.  Remember, I said that this could be current

13 issues, or it could also include things that might have

14 happened.  It could include the misrepresentations that the

15 FTC alleged that was happening.

16 Q.  If I could move on to the next line please.  Here,

17 Ms. Vandewater writes, "These are all things that have been

18 coming up lately, and the reps need to be reminded they cannot

19 do that," correct?  That's what it says?

20 A.  Correct.  That doesn't mean that that -- she does say

21 things like that also to get them to understand how important

22 it is to adhere to all of these.

23 Q.  Okay.  Now, since May 2015 when this e-mail went out,

24 Lifewatch actually hasn't terminated any outside sellers for

25 making misrepresentations during telemarketing calls, have

1    they?

2    A.  You're saying since May of 2015?

3    Q.  Um-hum, yeah.

4    A.  Lifewatch has -- definitely has terminated outside

5    sellers.

6    Q.  For misrepresentations?

7    A.  For compliance, definitely for compliance issues.

8    Q.  And these sorts of terminations would be documented, is

9    that correct?

10   A.  Not necessarily.  It could have been done via phone.

11   Q.  So, all terminations since May 2015 have solely been done

12   by telephone; is that what you're saying?

13   A.  I'm saying it's possible, yes.

14   Q.  Okay.  You also testified that Lifewatch keeps an internal

15   Do Not Call List, is that correct?

16   A.  Yes.

17   Q.  And is there a written policy about this internal Do Not

18   Call List that Lifewatch maintains, some sort of policy?

19   A.  No.  It's just an ongoing organic list.

20   Q.  And Ms. Vandewater provides this internal Do Not Call List

21   to Lifewatch's outside sellers, correct?

22   A.  Correct.

23   Q.  But you don't say in your declaration that the outside

24   sellers are actually required to upload their own internal

25   Do Not Call lists to Lifewatch, is that correct?

Baker - cross

1    A.  Correct.  We -- right.  They're required to adhere to all

2    DNC regulations required by law, and we do -- we have our own

3    internal Do Not Call List that we provide to them, but we do

4    not require them to provide us with a Do Not Call List.

5    Q.  So, your internal Do Not Call List wouldn't include Do Not

6    Call requests that were simply made to the outside sellers, is

7    that correct?

8    A.  Unless the outside sellers gave us that information and

9    said, you know, "Here's some additional numbers to add to the

10   list."

11   Q.  All right.  Thank you.  So, your outside sellers are also

12   expected to comply with the National Do Not Call List,

13   correct?

14   A.  Absolutely.

15   Q.  And according to Attachment E of your declaration -- well,

16   I will move on.

17          So, plaintiffs have submitted evidence that at least

18   one of your current outside sellers has 19 consumer complaints

19   alleging Do Not Call violations against it.  Are you aware of

20   that?

21   A.  No.

22   Q.  And now that you are aware of that, will you be

23   terminating your relationship with that outside seller?

24   A.  Yes, we will.

25   Q.  And you testified that when an outside seller makes the

1   deal, they enter it into your customer relationship database,

2   and then Lifewatch either accepts or declines the customer,

3   correct?

4   A.  Correct.

5   Q.  And one of the reasons that Lifewatch might decline the

6   customer is if they have only a P.O. Box as their address,

7   correct?

8   A.  Correct, absolutely.

9   Q.  And another is if they live in a place like Indiana,

10  because now you don't accept customers from Indiana, correct?

11  A.  Correct.

12  Q.  But you don't decline a customer because they're on the

13  National Do Not Call List, do you?

14  A.  No, we -- we wouldn't look for that customer's phone

15  number to be on there, because keep in mind that we don't know

16  how that customer was originated.  They could have called in

17  based on a TV commercial or a radio commercial.

18  Q.  And so you say that now you have this verification program

19  where all the calls go to a company called -- I think it's

20  called Med Guard, is that correct?

21  A.  Um-hum, correct, yes.

22  Q.  To verify that they understand that they're going to be

23  paid immediately, correct?

24  A.  Um-hum.

25  Q.  Does Med Guard also verify that the person didn't receive

Baker - cross

1   an illegal robo call, that the person didn't receive the

2   telemarketing call through an illegal robo call?

3   A.  No.

4   Q.  Do they confirm that the person is not on the National

5   Do Not Call List?

6   A.  No.

7   Q.  Do they confirm that the person was not told that a friend

8   or family member referred them for the device?

9   A.  No.

10  Q.  Do they confirm that the person was not told that if they

11  were unhappy, they would not be receiving a prepaid shipping

12  label?

13  A.  No, but the recordings confirm that.

14  Q.  Were they -- do they confirm during that confirmation that

15  the person was not told the device was endorsed by

16  organizations such as the American Heart Association, the

17  American Diabetes Association, or AARP?

18  A.  No.  The recordings would confirm that.

19          MS. REICH:  I've got nothing further.

20          THE COURT:  Okay.

21          MR. LIPARI:  Your Honor, may I do a brief redirect?

22          THE COURT:  Sure.  Actually, let me ask a couple of

23  questions.

24          Would Lifewatch be harmed if it were prohibited from

25  making any misrepresentations to potential customers?

1          THE WITNESS:  Would it be harmed?  No.

2          THE COURT:  Yes.

3          THE WITNESS:  No.

4          THE COURT:  Would Lifewatch be harmed if it were

5    prohibited from violating federal regulations?

6          THE WITNESS:  No.

7          THE COURT:  Okay.  Go ahead.

8                    REDIRECT EXAMINATION

9    BY MR. LIPARI:

10   Q.  Miss Baker, I just want to address a few points based upon

11   the testimony that was elicited by Ms. Reich.

12          As a general proposition, when Lifewatch purchases a

13   customer account, does Lifewatch know how that customer

14   account was specifically originated?

15   A.  No.

16   Q.  Why not?

17   A.  That's -- we just get the customer information.  It's --

18   and we -- when we get that customer, if we choose to purchase

19   that customer and we get the recording, that recording can --

20   we're not sure how it was originated.

21   Q.  And did Lifewatch send out a survey to determine the

22   methods used by the outside sellers?

23   A.  Yes.

24          MR. O'TOOLE:  Objection, your Honor.  I'm sorry.  If

25   he's going to be asking about a written document, then we

1    should see the written document.

2         MR. LIPARI:  Your Honor, let me respond to that more

3    specifically, as opposed to just a general legal proposition.

4    Specifically, that's a document that was addressed several

5    times by Ms. Reich during her cross-examination.

6         THE COURT:  Could you identify it?

7         MR. LIPARI:  Yes, your Honor.  That was -- I referred

8    to it as a survey.  It was the affidavit that Lifewatch sent

9    out to its outside sellers in June 2015.

10        THE COURT:  Okay.  So, what they called an affidavit,

11   you're calling a survey?

12        MR. LIPARI:  Correct, but it's the same --

13        THE COURT:  And I don't care what anybody calls it.

14   I just want to make sure that we all know what you're talking

15   about.

16        Do you know what he's talking about?

17        MR. O'TOOLE:  I don't know what he's talking about,

18   your Honor.

19        THE COURT:  He just told you, he's talking about the

20   affidavit.

21        MR. O'TOOLE:  I understand, your Honor.

22        THE COURT:  But he's calling it a survey.  And you

23   don't have to accept the fact that it's a survey.  All I need

24   to know is do you know that what he's calling a survey is what

25   you understand to be an affidavit.

1          MR. O'TOOLE:  If what he's calling the survey is like

2     the form that he sent -- but I guess I interpreted when he

3     said survey that this was something that, you know, the same

4     version went to lots of people and they all responded

5     together.

6          I guess I understand if he's -- if he could tell us

7     the docket number and the page number, then I don't care how

8     he characterizes it.

9          THE COURT:  I mean -- and by allowing -- by

10    overruling your objection, I'm not saying that I agree with

11    his characterization of the affidavit as a survey.  I may

12    think that he's trying to hide something by using that word.

13    I may agree with him.

14         All I'm saying is I don't care what he calls it, just

15    as long as everybody knows what he's talking about.

16         MR. O'TOOLE:  And, your Honor, I'm not arguing with

17    you about that.  I don't care what he calls it, either.  If he

18    just tells me what the document is, just with a Bates number,

19    I'll be fine.

20         THE COURT:  Which one are you referring to as like an

21    exemplar?

22         MR. LIPARI:  Your Honor, again, I'll call it an

23    affidavit or a survey.  It's June 2015, Lifewatch, as

24    Ms. Baker testified in response to Ms. Reich's questions, sent

25    out these form affidavits.  I believe that some of those

1    affidavits were filed under seal as Exhibit A to Ms. Baker's
2    declaration.
3              THE COURT:  Okay.
4              MS. REICH:  Your Honor, just to establish, Ms. Baker
5    never stated that these were all sent out in 2014 to all their
6    outside sellers.  That's not something that was established
7    during our cross.
8              MR. LIPARI:  '15.
9              MS. REICH:  '15.  Even so.
10             THE COURT:  So, Exhibit A of the Baker declaration is
11   a purchase agreement.  It's not an affidavit.
12             MR. LIPARI:  Your Honor, I think I -- then I
13   misspoke, your Honor.  E as in echo.
14             THE COURT:  Okay.  E?  And is it the one that was
15   signed on August 5th, 2015?
16             MR. LIPARI:  Correct, your Honor.  I had referred to
17   sending out a survey, but the affidavits may have been signed
18   after they were sent out.
19             THE COURT:  Okay.  And there's two affidavits.  One
20   of them is three pages that -- it has 20 paragraphs.  And the
21   other one is one page and has seven paragraphs.  Are you
22   referring to the first, the second, or both?
23             MR. LIPARI:  Your Honor, I am referring -- and
24   forgive me, the entirety of it is not in front of me.  I'm
25   referring to the affidavit where percentages were filled in.

1    THE COURT:  Got it.  So, that would be the second

2  one, and I think the percentage is filled in in paragraph 7.

3    So, are we all on the same page?  You can call it

4  what you want.  You can call it an orangutan.  You can call it

5  the country of North Korea.  I just -- we all know what you're

6  talking about, right?

7    MR. O'TOOLE:  I agree, your Honor.

8    THE COURT:  Okay.

9    MR. LIPARI:  And I will call it an affidavit.

10  BY MR. LIPARI:

11  Q.  So, Ms. Baker, beginning in approximately June 2015, did

12  Lifewatch begin sending out form affidavits where percentages

13  could be filled in?

14  A.  Yes.

15  Q.  What was the purpose for sending out those affidavits and

16  asking the outside sellers to fill in the percentage?

17  A.  Well, to get a sense as to exactly how many accounts that

18  we're purchasing are originated from outside telemarketing.

19  Q.  Okay.  Because when Lifewatch purchases the customer

20  account through the CRM process, it does not know how that

21  customer account was originated, correct?

22  A.  Correct.

23  Q.  And in response to that affidavit, which I know that

24  Lifewatch sent out for survey purposes, did Lifewatch make a

25  determination about the approximate percentage of customer

Baker - redirect

1    origination attributable to outbound telemarketing?

2    A.  It was very minimal, anywhere from 5 to 15 percent.

3    Q.  Okay.  Now, you were asked some questions about whether

4    certain aspects of the quality control program could address

5    whether outside sellers were making misrepresentations, right?

6    A.  Correct.

7    Q.  Please describe, what feature of Lifewatch's quality

8    control program enables Lifewatch to determine whether or not

9    misrepresentations are being made?

10   A.  The recordings.

11   Q.  And how so?

12   A.  When those recordings are reviewed, we are able to hear

13   exactly what was told to the customer.

14   Q.  Okay.  And do you have Mr. Nonsant's affidavit in front of

15   you?

16   A.  Yes.

17          MR. LIPARI:  May I approach just for a moment, your

18   Honor?

19          THE COURT:  Sure.

20          MR. LIPARI:  Thanks.

21   BY MR. LIPARI:

22   Q.  Now, to be clear, Payless was terminated as an outside

23   seller by Lifewatch, correct?

24   A.  Yes, correct.

25   Q.  And in the e-mails that were referenced by Ms. Reich

1  between Mr. Nonsant at Payless and Lauren Vandewater --

2  A.  Yes.

3  Q.  -- was that e-mail sent specifically to Mr. Nonsant and

4  specifically to Payless to specifically address violations by

5  Payless?

6  A.  Yes, it was.

7  Q.  Okay.  Was it also sent as a general e-mail?

8  Let me refer you to page 8 of 57 within Document 96.

9  A.  Yes.

10  Q.  Do you see at the top, it says, "This is a general e-mail,

11  that I'm sending this e-mail to everybody"?

12  A.  Oh, yes.

13  Q.  Was this e-mail sent as a general e-mail to all outside

14  sellers?

15  A.  No.

16  Q.  Okay.  Was it sent as a general e-mail only to

17  Mr. Nonsant?

18  A.  Yes, correct.

19  Q.  And did it specifically reference only violations by

20  Payless that Ms. Vandewater had become aware of?

21  A.  Correct.

22  Q.  And what was Ms. Vandewater's purpose for sending this

23  out?

24  A.  Just to make sure that it complied with our guidelines.

25  Q.  Okay.  Now, within the affidavit, is there any reference

 1  to -- the affidavit that the outside seller signed at the
 2  outset of the relationship, is there any reference to shipping
 3  labels as a possible area where there would be
 4  misrepresentations?
 5  A.  Not specifically shipping labels.
 6  Q.  Okay.  So, in addition to notifying the outside sellers
 7  about possible misrepresentations by sending them the
 8  affidavit, Lifewatch also from time to time sends e-mails?
 9  A.  Yes, correct.
10  Q.  Is that also part of the quality control program?
11  A.  It is, yes.
12  Q.  Okay.  And in accordance with the quality control program,
13  what kinds of e-mails does Lifewatch send to the outside
14  sellers?
15  A.  I mean, general -- general e-mails like that one that
16  mentions about P.O. Boxes and just, you know, providing
17  accurate information on customer accounts.
18  Q.  So, would it be fair to say that Lauren Vandewater, she
19  doesn't just listen to see if there are only those specific
20  misrepresentations in the affidavit that was signed at the
21  outset?
22  A.  Correct.  She listens for the entire -- for everything to
23  be correct, just that we are provided with valid customer
24  accounts, that -- where the customer understands that they are
25  signing up for a medical alert device and that they're going

Baker - redirect

1  to be charged monthly, and just for everything, for the

2  entire -- entire package.

3  Q.  Okay.  So, when she's listening to the audiotapes, again,

4  she's not simply checking off items in terms of, "Was this

5  said?  Were any of these areas within the affidavit

6  mentioned?"  She's looking for just general quality control,

7  right?

8  A.  Yes, absolutely.

9  Q.  Okay.  And what's her objective?

10  A.  To ensure that we are provided with valid customers that

11  are going to remain customers.

12  Q.  Okay.  Now, there was some suggestion earlier that of

13  those 800 customers that had not tested the device, they were

14  not using the device.  Do you recall that?

15  A.  Yes.

16  Q.  Okay.  Do you agree with that statement, that by virtue of

17  the customers not testing the device, they were not using the

18  device?

19  A.  No, no.  As -- as it was pretty clear, I mean, if there's

20  2200 people that, you know, haven't necessarily tested the

21  device, they're still -- they're still happy and they still

22  want to remain customers.

23  Q.  Among those individuals who didn't test the device, is it

24  your understanding that all they had to do was push the

25  button, and emergency medical services would have been

1    dispatched immediately?

2    A.  Yes, correct.

3    Q.  So, they didn't need to test the device in order to use

4    the device and avail themselves of the emergency services,

5    right?

6    A.  Correct.

7    Q.  There was some testimony about -- or some questions about

8    Lifewatch's relationship with Worldwide, right?

9    A.  Yes.

10   Q.  Do you recall when the FTC's receiver took Worldwide over?

11   If I said January 2014, does that sound right?

12   A.  Yes, yes.

13   Q.  Now, do you know -- did you do a search to determine the

14   last time Lifewatch bought a deal from Worldwide?

15   A.  Yes.

16   Q.  Okay.  And did your search reveal that Lifewatch last

17   bought a deal from Worldwide six months before the FTC's

18   receiver took over Worldwide?

19          MS. REICH:  Objection.  Your Honor, he's completely

20   leading the witness at this point.

21          THE COURT:  Sustained.  Why don't you ask her when --

22   it's too late now, but why don't you ask it in a proper form,

23   in a non-leading way.

24          MR. LIPARI:  Sure.

25   BY MR. LIPARI:

Baker - redirect

1  Q.  Approximately how many months before the receiver took

2  over Worldwide did Lifewatch last purchase a customer account

3  from Worldwide?

4  A.  The six months, I do -- it was definitely 2013.

5  Q.  What did you do to make that determination?

6  A.  Just research in the CRM.

7  Q.  And what information did the CRM yield that allowed you to

8  make that determination?

9  A.  An active customer, the last time an active customer was

10 entered.

11 Q.  Okay.

12        MR. LIPARI:  That's all I have.  Thank you very much.

13        MS. REICH:  Your Honor, can I ask a few more

14 questions?

15        THE COURT:  Sure.  I've been going after defendant,

16 so why don't I do that again.

