# In the Matter of:

# FTC v. LifeWatch Inc., et al.

*July 25, 2017*
*Evan Sirlin*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. LifeWatch Inc., et al.                                                    7/25/2017

**1**

```
 1                    UNITED STATES DISTRICT COURT
 2                FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                           EASTERN DIVISION
 4
 5    FEDERAL TRADE COMMISSION, et al.,   )
 6                        Plaintiffs,     )
 7            -against-                   ) Case No.
 8    LIFEWATCH INC.,                     ) 15cv5781
 9    a New York corporation,             )
10    also d/b/a                          )
11    LIFEWATCH USA and                   )
12    MEDICAL ALARM SYSTEMS, et al.,      )
13                        Defendants.     )
14    ----------------------------------X
15                              July 25, 2017
16                              10:20 a.m.
17
18                              One Bowling Green
19                              New York, New York
20
21         DEPOSITION of EVAN SIRLIN, taken by the
22    Plaintiff, pursuant to Article 31 of the Civil Practice
23    Law and Rules of Testimony, held at the above-mentioned
24    time and place, before ALBERT L. HAGLUND III, a Notary
25    Public of the State of New York.
```

**2**

```
 1    A P P E A R A N C E S :
 2
 3         UNITED STATES FEDERAL TRADE COMMISSION
 4         Attorneys for Plaintiffs
 5         230 S. Dearborn Street, Suite 3030
 6         Chicago, Illinois  60603-5001
 7    BY:  DAVID A. O'TOOLE, Staff Attorney
 8         SAMANTHA GORDON, Staff Attorney
 9
10         STATE OF FLORIDA ATTORNEY GENERAL'S OFFICE
11         Attorneys for Plaintiff State of Florida
12         135 West Central Boulevard, Suite 670
13         Orlando, Florida 32801
14    BY:  DENISE BEAMER, ESQ.
15
16         THE SULTZER LAW GROUP, PC
17         Attorneys for Defendants LifeWatch and Evan Sirlin
18         14 Wall Street, 20th Floor
19         New York, New York  10005
20    BY:  JOSEPH LIPARI, ESQ.
21         JASON A. SULTZER, ESQ.
22
23
24
25
```

**3**

```
 1    A P P E A R A N C E S :  (Cont'd.)
 2
 3         SWANSON, MARTIN & BELL, LLP
 4         Attorneys for Defendants MedGuard Alert, Inc.;
 5         SafeHome Security, Inc.; and David Roman
 6         330 North Wabash Avenue, Suite 3300
 7         Chicago, Illinois  60611
 8    BY:  THOMAS J. VERTICCHIO, ESQ.
 9
10
11    ALSO PRESENT
12         Melissa Evans, Intern
13         Elizabeth Kraus, Intern
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                            INDEX
 2
 3    EXAMINATION BY
 4              MR. O'TOOLE        5, 105
 5              MR. SULTZER        103
 6
 7
 8                          EXHIBITS
 9
10    NUMBER          DESCRIPTION                      PAGE
11    1               E-mails                           17
12    2               E-mail and Executive Summary      25
13    3               E-mails                           44
14    4               E-mails                           61
15    5               E-mails                           66
16    6               E-mail                            75
17    7               E-mails                           83
18    8               E-mail                            92
19    9               Photograph                       102
20    10              Photograph                       102
21
22
23
24
25
```

1 (Pages 1 to 4)

Sirlin

FTC v. LifeWatch Inc., et al.                                        7/25/2017

---

5

1    E V A N  S I R L I N, the Witness herein, having been
2    first duly sworn by a Notary Public in and of the State
3    of New York, was examined and testified as follows:
4    EXAMINATION BY
5    MR. O'TOOLE:
6        Q. Could you please state your name for the
7    record?
8        A. Evan Sirlin.
9        Q. And your business address?
10       A. 266 Merrick Road, Lynbrook, New York.
11           MR. O'TOOLE:  This is David O'Toole.  We've got
12    in the room --
13           MR. LIPARI:  My first name is Joseph.  My last
14    name is Lipari, L-I-P-A-R-I, and I represent Mr. Sirlin
15    and LifeWatch.
16           MR. SULTZER:  Jason Sultzer, S-U-L-T-Z-E-R.  We
17    represent Sirlin and LifeWatch.
18       Q. Mr. Sirlin, as I mentioned before we started,
19    you and I have talked before.  We have a problem of
20    interrupting each other.  I told the reporter to yell
21    at us if that happens.  Hopefully my voice will make
22    that impossible anyway.  Hopefully this won't translate
23    to you.
24       A. My throat hurts.
25       Q. I don't expect we are going to be here all day

---

6

1    anyway, and I'm not going to do anything to make us
2    stay here.
3           MR. SULTZER:  That means we are going to be
4    here all night.
5           MR. O'TOOLE:  Not me.  I don't have the
6    attention span.
7        Q. I know you testified in court.  Have you ever
8    given a deposition before?
9        A. Yes.
10       Q. I'm not going to explain to you.  You
11    understand how we are going to do this.
12       A. Yes.
13       Q. We are going to talk about a few different
14    subjects. I'll show you some documents along the way
15    probably, but we'll see what actually has to happen.
16    Is LifeWatch still operating?
17       A. Yes.
18       Q. What is it doing?  My understanding is you
19    might be the only employee of LifeWatch now.
20           MR. LIPARI:  What's the question, what is it
21    doing?
22           MR. O'TOOLE:  Right, what is it doing.
23       A. Selling medical alerts and providing services
24    to senior citizens.
25       Q. How many employees does LifeWatch have right

---

7

1    now?
2        A. You're starting already.  Are we talking about
3    LifeWatch or MedGuard and LifeWatch?
4           MR. LIPARI:  He's asking LifeWatch.
5        A. LifeWatch, as far as I know about five
6    employees.
7        Q. Besides yourself, who are the employees?
8        A. Sarai Baker, Will Singler, Angel and a couple
9    of other women.
10       Q. Is Mitch May still an employee of LifeWatch?
11       A. No.
12       Q. Is he an employee of MedGuard?
13       A. No.
14       Q. Is he an employee of any of the defendants in
15    this case?
16       A. No.
17       Q. Where is LifeWatch actually operating from?
18       A. 266 Merrick Road in Lynbrook, New York.
19       Q. Is LifeWatch also operating out of the
20    Cromwell, Connecticut office?
21       A. Cromwell or Middletown.  I'm not sure.
22       Q. Is that the same thing, Cromwell or Middletown?
23       A. Yes.
24       Q. There's only one Connecticut.
25       A. Yes.

---

8

1        Q. That address is -- what is that, 55 --
2        A. I don't know.
3        Q. What activities is LifeWatch doing in Merrick
4    or Lynbrook?  I'm sorry.
5        A. Sales and marketing.  Sales and marketing.
6        Q. What's going on in Connecticut?
7        A. Customer service and fulfillment.
8        Q. Does MedGuard --
9        A. And some sales.
10       Q. In Connecticut?
11       A. Yes.
12       Q. Is MedGuard operating in the Lynbrook office
13    too?
14       A. No.
15       Q. Did it ever?
16       A. No.
17       Q. But it operates in the Connecticut office?
18       A. Yes.
19       Q. In the Connecticut office, is the MedGuard
20    business separate from the LifeWatch business?
21    Physically is there a part of the building --
22       A. No.
23       Q. Are there employees that work for both?
24       A. Yes.
25       Q. Can you tell me who?

---

2 (Pages 5 to 8)

Sirlin

FTC v. LifeWatch Inc., et al.                                                    7/25/2017

---

9

1    A. No.
2    **Q. Do you know any?**
3    A. Doug Holoway.
4    **Q. Hallowell?**
5    A. Hallowell and then Kevin Carducci.
6    **Q. Do you work for MedGuard?**
7    A. No. I'm employed by LifeWatch.
8    **Q. Have you ever been employed by MedGuard?**
9    A. No.
10   **Q. My understanding was that in the Life Alert**
11   **lawsuit you actually signed on behalf of MedGuard in**
12   **that settlement as a vice president of MedGuard; am I**
13   **wrong about that?**
14   A. Is the question am I an employee of MedGuard?
15   **Q. I'm asking you are you a vice president of**
16   **MedGuard.**
17   A. I'm a shareholder of MedGuard.
18   **Q. You have been for some time.**
19   A. Yes.
20   **Q. When I asked earlier if Mitchel May was an**
21   **employee of LifeWatch, I should have asked is he**
22   **affiliated with LifeWatch in any way. Is he an officer**
23   **or owner of some kind?**
24   MR. LIPARI: Objection, compound. The word
25   "affiliated" I'm going to object to.

---

10

1    A. Yes.
2    **Q. What is his connection to LifeWatch?**
3    A. Shareholder.
4    **Q. Is he an officer, vice president?**
5    A. Vice president.
6    MR. SULTZER: When you referenced the Life
7    Alert settlement, did you actually see the settlement
8    agreement?
9    MR. O'TOOLE: I don't think I have.
10   MR. VERTICCHIO: Whomever was just speaking, if
11   they can keep their voice up a little louder.
12   MR. SULTZER: I'm asking a quick question to
13   Dave because there was a confidential settlement
14   reached with Life Alert.
15   MR. O'TOOLE: No, I understood it, and I know I
16   didn't hear that from anybody in the case.
17   MR. SULTZER: You didn't actually see the
18   settlement agreement.
19   MR. O'TOOLE: No.
20   MR. SULTZER: I just wanted to know because we
21   have confidential provisions in there.
22   MR. O'TOOLE: Honestly, it's something you
23   should have produced in this case, but I don't think we
24   have it in any case.
25   MR. LIPARI: I don't know off the top of my

---

11

1    head.
2    MR. O'TOOLE: I'm not going to make a fuss
3    about it.
4    MR. SULTZER: We can give it to you if you
5    want.
6    MR. LIPARI: Under an attorney's eyes only
7    provision, that's fine.
8    MR. O'TOOLE: Everything I cared about, he
9    answered. I just wanted to know. We are not going to
10   be talking about Life Alert.
11   **Q. The current business of LifeWatch, you're still**
12   **selling to seniors.**
13   A. Correct.
14   **Q. Through what channels?**
15   A. We rent devices to seniors and provide services
16   to seniors.
17   **Q. You rent a device from whom?**
18   A. To -- the medical alert industry provides the
19   devices at no cost, and the clients pay a monthly
20   monitoring fee, so it's not selling.
21   **Q. You were talking about how you got the device.**
22   **You own a device, buy it, you have it manufactured,**
23   **whatever, and then you're renting it to seniors, and**
24   **how are you getting it, how are the seniors buying it,**
25   **from what method of marketing?**

---

12

1    MR. LIPARI: I'm going to object to the form,
2    mischaracterizes testimony. You can answer.
3    A. Repeat the question.
4    **Q. How are you marketing it to senior citizen?**
5    A. For the rest of the day is "you" Evan or "you"
6    is LifeWatch?
7    **Q. LifeWatch.**
8    A. Most of the day is LifeWatch.
9    **Q. Some of it you'll understand is obviously just**
10   **about you when I asked what you did.**
11   MR. SULTZER: If you don't understand that --
12   MR. LIPARI: Tell him and he'll rephrase it.
13   **Q. I'm not trying to trick you. I'll make an**
14   **effort to distinguish between LifeWatch and you. How**
15   **does LifeWatch market to seniors now?**
16   A. We do TV, radio, internet, and we buy sales
17   from outside sellers.
18   **Q. If you do TV, and a person sees an ad on TV and**
19   **wants to rent the device and the service, who do they**
20   **call?**
21   A. They call LifeWatch.
22   **Q. Directly?**
23   A. Yes.
24   **Q. There's no call center in the middle.**
25   A. No.

---

3 (Pages 9 to 12)

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

13

1      Q. Do they do radio ads the same way?
2      A. Yes.
3      Q. Internet is not exactly but directly to
4   LifeWatch?
5      A. Yes or forms.
6      Q. Or?
7      A. Internet online forms.
8      Q. But it goes directly to LifeWatch. It's a
9   different marketing company.
10      A. Correct, correct.
11      Q. Then there's some that you buy from call
12   centers, the way this case is really all about. Is
13   that what you're saying?
14      A. I don't understand the question.
15      Q. You said the fourth way that you get contracts
16   from seniors now is from outside sellers, right?
17      A. Not necessarily the fourth way. Another way.
18   There are many more than four ways. There's a lot of
19   ways, and there are outside sellers that we buy from.
20      Q. That's all taking place in Lynbrook.
21      MR. LIPARI: Objection to form.
22      A. What's taking place?
23      Q. Those contracts that LifeWatch is purchasing,
24   people that are signing up with LifeWatch through these
25   other means.

---

14

1      A. I don't understand what "all" means.
2      Q. I'm trying to figure out what actual business
3   activities take place in the Lynbrook office compared
4   to the Cromwell office, so why don't you give me the
5   physical like when a person calls in I saw your TV ad,
6   I want to rent a device from LifeWatch, where does that
7   call come?
8      A. Can we ask what time frame we're talking about?
9      Q. Right now.
10      A. It's going to Connecticut.
11      Q. And the same thing is true for people that call
12   in from radio.
13      A. Correct.
14      Q. And the outside sellers that are selling
15   contracts, where are they communicating with LifeWatch?
16      A. In Connecticut or through me.
17      Q. Do you spend your time in Connecticut or in
18   Lynbrook or both?
19      A. Both.
20      Q. Mostly in Lynbrook?
21      A. Yes.
22      Q. Are you familiar with a company called
23   Harmonious Enterprises?
24      A. Yes.
25      Q. That's also known as MedWatch.

---

15

1      A. I don't know.
2      Q. Do they operate out of one of those two
3   facilities?
4      A. No.
5      Q. They are not actually physically located --
6      A. No.
7      Q. -- in Lynbrook.
8      A. No.
9      Q. Do they give the Lynbrook address as their
10   address?
11      A. No.
12      Q. Do you know anything about the Harmonious
13   business?
14      A. No.
15      Q. You have no connection to it.
16      A. No, I have no connection to it.
17      MR. LIPARI: I was going to object. Don't pay
18   any attention.
19      Q. I guess I will show you a document.
20      MR. LIPARI: Dave, I want to be clear about
21   something. He had asked you previously what time frame
22   are you talking about. You said I'm interested in
23   what's happening right now, so with respect -- I want
24   to be clear with respect to the Harmonious questioning,
25   that line of questioning, have we established a time

---

16

1   frame. Are you talking about from the beginning of
2   time, right now?
3      MR. O'TOOLE: I think my last question is has
4   he ever had any. I'll make it clear.
5      MR. LIPARI: It wasn't clear to me.
6      Q. Have you ever had any connection to Harmonious?
7      A. Has LifeWatch?
8      Q. Have you personally ever have any connection to
9   Harmonious?
10      A. No.
11      Q. Has LifeWatch had any connection to Harmonious?
12      A. Connection, no.
13      MR. O'TOOLE: I still don't understand why the
14   time frame mattered.
15      A. What's the word "connection" mean?
16      Q. I'm sorry. You should have asked me that.
17   What business arrangements did Harmonious and LifeWatch
18   ever have?
19      A. We had bought some sales from them.
20      Q. So customers?
21      A. Correct.
22      Q. Go ahead.
23      A. And we bought some monitoring from them.
24      Q. Meaning the provision of monitoring.
25      A. Correct.

---

4 (Pages 13 to 16)

Sirlin

FTC v. LifeWatch Inc., et al.                                          7/25/2017

---

17

1  Q. Have you bought equipment from them too?
2  A. Yes.
3  Q. So when did that all -- what's the time frame?
4  A. I don't remember.
5  Q. Roughly when did it end?
6  A. I don't know.
7  Q. In the last year?
8  A. I don't know.
9  Q. Do you remember any time that it was happening?
10  A. Time frame, no.
11  Q. I'm going to show you, Mr. Sirlin, a document
12  that's a series of e-mails. Here you go.
13  (Sirlin Exhibit 1, E-mails, was marked for
14  identification.)
15  MR. O'TOOLE: Tom, I just sent it to you.
16  MR. VERTICCHIO: Thank you. Got it. Thank
17  you.
18  Q. We'll make that Sirlin Deposition Exhibit 1,
19  plaintiff's Sirlin 1. It's a two-sided document. We
20  should do this chronologically. Let's go to the back
21  first. This looks to be an e-mail from somebody named
22  Jody Rookstool. Do you know that person?
23  A. No.
24  Q. She's writing an e-mail to you and to Mitchel
25  May. Take a look. Can you read that to yourself at

---

18

1  least? Do you recall this e-mail or do you recall the
2  subject of the e-mail?
3  A. No.
4  MR. VERTICCHIO: David, I notice there's no
5  Bates numbering on this document.
6  MR. O'TOOLE: Yes. Most of the documents today
7  are going to be documents that LifeWatch produced to
8  us, and they weren't Bates labeled, so that's why we're
9  going to use the exhibit numbers now. At some point
10  we'll pull together all the documents from there that
11  we are going to use and we'll put Bates labels on them.
12  MR. VERTICCHIO: As of now you have not done
13  that.
14  MR. O'TOOLE: Right, we have not done that.
15  The LifeWatch production is something like 500,000
16  objects, so we are not Bates labeling the whole thing.
17  We'll Bates label some portion of it.
18  MR. LIPARI: Dave, you flipped me one -- off
19  the record.
20  (A discussion was held off the record.)
21  Q. Let's go to the next chronological part of the
22  document. It's an e-mail from you back to Jody. Could
23  you read that and tell me if that refreshes your
24  recollection or if you understand what's involved in
25  it?

---

19

1  A. I do not understand it and I do not recall it.
2  Q. Do you think you sent this e-mail?
3  A. If it's here, it's here. If it's
4  evan@lifewatchusa, it must have been an e-mail that I
5  was copied on or sent, but I send thousands of
6  thousands.
7  Q. Jody Rookstool according to her e-mail address
8  works for KMR Medical. Do you know that company?
9  A. No.
10  Q. Before we leave the physical locations that I
11  was asking you about, there seem to be a number of
12  other companies that you have, you incorporated, own or
13  something, that are located at the same address
14  according to the corporate records, the Lynbrook
15  address, so I'm going to ask you about some of those
16  companies, and maybe you can tell me what they do.
17  A. Okay.
18  MR. LIPARI: Object to form.
19  Q. LifeWatch Realty Corporation, does that company
20  still exist?
21  A. Yes.
22  Q. What does it do?
23  A. It pays rent.
24  Q. How does it get the money to pay rent?
25  A. I don't know exactly. I don't know exactly.

---

20

1  Q. Does it come from the LifeWatch business?
2  A. I don't know how it's done.
3  Q. LifeWatch Security, Inc.
4  A. Don't know what that's used for. That would be
5  a -- not to add, it should be yes or no, but LifeWatch
6  Security, Inc., could be a d/b/a of an internet domain
7  for the future purposes of doing home security. That's
8  the only thing I would know about that.
9  Q. Med Discount, Inc.
10  A. I don't know what it does.
11  Q. Pro Athletes World, Inc.
12  A. I remember that one.
13  Q. What does that company do?
14  A. It does nothing.
15  Q. Did it ever do anything?
16  A. No.
17  Q. Final Expense Enterprises, Inc.
18  A. Does nothing that I know of.
19  Q. Do you know if it ever did anything?
20  A. To my knowledge no.
21  Q. What was it supposed to?
22  A. The final expense industry goes hand in hand
23  with medical alert industry.
24  Q. This is like funerals.
25  A. Final expense insurance is a --

---

5 (Pages 17 to 20)

Sirlin

FTC v. LifeWatch Inc., et al.                                7/25/2017

---

21

1    Q.  I see.
2    A.  -- category that seniors tend to buy.
3    Q.  It's a product that might be --
4    A.  Useful to clients of LifeWatch.
5    Q.  Voice Flow Technologies.
6    A.  I recall the name.
7    Q.  But you don't remember what it did.
8    A.  No.
9    Q.  If it still exists?
10   A.  If it exists I don't know.  I don't know.
11   Q.  Type Two Technologies.  Sounds like a diabetes
12   thing.
13   A.  Sounds like a diabetics thing.
14   Q.  But you don't --
15   A.  I don't do diabetics.
16   Q.  Content Management Solutions, Inc.
17   A.  Don't know what it does or did.
18   Q.  Genealogical Labs, Inc.
19   A.  That has to do with genome testing, which is
20   another thing that goes hand in hand with senior
21   citizens to see if their medication is useful to them
22   or not useful to them, so it's lab testing.
23   Q.  Does that company still exist?
24   A.  No.
25   Q.  It did though.  Did it actually ever do

---

22

1    anything?
2    A.  I believe it did a little bit.
3    Q.  My recollection was that, I maybe wrong, but I
4    think at the preliminary injunction hearing you
5    mentioned something as genome testing as one of the
6    businesses you were getting involved in.
7    A.  In a very small, dabbling way.
8    Q.  Is that the company you were doing it?
9    A.  That seems to be one of them.  I don't know if
10   there's others.  It's the category that I remember,
11   which is still a great -- it's like 23andMe, like that
12   kind of stuff.  It's an incredible future thing.
13   Q.  I don't understand 23andMe.
14   A.  You don't want to.  I could go for an hour
15   about genome testing.
16   Q.  That's okay.  I think that's all.  On Guard
17   Alert, Inc.
18   A.  Don't know.  Sounds like a medical alert
19   company, don't know though.
20   Q.  It seems to have a QRA might be another name
21   that's used.
22   A.  QRA I recall.
23   Q.  What's that?
24   A.  Quick Response Alert.
25   Q.  Is that the same company?

