**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

———————————————————————

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, and | ) | |
| | ) | |
| STATE OF FLORIDA, OFFICE OF THE | ) | |
| ATTORNEY GENERAL, DEPARTMENT | ) | |
| OF LEGAL AFFAIRS, | ) | Case No. 15cv5781 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey T. Gilbert |
| | ) | |
| LIFEWATCH, INC., a New York corporation, | ) | |
| also d/b/a LIFEWATCH USA and MEDICAL | ) | |
| ALARM SYSTEMS, | ) | |
| | ) | |
| SAFE HOME SECURITY, INC., a | ) | |
| Connecticut corporation, | ) | |
| | ) | |
| MEDGUARD ALERT, INC., a Connecticut | ) | |
| corporation, | ) | |
| | ) | |
| EVAN SIRLIN, individually and as an officer | ) | |
| or manager of Lifewatch Inc., | ) | |
| | ) | |
| MITCHEL MAY, individually and as an officer or | ) | |
| manager of Lifewatch Inc., and | ) | |
| | ) | |
| DAVID ROMAN, individually and as an officer | ) | |
| or manager of Lifewatch Inc., Safe Home Security, | ) | |
| Inc., and Medguard Alert, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————

### PLAINTIFFS' RESPONSE TO DEFENDANTS' DAVID ROMAN, SAFE HOME SECURITY, INC., AND MEGUARD ALERT, INC.'S LOCAL RULE 56.1(a) STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Lifewatch, Inc. is a New York personal emergency response system business that was incorporated in 1996.

1

**PLAINTIFFS' REPONSE TO STATEMENT 1**:  Undisputed.

2.      Lifewatch, Inc. was and is headquarted at 266 Merrick Road, Suite 104, Lynbrook, New York.

**PLAINTIFFS' RESPONSE TO STATEMENT 2**:  Disputed.  Lifewatch is currently operating its sales and marketing from 266 Merrick Road, Suite 104, Lynbrook, New York.  *See* Sirlin Deposition Page 8, lines 3-5.  Lifewatch is currently operating its customer service and fulfillment Connecticut.  *See* Sirlin Deposition Page 8, lines 6-7.  *See also* Lifewatch's website which lists its address as 1125 Middle Street, Middletown, Connecticut, http://www.lifewatch-usa.com/ (last viewed February 26, 2018).

3.      Since its inception, Lifewatch has provided emergency monitoring products and services to elderly, seriously ill, and disabled individual.

**PLAINTIFFS' RESPONSE TO STATEMENT** 3:  Undisputed.

4.      By pressing a button on Lifewatch-provided equipment, Lifewatch's customers have immediate access to emergency services.

**PLAINTIFFS' RESPONSE TO STATEMENT 4**:  Undisputed.

5.      Lifewatch has provided free equipment to its customers to allow them access to Lifewatch's services.

**PLAINTIFFS' RESPONSE TO STATEMENT 5**:  Disputed.  Lifewatch's equipment is not free.  Lifewatch charges the customer if its equipment is not returned.  *See, e.g.,* Dkt. 24-1 at 129, 138, PX 5, Bradley Dec. ¶ 5, Att. D (consumer billed same day as call); Dkt. 24-3 at 5, PX 7, Cuomo Dec. ¶ 5, Att. A (consumer complaint that mom paid over $2000 for unused service); Dkt. 24-3 at 5-7, PX 7, Cuomo Dec. Att. A (Lifewatch refused to cancel account of woman with dementia because son cannot find device to return it; demanding $475 as

alternative); Dkt. 24-3 at 13, PX 7, Cuomo Dec. Att. A (consumer paid monthly fee for several

months for unused service); Dkt. 24-3 at 15-16 , PX 7, Cuomo Dec. Att. A (consumer's father

paid over $130 for unused service); Dkt. 24-3 at 23, PX 7, Cuomo Dec. Att. A (consumer's

mother paid monthly fee for over a year for unused service); Dkt. 24-3 at 25-29, PX 7, Cuomo

Dec. Att. A (mother never agreed to service or received device, but told must return it or pay

$475 to cancel service); Dkt. 24-3 at 35, PX 7, Cuomo Dec. Att. A (consumer's sister paid for 7

months of fees for unused service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A (consumer's father

paid monthly fee for several months of unused service); Dkt. 24-3 at 40, PX 7, Cuomo Dec. Att.

A (consumer's mother billed over $400 for unused service); Dkt. 24-3 at 42, PX 7, Cuomo Dec.

Att. A (consumer's elderly parents paid approximately $700 for unused service); Dkt. 24-3 at 43,

PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive returned device, continued

billing); Dkt. 24-22 at 3, PX 26, Cavic Dec. ¶ 8 (mother charged for unactivated device for

nearly a year); Dkt. 25-2 at 3, PX 34, Felker Dec. ¶ 6 (charged monthly fees for a system that

was never received); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also said that [Lifewatch]

would only cancel my account after I mailed the device back at my own expense. I had

previously been told that there would be no cost to returning the device."); Dkt. 25-18 at 6, Dkt.

19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt. 25-18 at 11, Dkt.

20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the account unless

we get the equipment back…I said the collection efforts will continue."); Dkt. 25-24 at 4, PX 56,

Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer

threatened to "trash the device"); FTC-LW16-4397 – 4398 (4/9/14 email from Baker to May,

copying Sirlin, saying she is "completely shocked" that they are agreeing with Hallowell to

continue to bill consumers Lifewatch knows have not activated their devices; states "You both

understand this is where disputes/charge backs, BBB, AG complaints come from, right???????")[1]; FTC-LW16-4786 (7/2/14 email from Roman to Hallowell, May, and Sirlin showing the weekly percentage of Lifewatch customers paying despite not having activated their system ranging from 15-24.6%); FTC-LW16-4833-4838 (8/11/14 email from Cohen to Kevin Carducci, Baker, Hallowell, and Sara Weaver regarding giving a partial refund to consumers who had PERS unit for 7 months, paid for it, but never activated it); FTC-LW16-4861 – 4862 (8/21/14 email from Baker to Roman, Hallowell, and May, excited that "working hard!" had resulted in lower the number of Lifewatch PERS customers who had not activated their units to 11%); FTC-LW16-4984-4985 (9/4/14 email exchange between Roman, Hallowell, May and Baker noting that number of paying Lifewatch customers who had not activated their medical alert units had increased again); FTC-LW16-4999-5001 (9/5/14 email exchange between Kevin Carducci, Cohen, Sirlin, Roman, Hallowell, Baker, and May about consumers complaining that they were being told that they would not be charged until they activated the unit); FTC-LW16-6602 – 6603 (4/7/16 email from May to monitoring company, copying Roman, Sirlin, and Hallowell regarding the 50% of Defendants' accounts that were not sending any signal); FTC-LW16-6612 (4/11/16 email from Hallowell to Wajdowicz, SHS Chief Information Officer, copying Roman, attaching email from monitoring company showing 4367 out of 9312 active paying accounts had no signal); FTC-LW16-8036 (4/13/15 email from Vandewater to telemarketer re consumer told Lifewatch would pay return shipping if she cancelled, "which we wont do").

     6.     In conjunction with providing the free equipment, Lifewatch engages third-party monitoring companies to respond to emergency signals sent by Lifewatch's customers.

---

[1] Except where specified, all documents cited with only a bates label descriptor are described in Dkt. 252, PX 97, Al-Najjar Dec., and included in attachments to that declaration.

**PLAINTIFFS' RESPONSE TO STATEMENT 6**: Disputed. Lifewatch's equipment is not free. Lifewatch charges the customer if its equipment is not returned. *See, e.g.,* Dkt. 24-1 at 129, 138, PX 5, Bradley Dec. ¶ 5, Att. D (consumer billed same day as call); Dkt. 24-3 at 5, PX 7, Cuomo Dec. ¶ 5, Att. A (consumer complaint that mom paid over $2000 for unused service); Dkt. 24-3 at 5-7, PX 7, Cuomo Dec. Att. A (Lifewatch refused to cancel account of woman with dementia because son cannot find device to return it; demanding $475 as alternative); Dkt. 24-3 at 13, PX 7, Cuomo Dec. Att. A (consumer paid monthly fee for several months for unused service); Dkt. 24-3 at 15-16 , PX 7, Cuomo Dec. Att. A (consumer's father paid over $130 for unused service); Dkt. 24-3 at 23, PX 7, Cuomo Dec. Att. A (consumer's mother paid monthly fee for over a year for unused service); Dkt. 24-3 at 25-29, PX 7, Cuomo Dec. Att. A (mother never agreed to service or received device, but told must return it or pay $475 to cancel service); Dkt. 24-3 at 35, PX 7, Cuomo Dec. Att. A (consumer's sister paid for 7 months of fees for unused service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A (consumer's father paid monthly fee for several months of unused service); Dkt. 24-3 at 40, PX 7, Cuomo Dec. Att. A (consumer's mother billed over $400 for unused service); Dkt. 24-3 at 42, PX 7, Cuomo Dec. Att. A (consumer's elderly parents paid approximately $700 for unused service); Dkt. 24-3 at 43, PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive returned device, continued billing); Dkt. 24-22 at 3, PX 26, Cavic Dec. ¶ 8 (mother charged for unactivated device for nearly a year); Dkt. 25-2 at 3, PX 34, Felker Dec. ¶ 6 (charged monthly fees for a system that was never received); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also said that [Lifewatch] would only cancel my account after I mailed the device back at my own expense. I had previously been told that there would be no cost to returning the device."); Dkt. 25-18 at 6, Dkt. 19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt. 25-18 at 11, Dkt.

