**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and ) | |
| ) | |
| STATE OF FLORIDA, OFFICE OF THE ) | |
| ATTORNEY GENERAL, DEPARTMENT ) | |
| OF LEGAL AFFAIRS, ) | Case No. 15cv5781 |
| ) | |
| Plaintiffs, ) | Judge Gary Feinerman |
| ) | |
| v. ) | Magistrate Judge Jeffrey T. Gilbert |
| ) | |
| LIFEWATCH, INC., a New York corporation, ) | |
| also d/b/a LIFEWATCH USA and MEDICAL ) | |
| ALARM SYSTEMS, ) | |
| ) | |
| SAFE HOME SECURITY, INC., a ) | |
| Connecticut corporation, ) | |
| ) | |
| MEDGUARD ALERT, INC., a Connecticut ) | |
| corporation, ) | |
| ) | |
| EVAN SIRLIN, individually and as an officer ) | |
| or manager of Lifewatch Inc., ) | |
| ) | |
| MITCHEL MAY, individually and as an officer or ) | |
| manager of Lifewatch Inc., and ) | |
| ) | |
| DAVID ROMAN, individually and as an officer ) | |
| or manager of Lifewatch Inc., Safe Home Security, ) | |
| Inc., and Medguard Alert, Inc. ) | |
| ) | |
| Defendants. ) | |

_____

## PLAINTIFFS' RESPONSES TO DEFENDANT MITCHEL MAY'S LOCAL RULE 56.1(a) STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Lifewatch, Inc. is a New York personal emergency response system business that was incorporated in 1996.

1

**PLAINTIFFS' RESPONSE TO STATEMENT 1**:  Undisputed.

2.　　　Since its inception, Lifewatch has provided emergency monitoring products and services to elderly, seriously ill, and disabled individual.

**PLAINTIFFS' RESPONSE TO STATEMENT 2**:  Undisputed.

3.　　　By pressing a button on Lifewatch-provided equipment, Lifewatch's customers have immediate access to emergency services.

**PLAINTIFFS' RESPONSE TO STATEMENT 3**:  Undisputed.

4.　　　Lifewatch has provided free equipment to its customers to allow them access to Lifewatch's services.

**PLAINTIFFS' RESPONSE TO STATEMENT 4**:  Disputed.  Lifewatch's equipment is not free.  Lifewatch charges the customer if its equipment is not returned.  *See, e.g.,* Dkt. 24-1 at 129, 138, PX 5, Bradley Dec. ¶ 5, Att. D (consumer billed same day as call); Dkt. 24-3 at 5, PX 7, Cuomo Dec. ¶ 5, Att. A (consumer complaint that mom paid over $2000 for unused service); Dkt. 24-3 at 5-7, PX 7, Cuomo Dec. Att. A (Lifewatch refused to cancel account of woman with dementia because son cannot find device to return it; demanding $475 as alternative); Dkt. 24-3 at 13, PX 7, Cuomo Dec. Att. A (consumer paid monthly fee for several months for unused service); Dkt. 24-3 at 15-16 , PX 7, Cuomo Dec. Att. A (consumer's father paid over $130 for unused service); Dkt. 24-3 at 23, PX 7, Cuomo Dec. Att. A (consumer's mother paid monthly fee for over a year for unused service); Dkt. 24-3 at 25-29, PX 7, Cuomo Dec. Att. A (mother never agreed to service or received device, but told must return it or pay $475 to cancel service); Dkt. 24-3 at 35, PX 7, Cuomo Dec. Att. A (consumer's sister paid for 7 months of fees for unused service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A (consumer's father paid monthly fee for several months of unused service); Dkt. 24-3 at 40, PX 7, Cuomo Dec. Att.

A (consumer's mother billed over $400 for unused service); Dkt. 24-3 at 42, PX 7, Cuomo Dec.

Att. A (consumer's elderly parents paid approximately $700 for unused service); Dkt. 24-3 at 43,

PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive returned device, continued

billing); Dkt. 24-22 at 3, PX 26, Cavic Dec. ¶ 8 (mother charged for unactivated device for

nearly a year); Dkt. 25-2 at 3, PX 34, Felker Dec. ¶ 6 (charged monthly fees for a system that

was never received); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also said that [Lifewatch]

would only cancel my account after I mailed the device back at my own expense. I had

previously been told that there would be no cost to returning the device."); Dkt. 25-18 at 6, Dkt.

19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt. 25-18 at 11, Dkt.

20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the account unless

we get the equipment back…I said the collection efforts will continue."); Dkt. 25-24 at 4, PX 56,

Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer

threatened to "trash the device");  FTC-LW16-4397 – 4398 (4/9/14 email from Baker to May,

copying Sirlin, saying she is "completely shocked" that they are agreeing with Hallowell to

continue to bill consumers Lifewatch knows have not activated their devices; states "You both

understand this is where disputes/charge backs, BBB, AG complaints come from,

right???????")[1]; FTC-LW16-4786 (7/2/14 email from Roman to Hallowell, May, and Sirlin

showing the weekly percentage of Lifewatch customers paying despite not having activated their

system ranging from 15-24.6%); FTC-LW16-4833-4838 (8/11/14 email from Cohen to Kevin

Carducci, Baker, Hallowell, and Sara Weaver regarding giving a partial refund to consumers

who had PERS unit for 7 months, paid for it, but never activated it); FTC-LW16-4861 – 4862

(8/21/14 email from Baker to Roman, Hallowell, and May, excited that "working hard!" had

---

[1] Except where specified, all documents cited with only a bates label descriptor are described in Dkt. 252, PX 97, Al-Najjar Dec., and included in attachments to that declaration.

resulted in lower the number of Lifewatch PERS customers who had not activated their units to 11%); FTC-LW16-4984-4985 (9/4/14 email exchange between Roman, Hallowell, May and Baker noting that number of paying Lifewatch customers who had not activated their medical alert units had increased again); FTC-LW16-4999-5001 (9/5/14 email exchange between Kevin Carducci, Cohen, Sirlin, Roman, Hallowell, Baker, and May about consumers complaining that they were being told that they would not be charged until they activated the unit); FTC-LW16-6602 – 6603 (4/7/16 email from May to monitoring company, copying Roman, Sirlin, and Hallowell regarding the 50% of Defendants' accounts that were not sending any signal); FTC-LW16-6612 (4/11/16 email from Hallowell to Wajdowicz, SHS Chief Information Officer, copying Roman, attaching email from monitoring company showing 4367 out of 9312 active paying accounts had no signal); FTC-LW16-8036 (4/13/15 email from Vandewater to telemarketer re consumer told Lifewatch would pay return shipping if she cancelled, "which we wont do").

5.      In conjunction with providing the free equipment, Lifewatch engages third-party monitoring companies to respond to emergency signals sent by Lifewatch's customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 5**:  Disputed.  Lifewatch's equipment is not free.  Lifewatch charges the customer if its equipment is not returned.  *See, e.g.,* Dkt. 24-1 at 129, 138, PX 5, Bradley Dec. ¶ 5, Att. D (consumer billed same day as call); Dkt. 24-3 at 5, PX 7, Cuomo Dec. ¶ 5, Att. A (consumer complaint that mom paid over $2000 for unused service); Dkt. 24-3 at 5-7, PX 7, Cuomo Dec. Att. A (Lifewatch refused to cancel account of woman with dementia because son cannot find device to return it; demanding $475 as alternative); Dkt. 24-3 at 13, PX 7, Cuomo Dec. Att. A (consumer paid monthly fee for several months for unused service); Dkt. 24-3 at 15-16 , PX 7, Cuomo Dec. Att. A (consumer's father

paid over $130 for unused service); Dkt. 24-3 at 23, PX 7, Cuomo Dec. Att. A (consumer's

mother paid monthly fee for over a year for unused service); Dkt. 24-3 at 25-29, PX 7, Cuomo

Dec. Att. A (mother never agreed to service or received device, but told must return it or pay

$475 to cancel service); Dkt. 24-3 at 35, PX 7, Cuomo Dec. Att. A (consumer's sister paid for 7

months of fees for unused service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A (consumer's father

paid monthly fee for several months of unused service); Dkt. 24-3 at 40, PX 7, Cuomo Dec. Att.

A (consumer's mother billed over $400 for unused service); Dkt. 24-3 at 42, PX 7, Cuomo Dec.

Att. A (consumer's elderly parents paid approximately $700 for unused service); Dkt. 24-3 at 43,

PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive returned device, continued

billing); Dkt. 24-22 at 3, PX 26, Cavic Dec. ¶ 8 (mother charged for unactivated device for

nearly a year); Dkt. 25-2 at 3, PX 34, Felker Dec. ¶ 6 (charged monthly fees for a system that

was never received); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also said that [Lifewatch]

would only cancel my account after I mailed the device back at my own expense. I had

previously been told that there would be no cost to returning the device."); Dkt. 25-18 at 6, Dkt.

19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt. 25-18 at 11, Dkt.