17        How do you know that the Vandewater e-mail was sent

18 only to Mr. Nonsant?

19        THE WITNESS:  There was no one else that was copied

20 on the e-mail.

21        THE COURT:  I don't understand.  Do you have a copy

22 of it there?

23        THE WITNESS:  I do.

24        THE COURT:  So, who's on the "To" line?

25        THE WITNESS:  It looks like Mark Nonsant.

1          THE COURT:  No, I mean the "To" line, not the "bcc"

2      line.  Let me make sure we're looking at the same thing.

3          THE WITNESS:  Okay.  Maybe we're not.  This one?

4          THE COURT:  Oh, no.

5          THE WITNESS:  Oh, are you referring to this one?

6          THE COURT:  Yes.

7          THE WITNESS:  Okay.  No.  That was sent to all of the

8      outside sellers.

9          THE COURT:  Okay.  We -- so I'm going to say what I

10     think -- I'm going to correct the record; but if you think I'm

11     incorrectly correcting the record, you'll let me know.

12         Counsel asked Ms. Baker about an e-mail that I

13     believe he said was docket 96-1 at pages 8 through 10.  I

14     believe that Ms. Baker was looking at a different e-mail when

15     she answered the question.

16         And could you tell us what date that e-mail was sent

17     and what time?

18         THE WITNESS:  Which one are we talking about?

19         THE COURT:  The one that you thought you were -- the

20     one that was addressed only to Mr. Nonsant.

21         THE WITNESS:  The Thursday, 6-5, 2014.

22         THE COURT:  Okay.  Was that the e-mail you were

23     asking her about?  I don't think it was.

24         MR. LIPARI:  No.  Thanks, your Honor.  The e-mail I

25     was asking her about was page 8, and it was dated May 18th,

Baker - redirect

1    2015.

2              THE COURT:  Yeah, that's what I thought you were

3    asking her about.  And so her responses to your questions, she

4    was looking at a different e-mail, so I'm not sure how

5    valuable that testimony is.

6              MR. LIPARI:  Your Honor, can I -- since there was

7    this point of clarification, can I get up and re-ask questions

8    based upon that e-mail?

9              THE COURT:  Sure.  Go ahead.  First of all, does

10   anybody disagree that --

11             MR. O'TOOLE:  No, we agree, your Honor.

12             THE COURT:  Okay.  Go ahead.

13   BY MR. LIPARI:

14   Q.  Okay.  Ms. Baker, now that we've cleared that up --

15   A.  Sorry.

16   Q.  No, that's fine.  Do you see the first line that says,

17   "This is a general e-mail"?

18   A.  Yes.

19   Q.  Okay.  What is meant by that line, "This is a general

20   e-mail"?

21             THE COURT:  And just for the record, you're referring

22   to docket 96-1 at page 8, and it's a three-page e-mail, and

23   it's dated May 18th, 2015, and the time is 4:40:39 seconds,

24   correct?

25             MR. LIPARI:  Correct.

1  BY MR. LIPARI:

2  Q.  Is that the same, Ms. Baker?

3  A.  Correct.

4        THE COURT:  Okay.  We're all looking at the same

5  e-mail.

6  BY THE WITNESS:

7  A.  Okay.  This was an e-mail that was going to all the

8  outside sellers that we're currently -- we were currently

9  buying deals from at that time.

10  BY MR. LIPARI:

11  Q.  And there were various categories within this e-mail,

12  correct?

13  A.  Correct.

14  Q.  And these were not categories that Lifewatch wanted only

15  Mr. Nonsant to know about, correct?

16  A.  Correct.

17  Q.  In fact, these were categories that Lifewatch wanted all

18  its outside sellers to know about?

19  A.  Absolutely.

20  Q.  And how would Lifewatch develop these particular

21  categories?  Would that be through the audio recordings?

22  A.  Yes, um-hum, hearing such things and knowing how to

23  address them.

24  Q.  Okay.  So, in the instances -- has it ever happened where

25  Ms. Baker has -- or Ms. Vandewater has come to you, and she

1  says, "I'm not sure if this is compliant or non-compliant,"

2  and she has a question about something that she heard in the

3  audio recordings?

4  A.  Absolutely.

5  Q.  Was that what prompted this e-mail?  Did she come to you

6  with sort of open questions about certain things she had heard

7  in audio recordings?

8  A.  Yeah, usually that's the way it would happen; and then I

9  would tell her not only to address it, but also to mention all

10  of the other compliance items that we've run across in the

11  past.

12  Q.  Okay.  So, is it correct that this e-mail was sent out

13  generally to all outside sellers?

14  A.  Correct.

15  Q.  And it was done to provide them with additional

16  information about Lifewatch's guidelines?

17  A.  Yes, correct.

18  Q.  And Lifewatch does that from time to time, correct?

19  A.  Absolutely.

20  Q.  Okay.  Do you recall why Payless was terminated?

21  A.  I know it was for compliance issues.  I don't recall which

22  specific issue it was.

23  Q.  Sure.  And Ms. Reich earlier addressed, you know, giving

24  Payless a few chances before they were ultimately terminated.

25  Did that occur?

Baker - redirect

1    A.  Yes, yes.

2    Q.  Okay.  And why did that occur?  Why did Lifewatch give

3    Payless a few chances to come into compliance before they were

4    ultimately terminated?

5    A.  Because we did have a good relationship with them in terms

6    of they would provide good, quality customers, and they had

7    very few compliance issues.

8    Q.  But ultimately, they were terminated in what year?

9    A.  2015.

10   Q.  Okay.  Was it -- approximately when in 2015 were they

11   terminated, if you recall?

12   A.  I -- I'm sorry.  I don't recall.

13   Q.  Okay.  And has -- since the termination of Payless, has

14   Lifewatch done business with Mr. Nonsant through some other

15   forum or some other company?

16   A.  Not that I'm aware of.

17   Q.  Okay.  So, the last time Lifewatch terminated its

18   relationship with Payless is the last time that Lifewatch did

19   any business with Mr. Nonsant?

20   A.  Yes, from what I know.

21            MR. LIPARI:  Okay.  Thank you.

22            THE COURT:  Are you okay?  Is everybody okay to keep

23   going?  About how much longer do you have?

24            MS. REICH:  I have very few, very few.

25            THE COURT:  Okay.

1      MS. REICH:  And I mean it.

2                RECROSS-EXAMINATION

3  BY MS. REICH:

4  Q.  So, Ms. Baker, you want to be compliant with the

5  Telemarketing Sales Rule, and you don't want to be

6  making -- you don't want outside sellers to make

7  misrepresentations to your consumers, correct?

8  A.  Correct.

9  Q.  So, why don't you listen to all recordings before a sale

10 is made?  Why don't you listen to recordings before a sale is

11 made every time?

12 A.  The random sampling of recordings will still provide us

13 with enough information to base whether or not that seller is

14 providing accurate information to customers.

15 Q.  So, you believe a random sampling is sufficient is what

16 you're saying?

17 A.  If -- yes, yes.

18 Q.  Okay.  So, if you see that a telemarketer has made a

19 misrepresentation on one of these recordings, you've indicated

20 that you go and you talk to the telemarketer about it,

21 correct?

22 A.  Correct.

23 Q.  Do you also immediately provide a refund to the consumer

24 that participated in that call?

25 A.  No, but we do reach out to the customer or at least have

1  some -- some communication with the customer, whether --

2  because they might have called in.  We might have -- we might

3  reach out to them.  But there is some form of communication

4  with the customer.

5  Q.  And that communication talks about the fact that they were

6  told something that wasn't true during the call, is that

7  correct?

8  A.  And make sure that they understand exactly that --

9  whatever the -- if there's a compliance issue, whatever that

10  issue was, that was inaccurate regarding misrepresentations or

11  whatever that compliance issue was, yes, we try and make sure

12  that the customer fully understands what is accurate.

13  Q.  So, for instance, you would call a customer and say, "We

14  heard on a recording that a friend or family -- that the

15  telemarketer told you a friend or family member had purchased

16  this for you, and that's incorrect"?  That's what you would

17  tell a consumer?

18  A.  If we heard that on a recording, yes.

19  Q.  Okay.  And these -- records of these communications with

20  consumers are documented somewhere, is that correct?

21  A.  They would be documented that we reached out to them.

22  Q.  And it would indicate that you spoke with them about a

23  misrepresentation that occurred during their telemarketing

24  call?

25  A.  It would state that.  I don't that it would -- it wouldn't

1   necessary state specific what the misrepresentation was, but

2   yes, it would document the fact that we spoke to the customer

3   and that we wanted to make sure that they understood.

4   Q.  And this sort of documentation would have been provided to

5   Lifewatch's counsel, correct?

6   A.  The system -- our CRM doesn't have a way to export notes,

7   *per se*, or like interactions, and we don't keep a record, a

8   side record of that stating that -- like a spreadsheet or

9   anything stating that, "Oh, yeah, we spoke to this customer on

10  this day regarding that information."

11  Q.  And we've already gone over this, but I just want to

12  confirm, you don't ask for scripts from your outside sellers

13  before you begin working with them, correct?

14  A.  Correct, we do not.

15  Q.  But the one time that Ms. Vandewater happened to receive a

16  script and review it, there were actually problems with it,

17  isn't that correct?

18  A.  That is correct.

19  Q.  So, wouldn't it make sense to review the scripts before

20  the outside sellers start selling for Lifewatch?

21  A.  We have thought about changing the policy; but we decided

22  to defer to the outside sellers to actually create the sales

23  scripts, and we continue to provide to them what they cannot

24  say and information regarding product and pricing.

25  Q.  But for some reason, you still decided that you do not

1  want to be reviewing the scripts themselves, correct?

2  A.  Correct.

3  　　　　MS. REICH:  I've got no further questions.

4  　　　　THE COURT:  All right.  Thank you.  Anything further?

5  　　　　MR. LIPARI:  No.

6  　　　　THE COURT:  Okay.  Thank you, Ms. Baker.  You can

7  step down.

8  　　(Witness excused.)

9  　　　　THE COURT:  Why don't we take a lunch break.  It's

10  about 1:25.  And is it okay if we resume at 2:30, maybe?  Is

11  that okay?

12  　　　　MR. O'TOOLE:  That's fine with us, your Honor.

13  　　　　THE COURT:  All right.  Okay.  Then I'll see you at

14  2:30.  Is there anything that we need to deal with before we

15  break?

16  　　　　MR. O'TOOLE:  I don't think so, your Honor.  By the

17  way, will the courtroom be locked so that we can leave things

18  in here?  Can I ask that it be?

19  　　(Bench conference, not reported.)

20  　　　　THE COURT:  Yeah, the courtroom will be locked, and

21  it will be reopened at 2:20.  Is that okay?  Does anybody need

22  to get in there, into the courtroom before 2:20?  No?  Okay.

23  Then I'll see you at 2:30.

24  　　(Lunch recess had.)