---

23

1    A.  No, that I know of.
2    Q.  Does Quick Response Alert, Inc., still operate?
3    A.  I don't know.
4    Q.  What did it do?
5    A.  It was a medical alert company.
6    Q.  Meaning it sold medical alert devices.
7    A.  A competitor in the industry.
8    Q.  Did you --
9    A.  No.
10   Q.  So you didn't own --
11   A.  No.
12   Q.  -- quick Response Alert.
13       MR. SULTZER:  Let Dave finish the question
14   before you answer.
15   Q.  It's good for us, the way we talked in the
16   past.
17   A.  I'm trying.
18   Q.  Do you know who did or does own Quick Response
19   Alert?
20   A.  There is a gentleman from Jupiter, Florida, I
21   forgot his name, that owns or owned Quick Response
22   Alert.
23   Q.  Med Protection US, Inc.
24   A.  Don't know.
25   Q.  They seem to also go by the initials HEI, which

---

24

1    I thought was Harmonious Enterprises.  Are they the
2    same company?
3    A.  Are who the same company?
4    Q.  Is Med Protection US, Inc. --
5    A.  I don't know.
6    Q.  I want to ask you a little bit about the
7    medical alert industry and LifeWatch historically, so
8    we are not talking about right now.  In the document
9    production that we got from LifeWatch, there seemed to
10   be a lot of documents that were financial documents
11   being sent to potential buyers or investors of
12   LifeWatch, and it seems to me that basically since 2011
13   LifeWatch has been trying to sell itself almost all the
14   time; am I right about that?
15   A.  No.
16   Q.  Not anymore or what's wrong about it?  It
17   looked to me there were seven or eight distinct
18   attempts to sell LifeWatch.
19       MR. LIPARI:  What's the question?
20   A.  Are you trying to get me to talk for an hour
21   now?  Ask me a straight question.  I don't understand
22   the question.  I'm not being rude.  I don't understand
23   the question.
24   Q.  I'm asking for you to explain to me the efforts
25   you have taken over the last five or six years to sell

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

25

1    LifeWatch.
2        A. There is one clear effort of trying to raise
3    money in the 2011 period, which ultimately brought on
4    an equity investor.
5        Q. And that was David Roman.
6        A. Correct.
7            (Exhibit 2, E-mail and Executive Summary, was
8    marked for identification.)
9        MR. O'TOOLE: Exhibit 2. Tom, what I'm sending
10   you is not exactly Exhibit 2. There's an e-mail cover
11   that I don't have electronically, but I'm not going to
12   ask about that part of it any way.
13       MR. VERTICCHIO: Thank you.
14       Q. Mr. Sirlin, the first page of this is an e-mail
15   from -- it's the bottom is Mitchel May to you and you
16   forwarding this attachment to a Dr. Tammy Roz, R-O-Z.
17   Do you recall sending this?
18       A. I don't recall sending this.
19       Q. Do you know who Dr. Tammy Roz is?
20       A. Yes.
21       Q. Who is he or she?
22       A. My dentist.
23       Q. Why would you be sending this to her? Is it a
24   her?
25       A. It is a her. I would be sending it to get

---

26

1    overall interest.
2        Q. To see if she wants to buy or invest in
3    LifeWatch?
4        A. To see if she knew anybody that would be
5    interested as per the clearly what it says in the
6    e-mail.
7        Q. Okay. So you weren't necessarily trying to get
8    money from her.
9        A. No.
10       Q. But you thought she might know people.
11       A. Correct.
12       Q. And attached to this is the executive summary.
13   Do you recognize the executive summary?
14       A. I recognize it.
15       Q. Do you remember sending it to other people?
16       A. I don't remember sending it to other people.
17       Q. Do you remember when this was prepared?
18       A. No.
19       Q. Did you have any involvement in preparing it?
20       A. I don't remember.
21       Q. Do you know who worked on it?
22       A. Again, as the company grew, I would have people
23   that I would delegate things to such as Neil Seiden and
24   Mitchel May and other people that I don't recall right
25   now. I wouldn't know how to do something like this.

---

27

1        Q. I want to go through the executive summary with
2    you into some of the --
3        A. Sure.
4        Q. If you turn to page three, honestly, most of my
5    questions about this are going to be not so much if you
6    remember the details of what those things are, but I
7    want to find out what's true about this.
8            This page three, there's a couple of paragraphs
9    in the middle that talk about MRR, monthly recurring
10   revenue. I think that's also sometimes I see that as
11   RMR.
12       A. Yes.
13       Q. Can you explain what that concept is?
14       A. I can.
15       Q. Would you?
16       A. It's monthly recurring revenue.
17       Q. What does it mean in this industry?
18       A. It means monthly revenue that is recurring
19   monthly.
20       Q. Why would it be recurring monthly?
21       A. It's for services that are performed monthly.
22       Q. So in the context of LifeWatch, is monthly
23   recurring revenue or -- what does RMR stand for?
24       A. Recurring monthly revenue. You can say it any
25   way you want.

---

28

1        Q. Which way do you prefer?
2        A. RMR.
3        Q. RMR represents the people that have signed
4    medical alert contracts or are getting monthly services
5    from LifeWatch.
6        A. Yes.
7        Q. So the RMR would be the current customers, what
8    they're paying each month.
9        A. The RMR for the individual client is what the
10   individual client is paying month to month.
11       Q. And LifeWatch's RMR is the total of their
12   customers.
13       A. Yes.
14       Q. What they are paying each month, and my
15   understanding from this document and also from various
16   other documents is that when you're evaluating how much
17   LifeWatch as a company is worth, RMR is key; is that
18   right?
19       A. Yes.
20       Q. So the second full paragraph on this is talking
21   about it says, "The inevitable convergence with the
22   Health Care Industry." Read that paragraph.
23       A. Yes.
24       Q. You remember those events that it's talking
25   about, Philips purchasing lifeline?

---

7 (Pages 25 to 28)

Sirlin

FTC v. LifeWatch Inc., et al.                                                      7/25/2017

---

29

1    A. I remember those events. I don't know if the
2  numbers are correct.
3    Q. In the next paragraph talks about VRI
4  purchased.
5    A. Yes.
6    Q. Do you remember those events too?
7    A. I don't know who -- Blue Canyon, yes, and
8  Rockbridge, yes.
9    Q. The last paragraph seems to focus more on what
10 LifeWatch would be.
11   A. Is there a question?
12   Q. I want you to read it first so you remember
13 what it says.
14   A. I read it.
15   Q. There is a variety of possible numbers that
16 this discusses as how to possibly evaluate LifeWatch.
17   A. At that particular period.
18   Q. Right. What I want to know is at that
19 particular period, this is 2013, I'll tell you I have
20 seen versions of this document that were sent out in
21 2011, 2012. Are those numbers what you think were
22 reasonable approximations back then?
23   A. 2011 and '12, those are definitely what was
24 happening in the industry.
25   Q. So 2011 and '12, the right number for LifeWatch

---

30

1  would be what?
2    MR. SULTZER: Which document?
3    A. Are you asking an open-ended question? Be more
4  specific please.
5    Q. This document says that security performance
6  thinks 35 to 40 MRR was appropriate then, and then it
7  ends by saying that LifeWatch anticipates it's going to
8  increase the MRR, so maybe 40 to 50 would be the
9  appropriate MRR at some time in the future.
10   What I'm asking about in 2011/12 -- I'm not
11 trying to get an accounting here from you. I'm not
12 going to go back in time and buy LifeWatch. I just
13 want to know what was the expected value then.
14   MR. LIPARI: Object to form. Lacks foundation
15 and calls for speculation. You can answer.
16   A. You're not asking the right question. I don't
17 want to -- why don't you ask me -- how about Evan
18 Sirlin for the industry?
19   MR. SULTZER: Let him rephrase the question.
20 You're asking about -- the MMR isn't the value of the
21 company. I think he is getting confused.
22   Q. I want to know in 2011/12 if you were trying to
23 get somebody to invest in LifeWatch or buy LifeWatch,
24 the MRRs is the key statistic you are going to suggest
25 to them.

---

31

1    A. In the medical alert industry, MRR is typically
2  looked at and EBIDA is looked at.
3    Q. MRR is what I'm asking about here. What would
4  have been the correct MRR at that time?
5    A. MRR, the higher MRR goes, the higher the
6  multiple goes, period.
7    Q. If you have more, if the recurring revenue is
8  higher, then the multiplier is higher.
9    A. It's one factor that companies would take into
10 place in considering the valuation of a company, one
11 factor.
12   Q. If the monthly recurring revenue is a million
13 dollars, the MRR might be 40, the multiplier might be
14 40 months, but if it's $2 million, the multiplier would
15 be higher.
16   A. Might be higher based on a lot of other
17 factors, but that is one factor.
18   Q. Why would it be higher because of the higher
19 MRR?
20   A. It would be higher based on many multiple
21 factors including MRR because that's how the
22 industry -- I don't know. As a financial person, I
23 don't know, but the industry is valued that way.
24 Philips Lifeline as you headed here is valued a lot
25 more money because it's higher RMR.

---

32

1    Q. So when this talks about that Security -- who
2  is Security Performance Partners?
3    A. I don't remember. It says a mergers and
4  acquisition firm.
5    Q. Was that somebody that LifeWatch did business
6  with?
7    MR. LIPARI: Objection to form.
8    A. I don't remember.
9    Q. It says here "The SPP has advised LifeWatch the
10 purchase price for companies in the industry."
11   A. I did not write this.
12   Q. But you don't recall that being true.
13   A. I wouldn't know. Whoever wrote this would know
14 that.
15   Q. In any event SPP says that they think LifeWatch
16 would be valued at a multiple between 35 to 40. I'm
17 asking you of what you know about the industry in 2011
18 and '12, is that a reasonable number.
19   A. No. That would be an overvaluation.
20   Q. What did you think a better number would be?
21   A. I don't know. We would have to look at all the
22 financials and what was going on at the time.
23   Q. Why do you think it's high?
24   A. Actually I'm basing my answer on today.
25 Everything you are talking about, the industry is

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sirlin

FTC v. LifeWatch Inc., et al.                                                          7/25/2017



33

1  totally different.
2       Q. I guess that's really where I wanted to go
3  anyway. How is the industry different now?
4       A. Clients are not as valuable as they used to be
5  because of certain agencies in the country.
6       Q. You're smirking. You're looking at me. You're
7  saying like the FTC.
8       A. This is a deposition. I'm not looking at you.
9  I'm talking to the reporter.
10      Q. I'm just asking you --
11      A. This is not me and you, right? This is for the
12  world to see. I'm not smirking.
13      MR. SULTZER: Just answer the question.
14      A. No, I'm not smirking.
15      Q. Clients are less valuable because of certain
16  agencies in the government. What agencies are you
17  talking about?
18      A. The FTC.
19      Q. Because of the fact the FTC has brought cases
20  like this?
21      A. It has increased cost of companies in the
22  industry to make sure that they are doing the right
23  thing.
24      Q. So the value of the companies has gone down.
25      A. Correct, more expenses, increased expenses in

34

1  my opinion. Put that on the record, in my opinion. I
2  don't know that.
3       Q. Let's go to the next page, page four. There's
4  a heading called "The Company," and the second
5  paragraph there seems to be the beginning of the
6  history of the company since you took it over in 2007.
7  Can you read that paragraph?
8       A. Yes.
9       Q. Middle of the paragraph, there's a sentence
10  that starts with "LifeWatch's increase in revenue." Do
11  you see that sentence?
12      A. "LifeWatch increase in revenue and customers."
13      Q. Yes. It says, "LifeWatch's increase in revenue
14  and customers is directly related to the increase in
15  advertising expenditures." Was that true?
16      A. It's a significant part of the industry.
17      Q. I didn't see this before, but on the bottom of
18  the document it says it's an executive summary from
19  February 2012 but updated in October 2012, so was that
20  true in 2012? Did you think that was true?
21      A. Since my father died, I continued to spend more
22  money on marketing and advertising and relationships
23  and institutional sales.
24      Q. Right. Go to the next page. There's a big
25  chart, page five, and then the bottom there's a

35

1  paragraph that starts with "During the past two years."
2  It's a fairly long paragraph. Why don't you go ahead
3  and read that to yourself?
4       A. Yes.
5       Q. At the top of page six, it says, "In July
6  2011." That sentence, is that true? In July 2011 did
7  LifeWatch start to use outbound call centers?
8       A. In July 2011 the company started to test call
9  centers.
10      Q. I'm asking.
11      A. I would say the word "outbound" is false, but
12  call centers, yes.
13      Q. The next sentence says it proved to be
14  successful. I'm sure you don't remember exact numbers,
15  but do you think generally that's true, that next
16  sentence?
17      A. Yes.
18      Q. The next sentence, "Outbound call centers have
19  become the company's most successful channel of
20  acquiring new customers. LifeWatch currently dominates
21  this channel in the PERS industry." Are those two
22  sentences true?
23      A. I didn't write those sentences.
24      Q. I'm asking if they're true.
25      A. No, I don't think they are true.

36

1       Q. What's not true about it?
2       A. I think it's just more research and data would
3  need to go in to make that statement.
4       Q. But you don't remember who drafted this
5  document.
6       A. The only person I could think of is Neil
7  Seiden.
8       Q. Did Neil not do any research before he drafted
9  this?
10      MR. LIPARI: Objection. Calls for speculation.
11      A. I don't know.
12      Q. Do you recall Neil asking you for input on
13  anything from this document?
14      A. From me directly, I don't remember that.
15      Q. Do you remember editing this document?
16      A. No.
17      Q. The outbound call centers are the most
18  successful channel. You don't think that's true then.
19      A. I don't understand the question.
20      Q. I'm asking that sentence -- I asked you
21  originally about two sentences, and you said they
22  weren't true.
23      A. Based on the way that sentence is phrased, no.
24      Q. So outbound call centers had not become the
25  most successful channel for LifeWatch then.

9 (Pages 33 to 36)

FTC v. LifeWatch Inc., et al.                                      7/25/2017

---

37

1     A. No.
2         Q. And LifeWatch didn't currently dominate the
3     outbound call center channel at that time in the
4     industry.
5         A. I don't know.
6         Q. The last sentence of that paragraph has
7     "Outbound call centers are very successful and
8     efficient. LifeWatch hopes to increase expenditures
9     with this channel from the proceeds from additional
10    financing." Was that true?
11        A. No.
12        Q. That was not true, LifeWatch didn't plan to or
13    didn't do it.
14        A. No.
15        Q. Which, didn't plan to?
16        A. Repeat the question.
17        Q. LifeWatch did not plan or did not hope to
18    increase expenditures from this method of marketing.
19        A. No.
20        Q. Did LifeWatch increase their expenditures from
21    that kind of marketing?
22        A. No.
23        Q. Turn to page eight. It's a little bit harder.
24    In black and white there's a chart. If you look on the
25    legend on the chart, the top symbol is for outbound

---

38

1     call centers that will show up as the darkest part of
2     your chart. It looks to me there's no outbound call
3     center advertising expenditures until July 2011. Does
4     that look right?
5         A. Yes.
6         Q. By November 2011 it's substantially more than
7     half of LifeWatch's advertising. Are those two things
8     true?
9         A. Can we get a definition of "expenditures"?
10        MR. LIPARI: Go ahead. Ask him.
11        A. The question doesn't make sense.
12        Q. What's unclear? I don't know what's unclear
13    about "expenditures." Spend money. You spend money on
14    advertising, right? Is that what LifeWatch did, spend
15    money on advertising?
16        A. No.
17        Q. They didn't.
18        A. No.
19        Q. Did LifeWatch pay for advertising?
20        A. Yes.
21        Q. Does LifeWatch currently pay for advertising?
22        A. Yes.
23        Q. What types of advertising does LifeWatch pay
24    for?
25        A. TV, radio, print, internet and call center

---

39

1     types of marketing, not what you're talking about call
2     center. Your question doesn't make sense in relation
3     to call centers.
4         Q. I'm looking at it the chart. The chart says
5     "outbound call centers."
6         A. I didn't write this. It's incorrect. We did
7     not spend money on outbound call centers.
8         Q. The contracts that you buy from outside call
9     centers, that you didn't spend money. More than half
10    your expenditures were on that.
11        A. I don't know if more than half our expenditures
12    were on that, but we did buy sales from call centers
13    that get their sales from many different ways.
14        Q. And you consider those -- the money you pay, do
15    you consider that advertising?
16        A. I don't.
17        Q. This chart seems to.
18        A. I didn't write this chart. The chart is wrong.
19        Q. I'm trying to understand the disconnect here.
20    The problem from your perspective is you don't think of
21    that as advertising.
22        A. No.
23        Q. That's fine. Go to the next page. There's --
24    we'll go through this quickly. There's a title
25    "Management Team." They list you and Sarai Baker, and

---

40

1     the page after that on page ten, Les Steinmetz, and I
2     know we talked about Les Steinmetz, but Les Steinmetz
3     was part of the management team then.
4         A. He was a consultant, yes.
5         Q. Describes him as a senior marketing consultant.
6         A. Yes.
7         Q. That was correct.
8         A. Yes.
9         Q. Neil Seiden is the next one mentioned.
10        A. Yes.
11        Q. Part-time CFO. That's what it says. Is that
12    what he was?
13        A. He was a part-time financial consultant for me
14    and the company.
15        Q. On page 12 there's an organization chart. I
16    see the same people. That organization chart is
17    correct for that time period. This is October of 2012.
18        A. Yes.
19        Q. Go to page 20, the last paragraph. Read that.
20        A. Yes.
21        Q. In the middle of the paragraph, I guess maybe
22    the second sentence it says, "The company's goal is to
23    maximize customer acquisition." This outflow situation
24    becomes greatly compounded as LifeWatch continues to
25    aggressively add new customers." Do you understand

---

10 (Pages 37 to 40)

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

41

1   what that sentence is talking about?
2       A. No.
3       Q. During this time period, so we're talking
4   either February or October, I'm not sure, of 2012, were
5   you trying to maximize monthly recurring revenue at
6   LifeWatch?
7       A. LifeWatch always tries to help senior citizens,
8   and by doing that we tend to continue to grow.
9       Q. Let's turn to the last page, which is the back.
10  It's titled an "Addendum as of October 2012." Do you
11  recall being involved in drafting or editing this?
12      A. I don't recall this, no.
13      Q. The first paragraph says that "The effort by
14  the outbound call centers discussed on page six above
15  have proved to be very successful," and they list some
16  numbers. Was that true? Not the actual numbers. You
17  wouldn't remember that.
18      A. What's true? That statement is not true.
19      Q. The efforts by the outbound call centers that
20  we talked about before had not proved to be very
21  successful by October 2012.
22      A. What's your definition of "successful"?
23      Q. You said it isn't true. What's your definition
24  of "successful"?
25      A. I don't have one right now.

---

42

1       Q. Did the efforts from page six of the document
2   talking about using outbound call centers, did it
3   increase LifeWatch sales by October 2012?
4       A. We don't use outbound call centers. That is
5   incorrect.
6       Q. We are going to talk about WorldWide, the
7   WorldWide telemarketing companies in a minute, but
8   before we do that, WorldWide wasn't the first
9   telemarketing company that LifeWatch hired; is it?
10      MR. LIPARI: Objection to form.
11      A. I don't believe WorldWide is a telemarketing
12  company.
13      Q. WorldWide doesn't exist at all. It's been
14  defunct.
15      A. We were talking about this is 2011, 2012, 2013
16  did WorldWide exist. I don't understand the question.
17      Q. I'm not talking about this document anymore.
18      A. But you're talking about WorldWide.
19      Q. I'm talking about WorldWide. LifeWatch began
20  its business relationship with WorldWide in I think
21  maybe April 2012. Does that sound about right to you?
22      A. I don't remember.
23      Q. Does that sound about right to you?
24      A. I don't remember.
25      Q. You don't remember at all.

---

43

1       A. The time period, no.
2       Q. You don't have a rough idea of when the time
3   period was?
4       A. 2011, '12 or '13.
5       Q. WorldWide was not the first call center that
6   LifeWatch worked with though; is it?
7       A. I don't believe so.
8       Q. I think maybe TMI may have been the first.
9   Does that sound familiar to you?
10      A. That sounds familiar yes.
11      Q. TMI, do you know who owns or manages TMI; is
12  that David Reilly?
13      A. To my knowledge at that time, yes.
14      Q. Then sometime after working with TMI, I think
15  LifeWatch began to work with someone named Mike Flyer,
16  F-L-Y-E-R. Does that name sound familiar to you?
17      A. Yes.
18      Q. Can you tell me who he is?
19      A. From my recollection is that he was someone
20  that Les Steinmetz brought on to bring Les deals to
21  sell to LifeWatch. He was a friend of Les Steinmetz.
22      Q. Do you know was Mike Flyer, did he actually own
23  call centers or operate them, or was he a broker?
24      A. I don't know.
25      Q. Do you know how he was represented to you?

---

44

1       A. I don't remember.
2       Q. It seemed like there were a number of different
3   companies that worked with LifeWatch that came through
4   Mike Flyer, like Trusted Lead Source. Does that sound
5   familiar to you?
6       A. No, anything that came through Mike Flyer
7   would be coming from Les Steinmetz.
8       Q. Okay. But -- okay. Another telemarketing
9   company that LifeWatch may have worked with involved --
10      MR. O'TOOLE: Is it Mike Ramos?
11      MS. GORDON: Yes.
12      Q. Mike Ramos, do you know that name?
13      A. Yes.
14      Q. Do you know what his company is or was?
15      A. I don't think we ever dealt with any company of
16  his.
17      Q. I'll give you another document then.
18      (Exhibit 3, E-mails, was marked for
19  identification.)
20      Q. Mr. Sirlin, did you look at this document?
21      A. Yes.
22      Q. The first part of it chronologically seems to
23  be an e-mail from Paula Johnson. Who is Paula Johnson?
24      A. An ex-employee of LifeWatch.
25      Q. She sent something to Mitch May and then CC'd

---

11 (Pages 41 to 44)

Sirlin

FTC v. LifeWatch Inc., et al.                                                    7/25/2017

---

45

1   you about a threat to sue, a TCPA case. Do you recall
2   the case that's the subject here?
3       A. No.
4       Q. LifeWatch has been sued at least several times
5   for TCPA, right?
6       A. During what time period?
7       Q. Ever.
8       A. Yes.
9       Q. This document comes from September 6, 2013.
10      A. Yes.
11      Q. You don't remember the exact time though. You
12  don't remember this exact lawsuit.
13      A. No.
14      Q. Your response to Mitch on the e-mail is "Live
15  agent Ramos??? Impossible to be him -- LOL." Do you
16  remember what you meant by this?
17      A. I'm laughing but the answer is no.
18      Q. You were laughing.
19      A. I'm not laughing. This is not between me and
20  you. The answer is no.
21      Q. You don't remember what you meant by this.
22      A. No.
23      Q. WorldWide, and just to be clear, the same issue
24  came up during our preliminary injunction here. When
25  I'm talking about WorldWide, I don't mean just the

---

46

1   company WorldWide Information Services. You know there
2   are a bunch of other companies?
3       A. No, I don't know that.
4       Q. When I talk about WorldWide now, I'm going to
5   be talking about Elite Information Solutions, who I
6   don't think you ever dealt with, Absolute Solutions
7   Group, which again I don't think you did. I think
8   these were companies that worked internally for
9   WorldWide.
10          Global Interactive Technologies, which
11  LifeWatch I believe did work with, The Credit Voice,
12  which LifeWatch worked with, Wide Agent Response, which
13  LifeWatch worked with, American Innovative Concepts,
14  LifeWatch worked with, National Life Network and US
15  Affiliates, both of whom LifeWatch worked with, and I
16  think also Global Service Providers, but I don't think
17  that's a company that ever interfaced with LifeWatch,
18  so when I'm talking about WorldWide, I'm talking about
19  all those companies.
20          MR. LIPARI: I'm just going to object.
21          MR. SULTZER: That's too confusing.
22          MR. LIPARI: Yes.
23      A. My question is okay if you say so.
24          MR. LIPARI: I'm not suggesting this is being
25  done in bad faith, but you are suggesting a

---

47

1   relationship with LifeWatch that he may disagree or may
2   not know, so he's sort of taking your word for it.
3       THE WITNESS: Correct.
4       Q. Did LifeWatch have a business relationship with
5   WorldWide, the first company WorldWide?
6       A. Yes.
7       Q. Do you remember when that started?
8       A. No.
9       Q. What was that business relationship?
10      A. To be sales.
11      Q. Who at WorldWide did you personally, Evan
12  Sirlin, deal with?
13          MR. SULTZER: Are you referring to all the
14  listed companies?
15          MR. O'TOOLE: Right now just WorldWide, just
16  the company WorldWide.
17      A. I believe it was that Rick gentleman.
18      Q. You mean Rick -- I think you knew him as Rick
19  Sylvers.
20      A. Back that day. I still don't know. I don't
21  know if any of us know.
22      Q. But that was the name you knew.
23      A. The name I knew was Rick Sylvers something.
24      Q. I've seen it without a V.
25      A. I don't know.