20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the account unless

we get the equipment back…I said the collection efforts will continue."); Dkt. 25-24 at 4, PX 56,

Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer

threatened to "trash the device");  FTC-LW16-4397 – 4398 (4/9/14 email from Baker to May,

copying Sirlin, saying she is "completely shocked" that they are agreeing with Hallowell to

continue to bill consumers Lifewatch knows have not activated their devices; states "You both

understand this is where disputes/charge backs, BBB, AG complaints come from, right???????");

FTC-LW16-4786 (7/2/14 email from Roman to Hallowell, May, and Sirlin showing the weekly

percentage of Lifewatch customers paying despite not having activated their system ranging

from 15-24.6%); FTC-LW16-4833-4838 (8/11/14 email from Cohen to Kevin Carducci, Baker,

Hallowell, and Sara Weaver regarding giving a partial refund to consumers who had PERS unit

for 7 months, paid for it, but never activated it); FTC-LW16-4861 – 4862 (8/21/14 email from

Baker to Roman, Hallowell, and May, excited that "working hard!" had resulted in lower the

number of Lifewatch PERS customers who had not activated their units to 11%); FTC-LW16-

4984-4985 (9/4/14 email exchange between Roman, Hallowell, May and Baker noting that

number of paying Lifewatch customers who had not activated their medical alert units had

increased again); FTC-LW16-4999-5001 (9/5/14 email exchange between Kevin Carducci,

Cohen, Sirlin, Roman, Hallowell, Baker, and May about consumers complaining that they were

being told that they would not be charged until they activated the unit); FTC-LW16-6602 – 6603

(4/7/16 email from May to monitoring company, copying Roman, Sirlin, and Hallowell

regarding the 50% of Defendants' accounts that were not sending any signal); FTC-LW16-6612

(4/11/16 email from Hallowell to Wajdowicz, SHS Chief Information Officer,  copying Roman,

attaching email from monitoring company showing 4367 out of 9312 active paying accounts had

no signal); FTC-LW16-8036 (4/13/15 email from Vandewater to telemarketer re consumer told Lifewatch would pay return shipping if she cancelled, "which we wont do").

7.     Lifewatch actively sought ways to expand its customer base and entered into agreements with various independent sales companies, including WWIS ("WWIS"), beginning in approximately 2012.

**PLAINTIFFS' RESPONSE TO STATEMENT 7**:  Disputed.  The sales companies were not independent and began well before 2012. *See, e.g.,* Dkt. 96-1 at 54 (PX 89, Einikis Dec. Att. A) (3/28/14 email from Lifewatch employee forwarding Sirlin 3/26/14 email, copying May and Baker, to telemarketer instructing telemarketing room on upsells, including restaurant.com, grocery coupons, pharmacy discount cards, and smoke alarms); FTC-LW09-1065 (4/25/12 email from Steinmetz to Worldwide, copying multiple Lifewatch employees, including Sirlin, offering incentive from Lifewatch for top sales person at call center, and promising to gather information from "our other call centers"); FTC-LW09-1150-1 (6/27/12 email from Sirlin to Boling at Worldwide promising discussion with Worldwide and Steinmetz the following day "about all things," Connect America deals, billing issues, and high returns); FTC-LW09-1280 (8/11/12 email from Sirlin to Boling at Worldwide asking whether they have discontinued particular upsell, offering change in commissions relating to upsell, and suggesting change in script); FTC-LW09-1297 (8/28/12 email from Sirlin stating that Worldwide should stop telemarketing in Pennsylvania because of complaints); FTC-LW09-1379 - 80 (9/25/12 Sirlin email to Worldwide stating "please stop the coupons for NOW-we can't determine which go to them etc etc-so for all," forwarding threat from Connect America president that they will "terminate" program because of complaints); FTC-LW09-1381 – 82 (9/28/12 email from Sirlin to Worldwide suggesting alternative upsell, and forwarding email from Connect America president to Sirlin

and Steinmetz saying that "NO matter what you say Les, people interpret the offer differently");
FTC-LW09-1389 (10/3/12 email from Sirlin to Worldwide stating that they should change upsell
until Connect America is "comfortable with coupons"); FTC-LW09-1429 (10/16/12 email from
Sirlin to Worldwide, copying Baker, coaching Boling on how to answer questions bank will ask
in connection with their telemarketing for Lifewatch); FTC-LW09-1434 (10/26/12 email from
Sirlin to Worldwide, copying Steinmetz, saying must stop grocery coupon upsell for Connect
America because they are "giving us shit"); FTC-LW09-1493 (3/22/13 email from Baker to
Boling at Worldwide instructing Worldwide to immediately start "pitching Hydroxatone" as
upsell. "The company is ready to start working with us on this"); FTC-LW09-1538 (5/22/13
email from Sirlin to Worldwide instructing Worldwide "Also Wisconsin is giving us trouble-I
would not sell there," and forwarding email from Lifewatch customer service to Sirlin, May, and
Baker, about "John" robocalls from 5 spoofed caller IDs; "We, at Lifewatch USA, do not make
cold calls, do not call out to anyone. Blah blah blah-He finally believed me."); FTC-LW09-1542
(5/31/13 email from Sirlin to Worldwide, copying May, suggesting upsells and possible pricing
options; "Dave doesn't need the extra cash- I am just trying to think of ways to make more
upfront money for you guys with out the pressure of increasing sales"); FTC-LW09-1564
(6/19/13 Sirlin email to Worldwide suggesting upsells and pricing opportunity); FTC-LW09-
2269 (12/5/13 email from Sirlin to broker, Modugno, copying another Lifewatch employee,
noting that Lifewatch is no longer supplying telemarketing leads to US Digest); FTC-LW16-
4406-4407 (4/9/14 email from Lifewatch customer service representative to other Lifewatch and
SHS employees, noting that grocery coupons used as upsell are included in the equipment
package sent from Lifewatch to customers); FTC-LW17-292 - 293, Deposition Transcript of
Matthew Eggen by the Texas Attorney General (broker stating that Lifewatch purchased and

supplied leads to telemarketing room); FTC-LW17-402 - 405, Deposition Transcript of Housein Karachopan (Lifewatch broker, Eggen's partner, stating that Lifewatch purchased and supplied leads for at least two telemarketing rooms); PX 91, Robinson Dec. ¶ 6 (former telemarketer and telemarketing supervisor stating that Vandewater, May and Sirlin discussed changing scripts, what states telemarketer should call, changing autodialer or caller ID, and changing outgoing robocall message); PX 93, Boling Dec. ¶ 22-23 ("Lifewatch directed Worldwide to offer certain "upsells" such as identity theft protection, security systems, and smoke alarms. Lifewatch had final approval on all upsells Worldwide offered… Lifewatch directed Worldwide to offer certain incentives such as coupons and prescription drug cards. It is my understanding that Lifewatch received a kickback on every prescription drug card the telemarketers upsold."). In addition, Worldwide worked exclusively for Defendants. *See* Dkt. 24-10 at 4-5, PX 14, Hilgar Dec. ¶ 11 (all of the telemarketing conducted by Worldwide and its related entities was on behalf of Lifewatch); Dkt. 24-11 at 2-3, PX 15, Settecase Dec. ¶ 5 (Worldwide medical alert telemarketing was exclusively on behalf of Lifewatch);Dkt. 24-12 at 3, PX 16, Kane Dec. ¶ 4 (court-appointed Receiver concluded that Lifewatch was the only medical alert service provider that ever paid Worldwide); Dkt. 101-3 at 8-9 (Transcript of December 2, 2015 Deposition of Brick Kane) (court-appointed Receiver found no evidence showing Worldwide worked for any medical alert provider other than Lifewatch); FTC-LW09-1042 (4/16/12 email from Boling at Worldwide to Steinmetz confirming that Worldwide has and will continue to work exclusively for Lifewatch); FTC-LW09-1148 (6/26/12 email from Sirlin to Worldwide, forwarding earlier email in which Sirlin describes Worldwide to accountant as "our biggest marketing partner"); FTC-LW09-1191 (7/18/12 email from Boling at Worldwide to Sirlin and Steinmetz regarding details of residuals, back payments, and upcoming wire transfer; promising followup email confirming that

Worldwide will work exclusively for Lifewatch); FTC-LW09-1192 (7/18/12 email from Boling at Worldwide to Sirlin and Steinmetz confirming "express written commitment" to working exclusively with Lifewatch on medical alerts for three years); FTC-LW16-238 (4/4/12 email from Baker to Lifewatch customer service representatives providing dedicated 800 number Worldwide maintains for Lifewatch customer service calls);FTC-LW16-511-512 (7/28/12 emails between Sirlin, Baker, and Seiden, Lifewatch CFO, forwarding Boling's 7/18/12 email promising Worldwide exclusivity, discussing getting the commitment in writing on letterhead so Lifewatch "can send it to the bank");FTC-LW16-967 – 984 (12/2/12 email from Sirlin to May, enclosing 6/1/12 telemarketing agreement between Worldwide and Lifewatch; Sirlin states that "Worldwide is one of ricks company-again they signed whatever we asked including indemnification – but they have nothing to lose"); PX 93, Declaration of Roderic Boling ¶ 44 ("Lifewatch requested that Worldwide telemarket exclusively for Lifewatch.").