20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the account unless

we get the equipment back…I said the collection efforts will continue."); Dkt. 25-24 at 4, PX 56,

Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer

threatened to "trash the device"); FTC-LW16-4397 – 4398 (4/9/14 email from Baker to May,

copying Sirlin, saying she is "completely shocked" that they are agreeing with Hallowell to

continue to bill consumers Lifewatch knows have not activated their devices; states "You both

understand this is where disputes/charge backs, BBB, AG complaints come from, right???????");

FTC-LW16-4786 (7/2/14 email from Roman to Hallowell, May, and Sirlin showing the weekly

percentage of Lifewatch customers paying despite not having activated their system ranging

from 15-24.6%); FTC-LW16-4833-4838 (8/11/14 email from Cohen to Kevin Carducci, Baker,

Hallowell, and Sara Weaver regarding giving a partial refund to consumers who had PERS unit

for 7 months, paid for it, but never activated it); FTC-LW16-4861 – 4862 (8/21/14 email from

Baker to Roman, Hallowell, and May, excited that "working hard!" had resulted in lower the

number of Lifewatch PERS customers who had not activated their units to 11%); FTC-LW16-

4984-4985 (9/4/14 email exchange between Roman, Hallowell, May and Baker noting that

number of paying Lifewatch customers who had not activated their medical alert units had

increased again); FTC-LW16-4999-5001 (9/5/14 email exchange between Kevin Carducci,

Cohen, Sirlin, Roman, Hallowell, Baker, and May about consumers complaining that they were

being told that they would not be charged until they activated the unit); FTC-LW16-6602 – 6603

(4/7/16 email from May to monitoring company, copying Roman, Sirlin, and Hallowell

regarding the 50% of Defendants' accounts that were not sending any signal); FTC-LW16-6612

(4/11/16 email from Hallowell to Wajdowicz, SHS Chief Information Officer, copying Roman,

attaching email from monitoring company showing 4367 out of 9312 active paying accounts had

no signal); FTC-LW16-8036 (4/13/15 email from Vandewater to telemarketer re consumer told

Lifewatch would pay return shipping if she cancelled, "which we wont do").

6.     Lifewatch actively sought ways to expand its customer base and entered into

agreements with various independent sales companies, including WWIS ("WWIS"), beginning

in approximately 2012.

**PLAINTIFFS' RESPONSE TO STATEMENT 6**:  Disputed.  The sales companies

were not independent and began well before 2012. *See, e.g.,* Dkt. 96-1 at 54 (PX 89, Einikis Dec.

Att. A) (3/28/14 email from Lifewatch employee forwarding Sirlin 3/26/14 email, copying May

and Baker, to telemarketer instructing telemarketing room on upsells, including restaurant.com, grocery coupons, pharmacy discount cards, and smoke alarms); FTC-LW09-1065 (4/25/12 email from Steinmetz to Worldwide, copying multiple Lifewatch employees, including Sirlin, offering incentive from Lifewatch for top sales person at call center, and promising to gather information from "our other call centers"); FTC-LW09-1150-1 (6/27/12 email from Sirlin to Boling at Worldwide promising discussion with Worldwide and Steinmetz the following day "about all things," Connect America deals, billing issues, and high returns); FTC-LW09-1280 (8/11/12 email from Sirlin to Boling at Worldwide asking whether they have discontinued particular upsell, offering change in commissions relating to upsell, and suggesting change in script); FTC-LW09-1297 (8/28/12 email from Sirlin stating that Worldwide should stop telemarketing in Pennsylvania because of complaints); FTC-LW09-1379 - 80 (9/25/12 Sirlin email to Worldwide stating "please stop the coupons for NOW-we can't determine which go to them etc etc-so for all," forwarding threat from Connect America president that they will "terminate" program because of complaints); FTC-LW09-1381 – 82 (9/28/12 email from Sirlin to Worldwide suggesting alternative upsell, and forwarding email from Connect America president to Sirlin and Steinmetz saying that "NO matter what you say Les, people interpret the offer differently"); FTC-LW09-1389 (10/3/12 email from Sirlin to Worldwide stating that they should change upsell until Connect America is "comfortable with coupons"); FTC-LW09-1429 (10/16/12 email from Sirlin to Worldwide, copying Baker, coaching Boling on how to answer questions bank will ask in connection with their telemarketing for Lifewatch); FTC-LW09-1434 (10/26/12 email from Sirlin to Worldwide, copying Steinmetz, saying must stop grocery coupon upsell for Connect America because they are "giving us shit"); FTC-LW09-1493 (3/22/13 email from Baker to Boling at Worldwide instructing Worldwide to immediately start "pitching Hydroxatone" as

upsell. "The company is ready to start working with us on this"); FTC-LW09-1538 (5/22/13

email from Sirlin to Worldwide instructing Worldwide "Also Wisconsin is giving us trouble-I

would not sell there," and forwarding email from Lifewatch customer service to Sirlin, May, and

Baker, about "John" robocalls from 5 spoofed caller IDs; "We, at Lifewatch USA, do not make

cold calls, do not call out to anyone. Blah blah blah-He finally believed me."); FTC-LW09-1542

(5/31/13 email from Sirlin to Worldwide, copying May, suggesting upsells and possible pricing

options; "Dave doesn't need the extra cash- I am just trying to think of ways to make more

upfront money for you guys with out the pressure of increasing sales"); FTC-LW09-1564

(6/19/13 Sirlin email to Worldwide suggesting upsells and pricing opportunity); FTC-LW09-

2269 (12/5/13 email from Sirlin to broker, Modugno, copying another Lifewatch employee,

noting that Lifewatch is no longer supplying telemarketing leads to US Digest); FTC-LW16-

4406-4407 (4/9/14 email from Lifewatch customer service representative to other Lifewatch and

SHS employees, noting that grocery coupons used as upsell are included in the equipment

package sent from Lifewatch to customers); FTC-LW17-292 - 293, Deposition Transcript of

Matthew Eggen by the Texas Attorney General (broker stating that Lifewatch purchased and

supplied leads to telemarketing room); FTC-LW17-402 - 405, Deposition Transcript of Housein

Karachopan (Lifewatch broker, Eggen's partner, stating that Lifewatch purchased and supplied

leads for at least two telemarketing rooms); PX 91, Robinson Dec. ¶ 6 (former telemarketer and

telemarketing supervisor stating that Vandewater, May and Sirlin discussed changing scripts,

what states telemarketer should call, changing autodialer or caller ID, and changing outgoing

robocall message); PX 93, Boling Dec. ¶ 22-23 ("Lifewatch directed Worldwide to offer certain

"upsells" such as identity theft protection, security systems, and smoke alarms.  Lifewatch had

final approval on all upsells Worldwide offered… Lifewatch directed Worldwide to offer certain

incentives such as coupons and prescription drug cards. It is my understanding that Lifewatch received a kickback on every prescription drug card the telemarketers upsold."). In addition, Worldwide worked exclusively for Defendants. *See* Dkt. 24-10 at 4-5, PX 14, Hilgar Dec. ¶ 11 (all of the telemarketing conducted by Worldwide and its related entities was on behalf of Lifewatch); Dkt. 24-11 at 2-3, PX 15, Settecase Dec. ¶ 5 (Worldwide medical alert telemarketing was exclusively on behalf of Lifewatch);Dkt. 24-12 at 3, PX 16, Kane Dec. ¶ 4 (court-appointed Receiver concluded that Lifewatch was the only medical alert service provider that ever paid Worldwide); Dkt. 101-3 at 8-9 (Transcript of December 2, 2015 Deposition of Brick Kane) (court-appointed Receiver found no evidence showing Worldwide worked for any medical alert provider other than Lifewatch); FTC-LW09-1042 (4/16/12 email from Boling at Worldwide to Steinmetz confirming that Worldwide has and will continue to work exclusively for Lifewatch); FTC-LW09-1148 (6/26/12 email from Sirlin to Worldwide, forwarding earlier email in which Sirlin describes Worldwide to accountant as "our biggest marketing partner"); FTC-LW09-1191 (7/18/12 email from Boling at Worldwide to Sirlin and Steinmetz regarding details of residuals, back payments, and upcoming wire transfer; promising followup email confirming that Worldwide will work exclusively for Lifewatch); FTC-LW09-1192 (7/18/12 email from Boling at Worldwide to Sirlin and Steinmetz confirming "express written commitment" to working exclusively with Lifewatch on medical alerts for three years); FTC-LW16-238 (4/4/12 email from Baker to Lifewatch customer service representatives providing dedicated 800 number Worldwide maintains for Lifewatch customer service calls);FTC-LW16-511-512 (7/28/12 emails between Sirlin, Baker, and Seiden, Lifewatch CFO, forwarding Boling's 7/18/12 email promising Worldwide exclusivity, discussing getting the commitment in writing on letterhead so Lifewatch "can send it to the bank");FTC-LW16-967 – 984 (12/2/12 email from Sirlin to May,

enclosing 6/1/12 telemarketing agreement between Worldwide and Lifewatch; Sirlin states that "Worldwide is one of ricks company-again they signed whatever we asked including indemnification – but they have nothing to lose"); PX 93, Declaration of Roderic Boling ¶ 44 ("Lifewatch requested that Worldwide telemarket exclusively for Lifewatch.").

7.     Lifewatch also entered into a Marketing Alliance Agreement and an Amended Marketing Alliance Agreement with non-party Connect America.com LLC in 2012 and 2013.

**PLAINTIFFS' RESPONSE TO STATEMENT 7**: Undisputed.

8.     Pursuant to Lifewatch's purchase agreements with the independent sales companies, the independent sales companies originated customer accounts through radio, television, internet, and print advertising, as well as telemarketing.