25

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    FEDERAL TRADE COMMISSION and      )
 4  STATE OF FLORIDA, OFFICE OF        )
    THE ATTORNEY GENERAL,              )
 5  DEPARTMENT OF LEGAL AFFAIRS,       )
                                       )
 6              Plaintiffs,            )
                                       )
 7  -vs-                               )  Case No. 15 C 5781
                                       )
 8  LIFEWATCH, INC., a New York        )
    corporation, doing business        )
 9  as LIFEWATCH USA, doing            )
    business as MEDICAL ALARM          )
10  SYSTEMS; and EVAN SIRLIN,          )
    individually and as an            )
11  officer or manager of              )
    Lifewatch, Inc.,                   )  Chicago, Illinois
12                                     )  December 14, 2015
                Defendants.            )  2:30 p.m.
13
```

       TRANSCRIPT OF PROCEEDINGS - Preliminary Injunction Hearing
                BEFORE THE HONORABLE GARY FEINERMAN

APPEARANCES:

For Plaintiff FTC:        FEDERAL TRADE COMMISSION
                          BY:  MR. DAVID A. O'TOOLE
                               MS. ROZINA C. BHIMANI
                               MS. MARISSA J. REICH
                          55 East Monroe Street
                          Suite 1860
                          Chicago, Illinois  60603
                          (312) 960-5602

Court Reporter:

                    CHARLES R. ZANDI, CSR, RPR, FCRR
                        Official Court Reporter
                      United States District Court
                219 South Dearborn Street, Suite 2128
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5387
                email:  Charles_zandi@ilnd.uscourts.gov

1    APPEARANCES:   (Continued)

2    For Plaintiff                FLORIDA OFFICE OF THE ATTORNEY
     State of Florida:            GENERAL
3                                 BY:  MS. KRISTEN K. JOHNSON
                                  135 West Central Boulevard
4                                 Suite 670
                                  Orlando, Florida  32801
5                                 (407) 316-4840

6

7    For the Defendants:          GREENSFELDER, HEMKER & GALE, P.C.
                                  BY:   MR. DAVID B. GOODMAN
8                                       MR. THADFORD A. FELTON
                                  200 West Madison Street
9                                 Suite 2700
                                  Chicago, Illinois  60606
10                                (312) 345-5008

11                                THE SULTZER LAW GROUP
                                  BY:  MR. JASON P. SULTZER
12                                     MR. JOSEPH LIPARI
                                  85 Civic Center Plaza
13                                Suite 104
                                  Poughkeepsie, New York  12601
14                                (774) 705-7747

15

16

17

18

19

20

21

22

23

24

25

1  (Proceedings heard in open court:)

2      THE COURT:  So, who do we have next?

3      MR. SULTZER:  Your Honor, the defense would like to

4  call up Mr. Evan Sirlin to the stand.

5      THE COURT:  Okay.  If you could please step up, raise

6  your right hand, state your name.

7      THE WITNESS:  Evan Sirlin.

8   (Witness sworn.)

9      THE WITNESS:  Yes.

10     THE COURT:  You've been sworn.  You can be seated.

11     EVAN SIRLIN, DEFENDANTS' WITNESS, DULY SWORN.

12              DIRECT EXAMINATION

13 BY MR. SULTZER:

14 Q.  Mr. Sirlin, can you state your full name for the record.

15 A.  Evan Sirlin.

16 Q.  And do you work at Lifewatch?

17 A.  Yes.  I'm the CEO.

18 Q.  Okay.  Great.  How many years have you been involved in

19 the personal emergency response systems industry?

20 A.  I've been the CEO and operated at Lifewatch since 2000, so

21 that's 16 years.  And my family's been in the business for

22 35 years.

23 Q.  I'm going to come back later, Mr. Sirlin, and ask you just

24 about your role in the --

25     THE COURT:  Can you move so that's in front of you?

1    MR. SULTZER:  Right in front?

2    THE COURT:  No, all you need to do is move the -- so

3    you're talking towards it.  Thank you.

4    MR. SULTZER:  How's that?

5    THE COURT:  Perfect.  Thank you.

6    BY MR. SULTZER:

7    Q.  I'm going to come back later and talk about your role in

8    the company and the company itself, but I just want to dive

9    into some issues that the FTC has raised and get your response

10   to some of these questions.

11   Let me ask, if the Court enters this preliminary

12   injunction against Lifewatch, what would the impact be on

13   Lifewatch's bottom line financially?

14   A.  Right.  So, can I look at the judge or am I allowed --

15   Q.  Whatever makes you more comfortable.

16   A.  It's okay?

17   Q.  You can look wherever you want.  As long as you talk into

18   the microphone, I don't care.

19   A.  So, a formal injunction or a motion that we're talking

20   about here may actually put us out of business.

21   Q.  Why is that?

22   A.  So, from a financial point of view, what's happened ever

23   since the FTC has started going down the path of, I guess,

24   suing Lifewatch and talking to us, we've lost our ability many

25   times from credit card processors and ACH people.  So, today

1  let's say we have 66,000 clients.  A majority of them are

2  using recurring billing, which is through credit card

3  processors.  So, if they shut us off, the existing clientele

4  will have no way of funding us.

5       And I could go on and on as to why -- my personal

6  banking account has been terminated, and they said, "Because

7  the FTC is going against you, filing something against you."

8       So, I can only imagine if this happens, I really

9  don't know -- we didn't think about a plan of what to do.  We

10  actually have to -- we'd have to think about that.

11  Q.  And just to be clear, have you lost any credit card

12  processors since the FTC has initiated a suit against

13  Lifewatch?

14  A.  Yes, we have.

15  Q.  Which ones?

16  A.  There's been a few of them.  The biggest one that I can

17  recall who specifically said -- actually, I don't know who

18  said it, but somebody told them that the FTC -- something was

19  happening with the FTC, and TD Bank, our main processer, said

20  somebody told them -- and I don't recall if it was Life Alert

21  or who it was -- Lifewatch has been sued by the FTC, and on

22  the day after, they stopped our ability to process.

23  Q.  I want to jump back -- we've been talking a lot today

24  about these outside -- some people call them outside sellers;

25  others call them telemarketers, but we can call them whatever

1    you want.

2           But in terms of these outside sellers who do

3    telemarketing that Lifewatch has these contractual

4    arrangements with, do you have any specific knowledge as to

5    whether or not they're doing business with other competitors

6    in your industry?

7    A.  I have tons of knowledge of that since 2012, and even

8    maybe 2011, but -- and again, I don't know who's listening,

9    but --

10   Q.  Can you explain, give us some specific examples?

11   A.  Yeah.  Just Friday, I get -- I get calls in from

12   outside -- I'll call it outside marketers all the time that

13   want to do business not exclusively with us.

14          And the other day, they were telling me how Connect

15   America, Medical Guardian, Life Alert, Better Alarm, Life One,

16   and there are others, have been giving them existing IOs.

17   "Will you match it?  Will you pay more?  Will you pay less?"

18   It's every day.  But that's been going on for years, and there

19   is clear-cut evidence of that that I gave my lawyers.

20          And I have been listening earlier today, so I'm happy

21   that we're here, because when I heard the opening arguments,

22   this is -- you know, this is my life that we're talking about.

23   So, there's clear-cut evidence of this.

24   Q.  Let me ask you this, Mr. Sirlin.  If these are

25   non-exclusive arrangements -- the FTC has raised the issue

1    that some of these customers are transferred in realtime or

2    live to the Med Guard team, which is an affiliate of

3    Lifewatch, to verify the sale.  So, if they're not exclusive,

4    how are these calls transferring over in realtime?

5    A.  Right.  So, again, I was listening earlier to the opening

6    argument, and it -- I could transfer a call just by pressing a

7    different button.  It was a made a big deal, and I'm not

8    saying there's anything wrong with that; but from a

9    technological point of view, there's no reason they couldn't

10   just determine where to send that transfer to.

11          Plus, I have specific confirmed knowledge and e-mails

12   from people that have done transfers that are simultaneously

13   selling to others.  So, they did transfer, and they still are

14   selling to others.

15   Q.  Does that live -- does the transfer over to Med Guard on

16   some of these calls, does that help Lifewatch in any way in

17   terms of fulfilling the products and consummating the sale?

18   A.  It does.  It does.  It might be hurting us from the law

19   point of view.  I don't know how you interpret it.

20   Q.  Don't worry about that.  I'm just talking about from a

21   business point of view, how does that help you?

22   A.  Yes.  From our point of view, what it does for seniors,

23   they want to know clearly what they're getting, how they're

24   going to be billed, when they're going to be billed, and when

25   is it going to be received.

1            So, during that process, we're able to say, "You

2    clearly understand that the bill is going to start today.

3    Your cycle will not start today."  We give them a 10-day grace

4    period to make sure they get the equipment and receive it, but

5    it helps senior citizens be clear.

6            And a lot of this has started since 2012 because

7    there is no reason to want to get bad business.  None of this

8    makes sense.

9    Q.  Let's talk about that for a minute, the bad business for a

10   moment.  You know, the FTC alleges that Lifewatch is obtaining

11   many -- you've obtained many of your customers because of

12   various fraudulent misrepresentations about the product.

13           Let me ask you, from a business point of view, can

14   you explain to all of us why that simply just would be --

15   would not make sense from a business point of view?

16   A.  Yes, yes.  So, maybe we can throw it out, but I'm going to

17   take you through it.

18   Q.  Well, maybe explain the numbers to us.

19   A.  Okay.  So, this industry works this way, and then it

20   relates directly to us.

21           The piece of equipment that we supply at no cost to

22   the client is -- and I did bring a piece of equipment so

23   everyone sees what it is.  We're mailing a physical piece of

24   equipment.  This is just not just telling them we're billing

25   for something that they're not getting.

Sirlin - direct

1    So, that piece of equipment, we have to pay for.  The

2    average piece of equipment these days is $100.  So, right

3    away, we have to buy the equipment.  And there are no terms on

4    that equipment.  You have to pay for it right away.  So, it's

5    $100 for that piece of equipment.

6    And then to obtain a client from any outside marketer

7    or any marketing in general, it costs us about $350 to get

8    that client.  So, $350 to get the client is paid right away.

9    $100 for the equipment is paid right away.  That's $450 that

10   we outlay in this industry that is standard for this industry,

11   although there is one competitor that doesn't do it that way,

12   but -- called Life Alert.

13   But we outlay $450, and we send this piece of

14   equipment for $35 on average.  There are variables that change

15   that 34.95 number.

16   Now, picture this.  We've laid out $450.  We've taken

17   in $35.  And every month, we have our cost -- our monitoring

18   fee is on average $3.50.  Our customer service I think is

19   about 3 to 3.50.  So, that's 6, $7 of hard expenses every

20   month.  And then there's shipping fees, and then the

21   processor.  Even though we have different processors, it

22   averages out to about 3 percent.

23   So, of that 34.95, we net -- not profit, but we net

24   about $27.  And if you multiply that 27 or divide $450 by 27,

25   you're at 15 to 18 months.  That's quick math, but 15 to

1   18 months before we even break even.

2           But that is the model of the industry.  So, there is

3   no reason to get quick clients that are not going to want to

4   have this device.  This is what we do.  We help senior

5   citizens.  Why would they keep it if it's not real?

6   Q.  Let me ask you this:  Mr. O'Toole mentioned earlier today

7   in his opening statement this dramatic growth that Lifewatch

8   has had, I think, since 2011, '12, up until today.  And, you

9   know, I think the FTC attributes that growth to obtaining

10  customers illegally through telemarketing.

11          Can you describe for us why the company has grown

12  over the last several years?

13  A.  Easily.  The industry -- and then, you know, I do -- I

14  don't want to come off as cocky and all that stuff, but in

15  this industry, I do know all the statistics.  I do consult

16  with the industry.  I speak about this industry.

17          And the numbers for this industry, not for Lifewatch

18  alone, are growing equal to the growth that we had.  And we

19  could prove that and back that up.  And the reason is not

20  whatever he was saying earlier, Mr. O'Toole.  It's about this

21  industry was always done locally in person.  Even Philips Life

22  Line was always doing it, where they went into the home.  They

23  plug in a device with the senior citizen, and it was clear

24  what they were getting, how they used it.  And we did initial

25  tests.

1       That's how my father did it in 1980.  He died -- I

2   talk about him like this.  He died in 2007.  So, up until

3   2007, it was in his control, but in 2007 to 200- -- now, the

4   industry went to the point where you could actually mail this

5   equipment.

6       So, you take an industry that is local and regional,

7   just like Amazon and the rest of the world with the Internet,

8   we now mail the equipment throughout the country.  So, my

9   market went from local to national, so there's no reason why I

10  shouldn't be able to grow tremendously.

11      Then we have the statistic of how many people are

12  turning older.  And I am not that smart -- this industry is

13  not that smart, which I think if we read these e-mails, it's

14  funny some of these e-mails.  But we are falling into a

15  demographic that is explosive.

16      So, it's the demographic.  It's the way they can get

17  the equipment.  It's simple now.  And even with no land line

18  phones, technology now allows us to sell to customers or

19  purchase accounts for customers that actually don't have home

20  phone lines.  That was a whole market we couldn't take over.

21      The Spanish market, in the past, we couldn't take

22  Spanish clients because we didn't speak Spanish and Italian

23  and Russian.  We can now do all the languages.

24      So, the industry is growing, and they're getting

25  better.  People are getting aware of these products, and, you

1  know, hospitals refer these kinds of products all the time,

2  and many other people.

3  Q.  So, to be clear, the growth is not because of

4  telemarketing, obtaining customers through telemarketing?

5  A.  No.

6  Q.  Let's shift gears a moment, because this was raised as

7  well today.  An individual submitted an affidavit on behalf of

8  Lifewatch, on behalf of the FTC, and then I believe on behalf

9  of the FTC again, Michael Hilgar.

10        Do you know who Michael Hilgar is?

11 A.  So, I know who he is now, and I did see him once.  I did

12 not meet him.  I saw him.

13 Q.  When you say you know who he is now, is that because of

14 the litigation proceeding?

15 A.  Correct.

16 Q.  What date did you see him?

17 A.  I don't recall the exact date.

18 Q.  Was it sometime before 2013?

19 A.  It could have been right sometime early 2013 or late 2012.

20 Q.  Have you, has Lifewatch, has anyone affiliated with

21 Lifewatch ever given money to either Michael Hilgar or an

22 intermediary individual named Rick Bowman or anyone else to

23 pay for favorable testimony in an affidavit?  Are you aware of

24 anything like that?

25 A.  No, but not only aware, but we checked all our records.  I

1　definitely did not, but there is no -- nothing.  And I don't

2　know who Rick Bolling is, either, so --

3　Q.  Okay.  Let me switch -- let me switch gears for a moment,

4　another issue that has popped up, and I think you could offer

5　some clarification on this.

6　　　　　The FTC alleges that Lifewatch uses all of these

7　different aliases and business names simply to confuse

8　customers who want to purchase their products.  Can you

9　explain why that's not the case?

10　A.  Yeah.  I don't understand what they're saying, but the

11　reason to use a d/b/a would be when a senior citizen or the

12　children of senior citizens -- and a lot of our clients are

13　the children of senior citizens.  We're not trying to avoid

14　the children.  It's a normal part of our business.  They're

15　our biggest fans.  As we heard earlier, "I want my mom to get

16　one."  Sometimes mom doesn't want to get it.

17　　　　　So, repeat the specific question, though.

18　Q.  Well, what I want to know is for you to explain the

19　purpose of why Lifewatch uses the d/b/a's.

20　A.  The d/b/a's.  Okay.  When the children or the seniors see

21　the credit card statement, the name Lifewatch they might not

22　recognize because of the way we're buying sales from people

23　that sell to multiple companies in generic names, and it's not

24　just us.  So, our d/b/a of Medical Alarms lets it be clear of

25　what they're paying for.

1    And again, I don't know if it's admitted evidence,

2  but even as late as Friday, I saw a piece of paper from our

3  competition that says, "Our d/b/a is Medical Alerts."  It's

4  out there.  That's how it's done.

5  Q.  Let me ask you this, a different question.  There's an

6  individual named Ken Gross who submitted an affidavit on

7  behalf of the FTC in this case.  Do you know who Ken Gross is?

8  A.  Yes.

9  Q.  Who is he?

10 A.  He is the current chairman of Connect America.  He was the

11 CEO of Connect America at the time in 2013.

12 Q.  Now, have you reviewed an affidavit that Mr. Gross signed

13 and submitted in this case?

14 A.  Yes, yes.

15 Q.  I just want to ask you a couple of questions about that

16 exhibit.  If anyone wants to follow along, I think it's

17 Plaintiffs' Exhibit No. 13.

18    Okay.  On paragraph 19 in Mr. Gross's affidavit, he

19 claims that he went out to dinner with you and another

20 Lifewatch employee on about May 23rd, and he claims that you

21 stated Lifewatch was using telemarketers who were engaging in

22 robo-calling or as he called it, prerecorded messages.

23    Do you agree or disagree with Mr. Gross's statement?

24 A.  I disagree.

25 Q.  So, you never told him anything like that, correct?