---

48

1       Q. What did you think it was?
2       A. I don't know.
3       Q. He was the --
4       A. Les Steinmetz handled WorldWide.
5       Q. You personally. Who did you personally deal
6   with at WorldWide?
7       A. I don't remember, and there would be no real
8   reason for me to deal with them. I delegated to Les
9   Steinmetz. He brought it in to me.
10      Q. I thought you said Rick was the person you
11  dealt with before.
12      A. Thank you for correcting myself. If I did ever
13  speak with someone there, it might have been a Rick.
14  It might have been.
15      Q. But you don't recall speaking with anybody --
16      A. I don't recall.
17      Q. What about these other companies that you
18  mentioned?
19      A. I don't recall any of them.
20      Q. And you don't recall speaking with Rick about
21  them.
22      A. No.
23      Q. Let's talk about Rick then. We know Rick as
24  Roderic Boling. Are you aware that we obtained a
25  declaration from Roderic Boling?

---

12 (Pages 45 to 48)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

49

1     A. No.
2     **Q. You haven't seen the declaration.**
3     A. No.
4         MR. LIPARI: Just so the record is clear, the
5     question is do you know Rick Sylvers to be Roderic
6     Boling.
7         MR. O'TOOLE: I didn't ask that.
8         THE WITNESS: He didn't ask --
9         MR. LIPARI: That's what you're saying, Rick
10    Sylvers and Roderic Boling are one and the same.
11        MR. O'TOOLE: I think that is true, but I
12    didn't say that yet. I was going to ask.
13        MR. LIPARI: That's fine.
14    **Q. Do you know that Rick Sylvers is Roderic**
15    **Boling?**
16    A. I don't know that.
17    **Q. Do you know that's true?**
18    A. I don't know that and I haven't read any
19    declarations.
20    **Q. You haven't read a declaration from him.**
21    A. No.
22    **Q. Or from Rick Sylvers?**
23    A. From any Rick.
24    **Q. Do you know of the declaration?**
25    A. No. Do my attorneys know?

---

50

1         MR. SULTZER: Let him ask the question. If he
2     wants to show you something --
3         MR. O'TOOLE: I'm not going to show you the
4     declaration. I just wanted to know if you have seen
5     it, because then I'll show it to you, but if you
6     haven't seen it, I'm not going to show it to you. I'll
7     just ask you about the things he said.
8     **Q. Roderic Boling says that he went by the name**
9     **Rick Sylvers, and he says that when he worked at**
10    **WorldWide, which was 2012 and 2013, that he had nearly**
11    **daily contact with you and with Mitch May. Is that not**
12    **true?**
13    A. Maybe for a week or two, so the answer is no.
14    **Q. Did you ever meet Rick Sylvers in person?**
15    A. Yes.
16    **Q. How many times?**
17    A. At least once. I don't remember more than
18    once.
19    **Q. Where were you when you met Rick?**
20    A. In Florida and there was a second time in New
21    York.
22    **Q. What was the second time?**
23    A. I don't remember.
24    **Q. Why did you meet him in New York?**
25    A. He wanted to see our operations.

---

51

1     **Q. Did he see your operations?**
2     A. Yes.
3     **Q. When you met him in Florida, where did you meet**
4     **him in Florida?**
5     A. I don't remember exactly where.
6     **Q. Do you remember when?**
7     A. I don't remember when. I remember we had
8     dinner.
9     **Q. Did you visit WorldWide?**
10    A. What time frame?
11    **Q. With him at that meeting.**
12    A. At what time frame? Can we establish a time
13    frame?
14    **Q. I don't know. I'm asking you. You recall**
15    **having dinner with Rick Sylvers in Florida, and I'm**
16    **asking when you met him for dinner at that time did you**
17    **see the call center.**
18    A. I did see the call center, not alone.
19    **Q. Who was with you?**
20    A. Other people.
21    **Q. What other people were with you?**
22    A. I don't remember right now.
23    **Q. Rick Sylvers was with you.**
24    A. Yes.
25    **Q. Was Mitch May --**

---

52

1     A. Other LifeWatch people.
2     **Q. Was Mitch May with you?**
3     A. Yes.
4     **Q. Was Dave Roman with you?**
5     A. Yes.
6     **Q. When you saw the call center?**
7     A. Yes.
8     **Q. When you saw Rick Sylvers in New York, was any**
9     **other LifeWatch person with you?**
10    A. I believe Mitchel May was there. I don't
11    remember.
12    **Q. Did you just see him at LifeWatch or have**
13    **dinner with him on that trip too?**
14    A. I don't remember.
15    **Q. Is that the only time -- those two times, are**
16    **those the only times that you met Rick Sylvers?**
17    A. That I remember.
18    **Q. Did you ever -- let's go on. Rick Sylvers says**
19    **that originally customer service, LifeWatch customer**
20    **service was actually taking place at LifeWatch, but**
21    **because there were problems with that, it wasn't**
22    **efficient, that LifeWatch paid WorldWide to handle**
23    **customer service. Do you recall that?**
24    A. No.
25    **Q. Is it not true?**

---

13 (Pages 49 to 52)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sirlin

FTC v. LifeWatch Inc., et al.                                          7/25/2017

---

53

1    A. No, it's not true.
2    Q. He says that --
3    A. That's not true.
4    Q. Rick Sylvers says that LifeWatch paid WorldWide
5    to purchase a predictive dialer or predictive dialers;
6    is that true?
7    A. No.
8    Q. He also said that you and Mitch May asked him
9    to invoice LifeWatch but to change the description of
10   the invoice so that Dave Roman wouldn't know what it
11   was for. Is that not true?
12   A. Not true.
13   Q. He said that LifeWatch gave WorldWide about
14   $200,000 for the predictive dialers; is that not true?
15   A. That's not true.
16   Q. He also says that LifeWatch regularly overpaid
17   WorldWide and that he returned cash to you and to Mitch
18   May; is that true?
19   A. It's not true.
20   Q. He says that someone at WorldWide paid you and
21   Mitch May somewhere between 900,000 and 1.2 million
22   dollars. That's not true.
23   A. That's not true.
24   Q. Did Rick Sylvers or Danny Johnson or Mark
25   Harmon or Matt Egan ever pay you or Mitch May any cash

---

54

1    from WorldWide?
2    A. From what?
3    Q. Sorry. Did Rick Sylvers or Danny Johnson -- do
4    you know Danny Johnson by the way?
5    A. No.
6    Q. You don't know the name Danny Johnson.
7    A. No.
8    Q. You never met Danny Johnson.
9    A. No.
10   Q. You know Matt Egan.
11   A. Yes.
12   Q. Matt Egan was also involved with the WorldWide
13   bids, correct? He was in the chain somewhere with Les.
14   A. Somewhere with Les, yes. I don't know about
15   WorldWide, but with Les.
16   Q. You don't know if he was involved with
17   WorldWide at all.
18   A. Correct.
19   Q. Mark Harmon, did you know Mark Harmon?
20   A. No.
21   Q. So what I'm asking is did Rick Sylvers or Danny
22   Johnson or Mark Harmon or Matt Egan ever give you and
23   Mitch May any cash that came from the WorldWide
24   companies.
25   MR. LIPARI: Objection to form.

---

55

1    A. From the WorldWide companies -- say that again.
2    Q. I don't know if I can.
3    MR. LIPARI: Maybe there's some confusion
4    because you're asking him questions about individuals
5    he said he doesn't know.
6    A. WorldWide never gave me any cash.
7    Q. And the question is did
8    Mr. Harmon, who he doesn't know, give him any money
9    associated with WorldWide.
10   MR. O'TOOLE: That would be easy.
11   Q. Then none of those people, nobody from
12   WorldWide ever gave you and Mitch May any cash.
13   A. No.
14   Q. Mr. Silvers also says that you and Mitch May
15   would fly to Florida to collect the cash. That's not
16   true.
17   MR. SULTZER: Are you talking about Sylvers or
18   Roderic Boling?
19   MR. O'TOOLE: I'm saying it's the same person.
20   A. If it's the same person, no.
21   MR. SULTZER: What's his name? Is he going to
22   swear under oath his name is Roderic Boling?
23   MR. O'TOOLE: His name is Roderic Boling.
24   Q. What I asked was you and Mitch May never flew
25   to Florida to get money from either Rick Sylvers or

---

56

1    Roderic Boling if they are the same person.
2    A. No.
3    Q. He says that he flew you back to New York at
4    least on one occasion on his private plane. Do you
5    recall that?
6    A. I do recall that, but that's a misstatement. I
7    recall taking a private plane with him that he was
8    taking up to New York for other purposes to go see
9    other call centers and marketers that he deals with
10   anyway, and he said why don't you guys come with me,
11   I'm going there anyway to stop at I think it was
12   Virginia Beach, another center in Virginia Beach that
13   he did business with as WorldWide, so it was not
14   exclusive.
15   Q. Explain to me the trip. You were in Florida.
16   A. Yes.
17   Q. You and Mitch May were in Florida.
18   A. Yes.
19   Q. Visiting him?
20   A. No. I go to Florida a lot.
21   Q. You saw him while you were in Florida.
22   A. I took -- the answer is I took a plane with him
23   that he invited us on because he had it booked anyway
24   to go someplace.
25   Q. When I first started asking about Rick Sylvers

---

14 (Pages 53 to 56)

Sirlin

FTC v. LifeWatch Inc., et al.                                                    7/25/2017

---

57

1   and Roderic Boling, first you told me that the person
2   at WorldWide you dealt with was Rick, and then you said
3   if you dealt with anybody it would have been Rick, but
4   you don't recall ever working with Rick.
5        A. That's not what I said, and that's not the
6   question you asked.
7        Q. You do recall being on a plane with Rick.
8        A. I do recall being on a plane with Rick.
9        Q. How did that get arranged?
10       A. Rick invited us because we were going back to
11  New York, and he said I'm going back to New York.
12       Q. How did Rick know you were in Florida?
13       A. Maybe someone told him.
14       Q. Did he call you?
15       A. I don't remember.
16       Q. So you took a plane from Florida to Virginia
17  Beach.
18       A. Correct.
19       Q. That's all or did it keep going?
20       A. And to New York.
21       Q. Was Rick with you on both parts of that trip?
22       A. No.
23       Q. What part was he on?
24       A. Virginia Beach.
25       Q. And then you flew the rest of them.

---

58

1        A. I was in a plane that was flying with other
2   people, yes.
3        Q. You and Mitch May?
4        A. And other people.
5        Q. Who else?
6        A. I don't know. Your question it was not a plane
7   he owned. He rented a plane.
8        Q. He arranged this.
9        A. Yes, that's what he said.
10       Q. You didn't pay for it.
11       A. No.
12       Q. You didn't pay him back for it.
13       A. No, not that I know of. It's possible I did or
14  Mitch might have. I don't know.
15       Q. But you don't recall.
16       A. I don't recall.
17       Q. He also, Roderic Boling, says that in the
18  middle of 2013 that WorldWide and LifeWatch began to
19  negotiate where LifeWatch was going to purchase
20  WorldWide; do you recall that?
21       A. What date?
22       Q. He says in the middle of 2013.
23       A. I would not be involved in that.
24       Q. Why would you not be involved in that?
25       A. Dave ran the business after he took it over.

---

59

1        Q. Prior to the middle of 2013, did LifeWatch and
2   WorldWide engage in negotiations for LifeWatch to
3   purchase WorldWide?
4        A. No.
5        Q. Are you aware that Dave -- Dave Roman we're
6   talking about. Are you aware if Dave Roman engaged in
7   negotiations for LifeWatch to purchase WorldWide?
8        A. No, I'm not aware of that.
9        Q. Let me finish.
10       A. I'm just making it quicker.
11           MR. LIPARI: It doesn't make it quicker. We
12  want a clear record.
13           MR. SULTZER: It actually makes it slower.
14       Q. You met me before. You know I talk faster
15  usually. I'm doing the fastest I can right now.
16           So you're not aware at any time LifeWatch
17  negotiating with WorldWide to purchase WorldWide.
18       A. Correct.
19           MR. SULTZER: Let's take a break.
20       (A recess was taken.)
21       Q. We're back on the record. Before we leave the
22  Roderic Boling/Rick Sylvers subject, I think I asked
23  you but I'll ask again were you aware we obtained a
24  declaration from him.
25       A. I don't recall being told that.

---

60

1        Q. Did you know about it before I brought it up
2   today?
3        A. My brain says no. Can I refer to my lawyers on
4   that one?
5            MR. SULTZER: Just let him ask you the
6   question.
7        A. My brain says no. I don't remember that.
8        Q. I'm not asking if they got it.
9        A. I do not remember it.
10       Q. Do you remember anybody else at WorldWide that
11  you ever had any contact with?
12       A. No.
13       Q. I noticed -- sorry. I noticed in the e-mails
14  that LifeWatch produced to us in the case, and there's
15  400,000 or something, so a lot of what we've done is
16  trying to figure out who people are. There's a person
17  who seemed to correspond with you a lot who was in
18  Florida named Alex Davidson. I think it's a she. Did
19  she work with WorldWide?
20       A. Don't know who she is.
21       Q. You don't know the name Alex Davidson.
22       A. No.
23       Q. It's the only name I didn't recognize. That's
24  why I asked.
25       A. I don't. Or he. It could be a he.

---

15 (Pages 57 to 60)

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

61

1    Q. I don't remember. I'm not going to show you
2 any e-mails.
3       When LifeWatch was working with WorldWide, did
4 LifeWatch ask WorldWide to work exclusively with
5 LifeWatch in the medical alert industry or the PERS
6 industry?
7    A. No.
8    Q. LifeWatch did not ask them.
9    A. LifeWatch did not ask that.
10   Q. Did WorldWide ever offer or promise to work
11 exclusively?
12   A. The only thing I recall is maybe Neil Seiden
13 thought that was a good thing for the bank.
14   Q. Can you explain that to me?
15   A. No.
16   Q. This is deposition Exhibit #4.
17      (Exhibit 4, E-mails, was marked for
18 identification.)
19   Q. Take a look at this. Chronologically start at
20 the back. This purports to be an e-mail from WorldWide
21 to you?
22   A. To me?
23   Q. Signed by Rick Sylvers I think on the bottom to
24 you and Les Steinmetz both.
25   A. But Neil Seiden I see.

---

62

1    Q. The original message at the very bottom of the
2 first page, it says from InfoServices WorldWide to Evan
3 Todd Sirlin, and then flip the page to Les Steinmetz,
4 so that e-mail I'm looking at first. It's signed by
5 Rick Sylvers.
6    A. Okay.
7    Q. Do you remember getting this e-mail?
8    A. I don't remember the e-mail.
9    Q. Do you remember the content of the e-mail?
10   A. I remember Neil Seiden had something to do with
11 banks saying it would be good to have an exclusive from
12 somebody for the bank.
13   Q. But the first e-mail here is not from Neil
14 Seiden or to Neil Seiden. It's from you to Les
15 Steinmetz.
16   A. Who asked for the e-mail? Sorry. You didn't
17 ask the question. I take that back. I apologize.
18 What is your question?
19   Q. My question is do you remember getting this
20 e-mail.
21   A. No.
22   Q. Do you remember when this happened? Do you
23 remember that WorldWide said, Rick Sylvers said that
24 WorldWide worked exclusively for LifeWatch?
25   A. No.

---

63

1    Q. You don't recall that.
2    A. No.
3    Q. You only recall that Neil Seiden thought it
4 would be a good idea.
5    A. Yes.
6    Q. You don't recall Les Steinmetz ever asking
7 WorldWide and copying you on an e-mail.
8    A. I don't remember that.
9    Q. To be exclusive?
10   A. I don't remember that.
11   Q. You don't recall that.
12   A. No.
13   Q. So the second e-mail going up, that's the
14 bottom of the page, it's from you to Neil. So you are
15 forwarding this earlier e-mail, and you say "Three-year
16 exclusive." That's what the content of your e-mail is.
17   A. Where does it say that?
18   Q. Go to the very bottom. Three lines up is the
19 first e-mail, and the next one is an e-mail, the next
20 e-mail, go to the next one, "Original Message," from
21 you to Neil, and the content of the e-mail is
22 "Three-year exclusive."
23   A. The content is "Attempted Exclusivity."
24   Q. That's the subject, but the e-mail itself, all
25 it says is "Three-year exclusive."

---

64

1    A. Okay.
2    Q. Do you recall that?
3    A. No.
4    Q. I apologize that this is all in one, but most
5 of the e-mails we got are like this. We don't have
6 each individual e-mail to show you.
7    A. No problem.
8    Q. So you don't remember that.
9    A. No.
10   Q. But you remember that Neil thought this would
11 be a good idea.
12   A. The concept, correct.
13   Q. The next e-mail going up is from Neil to you,
14 and he says "Excellent. Can we get this into an
15 agreement?"
16   A. Yes.
17   Q. That's consistent with what you remember, and
18 Neil thought this would be a good idea.
19   A. Yes.
20   Q. The next e-mail going up is you to Neil, and
21 you copy Sarai Baker.
22   A. Okay. Yes.
23   Q. I apologize. Sometimes on the e-mails that
24 LifeWatch produced to us, e-mails to Sarai say "Evan
25 Sarai" the way that one does. I don't know why

---

16 (Pages 61 to 64)

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

65

1    exactly.
2        So you sent this to Sarai and said, "Can you
3    put this on letterhead and have Rick send it on
4    Monday?" Do you recall doing that?
5        A. I don't recall doing that, no. It says it
6    here, it says it here.
7        Q. It's not surprising to you given what you
8    remember about Neil.
9        A. Correct.
10       Q. The last one is the top e-mail is from Neil
11   saying it should be incorporated into the current
12   agreement, right?
13       A. It says that, yes.
14       Q. Do you know why Neil thought this would be a
15   good idea for the bank?
16       A. Do I know why Neil thought -- no.
17       Q. What did Neil tell you about this being a good
18   idea for the bank?
19       A. I don't remember.
20       Q. What does it mean to be a good idea for the
21   bank? I'm trying to understand what he could possibly
22   have meant.
23       A. I don't know.
24       Q. You don't remember asking him.
25       A. No.

---

66

1        Q. But you got it and you sent it to him, the
2    exclusive.
3        A. Many e-mails I would forward and send as per
4    Les or Neil.
5        MR. O'TOOLE: This will be 5.
6        (Exhibit 5, E-mails, was marked for
7    identification.)
8        Q. Mr. Sirlin, take a look at this e-mail. It's
9    fairly long. Do you recall seeing this e-mail?
10       A. No.
11       Q. Do you recall the subject what this is about?
12       A. I don't recall the subject. I think it's about
13   upselling, and I don't know who Katie is. You didn't
14   ask the question, but I don't know who Katie is.
15       Q. The e-mail subject line is "Bank Call Info."
16   Do you recall?
17       A. No.
18       MS. GORDON: We're looking at different
19   e-mails.
20       Q. Let's go to the one I gave you, and I sent you
21   the wrong one, Tom.
22       MR. VERTICCHIO: The one I have is still marked
23   5.
24       MR. O'TOOLE: No. The one you have is going to
25   be marked 6.

---

67

1        Q. The e-mail you are talking about says, "Hey,
2    some ideas on the top." That's the subject.
3        A. Yes.
4        Q. Do you remember sending this e-mail?
5        A. No.
6        Q. You volunteered a minute ago you don't know who
7    Katie is. Did you know Katie Sylvers?
8        A. Yes. Now I recall Katie. I don't know --
9        Q. I understand.
10       A. The Rick guy had a wife I think named Katie.
11       Q. And she worked in the business.
12       A. From what I recall.
13       Q. Do you remember what her role was?
14       A. He would say helping.
15       Q. Did you ever meet her?
16       A. I think so.
17       Q. When you were in Florida maybe or --
18       A. Or New York. Either one.
19       Q. You don't recall --
20       A. I had a good joke. I'm going to stop.
21       Q. I was looking at the wrong e-mail, so I'll ask
22   you again I guess. You don't recall sending this
23   e-mail.
24       A. No.
25       Q. The first line is "Some ideas for

---

68

1    increasing/justifying upfront payouts." Do you get
2    what that's talking about there?
3        A. Increasing the amount of money we pay them to
4    buy a sale.
5        Q. So this looks like what you're saying is here's
6    some ideas that might increase the amount you get from
7    us.
8        A. Correct.
9        Q. Then you ask about Medi-Lok.
10       A. Correct.
11       Q. Medi-Lok is what exactly?
12       A. It's a lockbox.
13       Q. Honestly, I'm a little bit confused. I
14   understand the product. Did LifeWatch provide
15   Medi-Loks also?
16       A. LifeWatch provided lockboxes. Medi-Lok is a
17   lockbox.
18       Q. Do you own Medi-Lok?
19       A. Yes, I do.
20       Q. Medi-Lok would be a little bit more cost to the
21   customer.
22       A. Correct. Not correct. It depends. Sometimes
23   it's a freebie.
24       Q. Maybe if the marketer --
25       A. It's a great thing to give away for free. It

---

17 (Pages 65 to 68)

Sirlin

FTC v. LifeWatch Inc., et al.                                          7/25/2017

---

69

1    helps ambulances get -- in the theme of the business,
2    it helps ambulances to get into the house without
3    breaking a door, and a lot of senior citizens are
4    concerned about getting into the door.
5        Q. It works like the real estate thing, right?
6        A. Correct, like a real estate lock, except
7    specific to the medical industry, invented by Evan
8    Sirlin.
9        Q. You?
10       A. Me personally, not LifeWatch.
11       Q. So sometimes Medi-Lok would be an extra charge,
12   but sometimes it would just be thrown in as a
13   sweetener.
14       A. Yes.
15       Q. You're asking if he's selling Medi-Lok.
16       A. Yes.
17       Q. The next sentence says, "What if we had a
18   36-month agreement section on paperwork and when you do
19   activation calls, that they sign that one (and mean it
20   -- LOL) we can do bonuses -- help justify total more
21   money per week, etcetera, etcetera." Do you know what
22   that's suggesting?
23       A. The "LOL" is suggesting nothing.
24       Q. I meant the first part first, the 36-month
25   agreement. What's that?