8.      Lifewatch also entered into a Marketing Alliance Agreement and an Amended Marketing Alliance Agreement with non-party Connect America.com LLC in 2012 and 2013.

**PLAINTIFFS' RESPONSE TO STATEMENT 8**:  Undisputed.

9.      Pursuant to Lifewatch's purchase agreements with the independent sales companies, the independent sales companies originated customer accounts through radio, television, internet, and print advertising, as well as telemarketing.

**PLAINTIFFS' RESPONSE TO STATEMENT 9**:  Disputed.  The sales companies were not independent.  *See* Plaintiffs' Response to Statement 7.  Also, Defendants point to no specific part of the purchase agreement supporting Statement 9.  Further, there is no evidence that the sales companies originated customer accounts through anything but telemarketing. *See, e.g.*, FTC-LW16-78 - 119 (1/21/12 email from Sirlin to potential investors touting unique

features of Lifewatch product and service, describing commitment to using "Outbound Call Centers" beginning in July 2011, noting that "Lifewatch dominates this channel in the PERS industry" and that LIfewatch hopes to increase this method if it receives additional financing; projects more than ten-fold increase in revenues in 3 years by utilizing telemarketing); FTC-LW16-143 – 144 (3/3/12 email from Sirlin to Seiden, Lifewatch's CFO, forwarding email from Lifewatch employee to Sirlin, Baker, and others, showing call center sales of over 100 a day two days in a row, including 130 on one day; "Shows how easy it will be to do 2000 plus- a month – crazy but ready."); FTC-LW16-150-153 (3/16/12 emails between Sirlin and telemarketer; Sirlin says he has "endless" leads and his partner has 30 million elderly sick names);LW-FTC-160-186 (Purchase Agreement with Tele America Response Inc., dated 9/15/15, requiring that "Seller" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising,  or door-to-door or in-person sales); LW-FTC-708-731 (Virtue Point Marketing LLC, dated 6/30/14, requiring that "Seller" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising,  or door-to-door or in-person sales); LW-FTC-756-780 (SHMS Marketing Solutions LLC, dated 8/27/15, requiring that "Seller" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising,  or door-to-door or in-person sales); FTC-LW16-7310-7328 (6/12 Telemarketing Services Agreement with Trusted Lead Network, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more

than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7330-7348 (8/24/12 Telemarketing Services Agreement with MCR Group, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7349-7366 (9/19/12 Multi-Media Marketing Services Agreement with Contact Center Dominicana, requiring that "Marketer"/"Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7368-7384 (9/20/12 Multi-Media Marketing Services Agreement with DBOSS Marketing RD S.R.L., requiring that "Marketer"/"Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7386-7403 (9/24/12 Telemarketing Services Agreement with MD247.COM, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7405-7423 (7/17/12 Telemarketing Services Agreement with The Consumer Voice, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television

advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7426-7441
(12/18/12 Telemarketing Services Agreement with US Digest LLC d/b/a Senior Care Alert,
requiring that "Telemarketer" not contact any customer on any local, federal or state "do not
call" registry, and containing more than 3 pages of compliance obligations, and no specific
obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-
door or in-person sales); FTC-LW16-7443-7460 (10/29/12 Multi-Media Marketing Services
Agreement with Broadband Corporation d/b/a – TBD, requiring that "Marketer"/"Telemarketer"
not contact any customer on any local, federal or state "do not call" registry, and containing more
than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio
or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-
7479-7496 (10/25/12 Multi-Media Marketing Services Agreement with Platinum Marketing
Group, requiring that "Telemarketer" not contact any customer on any local, federal or state "do
not call" registry, and containing more than 3 pages of compliance obligations, and no specific
obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-
door or in-person sales); FTC-LW16-7497-7515 (8/28/12 Telemarketing Services Agreement
with Qualworks, Inc. , requiring that "Telemarketer" not contact any customer on any local,
federal or state "do not call" registry, and containing more than 3 pages of compliance
obligations, and no specific obligations for sale by direct mail, radio or television advertising,
print advertising, or door-to-door or in-person sales); FTC-LW16-7517, 7541-7557 (6/1/12
Telemarketing Services Agreement with WorldWide Info Services, actually executed on 7/9/12,
requiring that "Telemarketer" not contact any customer on any local, federal or state "do not
call" registry, and containing more than 3 pages of compliance obligations, and no specific
obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-

door or in-person sales); FTC-LW16-7558-7574 (10/31/12 Multi-Media Services Agreement with DigitalMojo, requiring that "Marketer"/"Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7575 (2/20/13 email from May to potential lender, copying Roman and Sirlin, providing Worldwide contract in response to request for agreement with "outside firm" from whom "Lifewatch currently gets most of its customers."); Dkt. 252, PX 97, Al-Najjar Dec. ¶ 12 (summarizing spreadsheet of Defendants' sales attached to FTC-LW16-8129 – 34, 11/10/15 email from Baker to Christopher Parisi, showing 96.4% of Defendants' sales were through outside call centers); PX 98, Transcript of Deposition of Sirlin on July 25, 2017, at 12-13 (Sirlin testifying that any customers purchasing Lifewatch medical alert devices or service as a result of television, radio, or internet advertising contact Lifewatch directly and not through outside marketers).

10.     Pursuant to Lifewatch's purchase agreements, the independent sales companies offered to sell accounts to Lifewatch – and other emergency monitoring companies – on a non-exclusive basis.  Lifewatch's agreements with these independent sales companies explicitly provided that the independent companies are contractually obligated to comply with all applicable state and federal telemarketing laws.

**PLAINTIFFS' RESPONSE TO STATEMENT 10**:  Disputed.  The sale companies were not independent.  *See* Plaintiffs' Response to Statement 7.  Further, the document contains the following language:

1.     DESCRIPTION OF THE PURCHASE ARRANGEMENTS.  Throughout the Term of this Agreement (as defined below), the Seller shall operate in accordance with the following:

(a)     Seller shall use its best efforts to originate Contracts for its own account and to offer to sell Contracts for the Products to the Company and to others on a non-exclusive basis at a prices and terms to be mutually agreed upon from time-to-time;

11.     Furthermore, pursuant to Lifewatch's purchase agreements, the independent companies warrant and represent to Lifewatch that these laws are followed.

**PLAINTIFFS' RESPONSE TO STATEMENT 11**:  Disputed.  The companies are not independent.  See Plaintiffs' Response to Statement 7.  Further, the document contains the following language:

4.2     Compliance with applicable law.  The Seller shall at all times perform its obligations under this agreement in strict compliance with all applicable local, state and federal laws, as more fully described in Section 6 herein.

6.6     Compliance with State and Local Laws.  Each party shall comply with any applicable state telemarketing, telephone solicitation or consumer protection laws as well as with any applicable state registration and licensing requirements in any state in which it transacts business and/or renders services pursuant to this Agreement, as same may be amended from time to time.