**PLAINTIFFS' RESPONSE TO STATEMENT 8**: Disputed.  The sales companies were not independent.  *See* Plaintiffs' Response to Statement 6.  Also, Defendant points to no specific part of the purchase agreement supporting Statement 8.  Further, there is no evidence that the sales companies originated customer accounts through anything but telemarketing. *See, e.g.*, FTC-LW16-78 - 119 (1/21/12 email from Sirlin to potential investors touting unique features of Lifewatch product and service, describing commitment to using "Outbound Call Centers" beginning in July 2011, noting that "Lifewatch dominates this channel in the PERS industry" and that LIfewatch hopes to increase this method if it receives additional financing; projects more than ten-fold increase in revenues in 3 years by utilizing telemarketing); FTC-LW16-143 – 144 (3/3/12 email from Sirlin to Seiden, Lifewatch's CFO, forwarding email from Lifewatch employee to Sirlin, Baker, and others, showing call center sales of over 100 a day two days in a row, including 130 on one day; "Shows how easy it will be to do 2000 plus- a month – crazy but ready."); FTC-LW16-150-153 (3/16/12 emails between Sirlin and telemarketer; Sirlin

says he has "endless" leads and his partner has 30 million elderly sick names);LW-FTC-160-186

(Purchase Agreement with Tele America Response Inc., dated 9/15/15, requiring that "Seller"

not contact any customer on any local, federal or state "do not call" registry, and containing more

than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio

or television advertising, print advertising,  or door-to-door or in-person sales); LW-FTC-708-

731 (Virtue Point Marketing LLC, dated 6/30/14, requiring that "Seller" not contact any

customer on any local, federal or state "do not call" registry, and containing more than 3 pages of

compliance obligations, and no specific obligations for sale by direct mail, radio or television

advertising, print advertising,  or door-to-door or in-person sales); LW-FTC-756-780 (SHMS

Marketing Solutions LLC, dated 8/27/15, requiring that "Seller" not contact any customer on any

local, federal or state "do not call" registry, and containing more than 3 pages of compliance

obligations, and no specific obligations for sale by direct mail, radio or television advertising,

print advertising,  or door-to-door or in-person sales); FTC-LW16-7310-7328 (6/12

Telemarketing Services Agreement with Trusted Lead Network, requiring that "Telemarketer"

not contact any customer on any local, federal or state "do not call" registry, and containing more

than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio

or television advertising, print advertising,  or door-to-door or in-person sales); FTC-LW16-

7330-7348 (8/24/12 Telemarketing Services Agreement with MCR Group, requiring that

"Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and

containing more than 3 pages of compliance obligations, and no specific obligations for sale by

direct mail, radio or television advertising, print advertising,  or door-to-door or in-person sales);

FTC-LW16-7349-7366 (9/19/12 Multi-Media Marketing Services Agreement with Contact

Center Dominicana, requiring that "Marketer"/"Telemarketer" not contact any customer on any

local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7368-7384 (9/20/12 Multi-Media Marketing Services Agreement with DBOSS Marketing RD S.R.L., requiring that "Marketer"/"Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7386-7403 (9/24/12 Telemarketing Services Agreement with MD247.COM, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7405-7423 (7/17/12 Telemarketing Services Agreement with The Consumer Voice, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7426-7441 (12/18/12 Telemarketing Services Agreement with US Digest LLC d/b/a Senior Care Alert, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7443-7460 (10/29/12 Multi-Media Marketing Services Agreement with Broadband Corporation d/b/a – TBD, requiring that "Marketer"/"Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more

than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7479-7496 (10/25/12 Multi-Media Marketing Services Agreement with Platinum Marketing Group, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7497-7515 (8/28/12 Telemarketing Services Agreement with Qualworks, Inc. , requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7517, 7541-7557 (6/1/12 Telemarketing Services Agreement with WorldWide Info Services, actually executed on 7/9/12, requiring that "Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7558-7574 (10/31/12 Multi-Media Services Agreement with DigitalMojo, requiring that "Marketer"/"Telemarketer" not contact any customer on any local, federal or state "do not call" registry, and containing more than 3 pages of compliance obligations, and no specific obligations for sale by direct mail, radio or television advertising, print advertising, or door-to-door or in-person sales); FTC-LW16-7575 (2/20/13 email from May to potential lender, copying Roman and Sirlin, providing Worldwide contract in response to request for agreement with "outside firm" from whom "Lifewatch currently gets most of its customers."); Dkt. 252, PX 97, Al-Najjar Dec. ¶ 12 (summarizing spreadsheet of Defendants'

sales attached to FTC-LW16-8129 – 34, 11/10/15 email from Baker to Christopher Parisi,

showing 96.4% of Defendants' sales were through outside call centers); PX 98, Transcript of

Deposition of Sirlin on July 25, 2017, at 12-13 (Sirlin testifying that any customers purchasing

Lifewatch medical alert devices or service as a result of television, radio, or internet advertising

contact Lifewatch directly and not through outside marketers).

9.      Pursuant to Lifewatch's purchase agreements, the independent sales companies

offered to sell accounts to Lifewatch – and other emergency monitoring companies – on a non-

exclusive basis.  Lifewatch's agreements with these independent sales companies explicitly

provided that the independent companies are contractually obligated to comply with all

applicable state and federal telemarketing laws.

**PLAINTIFFS' RESPONSE TO STATEMENT 9**:  Disputed.  The sales companies

were not independent.  *See* Plaintiffs' Response to Statement 6.  Also, Defendant points to no

specific part of the purchase agreement supporting Statement 9.

10.      Furthermore, pursuant to Lifewatch's purchase agreements, the independent

companies warrant and represent to Lifewatch that these laws are followed.

**PLAINTIFFS' RESPONSE TO STATEMENT 10**:  Disputed.  The sales companies

were not independent.  *See* Plaintiffs' Response to Statement 6.  Further, the document contains

the following language:

4.2    <u>Compliance with applicable law</u>.  The Seller shall at all times perform its
obligations under this agreement in strict compliance with all applicable local, state and federal
laws, as more fully described in Section 6 herein.

6.6    <u>Compliance with State and Local Laws</u>.  Each party shall comply with any
applicable state telemarketing, telephone solicitation or consumer protection laws as well as with
any applicable state registration and licensing requirements in any state in which it transacts
business and/or renders services pursuant to this Agreement, as same may be amended from time
to time.

14

6.7 <u>Compliance with Federal Laws</u>. Each party shall comply with any applicable federal statutes, rules and regulations while rendering services pursuant to this Agreement, including but not limited to:

(a) The Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53(b) and 57b;

(b) The Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. § 6101;

(c) The Telemarketing Sales Rule, 16 C.F.R. 310;

(d) The Telephone Consumer Protection Act, 47 U.S.C. § 227, and 47 C.P.R. part 64.1200;

(e) If a party engages in an electronic marketing campaign, the Controlling The Assault of Non-solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM" Act");

(f) The provisions of Title 18, section 1037 of the United States Code relating to criminal fraud and related activity in connection with electronic mail;

(g) The Children's Online Privacy Protection Act ("COPPA"), Title 15, §§ 6501-6506 of the United States Code;

(h) The Computer Fraud and Abuse Act ("CFAA"), Title 18, section 1030 of The United States Code;

(i) The federal laws protecting intellectual property (Copyrights are protected by Title 17 of the United States Code, which provides civil remedies for infringement, and Title 18 of the United States Code, which imposes criminal penalties for copyright infringement. Patents and Trademarks are protected by Titles 35 and 15, respectively, of the United States Code, which provide civil remedies for infringement);

(j) the Electronic Communications Privacy Act (Title 18, sections 2510, 2511 and 2701 or the United States Code, which prohibits the interception, use and disclosure of wire, oral or electronic communications and provide civil remedies and criminal penalties for violations.);

(k) the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), which seeks to promote the use of electronic signatures in interstate and foreign commerce by declaring that a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form or an electronic signature or record was used in its formation. The Act also requires certain consumer disclosures and the retention of business records;

(l) The Fair Labor Standards Act of 1938 (Title 29, sections 201-219 of the United States Code) establishes minimum wages and maximum hours for employees and

15

provides remedies and protections to aggrieved employees. Title 29, sections 541.300 and 541.400 of the Code of Federal Regulations define the exemptions from the minimum wage and maximum hour requirements for executive, administrative, professional, computer and outside sales employees;

(m)     The Fair Housing Act (42 U.S.C. § 3601 et seq.), which prohibits certain forms of discrimination on the basis of race, color, religion, sex, familial status, or national origin;

(n)     The Restore Online Shoppers' Confidence Act (15 U.S.C. §§ 8401-8405), which Prohibits "any post-transaction third party seller" from charging or attempting to charge "any consumer's credit card, debit card, bank account or other financial account for any good or service sold in a transaction effected on the Internet, unless" the third party seller, before getting the consumer's billing information, "clearly and conspicuously" discloses to the consumer "all material terms of the transaction" and gets the consumer's "express informed consent for the charge." "All material terms of the transaction" must include, in addition to basics already required by existing law like "a description of the goods or services offered" and "the cost of such goods or services," that the "third party seller is not affiliated with the initial merchant" by disclosing the third party seller's name "in a manner that clearly differentiates the post-transaction third party seller from the initial merchant." In order to obtain "express informed consent," the third party seller must get from the consumer "the full account number of the account to be charged," "the consumer's name and address and a means to contact the consumer," and require the consumer "to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed." In addition to imposing new disclosure requirements on post-transaction third party sellers, the Act prohibits the initial merchant from disclosing "a credit card, debit card, bank account, or other financial account number or to disclose other billing information that is used to charge a customer of the initial merchant, to any post transaction third party seller for use in an Internet-based sale of any goods or service from that post-transaction third party seller." Finally, the Act prohibits "any person" from charging or attempting to charge "any consumer for any goods or service sold in a transaction effected on the Internet through a negative option feature" as defined by the Telemarketing Sales Rule unless the person "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information…obtains a consumer's express informed consent before charging the consumer's [account]…and provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's [account]." The Act does not apply unless the company is a (1) a "post-transaction third party seller," (2) discloses billing information to any post transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller, or (3) sells goods or services using a negative option feature.