1    A.   Not like that, but what I did tell him is we buy sales,

2    and some of the ways that they do it is telemarketing.  And

3    he's the one that also did that and said he would continue to

4    do that.

5          And, in fact, Connect America today is trying to buy

6    our company, so the CEO -- the current CEO knows of -- I

7    assume he knows of what's going on here, and he calls me and

8    e-mails me about acquiring my company.  So -- and during those

9    conversations, and I have e-mails of this, they say we're

10   buying from some of the same people, so we're going to have to

11   talk about that if we go together.

12   Q.   What was the relationship between Connect America and

13   Lifewatch?

14   A.   In what year?

15   Q.   In 2013.

16   A.   2013 at the end is when they also tried to buy us -- no,

17   at the beginning of 2013 is when they also tried to buy us.

18         In 2012, it was admiration on my part, and it still

19   is.  I respect Ken Gross.  I'm not saying he's a bad person.

20   He was the big guy in the industry, and when I did reach out

21   to him to say, "Would you like to buy these sales," he said,

22   "Oh, I'm probably dealing with them already.  Who are they?"

23         So, I actually didn't -- how could I do something

24   wrong if Ken Gross is doing it?  He was one of the largest

25   companies at the time.

1  Q.  So, just to be clear for the record, in 2012 and '13, you

2  had an actual contractual arrangement with Connect America

3  where they would buy --

4  A.  Yes.  I entered into a contractual agreement that stated

5  that they would take pass-through accounts from me.

6  Q.  And --

7  A.  I also -- I don't know.  I wanted to -- there was

8  another -- I don't know if it was written, but there are

9  e-mails.  There was another account that Ken Gross said, "I

10  want to buy from this guy, but he was selling to you."  And I

11  said, "Go ahead.  I can't -- I can't keep those deals."

12  Q.  And in the contractual agreement that you had, was there

13  anything in that agreement that suggested or implied or stated

14  that Lifewatch would control or direct the -- any of the

15  outside entities that you were purchasing deals from?

16  A.  No.  And he wrote the agreement.  His company wrote the

17  agreement.  We did not write it.

18  Q.  And in the termination letter, ultimately -- let me ask

19  you this.  Who terminated the agreement?

20  A.  Mark Leighton sent us an e-mail, I think.

21  Q.  And who was Mark Leighton?

22  A.  Vice president of marketing, I think, under Ken.

23  Q.  For Connect America?

24  A.  Correct.

25  Q.  And when he sent the letter terminating the agreement,

Sirlin - direct

1    was there indication in that letter suggesting that the

2    customers he purchased from you were obtained fraudulently or

3    in any way that was questionable?

4    A.  No.

5    Q.  Mr. Gross also states in his affidavit that Lifewatch

6    employed its own telemarketers in-house.  Is that true?

7    A.  The furthest from the truth.  And that is a recent --

8    that's the newest affidavit I read.  That's not the old one.

9    So, I don't know where he's coming up with that.

10   Q.  Okay.

11          THE WITNESS:  Sorry, your Honor.  I talk like this.

12          THE COURT:  All right.

13          THE WITNESS:  No disrespect.

14   BY MR. SULTZER:

15   Q.  Mr. Sirlin, has Lifewatch or yourself ever knowingly

16   encouraged any outside seller or any outside telemarketer that

17   you had a contractual arrangement with to engage in

18   robo-calling or to violate the Do Not Call List?

19   A.  No.  And it would not be good for our business to do --

20   first of all, it's breaking the law.  If it was legal, how

21   could it -- it wouldn't help us.  It's not how we want to get

22   clients and want to grow and be a company that's been in

23   business -- or acting in business for 35 years.  So, what's

24   the point?

25   Q.  To close up, can you just tell us briefly about Lifewatch,

1    about yourself and your role with the company?

2    A.  I'll try to do the brief part, but again, this was a

3    family business that basically started in the '80s from my

4    father.  And I was born in 1971, so I was a little boy growing

5    up around this industry.

6            And then, you know, I wound up going to -- is it

7    about me or the company or both?  The process?

8    Q.  Yeah, about yourself and your role with the company and

9    how that evolved.

10   A.  So, as the company started to develop locally and

11   regionally with my father running it, I went away to school,

12   and I graduated -- it's just important to know.  I graduated

13   from business school with honors, dean's list.  I worked in --

14   and it's relevant.  I worked at Dictaphone Corporation, which

15   I see we're using transcription here, and Centramatic

16   Corporation in the corporate world, in institutional

17   professional selling companies, and I was number one for my

18   company and for my region and for the whole country in sales

19   leadership conference.  Professional selling was how I grew up

20   after college while growing up in an entrepreneurial

21   environment with my father.

22           And at that point, my father started to get sick.

23   And the industry, I started to see what was really happening,

24   and it was going towards healthcare.  So, this industry, even

25   today, we talked to Google and Apple, and this is a real

1     industry.  It's not a gimmick.

2              And my father was more of -- he started to get his

3     heart condition.  He was happy to keep it small because he

4     wanted his free time.  So, I was the corporate salesman and

5     the -- in the national business world.  So, when I came on

6     full-time in 2000, I started to push.

7              And then basically right before he died, we had

8     discussions about -- he was offered to sell the company to

9     Philips Life Line back then, and he said, "Evan, I'm going to

10    do this," and I said, "No.  I want to make this really big."

11             So, only because I saw the Internet coming.  I saw

12    the national by mail coming.  And the healthcare is really

13    where this is at.  And we reduce readmissions.  We reduce

14    everything.

15             So, he gave me his blessing, and he died a few months

16    later.  And ever since then, I've been in control.

17             And along the way -- I'm not the smartest person.

18    I'm pretty good with medical alert systems.  But I went to

19    outside people.  In business, you delegate.  So, there was

20    Designer Brands, this professional company that dealt with

21    Dish Network and ADT.  And I had that gentleman who ran

22    Designer Brands come in and said he's going to help me.

23             Then I went to Ken Gross, and I said, "I need some

24    help.  I have too many sales."  And he said, "No, no, no.

25    That's what I do.  That's my thing."

1    And now I have two gentlemen helping me now.  So, you

2    can't do this all by yourself, and there's no reason to not

3    want good business.  So, whatever it takes to make everyone

4    here happy, I will do.  Just tell me what you want us to do,

5    and we'll do it.  I haven't heard anything -- we've been

6    asking for years, tell us what to do.  We'll do it.

7                    MR. SULTZER:  That's all for now, your Honor.

8                    THE COURT:  Okay.  Thank you.

9                    Plaintiffs?

10                           CROSS-EXAMINATION

11   BY MR. O'TOOLE:

12   Q.  Mr. Sirlin, I have the same problem that you do about

13   directions, so I'll do my best.  We met earlier today.  I'm

14   David O'Toole for the FTC.

15   A.  Yes.

16   Q.  In your direct examination, Mr. Sirlin, you testified as

17   to all the problems that are occurring in your business right

18   now because of this FTC case, right?

19   A.  Correct.

20   Q.  And you said that the PI -- a preliminary injunction might

21   put you out of business, that you've lost the ability to do

22   credit card processing and ACH processing.  That's currently

23   true, you've already lost that?

24   A.  We lost, had to stop charging clients while still

25   operating.  And we're lucky to get others that understood,

Sirlin - cross

1  after long discussions and evidence and everything like that,

2  we're going to wait for this.

3  Q.  So, which credit card processor cut you off?

4  A.  TD.

5  Q.  TD.  And when did they do that?

6  A.  I don't know.

7  Q.  Was it this month?  Last month?

8  A.  I don't know the date.  I don't.

9  Q.  But it was because of this case?

10  A.  Correct.

11  Q.  So, it was sometime since we filed this case at the end of

12  June?

13  A.  Correct.

14  Q.  And did they cut you off orally, or did they do it in a

15  letter?

16  A.  They actually -- at the time -- I don't know if they ever

17  sent the letter eventually, but at the time, they just cut us

18  off without notice.

19  Q.  And who was it that told you this?

20  A.  I don't recall.  If you said his name, I would know that.

21  Q.  I won't be able to help you there.

22  A.  But I can get you his name.  He's the guy in charge of

23  that whole thing for years.

24  Q.  Did you take notes when he told you this?

25  A.  No.

1  Q.  This is a conversation, and you don't think there's any

2  writing about it at all?

3  A.  That's not what I'm saying.

4  Q.  Please.

5  A.  I'm saying they first shut it off; and then after that, I

6  assume they put it in writing, but I don't know.  That's not

7  what -- I would delegate to other people to handle that.  I am

8  not a operations person, and we do have other operations

9  people that are helping us from major corporations that know

10  how to handle these things.

11  Q.  So, there may have been a writing; you just aren't sure?

12  A.  Yeah.

13  Q.  Mr. Sirlin, you recall that you got a Civil Investigative

14  Demand from the FTC last year, right?

15  A.  I don't recall the specific documents, but I was listening

16  to Sarai Baker, and I guess you -- yes.

17  Q.  Well, I think that it may have been in April 2014 the FTC

18  sent the CID to your attention?

19  A.  Did you send it to me or my lawyers?

20  Q.  It was -- I think it was actually delivered to your

21  office.

22  A.  Right, not to my house.

23  Q.  I don't know about you personally.

24  A.  It was not sent to my house.

25  Q.  But you're aware that it happened?

Sirlin - cross

162

1   A.  I am based on today, but before today, I wouldn't know

2   those little -- and don't misinterpret this.

3   Q.  And I'm not asking --

4   A.  I've seen a lot of documents over the years.

5          THE COURT:  Okay.  Let's -- you need to be able to

6   finish your questions, and you need to finish your answers,

7   so --

8          MR. O'TOOLE:  I apologize --

9          THE COURT:  -- let's not talk over one another,

10  because it's hard for Chip.

11         So, you were saying?

12         THE WITNESS:  I think it's his turn.

13         THE COURT:  Go ahead.

14  BY MR. O'TOOLE:

15  Q.  And I'm really not trying to get you to tell me the exact

16  name of the document.  I just want to know that you recall the

17  event, that you got --

18  A.  Are you talking about the lawsuit?

19  Q.  Not the lawsuit.  I'm asking you about when we -- when the

20  FTC sent --

21  A.  I do not recall that.

22  Q.  So, you don't recall having your lawyers produce data or

23  documents to us starting last April in response to our

24  requests?

25  A.  I do recall at times and still producing documents, not me

1    personally, but that you asked for documents and the case

2    asked for documents.

3    Q.  Okay.  So, when we asked for documents before the case and

4    when we asked for documents during the case, did you make

5    documents available to your lawyers?

6    A.  I didn't do anything in regards to that.

7    Q.  So, you didn't search for documents --

8    A.  No.

9    Q.  -- that might be responsive to --

10   A.  No.

11   Q.  Did you delegate that to somebody else?

12   A.  Yes.

13   Q.  Who did you delegate that to?

14   A.  Sarai.

15   Q.  Sarai.  And is it your understanding that Sarai made

16   documents available to your lawyers?

17   A.  Based on what I heard today.

18   Q.  But you didn't know that before today?

19   A.  Some documents.  I don't know how many.  I don't know if

20   it was in direct relation to what you're talking about right

21   now.  But over the last three years, yes, Sarai has presented

22   some documents.

23   Q.  Has there been any time when your lawyers asked for

24   documents to provide to the FTC, either to the earlier

25   requests or to discovery in this case, where you said, "No,

1    you can't give them those documents"?

2         MR. LIPARI:  Your Honor, we're getting into

3    privileged areas, so we would object.

4         MR. O'TOOLE:  Your Honor, I didn't ask what they

5    advised him.

6         THE COURT:  I'm not sure I follow.

7         MR. O'TOOLE:  He did not -- I didn't ask him if he

8    asked for legal advice, and I didn't ask if they gave him

9    legal advice.  I asked him if he gave them direction not to do

10   something.

11        THE COURT:  Counsel?

12        MR. LIPARI:  Your Honor, my recollection of the

13   question that was proposed was that Mr. O'Toole was

14   specifically calling for information about conversations,

15   privileged communications between counsel, between Mr. Sirlin.

16   It happened to have involved documents, but it called for

17   specifically what was said between counsel and the client.

18        THE COURT:  Right.  But what Mr. O'Toole is saying is

19   that because the question was directed to what Mr. Sirlin told

20   the lawyers about documents, it's not covered by the

21   privilege.

22        MR. LIPARI:  Well, it would be our contention that it

23   would be covered by the privilege if it's the client speaking

24   to the attorney about ongoing litigation or the threat of

25   litigation, but Mr. Sirlin has the ability to determine

1    whether or not he chooses to waive the privilege.

2          THE COURT:  So, you're not directing him --

3          MR. LIPARI:  No, of course I'm directing him.  I

4    don't think this is right for inquiry because it's an

5    attorney-client privilege, and I would direct him not to

6    answer.  I'm saying the client can decide to waive the

7    privilege.  The attorney can decide to waive the privilege.

8    Here, he's asking him about communications.

9          THE COURT:  Okay.  Why do you think that the

10   privilege doesn't cover the client's side of an

11   attorney-client conversation?

12         MR. O'TOOLE:  We're not talking about any legal

13   advice whatsoever.  What we're talking about is whether or not

14   they complied with document requests and discovery requests.

15   And all I want to know is if it was his decision or their

16   decision.

17         THE COURT:  To what?

18         MR. O'TOOLE:  To not turn over documents.  I want to

19   make sure there are no documents that we don't know about.  We

20   got a privileged log in this case, your Honor, with one line

21   item that says, "Communications back and forth."  That's it.

22         What I want to know is if there's -- Mr. Sirlin has

23   talked about a lot of documentary material, I think, so far

24   that we haven't seen anything about.

25         THE COURT:  Well, why don't you ask him about those

1  specific -- I'm a little uncomfortable with the question.

2        MR. O'TOOLE:  I'll withdraw the question.

3        THE COURT:  Why don't you ask him about all those

4  documents that he was referring to.

5        MR. O'TOOLE:  I will, your Honor.

6  BY MR. O'TOOLE:

7  Q.  Mr. Sirlin, you also testified that you lost the ability

8  to do ACH processing because of this lawsuit, is that correct?

9  A.  It's correct, and then I have resolved that issue

10  temporarily.

11  Q.  And who is the ACH processor that --

12  A.  Speed Checks was the company that shut it off.

13  Q.  And when did they do that?

14  A.  Around that same time.  I don't remember the dates.

15  Q.  And how were you able to convince them to start it again?

16  A.  I did not.  I had to switch to another one.

17  Q.  So, who do you use for ACH processing now?

18  A.  I don't know the name.  It's not what I do.  That wouldn't

19  be something that I would know the name.  I can guess the

20  name.  There's a lot of names out there in that industry.  I

21  get e-mails all the time offering me -- I don't know which

22  ones we use.  I don't make that final decision.

23  Q.  So, you said your personal banking account was also

24  terminated because of this lawsuit?

25  A.  Correct.

 1   Q.  And how do you know it was terminated because of this
 2   lawsuit?
 3   A.  So, good point.  I was -- that was not given to me in
 4   writing, but that was verbally told to me by an officer of the
 5   bank.
 6   Q.  And what bank is that?
 7   A.  Signature Bank.
 8   Q.  And who was it at Signature Bank that told you this?
 9   A.  I'll get you the name.  Not my -- not my banker.
10   Q.  When did this happen?
11   A.  Within the last nine months, a year, nine months.
12   Q.  Since this lawsuit was filed?
13   A.  I believe.
14   Q.  And you don't have a personal banking account now?
15   A.  I did create a new one, but it's not -- it caused a lot of
16   issues and still causes issues.
17   Q.  You testified that when Mr. Sultzer asked you about your
18   telemarketers doing business with your competitors, that you
19   have tons of knowledge about that; and you talked about
20   getting a call from an outside marketer last Friday, is that
21   correct?
22   A.  Yes.
23   Q.  Who was that outside marketer?
24   A.  Isaac Cohen.
25   Q.  And what company is Mr. Cohen from?

1  A.  A couple of different names.  I have that.  I have that.

2  I gave to it my attorneys.

3  Q.  Are they a current outside seller for you?

4  A.  They are not today.

5  Q.  Were they an outside seller in the past?

6  A.  Yes, yes.

7  Q.  And when did they stop being an outside seller for you?

8  A.  Months ago.

9  Q.  Why did they stop being an outside seller for you?

10  A.  Because they were told by Ken Gross -- not by Ken Gross,

11  by Connect America, I don't know who it was there, and Medical

12  Guardian that, "You should not do business with Evan because

13  he's being sued by the FTC and he has no money to handle your

14  business."

15  Q.  How do you know that?

16  A.  Verbally, what he told me.

17  Q.  So, Mr. Cohen told you that?

18  A.  Correct.

19  Q.  And he called you on Friday why?

20  A.  Because he said, "I want to do business with you."

21  Q.  Despite the fact that Mr. Gross and --

22  A.  Um-hum.  Because he's not happy with some of the things

23  they're saying, and that's what he said.

24  Q.  Because he's not happy with some of the things Mr. Gross

25  said about you?

1  A.  With what Medical Guard -- I don't know if it was

2  Mr. Gross.  I do not know it was him, but Medical Guardian,

3  who is Jeff Gross, who is Ken Gross's son, who is -- the paper

4  that he sent me was signed by Jeff Gross, Ken Gross's son, and

5  the paper from Connect America, the company that Ken Gross is