---

70

1        A. That would be a -- in the medical alert
2    industry, there's a company that does 36-month
3    contracts with seniors that has a lot of issues.
4        Q. That's one of the --
5        A. Mainly Life Alert.
6        Q. That's one of the ways you distinguish yourself
7    from Life Alert, right?
8        A. That we typically don't do a long-term
9    contract. However, after this date and time, the
10   person in control might have wanted contracts.
11       Q. You mean Mr. Roman might have wanted --
12       A. Yes.
13       Q. And I'm not asking you to testify for
14   Mr. Roman, but that's more common in the burglar alarm
15   or security industry.
16       A. Yes.
17       Q. So you think maybe in May 2013 that was
18   something that Mr. Roman was suggesting.
19       A. Yes.
20       Q. And you're saying that might be a way for
21   WorldWide to make a little more money.
22       A. Yes.
23       Q. You told me what you didn't mean by the "LOL."
24       A. Anything in writing with an "LOL" from Evan
25   Sirlin, knowing my personality, I think you realize

---

71

1    means nothing. It's my humor. It's my way of
2    lightening subjects. It's not meant with malice or
3    sarcasm. It seems to be taken way out of context.
4        Q. And then a few paragraphs down or lines down,
5    "Dave doesn't need the extra cash," that sentence. "I
6    am just trying to think of ways to make more upfront
7    money for you guys without the pressure of increasing
8    sales." So what are you saying here?
9        A. What I might have been saying, I could say I
10   don't know, but I will speculate on this one. Dave
11   doesn't need the extra cash, meaning Dave doesn't
12   believe in people paying in advance. Those are things that
13   typically in the industry are done.
14       Q. Stop. Just so we're clear, you are talking
15   about the two sentences before that.
16       A. And many other things. Dave doesn't believe in
17   a lot of things. Up until Dave took over the company,
18   I -- 100 percent industry person, but once he took over
19   the company he had control.
20       Q. What did you mean "100 percent industry
21   person"?
22       A. I am an industry expert. It's very standard to
23   take deposits. It's very standard to get people to pay
24   quarterly, annually in the industry. Dave doesn't care

---

72

1    about that.
2        The purpose of companies that you guys
3    hopefully look at in the industry of getting quarterly
4    and annual or three-year contracts is to get extra
5    money in advance. When they get a 36-month contract,
6    when you get a 36-month contract, you can sell it to a
7    bank and get cash upfront.
8        Q. It's more of a valuable asset for you.
9        A. For an average business, it's a valuable
10   assess. Dave, I don't know what he thinks. Our
11   competition, when they get 36-month contracts, sells it
12   off to get cash.
13       My intent in this was trying to help Katie,
14   Rick, whoever it is, as a good company that that's my
15   job in marketing and sales to help people.
16       Q. Not in this e-mail, but the 36-month contract
17   idea, when we talked at the beginning of the deposition
18   about the RMR, let me make sure I understand this
19   correctly, if somebody is on a 36-month contract, then
20   that contract is more valuable than a customer that
21   isn't on something like that.
22       A. I believe that financial people would say that.
23   That is not -- I disagree with it on a personal level.
24   It's wrong for seniors to have contracts, long-term.
25       Q. I don't mean valuable to the world. I mean

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sirlin

FTC v. LifeWatch Inc., et al.                                          7/25/2017

---

73

1    somebody is willing to pay more for it.
2        A. No.
3        Q. I think you said a bank is more willing to pay.
4        A. No, that's not what I said.
5        Q. Tell me what you said again.
6        A. I said I don't know. A 36-month contract in
7    any business to the best of my knowledge as a
8    businessman, not a lawyer or an accountant, is a
9    sellable piece of paper.
10       If you need cash and you have a 36-month
11   contract, 36 times 30 is let's say around a thousand
12   dollars, they will give you $800 now and hold the
13   paper. I don't do that. LifeWatch doesn't do that.
14       Q. It sounds like you were considering doing that,
15   LifeWatch was considering doing that then.
16       A. People that we buy sales from always say we and
17   the industry do not pay enough, so as a sales and
18   marketing person, I try to help everybody in good
19   business.
20       Q. Down a little bit, I want to ask you this.
21   There's about three more lines down there's a sentence
22   that start with "BUT," capital "BUT." I just need
23   translation.
24       A. Okay.
25       Q. "We all should look at preship activation

---

74

1    center and after-sale customer service expansion and we
2    can try to justify more upfront money." Then you have
3    a parenthetical, "Katie I need some data on success and
4    activations."
5        The way I understand this is you're saying that
6    if more customers get a preship call and activate their
7    devices that maybe LifeWatch would pay WorldWide a
8    little more for the sales; is that correct?
9        MR. LIPARI: Objection to form.
10       A. Repeat the question.
11       Q. I couldn't possibly.
12       A. The intent of the question.
13       Q. Could you explain to me what the sentence
14   means?
15       A. It was just talking about cultivating a senior
16   citizen as a client. In this industry it's best to
17   have a lot of communications with clients.
18       Q. It says at the end of that sentence, "And we
19   can try to justify more upfront money." What I'm
20   asking is what does that mean.
21       A. What it means is if Dave doesn't want to do it
22   in-house, maybe we can get a call center, not an
23   outside call center, a call center like a West or a
24   LiveOps or ThinkDirect, real companies that I'm sure
25   you know all these companies to do this service on our

---

75

1    behalf after they are a client.
2        Q. Did WorldWide ever get paid?
3        A. I don't remember.
4        Q. Let me just --
5        A. I still think it's a good idea.
6        Q. Let me ask the question. Did LifeWatch ever
7    pay WorldWide to --
8        A. I don't remember.
9        Q. Did LifeWatch ever pay WorldWide to do preship
10   or activation cost?
11       A. I don't remember.
12       MR. O'TOOLE: Now let's go to the next e-mail,
13   which is the one I sent you, Tom, that will now be 6.
14       (Exhibit 6, E-mail, was marked for
15   identification.)
16       Q. This is a long e-mail too. Take a look at it.
17       A. Yes.
18       Q. This e-mail is from you to WorldWide. Do you
19   recall sending this e-mail?
20       A. No.
21       Q. It's entitled "Bank Call Info." Do you recall
22   the events that this is relating to?
23       A. After looking at the e-mail, I vaguely
24   remember.
25       Q. What do you remember about this?

---

76

1        A. I remember something to do with Neil Seiden
2    trying to raise money for the company, and the bank
3    said they would like to talk to some of our marketing
4    sources or people who are outside sellers, people who
5    buy TV, radio, all that stuff, all marketing sources.
6        Q. So it looks to me like it references a David
7    Reilly in the e-mail.
8        A. I spoke with him also.
9        Q. They spoke with him. Is that maybe where you
10   got these questions?
11       A. I don't remember where I got these questions.
12       Q. Why were you sending these questions to
13   WorldWide?
14       A. I don't remember why.
15       Q. About four paragraphs down, there's a sentence
16   that starts with "Primary Services." Do you see that?
17   It says, "Primary Services you provide?" and then a
18   parenthetical "Mostly telemarketing." Do you recall
19   this?
20       A. I don't recall it, but I'm reading it right
21   now.
22       Q. Do you know what it means?
23       A. Yes.
24       Q. What does it mean?
25       A. That they're going to ask him how he does most

---

19 (Pages 73 to 76)

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

77

1    of his marketing.
2         Q.  And the rest of it is you can tell him what he
3    can say.
4         A.  That is not what I'm saying.  I am not telling
5    him what to say.
6         Q.  I didn't ask what to say, like what he can say.
7    It says, "Most telemarketing and you can say direct
8    mail, TV, customer service, quality controls, IVR,
9    etcetera."  You're saying these are the answers that
10   you can give.
11        A.  Not in your context.
12        Q.  There's no context.
13        A.  In my context I am saying it's okay to talk
14   about everything you do.  They are not just looking for
15   telemarketing.
16        Q.  What's IVR?  I mean it.  I'm not trying to
17   trick you.  What does IVR mean?
18        A.  I don't know what it stands for.  I think
19   Interactive Voice Response Systems.
20        Q.  Is that also known as Avatar?
21        A.  No.
22        Q.  You think I know more than I know.
23        A.  That's not good.
24        Q.  What does it mean?
25        A.  Can we go off?

---

78

1         Q.  We can.
2            (A discussion was held off the record.)
3         Q.  If you understand how IVR works, just tell me
4    how it works.
5         MR. LIPARI:  Was there a pending question?
6         MR. O'TOOLE:  I asked what IVR was.  I'm asking
7    him to explain to me what he knows about it.
8         A.  IVR to the best of any knowledge is Interactive
9    Voice Response, which is basically a system that takes
10   live calls or can even be done on outbound.  I'm not
11   giving judgment of compliance.  I'm saying what it
12   does, and it's an interactive voice response, so it
13   says, Mrs. Smith, thank you for your interest in this
14   promotion, you could press -- I'll tell you where I get
15   the basis for this.
16           You can press one if you're interested in a
17   special on medical alerts systems.  You can press two
18   if you're interested in final expense reports.  You can
19   press three if you're looking for medical sup insurance
20   and on and on and on.
21        Q.  Would this typically come at the end of a call?
22        A.  This is typically a live transfer to it from an
23   inbound phone call, and that's what IVR is.  It's a
24   press one in my world and in America's world on inbound
25   calls.

---

79

1         Q.  But it's not the kind of thing that somebody
2    just bought a knee brace and now we move on to this.
3         A.  If you buy a knee brace, then they could also
4    send it to an IVR after.  After buying a knee brace, a
5    company could send it to an IVR and say thank you for
6    buying a knee brace, now would you like to do this,
7    this.  I don't do that.  I do not do that.  LifeWatch
8    doesn't do that.
9         Q.  Does LifeWatch ever do that?
10        A.  No.
11        Q.  Then why is it in this?
12        A.  We don't own WorldWide.  This is talking to
13   WorldWide.
14        Q.  Okay.  So, again, even though LifeWatch didn't
15   do it, you seem to know something about it.
16        A.  Today LifeWatch deals with a lot of companies
17   that do IVR, and LifeWatch pays for -- they are going
18   to kill me, but you know this.  We pay for leads from
19   inbound IVR and provide them to marketers to sell on.
20   That we believe is compliant.
21        Q.  This is not relevant to the case.
22        A.  I know it's not going to save the case either.
23        Q.  If it gives you these choices, if you want a
24   medical device press one, a knee brace press two, and
25   depending on what you press the call is routed

---

80

1    someplace different.
2         A.  Yes.
3         Q.  Two more lines down, "How do you get your
4    leads?" that sentence, and then there's a reference of
5    David Reilly.
6         A.  Yes.
7         Q.  Why would you be telling him how David Reilly
8    answered this?
9         A.  I don't remember.
10        Q.  Do you remember is that how David Reilly got
11   his leads?
12        A.  Without looking at this, David Reilly gets
13   leads from many different ways that he's told me, and
14   in the beginning it was from offshore fronters and then
15   closers in America.
16        Q.  Offshore center something?
17        A.  Today he does direct mail.
18        Q.  Does LifeWatch deal with David Reilly still?
19        A.  Yes, and he has told us he's doing direct mail.
20        Q.  Is it still TMI?
21        A.  I don't know.
22        Q.  Do you remember any other names of companies
23   David Reilly is at?  I'm not going to be able to help
24   you.
25        A.  No.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

81

1    Q. What other outside marketers does LifeWatch
2    work with today?
3    A. A bunch of them.
4    Q. Do you know any other names?
5    A. We are not working with. We buy sales from
6    them. We do not work with them.
7        Do I know any other names? Right this second I
8    can't, no. Sorry.
9    Q. There's a couple more paragraphs down. It
10   says, "Then the key question was" -- do you see that?
11   It says, "Then the key question was," and, "Are you
12   aware of the AG/FTC investigations." Read those next
13   few lines. Do you remember that?
14   A. No.
15   Q. You end that by saying, "They might say do you
16   know Mike Hilgar or Safeline Alert. I don't think they
17   will." What are you referring to there?
18   A. I don't know.
19   Q. What is Safeline Alert?
20   A. I don't remember.
21   Q. Do you know who Mike Hilgar is?
22   A. Based on this case, yes.
23   Q. And he was involved with WorldWide based on
24   what you say you learned in this case.
25   A. Yes.

---

82

1    Q. I think in the preliminary injunction we talked
2    about this issue.
3    A. Yes.
4    Q. The next paragraph says, "You I am not sure how
5    to answer all of the above." I'm not going to comment
6    on your English. It's an e-mail. "You can say I'm
7    aware of Indiana and Kansas issues with LifeWatch, and
8    to date any clients they have mentioned as issues are
9    not from you." What is that referring to?
10   A. It seems like this whole thing is referring to
11   that Neil Seiden told me to prep them for a call from
12   the bank, so if Kansas and Indiana -- I think Indiana
13   filed something. That's all this is.
14   Q. So you're telling they might ask about it.
15   A. Just preparing. This is not a lawyer thing.
16   Q. My recollection of the Indiana suit is that
17   Indiana was about WorldWide.
18   A. I don't recall that.
19   Q. And Indiana first sued WorldWide and then added
20   LifeWatch.
21   A. I wouldn't know that.
22   Q. You were a defendant in that case also, right?
23   A. I don't know and don't remember if I was.
24   Q. A few more lines down you say, "He might ask
25   about relationship with Donna TCV." Do you know who

---

83

1    that is, "Donna TCV"?
2    A. It must have been another call center we were
3    buying deals from.
4    Q. "TCV," is that The Credit Voice?
5    A. That could be The Credit Voice.
6    Q. Do you know who Donna could be?
7    A. No. The Credit Voice had to do with everything
8    you spoke about earlier. Les Steinmetz, Mike Flyer,
9    Aaron, Mike Flyer, all these brokers.
10   Q. Right. But Donna is not a broker or you don't
11   remember who Donna is.
12       MR. LIPARI: Objection to form.
13   A. I don't remember who Donna is.
14   Q. "He might ask about US Affiliates." Do you
15   know who they are?
16   A. No.
17   Q. Other than WorldWide, the WorldWide company
18   itself, you knew that Rick Sylvers was managing or
19   consulting with other telemarketing firms too, right?
20       MR. LIPARI: Objection to form.
21   A. I don't know that.
22       (Exhibit 7, E-mails, was marked for
23   identification.)
24   Q. Chronologically, the first two e-mails here
25   seem to be someone named Alex Lindsley. Is she a

---

84

1    LifeWatch employee that you recall?
2    A. I don't remember.
3    Q. I'm not certain that's a woman. She's sending
4    to Doug Hallowell something about a customer named
5    Elizabeth Barnett, and unfortunately there's no
6    attachment to anything, so I don't know what it is.
7        And then Doug, I don't know for a fact because
8    we don't know where he sent the e-mail, but it looks
9    like he sent it to Dave Roman, maybe to other people.
10   His e-mail is Dave. "Alex seems to think this is Rick
11   -- new name National Life but says he's seeing a lot of
12   them, FYI."
13       And then Dave says he's not sure what Doug
14   seems to be referring to. Doug responds to Dave, Dave
15   sends you an e-mail, and Dave's e-mail is "Is Rick
16   routing a business through another dealer to bypass
17   chargebacks? If so, who?" Do you remember this
18   happening?
19   A. No.
20   Q. Just in time by the way, this is January 7,
21   2014. January 9th was the day that WorldWide got
22   shutdown, so this is in the last few days. By the way,
23   were you planning on going to Florida to meet with Rick
24   either that week or the next week?
25   A. I wouldn't remember. I'm trying to think. I

---

21 (Pages 81 to 84)

Sirlin

FTC v. LifeWatch Inc., et al.                                            7/25/2017

---

85

1   don't understand why you asked that question, but no.
2   I don't know.
3       Q.  I'm asking it so this was January 7th.  What
4   I'm asking is that week, the week of January 6th to the
5   13th, those two weeks, were you planning, you and Dave
6   and Mitch, planning, I'll just be clear, to go down and
7   meet with Rick.
8       A.  I don't remember that.
9           MR. SULTZER:  Objection to form.
10      Q.  Dave flips this to you and to Mitch and asks if
11  Rick is routing it through another dealer, and your
12  response is the rest of the e-mail.  So first after the
13  parenthetical, the first paragraph, if you look at
14  that, it says, "Dave re Alex and Doug, not sure why he
15  didn't bring this to my attention."  What are you
16  talking about there?
17      A.  Don't know.
18      Q.  You don't remember this.
19      A.  No.
20      Q.  You say midway through there that you're
21  talking about how you are supposed to be more involved
22  I guess or you want to be more involved.  I'm not sure.
23  Do you remember that?
24          MR. LIPARI:  Objection to form.
25      A.  It looks like it's saying I have no power to do

---

86

1   anything.
2       Q.  Was that the case then?
3       A.  Yes, ever since Dave took over.
4       Q.  And so it ends by saying -- okay.  The next
5   paragraph says, "In regards to Rick, it's very possible
6   that he's helping National Life and others."  Do you
7   recall that?
8       A.  No.
9       Q.  Do you think it was true?
10      A.  I don't remember.
11      Q.  The next paragraph is "Rick is friends with
12  lots of these guys and girls and has helped a lot of
13  them and has helped do confirms and activations and
14  customer service for a bunch of them, etcetera,
15  etcetera."  Do you remember that?
16      A.  I don't remember.
17      Q.  Do you think it was true?
18      A.  I think Rick -- nothing to do with this e-mail,
19  Rick was a person up until now I guess that was a big
20  in the call-center business.  He was introduced by Les
21  Steinmetz as being one of the best.
22      Q.  And the best at what?
23      A.  At getting sales for Dish Network and other
24  companies, one of the most successful people.
25      Q.  What do you think they were talking about here

---

87

1   that you're saying Rick is a big shot in this industry?
2           MR. LIPARI:  Objection to form.
3       A.  Rick is a very -- at that point in time, to me
4   Rick was known as one of the most knowledgeable, best,
5   creative, smart that every company in America was
6   dealing with him.  That's how it was represented to me
7   by Les about this gentleman Rick.
8       Q.  Do you believe that was true?
9       A.  At the time, yes.
10      Q.  Do you believe it now?
11      A.  No.
12      Q.  Why don't you believe it?
13      A.  Because I'm here.  Why am I here?  It seems to
14  be because of him.
15      Q.  The next two sentences later, it starts off
16  again with "BUT," capital B-U-T.
17      A.  Can I add one more point just for the record?
18          MR. SULTZER:  Just let him ask you the
19  question.
20      A.  Maybe we can address it later about Rick.
21  There might be other stuff we want to tell you off the
22  record.
23      Q.  Okay.  We're going to talk after the deposition
24  anyway.  That would be a good time to do it.
25      A.  Yes.  Thank you.

---

88

1       Q.  Just generally if there's things that you think
2   I should know, we don't have to put it in the
3   deposition.  We can talk.
4       A.  Good.  Thank you.
5           MR. SULTZER:  These are things we can address
6   later.
7           MR. O'TOOLE:  Let's go off for a second.
8           (A discussion was held off the record.)
9       Q.  The sentence starts with "BUT when he
10  threatened to quit."  That's the middle of that
11  paragraph.
12      A.  Got it.
13      Q.  Don't look at my copy because I have a
14  different version.  "BUT when he threatened to quit the
15  first time, I put in his head that he would be a great
16  consultant for all these rooms, and if he can't make
17  money for himself, he should get paid by them as a
18  consultant, and he would have almost no overhead.
19      "It was me that told him to roundup others when
20  he maxed out Orlando to give us more diversification to
21  buy from him."  Do you remember telling him those
22  things?
23      A.  That looks like something I would say.
24      Q.  Do you remember actually those conversations
25  with Rick?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sirlin

FTC v. LifeWatch Inc., et al.                                          7/25/2017

---

89

1      A. That looks like something I would say to
2   somebody like Rick at that time period believing -- I
3   always like for quality people to delegate things to
4   that are experts in their field. At that point in
5   time, I felt he was the best expert in the world, and
6   Dave should not -- and Dave should work with him.
7      **Q. And that's really I think the context of this**
8   **e-mail, right, you're trying to tell Dave let's work**
9   **with Rick?**
10     A. That was the context.
11     **Q. Maybe especially because of the way Dave**
12  **e-mailed to you, it says "Rick routing business through**
13  **another dealer to bypass chargebacks," it sounds to me**
14  **like what you're saying is let's deal with Rick.**
15     A. Let's talk to Rick. You as Dave Roman should
16  deal with Rick and decide what you want to do with him.
17     **Q. And then the next sentence says, "That is why**
18  **he wants to meet, because he believes he can use the**
19  **current location in Orlando to manage a bunch of deals**
20  **and to do BURG," and "BURG" is --**
21     A. Home security systems.
22     **Q. "And energy." I don't know what that is.**
23  **Doesn't matter, and confirms the preship and**
24  **activations and collections and confirms. You're**
25  **saying Rick wants to meet with you, Dave, and that's**

---

90

1   why.
2      A. To talk about doing a lot of stuff.
3      **Q. Dave Roman bought LifeWatch sometime in 2013.**
4      A. I believe so. It could have been '12, '13.
5   Around '13.
6      **Q. Was it in a single transaction?**
7      A. No.
8      **Q. How did it take place?**
9         MR. LIPARI: Objection to form.
10     A. To my understanding, as a nonlawyer, it was an
11  over-time transaction.
12     **Q. Meaning -- I don't understand what you mean by**
13  **that. I'm not looking for a legal explanation.**
14     A. Okay.
15     **Q. I'm just asking --**
16     A. He agreed to pay money over time.
17     **Q. Okay. For that he got a majority share in**
18  **LifeWatch.**
19     A. Yes.
20     **Q. You retained some ownership.**
21     A. Yes.
22     **Q. And Mitch May has some ownership.**
23     A. Yes.
24     **Q. And a trust or trust, maybe a family trust of**
25  **yours or something. I don't have it in front of me.**

---

91

1         MR. LIPARI: Objection to form.
2      A. What's the question?
3      **Q. They also -- the trust also has ownership**
4   **interest, or is it just you and Mitch and Dave?**
5         MR. VERTICCHIO: Objection to form.
6      A. Can you repeat the question or a new question?
7      **Q. When Dave purchased LifeWatch, you retained**
8   **some ownership interest, correct?**
9      A. I rephrased. No.
10     **Q. You owned some shares of LifeWatch.**
11     A. No.
12     **Q. Do you have any financial interest in LifeWatch**
13  **other than a salary?**
14     A. No.
15     **Q. You don't have any equity stake in LifeWatch.**
16        THE WITNESS: Could I tell him --
17        MR. LIPARI: No. If you don't understand the
18  question, just ask him to rephrase or explain it.
19     A. Evan Sirlin, no.
20     **Q. An Evan Sirlin trust?**
21     A. Yes.
22     **Q. Does Mitch May retain any ownership?**
23     A. No.
24     **Q. Does a Mitch May trust?**
25     A. Yes.