6.7     Compliance with Federal Laws.  Each party shall comply with any applicable federal statutes, rules and regulations while rendering services pursuant to this Agreement, including but not limited to:

(a)     The Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53(b) and 57b;

(b)     The Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. § 6101;

(c)     The Telemarketing Sales Rule, 16 C.F.R. 310;

(d)     The Telephone Consumer Protection Act, 47 U.S.C. § 227, and 47 C.P.R. part 64.1200;

(e)     If a party engages in an electronic marketing campaign, the Controlling The Assault of Non-solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM" Act");

(f)     The provisions of Title 18, section 1037 of the United States Code relating to criminal fraud and related activity in connection with electronic mail;

(g)     The Children's Online Privacy Protection Act ("COPPA"), Title 15, §§ 6501-6506 of the United States Code;

(h)     The Computer Fraud and Abuse Act ("CFAA"), Title 18, section 1030 of The United States Code;

(i)     The federal laws protecting intellectual property (Copyrights are protected by Title 17 of the United States Code, which provides civil remedies for infringement, and Title 18 of the United States Code, which imposes criminal penalties for copyright infringement. Patents and Trademarks are protected by Titles 35 and 15, respectively, of the United States Code, which provide civil remedies for infringement);

(j)     the Electronic Communications Privacy Act (Title 18, sections 2510, 2511 and 2701 or the United States Code, which prohibits the interception, use and disclosure of wire, oral or electronic communications and provide civil remedies and criminal penalties for violations.);

(k)     the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), which seeks to promote the use of electronic signatures in interstate and foreign commerce by declaring that a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form or an electronic signature or record was used in its formation.  The Act also requires certain consumer disclosures and the retention of business records;

(l)     The Fair Labor Standards Act of 1938 (Title 29, sections 201-219 of the United States Code) establishes minimum wages and maximum hours for employees and provides remedies and protections to aggrieved employees.  Title 29, sections 541.300 and 541.400 of the Code of Federal Regulations define the exemptions from the minimum wage and maximum hour requirements for executive, administrative, professional, computer and outside sales employees;

(m)     The Fair Housing Act (42 U.S.C. § 3601 et seq.), which prohibits certain forms of discrimination on the basis of race, color, religion, sex, familial status, or national origin;

(n)     The Restore Online Shoppers' Confidence Act (15 U.S.C. §§ 8401-8405), which Prohibits "any post-transaction third party seller" from charging or attempting to charge "any consumer's credit card, debit card, bank account or other financial account for any good or service sold in a transaction effected on the Internet, unless" the third party seller, before getting the consumer's billing information, "clearly and conspicuously" discloses to the consumer "all material terms of the transaction" and gets the consumer's "express informed consent for the charge."  "All material terms of the transaction" must include, in addition to basics already required by existing law like "a description of the goods or services being offered" and "the cost of such goods or services," that the "third party seller is not affiliated with the initial merchant" by disclosing the third party seller's name "in a manner that clearly differentiates the post-transaction third party seller from the initial merchant."  In order to obtain "express informed consent,"  the third party seller must get from the consumer "the full account number of the account to be charged," "the consumer's name and address and a means to contact the

16

consumer," and require the consumer "to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed." In addition to imposing new disclosure requirements on post-transaction third party sellers, the Act prohibits the initial merchant from disclosing "a credit card, debit card, bank account, or other financial account number or to disclose other billing information that is used to charge a customer of the initial merchant, to any post transaction third party seller for use in an Internet-based sale of any goods or service from that post-transaction third party seller." Finally, the Act prohibits "any person" from charging or attempting to charge "any consumer for any goods or service sold in a transaction effected on the Internet through a negative option feature" as defined by the Telemarketing Sales Rule unless the person "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information…obtains a consumer's express informed consent before charging the consumer's [account]…and provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's [account]." The Act does not apply unless the company is a (1) a "post-transaction third party seller," (2) discloses billing information to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller, or (3) sells goods or services using a negative option feature.

12.    Pursuant to the two Marketing Alliance Agreements between the companies,

Lifewatch and non-party Connect America combined marketing efforts. Connect America

provided Lifewatch with a non-transferable license to use its trademarks.

**PLAINTIFFS' RESPONSE TO STATEMENT 12**: Undisputed.

13.    In their combined customer welcome letter, Connect America and Lifewatch

included both of their logos and acknowledged the companies' partnership and a joint customer

service department.

**PLAINTIFFS' RESPONSE TO STATEMENT 13**:  Undisputed.

14.    The customer accounts acquired by Lifewatch and Connect America under the

Marketing Alliance Agreement originated from WWIS.

**PLAINTIFFS' RESPONSE TO STATEMENT 14**:  Undisputed.

15.    Entities affiliated with WWIS included American Innovative Concepts, Inc.,

National Life Network, The Credit Voice, and Global Interactive Technologies.

**PLAINTIFFS' RESPONSE TO STATEMENT 15**: Disputed. U.S. Affiliates, Inc. was also an affiliated entity. *See, e.g.*, PX 93, Boling Dec. ¶ 32 (Worldwide "rebranded" as American Innovative Concepts, Inc., National Life Network, and U.S. Affiliates); FTC-LW09-1530-31 (5/15/13 email from Sirlin to Worldwide forwarding complaint tied to Worldwide (US Affiliates) of customer being told family member had given product to him); FTC-LW16-3838-39 (12/23/13 email from Baker to Roman, copying Sirlin and May, forwarding emails from Lifewatch and SHS customer service employees noting that Boling's companies include American Innovative Concepts, Global Interactive Technologies, US Affiliates, and Slingshot).

16.　　As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch sustained at least $8.77 million in loses.

**PLAINTIFFS' RESPONSE TO STATEMENT 16**: Disputed. Whether Lifewatch sustained a loss as a result of its relationship with WordWide and its related entities is not material to any aspect of this matter. The proper measure of equitable monetary relief in this case is the full amount consumers lost, not defendants' net profits. *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997). *See also FTC v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009 ("consumer loss is a common measure for civil sanctions in … direct FTC actions); *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 571 (7th Cir. 1989 (affirming restitution award for violation of FTC Act); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988) (restitution "appropriate remedy" for violation of FTC Act).

Defendant's only two pieces of evidence for this statement do not support the statement. Defendant's Exhibit K, Flaherty Report, Dkt. 296-12, is an unsworn "expert report," which is not admissible evidence. *See Fowle v. C&C Cola*, 868 F.2d 59, 67 (3rd Cir. 1989) (unsworn expert report not competent evidence under FRCP 56 to be considered on a motion for summary judgment). If Defendant presents this report in an admissible form, Plaintiffs will address it at that time, presumably in a motion to exclude the testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579 (1993). Defendant's other citation is to Exhibit P, Sirlin December 26, 2017 Affidavit, Dkt. 296-16, but that affidavit contains no statement regarding Lifewatch losses.

17. As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch refunded $2,999,628 dollars to customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 17**: Disputed. Defendant's only two pieces of evidence for this statement do not support the statement. Defendant's Exhibit K, Flaherty Report, Dkt. 296-12, is an unsworn "expert report," which is not admissible evidence. *See Fowle v. C&C Cola*, 868 F.2d 59, 67 (3rd Cir. 1989) (unsworn expert report not competent evidence under FRCP 56 to be considered on a motion for summary judgment). If Defendant presents this report in an admissible form, Plaintiffs will address it at that time, presumably in a motion to exclude the testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendant's other citation is to Exhibit P, Sirlin December 26, 2017 Affidavit, Dkt. 296-16, but that affidavit contains no statement regarding refunds. Moreover, the total amount of refunds, chargebacks, and related fees for all Lifewatch sales regardless of source for this period was less than $1.9 million. *See* Dkt. 66 at 8 (Lifewatch Profit & Loss statement for 2012 showing total refunds, chargebacks, and other adjustments as $329,833.05); Dkt. 66 at 16 (Lifewatch Profit & Loss statement for 2013 showing total refunds, chargebacks, and other adjustments as $1,557,909.22).

18. As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch "gave away" to customers medical alert equipment that Lifewatch paid for and which had a retail value totaling $14 million.

**PLAINTIFFS' RESPONSE TO STATEMENT 18**: Disputed. Defendant's only two pieces of evidence for this statement do not support the statement. Defendant's Exhibit K, Flaherty Report, Dkt. 296-12, is an unsworn "expert report," which is not admissible evidence. *See Fowle v. C&C Cola*, 868 F.2d 59, 67 (3rd Cir. 1989) (unsworn expert report not competent evidence under FRCP 56 to be considered on a motion for summary judgment). If Defendant

presents this report in an admissible form, Plaintiffs will address it at that time, presumably in a motion to exclude the testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendant's other citation is to Exhibit P, Sirlin December 26, 2017 Affidavit, Dkt. 296-16, but that affidavit merely says that he believes approximately 50% of customers which purchased Lifewatch's system through WWIS did not return the equipment. Lifewatch's own financial documents, however, show that the total value of equipment not returned from all Lifewatch customers, regardless of sales source, for this time period was barely $150,000. *See* Dkt. 66 at 8 (Lifewatch Profit & Loss statement for 2012 showing total equipment not returned as 50,018.13); Dkt. 66 at 16 (Lifewatch Profit & Loss statement for 2013 showing total equipment not returned as $101,157.70).

19. Before May 31, 2013, Lifewatch sold accounts to non-parties including Philips Lifeline, Valued Relationship, Inc., First Street, and Security Partners.

**PLAINTIFFS' RESPONSE TO STATEMENT 19**: Undisputed.

20. In April 2014, as a result of the allegations made by the FTC and the Florida Attorney General in the Florida enforcement proceedings filed against WWIS voluntarily created a customer refund program to address WWIS's alleged violations to the extent they impacted existing Lifewatch customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 20**: Undisputed.

21. As part of this refund program, Lifewatch provided its customers with information about the Florida litigation and offered and provided full refunds to customers who had purchased Lifewatch's products or services based on, inter alia, any of the allegedly false and misleading statements of the independent companies cited by the FTC and the Florida Attorney General in their legal action.