11.     Pursuant to the two Marketing Alliance Agreements between the companies,

Lifewatch and non-party Connect America combined marketing efforts. Connect America

provided Lifewatch with a non-transferable license to use its trademarks.

16

**PLAINTIFFS' RESPONSE TO STATEMENT 11**: Undisputed.

12.　　In their combined customer welcome letter, Connect America and Lifewatch included both of their logos and acknowledged the companies' partnership and a joint customer service department.

**PLAINTIFFS' RESPONSE TO STATEMENT 12**: Undisputed.

13.　　The customer accounts acquired by Lifewatch and Connect America under the Marketing Alliance Agreement originated from WWIS.

**PLAINTIFFS' RESPONSE TO STATEMENT 13**: Undisputed.

14.　　Entities affiliated with WWIS included American Innovative Concepts, Inc., National Life Network, The Credit Voice, and Global Interactive Technologies.

**PLAINTIFFS' RESPONSE TO STATEMENT 14**: Disputed.  U.S. Affiliates, Inc. was also an affiliated entity.  *See, e.g.*, PX 93, Boling Dec. ¶ 32 (Worldwide "rebranded" as American Innovative Concepts, Inc., National Life Network, and U.S. Affiliates); FTC-LW09-1530-31 (5/15/13 email from Sirlin to Worldwide  forwarding complaint tied to Worldwide (US Affiliates) of customer being told family member had given product to him); FTC-LW16-3838-39 (12/23/13 email from Baker to Roman, copying Sirlin and May, forwarding emails from Lifewatch and SHS customer service employees noting that Boling's companies include American Innovative Concepts, Global Interactive Technologies, US Affiliates, and Slingshot).

15.　　As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch sustained at least $8.77 million in loses.

**PLAINTIFFS' RESPONSE TO STATEMENT 15**: Disputed.  Whether Lifewatch sustained a loss as a result of its relationship with WordWide and its related entities is not material to any aspect of this matter.  The proper measure of equitable monetary relief in this case is the full amount consumers lost, not defendants' net profits.  *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir.

1997).  *See also FTC v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009 ("consumer loss is a common measure for civil sanctions in … direct FTC actions); *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 571 (7th Cir. 1989 (affirming restitution award for violation of FTC Act); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988) (restitution "appropriate remedy" for violation of FTC Act).

    Defendant's only two pieces of evidence for this statement do not support the statement. Defendant's Exhibit K, Flaherty Report, Dkt. 296-12, is an unsworn "expert report," which is not admissible evidence. *See Fowle v. C&C Cola*, 868 F.2d 59, 67 (3rd Cir. 1989) (unsworn expert report not competent evidence under FRCP 56 to be considered on a motion for summary judgment).  If Defendant presents this report in an admissible form, Plaintiffs will address it at that time, presumably in a motion to exclude the testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Defendant's other citation is to Exhibit P, Sirlin December 26, 2017 Affidavit, Dkt. 296-16, but that affidavit contains no statement regarding Lifewatch losses.

    16.    As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch refunded $2,999,628 dollars to customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 16**:  Disputed.  Defendant's only two pieces of evidence for this statement do not support the statement.  Defendant's Exhibit K, Flaherty Report, Dkt. 296-12, is an unsworn "expert report," which is not admissible evidence. *See Fowle v. C&C Cola*, 868 F.2d 59, 67 (3rd Cir. 1989) (unsworn expert report not competent evidence under FRCP 56 to be considered on a motion for summary judgment).  If Defendant presents this report in an admissible form, Plaintiffs will address it at that time, presumably in a motion to exclude the testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Defendant's other citation is to Exhibit P, Sirlin December 26, 2017 Affidavit, Dkt. 296-16, but that affidavit contains no statement regarding refunds.  Moreover, the total amount of refunds, chargebacks, and related fees for all Lifewatch sales regardless of source for this period was less than $1.9 million. *See* Dkt. 66 at 8 (Lifewatch Profit & Loss statement for 2012 showing total refunds, chargebacks, and other adjustments as

$329,833.05); Dkt. 66 at 16 (Lifewatch Profit & Loss statement for 2013 showing total refunds, chargebacks, and other adjustments as $1,557,909.22).

17. As a result of Lifewatch's relationship with WWIS and affiliated entities, Lifewatch "gave away" to customers medical alert equipment that Lifewatch paid for and which had a retail value totaling $14 million.

**PLAINTIFFS' RESPONSE TO STATEMENT 17**: Disputed. Defendant's only two pieces of evidence for this statement do not support the statement. Defendant's Exhibit K, Flaherty Report, Dkt. 296-12, is an unsworn "expert report," which is not admissible evidence. *See Fowle v. C&C Cola*, 868 F.2d 59, 67 (3rd Cir. 1989) (unsworn expert report not competent evidence under FRCP 56 to be considered on a motion for summary judgment). If Defendant presents this report in an admissible form, Plaintiffs will address it at that time, presumably in a motion to exclude the testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendant's other citation is to Exhibit P, Sirlin December 26, 2017 Affidavit, Dkt. 296-16, but that affidavit merely says that he believes approximately 50% of customers which purchased Lifewatch's system through WWIS did not return the equipment. Lifewatch's own financial documents, however, show that the total value of equipment not returned from all Lifewatch customers, regardless of sales source, for this time period was barely $150,000. *See* Dkt. 66 at 8 (Lifewatch Profit & Loss statement for 2012 showing total equipment not returned as 50,018.13); Dkt. 66 at 16 (Lifewatch Profit & Loss statement for 2013 showing total equipment not returned as $101,157.70).

18. Before May 31, 2013, Lifewatch sold accounts to non-parties including Connect America, Philips Lifeline, Valued Relationships Inc., First Street, and Security Partners.

**PLAINTIFFS" RESPONSE TO STATEMENT 18**: Undisputed.

19. Mitchel May began working as a consultant for Lifewatch Inc. sometime in 2012 after meeting Evan Sirlin, Lifewatch's CEO.

**PLAINTIFFS' RESPONSE TO STATEMENT 19**: Undisputed.

20.     When Mitchel May arrived as a consultant at Lifewatch, Lifewatch was already transacting business with Worldwide Info Services, Inc. pursuant to written agreements.

**PLAINTIFFS' RESPONSE TO STATEMENT 20**:  Undisputed.

21.     As a consultant, Mitchel May was primarily involved in:  purchasing medical alert devices from third-parties for use by Lifewatch's customers; monitoring and maintaining an adequate inventory of medical alert devices; and streamlining the process of shipping  medical alert devices to customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 21**:  Disputed.  May was Vice-President of Lifewatch. Dkt. 15-2, PX 1, Menjivar Dec. Att. M (Lifewatch Organization Chart produced to FTC pursuant to Civil Investigative Demand on April 14, 2014, showing Mitchel May as Vice President); FTC-LW16-9008 (Lifewatch tax return for fiscal year ending 11/30/13, Form 1125-E "Compensation of Officers" listing May's compensation as $151,600); FTC-LW16-9084 (Lifewatch tax return for fiscal year ending 11/30/14, Form 1125-E "Compensation of Officers" listing May's compensation as $515,380); FTC-LW16-6853 (Lifewatch tax return for fiscal year ending 11/30/15, Form 1125-E "Compensation of Officers" listing May's compensation as $275,442). May was involved in the formulating the business practices of Defendants. *See, e.g.*, Dkt. 96-1 at 54 (PX 89, Einikis Dec. Att. A) (3/28/14 email from Lifewatch employee forwarding Sirlin 3/26/14 email, copying May and Baker, to telemarketer instructing telemarketing room on upsells, including restaurant.com, grocery coupons, pharmacy discount cards, and smoke alarms); FTC-LW09-1538 (5/22/13 email from Sirlin to Worldwide instructing Worldwide "Also Wisconsin is giving us trouble-I would not sell there," and forwarding email from Lifewatch customer service to Sirlin, May, and Baker, about "John" robocalls from 5 spoofed caller IDs; "We, at Lifewatch USA, do not make cold calls, do not call

out to anyone. Blah blah blah-He finally believed me."); FTC-LW09-1542 (5/31/13 email from Sirlin to Worldwide, copying May, suggesting upsells and possible pricing options; "Dave doesn't need the extra cash- I am just trying to think of ways to make more upfront money for you guys with out the pressure of increasing sales"); FTC-LW09-1564 (6/19/13 Sirlin email to Worldwide suggesting upsells and pricing opportunity); FTC-LW09-2237-2238 (9/10/13 email from Sirlin to broker, Modugno, copying May, stating that it would be a conflict for broker to work for any other seller of medical alert sales, even if not telemarketing); FTC-LW16-950 – 957 (12/1/12 email from May to Sirlin, responding to Sirlin email describing potential Lifewatch deals, stating "My opinion at this point lets follow All roads."); FTC-LW16-2942-2943 (5/20/13 email from Sirlin to May saying they need Worldwide to create a new company without Hilgar's name as president – "I think his name was pres of worldwide which I think means just as bad as worldwide - We need a company he is not a officer of???"). May supervised the day-to-day business activities of Defendants. *See, e.g.*, FTC-LW09-1461 (1/9/13 email from Sirlin to May and Boling at Worldwide regarding Connect America retaining "no good deals" but "still charge us back – WTF"); FTC-LW09-1495 (4/11/13 email from May email to Worldwide, Sirlin, Baker, and other Lifewatch employee, agreeing with Sirlin that they should use 2 or more credit card processors going forward "to spread chargebacks out," which would require Worldwide agents to log in from different companies); FTC-LW16-967 – 984 (12/2/12 email from Sirlin to May, enclosing 6/1/12 telemarketing agreement between Worldwide and Lifewatch; Sirlin states that "Worldwide is one of ricks company-again they signed whatever we asked including indemnification – but they have nothing to lose"); FTC-LW16-1022 – 1023 (12/4/12 email from May to Sirlin responding "Great" to Sirlin email stating that he "would get (May) on a call" with him and Boling of Worldwide the next day "to show him positive creative thinking."); FTC-