6  the chairman.  They both companies told him not to do business

7  with us is what he said.

8       We can get an affidavit from him, but this is about

9  an injunction, I think.  And I was just trying to show you

10  we're not what you said earlier.

11  Q.  I understand.

12  A.  Everyone buys business from outside marketers.  I'm not

13  saying that makes us innocent.  If that's proven that that's a

14  problem, we're all going to fix it.  But how can we control if

15  they're dealing with other companies?

16  Q.  I'm not going to argue with you, Mr. Sirlin.

17  A.  I'm not arguing.

18  Q.  But I didn't follow what you were saying.

19  A.  It's been years for me not being able -- no one's even

20  tried to depose me.  It's frustrating.

21  Q.  Mr. Sirlin, I'm trying to understand what you just said.

22  You talked about a paper that you received from Medical

23  Guardian?  I didn't follow.

24  A.  Yes.

25  Q.  What do you mean?

1  A.  We could enter it, but I have it.  It's a purchase order,

2  I believe, a purchase agreement from Medical Guardian signed

3  by Jeff Gross, Ken Gross's son.  And I have -- at the same

4  time, I have a purchase order from Connect America signed by

5  Brooks, Mr. Brooks.

6  Q.  A purchase order between whom?  I don't understand.

7  A.  Another company.

8  Q.  So, Ken Gross's son -- I'm sorry, what was his first name?

9  A.  Jeff.

10  Q.  Jeff Gross.  So, Jeff Gross sent you a purchase order from

11  Medical Guardian and --

12  A.  Isaac Cohen sent me a purchase order from Medical Guardian

13  and from Connect America.  I also got an e-mail from another

14  company with a list of people that they sell to and have sold

15  to while dealing with us, and it includes other companies'

16  names.  There are five other names.

17  Q.  And who is that e-mail from?

18  A.  TMI.

19  Q.  TMI.  And TMI is a company that you used in the past?

20  A.  Correct.

21  Q.  And you don't use them currently?

22  A.  I don't know if we shut them down, but we're not buying --

23  I don't know if they're still operating.  We're not buying

24  sales from them right now.

25  Q.  So, when did this e-mail come to you?

1   A.  This week.

2   Q.  This week.  But you're not sure if TMI is still operating?

3   A.  I don't know.  We're not buying deals from them.

4   Q.  So, what does this e-mail -- obviously, we don't have it,

5   so what does this e-mail say?

6   A.  "While I was selling to Lifewatch, I was also selling to

7   Life Station, Life One, a bunch of other names."  The Life

8   Station, I know, because it was local.

9   Q.  And why did he send you this e-mail?

10  A.  Because you keep saying -- not you, the FTC keeps saying

11  that no one dealt with other companies.

12  Q.  So, he thought that -- I'm sorry.  Was this a conversation

13  that I apparently had with TMI?  I don't follow you.

14  A.  I don't know.  I don't know.  I don't know.

15  Q.  So, okay.  I'm trying to understand how --

16  A.  I don't understand.

17  Q.  Did you contact TMI to ask him this question?  How did

18  this come about is what I'm trying to find out?

19  A.  I don't know, but I have it.  We have 90 employees --

20  although it's down since the FTC case, so maybe it's 67

21  employees currently.  There's 66,000 clients.  We're not a

22  small, little company.  And even before these accusations or

23  whatever happened in 2012, we were not so small.  We had

24  23,000 clients, I think it is.  So, we only tripled.  We were

25  not a little, tiny company.

1  Q.  Mr. Sultzer asked you some questions about the

2  transferring of telemarketing calls in realtime; and I guess I

3  was having a little trouble understanding, so I want to make

4  sure I do, and that's really why I'm asking.

5       You said that a telemarketer could transfer a call to

6  another medical alert company by pushing a different button.

7  What do you mean?

8  A.  That is just my opinion.

9  Q.  No.  I'm asking you to explain, what is it that you mean?

10 A.  I am not into telephony, but --

11      THE WITNESS:  Do I have to answer this question?  I

12 don't understand.

13      THE COURT:  Well, if you don't understand the

14 question, then -- what don't you understand about the

15 question?

16      THE WITNESS:  He asked the question, and I answered

17 it.  You could transfer a call on your telephone, call

18 forward, call transfer.  That's what I'm saying.

19 BY MR. O'TOOLE:

20 Q.  So, you're saying that you think that telemarketers have

21 different transfer buttons on their phones, and they decide

22 who they're going to transfer a sales call to?

23 A.  I -- that is -- that would be my opinion, that it's

24 possible to do that.

25 Q.  And what's the basis for that opinion?  Have you ever seen

1  a phone like this that has a telemarketer --

2  A.  Yeah, I've seen phones, not from telemarketers, that you

3  can transfer and switch calls.  Just in my office, we take

4  calls in, and you can transfer it to other places.  That's not

5  a technological thing that I don't think exists.

6  Q.  You testified that the purpose of the verification -- and

7  you're using a company now called Med Guard, is that right?

8  A.  Correct.

9  Q.  The purpose is that you don't want to get bad business,

10  and then you explained the costs and how it would be

11  unprofitable for you to get bad business.

12  A.  And more than profit.  It's reputation.

13  Q.  Right.  And so you provide Med Guard with a script,

14  correct?

15  A.  I don't -- I don't know.

16  Q.  There's certain information that you require that Med

17  Guard get from customers.  I think you testified to some of

18  that.

19  A.  In an affidavit?

20  Q.  I think you testified actually today, some of the things

21  you want to make sure of, that they know --

22  A.  Yeah, Lifewatch, not me, but yes, Lifewatch.

23  Q.  So, during that Med Guard portion of the call --

24  A.  Not me personally, because sometimes I take it that way,

25  but yes, Lifewatch would provide that.

1  Q.  So, Lifewatch would say, "This is the information we need

2  to get from customers to make sure that it's a good sale"?

3  A.  Yes.

4  Q.  And one of the questions that you ask is not, "Are you on

5  the National Do Not Call List," right?

6  A.  That is not what we do.  Would you like us to do it?

7  Q.  I'm just asking you if you have.

8  A.  If it would change things, I would do it.

9  Q.  You don't ask, "Were you told that a family or friend

10  referred you"?

11  A.  No.  So, that would get very confusing for a senior to ask

12  them that question.

13  Q.  So, you don't ask that question?

14  A.  We do not ask that question because it would get confusing

15  to a senior.  I would love to ask it because I don't want that

16  business.  Why would we want that?

17  Q.  Do you have Med Guard ask whether or not the consumer was

18  told that the American Hospital Association or the American

19  Diabetes Association recommended your product?

20  A.  We do not ask that.  And again, we probably could do that.

21  Q.  But you don't do that now?

22  A.  No one told us to.

23  Q.  You don't ask, "Did this sale come through a robo-call"?

24  A.  That would probably be confusing.  But again, if that's

25  what we decide -- all decide together to do, I'm open to that.

1    That's why we -- we want -- if there are issues, we want them

2    gone.

3    Q.  You don't ask them if they were told that they wouldn't

4    have to pay anything to return the product if they canceled?

5    A.  Repeat the question.

6    Q.  I'm sorry.  That was a poorly-phrased question.

7            One of the questions that you have Med Guard ask is

8    not, "Were you told that you won't have to pay anything to

9    return the product if you cancel it"?

10   A.  It's not, but we would happily pay to return equipment and

11   again to refund anyone that is not happy.  Why not?

12   Q.  So, your testimony is that if a consumer cancels their

13   contract with you, you always pay return shipping?

14   A.  You put the word "always" in there, so that is not my

15   testimony with always, but a lot of times we do.

16   Q.  And why do you do?

17   A.  Because it depends how long they've been with us.  There's

18   a lot of different variables.  And everything I do -- and by

19   the way, the same thing with the BBB.  We have an A-plus

20   rating with the BBB.  That is because -- and we have very --

21   under 100 complaints over these years.  So, for a business

22   this size, I -- I cried the first time I ever got a BBB

23   complaint.

24           This is -- when you grow a business with senior

25   citizens, you want to make them happy; but you can't always

1  make them happy, so you do everything possible that you can.

2  And that is how I preach and train people in my company.  And

3  as you grow, there might be a weak link.

4  Q.  When you testified, Mr. Sirlin, about the various costs

5  that are involved in providing the equipment, it costs, you

6  said, $100 to purchase the equipment, the medical alert

7  device.  I think that's right, right?

8  A.  Average, yes.

9  Q.  And you pay $350 to the outside sellers for each sale?

10 A.  Outside companies that we buy sales from, on average, 350.

11 And if we do TV and radio direct, on average, 350.  Marketing,

12 average 350.

13 Q.  And then you pay a monitoring fee, you said, I think it

14 averages $3.50?

15 A.  Correct, per month.

16 Q.  And customer service costs 3 to 3.50?

17 A.  Yes.

18 Q.  Is that an internal cost, or is there an outsider you're

19 paying for that?

20 A.  That's an internal cost.  The outside does exist in the

21 industry.

22 Q.  But you don't pay outside?

23 A.  No.

24 Q.  And then you said something about a processing fee, but I

25 didn't actually --

1  A.  Credit card processors on average are 3 percent, 3 percent

2  cost per month, per transaction.  And they charge per

3  processing, too, so refunding and this and that -- and the

4  whole credit card processing thing, it's also self-regulated,

5  in my opinion.  They call us when they have problems with

6  charge-backs, so it's another way that we are able to monitor

7  issues.

8  Q.  When you have a charge-back, do they call you, or do they

9  send you a letter?

10  A.  So -- both.  And not me.  Lifewatch they call.

11  Q.  Do they ever only call for a charge-back?  Is there ever

12  an indication --

13  A.  No.  They follow up with -- in writing.

14  Q.  And those charge-backs that -- letters that come from the

15  processors, are those things that Lifewatch keeps?

16  A.  I don't know.

17  Q.  The letters?

18  A.  I don't know.

19  Q.  When you finished describing the costs of each product,

20  you said it takes you 15 to 18 months to break even on a

21  contract.  That's right?

22  A.  Correct.

23  Q.  What about when you sell the contract?  How long does it

24  take you to break even then?

25  A.  When I sell -- or when I did -- in the agreement with

 1   Connect America?

 2   Q.  Well, not just -- I'm sorry, not just Connect America,

 3   but, yeah, Connect America.

 4   A.  In 2012?  I never made any profit.

 5   Q.  I'm sorry.  When you sold the contracts to Connect

 6   America --

 7   A.  It was a pass-through.

 8   Q.  So, it didn't take you any time to break even; you broke

 9   even right away?

10   A.  So, what happened in that situation was there was -- there

11   was a little situation where for basically every five clients

12   that they purchased, we were able to keep one.  But we did not

13   make any financial gain.

14   Q.  So, you just -- whatever it cost you to pay the

15   telemarketer --

16   A.  Passed right through.

17   Q.  Connect America paid it.

18        What about when you sell to other companies other

19   than Connect America?

20   A.  Now or back then?

21   Q.  Now.

22   A.  I don't.

23   Q.  You don't sell any contracts to anybody now?

24   A.  That I know of, no.

25   Q.  Other than Connect America, were there any companies you

1  sold contracts to in 2014?

2  A.  I don't believe so.

3  Q.  What about 2013?

4  A.  2012-'13 in my head is together, and yes.

5  Q.  And who was that?

6  A.  Philips Life Line and some others.

7  Q.  Do you know a company called SHS?  SHS.  I think it stands

8  for Safe Home Security.

9  A.  Safe Home Security, yes.

10 Q.  Do you sell contracts to them?

11 A.  Do I -- no, no.

12 Q.  Have you ever sold contracts to them?

13 A.  Not that I know of.

14 Q.  Okay.  I'm going to hand you -- this is Attachment V to

15 PX 1, Menjivar declaration.  These are financial statements

16 that Lifewatch provided to us in response to the Civil

17 Investigative Demand.

18          THE COURT:  And this is Plaintiffs' Exhibit 1?

19          MR. O'TOOLE:  Plaintiffs' Exhibit 1, Attachment V.

20          THE COURT:  V like Victor?

21          MR. O'TOOLE:  V like Victor.  It's actually docket

22 number -- actually, this is one of the sealed documents, your

23 Honor, so the way -- the public version of this is docket

24 No. 66.  This is one of the documents that we originally filed

25 and that we put a redacted version in.  I'm showing him the

1  redacted version so we don't have any problem with -- with

2  trade secrets or the like.

3          THE COURT:  Okay.  And this is a Lifewatch P & L

4  statement from January through December of 2011?

5          MR. O'TOOLE:  It's actually 2012 is later in this.

6          THE COURT:  I see.  So, there's four sets of P & L

7  statements, and the last one is January through August

8  of 2014?

9          MR. O'TOOLE:  Correct, your Honor.

10          THE COURT:  Okay.  Defense table, do you know what

11  we're talking about here?

12          MR. LIPARI:  Yes.  Your Honor, it's our understanding

13  that it's the publicly-available version of the financial

14  statement.

15          THE COURT:  Fine.

16          MR. O'TOOLE:  This is the document No. 66, the one

17  that we submitted after the motion to seal.

18          MR. LIPARI:  That's fine, your Honor.

19          THE COURT:  Fine.

20  BY MR. O'TOOLE:

21  Q.  Mr. Sirlin, do you know what these are?

22  A.  It's a profit and loss from December 2011, P & L.

23  Q.  Right.  Have you seen these documents before?

24  A.  Maybe.

25  Q.  Are you familiar with what goes in to these documents?

1   A.  As the CEO in general, but I have financial advisors.  So,

2   again, I don't want to sound like what you think I'm sounding

3   like.  It's --

4   Q.  No, I just want you to explain --

5   A.  We want to make money, and we want to help seniors, so

6   these things are important.

7   Q.  Okay.  So, turn to what's on the bottom of the page

8   marked -- it's 15 of 27.

9           THE COURT:  What's the Bates number?

10          MR. O'TOOLE:  It's page 6 -- the Bates number, that's

11  1980, FTC 1980.  It's also got a page 1 of 7 underneath that

12  on the page.

13          THE COURT:  1 of 7?

14          MR. O'TOOLE:  1 of 7, yeah, sorry.  It's page 15 of

15  27.

16  BY MR. O'TOOLE:

17  Q.  It says Menjivar Attachment V, page 15 of 27.  Do you see

18  where I'm at, Mr. Sirlin?

19  A.  Page -- I thought you were talking to him.  15 of 27.  I'm

20  on that page.

21  Q.  And the top of it is all blacked out?

22  A.  Yes, yes.

23  Q.  And then slightly below that, there's a line that reads,

24  "Total 42213, Monthly Monitoring Revenue," and it shows -- I

25  believe this means it shows a little more than $8 million in

1 monitoring -- I'm sorry, $11 million in monitoring revenue for

2 2012 -- or I'm sorry, 2013, is that correct?

3 A.  It sounds reasonable.

4 Q.  Just below that is a heading called, "43010 Selling," and

5 below that, a heading, "Sale of Customer Accounts."  Do you

6 see that?

7 A.  I do.

8 Q.  And just below that is the account No. 42250, SHS, and

9 that shows $20,655,000 roughly, is that correct?

10 A.  That's what it shows here.

11 Q.  So, does that suggest that Lifewatch sold $20 million

12 worth of accounts to SHS?

13 A.  In what definition from the earlier question?  I -- this

14 could be a total -- we should have financial people look at

15 this.  This -- I don't even know the point.

16 Q.  So, you don't know --

17 A.  Six -- SHS --

18 Q.  What I'm trying to find out is what this number means.

19 A.  I don't know.

20 Q.  But as far as you know, you didn't get $20 million for

21 accounts from SHS in 2013?

22 A.  Not that I know of.

23 Q.  As far as you know, you didn't get any money from SHS --

24 A.  No.  But again, along the way, to grow a business like

25 this, you -- I have gone to outside funding sources.  So, I

1    don't know if maybe that's what this is showing here, but

2    that's not -- when you say the word, "selling accounts," I

3    think of it differently.

4    Q.  So --

5    A.  This could be a funding source.  I don't know.

6    Q.  So, it might be that SHS gave you $20 million in funding?

7    Is that what you're saying?

8    A.  I'm saying we should ask financial people and CPAs and

9    accountants.

10   Q.  Do you have any -- any connection to the company SHS, Safe

11   Home Security?  Do you have any role in the company?

12   A.  No, I do not.

13   Q.  You have no -- you have no title --

14   A.  No.

15   Q.  -- or employment with SHS?

16   A.  No.

17   Q.  Have you ever?

18   A.  No.

19   Q.  If you'd turn to page 22 of 27 in the same document --

20              THE COURT:  Can you give a Bates number, please.

21              MR. O'TOOLE:  That's Bates number -- it's covered a

22   little bit.  I think it's FTC 09202.

23              THE COURT:  FTC 09202?

24              MR. O'TOOLE:  Yeah.

25              THE COURT:  Okay.

1       MR. O'TOOLE:  And I think it's -- the docket number

2   is actually page 23 of 28 on the top, but it's also obscured.

3   BY MR. O'TOOLE:

4   Q.  Do you see where I am, Mr. Sirlin?

5   A.  You're talking to me?  Page 22 of 27.

6   Q.  Yeah.

7   A.  What am I looking at?

8   Q.  This is titled, "Profit and Loss, January through

9   August 2014"?

10  A.  Yes.

11  Q.  And again, if you go down the page, it shows monthly

12  monitoring revenue of almost $6 million, is that correct?

13  A.  Right.  By the way, but that's not monthly for one month.

14  Q.  That's the whole year.

15  A.  Just to be clear.

16  Q.  I understand.

17  A.  It sounds like all this money, but --

18  Q.  So, January to August 2014, there was almost $6 million in

19  revenue that came from the monthly fees that consumers pay?

20  A.  That's -- if you say so.

21  Q.  I'm asking you.

22  A.  I'm not a financial analyst.

23  Q.  So, you don't know if this is correct?

24  A.  Right this second, I don't know.  I would ask my financial

25  people, and they would review it with me and tell me, "This is

1  correct.  This is not correct."

2  Q.  Just below that --

3  A.  And I don't mean that nasty, either.  It's a big business.

4         MR. LIPARI:  I'm going to object.  I think this

5  entire line of questioning lacks foundation, and -- as a

6  threshold matter.

7         THE COURT:  You're saying the CEO doesn't have

8  foundation to talk about his own company's profit and loss

9  statement and whether he got $20 million from a certain

10  company?

11         MR. LIPARI:  Your Honor, I'm talking about

12  specifically the questions going to the accuracy of this