---

92

1      **Q. I know it may not be named a "Mitch May trust."**
2   **As far as you know, there's only three shareholders of**
3   **LifeWatch.**
4      A. There's a fourth as far as I recall.
5      **Q. Is that Greg Glisby?**
6      A. Yes.
7      **Q. Did that happen at one time or evolve?**
8         MR. LIPARI: Objection to form. Calls for
9   speculation and a legal conclusion. You can answer.
10     A. You can ask a lawyer, but to my understanding
11  when we closed, it was established that way.
12     **Q. It remains the same now.**
13     A. Yes.
14        (Exhibit 8, E-mail, was marked for
15  identification.)
16     **Q. This is an e-mail looks like to pretty much**
17  **everybody in the world. If you don't see, you're in**
18  **there. From Lisa Benzola. Do you know who that is?**
19     A. Yes.
20     **Q. Who is it?**
21     A. HR director. Is that right? At this point in
22  time.
23     **Q. Doesn't work at LifeWatch anymore.**
24     A. No.
25     **Q. She starts off by saying -- this is to the**

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

93

1    staff. Do you remember when this e-mail was sent?
2        A. No.
3        Q. Were you involved in drafting this e-mail?
4        A. No.
5        Q. It starts by saying, "As you may already know,
6    LifeWatch recently merged with Safe Home Security." Is
7    that what happened?
8        A. No.
9        MR. LIPARI: Objection, calls for --
10       A. But the answer is no.
11       Q. That is not correct.
12       A. That is not correct.
13       Q. LifeWatch did not merge with Safe Home
14   Security.
15       A. No.
16       Q. It says, "SHS focuses mainly on burglar alarms
17   but does have their own PERS division known as
18   MedGuard." Was that true?
19       A. Was it true? At the time I did not know what
20   MedGuard is or was or does.
21       Q. Was that true though? I'm not asking what you
22   knew --
23       A. I don't know.
24       Q. Was MedGuard a PERS division of SHS?
25       A. I don't know.

---

94

1        Q. Middle of the paragraph, it says, "We are now
2    under the SHS umbrella and should be looked at as the
3    same company." Was that true?
4        A. I don't see where it says that, but that's not
5    true.
6        Q. It wasn't true then.
7        A. It's not true now.
8        Q. I'm asking both.
9        A. It's never been true.
10       Q. LifeWatch has never merged with SHS.
11       A. Correct. Correct meaning no, we have nothing
12   to do with SHS.
13       Q. Do you recall after getting this e-mail sending
14   an e-mail to all these people and saying that's not
15   true?
16       A. I don't recall ever seeing this e-mail or
17   getting this e-mail. I don't remember anyone saying to
18   me comments about this e-mail. If somebody did I would
19   have rephrased it.
20       Q. How would you have rephrased it?
21       A. LifeWatch has gotten an equity investor named
22   Dave Roman.
23       Q. Okay.
24       A. But I read some of the things in here, and the
25   purpose of it is to help with more efficient business

---

95

1    operations, customer service, etcetera, etcetera, CRM,
2    database, health benefits.
3        Q. So you would rephrase it to say LifeWatch has
4    an equity investor in Dave Roman.
5        A. Not as a lawyer. Thinking quickly right now,
6    that's what I would phrase it without speaking to a
7    lawyer.
8        Q. Is LifeWatch currently is Dave Roman only as an
9    equity investor?
10       A. Repeat.
11       MR. VERTICCHIO: Objection to form.
12       A. Maybe rephrase that, yes.
13       Q. Does Dave Roman have a role at LifeWatch other
14   than equity investor?
15       A. Yes. Everything.
16       Q. Meaning?
17       A. Everything.
18       Q. He's in charge of everything.
19       A. Yes.
20       Q. Was that true in July of 2013?
21       MR. VERTICCHIO: Objection to form.
22       A. What's the date of the transaction?
23       Q. That e-mail is July 2013.
24       A. If the transaction was already done, yes.
25       Q. From that point on --

---

96

1        A. Control.
2        Q. -- Dave has been in control of everything.
3        A. Yes.
4        Q. Do you retain any authority in LifeWatch?
5        A. No, sadly.
6        Q. You provide advice.
7        A. Yes.
8        Q. Anything else?
9        A. No.
10       Q. Do you hire people or fire people?
11       A. No.
12       Q. Does anybody besides Dave have authority to do
13   that?
14       MR. LIPARI: Objection to form.
15       MR. VERTICCHIO: Foundation.
16       A. Not in New York and I don't know about
17   Connecticut.
18       Q. Is there any part of LifeWatch that Dave
19   doesn't have authority over?
20       MR. LIPARI: Objection to form.
21       MR. VERTICCHIO: Objection to form.
22       THE WITNESS: Am I still supposed to answer
23   when you do that.
24       MR. LIPARI: We're putting an objection on the
25   record.

---

24 (Pages 93 to 96)

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

97

1    Q.  Is there any function of LifeWatch that Dave
2  doesn't have authority over?
3        MR. LIPARI:  Same objection.
4        MR. VERTICCHIO:  Objection to form.
5    A.  He has authority over everything.
6    Q.  Just a couple little things that are unrelated.
7  I remember the preliminary injunction hearing I asked
8  you about how LifeWatch responded to the civil
9  investigative demand that the FTC sent to the CID, and
10 we got into a little argument about privilege and all.
11 Do you recall when the FTC sent the civil investigative
12 demand to LifeWatch in March 2014?
13   A.  No.
14   Q.  You don't remember getting the CID.
15   A.  I still don't, no.
16   Q.  Do you recall anything you did at that point to
17 respond to it?
18   A.  No.
19   Q.  Or to preserve your documents?
20   A.  No.
21   Q.  Since March 12, 2014, when the CID was
22 delivered, have you taken any steps to preserve
23 documents related to LifeWatch?
24       MR. LIPARI:  I'm going to object to form.  I
25 think it's inherently vague.

98

1    A.  I don't know control LifeWatch's documents.
2    Q.  Have you taken any steps?  So the answer is no,
3  you have not taken any steps.
4        MR. LIPARI:  Objection to form.
5    A.  I think I'm misunderstanding the question.  So
6  to the best of my knowledge, I personally might not
7  have.  I don't remember what you're talking about.
8  Maybe at a later point I'll remember what you're
9  talking about.
10   Q.  I'm asking after the CID was issued on March
11 12, 2014 --
12   A.  What's a CID?
13   Q.  Civil investigative demand.
14   A.  Is that the injunction?
15   Q.  No.  Civil investigative demand is when --
16   A.  I don't recall.
17   Q.  Prior to this lawsuit, the FTC sent you a civil
18 investigative demand.  It actually went to you at
19 LifeWatch.  That asked for a lot of information.  This
20 was shortly after the WorldWide case had happened, and
21 over the next six months to a year LifeWatch produced a
22 bunch of records to us.
23   A.  Okay.
24   Q.  And I'm asking you after you got, after that
25 date when you got the CID, did you personally take any

99

1  steps to preserve documents, your own documents or
2  LifeWatch documents, relating to telemarketing?
3        MR. SULTZER:  Why didn't you ask him first who
4  was in charge of --
5        MR. O'TOOLE:  I'm not asking that.  I'm asking
6  if he did anything.
7        MR. SULTZER:  If somebody else at the company
8  is in charge of preserving documents --
9        MR. O'TOOLE:  I'm not trying to get that.  I
10 really am asking him what he did.
11   A.  I did nothing to not preserve documents.
12   Q.  But you didn't take any steps to preserve
13 documents.
14   A.  What would those steps might be?  If you tell
15 me, what they might be.
16   Q.  Did you send an e-mail to everybody in the
17 company saying don't destroy any documents?  Did you do
18 that?
19   A.  You, Evan Sirlin?
20   Q.  You, Evan Sirlin.  That's all I'm asking.
21   A.  If Evan Sirlin did do it, I would have
22 delegated it to somebody else to do it for me or with
23 me.
24   Q.  Do you recall doing it?
25   A.  I don't recall doing it.

100

1    Q.  Did you do anything to your G-mail account,
2  e-mail account, to make sure no e-mails were destroyed
3  after that date?
4    A.  Like what?  What can I do?
5    Q.  I don't know.
6    A.  I did not do anything to do anything to destroy
7  e-mails or whatever you're asking.
8    Q.  What about your EarthLink account?
9    A.  What EarthLink account?
10   Q.  We have the variety --
11   A.  I do not have an EarthLink account.
12   Q.  In the preliminary injunction hearing, I showed
13 you an e-mail that related to Mike Hilgar's declaration
14 that was from your Earthlink account.
15   A.  No, you didn't.
16   Q.  You never had an EarthLink account.
17   A.  No.
18   Q.  So any e-mails that we have that say
19 evansirlin@earthlink.net are not you.
20   A.  Correct.
21   Q.  Even though LifeWatch produced it to us.
22   A.  Correct.  I'd still like to see those.  We can
23 do that afterwards.
24       MR. SULTZER:  Just so you know, Mitch May has
25 an EarthLink account.

25 (Pages 97 to 100)

Sirlin

FTC v. LifeWatch Inc., et al.                                    7/25/2017

---

101

1        MR. O'TOOLE:  I understand but he also has one.
2    A.  No, I do not.  For the record, I do not.
3    **Q.  It doesn't matter.**
4    A.  You just told me that's not true.  I'm sorry.
5    I'm not jousting you.  I believe I don't have an
6    EarthLink account, period.
7    **Q.  How many G-mail accounts do you believe you**
8    **have?**
9    A.  Evan@lifewatch-usa, that's powered by G-mail I
10   would assume.
11   **Q.  Is evantsirlin@gmail the same?**
12   A.  The same as with what?
13   **Q.  The evan@lifewatch you were saying.**
14   A.  Evantsirlin@gmail is a G-mail account.
15   Evansirlin@gmail is a G-mail account, but
16   evan@lifewatch is also I think powered by G-mail, and I
17   might have evan@medilok.com.
18   **Q.  In all those accounts, did you take any steps**
19   **yourself to make sure that no documents were destroyed**
20   **after March 12, 2014?**
21   A.  Yes.
22   **Q.  What was that?**
23   A.  Doing nothing to destroy them.
24   **Q.  So everything that was in those accounts on**
25   **March 12, 2014, are still in those accounts.**

---

102

1    A.  I don't know.  Does G-mail save them?
2    **Q.  I don't know.**
3    A.  I don't know.
4    **Q.  But you didn't do anything.**
5    A.  I didn't do anything.
6        MR. LIPARI:  I think it's been asked and
7    answered.
8    A.  I didn't do anything.
9        MR. O'TOOLE:  That's what I got for now.  We're
10   going to maybe do some cleanup after lunch if you have
11   questions after that, and then we'll talk.
12       (A recess was taken.)
13   **Q.  We talked for a long time about Rick Sylvers**
14   **and Roderic Boling are the same people.  I want to make**
15   **sure we're talking about the same person.  I'm showing**
16   **you a picture.  This is deposition Exhibit 9.**
17       (Exhibits 9 and 10, Photographs, were marked
18   for identification.)
19   **Q.  Is that you and Rick Sylvers?**
20   A.  Yes.
21   **Q.  Here is another picture.  I think that's in**
22   **front of LifeWatch; am I right?  Is that what's behind**
23   **him?**
24   A.  No.
25   **Q.  The person in that picture is who you think is**

---

103

1    Rick Sylvers.
2    A.  Yes.
3        MR. O'TOOLE:  That's all I've got.
4        MR. SULTZER:  I just got a couple follow ups.
5    EXAMINATION BY
6    MR. SULTZER:
7    **Q.  I want to go back.  Mr. O'Toole asked you some**
8    **questions about a couple of visits you may have made to**
9    **Florida where you met we'll call him Rick Sylvers for**
10   **now.**
11       **At any time during those visits, did you have**
12   **any impression that this call center that you visited,**
13   **did you have any impression about that center that they**
14   **were making outbound robocalls?**
15   A.  No.
16   **Q.  Did you have any impression, did anyone tell**
17   **you at the center including Rick Sylvers that they were**
18   **making outbound robocalls?**
19   A.  No.
20   **Q.  Did anyone tell you that they were making**
21   **outbound calls to individuals or potential customers**
22   **who are on a do-not-call list?**
23   A.  No.
24   **Q.  Did anyone at that center tell you including**
25   **Rick Sylvers that they were making any calls to any**

---

104

1    potential consumers and making any misrepresentations
2    trying to trick people into buying the products that
3    you were selling?
4    A.  No.
5    **Q.  At the time that you made these visits, did you**
6    **see any part of the facility that gave you an**
7    **indication of how they were getting customers and**
8    **selling these customers to whomever wanted to buy them?**
9    A.  Yes.
10   **Q.  What part of the facility was that?**
11   A.  There's a whole direct-mail department.
12   **Q.  What was your understanding about that**
13   **direct-mail department?**
14   A.  They were doing tons of direct mail, which
15   would go to seniors for medical alerts, that's what
16   they said, to drive inbound phone calls.
17   **Q.  Did anyone tell you at the center that that was**
18   **the purpose of this mailroom?**
19   A.  Yes.
20   **Q.  Who told you that?**
21   A.  This Rick.  This Rick.
22   **Q.  So your understanding is the way that this**
23   **company was obtaining customers you may have bought**
24   **from was through this direct-mailing campaign?**
25   A.  Yes.

---

26 (Pages 101 to 104)

Sirlin

FTC v. LifeWatch Inc., et al.                                      7/25/2017

105

1           MR. SULTZER:  That's all I have.
2           MR. O'TOOLE:  I'm going to follow up with one.
3     EXAMINATION BY
4     MR. O'TOOLE:
5           **Q.  Jason asked you about what you knew when you**
6     **went to visit Mr. Sylvers in Florida.  At any time**
7     **prior to when the FTC brought action against WorldWide,**
8     **did you know that WorldWide was doing robocalls?**
9           MR. LIPARI:  I'm going to object.  Do you
10    understand the date?
11          THE WITNESS:  I have no idea what he's talking
12    about.
13          **Q.  You know the FTC sued WorldWide.**
14          A.  Yes.
15          **Q.  I'm asking at any time prior to that did you**
16    **know that WorldWide was doing robocalls.**
17          A.  No.
18          **Q.  Did you know that they were doing outbound**
19    **calls?**
20          A.  No.
21          MR. O'TOOLE:  That's all.
22          MR. SULTZER:  That's all I have for now.
23          MR. O'TOOLE:  We're done.
24          (Time Noted:  1:46 p.m.)
25

106

1           C E R T I F I C A T E
2
3           I, ALBERT L. HAGLUND, a Notary Public in and
4     for the State of New York, do hereby certify:
5           THAT the witness whose testimony is
6     hereinbefore set forth, was duly sworn by me; and
7           THAT the within transcript is a true record
8     of the testimony given by said witness.
9           I further certify that I am not related,
10    either by blood or marriage, to any of the parties in
11    this action; and
12          THAT I am in no way interested in the outcome
13    of this matter.
14          IN WITNESS WHEREOF, I have hereunto set my
15    hand this 30th day of July 2017.
16
17
18          s/Albert L. Haglund
19          ALBERT L. HAGLUND
20
21
22
23
24
25

27 (Pages 105 to 106)

## A

**a.m** 1:16
**Aaron** 83:9
**able** 80:23
**above-mentioned** 1:23
**Absolute** 46:6
**account** 100:1,2,8,9 100:11,14,16,25 101:6,14,15
**accountant** 73:8
**accounting** 30:11
**accounts** 101:7,18 101:24,25
**acquiring** 35:20
**acquisition** 32:4 40:23
**action** 105:7 106:11
**activate** 74:6
**activation** 69:19 73:25 75:10
**activations** 74:4 86:13 89:24
**activities** 8:3 14:3
**actual** 14:2 41:16
**ad** 12:18 14:5
**add** 20:5 40:25 87:17
**added** 82:19
**Addendum** 41:10
**additional** 37:9
**address** 5:9 8:1 15:9 15:10 19:7,13,15 87:20 88:5
**ads** 13:1
**advance** 71:12 72:5
**advertising** 34:15 34:22 38:3,7,14,15 38:19,21,23 39:15 39:21
**advice** 96:6
**advised** 32:9
**affiliated** 9:22,25
**Affiliates** 46:15 83:14
**after-sale** 74:1

**AG/FTC** 81:12
**against-** 1:7
**agencies** 33:5,16,16
**agent** 45:15 46:12
**aggressively** 40:25
**ago** 67:6
**agreed** 90:16
**agreement** 10:8,18 64:15 65:12 69:18 69:25
**ahead** 16:22 35:2 38:10
**al** 1:5,12
**alarm** 1:12 70:14
**alarms** 93:16
**ALBERT** 1:24 106:3,19
**alert** 3:4 9:10 10:7 10:14 11:10,18 20:23 22:17,18,24 23:2,5,6,12,19,22 24:7 28:4 31:1 61:5 70:1,5,7 81:16,19
**alerts** 6:23 78:17 104:15
**Alex** 60:18,21 83:25 84:10 85:14
**ambulances** 69:1,2
**America** 80:15 87:5
**America's** 78:24
**American** 46:13
**amount** 68:3,6
**Angel** 7:8
**annual** 72:4
**annually** 71:25
**answer** 12:2 23:14 30:15 32:24 33:13 45:17,20 50:13 56:22 82:5 92:9 93:10 96:22 98:2
**answered** 11:9 80:8 102:7
**answers** 77:9
**anticipates** 30:7
**anybody** 10:16 26:4 48:15 57:3 60:10

96:12
**anymore** 24:16 42:17 92:23
**anyway** 5:22 6:1 33:3 56:10,11,23 87:24
**apologize** 62:17 64:4,23
**appropriate** 30:6,9
**approximations** 29:22
**April** 42:21
**argument** 97:10
**arranged** 57:9 58:8
**arrangements** 16:17
**Article** 1:22
**asked** 9:20,21 12:10 15:21 16:16 36:20 53:8 55:24 57:6 59:22 60:24 62:16 78:6 85:1 97:7 98:19 102:6 103:7 105:5
**asking** 7:4 9:15 10:12 19:11 24:24 30:3,10,16,20 31:3 32:17 33:10 35:10 35:24 36:12,20 51:14,16 54:21 55:4 56:25 60:8 63:6 65:24 69:15 70:13 74:20 78:6 85:3,4 90:15 93:21 94:8 98:10,24 99:5 99:5,10,20 100:7 105:15
**asks** 85:10
**assess** 72:10
**asset** 72:8
**associated** 55:9
**assume** 101:10
**Athletes** 20:11
**attached** 26:12
**attachment** 25:16 84:6
**Attempted** 63:23
**attempts** 24:18

**attention** 6:6 15:18 85:15
**Attorney** 2:7,8,10
**attorney's** 11:6
**attorneys** 2:4,11,17 3:4 49:25
**authority** 96:4,12,19 97:2,5
**Avatar** 77:20
**Avenue** 3:6
**average** 72:9
**aware** 48:24 59:5,6 59:8,16,23 81:12 82:7

## B

**B-U-T** 87:16
**back** 17:20 18:22 29:22 30:12 41:9 47:20 56:3 57:10 57:11 58:12 59:21 61:20 62:17 103:7
**bad** 46:25
**Baker** 7:8 39:25 64:21
**bank** 61:13 62:12 65:15,18,21 66:15 72:7 73:3 75:21 76:2 82:12
**banks** 62:11
**Barnett** 84:5
**based** 31:16,20 36:23 81:22,23
**basically** 24:12 78:9
**basing** 32:24
**basis** 78:15
**Bates** 18:5,8,11,16 18:17
**Beach** 56:12,12 57:17,24
**BEAMER** 2:14
**began** 42:19 43:15 58:18
**beginning** 16:1 34:5 72:17 80:14
**behalf** 9:11 75:1
**believe** 22:2 42:11

43:7 46:11 47:17 52:10 71:12,13,17 72:22 79:20 87:8 87:10,12 90:4 101:5,7
**believes** 89:18
**believing** 89:2
**BELL** 3:3
**benefits** 95:2
**Benzola** 92:18
**best** 73:7 74:16 78:8 86:21,22 87:4 89:5 98:6
**better** 32:20
**bids** 54:13
**big** 34:24 86:19 87:1
**bit** 22:2 24:6 37:23 68:13,20 73:20
**black** 37:24
**blood** 106:10
**Blue** 29:7
**Boling** 48:24,25 49:6,10,15 50:8 55:18,22,23 56:1 57:1 58:17 102:14
**Boling/Rick** 59:22
**bonuses** 69:20
**booked** 56:23
**bottom** 25:15 34:17 34:25 61:23 62:1 63:14,18
**bought** 16:19,23 17:1 79:2 90:3 104:23
**Boulevard** 2:12
**Bowling** 1:18
**brace** 79:2,3,4,6,24
**brain** 60:3,7
**break** 59:19
**breaking** 69:3
**bring** 43:20 85:15
**broker** 43:23 83:10
**brokers** 83:9
**brought** 25:3 33:19 43:20 48:9 60:1 105:7
**building** 8:21

Sirfin

FTC v. LifeWatch Inc., et al.                                                        7/25/2017

[108]

**bunch** 46:2 81:3
  86:14 89:19 98:22
**BURG** 89:20,20
**burglar** 70:14 93:16
**business** 5:9 8:20,20
  11:11 14:2 15:13
  16:17 20:1 32:5
  42:20 47:4,9 56:13
  58:25 67:11 69:1
  72:9 73:7,19 84:16
  86:20 89:12 94:25
**businesses** 22:6
**businessman** 73:8
**buy** 11:22 12:16
  13:11,19 21:2 26:2
  30:12,23 39:8,12
  68:4 73:16 76:5
  79:3 81:5 88:21
  104:8
**buyers** 24:11
**buying** 11:24 79:4,6
  83:3 104:2
**bypass** 84:16 89:13