**PLAINTIFFS' RESPONSE TO STATEMENT 21**: Disputed. Lifewatch only sent letters to a small percentage of WorldWide customers and did not provide full refunds. *See, e.g.*, FTC-LW16-3474 (Sarai Baker email to Katie Sylvers, a manager at WorldWide (and Roderick Boling's wife) on September 5, 2013 - shortly before WorldWide was shut down by Plaintiffs - reminding her that customer accounts could not be canceled until they returned their devices. Baker copied Sirlin and May on the email and concluded the email by saying "As always you guys do a great job.")(Sirlin subsequently forwarding the email to Roderick Boling); FTC-LW16-3672-3673 (Katie Sylvers repeated the same information in an email to Doug Hallowell and other Lifewatch and Safe Home Security employees on October 30, 2013, which Baker forwarded to Sirlin and May.); FTC-LW16-4498-4500 (4/28/14 email from Baker to Roman stating that they had received only 12 calls from first 500 letters sent to consumers); FTC-LW16-4578-4580 (5/20/14 email from Baker to Roman reporting that they had received only 16 calls from first 1000 letters sent).

22.     Through this Lifewatch refund program, Lifewatch sent letters to its customers, and those who responded were issued a refund.

**PLAINTIFFS' RESPONSE TO STATEMENT 22**: Disputed. Lifewatch did not provide full refunds. *See, e.g.*, FTC-LW16-4833-4838 (8/11/14 email chain between various Lifewatch and Safe Home Security customer service personnel, Baker, and Hallowell, discussing how letter sent to WWIS customers did not specify how much of a refund consumers would receive and concluding that customer would only get refund for 3 months); FTC-LW16-4866-4873 (8/24/14 emails between Baker and Lifewatch customer service manager discussing limiting refunds to 2-3 months).

23.     David Roman has been the president and majority shareholder in Safe Home Security, Inc., a Connecticut home security company, since its incorporation in 1988.

**PLAINTIFFS' RESPONSE TO STATEMENT 23**:  Undisputed.

24.     Roman has been a majority shareholder in Medguard Alert, Inc., a Connecticut Company, since its incorporation in 2011.  Medguard Alert, Inc. provides personal emergency response equipment and services to customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 24**:  Undisputed.

25.     Roman met Evan Sirlin, the CEO of Lifewatch, Inc., in approximately 2012 after being made aware that Lifewatch was looking for investors.

**PLAINTIFFS' RESPONSE TO STATEMENT 25**:  Undisputed.

26.     After reviewing Lifewatch's accounts receivable information and accounts-payments history and determining that Lifewatch already had a sizeable customer pool, Roman invested in Lifewatch, Inc.

**PLAINTIFFS' RESPONSE TO STATEMENT 26**:  Undisputed.

27.     On May 31, 2013, Roman entered into a Share Purchase Agreement in order to acquire an ownership interest in Lifewatch.

**PLAINTIFFS' RESPONSE TO STATEMENT 27**:  Undisputed.

28.     Pursuant to the Share Purchase Agreement, Roman acquired 72% of the outstanding shares in Lifewatch.  Another shareholder in Medguard Alert Inc., Craig Cleasby, also acquired 8% of the outstanding shares in Lifewatch.  Pursuant to the Share Purchase Agreement, 125 shares (out of 1250) in MedGuard Alert Inc. were provided to the Sirlin Trust (of which Evan Sirlin was the executor, administrator, or trustee) and 125 shares (out of 1250) in

22

Medguard Alert Inc. were provided to the May Trust (of which Mitchel May was executor, administrator, or trustee).

**PLAINTIFFS' RESPONSE TO STATEMENT 28**:  Undisputed.

29.    Roman was not involved in the formation of Lifewatch's relationship with WWIS which was selling customer accounts to Lifewatch since the beginning of 2012.

**PLAINTIFFS' RESPONSE TO STATEMENT 29**:  Undisputed.

30.    Roman did not sign the agreements between Lifewatch and WWIS or any of the entities alleged by the FTC to be related to WWIS (i.e. the entities named in the FTC's suit against WWIS and the related defendants).

**PLAINTIFFS' RESPONSE TO STATEMENT 30**:  Undisputed.

31.    Roman did not provide call lists to telemarketers, create sales scripts, or otherwise assisted third parties in engaging in violative conduct as alleged in the Amended Complaint.

**PLAINTIFFS' RESPONSE TO STATEMENT 31**:  Disputed.  Roman assisted the telemarketers.  FTC-LW16-1354-1356 (1/24/13 email from MedGuard official to Roman enclosing the quality assurance script that MedGuard was using with Worldwide, for Roman to review); FTC-LW16-1365 and 1370 (2/28/13 email from Baker to Roman attaching the call script for Lifewatch's pre- ship calls); FTC-LW16-1366 (1/31/13 email from Roman to May and Sirlin asking them to contact a possible new PERS dealer); FTC-LW16-2494 (3/29/13 email from Roman to May, and Sirlin regarding installer contacting Roman); FTC-LW16-2562 (4/9/13 email from May responding to Roman stating he can reach a deal with telemarketer if May and Sirlin can figure out a source that will purchase the additional PERS accounts); FTC-LW16-2869 (5/1/13 email from Roman to May and Sirlin discussing lease schedules and settlement with VRI); FTC-LW16-2936-2937 (5/16/13 email from Roman asking Sirlin and May to contact a

23

new PERS dealer); FTC-LW16-3103-3105 (6/21/13 email from Gladys Santiago to Sirlin requesting consumer call recordings stating that she is "helping Mr. Roman with these accounts"); FTC-LW16-3106-3107 and 3109 (6/25/13 email from Roman to Oliveri requesting a list of all active PERS dealers ranked by weekly volume including marketing method, state location, average weekly volume funded and a ranking of quality of business); FTC-LW16-3111-3116 (6/26/13 email from Roman to Sirlin asking for all 25 call recordings to ensure that Worldwide didn't just send the "good" recordings); FTC-LW16-3238 (7/23/13 email from Sirlin to Roman confirming their Orlando trip and meeting with Boling on August 5, 2013); FTC-LW16-3245 (7/29/13 email from May to Roman, copying Sirlin, confirming meeting at call center and dinner with Boling at Worldwide, and asking how to start setting up home security dealers to sell for Defendants); FTC-LW16-3360 (8/1/13 email between Roman and Sirlin regarding why Worldwide PERS sales numbers are down and call center payments); FTC-LW16-3395 (8/16/13 email from Roman to Sirlin regarding upsell strategies); FTC-LW16-3418 (8/28/13 email from Roman to Sirlin and May seeking Mike Ramos's (manager of Direct Agent Response call center) cell phone number); FTC-LW16-3567 (9/25/13 email from Roman to May, Cleasby, and Sirlin dictating new procedures for dealing with dealers); FTC-LW16-3574 (9/26/13 email from Roman to May and Sirlin seeking Mike Ramos's (manager of Direct Agent Response call center) email address); FTC-LW16-3571 (9/26/13 email from Roman to May, Cleasby, Sirlin, Baker, Alex Lindsley, Hallowell, and Duran dictating various new procedures for Lifewatch, including automatic price increases, cutting payments to dealers, and increasing pre-ship calls); FTC-LW16-3836-3837 (12/23/13 email from Kevin Carducci to Hallowell and Sara Weaver that Hallowell forwards to May and Roman giving the phone number for Boling of Worldwide); FTC-LW16-3847-48 (12/26/13 email exchange between Oliveri and Roman about

payments to Boling at Worldwide); FTC-LW16-4239-4240 (2/21/14 email from Hallowell to

Baker, Sara Weaver, Sirlin, and May telling the group that Roman wants particular deal

discontinued); FTC-LW16-4267 (3/3/14 email from Roman to Oliveri and Baker instructing

Baker to terminate Dick Van Patten); FTC-LW16-4365 – 4366 (3/31/14 email exchange setting

up call between telemarketer, Roman, May, and Sirlin regarding new telemarketing campaign);

FTC-LW16-4432-4433 (4/11/14 email from Roman to telemarketer providing details for deal

with regarding a new call center); FTC-LW16-4483 – 4489 (4/23/14 email from Roman to Sirlin

suggesting a new lead generator); FTC-LW16-4823- 4825 (8/6/14 email from Cohen to Roman,

May, and Sirlin where Cohen is enclosing a script on how to respond to "Subscribers Who Feel

They Were Misled by Sales Agents."); FTC-LW16-5033 (9/11/14 email from  May to Sirlin

stating that Roman says call centers are not to pitch particular deal); FTC-LW16-5439 – 5440

(1/14/15 email exchange between Kevin Carducci, Hallowell, Roman, Baker and Sirlin regarding

HEI also using the Medical Alarm Systems); FTC-LW16-5468 – 5469 (1/28/15 email from

Roman to Sirlin about exploring marketing relationship with senior group); FTC-LW16-5913

(7/27/15 email from Roman to Oliveri regarding whether new telemarketing companies were

being formed to avoid chargebacks); FTC-LW16-6463 (1/27/16 email from Hallowell to Sirlin

stating that Roman approved the change in the script for the unit price); FTC-LW16-7092 – 7093

(12/8/16 email exchange between Baker and Greg Fradette, copying Roman and Cleasby re

Lifewatch renewing its Florida telemarketing surety bond); PX 98, Transcript of Deposition of

Sirlin on July 25, 2017, at 51-52 (Sirlin testifying that he visited the Worldwide call center, with

May and Roman, at least once, and that Boling met visited Lifewatch headquarters at least once);

*id.* at 69-70 (Sirlin testifying that although Lifewatch had distinguished itself in the market was

by not requiring customers to sign long-term contracts because such "contracts with seniors

[cause] a lot of issues," Roman wanted to offer bonuses to telemarketers for signing up customers to 36-month contracts).