21

LW16-2354 – 2356 (3/11/13 emails between Sirlin and May discussing Connect America and

MAMA's warnings about robocalling; Sirlin says "The board of MAMA is asking about robo

and lifewatch and others and ftc – I said relax you are in control and are doing nothing wrong.");

FTC-LW16-2489-2490 (3/28/13 email from Sirlin to May and Baker, forwarding emails between

Worldwide and Lifewatch employees about mistakes Worldwide has been making in running

credit card charges themselves); FTC-LW16-2565, 2571 – 2587 (4/10/13 from Worldwide to

May and Sirlin, enclosing "revised rebuttals"); FTC-LW16-2566 – 2569 (4/10/13 email from

Worldwide to May and Sirlin, enclosing script, containing references to certified EMT, being in

business over 30 years, away from home "Protection Card," daily wellness check); FTC-LW16-

2933 – 2934 (5/15/13 email from Lifewatch customer service representative to Sirlin, responding

to email from May, copying Sirlin and Baker, regarding complaint tied to Worldwide (US

Affiliates) of customer being told family member had given product to him; "When I first started

hearing about these type of calls-family member purchased the equipment, I thought it was a few

shady salespeople. I am no realizing it is part of the Script.").

     22.    Mitchel May was paid as a 1099 contractor up until July 1, 2015, when he

transitioned to W2 status.

     **PLAINTIFFS' RESPONSE TO STATEMENT 22**:  Disputed.  May was Vice-

President of Lifewatch.  Dkt. 15-2, PX 1, Menjivar Dec. Att. M (Lifewatch Organization Chart

produced to FTC pursuant to Civil Investigative Demand on April 14, 2014, showing Mitchel

May as Vice President); FTC-LW16-9008 (Lifewatch tax return for fiscal year ending 11/30/13,

Form 1125-E "Compensation of Officers" listing May's compensation as $151,600); FTC-

LW16-9084 (Lifewatch tax return for fiscal year ending 11/30/14, Form 1125-E "Compensation

of Officers" listing May's compensation as $515,380); FTC-LW16-6853 (Lifewatch tax return

for fiscal year ending 11/30/15, Form 1125-E "Compensation of Officers" listing May's

compensation as $275,442). Moreover, the only evidence cited is Mr. May's affidavit. *See FTC*

*v. Bay Area Business Council, Inc.* 423 F.3d 627, 634 (7th Cir. 2005) (Defendants' affidavit

without citation to any documentary evidence in record for support insufficient in response to

motion for summary judgment). Defendants have neither introduced or produced any

documentary evidence in support of this statement, although if the statement were true, such

documents would exist.

23.     Mitchel May's interactions with Worldwide during this time were primarily about

ensuring adequate inventory.

**PLAINTIFFS' RESPONSE TO STATEMENT 23**: Disputed. May was involved in

all aspects of Defendants' relationship with Worldwide. *See, e.g.*, FTC-LW09-1538 (5/22/13

email from Sirlin to Worldwide instructing Worldwide "Also Wisconsin is giving us trouble-I

would not sell there," and forwarding email from Lifewatch customer service to Sirlin, May, and

Baker, about "John" robocalls from 5 spoofed caller IDs; "We, at Lifewatch USA, do not make

cold calls, do not call out to anyone. Blah blah blah-He finally believed me."); FTC-LW09-1542

(5/31/13 email from Sirlin to Worldwide, copying May, suggesting upsells and possible pricing

options; "Dave doesn't need the extra cash- I am just trying to think of ways to make more

upfront money for you guys with out the pressure of increasing sales"); FTC-LW09-1564

(6/19/13 Sirlin email to Worldwide suggesting upsells and pricing opportunity);; FTC-LW16-

2942-2943 (5/20/13 email from Sirlin to May saying they need Worldwide to create a new

company without Hilgar's name as president – "I think his name was pres of worldwide which I

think means just as bad as worldwide - We need a company he is not a officer of???"); FTC-

LW09-1461 (1/9/13 email from Sirlin to May and Boling at Worldwide regarding Connect

America retaining "no good deals" but "still charge us back – WTF"); FTC-LW09-1495 (4/11/13 email from May email to Worldwide, Sirlin, Baker, and other Lifewatch employee, agreeing with Sirlin that they should use 2 or more credit card processors going forward "to spread chargebacks out," which would require Worldwide agents to log in from different companies); FTC-LW16-967 – 984 (12/2/12 email from Sirlin to May, enclosing 6/1/12 telemarketing agreement between Worldwide and Lifewatch; Sirlin states that "Worldwide is one of ricks company-again they signed whatever we asked including indemnification – but they have nothing to lose"); FTC-LW16-1022 – 1023 (12/4/12 email from May to Sirlin responding "Great" to Sirlin email stating that he "would get (May) on a call" with him and Boling of Worldwide the next day "to show him positive creative thinking."); FTC-LW16-2354 – 2356 (3/11/13 emails between Sirlin and May discussing Connect America and MAMA's warnings about robocalling; Sirlin says "The board of MAMA is asking about robo and lifewatch and others and ftc – I said relax you are in control and are doing nothing wrong."); FTC-LW16-2489-2490 (3/28/13 email from Sirlin to May and Baker, forwarding emails between Worldwide and Lifewatch employees about mistakes Worldwide has been making in running credit card charges themselves); FTC-LW16-2565, 2571 – 2587 (4/10/13 from Worldwide to May and Sirlin, enclosing "revised rebuttals"); FTC-LW16-2566 – 2569 (4/10/13 email from Worldwide to May and Sirlin, enclosing script, containing references to certified EMT, being in business over 30 years, away from home "Protection Card," daily wellness check); FTC-LW16-2933 – 2934 (5/15/13 email from Lifewatch customer service representative to Sirlin, responding to email from May, copying Sirlin and Baker, regarding complaint tied to Worldwide (US Affiliates) of customer being told family member had given product to him; "When I first started hearing about these type of calls-family member purchased the equipment, I thought it was a few shady

24

salespeople. I am no realizing it is part of the Script."); PX 93, Boling Dec. ¶ 3 ("Lifewatch was aware of the pre-recorded message because Settecase uploaded Sirlin and May's cell phone numbers to the predictive dialer so it would call them and they could hear the pre-recorded message."); *id.* at ¶ 30 (Boling and Mark Harmon were constantly fighting with Sirlin and May about the reconciliation of Worldwide chargebacks); *id.* at ¶ 32 (Sirlin and May negotiated with call centers as one Worldwide entity would be replaced by another because of high chargebacks); *id.* at ¶ 45 (Boling spoke with Sirlin and May nearly every day and they visited call centers on numerous occasions); *id.* at ¶ 46 ("I had multiple conversations with Sirlin and May about call center operations including the use of predictive dialers and pre-recorded messages also called 'voice broadcasting' or 'robocalling.'"); *id.* at ¶¶ 47, 48, 50 (Lifewatch gave $200,000 to Worldwide to pay for predictive dialer; "overpaid" Worldwide by $900,000 – 1.2 million to return to Sirlin and May in cash; broker, Matt Eggen, given money to set up at least five new call centers after Worldwide shut down); *id.* at ¶ 55 (May involved in negotiations for Lifewatch to purchase Worldwide).

24.     While Mitchel May's role within Lifewatch changed after May Trust 2013's acquisition of the shares on May 31, 2013, he did not have knowledge or awareness before or after May 31, 2013 as to Lifewatch engaging in dishonest, fraudulent, unfair, deceptive, or violative conduct as alleged in the Amended Complaint.

**PLAINTIFFS' RESPONSE TO STATEMENT 24**: Disputed.  May knew prior to and after May 31, 2013, that Lifewatch was engaging in abusive and deceptive telemarketing acts and practices.  FTC-LW16-985, 895 (12/3/12 email from Sirlin to May, prior to May joining Lifewatch, attaching 11/29/12 letter from The Privatebank and Trust Company, confirming that the bank will not provide credit to Lifewatch because the Indiana AG lawsuit and other

government actions against Lifewatch "represents an unacceptable credit risk for the Bank.");

PX 100, Transcript of Deposition of May on July 26, 2017, at 15 (May testifying that in 2012 he

knew about Indiana AG lawsuit against Lifewatch for DNC violations).

25.     Mitchel May did not provide call lists to telemarketers, create sales scripts, or

otherwise assist third parties in engaging in violative conduct as alleged in the Amended

Complaint.