13  financial data and whether or not he has had any involvement

14  in preparing it and whether or not he can speak to its

15  accuracy and what these numbers mean.

16         I think as a threshold matter, it hasn't been

17  established that Mr. Sirlin had any involvement in preparing

18  this document or has any specific knowledge about what this

19  document means and what these figures mean.

20         THE COURT:  I'm going to overrule the objection.  I

21  think the CEO should be able to talk about seven-figure items

22  on a P & L statement.  At least he has the foundation to know.

23  Maybe he can't, and that's fine; but as a foundational matter,

24  there's no problem asking a CEO the things that Mr. O'Toole

25  thus far has been asking him.

1          So, do you want to repeat your question?

2    BY MR. O'TOOLE:

3    Q.  So, my question, Mr. Sirlin, is that on page -- I'm sorry,

4    well 22 of 27, the monthly monitoring revenue of nearly

5    $6 million --

6          THE COURT:  Do you want to just indicate what line

7    you're talking about?

8          MR. O'TOOLE:  So, it's line -- I'm sorry.  I didn't

9    realize there were lines.

10   BY MR. O'TOOLE:

11   Q.  On line 24 -- on the left-hand side of the margin, there's

12   numbers?

13   A.  Yes.

14   Q.  On line 24, it shows monthly monitoring revenue of

15   $5,864,080.63.

16   A.  Yes.

17   Q.  And what I'm asking you is:  Is that what Lifewatch --

18   approximately, at least, what Lifewatch earned from the

19   sale -- from the monthly fees paid by consumers for the period

20   January through August of 2014?

21   A.  I could answer that.  I'd just have to do the math.  I

22   haven't looked at it recently, but January -- how many months

23   are we talking about?

24   Q.  The document says -- and this is -- this is a profit and

25   loss statement, by the way, that Lifewatch provided to us.

Sirlin - cross

1   A.  Yeah.

2   Q.  January through August of 2014, so eight months.

3   A.  Right.

4   Q.  A little under $6 million.

5        THE COURT:  What he's asking is:  Does $6 million in

6   monitoring revenue sound like it's in the ballpark for eight

7   months in 2014?

8        THE WITNESS:  For eight months in 2014, it does.

9        MR. O'TOOLE:  Thank you, Judge.

10  BY MR. O'TOOLE:

11  Q.  A few lines down on line 28, under the heading, "Selling,

12  Sale of Customer Accounts, SHS," it shows $13,331,575.  And

13  what I'm asking is:  Is that the amount that Safe Home

14  Security paid to Lifewatch for accounts in that eight-month

15  period?

16  A.  And that, I do not know that -- I don't know that.

17  Q.  Do you know that -- if Safe Home Security paid any money

18  to Lifewatch for accounts in 2014?

19  A.  I don't know.  But again, can -- Safe Home is no one that

20  I'm affiliated with, but the CEO of Safe Home, I do know.

21  Q.  And who is that?

22  A.  Dave Roman.  And I know who he is.

23  Q.  Does he have a role at Lifewatch?

24  A.  Yes, he does.

25  Q.  What's his role at Lifewatch?

1  A.  He's the chairman.

2  Q.  But again, you have no role at Safe Home Security?

3  A.  Correct.

4  Q.  You've never been an officer of Safe Home Security?

5  A.  Never.  So, that's the connection.

6  Q.  But as far as you know, Lifewatch hasn't sold any

7  contracts to Safe Home Security?

8  A.  As far as I know, no.  But that's where Dave Roman is the

9  chairman, and he has that expertise.  And that's why I look to

10  for him and CFOs.

11        You're making me feel very stupid because of a P & L.

12  Q.  I'm sorry, your Honor, but -- or I'm sorry, Mr. Sirlin.

13  So, as the CEO, if these numbers are correct, you're not aware

14  that two-thirds or more of your company's income is coming

15  from the sale of accounts to SHS?

16  A.  I'm aware that -- of what -- we sell thousands of

17  accounts, and they pay a monthly fee every month.  And the

18  financials, we -- you lose money to make money.  That's the

19  financials of this business.  What the CFO and them do for

20  presenting a P & L, I have not reviewed that.

21        And again, we're coming from a small entrepreneurial

22  company for somebody who had his father to help him with this,

23  and then I brought in other people because this is not my

24  expertise, the P & L.

25  Q.  Mr. Sirlin, I'm going to give you Plaintiffs' Exhibit

Sirlin - cross

1    No. 90.  This is docket No. 97.

2            And, Mr. Sirlin, you've seen this document before?

3    A.  Yes.

4    Q.  This is the declaration of Michael Hilgar that you were

5    asked about during your direct examination?

6    A.  Yes.

7    Q.  And you testified that you met -- or you saw Michael

8    Hilgar once in late 2012 or early 2013, is that correct?

9    A.  Yes.

10   Q.  And that's the only time you've ever seen Mr. Hilgar?

11   A.  Yes.

12   Q.  Did you ever communicate with Mr. Hilgar in any way?

13   A.  No.

14   Q.  Never?  You've never e-mailed with Mr. Hilgar?

15   A.  No.

16   Q.  And you've never talked to Mr. Hilgar on the phone?

17   A.  He might have been in the background of conversations.  I

18   don't recall.

19   Q.  If he was in the background of conversations,

20   conversations with whom?

21   A.  With probably -- I don't remember exact names, but people

22   like a Les Steinmetz from Designer Brands, maybe Mark, I don't

23   know his last name, and maybe a Rick, but not Rick Bolling.

24   Q.  What's Rick's last name?

25   A.  The Rick that I dealt with was Rick Sylers.

1    Q.  Rick Sylers, okay.

2         If you could turn to about the sixth page of this,

3    there's what's called Hilgar Attachment A.  It's

4    Document 97-1, page 2 of 6.  Do you see the page I'm on?

5    Again, there's a big black marker on top of the page.

6    A.  No, I actually don't.  Where am I going?

7    Q.  Just after the --

8    A.  Attachment?

9    Q.  Attachment A, the first page of that.

10   A.  Yes.

11   Q.  Do you see that?

12   A.  Yes.

13   Q.  At the bottom of the page, it looks like there's an e-mail

14   from Mitchell May to you?

15   A.  Okay.

16   Q.  Do you see that?  Do you recall getting that e-mail?

17   A.  I recall seeing this when you brought it up.

18   Q.  You don't recall seeing the e-mail when you got it?

19   A.  From Mitchell May?

20   Q.  Yeah.

21   A.  Is there anything in the e-mail?

22   Q.  Well, it looks like it's attaching something.  There

23   actually is an attachment to this e-mail.

24   A.  I don't see that.

25   Q.  Three pages later is the actual attachment.

1   A.  Oh, okay.  Got it.

2   Q.  So, this looks like it's an e-mail from Mitchell May to

3   you attaching this document.

4   A.  Got it, yes.

5   Q.  And Mitchell May's e-mail address is -- I notice it's not

6   a Lifewatch e-mail address, is that correct?

7   A.  What it says on this sheet of paper is

8   MitchellDMay@earthlink.net.  That is not a Lifewatch e-mail.

9   Q.  And then the e-mail goes to you, and then you send the

10  e-mail to someone that is Matt Eggen, E-G-G-E-N?

11  A.  Correct.

12  Q.  Is that the Matt you mentioned a minute ago?

13  A.  No.

14  Q.  Okay.

15  A.  I didn't -- I mentioned a Mark a minute ago.

16  Q.  A Mark.  Okay.  And that e-mail from you is also not from

17  a Lifewatch e-mail address, I notice, is that correct?

18  A.  That's correct.

19  Q.  Who is Matt Eggen?

20  A.  He's a broker.

21  Q.  Can you explain to me what that means?

22  A.  He was introduced when Designer Brand and Les Steinmetz

23  and Rene and Aaron and Mike Flyer, all of these brokers with

24  Worldwide, he was one of them that I guess got an override

25  from Les or I don't know where.

1  Q.  So, Matt was -- Matt Eggen was part of the chain of people

2  that brought you the Worldwide business?

3  A.  Yes.

4  Q.  And the other people that were part of that, you said Les

5  Steinmetz.  Who else was part of that?

6  A.  Rene O'Rourke and Aaron something.

7  Q.  And Matt, you said, got an override.  Can you explain what

8  that means?

9  A.  I don't know if he got an override, but he got some sort

10  of commission from -- and I don't know if it was from Les

11  Steinmetz or from us, but a broker would get -- let's say we

12  paid $350.  Les Steinmetz at Designer Brands would say, "Okay.

13  Pay them 250.  Pay this one $5.  Pay this one $10.  Pay this

14  one 20."  And that's how I was doing it back then.

15  Q.  And so Matt Eggen got a percentage of each sale --

16  A.  I believe so.

17  Q.  -- that came through the Worldwide?

18  A.  I believe so.

19  Q.  And when we talk about the Worldwide companies, you

20  understand we're not talking about just one company name,

21  right?

22  A.  The named in that action, yes.

23  Q.  And you're familiar with those companies, at least in the

24  aggregate?

25  A.  In the aggregate.

Sirlin - cross

1  Q.  Okay.  And so why would you have forwarded this

2  declaration to Matt Eggen?

3  A.  To have -- to get -- I don't have Mike Hilgar's e-mail or

4  anything.

5  Q.  Okay.  So, then Mr. Eggen, although it actually says that

6  it's Matt Even, when you go up on it --

7  A.  Yeah, that's wrong.

8  Q.  He sent this to somebody at Solarbiz3.  Do you have any

9  idea who that is?

10 A.  No.

11 Q.  You don't know who that is?

12 A.  No.

13 Q.  Do you have any -- does Mr. Eggen broker for any of your

14 current telemarketers?

15 A.  I don't know.

16 Q.  What would help you know?  How could I refresh your

17 recollection, or how would you learn it if you wanted to know?

18 A.  I would go to the list of I guess the seven that we're

19 talking about, and see if he was related to that.

20 Q.  Do you know of any other companies besides the Worldwide

21 companies that Mr. Eggen was the broker for?

22 A.  I don't recall.

23 Q.  Has Mr. Eggen been the broker for any companies that have

24 sold contracts to Lifewatch in 2015?

25 A.  I don't know.

Sirlin - cross

1  Q.  Has Mr. Eggen been the broker for any company other than

2  Worldwide, the Worldwide companies, that sold contracts to

3  Lifewatch?

4  A.  I don't know, but what I do know about him is he's in many

5  different businesses.  And I've been in other businesses, too.

6  Q.  When was the last time you had contact with Mr. Eggen?

7  A.  He texted me today.

8  Q.  And what was the text?

9  A.  It was just a, "Hey, what's going on?"  So maybe -- I

10  would just guess that he knows I'm here or that maybe you

11  spoke to him and told him, you know, let's do an affidavit or

12  something.

13  Q.  Has Mr. -- are you aware of any business that you've done

14  with Mr. Eggen in 2015?

15  A.  For medical alert, I don't recall.

16  Q.  Have you done business that's not medical alert with

17  Mr. Eggen in 2015?

18  A.  Yeah.

19  Q.  What businesses do you do that aren't medical alert?

20  A.  I got some commission on some medical business.

21  Q.  I'm sorry.  Could you explain that to me?

22  A.  Is it relevant?  Is that relevant right now?  It's not

23  about medical alerts.

24        THE COURT:  I don't have an objection, so why don't

25  we -- why don't you answer the question.

1  BY MR. O'TOOLE:

2  Q.  What's the medical business that you're talking about,

3  Mr. Sirlin?

4  A.  So, I think it had to do with lab testing and genome

5  testing.  It's a big thing for senior citizens.  So, I

6  referred him to some people, and I'm entitled to a commission

7  on that.

8  Q.  And that's not as part of -- part of Lifewatch?

9  A.  No.

10  Q.  Mr. Sirlin, you talked about -- in your direct examination

11  about the conversation that Ken Gross testified to in his

12  affidavit.  Do you recall that?

13  A.  Yes.

14  Q.  And in Mr. Gross's affidavit, we're looking at PX 13.

15  Actually, I'll give you a copy, too.  PX 13 is docket 24-9.

16        And Mr. Sultzer asked you questions about -- I'm not

17  sure he asked you about both meetings you had with Mr. Gross,

18  but I'd like to clarify exactly what happened.

19        So, in paragraph 13 of Mr. Gross's declaration, he

20  testifies to a dinner meeting you had with him in March 2013.

21  And I know that in your direct examination, you generally --

22  you just said you denied something about this, but do you

23  agree that you had a dinner meeting with him on March 4th,

24  2013?

25  A.  I agree I had dinner with Mr. Gross.

1  Q.  And who else was present at this dinner?

2  A.  There were two dinners.  So, one, we were alone.  And is

3  this the one where we were alone or the other one where Dave

4  Roman and Mitchell May were there?

5  Q.  Well, the declaration says that the March 4th -- Mr. Gross

6  says, at least, and I'm asking you if it's your recollection.

7  But Mr. Gross says at the March 4th meeting, Mr. Roman and

8  Mr. May were there.

9  A.  So, yes, that's the one that they were there.

10  Q.  And Mr. Gross said that during that meeting, he expressed

11  his belief about the damage that the use of robo-calls in

12  connection with telemarketing was doing to the entire medical

13  alert system industry.

14          Is it your recollection that he did do that at that

15  meeting?

16  A.  Yes.

17  Q.  He did say that?

18  A.  Part of other things, yes.

19  Q.  And he says that you told him that Lifewatch was then

20  obtaining 8,000 customers a month from telemarketing call

21  centers and would continue to do so.  Did you tell him that?

22  A.  Not in those words.

23  Q.  Was that true?

24  A.  Was what true?

25  Q.  Were you obtaining 8,000 customers from telemarketing?

1  A.  No.  We were obtaining 8,000 customers a month from
2  outside marketers and regular marketing and referrals and
3  organizations and the state.  We're Medicaid-approved in many
4  states, too.  We work with many organizations that pay us
5  directly.  The M.S. Society pays us directly.  We have 8,000
6  clients a month, correct, from many different places.
7  Q.  So, your testimony is --
8  A.  HIDATSA, HUDSOLA (phonetic), they pay us money, 8,000
9  clients, 8,000 senior citizens.
10  Q.  So, your testimony is that if you said it was 8,000
11  customers a month, it wasn't just from telemarketing?
12  A.  That is my testimony.
13  Q.  On March 19th --
14  A.  I don't even know what -- I'm not a telemarketing expert,
15  either.  This is the FTC, so it's intimidating.  But TV,
16  radio, print, Internet, inbound calls, it's marketing.
17  Q.  Mr. Sirlin, in paragraph 15, Mr. Gross said that he sent
18  you a letter on March 19th terminating the agreement.  That's
19  correct?
20  A.  Yes, yes.
21  Q.  And I think actually that letter is attached as
22  Attachment C, which is about five pages later.  Do you recall
23  getting that letter?
24  A.  Yes, yes.
25  Q.  And then in paragraph 19, Mr. Gross -- no, I'm sorry.

1    Before that.

2          In paragraph 16, Mr. Gross says that Connect

3    America's CEO, Mark Leighton -- is it Leighton?  Is that how

4    you say it?

5    A.  Leighton.

6    Q.  Sent you an e-mail on April 25th, 2013.  And that's

7    attached at Attachment D.  Would you take a look at that?

8    That's probably the last page of the exhibit.

9          Do you see the e-mail, Mr. Sirlin?

10   A.  I see it here, yes.

11   Q.  And the e-mail says -- well, why don't you read to me what

12   the e-mail says.

13         Do you recall getting this e-mail?

14   A.  At the time, no.

15   Q.  You've seen the e-mail since?

16   A.  I'm looking at it right now.

17   Q.  Have you seen the e-mail before right now?

18   A.  I don't know.  I'm sure I did, though, if you want a

19   guess.

20   Q.  So, in the e-mail, he says that, "The whole PERS" --

21   that's Personal Emergency Response System, is that right?

22   A.  That is right.  They don't really use that these days.

23   It's medical alerts.  That's why they d/b/a Medical Alerts and

24   Medical Alarms.

25   Q.  So, "The whole PERS industry is concerned over the sudden

1  rise of consumer complaints due to telemarketing and

2  robo-dialing seniors.  These tactics, as you know, are not

3  something that we approve of and feel that they will have a

4  negative impact on the industry as a whole.

5        "We have made it clear that we cannot accept accounts

6  that are derived from such tactics.  We gave you notice in

7  writing that we terminated our agreement on March 19th, 2013.

8        "In addition, we are hearing of misleading and false

9  advertising within the script of these calls.  This again is

10  not acceptable.  Through some due diligence, we have found

11  that many of the calls are initiated from call centers

12  representing Lifewatch."

13        Do you remember this?

14  A.  It makes sense.  I would write the same thing.

15  Q.  Why would you write the same thing?

16  A.  Because it's about the industry.  It's not about one

17  particular company.

18        Connect America sent me recordings from outside

19  marketers that they were buying, and we had a Life Alert

20  lawsuit, so that became an issue with Life Alert saying some

21  things.  And they sent me a robo-call, that I recall, and it

22  was not from us.

23  Q.  You mean they sent you a recording of a robo-call?

24  A.  Correct.

25  Q.  You mean Life Alert sent you --

1   A.   Connect America.

2   Q.   Oh, Connect America sent you a recording of a robo-call?

3   A.   Yes.

4   Q.   That wasn't Lifewatch?

5   A.   Correct.

6   Q.   Who was the robo-call from?

7   A.   Adam Shore.

8   Q.   Who's Adam Shore?

9   A.   The owner of an outside marketing company, I don't

10  remember the name, who's another one that we also did buy in

11  the past from.

12  Q.   Okay.  Mr. Sirlin, do you recall being contacted by an

13  investigator from the Better Business Bureau in St. Louis

14  named Bill Smith?

15  A.   I do not.

16  Q.   You do not recall being contacted by him?

17  A.   No.

18  Q.   I'm going to give you PX 6.  This is docket No. 24-2.

19  Attachment A to this exhibit, which is on the eighth page,

20  appears to be an e-mail from Mr. Smith to you.  Do you see

21  that?

22  A.   Yes, yes.

23  Q.   Do you recall getting this e-mail?

24  A.   I mean, I don't recall right now.

25  Q.   You don't recall getting this e-mail?  Okay.

1  A.  But if it's here, it's here.

2  Q.  Attachment B, two pages later, that's page 10 of 14 on

3  the docket, appears to be an e-mail from you to him.  Do you

4  see that?

5  A.  I do.

6  Q.  Do you remember sending this e-mail?

7  A.  No, but I can read it now.  Just because I -- I don't

8  remember, there's a lot of -- it's a lot of years, a lot of

9  clients, a lot of business.  I'm not trying to say -- to hide

10 something.

11 Q.  I understand.  And I'm asking you if you recall.  You

12 don't recall?

13 A.  No, but I'll read it now.

14 Q.  Okay.  Well, read the text of that e-mail.  It says, "I

15 apologize for any miscommunication.  Pam or Mitch, I thought,

16 were handling.  We do not make automated messages in your

17 area."

18        Do you see that?

19 A.  Yes.

20 Q.  So what does that last --

21 A.  Oh, here we go.  "We do not make automated messages in

22 your area."  There's no intent in saying that we do it in

23 other places.

24 Q.  But you don't recall sending this e-mail, but you're sure

25 there was no intent?

1   A.  If that was my words, which actually does look like the

2   words, as you're starting to get to know me, that I could use.