**C**

**C** 2:1 3:1 106:1,1
**call** 12:20,21,24
  13:11 14:7,11 35:7
  35:8,12,18 36:17
  36:24 37:3,7 38:1
  38:2,25 39:1,3,5,7
  39:8,12 41:14,19
  42:2,4 43:5,23
  51:17,18 52:6 56:9
  57:14 66:15 74:6
  74:22,23,23 75:21
  78:21,23 79:25
  82:11 83:2 103:9
  103:12
**call-center** 86:20
**called** 14:22 34:4
**calls** 14:5 30:15
  36:10 69:19 78:10
  78:25 92:8 93:9
  103:21,25 104:16
  105:19
**campaign** 104:24

**Canyon** 29:7
**capital** 73:22 87:16
**Carducci** 9:5
**care** 28:22 71:25
**cared** 11:8
**case** 1:7 7:15 10:16
  10:23,24 13:12
  45:1,2 60:14 79:21
  79:22 81:22,24
  82:22 86:2 98:20
**cases** 33:19
**cash** 53:17,25 54:23
  55:6,12,15 71:5,11
  72:7,12 73:10
**category** 21:2 22:10
**CC'd** 44:25
**center** 12:24 37:3
  38:3,25 39:2 43:5
  51:17,18 52:6
  56:12 74:1,22,23
  74:23 80:16 83:2
  103:12,13,17,24
  104:17
**centers** 13:12 35:7,9
  35:12,18 36:17,24
  37:7 38:1 39:3,5,7
  39:9,12 41:14,19
  42:2,4 43:23 56:9
**Central** 2:12
**certain** 33:5,15 84:3
**certify** 106:4,9
**CFO** 40:11
**chain** 54:13
**change** 53:9
**channel** 35:19,21
  36:18,25 37:3,9
**channels** 11:14
**charge** 69:11 95:18
  99:4,8
**chargebacks** 84:17
  89:13
**chart** 34:25 37:24
  37:25 38:2 39:4,4
  39:17,18,18 40:15
  40:16
**Chicago** 2:6 3:7
**choices** 79:23

**chronological** 18:21
**chronologically**
  17:20 44:22 61:19
  83:24
**CID** 97:9,14,21
  98:10,12,25
**citizen** 12:4 74:16
**citizens** 6:24 21:21
  41:7 69:3
**civil** 1:22 97:8,11
  98:13,15,17
**cleanup** 102:10
**clear** 15:20,24 16:4
  16:5 25:2 45:23
  49:4 59:12 71:15
  85:6
**clearly** 26:5
**client** 28:9,10 74:16
  75:1
**clients** 11:19 21:4
  33:4,15 74:17 82:8
**closed** 92:11
**closers** 80:15
**collect** 55:15
**collections** 89:24
**come** 14:7 20:1
  56:10 78:21
**comes** 45:9
**coming** 44:7
**comment** 82:5
**comments** 94:18
**COMMISSION** 1:5
  2:3
**common** 70:14
**communicating**
  14:15
**communications**
  74:17
**companies** 19:12,16
  31:9 32:10 33:21
  33:24 42:7 44:3
  46:2,8,19 47:14
  48:17 54:24 55:1
  72:2 74:24,25
  79:16 80:22 86:24
**company** 13:9 14:22
  19:8,19 20:13

  21:23 22:8,19,25
  23:5 24:2,3 26:22
  28:17 30:21 31:10
  34:4,6 35:8 40:14
  42:9,12 44:9,14,15
  46:1,17 47:5,16
  70:2 71:18,20
  72:14 76:2 79:5
  83:17 87:5 94:3
  99:7,17 104:23
**company's** 35:19
  40:22
**compared** 14:3
**competition** 72:11
**competitor** 23:7
**compliance** 78:11
**compliant** 79:20
**compound** 9:24
**compounded** 40:24
**concept** 27:13 64:12
**Concepts** 46:13
**concerned** 69:4
**conclusion** 92:9
**confidential** 10:13
  10:21
**confirms** 86:13
  89:23,24
**confused** 30:21
  68:13
**confusing** 46:21
**confusion** 55:3
**Connecticut** 7:20,24
  8:6,10,17,19 14:10
  14:16,17 96:17
**connection** 10:2
  15:15,16 16:6,8,11
  16:12,15
**consider** 39:14,15
**considering** 31:10
  73:14,15
**consistent** 64:17
**consultant** 40:4,5,13
  88:16,18
**consulting** 83:19
**consumers** 104:1
**Cont'd** 3:1
**contact** 50:11 60:11

**content** 21:16 62:9
  63:16,21,23
**context** 27:22 71:3
  77:11,12,13 89:7
  89:10
**continue** 41:8
**continued** 34:21
**continues** 40:24
**contract** 70:9 72:5,6
  72:16,19,20 73:6
  73:11
**contracts** 13:15,23
  14:15 28:4 39:8
  70:3,10 72:4,11,24
**control** 70:10 71:20
  96:1,2 98:1
**controls** 77:8
**convergence** 28:21
**conversations** 88:24
**copied** 19:5
**copy** 64:21 88:13
**copying** 63:7
**corporate** 19:14
**corporation** 1:9
  19:19
**correct** 11:13 13:10
  13:10 14:13 16:21
  16:25 25:6 26:11
  29:2 31:4 33:25
  40:7,17 47:3 54:13
  54:18 57:18 59:18
  64:12 65:9 68:8,10
  68:22,22 69:6 74:8
  91:8 93:11,12
  94:11,11 100:20
  100:22
**correcting** 48:12
**correctly** 72:19
**correspond** 60:17
**cost** 11:19 33:21
  68:20 75:10
**country** 33:5
**couple** 7:8 27:8 81:9
  97:6 103:4,8
**court** 1:1 6:7
**cover** 25:10
**creative** 87:5

Sirfin

FTC v. LifeWatch Inc., et al.

7/25/2017

[109]

Credit 46:11 83:4,5
  83:7
CRM 95:1
Cromwell 7:20,21
  7:22 14:4
cultivating 74:15
current 11:11 28:7
  65:11 89:19
currently 35:20
  37:2 38:21 95:8
customer 8:7 40:23
  52:19,19,23 68:21
  72:20 74:1 77:8
  84:4 86:14 95:1
customers 16:20
  28:7,12 34:12,14
  35:20 40:25 74:6
  103:21 104:7,8,23

**D**

d/b/a 1:10 20:6
dabbling 22:7
daily 50:11
Danny 53:24 54:3,4
  54:6,8,21
darkest 38:1
data 36:2 74:3
database 95:2
date 58:21 70:9 82:8
  95:22 98:25 100:3
  105:10
Dave 10:13 15:20
  18:18 23:13 52:4
  53:10 58:25 59:5,5
  59:6 71:5,10,11,12
  71:17,18,25 72:10
  74:21 84:9,10,13
  84:14,14 85:5,10
  85:14 86:3 89:6,6
  89:8,11,15,25 90:3
  91:4,7 94:22 95:4
  95:8,13 96:2,12,18
  97:1
Dave's 84:15
David 2:7 3:5 5:11
  18:4 25:5 43:12
  76:6 80:5,7,10,12

80:18,23
Davidson 60:18,21
day 5:25 12:5,8
  47:20 84:21
  106:15
days 84:22
deal 47:12 48:5,8
  80:18 89:14,16
dealer 84:16 85:11
  89:13
dealing 87:6
deals 43:20 56:9
  79:16 83:3 89:19
dealt 44:15 46:6
  48:11 57:2,3
Dearborn 2:5
decide 89:16
declaration 48:25
  49:2,20,24 50:4
  59:24 100:13
declarations 49:19
defendant 82:22
defendants 1:13
  2:17 3:4 7:14
definitely 29:23
definition 38:9
  41:22,23
defunct 42:14
delegate 26:23 89:3
delegated 48:8
  99:22
delivered 97:22
demand 97:9,12
  98:13,15,18
DENISE 2:14
dentist 25:22
department 104:11
  104:13
depending 79:25
depends 68:22
deposit 71:13
deposition 1:21 6:8
  17:18 33:8 61:16
  72:17 87:23 88:3
  102:16
deposits 71:24
Describes 40:5

description 4:10
  53:9
destroy 99:17 100:6
  101:23
destroyed 100:2
  101:19
details 27:6
device 11:17,21,22
  12:19 14:6 79:24
devices 11:15,19
  23:6 74:7
diabetes 21:11
diabetics 21:13,15
dialer 53:5
dialers 53:5,14
died 34:21
different 6:13 13:9
  33:1,3 39:13 44:2
  66:18 80:1,13
  88:14
dinner 51:8,15,16
  52:13
direct 77:7 80:17,19
  104:14
direct-mail 104:11
  104:13
direct-mailing
  104:24
directly 12:22 13:3
  13:8 34:14 36:14
director 92:21
disagree 47:1 72:23
disconnect 39:19
Discount 20:9
discussed 41:14
discusses 29:16
discussion 18:20
  78:2 88:8
Dish 86:23
distinct 24:17
distinguish 12:14
  70:6
DISTRICT 1:1,2
diversification
  88:20
division 1:3 93:17
  93:24

do-not-call 103:22
document 15:19
  17:11,19 18:5,22
  24:8 28:15 29:20
  30:2,5 34:18 36:5
  36:13,15 42:1,17
  44:17,20 45:9
documents 6:14
  18:6,7,10 24:10,10
  28:16 97:19,23
  98:1 99:1,1,2,8,11
  99:13,17 101:19
doing 6:18,21,22 8:3
  20:7 22:8 33:22
  41:8 59:15 65:4,5
  73:14,15 80:19
  90:2 99:24,25
  101:23 104:14
  105:8,16,18
dollars 31:13 53:22
  73:12
domain 20:6
dominate 37:2
dominates 35:20
Donna 82:25 83:1,6
  83:10,11,13
door 69:3,4
Doug 9:3 84:4,7,13
  84:14 85:14
Dr 25:16,19
drafted 36:4,8
drafting 41:11 93:3
drive 104:16
duly 5:2 106:6

**E**

E 2:1,1 3:1,1 5:1
  106:1,1
e-mail 4:12,16,18
  17:21,24 18:1,2,22
  19:2,4,7 25:7,10
  25:14 26:6 44:23
  45:14 61:20 62:4,7
  62:8,9,13,16,20
  63:7,13,15,16,19
  63:19,20,21,24
  64:6,13,20 65:10

66:8,9,15 67:1,4
  67:21,23 72:16
  75:12,14,16,18,19
  75:23 76:7 82:6
  84:8,10,15,15
  85:12 86:18 89:8
  92:14,16 93:1,3
  94:13,14,16,17,18
  95:23 99:16 100:2
  100:13
e-mailed 89:12
e-mails 4:11,13,14
  4:15,17 17:12,13
  44:18 60:13 61:2
  61:17 64:5,23,24
  66:3,6,19 83:22,24
  100:2,7,18
earlier 9:20 63:15
  83:8
EarthLink 100:8,9
  100:11,14,16,25
  101:6
EASTERN 1:3
easy 55:10
EBIDA 31:2
editing 36:15 41:11
efficient 37:8 52:22
  94:25
effort 12:14 25:2
  41:13
efforts 24:24 41:19
  42:1
Egan 53:25 54:10,12
  54:22
eight 24:17 37:23
either 41:4 55:25
  67:18 79:22 84:24
  106:10
electronically 25:11
Elite 46:5
Elizabeth 3:13 84:5
employed 9:7,8
employee 6:19 7:10
  7:12,14 9:14,21
  84:1
employees 6:25 7:6
  7:7 8:23

Sirlin

FTC v. LifeWatch Inc., et al.

7/25/2017

[110]

ends 30:7 86:4
energy 89:22
engage 59:2
engaged 59:6
English 82:6
Enterprises 14:23
 20:17 24:1
entitled 75:21
equipment 17:1
equity 25:4 91:15
 94:21 95:4,9,14
especially 89:11
ESQ 2:14,20,21 3:8
establish 51:12
established 15:25
 92:11
estate 69:5,6
et 1:5,12
etcetera 69:21,21
 77:9 86:14,15 95:1
 95:1
evaluate 29:16
evaluating 28:16
Evan 1:21 2:17 5:8
 12:5 30:17 47:11
 62:2 64:24 69:7
 70:24 91:19,20
 99:19,20,21
evan@lifewatch
 101:13,16
Evan@lifewatch-...
 101:9
evan@lifewatchusa
 19:4
evan@medilok.com
 101:17
Evans 3:12
evansirlin@earthl...
 100:19
Evansirlin@gmail
 101:15
evantsirlin@gmail
 101:11,14
event 32:15
events 28:24 29:1,6
 75:22
everybody 73:18

92:17 99:16
evolve 92:7
ex-employee 44:24
exact 35:14 45:11,12
exactly 13:3 19:25
 19:25 25:10 51:5
 65:1 68:11
EXAMINATION
 4:3 5:4 103:5
 105:3
examined 5:3
Excellent 64:14
exclusive 56:14
 62:11 63:9,16,22
 63:25 66:2
exclusively 61:4,11
 62:24
Exclusivity 63:23
executive 4:12 25:7
 26:12,13 27:1
 34:18
exhibit 17:13,18
 18:9 25:7,9,10
 44:18 61:16,17
 66:6 75:14 83:22
 92:14 102:16
Exhibits 4:8 102:17
exist 19:20 21:23
 42:13,16
exists 21:9,10
expansion 74:1
expect 5:25
expected 30:13
expenditures 34:15
 37:8,18,20 38:3,9
 38:13 39:10,11
expense 20:17,22,25
 78:18
expenses 33:25,25
expert 71:23 89:5
experts 89:4
explain 6:10 24:24
 27:13 56:15 61:14
 74:13 78:7 91:18
explanation 90:13
extra 69:11 71:5,11
 72:4

eyes 11:6

**F**

F 106:1
F-L-Y-E-R 43:16
facilities 15:3
facility 104:6,10
fact 33:19 84:7
factor 31:9,11,17
factors 31:17,21
fairly 35:2 66:9
faith 46:25
false 35:11
familiar 14:22 43:9
 43:10,16 44:5
family 90:24
far 7:5 92:2,4
faster 59:14
fastest 59:15
father 34:21
February 34:19
 41:4
FEDERAL 1:5 2:3
fee 11:20
felt 89:5
field 89:4
figure 14:2 60:16
filed 82:13
final 20:17,22,25
 78:18
financial 24:10
 31:22 40:13 72:22
 91:12
financials 32:22
financing 37:10
find 27:7
fine 11:7 39:23
 49:13
finish 23:13 59:9
fire 96:10
firm 32:4
firms 83:19
first 5:2,13 17:21
 25:14 29:12 41:13
 42:8 43:5,8 44:22
 47:5 56:25 57:1
 62:2,4,13 63:19

67:25 69:24,24
 82:19 83:24 85:12
 85:13 88:15 99:3
five 7:5 24:25 34:25
 55:24 56:3
 57:25
flip 62:3
flipped 18:18
flips 85:10
Floor 2:18
Florida 2:10,11,13
 23:20 50:20 51:3,4
 51:15 55:15,25
 56:15,17,20,21
 57:12,16 60:18
 67:17 84:23 103:9
 105:6
Flow 21:5
fly 55:15
Flyer 43:15,22 44:4
 44:6 83:8,9
flying 58:1
focus 29:9
focuses 93:16
follow 103:4 105:2
follows 5:3
forgot 23:21
form 12:1 13:21
 19:18 30:14 32:7
 42:10 54:25 74:9
 83:12,20 85:9,24
 87:2 90:9 91:1,5
 92:8 95:11,21
 96:14,20,21 97:4
 97:24 98:4
forms 13:5,7
forth 106:6
forward 66:3
forwarding 25:16
 63:15
foundation 30:14
 96:15
four 13:18 34:3
 76:15
fourth 13:15,17 92:4
frame 14:8 15:21
 16:1,14 17:3,10

51:10,12,13
free 68:25
freebie 68:23
friend 43:21
friends 86:11
front 90:25 102:22
fronters 80:14
FTC 33:7,18,19
 97:9,11 98:17
 105:7,13
fulfillment 8:7
full 28:20
function 97:1
funerals 20:24
further 106:9
fuss 11:2
future 20:7 22:12
 30:9
FYI 84:12

**G**

G-mail 100:1 101:7
 101:9,14,15,16
 102:1
Genealogical 21:18
GENERAL'S 2:10
generally 35:15 88:1
genome 21:19 22:5
 22:15
gentleman 23:20
 47:17 87:7
getting 11:24 22:6
 28:4 30:21 62:7,19
 69:4 72:3 86:23
 94:13,17 97:14
 104:7
girls 86:12
give 11:4 14:4 15:9
 44:17 54:22 55:8
 68:25 73:12 77:10
 88:20
given 6:8 65:7 106:8
gives 79:23
giving 78:11
Glisby 92:5
Global 46:10,16
go 16:22 17:12,20

18:21 22:14 23:25
27:1 30:12 33:2
34:3,24 35:2 36:3
38:10 39:23,24
40:19 52:18 56:8
56:20,24 63:18,20
66:20 75:12 77:25
85:6 88:7 103:7
104:15
**goal** 40:22
**goes** 13:8 20:22
21:20 31:5,6
**going** 5:25 6:1,3,10
6:11,13 8:6 9:25
11:2,9 12:1 14:10
15:17 17:11 18:7,9
18:11 19:15 25:11
27:5 30:7,12,24
32:22 42:6 46:4,20
49:12 50:3,6 55:21
56:11 57:10,11,19
58:19 61:1 63:13
64:13,20 66:24
67:20 76:25 79:17
79:22 80:23 82:5
84:23 87:23 97:24
102:10 105:2,9
**good** 23:15 61:13
62:11 63:4 64:11
64:18 65:15,17,20
67:20 72:14 73:18
75:5 77:23 87:24
88:4
**GORDON** 2:8
44:11 66:18
**gotten** 94:21
**government** 33:16
**great** 22:11 68:25
88:15
**greatly** 40:24
**Green** 1:18
**Greg** 92:5
**grew** 26:22
**Group** 2:16 46:7
**grow** 41:8
**Guard** 22:16
**guess** 15:19 33:2

40:21 67:22 85:22
86:19
**guy** 67:10
**guys** 56:10 71:7 72:2
86:12

**H**

**Haglund** 1:24 106:3
106:18,19
**half** 38:7 39:9,11
**Hallowell** 9:4,5 84:4
**hand** 20:22,22 21:20
21:20 106:15
**handle** 52:22
**handled** 48:4
**happen** 6:15 92:7
**happened** 62:22
93:7 98:20
**happening** 15:23
17:9 29:24 84:18
**happens** 5:21
**harder** 37:23
**Harmon** 53:25
54:19,19,22 55:8
**Harmonious** 14:23
15:12,24 16:6,9,11
16:17 24:1
**he'll** 12:12
**head** 11:1 88:15
**headed** 31:24
**heading** 34:4
**health** 28:22 95:2
**hear** 10:16
**hearing** 22:4 97:7
100:12
**HEI** 23:25
**held** 1:23 18:20 78:2
88:8
**help** 41:7 69:20
72:13,15 73:18
80:23 94:25
**helped** 86:12,13
**helping** 67:14 86:6
**helps** 69:1,2
**hereinbefore** 106:6
**hereunto** 106:14
**Hey** 67:1

**high** 32:23
**higher** 31:5,5,8,8,15
31:16,18,18,20,25
**Hilgar** 81:16,21
**Hilgar's** 100:13
**hire** 96:10
**hired** 42:9
**historically** 24:7
**history** 34:6
**hold** 73:12
**Holoway** 9:3
**home** 20:7 89:21
93:6,13
**honestly** 10:22 27:4
68:13
**hope** 37:17
**hopefully** 5:21,22
72:3
**hopes** 37:8
**hour** 22:14 24:20
**house** 69:2
**HR** 92:21
**humor** 71:1
**hurts** 5:24

**I**

**idea** 43:2 63:4 64:11
64:18 65:15,18,20
72:17 75:5 105:11
**ideas** 67:2,25 68:6
**identification** 17:14
25:8 44:19 61:18
66:7 75:15 83:23
92:15 102:18
**III** 1:24
**Illinois** 1:2 2:6 3:7
**impossible** 5:22
45:15
**impression** 103:12
103:13,16
**in-house** 74:22
**inbound** 78:23,24
79:19 104:16
**including** 31:21
103:17,24
**incorporated** 19:12
65:11

**incorrect** 39:6 42:5
**increase** 30:8 34:10
34:12,13,14 37:8
37:18,20 42:3 68:6
**increased** 33:21,25
**increasing** 68:3 71:7
**increasing/justifyi...**
68:1
**incredible** 22:12
**INDEX** 4:1
**Indiana** 82:7,12,12
82:16,17,19
**indication** 104:7
**individual** 28:9,10
64:6
**individuals** 55:4
103:21
**industry** 11:18
20:22,23 23:7 24:7
27:17 28:22 29:24
30:18 31:1,22,23
32:10,17,25 33:3
33:22 34:16 35:21
37:4 61:5,6 69:7
70:2,15 71:14,19
71:21,23,25 72:3
73:17 74:16 87:1
**inevitable** 28:21
**Info** 66:15 75:21
**information** 46:1,5
98:19
**InfoServices** 62:2
**inherently** 97:25
**initials** 23:25
**injunction** 22:4
45:24 82:1 97:7
98:14 100:12
**Innovative** 46:13
**input** 36:12
**institutional** 34:23
**insurance** 20:25
78:19
**intent** 72:13 74:12
**interactive** 46:10
77:19 78:8,12
**interest** 26:1 78:13
91:4,8,12

**interested** 15:22
26:5 78:16,18
106:12
**interfaced** 46:17
**Intern** 3:12,13
**internally** 46:8
**internet** 12:16 13:3
13:7 20:6 38:25
**interrupting** 5:20
**introduced** 86:20
**invented** 69:7
**invest** 26:2 30:23
**investigations** 81:12
**investigative** 97:9
97:11 98:13,15,18
**investor** 25:4 94:21
95:4,9,14
**investors** 24:11
**invited** 56:23 57:10
**invoice** 53:9,10
**involved** 18:24 22:6
41:11 44:9 54:12
54:16 58:23,24
81:23 85:21,22
93:3
**involvement** 26:19
**issue** 45:23 82:2
**issued** 98:10
**issues** 70:3 82:7,8
**IVR** 77:8,16,17 78:3
78:6,8,23 79:4,5
79:17,19

**J**

**J** 3:8
**January** 84:20,21
85:3,4
**Jason** 2:21 5:16
105:5
**job** 72:15
**Jody** 17:22 18:22
19:7
**Johnson** 44:23,23
53:24 54:3,4,6,8
54:22
**joke** 67:20
**Joseph** 2:20 5:13

Slrt1in

FTC v. LifeWatch Inc., et al.