32.     In his June 5, 2017 affidavit, Roderic Boling indicated that Messrs. May and Sirlin were aware that WWIS was engaged in using pre-recorded messages and that Messrs. May and Sirlin and WWIS personnel actively concealed information from Roman.

**PLAINTIFFS' RESPONSE TO STATEMENT 32**:  Disputed. While Mr. Boling states that Messrs. May and Sirlin were aware that WWIS was engaged in robocalling, Mr. Boling does not say that they concealed that information from Defendant Roman. Dkt. 247 at 8. Furthermore, Mr. Roman's affidavit also does not allege that Messrs. May and Sirlin concealed the fact that WWIS was robocalling on Defendants' behalf, or any other material fact, from him.  Dkt. 293-14 at 4-5.

33.     In July 2013, Roman asked May and Sirlin about whether Mr. Boling's failure to provide recordings was indicative of potential violations of Lifewatch's Purchase Agreements.

**PLAINTIFFS' RESPONSE TO STATEMENT 33**:  Disputed.  The only evidence cited is Mr. Roman's affidavit, but that statement is inadmissible hearsay.  *See FTC v. Bay Area Business Council, Inc.* 423 F.3d 627, 634 (7th Cir. 2005) (Defendants' affidavit without citation to any documentary evidence in record for support insufficient in response to motion for summary judgment); *Cariel v. Alderen*, 821 F.3d 823, 830 (7th Cir. 2016) (inadmissible hearsay may not be considered on motion for summary judgment); *Kozar v. Munoz*, 230 F. Supp, 3d 915, 922 (N.D. Ill. 2017) (Feinerman, J.) (same).

34.     Mr. Boling claims Messrs. May and Sirlin were aware Worldwide was manipulating recordings that he would send so that Roman would not know about underlying violative pre-recordings.

26

**PLAINTIFFS' RESPONSE TO STATEMENT 34**: Disputed. While Mr. Boling states that Messrs. May and Sirlin were aware that WWIS manipulated recordings, Mr. Boling does not say, and would not know, that they concealed that information from Defendant Roman. Dkt. 247 at 8.

35.     Mr. Boling claims predictive dialers were acquired and concealed from Roman.

**PLAINTIFFS' RESPONSE TO STATEMENT 35**: Undisputed.

36.     Mr. Boling claims that "overpayments" were made to Worldwide so that cash payments approximating $1.2 million could be provided to May and Sirlin and concealed from Roman.

**PLAINTIFFS' RESPONSE TO STATEMENT 36**: Undisputed.

37.     Since 1988, Safe Home Security, Inc., has been in the business of selling home and business alarm systems and services. The business was previously headquartered at 55 Sebethe Drive, Cromwell, Connecticut and is now headquartered at 1125 Middle Street in Middletown, Connecticut.

**PLAINTIFFS' RESPONSE TO STATEMENT 37**: Undisputed.

38.     Safe Home Security has not sold personal emergency response systems, though a small percentage of its home alarm customers have been provided with personal pendants, which are attachments to their existing alarm systems.

**PLAINTIFFS' RESPONSE TO STATEMENT 38**: Disputed. *See,e .g.,* FTC-LW16-5069 – 5070 (9/24/14 email from Hallowell to Baker, discussing the 2000 SHS PERS accounts not directly connected to Lifewatch).

39.     None of Roman's co-defendants in this litigation have ever held an ownership interest in Safe Home Security, Inc., nor have any of the co-defendants been officers or employees of Safe Home Security, Inc.

**PLAINTIFFS' RESPONSE TO STATEMENT 39**:  Undisputed.

40.     Safe Home Security, Inc.'s office was located at 55 Sebethe Drive in Cromwell, Connecticut, and has recently moved to Middletown, Connecticut.

**PLAINTIFFS' RESPONSE TO STATEMENT 40**:  Undisputed.

41.     Safe Home Security, Inc. did not share office space, officers, or personnel with Lifewatch at any time before May 31, 2013.

**PLAINTIFFS' RESPONSE TO STATEMENT 41**: Undisputed.

42.     Safe Home Security, Inc. and Lifewatch Inc. have not shared or co-mingled operating accounts.

**PLAINTIFFS' RESPONSE TO STATEMENT 42**:  Disputed. The only evidence cited is Mr. Roman's affidavit.  *See FTC v. Bay Area Business Council, Inc.* 423 F.3d 627, 634 (7th Cir. 2005) (Defendants' affidavit without citation to any documentary evidence in record for support insufficient in response to motion for summary judgment).  Defendants have neither introduced or produced any documentary evidence in support of this statement, although if the statement were true, such documents would exist.

43.     Safe Home Security, Inc. and Lifewatch Inc. have always filed separate tax returns.

**PLAINTIFFS' RESPONSE TO STATEMENT 43**:  Undisputed.

44.     Safe Home Security, Inc. and Lifewatch Inc. have always maintained separate payrolls.

**PLAINTIFFS' RESPONSE TO STATEMENT 44**:  Disputed. The only evidence cited is Mr. Roman's affidavit.  *See FTC v. Bay Area Business Council, Inc.* 423 F.3d 627, 634 (7th Cir. 2005) (Defendants' affidavit without citation to any documentary evidence in record for support insufficient in response to motion for summary judgment).  Defendants have neither introduced or produced any documentary evidence in support of this statement, although if the statement were true, such documents would exist.

45.     Safe Home Security, Inc. and MedGuard Alert Inc. did not share personnel between 2013 and 2016.

**PLAINTIFFS' RESPONSE TO STATEMENT 45**:  Disputed. *See, e.g.,* FTC-LW16-3053 (6/14/13 email from Kevin Carducci, with signature block "Account Manager, MedGuard Alert, but but with email address @safehomesecurityinc.com, and lists website www.safehomesecurityinc.com, to Cohen, asking that only billing and cancel calls be sent to him); FTC-LW16-6614, 6617-6618 (4/13/16 email from Roman to Gladys Santiago and Oliveri dictating that SHS employee, who is working at Lifewatch office in Lynbrook, be moved to either Lifewatch or Medguard payroll); FTC-LW16-7464, 7472 (1/6/16 email from Cleasb to Oliveri and Christopher Parisi, enclosing payroll statements for MedGuard Alert, including for period 12/6/14 through 12/19/14, listing the following employees who have Lifewatch signature blocks and email addresses @safehomesecurityinc.com: Kevin Carducci, Emily Duda, Sara Emond, Megan Gibbons, Vanessa Green, Kathleen Hernandez, Susan Hill, Emanuela R. Imme, Magaly Infante, Kathleen Larocque, Flavio Mastrodomeico, Valdez Reid, Ivana Schulman, Jeffrey Schweiger, Larry Tucker, Sara Weaver); MG 0001 – MG0006 MedGuard Employee List (MedGuard Employee Lists 2013 – 2016 show the following employees who have Lifewatch signature blocks, and email addresses @safehomesecurityinc.com: Kevin Carducci, Sara Emond,

Catherine Gecheran, Natalia Iwanczuk, Christopher Knight, Valdez Reid, Jeffrey Schweiger, Myles Tripp, Sara Weaver, Carmello Bello, Vanessa Brillant, Emily Duda, Jenn Groff); PX 101, Transcript of Deposition of Hallowell on August 1, 2017, at 7, 11-12 (Hallowell testifying that while he is not employed by Lifewatch, Safe Home Security, or MedGuard Alert, he oversees MedGuard managers for customer service, collections, confirmation, and shipping, including Kevin Carducci and Cathy Hernandez).

46.     Medguard Alert, Inc., a Connecticut company, incorporated in 2011 provides personal emergency response equipment and services to customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 46**:  Undisputed.

47.     Medguard Alert, Inc. had a pool of customers beginning in approximately January 2013, after having purchased those customer accounts, in bulk, from a non-party entity.

**PLAINTIFFS' RESPONSE TO STATEMENT 47**:  Undisputed.

48.     In conjunction with and after the Share Purchase Agreement, Medguard Alert, Inc. also obtained additional customers by buying bulk accounts from Lifewatch Inc.