**PLAINTIFFS' RESPONSE TO STATEMENT 25**:  Disputed.  May was involved in

creating sales scripts and managed the details of Defendants' assisting third parties in the illegal

conduct alleged in the Amended Complaint. *See, e.g.*, Dkt. 96-1 at 54 (PX 89, Einikis Dec. Att.

A) (3/28/14 email from Lifewatch employee forwarding Sirlin 3/26/14 email, copying May and

Baker, to telemarketer instructing telemarketing room on upsells, including restaurant.com,

grocery coupons, pharmacy discount cards, and smoke alarms); FTC-LW09-1538 (5/22/13 email

from Sirlin to Worldwide instructing Worldwide "Also Wisconsin is giving us trouble-I would

not sell there," and forwarding email from Lifewatch customer service to Sirlin, May, and Baker,

about "John" robocalls from 5 spoofed caller IDs; "We, at Lifewatch USA, do not make cold

calls, do not call out to anyone. Blah blah blah-He finally believed me."); FTC-LW09-1542

(5/31/13 email from Sirlin to Worldwide, copying May, suggesting upsells and possible pricing

options; "Dave doesn't need the extra cash- I am just trying to think of ways to make more

upfront money for you guys with out the pressure of increasing sales"); FTC-LW09-1564

(6/19/13 Sirlin email to Worldwide suggesting upsells and pricing opportunity); FTC-LW09-

2237-2238 (9/10/13 email from Sirlin to broker, Modugno, copying May, stating that it would be

a conflict for broker to work for any other seller of medical alert sales, even if not

telemarketing); FTC-LW16-950 – 957 (12/1/12 email from May to Sirlin, responding to Sirlin

email describing potential Lifewatch deals, stating "My opinion at this point lets follow All roads."); FTC-LW16-2942-2943 (5/20/13 email from Sirlin to May saying they need Worldwide to create a new company without Hilgar's name as president – "I think his name was pres of worldwide which I think means just as bad as worldwide - We need a company he is not a officer of???"). May supervised the day-to-day business activities of Defendants. *See, e.g.*, FTC-LW09-1461 (1/9/13 email from Sirlin to May and Boling at Worldwide regarding Connect America retaining "no good deals" but "still charge us back – WTF"); FTC-LW09-1495 (4/11/13 email from May email to Worldwide, Sirlin, Baker, and other Lifewatch employee, agreeing with Sirlin that they should use 2 or more credit card processors going forward "to spread chargebacks out," which would require Worldwide agents to log in from different companies); FTC-LW16-967 – 984 (12/2/12 email from Sirlin to May, enclosing 6/1/12 telemarketing agreement between Worldwide and Lifewatch; Sirlin states that "Worldwide is one of ricks company-again they signed whatever we asked including indemnification – but they have nothing to lose"); FTC-LW16-1022 – 1023 (12/4/12 email from May to Sirlin responding "Great" to Sirlin email stating that he "would get (May) on a call" with him and Boling of Worldwide the next day "to show him positive creative thinking."); FTC-LW16-2354 – 2356 (3/11/13 emails between Sirlin and May discussing Connect America and MAMA's warnings about robocalling; Sirlin says "The board of MAMA is asking about robo and lifewatch and others and ftc – I said relax you are in control and are doing nothing wrong."); FTC-LW16-2489-2490 (3/28/13 email from Sirlin to May and Baker, forwarding emails between Worldwide and Lifewatch employees about mistakes Worldwide has been making in running credit card charges themselves); FTC-LW16-2565, 2571 – 2587 (4/10/13 from Worldwide to May and Sirlin, enclosing "revised rebuttals"); FTC-LW16-2566 – 2569 (4/10/13 email from Worldwide to May

and Sirlin, enclosing script, containing references to certified EMT, being in business over 30 years, away from home "Protection Card," daily wellness check); FTC-LW16-2933 – 2934 (5/15/13 email from Lifewatch customer service representative to Sirlin, responding to email from May, copying Sirlin and Baker, regarding complaint tied to Worldwide (US Affiliates) of customer being told family member had given product to him; "When I first started hearing about these type of calls-family member purchased the equipment, I thought it was a few shady salespeople. I am no realizing it is part of the Script.").

26.     On May 31, 2013, May Trust 2013, of which Mitchel May is executor, administrator, or trustee, acquired at 10% stake in Lifewatch pursuant to a Share Purchase Agreement.  As such, May never had an individual ownership interest in Lifewatch.

**PLAINTIFFS' RESPONSE TO STATEMENT 26**:  Disputed.  Tax returns show May owned 10% of Lifewatch personally.  *See* FTC-LW16-4895 (Lifewatch tax return for fiscal year ending 11/30/13, Form 1125-E "Compensation of Officers" listing May as owning 10% of the common stock of Lifewatch and his compensation as $151,600); FTC-LW16-7185 (Lifewatch tax return for fiscal year ending 11/30/14, Form 1125-E "Compensation of Officers" listing May as owning 10% of the common stock of Lifewatch and his compensation as $515,380); FTC-LW16-6853 (Lifewatch tax return for fiscal year ending 11/30/15, Form 1125-E "Compensation of Officers" listing May as owning 10% of the common stock of Lifewatch and his compensation as $275,442).

27.     Pursuant to the Share Purchase Agreement, 125 shares (out of 1250) in Medguard Alert, Inc. were provided to May Trust 2013, of which May is executor, administrator, or trustee.

**PLAINTIFFS' RESPONSE TO STATEMENT 27**:  Undisputed.

28.     May has never had an individual ownership interest in Medguard Alert, Inc.

**PLAINTIFFS' RESPONSE TO STATEMENT 28**:  Undisputed.

29.    In April 2014, as a result of the allegations made by the FTC and the Florida

Attorney General in the Florida enforcement proceedings filed against WWIS voluntarily created

a customer refund program to address WWIS's alleged violations to the extent they impacted

existing Lifewatch customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 29**:  Undisputed.

30.    As part of this refund program, Lifewatch provided its customers with

information about the Florida litigation and offered and provided full refunds to customers who

had purchased Lifewatch's products or services based on, inter alia, any of the allegedly false

and misleading statements of the independent companies cited by the FTC and the Florida

Attorney General in their legal action.

**PLAINTIFFS' RESPONSE TO STATEMENT 30**:  Disputed.  Lifewatch only sent

letters to a small percentage of WorldWide customers and did not provide full refunds.  *See, e.g.*,

FTC-LW16-3474 (Sarai Baker email to Katie Sylvers, a manager at WorldWide (and Roderick

Boling's wife) on September 5, 2013 - shortly before WorldWide was shut down by Plaintiffs -

reminding her that customer accounts could not be canceled until they returned their devices.

Baker copied Sirlin and May on the email and concluded the email by saying "As always you

guys do a great job.")(Sirlin subsequently forwarding the email to Roderick Boling); FTC-

LW16-3672-3673 (Katie Sylvers repeated the same information in an email to Doug Hallowell

and other Lifewatch and Safe Home Security employees on October 30, 2013, which Baker

forwarded to Sirlin and May.); FTC-LW16-4498-4500 (4/28/14 email from Baker to Roman

stating that they had received only 12 calls from first 500 letters sent to consumers); FTC-LW16-

4578-4580 (5/20/14 email from Baker to Roman reporting that they had received only 16 calls from first 1000 letters sent).

31. Through this Lifewatch refund program, Lifewatch sent letters to its customers, and those who responded were issued a refund.

**PLAINTIFFS' RESPONSE TO STATEMENT 31**: Disputed. Lifewatch did not provide full refunds. *See, e.g.*, FTC-LW16-4833-4838 (8/11/14 email chain between various Lifewatch and Safe Home Security customer service personnel, Baker, and Hallowell, discussing how letter sent to WWIS customers did not specify how much of a refund consumers would receive and concluding that customer would only get refund for 3 months); FTC-LW16-4866-4873 (8/24/14 emails between Baker and Lifewatch customer service manager discussing limiting refunds to 2-3 months).

32. Medguard Alert, Inc., a Connecticut company, incorporated in 2011 provides personal emergency response equipment and services to customers.

**PLAINTIFFS' RESPONSE TO STATEMENT 31**: Undisputed.

33. Medguard Alert, Inc. had a pool of customers beginning in approximately January 2013, after having purchased those customer accounts, in bulk, from a non-party entity.

**PLAINTIFFS' RESPONSE TO STATEMENT 32**: Undisputed.

34. The FTC has alleged the following statements were made by third-party sellers in connection with selling Lifewatch's services:

- A friend, family member, health care provider, or other acquaintance of the consumer referred the consumer to Defendants, or purchased the medical alert system for the consumer;

30

- Defendants' medical alert system is endorsed by reputable organizations, including, but not limited to, the American Heart Association, the American Diabetes Association, the National Institute on Aging, the AARP, the American Red Cross, and/or health care providers;

- Consumers will not be charged the first monitoring fee until they have received and activated the medical alert system;

- Consumers may cancel the monitoring service at any time without any further financial obligation

**PLAINTIFFS' RESPONSE TO STATEMENT 33**:  Undisputed.

35.    In fact medical alert systems have been endorsed by reputable organizations and health care providers.

**PLAINTIFFS' RESPONSE TO STATEMENT 35**:  Undisputed, but immaterial Plaintiffs did not allege that medical alert systems have not been endorsed by various organizations, but that Defendants' medical alert systems have not been so endorsed.  *See* 299-1, PSMF 14.