3   I do not recall making this e-mail, but reading it now, that

4   was something -- Pam Cohen handles all my BBB complaints.

5   She's been with me for 15 or 13 years.  And she -- everything

6   I'm saying is exactly how she is, and that's why I put her in

7   charge of that, to make sure everyone is taken care of

8   promptly.  So, a BBB complaint would be resolved.

9   Q.  So, would Pam Cohen have been the one to send that e-mail

10  to Mr. Smith?

11  A.  That looks like my words.

12  Q.  Okay.

13  A.  We don't do any telemarketing or outbound telemarketing or

14  outbound automated calls or recorded calls.  Or I don't even

15  know -- we do not make messages in your area was not that

16  intent, to say we do it in other areas.

17  Q.  In your declaration, Mr. --

18  A.  That's specific to if you read the page before, he's

19  talking about his specific area, so it's just a quick e-mail,

20  because again, I am concerned.  But Pam -- and we -- is

21  incredible at making sure these people are happy.

22          And I used to be the one that would do that all the

23  time because we were much smaller then.  And that all comes

24  from the family touch of helping seniors.

25  Q.  Mr. Sirlin, in Ms. Baker's testimony this morning, she

Sirlin - cross

1  talked about the purchase agreements that Lifewatch entered

2  into with its outside sellers.  Do you recall that?

3  A.  Yes.

4  Q.  You sign those agreements, right?

5  A.  That, I -- yes.

6  Q.  You're the person that actually signs it?

7  A.  Yes, I recall that.

8  Q.  And can anybody else at Lifewatch sign those agreements?

9  Does anybody else have authority to sign those agreements?

10  A.  Dave would have authority, but I do it.

11  Q.  You do it.  Now, Lifewatch hasn't always used purchase

12  agreements, right?  They used to use a different form of

13  agreement, didn't they?

14  A.  I don't know what you mean.

15  Q.  All right.  I'm going to give you Attachment Q to

16  Menjivar's declaration.  This is docket No. 16-1.  It's a

17  telemarketing sales agreement that's one of the documents

18  that Lifewatch produced to the FTC pursuant to the CID.

19          Do you see that?

20  A.  I do.

21  Q.  At the top of the document, it says, "Telemarketing Sales

22  Agreement," and it says that it's between Lifewatch, Inc.,

23  d/b/a Lifewatch USA, which is defined as the, quote,

24  "Company," end quote, correct?

25  A.  Correct.

1  Q.  And MD247.com, Inc., the, quote, "Telemarketer," end

2  quote, correct?

3  A.  Yes.

4  Q.  About halfway down the page --

5        MR. O'TOOLE:  Your Honor, this is Attachment Q.

6  BY MR. O'TOOLE:

7  Q.  About halfway down the page, there's a description of

8  services.  Do you see that?

9  A.  I do.

10  Q.  And in B, it says that, "All contact between the

11  Telemarketer and any person on behalf of the Company shall be

12  primarily by outbound telemarketing."  Do you see that?

13  A.  In September 2012, this one?

14  Q.  Yes.  In this --

15  A.  Yes, from September 2012.

16  Q.  So, MD247.com would primarily be doing telemarketing,

17  according to the contract?

18  A.  From what I recall, MD247 is a tele-doc company, so -- and

19  if they were headquartered in Florida -- I don't know if they

20  were -- so they were dealing with people in healthcare.  So,

21  maybe they requested this.  I don't know.  But they were into

22  tele-doc stuff.

23  Q.  What does tele-doc mean?

24  A.  Where you could speak to a doctor 24 hours a day live on

25  the telephone, which is a value-add to senior citizens to be

1    able to talk to a doctor 24/7.

2    Q.  So, MD247.com was selling tele-doc services on behalf of

3    Lifewatch?

4    A.  No.  I believe that was their business at the time, and

5    they must -- this comes to me all the time.  Through a broker,

6    they must have said, "You'd be great at selling medical alerts

7    also."

8    Q.  Down to line -- subparagraph d, it says, "All employees of

9    the Telemarketer," which I assume is MD247.com, "shall only

10   use scripts identified by the Company," which is Lifewatch

11   USA, "as approved, which approval shall be in the Company's

12   sole discretion."

13           Do you see that?

14   A.  I do.

15   Q.  So, this contract looks like Lifewatch says, "You can only

16   use scripts that we approve."  Is that what this contract

17   says?

18   A.  In September 2012, it looks like this contract says that

19   in regards to MD247.  And who created this contract?  Was it

20   the broker or me?

21   Q.  Turn to the last --

22   A.  I still -- I understand even if it was wrong, it's my

23   responsibility, but I didn't create that.

24   Q.  So you signed this contract?

25   A.  Yes, in September of 2012.

Sirlin - cross

1  Q.  And you've seen other contracts that Lifewatch has with

2  outside sellers, right?

3  A.  Today, yes.

4  Q.  But other than -- and other than the title on the

5  agreement and this one provision, they look a lot like this,

6  don't they?

7  A.  No.

8  Q.  Most of Lifewatch's contracts --

9  A.  The ones I saw from Connect America and Medical Guardian

10  look like this.

11  Q.  You're saying this is a contract from Connect America or

12  Medical Guardian?

13  A.  No, I'm saying the ones that I sent to my attorneys,

14  actually, the front page looks exactly like this, and we'll

15  show it to you.

16  Q.  Turn to page 3 --

17  A.  And actually, Life Alert has one, too.

18  Q.  Turn to page 3 of the attachment.  It's page 4 on the top

19  of the page, Bates label FTC 1334.

20        Towards the bottom of the page, No. 3 is a

21  termination provision.  Do you see that?

22  A.  Yes.

23  Q.  It says, "Notwithstanding the term or any renewal term,

24  this agreement may be terminated by either party effective

25  immediately upon written notice to the other party if any of

1  the following occurs," and then it lists some conditions.

2         Do you see that?

3  A.  Yes.

4  Q.  So, this contract looks to me like termination needs to be

5  in writing, is that correct?

6  A.  From what I understand, I would not know that answer.  It

7  says that there, but then there's all kinds of other stuff.

8  But -- and that might have been specifically for 247.

9  Q.  So, your testimony is you don't think that that clause is

10  in other Lifewatch contracts?

11  A.  I don't know.

12         And again, we're not looking for a loophole.  When we

13  buy accounts, we want good accounts.  So, the -- what I do

14  today, September 2012 was different.

15  Q.  Mr. Sirlin, I'm handing you what's been labeled

16  Attachment T to Mr. Menjivar's declaration.  It's docket

17  No. 16-1, page 57 of 75.  The Bates label on the first page

18  is FTC 1755.

19         Do you see this agreement?

20  A.  Page 1?

21  Q.  Page 1 of 18.

22  A.  Yes.

23  Q.  The title is "Purchase Agreement"?

24  A.  Yes.

25  Q.  And this is a purchase agreement from May 1st, 2013,

1  between Lifewatch and a company called Life One Wireless.  Do

2  you see that?

3  A.  I do.

4  Q.  Do you know who Life One Wireless is?

5  A.  Can I look at who signed?

6  Q.  Sure.

7  A.  By the name --

8  Q.  If that would help you, yeah.

9  A.  There's no name.  Do you know?

10 Q.  I don't.

11 A.  Who was the CEO?

12 Q.  I don't know.

13 A.  No, I don't know.

14 Q.  And unfortunately, the section where it says who you

15 should send copies to the seller doesn't have a name in there.

16         This looks like a Lifewatch contract, though, right?

17 A.  What year is this?

18 Q.  May 1st, 2013.

19 A.  They look different today, but a lot of -- lot of writing,

20 legal writing.

21 Q.  On page 3 of this contract, there's a provision called

22 "Termination."  That's Bates labeled FTC 1757.  Do you see

23 that?

24 A.  Yes.

25 Q.  This provision also seems to require written notice.  Do

1   you see that?

2   A.  2 or 3?

3   Q.  3.

4   A.  Yes.

5   Q.  So, is it your testimony that Lifewatch doesn't have to

6   provide written notice to its outside sellers when it's

7   terminating them?

8          MR. LIPARI:  Objection.  Calls for a legal

9   conclusion.

10         THE COURT:  Overruled.  He's just asking for his

11  understanding as the CEO.

12  BY THE WITNESS:

13  A.  Today, we don't.

14  BY MR. O'TOOLE:

15  Q.  Today, you don't?

16  A.  No.  We act and then document later.

17  Q.  You document in writing later?

18  A.  We -- sometimes.  I don't know if we do it all the time.

19  Q.  Lifewatch doesn't have a policy about doing that?

20  A.  I don't know.

21  Q.  And that provision or a similar provision aren't in

22  Lifewatch's current contracts?

23  A.  I don't think so.

24  Q.  Who did -- who were the people at Worldwide that you had

25  contact with?

1   A.  Most of the time, I didn't.  It was Les Steinmetz of

2   Designer Brands and Rene and Aaron of, you know, the brokers.

3   They --

4   Q.  So, you would have contact with the brokers?

5   A.  We were like a servicer.

6   Q.  Rene's last name was who?

7   A.  O'Rourke.

8   Q.  And you testified that you don't know who Rick Bolling is?

9   A.  Correct.

10  Q.  Do you know him by another name?

11  A.  Can you ask the question in a different way?

12  Q.  Do you know that Rick Silvers is Rick Bolling?

13  A.  No, I do not.

14  Q.  Do you believe that Rick Silvers is Rick Bolling?

15  A.  The only time that was even inferred -- put into my head

16  was today.  So, I don't know.

17  Q.  Have you had any recent contact with Rick Silvers, the man

18  you know as Rick Silvers?

19  A.  No.

20  Q.  When was the last time you had any contact with Rick

21  Silvers?

22  A.  Very close to when Worldwide was shut down.

23  Q.  You weren't friends with Rick Silvers?

24  A.  No.

25  Q.  Not friends with Matt Eggen?

1    A.  No.

2    Q.  Or Les Steinmetz?

3    A.  Les, I considered -- I still would consider a friend.  And

4    it's sad.

5    Q.  And the last time you spoke to Rick Silvers was around the

6    time Worldwide was shut down?

7    A.  He texted me.

8    Q.  Mr. Sirlin, I'm going to hand you -- this is PX-4.  It's a

9    declaration from Mirisasha Velez.  And don't worry.  It's

10   thicker.  We're not going to go through all of that.  This is

11   docket No. 22-1.  And this actually relates to one of the

12   paragraphs in your declaration.

13        In your declaration, you said that Lifewatch applied

14   for a telemarketing license -- and I'm sorry, I don't have the

15   paragraph number -- Lifewatch applied for a telemarketing

16   license in Florida out of an abundance of caution, is that

17   correct?

18   A.  No.  That sounds weird the way you're saying it.

19   Q.  Okay.  So, in paragraph 25, at least -- yeah, okay, in

20   paragraph 25 in your declaration, your declaration, not

21   Ms. Velez's declaration, in your declaration, you said that,

22   "Given that at the time Lifewatch was receiving inbound calls

23   in connection with its television and radio advertising, and

24   in an abundance of caution, Lifewatch's counsel submitted this

25   application in Florida."  Is that what you said in your

1  declaration?

2  A.  Yeah, but I'm not following you in here.

3  Q.  It's not in there.

4  A.  Oh, okay.

5  Q.  I'm asking you about your declaration, and it's going to

6  relate what I just gave you.

7  A.  Okay.

8  Q.  So, should I say this again?

9  A.  Yes, please.

10  Q.  Okay.  So, in your declaration, you said -- in explaining

11  why Lifewatch got a telemarketing license in Florida, you

12  said, "Given that at the time Lifewatch was receiving inbound

13  calls in connection with its television and radio advertising,

14  and in an abundance of caution, Lifewatch's counsel submitted

15  this application in Florida."

16        That's what you said, right?

17  A.  Yes.

18  Q.  And that's what your testimony was?

19  A.  We could take the word "caution" away.  I understood from

20  Sasha, the head of the Department of Agriculture in Florida,

21  that she advised us that the way the law is interpreted in

22  Florida, even when you're doing TV and radio and print and

23  Internet and getting calls from organizations like Joshua,

24  Joe's Family Healthcare in Boca, when they called us in

25  New York, the way they interpreted that, we needed to file

1   for a telemarketing license.

2           And I said, "If you're saying to do that, let's do

3   it."  I didn't even have the money at the time, but we still

4   did it.  We found it and took care of it.

5   Q.  So, you did file for a license in Florida?

6   A.  Absolutely.

7   Q.  And Attachment A to the exhibit I just gave you, which is

8   not very many pages in, but the docket number -- for you,

9   Mr. Sirlin, you'll see there's -- maybe the sixth page.

10  It's docket No. 22-2, page 2 of 12, Velez Attachment A, page 1

11  of 7 for everybody else.

12          Do you see the business license, Mr. Sirlin?

13  A.  No.  Go back.  Sorry.

14  Q.  Page 5 of the attachment -- maybe it's more than that.

15  There's a signature, Ms. Velez's signature.

16  A.  Page 5?  U.S. Digest, is this what we're talking about?

17  Q.  No.  Ms. Velez's declaration is 23 pages, and then there's

18  something called Attachment A, and that's what I'm directing

19  you to.

20  A.  Attachment A, the license?  This one.

21  Q.  Yeah, great.

22  A.  Yes, I have the application.

23  Q.  So, this is the application for license that you applied

24  for in Florida?

25  A.  Yes.

1   Q.  And you agreed to --

2   A.  Yes.

3   Q.  -- do this license because Ms. Velez said you needed to?

4   A.  Not because we were doing inbound calls or we were

5   telemarketing or because we were receiving -- or doing

6   outbound calls, the reason she said and advised us to do it

7   was the interpretation of the law, which was written by a

8   gentleman, you know, Andrew Cove said he wrote that law.  The

9   interpretation, we may get in trouble for our TV, radio,

10  Internet.

11          And that's what my father did for 30 years, so I was

12  in shock.  But as I understand, I had to do it.

13  Q.  And Mr. Cove is Lifewatch's lawyer, right?

14  A.  At that time, he was one of them.  I don't know about my

15  lawyer, but for this specific purpose, I used him.

16  Q.  He worked for Lifewatch?

17  A.  For this specific purpose, I used him.  He was a Florida

18  telemarketing attorney is what I was told by Mr. Steinmetz at

19  Designer Brands.

20  Q.  So, you applied for a license, and this is the form?

21  A.  Correct.

22  Q.  On page 5 of this attachment, there's question 12 -- I'm

23  sorry, question 11.  Do you see that?

24  A.  I do.

25  Q.  And question 11 says, "A.  Attached are copies of all

Sirlin - cross

1    sales scripts given to those soliciting for us," and then it

2    follows -- there's a Florida statute number after that.  Do

3    you see that?

4    A.  Yes.

5    Q.  And B says, "We do not use sales scripts," right?

6    A.  Yes.

7    Q.  And the box is checked for A, right?

8    A.  On here, yes.

9    Q.  Question 12, "Attached are copies of all sales information

10   or literature we provide our salespeople."  Do you see that?

11   A.  Yes.

12   Q.  And then B is, "We don't provide" -- "We do not provide

13   our salespersons with" -- and it goes on.  Do you see that?

14   A.  Yes.

15   Q.  And you checked A again, right?

16   A.  Who checked A?

17   Q.  It's checked on this application.

18   A.  It is checked on this application.  And the attorney that

19   did this for us did check that.

20   Q.  So, he wasn't authorized --

21   A.  Not Evan Sirlin.

22   Q.  He wasn't authorized to check that?

23   A.  I assume -- I'm sure he was, but I -- you know, I'm me

24   individually here, so I, Evan Sirlin, did not do this.

25   Q.  On page 7 of the application, which is docket page 8 of

1  112, near the top, there's a heading called, "Uploaded

2  Documents."  Do you see that?

3  A.  "All uploaded documents"?

4  Q.  Sure.  Just below that --

5  A.  Yes.

6  Q.  -- there's a number of documents listed?

7  A.  Yes.

8  Q.  And one of them is called Call Center Welcome Package.pdf.

9  Do you see that?

10  A.  Yes.

11  Q.  Does that indicate to you that a Call Center Welcome

12  Package was attached to this license application?

13  A.  It does indicate that, in September 2012?

14  Q.  Yes.

15  A.  Yes.

16  Q.  And there was a Call Center Welcome Package at that time?

17  A.  It was developed by outside people.

18  Q.  What do you mean by outside people?

19  A.  Les Steinmetz, Aaron, and Rene.

20  Q.  So, this Call Center Welcome Package was something that

21  you gave to outside sellers in 2012?

22  A.  I believe they gave.  I did not, and I don't know if

23  Lifewatch did.  But the brokers, I'm sure, did.

24  Q.  So, this Call Center Welcome Package isn't a Lifewatch

25  Call Center Welcome Package; it's a Les Steinmetz package?

1  A.  Again, if I'm responsible, I'll take responsibility, but I

2  did not do it personally.  If Lifewatch is responsible, yes.

3  But Les Steinmetz, there are people that will tell you Les

4  Steinmetz -- and I could get it in.  This is an injunction,

5  not a trial, so there are people who will tell you that Les

6  Steinmetz represented himself as a CEO for certain things,

7  including -- and he wound up working for Life Alert, and he

8  wound up being with Connect America, correct?

9  Q.  The Call Center Welcome Package that's here is represented

10  as being from Lifewatch.  Are you saying it's not really from

11  Lifewatch?

12  A.  It looks like it could be.

13  Q.  The similar Call Center Welcome Packages that were

14  attached to licenses from a variety of other telemarketers in

15  Florida that they said came from Lifewatch, they didn't come

16  from Lifewatch?

17       What I'm asking you is:  Did Lifewatch provide a

18  Call Center Welcome Package to its outside sellers?

19  A.  The brokers did.

20  Q.  The brokers did.  On behalf of Lifewatch?

21  A.  I don't know.

22  Q.  Who else were they working for besides Lifewatch?

23  A.  I have pictures of Les talking to Ken Gross and driving

24  around in their car.  I have Life Alert meeting with Les

25  Steinmetz.  I have Life One, who used to work for Connect

Sirlin - cross

1  America.  So, how do I know they're just for us only?

2  Q.  So, the Call Center Welcome Packages attached to a

3  Lifewatch application is really a Connect America Call Center

4  Welcome Package?

5  A.  It could be a generic one for the industry.

6  Q.  That's given to telemarketing rooms that are doing

7  telemarketing on behalf of Lifewatch, right?

8  A.  No.  Our rooms that we might be buying sales from --

9  Q.  Right.

10 A.  -- back in 2012, and who were doing telemarketing, as what

11 we surveyed, a small percentage of outbound, not so small, I'm

12 not denigrating it, but 15, 20 percent of outbound

13 telemarketing, yes.

14 Q.  Lifewatch renewed its telemarketing license in December of

15 2013, right, in Florida?

16 A.  Yes.

17 Q.  And then again in January 2015?

18 A.  Yes.

19 Q.  Turn to Attachment H of this document, which really begins

20 on page 55 on top, Velez Attachment H, 1 of 9.

21 A.  I have that.

22 Q.  Are you there?

23 A.  Yes.

24 Q.  This is the application from 2015, right?

25 A.  Okay.

1    Q.  And Lifewatch applied for a telemarketing license in