7/25/2017

[112]

**jousting** 101:5
**judgment** 78:11
**July** 1:15 35:5,6,8
  38:3 95:20,23
  106:15
**Jupiter** 23:20
**justify** 69:20 74:2,19

**K**

**Kansas** 82:7,12
**Katie** 66:13,14 67:7
  67:7,8,10 72:13
  74:3
**keep** 10:11 57:19
**Kevin** 9:5
**key** 28:17 30:24
  81:10,11
**kill** 79:18
**kind** 9:23 22:12
  37:21 79:1
**KMR** 19:8
**knee** 79:2,3,4,6,24
**knew** 26:4 47:18,22
  47:23 83:18 93:22
  105:5
**know** 6:7 7:5 8:2 9:2
  10:15,20,25 11:9
  15:1,12 17:6,8,22
  19:8,25,25 20:2,4
  20:8,10,18,19
  21:10,10,17 22:9
  22:18,19 23:1,3,18
  23:24 24:5 25:19
  26:10,21,25 29:1,7
  29:18 30:13,22
  31:22,23 32:13,13
  32:17,21 34:2
  36:11 37:5 38:12
  39:11 40:2 43:11
  43:22,24,25 44:12
  44:14 46:1,3 47:2
  47:20,21,21,25
  48:2,23 49:5,14,16
  49:17,18,24,25
  50:4 51:14 53:10
  54:4,6,10,14,16,19
  55:2,5,8 57:12

58:6,13,14 59:14
60:1,20,21 64:25
65:14,16,23 66:13
66:14 67:6,7,8
69:21 71:10 72:10
73:6 74:25 76:22
77:18,22,22 79:15
79:18,22 80:21
81:4,7,16,18,21
82:21,23,25 83:6
83:15,21 84:6,7,8
85:2,17 88:2 89:22
92:1,2,18 93:5,19
93:23,25 96:16
98:1 100:5,24
102:1,2,3 105:8,13
105:16,18
**knowing** 70:25
**knowledge** 20:20
  43:13 73:7 78:8
  98:6
**knowledgeable** 87:4
**known** 14:25 77:20
  87:4 93:17
**knows** 78:7
**Kraus** 3:13

**L**

**L** 1:24 5:1 106:3,18
  106:19
**L-I-P-A-R-I** 5:14
**lab** 21:22
**label** 18:17
**labeled** 18:8
**labeling** 18:16
**labels** 18:11
**Labs** 21:18
**Lacks** 30:14
**laughing** 45:17,18
  45:19
**Law** 1:23 2:16
**lawsuit** 9:11 45:12
  98:17
**lawyer** 73:8 82:15
  92:10 95:5,7
**lawyers** 60:3
**Lead** 44:4

**leads** 79:18 80:4,11
  80:13
**learned** 81:24
**leave** 19:10 59:21
**legal** 90:13 92:9
**legend** 37:25
**Les** 40:1,2,2 43:20
  43:20,21 44:7 48:4
  48:8 54:13,14,15
  61:24 62:3,14 63:6
  66:4 83:8 86:20
  87:7
**let's** 17:20 18:21
  34:3 41:9 48:23
  52:18 59:19 66:20
  73:11 75:12 88:7
  89:8,14,15
**letterhead** 65:3
**level** 72:23
**Life** 9:10 10:6,14
  11:10 46:14 70:5,7
  84:11 86:6
**lifeline** 28:25 31:24
**LifeWatch** 1:8,11
  2:17 5:15,17 6:16
  6:19,25 7:3,3,4,5
  7:10,17,19 8:3,20
  9:7,21,22 10:2
  11:11 12:6,7,8,14
  12:15,21 13:4,8,23
  13:24 14:6,15 16:7
  16:11,17 18:7,15
  19:19 20:1,3,5
  21:4 24:7,9,12,13
  24:18 25:1 26:3
  27:22 28:5,17
  29:10,16,25 30:7
  30:12,23,23 32:5,9
  32:15 34:12 35:7
  35:20 36:25 37:2,8
  37:12,17,20 38:14
  38:19,21,23 40:24
  41:6,7 42:3,9,19
  43:6,15,21 44:3,9
  44:24 45:4 46:11
  46:12,13,14,15,17
  47:1,4 52:1,9,12

52:19,20,22 53:4,9
53:13,16 58:18,19
59:1,2,7,16 60:14
61:3,4,5,8,9 62:24
64:24 68:14,16
69:10 73:13,15
74:7 75:6,9 79:7,9
79:14,16,17 80:18
81:1 82:7,20 84:1
90:3,18 91:7,10,12
91:15 92:3,23 93:6
93:13 94:10,21
95:3,8,13 96:4,18
97:1,8,12,23 98:19
98:21 99:2 100:21
102:22
**LifeWatch's** 28:11
  34:10,13 38:7 98:1
**lightening** 71:2
**Lindsley** 83:25
**line** 15:25 66:15
  67:25
**lines** 63:18 71:4
  73:21 80:3 81:13
  82:24
**Lipari** 2:20 5:13,14
  6:20 7:4 9:24
  10:25 11:6 12:1,12
  13:21 15:17,20
  16:5 18:18 19:18
  24:19 30:14 32:7
  36:10 38:10 42:10
  46:20,22,24 49:4,9
  49:13 54:25 55:3,7
  59:11 74:9 78:5
  83:12,20 85:24
  87:2 90:9 91:1,17
  92:8 93:9 96:14,20
  96:24 97:3,24 98:4
  102:6 105:9
**Lisa** 92:18
**list** 39:25 41:15
  103:22
**listed** 47:14
**little** 10:11 22:2 24:6
  37:23 68:13,20
  70:21 73:20 74:8

97:6,10
**live** 45:14 78:10,22
**LiveOps** 74:24
**LLP** 3:3
**located** 15:5 19:13
**location** 89:19
**locations** 19:10
**lock** 69:6
**lockbox** 68:12,17
**lockboxes** 68:16
**LOL** 45:15 69:20,23
  70:23,24
**long** 35:2 66:9 75:16
  102:13
**long-term** 70:8
  72:24
**look** 17:25 32:21
  37:24 38:4 44:20
  61:19 66:8 72:3
  73:25 75:16 85:13
  88:13 89:3
**looked** 24:17 31:2,2
  94:2
**looking** 33:6,8 39:4
  62:4 66:18 67:21
  75:23 77:14 78:19
  80:12 90:13
**looks** 17:21 38:2
  68:5 76:6 84:8
  85:25 88:23 89:1
  92:16
**lot** 13:18 24:10
  31:16,24 56:20
  60:15,17 69:3 70:3
  71:18 74:17 79:16
  84:11 86:12 90:2
  98:19
**lots** 86:12
**louder** 10:11
**lunch** 102:10
**Lynbrook** 5:10 7:18
  8:4,12 13:20 14:3
  14:18,20 15:7,9
  19:14

**M**

**mail** 77:8 80:17,19

Sirlin

FTC v. LifeWatch Inc., et al.

7/25/2017

104:14
mailroom 104:18
majority 90:17
making 59:10
  103:14,18,20,25
  104:1
malice 71:2
manage 89:19
management 21:16
  39:25 40:3
manages 43:11
managing 83:18
manufactured
  11:22
March 97:12,21
  98:10 101:20,25
Mark 53:24 54:19
  54:19,22
marked 17:13 25:8
  44:18 61:17 66:6
  66:22,25 75:14
  83:22 92:14
  102:17
market 12:15
marketer 68:24
marketers 56:9
  79:19 81:1
marketing 8:5,5
  11:25 12:4 13:9
  34:22 37:18,21
  39:1 40:5 72:15
  73:18 76:3,5 77:1
marriage 106:10
MARTIN 3:3
Matt 53:25 54:10,12
  54:22
matter 89:23 101:3
  106:13
mattered 16:14
maxed 88:20
maximize 40:23
  41:5
mean 16:15 27:17
  45:25 47:18 65:20
  69:19 70:11,23
  71:21 72:25,25
  74:20 76:24 77:16

77:17,24 90:12
meaning 16:24 23:6
  71:11 90:12 94:11
  95:16
means 6:3 13:25
  14:1 27:18 71:1
  74:14,21 76:22
meant 45:16,21
  65:22 69:24 71:2
Med 20:9 23:23 24:4
MedGuard 3:4 7:3
  7:12 8:8,12,19 9:6
  9:8,11,12,14,16,17
  93:18,20,24
Medi-Lok 68:9,11
  68:16,18,20 69:11
  69:15
Medi-Loks 68:15
medical 1:12 6:23
  11:18 19:8 20:23
  22:18 23:5,6 24:7
  28:4 31:1 61:5
  69:7 70:1 78:17,19
  79:24 104:15
medication 21:21
MedWatch 14:25
meet 50:14,24 51:3
  67:15 84:23 85:7
  89:18,25
meeting 51:11
Melissa 3:12
mentioned 5:18
  22:5 40:9 48:18
  82:8
merge 93:13
merged 93:6 94:10
mergers 32:3
Merrick 5:10 7:18
  8:3
message 62:1 63:20
met 50:19 51:3,16
  52:16 54:8 59:14
  103:9
method 11:25 37:18
middle 12:24 27:9
  34:9 40:21 58:18
  58:22 59:1 88:10

94:1
Middletown 7:21,22
midway 85:20
Mike 43:15,22 44:4
  44:6,10,12 81:16
  81:21 83:8,9
  100:13
million 31:12,14
  53:21
minute 42:7 67:6
mischaracterizes
  12:2
misrepresentations
  104:1
misstatement 56:6
misunderstanding
  98:5
Mitch 7:10 44:25
  45:14 50:11 51:25
  52:2 53:8,17,21,25
  54:23 55:12,14,24
  56:17 58:3,14 85:6
  85:10 90:22 91:4
  91:22,24 92:1
  100:24
Mitchel 9:20 17:24
  25:15 26:24 52:10
MMR 30:20
Monday 65:4
money 19:24 25:3
  26:8 31:25 34:22
  38:13,13,15 39:7,9
  39:14 55:8,25 68:3
  69:21 70:21 71:7
  72:5 74:2,19 76:2
  88:17 90:16
monitoring 11:20
  16:23,24
month 28:8,10,10
  28:14
monthly 11:19 27:9
  27:16,18,19,20,21
  27:22,24 28:4
  31:12 41:5
months 31:14 98:21
move 79:2
MRR 27:9 30:6,8,9

31:1,3,4,5,5,13,19
  31:21
MRRs 30:24
multiple 31:6,20
  32:16
multiplier 31:8,13
  31:14

_____

**N**

N 2:1 3:1 5:1,1
name 5:6,13,14 21:6
  22:20 23:21 43:16
  44:12 47:22,23
  50:8 54:6 55:21,22
  55:23 60:21,23
  84:11
named 17:21 43:15
  60:18 67:10 83:25
  84:4 92:1 94:21
names 80:22 81:4,7
National 46:14
  84:11 86:6
nearly 50:10
necessarily 13:17
  26:7
need 36:3 71:5,11
  73:10,22 74:3
negotiate 58:19
negotiating 59:17
negotiations 59:2,7
Neil 26:23 36:6,8,12
  40:9 61:12,25
  62:10,13,14 63:3
  63:14,21 64:10,13
  64:18,20 65:8,10
  65:14,16,17 66:4
  76:1 82:11
Network 46:14
  86:23
never 54:8 55:6,24
  94:9,10 100:16
new 1:9,19,19,25
  2:19,19 5:3,10
  7:18 35:20 40:25
  50:20,24 52:8 56:3
  56:8 57:11,11,20
  67:18 84:11 91:6

96:16 106:4
night 6:4
nonlawyer 90:10
North 3:6
NORTHERN 1:2
Notary 1:24 5:2
  106:3
Noted 105:24
notice 18:4
noticed 60:13,13
November 38:6
number 4:10 19:11
  29:25 32:18,20
  44:2
numbering 18:5
numbers 18:9 29:2
  29:15,21 35:14
  41:16,16

_____

**O**

O'Toole 2:7 4:4 5:5
  5:11,11 6:5,22
  10:9,15,19,22 11:2
  11:8 16:3,13 17:15
  18:6,14 25:9 44:10
  47:15 49:7,11 50:3
  55:10,19,23 66:5
  66:24 75:12 78:6
  88:7 99:5,9 101:1
  102:9 103:3,7
  105:2,4,21,23
oath 55:22
object 9:25 12:1
  15:17 19:18 30:14
  46:20 97:24 105:9
objection 9:24 13:21
  32:7 36:10 42:10
  54:25 74:9 83:12
  83:20 85:9,24 87:2
  90:9 91:1,5 92:8
  93:9 95:11,21
  96:14,20,21,24
  97:3,4 98:4
objects 18:16
obtained 48:24
  59:23
obtaining 104:23

FTC v. LifeWatch Inc., et al.

7/25/2017

obviously 12:9
occasion 56:4
October 34:19
   40:17 41:4,10,21
   42:3
offer 61:10
office 2:10 7:20 8:12
   8:17,19 14:3,4
officer 9:22 10:4
offshore 80:14,16
okay 19:17 22:16
   26:7 44:8,8 46:23
   62:6 64:1,22 73:24
   77:13 79:14 86:4
   87:23 90:14,17
   94:23 98:23
once 50:17,18 71:19
online 13:7
open-ended 30:3
operate 15:2 23:2
   43:23
operates 8:17
operating 6:16 7:17
   7:19 8:12
operations 50:25
   51:1 95:1
opinion 34:1,1
organization 40:15
   40:16
original 62:1 63:20
originally 36:21
   52:19
Orlando 2:13 88:20
   89:19
outbound 35:7,11
   35:18 36:17,24
   37:3,7,25 38:2
   39:5,7 41:14,19
   42:2,4 78:10
   103:14,18,21
   105:18
outcome 106:12
outflow 40:23
outside 12:17 13:16
   13:19 14:14 39:8
   74:23 76:4 81:1
over-time 90:11

overall 26:1
overhead 88:18
overpaid 53:16
overvaluation 32:19
owned 23:21 58:7
   91:10
owner 9:23
ownership 90:20,22
   91:3,8,22
owns 23:21 43:11

P
P 2:1,1 3:1,1
p.m 105:24
page 4:10 25:14
   27:4,8 34:3,3,24
   34:25 35:5 37:23
   39:23 40:1,1,15,19
   41:9,14 42:1 62:2
   62:3 63:14
paid 52:22 53:4,20
   75:2 88:17
paper 73:9,13
paperwork 69:18
paragraph 28:20,22
   29:3,9 34:5,7,9
   35:1,2 37:6 40:19
   40:21 41:13 82:4
   85:13 86:5,11
   88:11 94:1
paragraphs 27:8
   71:4 76:15 81:9
parenthetical 74:3
   76:18 85:13
part 8:21 18:21
   25:12 34:16 38:1
   40:3 44:22 57:23
   69:24 96:18 104:6
   104:10
part-time 40:11,13
particular 29:17,19
parties 106:10
Partners 32:2
parts 57:21
Paula 44:23,23
pay 11:19 15:17
   19:24 38:19,21,23

39:14 53:25 58:10
   58:12 68:3 71:24
   73:1,3,17 74:7
   75:7,9 79:18 90:16
paying 28:8,10,14
   71:12
payouts 68:1
pays 19:23 79:17
PC 2:16
pending 78:5
people 13:24 14:11
   26:10,15,16,22,24
   28:3 40:16 51:20
   51:21 52:1 55:11
   58:2,4 60:16 71:12
   71:24 72:15,22
   73:16 76:4,4 84:9
   86:24 89:3 94:14
   96:10,10 102:14
   104:2
percent 71:19,21
performance 30:5
   32:2
performed 27:21
period 25:3 29:17
   29:19 31:6 40:17
   41:3 43:1,3 45:6
   89:2 101:6
PERS 35:21 61:5
   93:17,24
person 12:18 14:5
   17:22 31:22 36:6
   48:10 50:14 52:9
   55:19,20 56:1 57:1
   60:16 70:10 71:9
   71:22 73:18 86:19
   102:15,25
personal 72:23
personality 70:25
personally 16:8
   47:11 48:5,5 69:10
   98:6,25
perspective 39:20
Philips 28:25 31:24
phone 78:23 104:16
Photograph 4:19,20
Photographs 102:17

phrase 95:6
phrased 36:23
physical 14:5 19:10
physically 8:21 15:5
picture 102:16,21
   102:25
piece 73:9
place 1:24 13:20,22
   14:3 31:10 52:20
   90:8
Plaintiff 1:22 2:11
plaintiff's 17:19
Plaintiffs 1:6 2:4
plan 37:12,15,17
plane 56:4,7,22 57:7
   57:8,16 58:1,6,7
planning 84:23 85:5
   85:6
please 5:6 30:4
point 18:9 87:3,17
   89:4 92:21 95:25
   97:16 98:8
portion 18:17
possible 29:15 58:13
   86:5
possibly 29:16 65:21
   74:11
potential 24:11
   103:21 104:1
power 85:25
powered 101:9,16
Practice 1:22
predictive 53:5,5,14
prefer 28:1
preliminary 22:4
   45:24 82:1 97:7
   100:12
prep 82:11
prepared 26:17
preparing 26:19
   82:15
PRESENT 3:11
preserve 97:19,22
   99:1,11,12
preserving 99:8
preship 73:25 74:6
   75:9 89:23

president 9:12,15
   10:4,5
press 78:14,16,17,19
   78:24 79:24,24,25
pressure 71:7
pretty 92:16
previously 15:21
price 32:10
Primary 76:16,17
print 38:25
prior 59:1 98:17
   105:7,15
private 56:4,7
privilege 97:10
Pro 20:11
probably 6:15
problem 5:19 39:20
   64:7
problems 52:21
proceeds 37:9
produced 10:23
   18:7 60:14 64:24
   98:21 100:21
product 21:3 68:14
production 18:15
   24:9
products 104:2
promise 61:10
promotion 78:14
Protection 23:23
   24:4
proved 35:13 41:15
   41:20
provide 11:15 68:14
   76:17 79:19 96:6
provided 68:16
Providers 46:16
provides 11:18
providing 6:23
provision 11:7
   16:24
provisions 10:21
Public 1:25 5:2
   106:3
pull 18:10
purchase 32:10 53:5
   58:19 59:3,7,17

Sirlin

FTC v. LifeWatch Inc., et al.                                                                7/25/2017

purchased 29:4 91:7
purchasing 13:23
    28:25
purports 61:20
purpose 72:2 94:25
    104:18
purposes 20:7 56:8
pursuant 1:22
put 18:11 34:1 65:3
    88:2,15
putting 96:24

**Q**
QRA 22:20,22
quality 77:8 89:3
quarterly 71:25
    72:3
question 6:20 9:14
    10:12 12:3 13:14
    16:3 23:13 24:19
    24:21,22,23 29:11
    30:3,16,19 33:13
    36:19 37:16 38:11
    39:2 42:16 46:23
    49:5 50:1 55:7
    57:6 58:6 60:6
    62:17,18,19 66:14
    74:10,12 75:6 78:5
    81:10,11 85:1
    87:19 91:2,6,6,18
    98:5
questioning 15:24
    15:25
questions 27:5 55:4
    76:10,11,12
    102:11 103:8
quick 10:12 22:24
    23:2,12,18,21
quicker 59:10,11
quickly 39:24 95:5
quit 88:10,14

**R**
R 2:1 3:1 5:1 106:1
R-O-Z 25:16
radio 12:16 13:1
    14:12 38:25 76:5

raise 25:2 76:2
Ramos 44:10,12
    45:15
ran 58:25
reached 10:14
read 17:25 18:23
    28:22 29:12,14
    34:7 35:3 40:19
    49:18,20 81:12
    94:24
reading 76:20
real 48:7 69:5,6
    74:24
realize 70:25
really 13:12 33:2
    89:7 99:10
Realty 19:19
reason 48:8
reasonable 29:22
    32:18
recall 18:1,1 19:1
    21:6 22:22 25:17
    25:18 26:24 32:12
    36:12 41:11,12
    45:1 48:15,16,19
    48:20 51:14 52:23
    56:5,6,7 57:4,7,8
    58:15,16,20 59:25
    61:12 63:1,3,6,11
    64:2 65:4,5 66:9
    66:11,12,16 67:8
    67:12,19,22 75:19
    75:21 76:18,20
    82:18 84:1 86:7
    92:4 94:13,16
    97:11,16 98:16
    99:24,25
recess 59:20 102:12
recognize 26:13,14
    60:23
recollection 18:24
    22:3 43:19 82:16
record 5:7 18:19,20
    34:1 49:4 59:12,21
    78:2 87:17,22 88:8
    96:25 101:2 106:7
records 19:14 98:22

recurring 27:9,16
    27:18,20,23,24
    31:7,12 41:5
refer 60:3
reference 80:4
referenced 10:6
references 76:6
referring 47:13
    81:17 82:9,10
    84:14
refreshes 18:23
refundable 71:13
regards 86:5
regularly 53:16
Reilly 43:12 76:7
    80:5,7,10,12,18,23
related 34:14 97:23
    100:13 106:9
relating 75:22 99:2
relation 39:2
relationship 42:20
    47:1,4,9 82:25
relationships 34:22
relevant 79:21
remains 92:12
remember 17:4,9
    20:12 21:7 22:10
    26:15,16,17,20
    27:6 28:24 29:1,6
    29:12 32:3,8 35:14
    36:4,14,15 41:17
    42:22,24,25 44:1
    45:11,12,16,21
    47:7 48:7 50:17,23
    51:5,6,7,7,22
    52:11,14,17 57:15
    60:7,9,10 61:1
    62:7,8,9,10,19,22
    62:23 63:8,10 64:8
    64:10,17 65:8,19
    65:24 67:4,13 75:3
    75:8,11,24,25 76:1
    76:11,14 80:9,10
    80:22 81:13,20
    82:23 83:11,13
    84:2,17,25 85:8,18
    85:23 86:10,15,16

88:21,24 93:1
    94:17 97:7,14 98:7
    98:8
rent 11:15,17 12:19
    14:6 19:23,24
rented 58:7
renting 11:23
repeat 12:3 37:16
    74:10 91:6 95:10
rephrase 12:12
    30:19 91:18 95:3
    95:12
rephrased 91:9
    94:19,20
reporter 5:20 33:9
reports 78:18
represent 5:14,17
represented 43:25
    87:6
represents 28:3
research 36:2,8
respect 15:23,24
respond 97:17
responded 97:8
responds 84:14
response 22:24 23:2
    23:12,18,21 45:14
    46:12 77:19 78:9
    78:12 85:12
rest 12:5 57:25 77:2
    85:12
retain 91:22 96:4
retained 90:20 91:7
returned 53:17
revenue 27:10,16,18
    27:23,24 31:7,12
    34:10,12,13 41:5
Rick 47:17,18,18,23
    48:10,13,20,23,23
    49:5,9,14,22,23
    50:9,14,19 51:5
    51:23 52:8,16,18
    53:4,24 54:3,21
    55:25 56:25 57:2,3
    57:4,7,8,10,12,21
    61:23 62:5,23 65:3
    67:10 72:14 83:18

84:10,15,23 85:7
    85:11 86:5,11,18
    86:19 87:1,3,4,7
    87:20 88:25 89:2,9
    89:12,14,15,16,25
    102:13,19 103:1,9
    103:17,25 104:21
    104:21
right 6:22,25 13:16
    14:9 15:23 16:2
    18:14 24:8,14
    26:24 28:18 29:18
    29:25 30:16 33:11
    33:22 34:24 38:4
    38:14 41:25 42:21
    42:23 45:5 47:15
    51:22 59:15 65:12
    69:5 70:7 76:20
    81:7 82:22 83:10
    83:19 89:8 92:21
    95:5 102:22
RMR 27:11,23 28:2
    28:3,7,9,11,17
    31:25 72:18
Road 5:10 7:18
robocalls 103:14,18
    105:8,16
Rockbridge 29:8
Roderic 48:24,25
    49:5,10,14 50:8
    55:18,22,23 56:1
    57:1 58:17 59:22
    102:14
role 67:13 95:13
Roman 3:5 25:5
    52:4 53:10 59:5,6
    70:11,14,18 84:9
    89:15 90:3 94:22
    95:4,8,13
Rookstool 17:22
    19:7
room 5:12
rooms 88:16
rough 43:2
Roughly 17:5
roundup 88:19
routed 79:25

FTC v. LifeWatch Inc., et al.