**PLAINTIFFS' RESPONSE TO STATEMENT 48**:  Undisputed.

49.     After the Share Purchase Agreement, Medguard Alert, Inc. also purchased customer accounts in 2014 from non-party entities.

**PLAINTIFFS' RESPONSE TO STATEMENT 49**:  Undisputed.

50.     MedGuard Alert, Inc.'s office have always been in Connecticut.

**PLAINTIFFS' RESPONSE TO STATEMENT 50**:  Undisputed.

51.     Up until May 31, 2013, MedGuard Alert, Inc. did not share office space, officers, or personnel with Lifewatch.

**PLAINTIFFS' RESPONSE TO STATEMENT 51**: Disputed. The only evidence cited is Mr. Roman's affidavit. *See FTC v. Bay Area Business Council, Inc.* 423 F.3d 627, 634 (7th Cir. 2005) (Defendants' affidavit without citation to any documentary evidence in record for support insufficient in response to motion for summary judgment). Defendants have neither introduced or produced any documentary evidence in support of this statement, although if the statement were true, such documents would exist.

52.     Medguard Alert, Inc. and Lifewatch Inc. have not shared or co-mingled operating accounts.

**PLAINTIFFS' RESPONSE TO STATEMENT 52**: Disputed. The only evidence cited is Mr. Roman's affidavit. *See FTC v. Bay Area Business Council, Inc.* 423 F.3d 627, 634 (7th Cir. 2005) (Defendants' affidavit without citation to any documentary evidence in record for support insufficient in response to motion for summary judgment). Defendants have neither introduced or produced any documentary evidence in support of this statement, although if the statement were true, such documents would exist.

53.     Medguard Alert, Inc. and Lifewatch have always filed separate tax returns.

**PLAINTIFFS' RESPONSE TO STATEMENT 53**: Undisputed.

54.     Medguard Alert, Inc. and Lifewatch Inc. have maintained separate payrolls.

**PLAINTIFFS' RESPONSE TO STATEMENT 54**: Disputed. The only evidence cited is Mr. Roman's affidavit. *See FTC v. Bay Area Business Council, Inc.* 423 F.3d 627, 634 (7th Cir. 2005) (Defendants' affidavit without citation to any documentary evidence in record for support insufficient in response to motion for summary judgment). Defendants have neither introduced or produced any documentary evidence in support of this statement, although if the statement were true, such documents would exist. *See also* FTC-LW16-6614, 6617-6618 (4/13/16 email

from Roman to Gladys Santiago and Oliveri dictating that SHS employee, who is working at Lifewatch office in Lynbrook, be moved to either Lifewatch or Medguard payroll); FTC-LW16-7438-7449 (7/9/15 email from Lifewatch Director of Human Resources to Oliveri, enclosing weekly payroll journal for Lifewatch, including only 4 of the 36 Lifewatch employees listed on FTC-LW16-7438 as Lifewatch-Middle Street employee list, 2 of which were also listed on Lifewatch-Long Island employee list; all 48 employees on Lifewatch-Long Island employee list included in payroll journal); FTC-LW16-7450-52 (7/17/15 email from Cohen to various Lifewatch employees, enclosing phone lists for Lifewatch-Middle Street and Lifewatch-Long Island, showing 31 out of 36 employees at Middle Street with email addresses @safehomesecurityinc.com); FTC-LW16-7464, 7472 (1/6/16 email from Cleasb to Oliveri and Christopher Parisi, enclosing payroll statements for MedGuard Alert, including for period 12/6/14 through 12/19/14, listing the following employees who have Lifewatch signature blocks and email addresses @safehomesecurityinc.com: Kevin Carducci, Emily Duda, Sara Emond, Megan Gibbons, Vanessa Green, Kathleen Hernandez, Susan Hill, Emanuela R. Imme, Magaly Infante, Kathleen Larocque, Flavio Mastrodomeico, Valdez Reid, Ivana Schulman, Jeffrey Schweiger, Larry Tucker, Sara Weaver); MG 0001 – MG0006 MedGuard Employee List (MedGuard Employee Lists 2013 – 2016 show the following employees who have Lifewatch signature blocks, and email addresses @safehomesecurityinc.com: Kevin Carducci, Sara Emond, Catherine Gecheran, Natalia Iwanczuk, Christopher Knight, Valdez Reid, Jeffrey Schweiger, Myles Tripp, Sara Weaver, Carmello Bello, Vanessa Brillant, Emily Duda, Jenn Groff.

55.    The FTC has alleged the following statements were made by third-party sellers in connection with selling Lifewatch's services:

- A friend, family member, health care provider, or other acquaintace of the consumer referred the consumer to Defendants, or purchased the medical alert system for the consumer;

- Defendants' medical alert system is endorsed by reputable organizations, including, but not limited to, the American Heart Association, the American Diabetes Association, the National Institute on Aging, the AARP, the American Red Cross, and/or health care providers;

- Consumers will not be charged the first monitoring fee until they have received and activated the medical alert system;

- Consumers may cancel the monitoring service at any time without any further financial obligation

**PLAINTIFFS' RESPONSE TO STATEMENT 55**: Undisputed.

56.    In fact medical alert systems have been endorsed by reputable organizations and health care providers.

**PLAINTIFFS' RESPONSE TO STATEMENT 56**: Undisputed, but immaterial Plaintiffs did not allege that medical alert systems have not been endorsed by various organizations, but that Defendants' medical alert systems have not been so endorsed. *See* 299-1, PSMF 14.

57.    Lifewatch's customer's can cancel without further financial obligation.

**PLAINTIFFS' RESPONSE TO STATEMENT 57**: Disputed.  Not only will they be charged for the device if they don't return it, but they can also be charged the balance of their contract. *See, e.g.,* Dkt. 24-1 at 129, 138, PX 5, Bradley Dec. ¶ 5, Att. D (consumer billed same day as call); Dkt. 24-3 at 5, PX 7, Cuomo Dec. ¶ 5, Att. A (consumer complaint that mom paid

33

over $2000 for unused service); Dkt. 24-3 at 5-7, PX 7, Cuomo Dec. Att. A (Lifewatch refused

to cancel account of woman with dementia because son cannot find device to return it;

demanding $475 as alternative); Dkt. 24-3 at 13, PX 7, Cuomo Dec. Att. A (consumer paid

monthly fee for several months for unused service); Dkt. 24-3 at 15-16 , PX 7, Cuomo Dec.

A (consumer's father paid over $130 for unused service); Dkt. 24-3 at 23, PX 7, Cuomo Dec.

Att. A (consumer's mother paid monthly fee for over a year for unused service); Dkt. 24-3 at 25-

29, PX 7, Cuomo Dec. Att. A (mother never agreed to service or received device, but told must

return it or pay $475 to cancel service); Dkt. 24-3 at 35, PX 7, Cuomo Dec. Att. A (consumer's

sister paid for 7 months of fees for unused service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A

(consumer's father paid monthly fee for several months of unused service); Dkt. 24-3 at 40, PX

7, Cuomo Dec. Att. A (consumer's mother billed over $400 for unused service); Dkt. 24-3 at 42,

PX 7, Cuomo Dec. Att. A (consumer's elderly parents paid approximately $700 for unused

service); Dkt. 24-3 at 43, PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive

returned device, continued billing); Dkt. 24-22 at 3, PX 26, Cavic Dec. ¶ 8 (mother charged for

unactivated device for nearly a year); Dkt. 25-2 at 3, PX 34, Felker Dec. ¶ 6 (charged monthly

fees for a system that was never received); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also

said that [Lifewatch] would only cancel my account after I mailed the device back at my own

expense.  I had previously been told that there would be no cost to returning the device."); Dkt.

25-18 at 6, Dkt. 19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt.

25-18 at 11, Dkt. 20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the

account unless we get the equipment back…I said the collection efforts will continue."); Dkt. 25-

24 at 4, PX 56, Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping

until consumer threatened to "trash the device");  FTC-LW16-4397 – 4398 (4/9/14 email from

Baker to May, copying Sirlin, saying she is "completely shocked" that they are agreeing with Hallowell to continue to bill consumers Lifewatch knows have not activated their devices; states "You both understand this is where disputes/charge backs, BBB, AG complaints come from, right???????"); FTC-LW16-4786 (7/2/14 email from Roman to Hallowell, May, and Sirlin showing the weekly percentage of Lifewatch customers paying despite not having activated their system ranging from 15-24.6%); FTC-LW16-4833-4838 (8/11/14 email from Cohen to Kevin Carducci, Baker, Hallowell, and Sara Weaver regarding giving a partial refund to consumers who had PERS unit for 7 months, paid for it, but never activated it); FTC-LW16-4861 – 4862 (8/21/14 email from Baker to Roman, Hallowell, and May, excited that "working hard!" had resulted in lower the number of Lifewatch PERS customers who had not activated their units to 11%); FTC-LW16-4984-4985 (9/4/14 email exchange between Roman, Hallowell, May and Baker noting that number of paying Lifewatch customers who had not activated their medical alert units had increased again); FTC-LW16-4999-5001 (9/5/14 email exchange between Kevin Carducci, Cohen, Sirlin, Roman, Hallowell, Baker, and May about consumers complaining that they were being told that they would not be charged until they activated the unit); FTC-LW16-6602 – 6603 (4/7/16 email from May to monitoring company, copying Roman, Sirlin, and Hallowell regarding the 50% of Defendants' accounts that were not sending any signal); FTC-LW16-6612 (4/11/16 email from Hallowell to Wajdowicz, SHS Chief Information Officer, copying Roman, attaching email from monitoring company showing 4367 out of 9312 active paying accounts had no signal); FTC-LW16-8036 (4/13/15 email from Vandewater to telemarketer re consumer told Lifewatch would pay return shipping if she cancelled, "which we wont do").