36.    Lifewatch's customer's could and can cancel without further financial obligation.

**PLAINTIFFS' RESPONSE TO STATEMENT 36**:  Disputed.  Not only are consumers charged for the device if they don't return it, but they can also be charged the balance of their contract. *See, e.g.,* Dkt. 24-1 at 129, 138, PX 5, Bradley Dec. ¶ 5, Att. D (consumer billed same day as call); Dkt. 24-3 at 5, PX 7, Cuomo Dec. ¶ 5, Att. A (consumer complaint that mom paid over $2000 for unused service); Dkt. 24-3 at 5-7, PX 7, Cuomo Dec. Att. A (Lifewatch refused to cancel account of woman with dementia because son cannot find device to return it; demanding $475 as alternative); Dkt. 24-3 at 13, PX 7, Cuomo Dec. Att. A (consumer paid

monthly fee for several months for unused service); Dkt. 24-3 at 15-16 , PX 7, Cuomo Dec. Att.

A (consumer's father paid over $130 for unused service); Dkt. 24-3 at 23, PX 7, Cuomo Dec.

Att. A (consumer's mother paid monthly fee for over a year for unused service); Dkt. 24-3 at 25-

29, PX 7, Cuomo Dec. Att. A (mother never agreed to service or received device, but told must

return it or pay $475 to cancel service); Dkt. 24-3 at 35, PX 7, Cuomo Dec. Att. A (consumer's

sister paid for 7 months of fees for unused service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A

(consumer's father paid monthly fee for several months of unused service); Dkt. 24-3 at 40, PX

7, Cuomo Dec. Att. A (consumer's mother billed over $400 for unused service); Dkt. 24-3 at 42,

PX 7, Cuomo Dec. Att. A (consumer's elderly parents paid approximately $700 for unused

service); Dkt. 24-3 at 43, PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive

returned device, continued billing); Dkt. 24-22 at 3, PX 26, Cavic Dec. ¶ 8 (mother charged for

unactivated device for nearly a year); Dkt. 25-2 at 3, PX 34, Felker Dec. ¶ 6 (charged monthly

fees for a system that was never received); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also

said that [Lifewatch] would only cancel my account after I mailed the device back at my own

expense.  I had previously been told that there would be no cost to returning the device."); Dkt.

25-18 at 6, Dkt. 19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt.

25-18 at 11, Dkt. 20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the

account unless we get the equipment back…I said the collection efforts will continue."); Dkt. 25-

24 at 4, PX 56, Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping

until consumer threatened to "trash the device");  FTC-LW16-4397 – 4398 (4/9/14 email from

Baker to May, copying Sirlin, saying she is "completely shocked" that they are agreeing with

Hallowell to continue to bill consumers Lifewatch knows have not activated their devices; states

"You both understand this is where disputes/charge backs, BBB, AG complaints come from,

right???????"); FTC-LW16-4786 (7/2/14 email from Roman to Hallowell, May, and Sirlin showing the weekly percentage of Lifewatch customers paying despite not having activated their system ranging from 15-24.6%); FTC-LW16-4833-4838 (8/11/14 email from Cohen to Kevin Carducci, Baker, Hallowell, and Sara Weaver regarding giving a partial refund to consumers who had PERS unit for 7 months, paid for it, but never activated it); FTC-LW16-4861 – 4862 (8/21/14 email from Baker to Roman, Hallowell, and May, excited that "working hard!" had resulted in lower the number of Lifewatch PERS customers who had not activated their units to 11%); FTC-LW16-4984-4985 (9/4/14 email exchange between Roman, Hallowell, May and Baker noting that number of paying Lifewatch customers who had not activated their medical alert units had increased again); FTC-LW16-4999-5001 (9/5/14 email exchange between Kevin Carducci, Cohen, Sirlin, Roman, Hallowell, Baker, and May about consumers complaining that they were being told that they would not be charged until they activated the unit); FTC-LW16-6602 – 6603 (4/7/16 email from May to monitoring company, copying Roman, Sirlin, and Hallowell regarding the 50% of Defendants' accounts that were not sending any signal); FTC-LW16-6612 (4/11/16 email from Hallowell to Wajdowicz, SHS Chief Information Officer, copying Roman, attaching email from monitoring company showing 4367 out of 9312 active paying accounts had no signal); FTC-LW16-8036 (4/13/15 email from Vandewater to telemarketer re consumer told Lifewatch would pay return shipping if she cancelled, "which we wont do").

37. Lifewatch's consumers are charged in conjunction with receiving medical alert systems, which are already active and ready to be used because Lifewatch engages monitoring centers for each customer before the devices are even sent.

**PLAINTIFFS' RESPONSE TO STATEMENT 37**: Disputed. Consumers are charged

upon purchase, not receipt. *See, e.g.,* Dkt. 24-1 at 129, 138, PX 5, Bradley Dec. ¶ 5, Att. D

(consumer billed same day as call); Dkt. 24-3 at 5, PX 7, Cuomo Dec. ¶ 5, Att. A (consumer

complaint that mom paid over $2000 for unused service); Dkt. 24-3 at 5-7, PX 7, Cuomo Dec.

Att. A (Lifewatch refused to cancel account of woman with dementia because son cannot find

device to return it; demanding $475 as alternative); Dkt. 24-3 at 13, PX 7, Cuomo Dec. Att. A

(consumer paid monthly fee for several months for unused service); Dkt. 24-3 at 15-16 , PX 7,

Cuomo Dec. Att. A (consumer's father paid over $130 for unused service); Dkt. 24-3 at 23, PX

7, Cuomo Dec. Att. A (consumer's mother paid monthly fee for over a year for unused service);

Dkt. 24-3 at 25-29, PX 7, Cuomo Dec. Att. A (mother never agreed to service or received device,

but told must return it or pay $475 to cancel service); Dkt. 24-3 at 35, PX 7, Cuomo Dec. Att. A

(consumer's sister paid for 7 months of fees for unused service); Dkt. 24-3 at 38, PX 7, Cuomo

Dec. Att. A (consumer's father paid monthly fee for several months of unused service); Dkt. 24-

3 at 40, PX 7, Cuomo Dec. Att. A (consumer's mother billed over $400 for unused service); Dkt.

24-3 at 42, PX 7, Cuomo Dec. Att. A (consumer's elderly parents paid approximately $700 for

unused service); Dkt. 24-3 at 43, PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive

returned device, continued billing); Dkt. 24-22 at 3, PX 26, Cavic Dec. ¶ 8 (mother charged for

unactivated device for nearly a year); Dkt. 25-2 at 3, PX 34, Felker Dec. ¶ 6 (charged monthly

fees for a system that was never received); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also

said that [Lifewatch] would only cancel my account after I mailed the device back at my own

expense. I had previously been told that there would be no cost to returning the device."); Dkt.

25-18 at 6, Dkt. 19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt.

25-18 at 11, Dkt. 20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the

account unless we get the equipment back…I said the collection efforts will continue."); Dkt. 25-24 at 4, PX 56, Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer threatened to "trash the device"); FTC-LW16-4397 – 4398 (4/9/14 email from Baker to May, copying Sirlin, saying she is "completely shocked" that they are agreeing with Hallowell to continue to bill consumers Lifewatch knows have not activated their devices; states "You both understand this is where disputes/charge backs, BBB, AG complaints come from, right???????"); FTC-LW16-4786 (7/2/14 email from Roman to Hallowell, May, and Sirlin showing the weekly percentage of Lifewatch customers paying despite not having activated their system ranging from 15-24.6%); FTC-LW16-4833-4838 (8/11/14 email from Cohen to Kevin Carducci, Baker, Hallowell, and Sara Weaver regarding giving a partial refund to consumers who had PERS unit for 7 months, paid for it, but never activated it); FTC-LW16-4861 – 4862 (8/21/14 email from Baker to Roman, Hallowell, and May, excited that "working hard!" had resulted in lower the number of Lifewatch PERS customers who had not activated their units to 11%); FTC-LW16-4984-4985 (9/4/14 email exchange between Roman, Hallowell, May and Baker noting that number of paying Lifewatch customers who had not activated their medical alert units had increased again); FTC-LW16-4999-5001 (9/5/14 email exchange between Kevin Carducci, Cohen, Sirlin, Roman, Hallowell, Baker, and May about consumers complaining that they were being told that they would not be charged until they activated the unit); FTC-LW16-6602 – 6603 (4/7/16 email from May to monitoring company, copying Roman, Sirlin, and Hallowell regarding the 50% of Defendants' accounts that were not sending any signal); FTC-LW16-6612 (4/11/16 email from Hallowell to Wajdowicz, SHS Chief Information Officer, copying Roman, attaching email from monitoring company showing 4367 out of 9312 active paying accounts had no signal).

38.     The customer is not charged for use of the device, and, therefore the device is free to the consumer.

**PLAINTIFFS' RESPONSE TO STATEMENT 38**:  Disputed.  The customer is, in fact, charged for using the device.  Without "using" the device the consumer would have no way to reach the monitoring service.  And, if the consumer cancels and fails to return the device they are charged. *See, e.g.*, Dkt. 24-3 at 25-29, PX 7, Cuomo Dec. Att. A (mother never agreed to service or received device, but told must return it or pay $475 to cancel service); Dkt. 24-3 at 38, PX 7, Cuomo Dec. Att. A (cannot find device supposedly sent to elderly father, but told must return it or pay $425 to stop monthly charges); Dkt. 24-3 at 43, PX 7, Cuomo Dec. Att. A (Lifewatch claimed it did not receive returned device, continued billing); Dkt. 25-14 at 3, PX 46, Lifshitz Dec. ¶ 6 ("He also said that [Lifewatch] would only cancel my account after I mailed the device back at my own expense.  I had previously been told that there would be no cost to returning the device."); Dkt. 25-18 at 6, Dkt. 19-1 at 28, PX 50 Mey Dec. ¶ 16 (if do not return device, charged $475); Dkt. 25-18 at 11, Dkt. 20-1 at 6, PX 50, Mey Dec. ¶ 31 ("Well, then, you know, we can't close out the account unless we get the equipment back…I said the collection efforts will continue.");Dkt. 25-24 at 4, PX 56, Rench Dec. ¶ 7 (consumer told he was responsible for paying return shipping until consumer threatened to "trash the device"); FTC-LW16-8036 (4/13/15 email from Vandewater to telemarketer re consumer told Lifewatch would pay return shipping if she cancelled, "which we wont do").