2    Florida again.  I think it's January 5th of 2015, right?

3    A.  Yes.

4    Q.  Okay.

5    A.  Maybe, possibly.

6    Q.  Is it your testimony that you didn't apply for a

7    telemarketing license in Florida in January --

8    A.  If it's here, Lifewatch did it.  And again, if it's -- the

9    law requires that for inbound phone calls from TV, radio, and

10   print in the State of Florida, we will continue to do it

11   unless you tell us not to.

12   Q.  On page --

13   A.  And Sasha told us we should do it again.

14   Q.  On page -- Sasha told you you should do it again in 2015?

15   A.  Correct.

16   Q.  And did Sasha tell you what you to attach to the

17   application in 2015?

18   A.  Not me personally.

19   Q.  How do you -- who did Sasha tell to file again in 2015?

20   A.  Our attorneys, I believe, and other people, I believe.

21   Q.  Do you mean Mr. Cove, or do you mean different attorneys?

22   A.  I think Mr. Cove, but I don't remember.

23   Q.  The last page of this --

24   A.  Or Tiffany, who works for Mr. Cove.

25   Q.  Right.

1  A.  That makes sense.

2  Q.  Right.  That's what I was going to direct you to.

3         On the next-to-last page, or maybe it's the

4  third-from-the-last page, because I think there's a blank,

5  page 8 of 9, which is docket page No. 62, do you see that

6  page?

7  A.  8 of 8?

8  Q.  8 of 9, Attachment H, 8 of 9.

9  A.  The Community National Bank on top?

10  Q.  Yes, correct.

11  A.  Page 8 of 9?  Yes.

12  Q.  Two-thirds of the way down the page is the heading for

13  uploaded documents again.  Do you see that?

14  A.  Yes.

15  Q.  And the last one says, "Call Center Welcome Package.pdf"?

16  A.  Yes.

17  Q.  That indicates that a Call Center Welcome Package was

18  attached to this application, too, is that correct?

19  A.  I don't know.  If it does, it does.

20  Q.  Is it your testimony that Lifewatch doesn't attach the

21  Call Center Welcome Package to their -- didn't attach the

22  Call Center Welcome Package to the license in 2015?

23  A.  I don't know.

24  Q.  This morning, Miss Baker testified that Lifewatch stopped

25  working with Worldwide about six months before Worldwide was

Sirlin - cross

1    shut down.  Did you hear that?

2    A.  I did hear that.

3    Q.  Is that true?

4    A.  Yes.

5    Q.  So, your testimony is that -- and to be clear, when we're

6    talking about Worldwide, we're not just talking about the

7    company named Worldwide.  We're talking about the companies

8    that were defendants in that case, right?

9    A.  The company named Worldwide was stopped at that time.

10   Q.  The company named --

11   A.  She was not asked that question, from what I recall.  So,

12   it's very possible that other companies continued after that.

13   Q.  Okay.  So just so I understand -- I got confused.  So,

14   you, at least, think her testimony was that Worldwide, the

15   Worldwide company, Worldwide Information Services, that

16   Lifewatch stopped doing business with them some six months

17   before they were shut down?

18   A.  Correct.

19   Q.  But Lifewatch continued to work with the other Worldwide

20   companies, at least some of them, up until the time they got

21   shut down, correct?

22   A.  No.

23   Q.  No?

24   A.  No.

25   Q.  So Lifewatch --

1   A.  The question -- I don't understand the question.

2   Worldwide companies, you mean named parties?

3   Q.  The named parties in the --

4   A.  Six months later that we stopped dealing with six months

5   earlier?

6   Q.  What I'm asking is:  When the FTC in Florida shut down the

7   companies, the Worldwide companies, Worldwide Information

8   Services, Elite -- I don't remember all the names -- National

9   Life Network, Unique something, Global Information Services --

10  this is embarrassing.

11  A.  That's okay.

12  Q.  When the FTC shut those companies down in January of

13  2013 -- 2014, Lifewatch had not done any business with any of

14  those companies for six months prior?

15  A.  That is not my testimony.

16  Q.  So --

17  A.  I don't know.  But if we were still doing business with

18  them, the day that happened, we would have stopped.

19  Q.  But your testimony is not that you stopped before it

20  happened?

21  A.  The only one that I researched before today was Worldwide,

22  so the answer is Worldwide was stopped before that.

23  Q.  But you don't know if you were dealing with the other

24  companies until they were shut down?

25  A.  All of them?  I don't know.

Sirlin - cross

1   Q.  With any of them is what I'm asking you.

2   A.  I don't know, but I would say probably.

3   Q.  Lifewatch probably was dealing with --

4   A.  Buying sales from a company that was selling to my

5   competition that is much, much, much bigger than me, and is

6   continuing to do it today when we're talking about an

7   injunction.

8   Q.  When you first started testifying -- when Mr. Sultzer

9   first started asking you questions, you explained the business

10  incentives, the business reasons why you don't want to get

11  bad -- I think you said bad deals, right?

12  A.  Yes.

13  Q.  And Miss Baker said that Lifewatch policy is that they

14  don't review the scripts that outside sellers use, correct?

15  A.  Yes.

16  Q.  And I think she said you considered it -- Lifewatch had

17  considered it, but decided against it?

18  A.  That's what she said, yes.

19  Q.  Is that true?

20  A.  Lifewatch?  I would still consider it, if you guys say

21  that's what we're supposed to do.

22  Q.  But have you considered it?

23  A.  Well, our decision not to do it was based on the fact that

24  if we're listening to recordings, we're going to get exactly

25  what they're saying versus -- they're going to -- if they

1    submit us scripts, that doesn't help prove anything, that

2    they're following the scripts.  Listening to the recordings,

3    and we continue to increase the amount of recordings we're

4    listening to.

5    Q.  But if there are misrepresentations in the script, you'd

6    want to know that, wouldn't you?

7    A.  Absolutely.

8    Q.  Because your testimony is that you can't even know that

9    they'll follow the script if it was compliant?

10   A.  That's not my testimony.  I don't know what you're trying

11   to say.

12   Q.  I think you just said that you don't need to see scripts

13   because the recordings are the best evidence?

14   A.  For compliance.

15   Q.  For compliance.

16   A.  For the industry, it would be great to see all the scripts

17   out there and to hear what people think.  I look at Life

18   Alert's print ads every week.  It says, "Saving a life from

19   catastrophe every 10 minutes."  That's wrong.

20        I look at other ads and I listen to other TV

21   commercials that say, "Get a free medical alert system."  That

22   is wrong, as per -- I learned later on, I think, you guys

23   would say it's not free.  We give them the equipment to use,

24   and they're responsible to return it.

25        So, I would love to be able to do all of that if I

Sirlin - cross

1   could.

2   Q.  Lifewatch --

3   A.  The industry doesn't need any tricks.

4   Q.  Miss Baker testified --

5   A.  There's a huge demand for this.

6   Q.  Miss Baker testified and her declaration said that

7   Lifewatch currently has seven outside sellers, correct?

8   A.  And other marketing things.  We're only talking about

9   that.  But if that's what we want to talk about, yes, there

10  are seven right now.

11  Q.  So, the seven that could be using telemarketing?

12  A.  Yes.

13  Q.  So when Ms. --

14  A.  Outbound telemarketing, because there are others that you

15  guys might use in the definition of telemarketing.

16  Q.  So, if Lifewatch wanted to review the scripts of those

17  seven companies, how big a burden would that be?

18  A.  That wouldn't be a major burden for seven companies.

19  Q.  But Lifewatch doesn't review the scripts?

20  A.  We listen to enough of the recordings to know.

21  Q.  Do the recordings include robo-calls?

22  A.  The ones that I've heard of don't.

23  Q.  And they couldn't, could they?

24  A.  I don't understand.

25  Q.  Would it be possible?  Your understanding of --

1    A.  I've heard robo-calls -- and again, we should use -- I
2    don't know if it's illegal or not, but back in September of
3    2012, Ken Gross played for me a -- what he called a robo-call
4    that I heard a recorded message, and that was from Adam
5    Shore's company who we were not buying from at that time.
6              MR. O'TOOLE:  Okay.  I have nothing further, your
7    Honor.
8              THE COURT:  Okay.  Is there going to be any redirect?
9              MR. SULTZER:  No, your Honor.
10             THE COURT:  No?  If you want to take a break and
11   consider it?
12             MR. SULTZER:  You know what, maybe if we take a
13   two-minute break.
14             THE COURT:  Let's take a five-minute break, and we'll
15   come back at 4:30.
16             You can step down for the time being.
17       (Recess had.)
18             THE COURT:  Everybody can be seated.
19             Okay.  Will you be calling Mr. Sirlin for redirect,
20   or not?
21             MR. SULTZER:  Unless you have any questions for him,
22   your Honor, we're not going to call him back up.
23             THE COURT:  Okay.  That's fine.
24             Do you have anybody else who will be testifying this
25   afternoon?

1          MR. SULTZER:  That is it for us, your Honor.

2          THE COURT:  Okay.  All right.  Any rebuttal witnesses

3     from the FTC?

4          MR. O'TOOLE:  No, your Honor.

5          THE COURT:  So, that closes the testimonial portion

6     of the hearing.  We now need to deal with the exhibits.  And

7     so we're obviously -- well, unless this goes really quickly

8     and there aren't many objections, we're not going to finish

9     this today.  So, give me some sense as to what the scope of

10    our endeavor is going to be.

11         So, I have the plaintiffs' exhibit list for the

12    preliminary injunction hearing, which was filed on Friday.

13    And it's about five-and-a-half pages of exhibits.

14         And to how many of those exhibits do the defendants

15    have objections?

16         MR. GOODMAN:  I think we would object to, if not all

17    of them, the majority of the exhibits.  We're going to be

18    renewing the motion to strike that we brought before, which

19    addresses -- there are bits and pieces.  They took out some of

20    the attachments, but it's basically the same things that they

21    had asserted before, the same evidence that they offered.  And

22    nothing in discovery has changed, but they've also added some

23    additional exhibits to which we have objections.

24         THE COURT:  Okay.

25         MR. GOODMAN:  Including what we filed this morning.

Sirlin - cross

1          THE COURT:  Right.  So, the scope of the endeavor is

2   broad, and I'm wondering, what's the plaintiffs' proposal for

3   how procedurally we ought to go about resolving those

4   objections?

5          MR. O'TOOLE:  Well, your Honor, about half of the

6   exhibits that we originally filed, they didn't object to.

7   Their motion to strike didn't say anything about about half of

8   the original ones.

9          THE COURT:  Okay.

10          MR. O'TOOLE:  The ones -- a large chunk of the rest

11  are basically the same objection.  The consumers, for example,

12  are basically the same objection.

13          The fact is, we've done all of this in writing.

14  There's a few new exhibits that they haven't had a chance to

15  object to in this format.  We could just deal with those

16  exhibits whenever, tomorrow or later today.  And then they

17  made their motion to strike, we responded, they replied on all

18  of their original ones.  I'm not sure there's anything to be

19  gained by reading all of that.

20          THE COURT:  Okay.  And the original ones --

21          MR. O'TOOLE:  Are 1 through 80.

22          THE COURT:  1 through 80.  And then we have 81, 88,

23  and then 90 through 97.  And those are new, is that right?

24          MR. O'TOOLE:  There's also an 87.

25          MR. GOODMAN:  Right, which we did object to.  And

1    that's also addressed in the motion we filed.

2            THE COURT:  Okay.  So, have you not been -- so, we

3    have fully-briefed objections on 1 through 80, is that right?

4            MR. O'TOOLE:  Yes.

5            MR. GOODMAN:  That's correct.

6            THE COURT:  And as to the others, you've addressed

7    87.

8            MR. GOODMAN:  Parts of -- we addressed parts of 87.

9    We addressed two of the attachments to 87.  I will tell you

10   that there will be objections to other pieces of 87, too.

11           THE COURT:  So, what is there left for you to do, the

12   defendants?

13           MR. GOODMAN:  We could -- what I would do is submit

14   something that addresses the remaining objections to the

15   exhibits that weren't addressed in our -- the brief that we

16   filed back in August.

17           THE COURT:  Okay.

18           MR. GOODMAN:  You know, that's the 1 through 80, I

19   think.

20           THE COURT:  Right.  And you would rather do that in

21   writing rather than orally?

22           MR. GOODMAN:  I think so.  I think that, you know, a

23   lot of it, there are things specifically that I'd like to be

24   able to give the Court.  There are things that, for example,

25   will identify some of the issues that pertain to the

1    documents.

2          Some of it we can do orally, but I think mostly -- I

3    think that would actually make it easier.  I think it would

4    make it easier and get the process resolved more quickly.

5          THE COURT:  What are your thoughts on that?

6          MR. O'TOOLE:  It sounds -- I think the idea of doing

7    it in writing makes sense.  I'm not really sure what

8    Mr. Goodman means by some other things he wants to -- but I

9    think it's something that -- I think even the newer exhibits,

10    the objections are likely to be very similar to the ones that

11    they made before, so it may be very efficient to do it on

12    paper.

13          THE COURT:  Okay.  So, let's have a schedule for

14    doing that.  What's your opening bid?  I mean, there's only a

15    handful.

16          MR. GOODMAN:  There is, but some of the handful will

17    actually be big chunks of stuff.  And since we weren't having

18    a hearing tomorrow, I know that I have a meeting out of town

19    tomorrow and Wednesday.  So, I mean, if -- my opening bid was

20    Wednesday.  I'm sure that we could beat that.

21          THE COURT:  This Wednesday?

22          MR. GOODMAN:  Oh, no, no.  This Wednesday, as I say,

23    I'm going to be out of town tomorrow and --

24          THE COURT:  So, you're talking about next Wednesday?

25          MR. GOODMAN:  Yes.

Sirlin - cross

1          THE COURT:  So, that would be the 23rd.

2          MR. GOODMAN:  It's my birthday.

3          THE COURT:  Okay.  And that kind of brings us to the

4   holidays, and so what's -- what do you think of the 23rd, and

5   if the 23rd, when you would want to respond?

6          MR. GOODMAN:  Actually, can we do the 22nd?  Because

7   it is my birthday.

8          THE COURT:  Okay.  So, we'll do it the 22nd.

9          MR. O'TOOLE:  Well, that eases the pressure.

10          THE COURT:  And I get that there's the 24th and the

11   25th, and people may be out of town, so just tell me what's

12   doable without being too --

13          MR. O'TOOLE:  I mean, actually, your Honor, I'll be

14   out of town and Ms. Bhimani will be out of town that whole

15   time, that whole week after the 22nd.  I'm out before that,

16   even.  I think we could do maybe the 6th, is that right?  I'm

17   guessing the days.  The 5th?  Well, we won't be here.  So,

18   we'll say the 5th.

19          THE COURT:  Okay.  So, we'll say the 5th, and then

20   let's make it the 12th for a reply.

21          MR. GOODMAN:  Great.

22          THE COURT:  And then I won't -- obviously, I won't

23   rule until after I get everything on the exhibits, and then

24   I'll have to -- to the extent that the exhibits are material,

25   I'll have to resolve the evidentiary objections to the

1    exhibits.  It may be that some of the exhibits are not

2    material, it may be that all of them are, to the decision, so

3    I'll have to work through that.  And then I will get you a

4    ruling as quickly as possible.

5         I may end up giving you an oral ruling just to

6    expedite everything so whoever is on the -- whoever comes in

7    second can appeal quicker rather than have to wait for a

8    written ruling.  If, in fact, an appeal is in the cards, I

9    want to give you the opportunity to do that.  And I figure

10    both sides would want an answer sooner rather than later.

11         So, I may end up giving you an oral ruling, maybe

12    not, but I'll do it as quickly as possible after the 12th.

13         Jackie will just put in a status date.  It isn't

14    going to mean anything, I don't think.  She's just going to

15    give us a status date, and I may have to move that.

16         Is there anything else?  Does either side -- would

17    either side like to make any -- I didn't give you the

18    opportunity to make any closing arguments based on the

19    testimony that was given today.

20         MR. GOODMAN:  Would it be helpful to the Court if we

21    submitted, like, a five-page summation or something like that?

22         MR. O'TOOLE:  Your Honor, I actually don't see it

23    necessary; but if you think it would be helpful, we'll be

24    happy to do it.

25         THE COURT:  Okay.  If you'd like to do a short

1    summation in writing, that would be fine.  What date do you

2    propose?

3              MR. SULTZER:  Is it possible to get the transcripts.

4              MR. GOODMAN:  Of course it is.

5      (Bench conference, not reported.)

6              THE COURT:  Okay.  So, if you get the transcripts by

7    the end of this week, when do you want to do the written

8    summations?

9              MR. GOODMAN:  I would still think the 5th, as you're

10   out of town the week of -- you're out next week, I assume.

11             MR. O'TOOLE:  Yeah, but I have people who can type,

12   so -- I think we can do the 5th, so --

13             MR. GOODMAN:  I was going to say, these guys are

14   saying the 12th.  Our final brief is due on the 12th, so --

15             THE COURT:  Just give me a date.

16             MR. GOODMAN:  How about the 12th?

17             MR. O'TOOLE:  That works, your Honor.

18             THE COURT:  Okay.  So, the written summations are

19   going to be on the 12th.

20             Anything else that anybody would like to address?

21             MR. O'TOOLE:  No, your Honor.

22             THE COURT:  Okay.  Thank you very much.

23             MR. GOODMAN:  Thank you, your Honor.

24             MR. SULTZER:  Thank you, your Honor.

25     (Which were all the proceedings heard.)

Sirlin - cross

234

CERTIFICATE

I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.


*/s/Charles R. Zandi*                    *December 18, 2015*
_____          _____
Charles R. Zandi                         Date
Official Court Reporter