7/25/2017

**routing** 84:16 85:11
89:12
**Roz** 25:16,19
**rude** 24:22
**Rules** 1:23

**S**

**S** 2:1,5 3:1 5:1
**S-U-L-T-Z-E-R**
5:16
**s/Albert** 106:18
**sadly** 96:5
**Safe** 93:6,13
**SafeHome** 3:5
**Safeline** 81:16,19
**salary** 91:13
**sale** 68:4
**sales** 8:5,5,9 12:16
16:19 34:23 39:12
39:13 42:3 47:10
71:8 72:15 73:16
73:17 74:8 81:5
86:23
**SAMANTHA** 2:8
**Sarai** 7:8 39:25
64:21,24,25 65:2
**sarcasm** 71:3
**save** 79:22 102:1
**saw** 14:5 52:6,8
56:21
**saying** 13:13 30:7
33:7 49:9 55:19
62:11 65:11 68:5
70:20 71:8,9 74:5
77:4,9,13 78:11
81:15 85:25 86:4
87:1 89:14,25
92:25 93:5 94:14
94:17 99:17
101:13
**says** 26:5 28:21
29:13 30:5 32:3,9
32:15 34:13,18
35:5,13 39:4 40:11
40:22 41:13 50:8,9
52:18 53:2,4,16,20
55:14 56:3 58:17

58:22 60:3,7 62:2
63:25 64:14 65:5,6
65:13 67:1 69:17
74:18 76:17 77:7
78:13 81:10,11
82:4 84:11,13
85:14 86:5 89:12
89:17 93:16 94:1,4
**second** 28:20 34:4
40:22 50:20,22
63:13 81:7 88:7
**section** 69:18
**security** 5:3 20:3,6,7
30:5 32:1,2 70:15
89:21 93:6,14
**see** 6:15 10:7,17
21:1,21 26:2,4
27:10 33:12 34:11
34:17 40:16 50:25
51:1,17,18 52:12
56:8 61:25 76:16
81:10 92:17 94:4
100:22 104:6
**seeing** 66:9 84:11
94:16
**seen** 29:20 47:24
49:2 50:4,6
**sees** 12:18
**Seiden** 26:23 36:7
40:9 61:12,25
62:10,14,14 63:3
76:1 82:11
**sell** 24:13,18,25
43:21 72:6 79:19
**sellable** 73:9
**sellers** 12:17 13:16
13:19 14:14 76:4
**selling** 6:23 11:12,20
14:14 69:15 104:3
104:8
**sells** 72:11
**send** 19:5 65:3 66:3
79:4,5 99:16
**sending** 25:9,17,18
25:23,25 26:15,16
67:4,22 75:19
76:12 84:3 94:13

**sends** 84:15
**senior** 6:24 12:4
21:20 40:5 41:7
69:3 74:15
**seniors** 11:12,15,16
11:23,24 12:15
13:16 21:2 70:3
72:24 104:15
**sense** 38:11 39:2
**sent** 17:15 19:2,5
24:11 29:20 44:25
65:2 66:1,20 75:13
84:8,9 93:1 97:9
97:11 98:17
**sentence** 34:9,11
35:6,13,16,18
36:20,23 37:6
40:22 41:1 69:17
71:5 73:21 74:13
74:18 76:15 80:4
88:9 89:17
**sentences** 35:22,23
36:21 71:16 87:15
**separate** 8:20
**September** 45:9
**series** 17:12
**service** 8:7 12:19
46:16 52:19,20,23
74:1,25 77:8 86:14
95:1
**services** 6:23 11:15
27:21 28:4 46:1
76:16,17
**set** 106:6,14
**settlement** 9:12 10:7
10:7,13,18
**seven** 24:17
**share** 90:17
**shareholder** 9:17
10:3
**shareholders** 92:2
**shares** 91:10
**shortly** 98:20
**shot** 87:1
**show** 6:14 15:19
17:11 38:1 50:2,3
50:5,6 61:1 64:6

**showed** 100:12
**showing** 102:15
**SHS** 93:16,24 94:2
94:10,12
**shutdown** 84:22
**sign** 69:19
**signed** 9:11 28:3
61:23 62:4
**significant** 34:16
**signing** 13:24
**Silvers** 55:14
**single** 90:6
**Singler** 7:8
**Sirlin** 1:21 2:17 5:8
5:14,17,18 17:11
17:13,18,19 25:14
30:18 44:20 47:12
62:3 66:8 69:8
70:25 91:19,20
99:19,20,21
**situation** 40:23
**six** 24:25 35:5 41:14
42:1 98:21
**slower** 59:13
**small** 22:7
**smart** 87:5
**smirking** 33:6,12,14
**Smith** 78:13
**sold** 23:6
**Solutions** 21:16 46:5
46:6
**somebody** 17:21
30:23 32:5 62:12
72:19 73:1 79:1
89:2 94:18 99:7,22
**someplace** 56:24
80:1
**sorry** 8:4 16:16 54:3
60:13 62:16 81:8
101:4
**sort** 47:2
**sound** 42:21,23 43:9
43:16 44:4
**sounds** 21:11,13
22:18 43:10 73:14
89:13
**Source** 44:4

**sources** 76:4,5
**span** 6:6
**speak** 48:13
**speaking** 10:10
48:15,20 95:6
**special** 78:17
**specific** 30:4 69:7
**speculate** 71:10
**speculation** 30:15
36:10 92:9
**spend** 14:17 34:21
38:13,13,14 39:7,9
**spoke** 76:8,9 83:8
**SPP** 32:9,15
**staff** 2:7,8 93:1
**stake** 91:15
**stand** 27:23
**standard** 71:23,24
**stands** 77:18
**start** 35:7 61:19
73:22
**started** 5:18 35:8
47:7 56:25
**starting** 7:2
**starts** 34:10 35:1
76:16 87:15 88:9
92:25 93:5
**state** 1:25 2:10,11
5:2,6 106:4
**statement** 36:3
41:18
**STATES** 1:1 2:3
**statistic** 30:24
**stay** 6:2
**Steinmetz** 40:1,2,2
43:20,21 44:7 48:4
48:9 61:24 62:3,15
63:6 83:8 86:21
**steps** 97:22 98:2,3
99:1,12,14 101:18
**stop** 56:11 67:20
71:15
**straight** 24:21
**Street** 2:5,18
**stuff** 22:12 76:5
87:21 90:2
**subject** 18:2 45:2

59:22 63:24 66:11
66:12,15 67:2
**subjects** 6:14 71:2
**substantially** 38:6
**success** 74:3
**successful** 35:14,19
36:18,25 37:7
41:15,21,22,24
86:24
**sue** 45:1
**sued** 45:4 82:19
105:13
**suggest** 30:24
**suggesting** 46:24,25
69:22,23 70:18
**suit** 82:16
**Suite** 2:5,12 3:6
**Sultzer** 2:16,21 4:5
5:16,16 6:3 10:6
10:12,17,20 11:4
12:11 23:13 30:2
30:19 33:13 46:21
47:13 50:1 55:17
55:21 59:13,19
60:5 85:9 87:18
88:5 99:3,7 100:24
103:4,6 105:1,22
**summary** 4:12 25:7
26:12,13 27:1
34:18
**sup** 78:19
**supposed** 20:21
85:21 96:22
**sure** 7:21 27:3 33:22
35:14 41:4 72:18
74:24 82:4 84:13
85:14,22 100:2
101:19 102:15
**surprising** 65:7
**SWANSON** 3:3
**swear** 55:22
**sweetener** 69:13
**sworn** 5:2 106:6
**Sylvers** 47:19,23
49:5,10,14,22 50:9
50:14 51:15,23
52:8,16,18 53:4,24

54:3,21 55:17,25
56:25 59:22 61:23
62:5,23 67:7 83:18
102:13,19 103:1,9
103:17,25 105:6
**symbol** 37:25
**system** 78:9
**systems** 1:12 77:19
78:17 89:21

---

**T**

**T** 106:1,1
**take** 14:3 17:25 31:9
59:19 61:19 62:17
66:8 71:24 75:16
90:8 98:25 99:12
101:18
**taken** 1:21 24:25
59:20 71:3 97:22
98:2,3 102:12
**takes** 78:9
**talk** 6:13 24:20 27:9
42:6 46:4 48:23
59:14 76:3 77:13
87:23 88:3 89:15
90:2 102:11
**talked** 5:19 23:15
40:2 41:20 72:17
82:1 102:13
**talking** 7:2 11:10,21
14:8 15:22 16:1
24:8 28:20,24
32:25 33:9,17 39:1
41:1,3 42:2,15,17
42:18,19 45:25
46:5,18,18 55:17
59:6 67:1 68:2
71:15 74:15 79:12
85:16,21 86:25
98:7,9 102:15
105:11
**talks** 29:3 32:1
**Tammy** 25:16,19
**TCPA** 45:1,5
**TCV** 82:25 83:1,4
**team** 39:25 40:3
**Technologies** 21:5

21:11 46:10
**telemarketing** 42:7
42:9,11 44:8 76:18
77:7,15 83:19 99:2
**tell** 8:25 12:12 18:23
19:16 29:19 43:18
65:17 73:5 77:2
78:3,14 87:21 89:8
91:16 99:14
103:16,20,24
104:17
**telling** 77:4 80:7
82:14 88:21
**ten** 40:1
**tend** 21:2 41:8
**test** 35:8
**testified** 5:3 6:7
**testify** 70:13
**testimony** 1:23 12:2
106:5,8
**testing** 21:19,22
22:5,15
**thank** 17:16,16
25:13 48:12 78:13
79:5 87:25 88:4
**theme** 69:1
**thing** 7:22 14:11
18:16 20:8 21:12
21:13,20 22:12
33:23 61:12,13
68:25 69:5 79:1
82:10,15
**things** 26:23 27:6
38:7 50:7 71:13,17
71:18 88:1,5,22
89:3 94:24 97:6
**think** 10:9,23 16:3
19:2 22:4,16 27:10
29:21 30:21 32:15
32:20,23 34:20
35:15,25 36:2,6,18
39:20 42:20 43:8
43:14 44:15 46:6,7
46:7,16,16 47:18
48:1 49:11 56:11
59:22 60:18 61:23
66:12 67:10,16

70:17,25 71:6 73:3
75:5 77:18,22
81:16 82:1,12
84:10,25 86:9,17
86:18,25 88:1 89:7
97:25 98:5 101:16
102:6,21,25
**ThinkDirect** 74:24
**Thinking** 95:5
**thinks** 30:6 72:10
**THOMAS** 3:8
**thought** 24:1 26:10
48:10 61:13 63:3
64:10,18 65:14,16
**thousand** 73:11
**thousands** 19:5,6
**threat** 45:1
**threatened** 88:10,14
**three** 27:4,8 63:18
73:21 78:19 92:2
**three-year** 63:15,22
63:25 72:4
**throat** 5:24
**thrown** 69:12
**time** 1:24 9:18 14:8
14:17 15:21,25
16:2,14 17:3,9,10
24:14 30:9,12 31:4
32:22 37:3 40:17
41:3 43:1,2,13
45:6,11 50:20,22
51:10,12,12,16
52:15 59:16 70:9
84:20 87:3,9,24
88:15 89:2,5 90:16
92:7,22 93:19
102:13 103:11
104:5 105:6,15,24
**times** 45:4 50:16
52:15,16 73:11
**title** 39:24
**titled** 41:10
**TMI** 43:8,11,11,14
80:20
**today** 18:6 32:24
60:2 79:16 80:17
81:2

**Todd** 62:3
**told** 5:20 57:1,13
59:25 70:23 80:13
80:19 82:11 88:19
101:4 104:20
**Tom** 17:15 25:9
66:21 75:13
**tons** 104:14
**top** 10:25 35:5 37:25
65:10 67:2
**total** 28:11 69:20
**totally** 33:1
**TRADE** 1:5 2:3
**transaction** 90:6,11
95:22,24
**transcript** 106:7
**transfer** 78:22
**translate** 5:22
**translation** 73:23
**trick** 12:13 77:17
104:2
**tries** 41:7
**trip** 52:13 56:15
57:21
**true** 14:11 27:7
32:12 34:15,20,20
35:6,15,22,24,25
36:1,18,22 37:10
37:12 38:8 41:16
41:18,18,23 49:11
49:17 50:12 52:25
53:1,3,6,11,12,14
53:15,18,19,22,23
55:16 86:9,17 87:8
93:18,19,21 94:3,5
94:6,7,9,15 95:20
101:4 106:7
**trust** 90:24,24,24
91:3,20,24 92:1
**Trusted** 44:4
**try** 73:18 74:2,19
**trying** 12:13 14:2
23:17 24:13,20
25:2 26:7 30:11,22
39:19 41:5 60:16
65:21 71:6 72:13
76:2 77:16 84:25

Sirlin

FTC v. LifeWatch Inc., et al.                                          7/25/2017

[118]

89:8 99:9 104:2
**turn** 27:4 37:23 41:9
**TV** 12:16,18,18 14:5
  38:25 76:5 77:8
**two** 15:2 21:11 35:1
  35:21 36:21 38:7
  50:13 52:15 71:16
  78:17 79:24 80:3
  83:24 85:5 87:15
**two-sided** 17:19
**Type** 21:11
**types** 38:23 39:1
**typically** 31:1 70:8
  71:14 78:21,22

**U**

**ultimately** 25:3
**umbrella** 94:2
**unclear** 38:12,12
**understand** 6:11
  12:9,11 13:14 14:1
  16:13 18:24 19:1
  22:13 24:21,22
  36:19 39:19 40:25
  42:16 65:21 67:9
  68:14 72:18 74:5
  78:3 85:1 90:12
  91:17 101:1
  105:10
**understanding** 6:18
  9:10 28:15 90:10
  92:10 104:12,22
**understood** 10:15
**unfortunately** 84:5
**UNITED** 1:1 2:3
**unrelated** 97:6
**updated** 34:19
**upfront** 68:1 71:6
  72:7 74:2,19
**ups** 103:4
**upselling** 66:13
**USA** 1:11
**use** 18:9,11 35:7
  42:4 89:18
**useful** 21:4,21,22
**usually** 59:15

**V**

**V** 5:1 47:24
**vague** 97:25
**vaguely** 75:23
**valuable** 33:4,15
  72:8,9,20,25
**valuation** 31:10
**value** 30:13,20
  33:24
**valued** 31:23,24
  32:16
**variety** 29:15
  100:10
**various** 28:15
**version** 88:14
**versions** 29:20
**VERTICCHIO** 3:8
  10:10 17:16 18:4
  18:12 25:13 66:22
  91:5 95:11,21
  96:15,21 97:4
**vice** 9:12,15 10:4,5
**Virginia** 56:12,12
  57:16,24
**visit** 51:9 105:6
**visited** 103:12
**Visiting** 56:19
**visits** 103:8,11 104:5
**voice** 5:21 10:11
  21:5 46:11 77:19
  78:9,12 83:4,5,7
**volunteered** 67:6
**VRI** 29:3

**W**

**Wabash** 3:6
**Wall** 2:18
**want** 11:5 14:6
  15:20,23 22:14
  24:6 27:1,7,25
  29:12,18 30:13,17
  30:22 59:12 73:20
  74:21 79:23 85:22
  87:21 89:16
  102:14 103:7
**wanted** 10:20 11:9

33:2 50:4,25 70:10
  70:11 104:8
**wants** 12:19 26:2
  50:2 89:18,25
**wasn't** 16:5 42:8
  52:21 94:6
**way** 6:14 9:22 13:1
  13:12,15,17,17
  22:7 23:15 25:12
  27:25 28:1 31:23
  36:23 54:4 64:25
  70:20 71:1,3 74:5
  84:20,22 89:11
  92:11 104:22
  106:12
**ways** 13:18,19 39:13
  70:6 71:6 80:13
**we'll** 6:15 17:18
  18:10,11,17 39:24
  102:11 103:9
**we're** 14:8 18:8 41:3
  59:5,21 66:18
  71:15 87:23 96:24
  102:9,15 105:23
**we've** 5:11 60:15
**week** 50:13 69:21
  84:24,24 85:4,4
**weeks** 85:5
**went** 50:8 98:18
  105:6
**weren't** 18:8 26:7
  36:22
**West** 2:12 74:23
**WHEREOF** 106:14
**white** 37:24
**Wide** 46:12
**wife** 67:10
**willing** 73:1,3
**witness** 5:1 47:3
  49:8 91:16 96:22
  105:11 106:5,8,14
**woman** 84:3
**women** 7:9
**word** 9:24 16:15
  35:11 47:2
**work** 8:23 9:6 43:15
  46:11 60:19 61:4

61:10 81:2,6 89:6
  89:8 92:23
**worked** 26:21 43:6
  44:3,9 46:8,12,13
  46:14,15 50:9
  62:24 67:11
**working** 43:14 57:4
  61:3 81:5
**works** 19:8 69:5
  78:3,4
**world** 20:11 33:12
  72:25 78:24,24
  89:5 92:17
**WorldWide** 42:6,7
  42:8,11,13,16,18
  42:19,20 43:5
  45:23,25 46:1,4,9
  46:18 47:5,5,11,15
  47:16 48:4,6 50:10
  51:9 52:22 53:4,13
  53:17,20 54:1,12
  54:15,17,23 55:1,6
  55:9,12 56:13 57:2
  58:18,20 59:2,3,7
  59:17,17 60:10,19
  61:3,4,10,20 62:2
  62:23,24 63:7
  70:21 74:7 75:2,7
  75:9,18 76:13
  79:12,13 81:23
  82:17,19 83:17,17
  84:21 98:20 105:7
  105:8,13,16
**worth** 28:17
**wouldn't** 26:25
  32:13 41:17 53:10
  82:21 84:25
**write** 32:11 35:23
  39:6,18
**writing** 17:24 70:24
**wrong** 9:13 22:3
  24:16 39:18 66:21
  67:21 72:24
**wrote** 32:13

**X**

**X** 1:14

**Y**

**year** 17:7 98:21
**years** 24:25 35:1
**yell** 5:20
**York** 1:9,19,19,25
  2:19,19 5:3,10
  7:18 50:21,24 52:8
  56:3,8 57:11,11,20
  67:18 96:16 106:4

**Z**

**0**

**1**

**1** 4:11 17:13,18,19
**1.2** 53:21
**1:46** 105:24
**10** 4:20 102:17
**10:20** 1:16
**100** 71:19,21
**10005** 2:19
**102** 4:19,20
**103** 4:5
**105** 4:4
**12** 29:23,25 32:18
  40:15 43:4 90:4
  97:21 98:11
  101:20,25
**13** 43:4 90:4,5
**135** 2:12
**13th** 85:5
**14** 2:18
**15cv5781** 1:8
**17** 4:11

**2**

**2** 4:12 25:7,9,10
  31:14
**20** 40:19
**200,000** 53:14
**2007** 34:6
**2011** 24:12 25:3
  29:21,23,25 32:17
  35:6,6,8 38:3,6
  42:15 43:4
**2011/12** 30:10,22

Sirlin

FTC v. LifeWatch Inc., et al.                                                    7/25/2017

**2012** 29:21 34:19,19
   34:20 40:17 41:4
   41:10,21 42:3,15
   42:21 50:10
**2013** 29:19 42:15
   45:9 50:10 58:18
   58:22 59:1 70:17
   90:3 95:20,23
**2014** 84:21 97:12,21
   98:11 101:20,25
**2017** 1:15 106:15
**20th** 2:18
**230** 2:5
**23andMe** 22:11,13
**25** 1:15 4:12
**266** 5:10 7:18

**3**

**3** 4:13 44:18
**30** 73:11
**3030** 2:5
**30th** 106:15
**31** 1:22
**32801** 2:13
**330** 3:6
**3300** 3:6
**35** 30:6 32:16
**36** 73:11
**36-month** 69:18,24
   70:2 72:5,6,11,16
   72:19 73:6,10

**4**

**4** 4:14 61:16,17
**40** 30:6,8 31:13,14
   32:16
**400,000** 60:15
**44** 4:13

**5**

**5** 4:4,15 66:5,6,23
**50** 30:8
**500,000** 18:15
**55** 8:1

**6**

**6** 4:16 45:9 66:25

   75:13,14
**60603-5001** 2:6
**60611** 3:7
**61** 4:14
**66** 4:15
**670** 2:12
**6th** 85:4

**7**

**7** 4:17 83:22 84:20
**75** 4:16
**7th** 85:3

**8**

**8** 4:18 92:14
**800** 73:12
**83** 4:17

**9**

**9** 4:19 102:16,17
**900,000** 53:21
**92** 4:18
**9th** 84:21