58.     Lifewatch's consumers are charged in conjunction with receiving medical alert systems, which are already active and ready to be used because Lifewatch engages monitoring centers for each customer before the devices are even sent.

**PLAINTIFFS' RESPONSE TO STATEMENT 58**:  Disputed.  Consumers are charged upon purchase, not receipt. *See, e.g.,* Dkt. 24-1 at 129, 138, PX 5, Bradley Dec. ¶ 5, Att. D (consumer billed same day as call); Dkt. 24-3 at 5, PX 7, Cuomo Dec. ¶ 5, Att. A (consumer complaint that mom paid over $2000 for unused service); Dkt. 24-3 at 5-7, PX 7, Cuomo Dec. Att. A (Lifewatch refused to cancel account of woman with dementia because son cannot find device to return it; demanding $475 as alternative); Dkt. 24-3 at 13, PX 7, Cuomo Dec. Att. A (consumer paid monthly fee for several months for unused service); Dkt. 24-3 at 15-16 , PX 7, Cuomo Dec. Att. A (consumer's father paid over $130 for unused service); Dkt. 24-3 at 23, PX 7, Cuomo Dec. Att. A (consumer's mother paid monthly fee for over a year for unused service); Dkt. 24-3 at 25-29, PX 7, Cuomo Dec. Att. A (mother never agreed to service or received device, but told must return it or pay $475 to cancel service); Dkt. 24-3 at 35, PX 7, Cuomo Dec. Att. A (consumer's sister paid for 7 months of fees for unused service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A (consumer's father paid monthly fee for several months of unused service); Dkt. 24-3 at 40, PX 7, Cuomo Dec. Att. A (consumer's mother billed over $400 for unused service); Dkt. 24-3 at 42, PX 7, Cuomo Dec. Att. A (consumer's elderly parents paid approximately $700 for unused service); Dkt. 24-3 at 43, PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive returned device, continued billing); Dkt. 24-22 at 3, PX 26, Cavic Dec. ¶ 8 (mother charged for unactivated device for nearly a year); Dkt. 25-2 at 3, PX 34, Felker Dec. ¶ 6 (charged monthly fees for a system that was never received); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also said that [Lifewatch] would only cancel my account after I mailed the device back at my own

expense. I had previously been told that there would be no cost to returning the device."); Dkt. 25-18 at 6, Dkt. 19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt. 25-18 at 11, Dkt. 20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the account unless we get the equipment back…I said the collection efforts will continue."); Dkt. 25-24 at 4, PX 56, Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer threatened to "trash the device"); FTC-LW16-4397 – 4398 (4/9/14 email from Baker to May, copying Sirlin, saying she is "completely shocked" that they are agreeing with Hallowell to continue to bill consumers Lifewatch knows have not activated their devices; states "You both understand this is where disputes/charge backs, BBB, AG complaints come from, right???????"); FTC-LW16-4786 (7/2/14 email from Roman to Hallowell, May, and Sirlin showing the weekly percentage of Lifewatch customers paying despite not having activated their system ranging from 15-24.6%); FTC-LW16-4833-4838 (8/11/14 email from Cohen to Kevin Carducci, Baker, Hallowell, and Sara Weaver regarding giving a partial refund to consumers who had PERS unit for 7 months, paid for it, but never activated it); FTC-LW16-4861 – 4862 (8/21/14 email from Baker to Roman, Hallowell, and May, excited that "working hard!" had resulted in lower the number of Lifewatch PERS customers who had not activated their units to 11%); FTC-LW16-4984-4985 (9/4/14 email exchange between Roman, Hallowell, May and Baker noting that number of paying Lifewatch customers who had not activated their medical alert units had increased again); FTC-LW16-4999-5001 (9/5/14 email exchange between Kevin Carducci, Cohen, Sirlin, Roman, Hallowell, Baker, and May about consumers complaining that they were being told that they would not be charged until they activated the unit); FTC-LW16-6602 – 6603 (4/7/16 email from May to monitoring company, copying Roman, Sirlin, and Hallowell regarding the 50% of Defendants' accounts that were not sending any signal); FTC-

LW16-6612 (4/11/16 email from Hallowell to Wajdowicz, SHS Chief Information Officer, copying Roman, attaching email from monitoring company showing 4367 out of 9312 active paying accounts had no signal).

59.     The customer is not charged for use of the device, and, therefore the device is free to the consumer.

**PLAINTIFFS' RESPONSE TO STATEMENT 59**:  Disputed.  The customer is, in fact, charged for using the device.  Without "using" the device the consumer would have no way to reach the monitoring service.  And, if the consumer cancels and fails to return the device they are charged. *See, e.g.*, Dkt. 24-3 at 25-29, PX 7, Cuomo Dec. Att. A (mother never agreed to service or received device, but told must return it or pay $475 to cancel service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A (cannot find device supposedly sent to elderly father, but told must return it or pay $425 to stop monthly charges); Dkt. 24-3 at 43, PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive returned device, continued billing); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also said that [Lifewatch] would only cancel my account after I mailed the device back at my own expense.  I had previously been told that there would be no cost to returning the device."); Dkt. 25-18 at 6, Dkt. 19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt. 25-18 at 11, Dkt. 20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the account unless we get the equipment back…I said the collection efforts will continue.");Dkt. 25-24 at 4, PX 56, Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer threatened to "trash the device"); FTC-LW16-8036 (4/13/15 email from Vandewater to telemarketer re consumer told Lifewatch would pay return shipping if she cancelled, "which we wont do").

60.     After May 24, 2013, a single customer was signed up on July 12, 2013.  However, the customer canceled within thirty days, thus requiring a refund.

**PLAINTIFFS' RESPONSE TO STATEMENT 60**: Disputed.  Presumably, Defendants intended to cite to Roman Affidavit ¶ 23 and not ¶ 24, but the evidence he cites and Defendants presumably intend to rely on by citing Exhibit Q "generally" (Defendants' purported expert report) relates only to customer data produced by Defendants as to the entity named Worldwide Info Systems. The same records demonstrate more than 33,000 customers signing up with Defendants from other Worldwide companies (Global Interactive Technologies, Inc., American Innovative Concepts, Inc., and National Life Network, Inc.) after May 24, 2013. *See* Dkt. 252 at 5, PX 97, Al-Najjar Dec. ¶ 14.  This does not include the tens or hundreds of thousands of customers who purchased Defendants' medical alert systems from telemarketers other than Worldwide since May 24, 2013, and after Worldwide was shut down in January 2014. *See* PSMF 39).

Dated:  February 26, 2018              /s/Samantha Gordon
                                       SAMANTHA GORDON
                                       DAVID A. O'TOOLE
                                       Federal Trade Commission, Midwest Region
                                       230 South Dearborn Street, Suite 3030
                                       Chicago, Illinois 60604
                                       Telephone: (312) 960-5634
                                       Facsimile: (312) 960-5600

                                       Attorneys for Plaintiff
                                       FEDERAL TRADE COMMISSION

                                       PAMELA JO BONDI
                                       Attorney General
                                       State of Florida

                                        /s/Denise Beamer
                                       DENISE BEAMER
                                       Assistant Attorney General
                                       Florida Bar # 69369

Office of the Attorney General
Consumer Protection Division
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone:  (407) 245-0833
Facsimile:  (407) 245-0365

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL

## CERTIFICATE OF SERVICE

I, Samantha Gordon, hereby certify that on February 26 2018, I electronically filed

PLAINTIFFS' RESPONSE TO DEFENDANTS' DAVID ROMAN, SAFE HOME SECURITY,

INC., AND MEGUARD ALERT, INC.'S LOCAL RULE 56.1(a) STATEMENT OF

UNDISPUTED MATERIAL FACTS, with the Court using the CM/ECF system, which will

automatically send copies to any attorney of record in the case.

Respectfully Submitted,

/s/ Samantha Gordon
SAMANTHA GORDON
Federal Trade Commission
Midwest Region
230 S. Dearborn St., Room 3030
Chicago, Illinois 60603
Voice: (312) 960-5634
Fax:     (312) 960-5600
email: sgordon@ftc.gov