39.     During the time in which Lifewatch provided equipment at no cost to customers acquired from the WorldWide entities throughout 2012 and 2013, approximately 50% of the customers who received the equipment and cancelled did not return the equipment to Lifewatch.  These customers received a refund and kept the equipment at Lifewatch's expense.

**PLAINTIFFS' RESPONSE TO STATEMENT 39**:  Disputed. Defendant's only two pieces of evidence for this statement do not support the statement.  Defendant's Exhibit K, Flaherty Report, Dkt. 296-12, is an unsworn "expert report," which is not admissible evidence. *See Fowle v. C&C Cola*, 868 F.2d 59, 67 (3rd Cir. 1989) (unsworn expert report not competent evidence under FRCP 56 to be considered on a motion for summary judgment).  If Defendant presents this report in an admissible form, Plaintiffs will address it at that time, presumably in a motion to exclude the testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Moreover, the document merely relies on Defendant's other citation is to Exhibit P, Sirlin December 26, 2017 Affidavit, Dkt. 296-16. That affidavit is contradicted by Lifewatch's own financial documents, however, which show that the total value of equipment not returned from all Lifewatch customers, regardless of sales source, for this time period was barely $150,000. *See* Dkt. 66 at 8 (Lifewatch Profit & Loss statement for 2012 showing total equipment not returned as 50,018.13);  Dkt. 66 at 16 (Lifewatch Profit & Loss statement for 2013 showing total equipment not returned as $101,157.70).

40.     Mitchel May has believed and understood that medical alert systems have been endorsed by reputable organizations and health care providers.

**PLAINTIFFS' RESPONSE TO STATEMENT 40**:  Undisputed, but immaterial. Plaintiffs did not allege that medical alert systems have not been endorsed by various organizations, but that Defendants' medical alert systems have not been so endorsed.  *See* 299-1, Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue No. 14.

41.     Mitchel May has believed and understood that Lifewatch's consumers can cancel without further financial obligation and that Lifewatch's consumers are charged in connection

with receiving medical alert systems, which are already active and ready to be used because Lifewatch engages monitoring centers for each consumer before the devices are even sent.

**PLAINTIFFS' RESPONSE TO STATEMENT 41**: May knew that consumers would be charged for the price of the device if they did not return it upon cancellation. He knew that some consumers were charged the remainder of their contract if they cancelled. He knew that consumers were charged immediately upon their purchase of Lifewatch's services. *See, e.g.*, Dkt. 14-3 at 46, PX 1, Menjivar Dec. Att. B (8/20/13 email from Sirlin to Baker and Worldwide, responding to 8/20/13 email from Baker to Sirlin and May stating "here is a dispute where customer was told she wouldn't have to pay until she activates it. i have gotten others like this. was rick told to remove this from his pitch?"); FTC-LW09-1495 (4/11/13 email from May email to Worldwide, Sirlin, Baker, and other Lifewatch employee, agreeing with Sirlin that they should use 2 or more credit card processors going forward "to spread chargebacks out," which would require Worldwide agents to log in from different companies); FTC-LW09-1544 – 45 (6/6/13 email from Sirlin to Worldwide regarding complaint tied to Worldwide and forwarded to Sirlin and May, in which customer was "told the same things as previous accounts," that "'a family member paid 400 for unit'"); FTC-LW09-1556 – 59 (6/18/13 email from Sirlin to Worldwide, asking for information and to add a number to DNC, forwarding customer service email to Sirlin and May from customer who received robocall tied to Lifewatch, and noting she found 24 similar complaints, stating that someone had purchased device for her; customer service representative stated she told customer "Of course I said all the right things—we have nothing to do with them, blah blah blah, and she believes me and feels 'bad' for our company that this will damage our reputation if this other company keeps making these calls lol!"); FTC-LW09-1565 – 70 (6/20/13 email from Sirlin to Worldwide requesting that "someone blast seo on internt about

scam lifewatch and medical alerts etc etc- So real stupid stuff below goes low down," and forwarding emails from Baker to Sirlin and May with links to nationwide news reports of government alerts and private actions tying Lifewatch to widespread robocall "scam," including false claims that device is free, caller ID spoofing, "trades on the well-known brand of Life Alert," false claims about easy cancellations, false endorsement by American Diabetes Association, violations of DNC registry, and unauthorized use of BBB name and logo in promotional materials."); FTC-LW16-985, 895 (12/3/12 email from Sirlin to May, prior to May joining Lifewatch, attaching 11/29/12 letter from The Privatebank and Trust Company, confirming that the bank will not provide credit to Lifewatch because the Indiana AG lawsuit and other government actions against Lifewatch "represents an unacceptable credit risk for the Bank."); FTC-LW16-985, 895 (12/3/12 email from Sirlin to May, prior to May joining Lifewatch, attaching 11/29/12 letter from The Privatebank and Trust Company, confirming that the bank will not provide credit to Lifewatch because the Indiana AG lawsuit and other government actions against Lifewatch "represents an unacceptable credit risk for the Bank."); FTC-LW16-2914-2915 (5/14/13 email from May to Sirlin and Baker, forwarding earlier email from Lifewatch customer service sent to Sirlin, May, and Baker, regarding complaint that customer was told daughter had ordered unit for her. "I cannot begin to tell you how many of these I am hearing…that the Sales Agent is telling the Subscriber that a family member ordered the unit for them, so the unit is free."); FTC-LW16-2933 – 2934 (5/15/13 email from Lifewatch customer service representative to Sirlin, responding to email from May, copying Sirlin and Baker, regarding complaint tied to Worldwide (US Affiliates) of customer being told family member had given product to him; "When I first started hearing about these type of calls-family member purchased the equipment, I thought it was a few shady salespeople. I am no realizing it

is part of the Script."); FTC-LW16-3387-3388 (8/13/13 email from Roman to Sirlin, May, Baker, and other Lifewatch and SHS personnel, describing his review of all calls coming in to Lifewatch customer service: 75% of all calls are from customers calling to cancel; "Most appear to be aggressive sales practices or customers with no recollection of buying anything," and stating that complaints about free trials and that a relative ordered the product for the customer "are undermining our reputation, adding to expenses, wasting call center time, and demoralizing our staff."); FTC-LW16-4397 – 4398 (4/9/14 email from Baker to May, copying Sirlin, saying she is "completely shocked" that May is agreeing with Hallowell to continue to bill consumers Lifewatch knows have not activated their devices; states "You both understand this is where disputes/charge backs, BBB, AG complaints come from, right???????"); FTC-LW16-5220-5221 (10/13/14 email from Sirlin to Nonsant at Payless, asking him to address attached email from SHS employee to Vandewater, Baker, Roman, May,and Sirlin with complaint from customer told that she would not be charged until unit was activated); FTC-LW16-7370 – 7371 (8/1/13 email from Roman to May and Sirlin, attaching link to 7/30/13 press release from Connecticut Office of Attorney General, Department of Consumer Protection, warning seniors about rampant robocalls using spoofed caller IDs to false promise "free" medical alert devices to seniors, and asking why Worldwide sales are down).

42.     Defendants attempted several times to serve the FTC's witness Roderic Boling with a subpoena.  Mr. Boling was not served with the subpoena despite these attempts.

**PLAINTIFFS' RESPONSE TO STATEMENT 42**:  Undisputed.


Dated:  February 26, 2018                /s/Samantha Gordon
                                         SAMANTHA GORDON
                                         DAVID A. O'TOOLE
                                         Federal Trade Commission, Midwest Region
                                         230 South Dearborn Street, Suite 3030

Chicago, Illinois 60604
Telephone: (312) 960-5634
Facsimile: (312) 960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PAMELA JO BONDI
Attorney General
State of Florida

 /s/Denise Beamer
DENISE BEAMER
Assistant Attorney General
Florida Bar # 69369
Office of the Attorney General
Consumer Protection Division
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone:  (407) 245-0833
Facsimile:  (407) 245-0365

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL

## <u>CERTIFICATE OF SERVICE</u>

I, Samantha Gordon, hereby certify that on February 26 2018, I electronically filed

PLAINTIFFS' RESPONSE TO DEFENDANT MITCHEL MAY'S LOCAL RULE 56.1(a)

STATEMENT OF UNDISPUTED MATERIAL FACTS, with the Court using the CM/ECF

system, which will automatically send copies to any attorney of record in the case.


Respectfully Submitted,

/s/ Samantha Gordon
SAMANTHA GORDON
Federal Trade Commission
Midwest Region
230 S. Dearborn St., Room 3030
Chicago, Illinois 60603
Voice: (312) 960-5634
Fax:    (312) 960-5600
email: sgordon@ftc.gov