**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION,<br>STATE OF FLORIDA, OFFICE OF THE<br>ATTORNEY GENERAL, DEPARTMENT<br>OF LEGAL AFFAIRS, | ) <br> ) <br> ) <br> ) <br> ) | Case No. 15cv5781 |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | Judge Gary Feinerman |
| LIFEWATCH INC., a New York corporation,<br>also d/b/a LIFEWATCH USA and MEDICAL<br>ALARM SYSTEMS, | ) <br> ) <br> ) <br> ) | |
| SAFE HOME SECURITY, INC., a<br>Connecticut corporation, | ) <br> ) <br> ) | |
| MEDGUARD ALERT, INC., a Connecticut<br>corporation, | ) <br> ) <br> ) | |
| EVAN SIRLIN, individually and as an officer<br>or manager of Lifewatch Inc., | ) <br> ) <br> ) | |
| MITCHEL MAY, individually and as an officer or<br>manager of Lifewatch Inc., and | ) <br> ) <br> ) | |
| DAVID ROMAN, individually and as an officer<br>or manager of Lifewatch Inc., Safe Home Security,<br>Inc. and MedGuard Alert, Inc.<br>Defendants. | ) <br> ) <br> ) <br> ) <br> ) | |

**LIFEWATCH INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS………………………………………………………………………I-II

TABLE OF AUTHORITIES…………………………………………………………………..III-VII

PRELIMINARY STATEMENT…………………………………………………………………1

LEGAL ARGUMENTS…………………………………………………………………………...5

1. Alleged Deceptive Acts or Practices………………………………………………8

    A. Plaintiff's Conflation of the Outside Sellers………………………………..9

    B. Materiality………………………………………………………………………10

    C. Falsity…………………………………………………………………………...11

    D. Dissemination and Reliance…………………………………………………12

2. Alleged Violations of the TSR…………………………………………………...18

    A. Agency…………………………………………………………………………18

    B. Section 310.3…………………………………………………………………21

Material Aspects of the Refund, Cancellation, Exchange or Repurchase Policies………………21

Affiliation, Endorsements, Sponsorships and False or Misleading Statements…………………23

    C. Alleged Violations of the TSR – Section 310.4 (a)(8)………………………25

    D. Alleged Violations of 310.4(b)……………………………………………...26

    E. Alleged Violations of 310.3(b), Alleged Assistance and Facilitation of TSR violations………………………………………………………………………27

3. Permanent Injunctive Relief…………………………………………………………28

4. Equitable Monetary Relief……………………………………………………………29

Distinction Between Outside Sellers and Marketing Methods………………………………29

Traceability………………………………………………………………………………31

Refunds already Provided to Consumers…………………………………………………...33

I

Sales to Third Parties and Third Party Costs……………………………………………35

Services Rendered………………………………………………………………………36

Insufficient Evidence of Violations in 2015 and 2016…………………………………..38

Inability to Pay Must be Considered……………………………………………………..38

    5.   Safe Harbor Affirmative Defense……………………………………………..39

CONCLUSION …………………………………………………………………………40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander v Bosch Automotive Sys., Inc.*,
    232 Fed. Appx. 491 (6th Cir. 2007)....................................................................31

*Ameritas Variable Life Ins. Co. v. Roach*,
    411 F.3d 1328 (11th Cir. 2005) .....................................................................39

*Bridgeview Health Care Ctr., Ltd. v. Clark*,
    816 F.3d 935 (7th Cir. 2016) .........................................................................20

*CFTC v. Wilshire Inv. Mgmt. Corp.*,
    531 F.3d 1339 (11th Cir. 2008) .....................................................................35

*Chemtool, Inc. v. Lubrication Technologies, Inc.*,
    148 F.3d 742 (7th Cir. 1998) .........................................................................19

*Coastal Physician Servs., Inc. v. Ortiz*,
    764 So. 2d 7 (Fla. Dist. Ct. App. 1999) .........................................................8

*Derby Indus. v. Chestnut Ridge Foam, Inc.*,
    202 F. Supp. 2d 818 (N.D. In. 2002) ...........................................................10

*Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988).........................................................................30

*FTC v. All Us Mktg. LLC*,
    2017 U.S. Dist. LEXIS 77291 (M.D. Fl. 2017) ...........................................26

*FTC v. Arlington Press, Inc.*,
    1999 U.S. Dist. LEXIS 2055 (C.D. Cal. Jan 21, 1999) ...............................22

*FTC v. Bronson Partners, LLC*,
    2006 U.S. Dist. LEXIS 3315 (D.Conn. Jan 25, 2006)..................................34

*FTC v. Bronson Partners*,
    LLC, 654 F.3d 359 (2d. Cir. 2011)................................................................35

*FTC v. Direct Mktg. Concepts, Inc.*,
    569 F. Supp. 2d 285 (D. Mass. 2008) ...........................................................10

*FTC v. Direct Mktg. Concepts, Inc.*,
    648 F. Supp. 2d 202 (D. Mass. 2009) ...........................................................39

*FTC v. Equifin Int'l*,
    1997 U.S. Dist. LEXIS 10288 (C.D. Cal. July 3, 1997) ............................................................14

*FTC v. Febre*,
    128 F.3d 530 (7th Cir. 1997) ....................................................................................................29

*FTC v. Five-Star Auto Club*,
    97 F. Supp. 2d 502 (S.D.N.Y. 2000) .......................................................................................33

*FTC v. Freecom Communs., Inc.*,
    401 F.3d 1192 (10th Cir. 2005) ................................................................................................39

*FTC v. Home Assure, LLC*,
    2009 U.S. Dist. LEXIS 32055 (M.D. Fl. Apr. 16, 2009) ..........................................................34

*FTC v. Inc21.com Corp.*,
    475 Fed. Appx. 106 (9th Cir. 2012) .........................................................................................34

*FTC v. Int'l Diamond Corp.*,
    1983 U.S. Dist. LEXIS 11862 (N.D. Cal. Nov. 8, 1983) ..........................................................13

*FTC v. Ivy Capital, Inc.*,
    2013 U.S. Dist. LEXIS 42369 (D. NV. March 26, 2013) ..........................................................22

*FTC v. John Beck Amazing Profits, LLC*,
    888 F. Supp. 2d 1006 (C.D. Cal. 2012) .............................................................................28, 36

*FTC v. Johnson*,
    96 F. Supp. 3d 1110 (D. Nev. 2015) ........................................................................................10

*FTC v. Magui Publishers, Inc.*,
    1991 WL 90895 (C.D. Cal. Mar. 28, 1991), aff'd, 9 F.3d 1551 (9th Cir. 1993) ....................37

*FTC v. Medical Billers Network, Inc.*,
    543 F. Supp. 2d 283 (S.D.N.Y. 2008) .....................................................................................30

*FTC v. Nat'l Urological Group*,
    2008 U.S. Dist. LEXIS 44145 (N.D. Ga. June 4, 2008) ..........................................................34

*FTC v. Netran Dev. Corp.*,
    2006 U.S. Dist. LEXIS 98308 (S.D. Fl. Jul. 7, 2006) ..............................................................33

*FTC v. Network Servs. Depot, Inc.*,
    617 F.3d 1127 (9th Cir. 2010) ..................................................................................................33

*FTC v. Oks*,
    2007 U.S. Dist. LEXIS 82170 (N.D. Ill. Nov. 2, 2007) ...........................................................30

*FTC v. Oks*,
   U.S. Dist. LEXIS 82170 (N.D. Ill. Nov. 2, 2007)....................................................29

*FTC v. Pantron I Corp.*,
   33 F.3d 1088 (9th Cir. 1994) ........................................................................5

*FTC v. Publrs. Bus. Servs.*
   No. 2:08-cv-00620-APG-GWF, 2017 U.S. Dist. LEXIS 14720 (D. Nev. Feb.
   1, 2017) ....................................................................................12, 13

*FTC v. QT, Inc.*,
   448 F. Supp. 2d 908 (N.D. Ill. Sept. 8, 2006) ........................................................35

*FTC v. Security Rare Coin & Bullion Corp.*,
   931 F.2d 1312 (8th Cir. 1991) .....................................................................37

*FTC v. Silueta Distribs.*,
   No. C 93-4141 ......................................................................................5

*FTC v. Solomon Trading Co., Inc.*,
   1994 WL 421478 (D. Ariz. June 28, 1994) ..........................................................37

*FTC v. Student Aid Ctr., Inc.*,
   No. 16-21843-CIV, 2016 U.S. Dist. LEXIS 173658 (S.D. Fla. Dec. 14, 2016).....................18

*FTC v. Vacation Prop. Servs.*,
   2012 U.S. Dist. LEXIS 70213 (M.D. Fla. 2012) ....................................................27

*FTC v. Verity Int'l, Ltd.*,
   443 F.3d 48 ............................................................29, 30, 32, 34, 35, 36

*FTC v. Voc. Guides, Inc.*,
   2006 U.S. Dist. LEXIS 82308 (M.D. TN. 2006) .....................................................28

*FTC v. Wash. Data Res.*,
   2012 U.S. Dist. LEXIS 56233 (M.D. Fl. Apr. 23, 2012)..............................................24

*FTC v. Wetherill*,
   1993 WL 563621 (C.D. Cal. May 14, 1993) ........................................................37

*FTC v. Wilcox*,
   9 Fla. L. Weekly Fed. D 791 (U.S. S.D. Fla. 1995)..................................................36

*FTC v. Wilcox*,
   926 F. Supp. 1091 (S.D. Fla. 1995) ................................................................36

*FTC v. World Travel Vacation Brokers, Inc.*,
   861 F.2d 1020 (7th Cir. 1988) .....................................................................13

*FTC v. Zamani*,
   2011 U.S. Dist. LEXIS 60913 (C.D. Cal. June 6, 2011) ........................................34

*George & Co., LLC v. Imagination Entm't Ltd.*,
   575 F.3d 383 (4th Cir. 2009) ...............................................................17

*Great-West Life and Annuity Ins. Co. v Knudson*,
   534 U.S. 204 (2002) .........................................................................31, 33

*In re J.B. Williams Co.*,
   68 F.T.C. 481 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967) .......................10

*KC Leisure, Inc. v. Haber*,
   972 So.2d 1069 (Fla. 5th DCA 2008) .....................................................8

*Kristensen v. Credit Payment Servs. Inc.*,
   2015 U.S. Dist. LEXIS 96036 (D. Nev. July 20, 2015) ..............................19

*Lary v. Trinity Physician Fin. & Ins. Servs.*,
   780 F.3d 1101 (11th Cir. 2015) ..........................................................28

*Luis v. United States*,
   136 S. Ct. 1083 (2016) ......................................................................32

*Makaron v. GE Sec. Mfg.*,
   2015 U.S. Dist. LEXIS 75240 (C.D. Cal. May 18, 2015) ..........................19

*Marr v. Bank of America, N.A.*,
   662 F.3d 963, 2011 U.S. App. LEXIS 24134, 2011 WL 6091806 (7th Cir.
   Dec. 6, 2011) ................................................................................17

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) ..........................................................30

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) .........................................................................28

*North American Clearing, Inc. v. Brokerage Computer Systems, Inc.*,
   666 F.Supp.2d 1299 (M.D. Fla. 2009) ...................................................8

*Novartis Corp. v. FTC*,
   223 F.3d 783, 343 U.S. App. D.C. 111 (D.C. Cir. 2000) ..........................10

*Peterson v. Vill. of Downers Grove*,
   2016 U.S. Dist. LEXIS 13867 (N.D. Ill. Feb 4, 2016) ..............................28

*Pfizer, Inc. v. Miles, Inc.*,
   868 F. Supp. 437 (D. Conn. 1994) .......................................................11

VI

*Runge v. Stanley Fastening Sys., L.P.*,
2011 U.S. Dist. LEXIS 147924 ...............................................................17

*SEC v. Huffman*,
996 F.2d 800 (5th Cir. 1993) .................................................................39

*SEC v. McGinn*,
2010 U.S. Dist. LEXIS 147486 (N.D.N.Y. Dec. 15, 2010)...................39

*SEC v. McNamee*,
481 F.3d 451 (7th Cir. 2007) .................................................................37

*SEC v. Warren*,
534 F.3d 1368 (11th Cir. 2008) .............................................................39

*Sereboff v. Mid Atl. Med. Servs.*,
547 U.S. 356 (2006)...............................................................................31

*Sonnenschein v. Reliance Ins. Co.*,
353 F.2d 935 (2d Cir. 1965)............................................................31, 32

*Spitz v. Proven Winners of North America LLC*,
759 F.3d 724 (7th Cir. 2014) .................................................................19

*Stein v. Marquis Yachts, LLC*,
2015 U.S. Dist. LEXIS 35088 (S.D. Fla. Mar. 20, 2015).......................8

*TemPay, Inc. v. Biltres Staffing*
945 F. Supp. 2d 1331 (M.D. Fla. 2013)...................................................8

*United States v. Articles of Drug*,
1986 U.S. Dist. LEXIS 27300 (D. NE. 1986).......................................29

*United States v. Dish Network LLC*,
256 F. Supp. 3d 810 (C.D. Ill. 2017) ...............................................26, 38

*United States v. McDaniel*,
398 F.3d 540 (6th Cir. 2005) .................................................................34

*United States v. Peden*,
872 F.2d 1303 (7th Cir. 1989) ...............................................................38

*United States v. Rostoff*,
164 F.3d 63 (1st Cir. 1999).....................................................................38

*Vasquez v. Superior Court*,
4 Cal. 3d 800, 94 Cal. Rptr. 796, 484 P.2d 964 (1971) ........................13

*Worsham v. Travel Options, Inc.*,
   2016 U.S. Dist. LEXIS 118774 (D. Md. 2016) ....................................................25

**Statutes**

FTC Act Section 5 ..................................................................................................18, 39

FTC Act Section 5(a) ...................................................................................................8

FTCA ....................................................................................................................28, 32

FTCA Section 13(a) ...................................................................................................39

FTCA Section 13(b) ........................................................................................32, 33, 38

Lanham Act ...............................................................................................................10

Defendant, by and through counsel, submits this memorandum of law in opposition to Plaintiffs' Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Plaintiffs' motion must be denied. Plaintiffs have annexed many thousands of pages of documents to their moving papers and they've characterized the evidence as "overwhelming." But, while the volume may be overwhelming, the evidence itself is not. As set forth herein, there are many triable issues of fact as to liability and damages that preclude an award of summary judgment in plaintiffs' favor.

By way of background, and as plaintiffs acknowledge, Lifewatch entered into purchase agreements with *hundreds* of third-party sales companies ("outside sellers") between 2012 and 2016.[1] Pursuant to those purchase agreements, which explicitly prohibit violative telemarketing, Lifewatch obtained customer accounts through a wide variety of methods and means.[2] The many dozens of outside sellers that sold customer accounts to Lifewatch used a multitude of different sales scripts and a variety of different methods to obtain customers[3]. Indeed, annexed affidavits indicate that customer origination was not accomplished solely through outbound telemarketing.[4] Annexed outside seller affidavits and other evidence also indicate that in originating customer accounts for Lifewatch violative telemarketing practices were not employed and the alleged misrepresentations at issue in this case were not made to prospective customers.[5] Many of the call transcripts and sales scripts confirm that Lifewatch's outside sellers did not use

---

[1] Joint Statement of Additional Facts ("JSAF") 3
[2] JSAF 1, 2
[3] JSAF 1, 2, 8, 9, 10, 11, 12
[4] JSAF 1, Exhibit A
[5] Exhibit E, JSAF 8, 9, 10, 11, 12

the alleged misrepresentations at issue in connection with originating customer accounts. Further, chargeback rates varied among outside sellers.[6]

As such, it would be inappropriate, illogical, and impermissible to treat Lifewatch's sales practices as homogeneous and unvarying from 2012 through 2016, to then impute the acts of a small number of outside sellers to all outside sellers over a five year period, and then to award restitutionary damages amounting to a forfeiture of five years of revenue. Simply stated, plaintiffs' evidence that some outside sellers engaged in violative conduct during certain periods of time is insufficient to obtain summary judgment -- and an award of restitutionary damages amounting to the forfeiture of 5 years of revenue -- when, *inter alia*, there is significant countervailing evidence that Lifewatch's other outside sellers (who originated customers for Lifewatch) did not engage in violative conduct. Additionally, evidence shows that Lifewatch's quality control program -- wherein Lifewatch set forth strict compliance guidelines, used a verification or confirmation call process, listened to call recordings and, *inter alia*, terminated outside sellers who did not comply -- successfully curtailed any customer origination through violative practices.

Plaintiffs argue they have established that the alleged misrepresentations were widely disseminated. But, this is not a case involving an alleged misrepresentation within a singular, uniform national television advertisement or a singular telemarketing campaign (including a single, standardized telemarketing script) wherein it can be presumed that all customers relied upon the misrepresentation if they became customers while the offending television advertisement ran or when the offending telemarketing campaign was conducted. Even if an alleged misrepresentation was disseminated to a particular subset of customers originated by a particular outside seller at a particular time, it does not follow that an alleged misrepresentation

[6] JSAF 4

2

was widely disseminated among Lifewatch's entire customer base during a five year period. Again, evidence (e.g. scripts used by various outside sellers who engaged in telemarketing) confirms that many of the outside sellers did not make misrepresentations, let alone widely disseminate them to customers they originated for Lifewatch[7]. So, even if arguendo, plaintiffs could show that an alleged misrepresentation was disseminated by Worldwide Info Services in 2012,[8] they cannot show that an alleged misrepresentation was made by, for instance, TMI in 2014 or 2015 – a company that originated customer accounts for Lifewatch and from which Lifewatch derived a quantifiable and measurable portion of its revenue[9].

Plaintiffs disclosed the declarations of consumers who were either dissatisfied or who alleged they received violative telemarketing calls. Given the approximately 60,000 customers Lifewatch has had since issuance of the FTC's Civil Investigative Demand ("CID"), the number of consumer declarations disclosed by the FTC equates to about 0.08% of Lifewatch's customer base, which was developed through, *inter alia*, many dozens of outside sellers. Moreover, of the disclosed individuals, only 14 were customers (or were linked to customers) and thus appeared in Lifewatch's customer data base (i.e. 0.02%), and those 14 accounts were originated by approximately 4 outside sellers (out of the hundreds used by Lifewatch) including Worldwide Info Services or its d/b/a/ companies. [10] Moreover, of the 14 accounts, only 2 individuals (contacted by 1 seller: Worldwide Info Services) personally allege they signed up for the Lifewatch service after hearing one of the alleged misrepresentations at issue in this case. Thus, the plaintiffs' disclosed consumers make up a *de minimis* segment of the consumer pool and the

---

[7] JSAF 8, 9, 10, 11
[8] Notably, evidence shows that during this time period WWIS used scripts for and telemarketed for PERS manufactures including, Philips Lifeline and First Street. See JSAF 5, FTC-LW-09-1193-96; FTC-LW09-1202-1205; FTC-LW09-1300.
[9] JSAF 3
[10] JSAF 15

outside sellers connected with those consumers make up a *de minimis* segment of Lifewatch's outside sellers. In stark contrast, Lifewatch's witnesses will testify that when Lifewatch was first served with the CID, Lifewatch sent the FTC drafts of a proposed letter to consumers that offered a full refund for any customer who relied on the alleged misrepresentations at issue in this case. After sending the draft letter to the FTC and looping-in the FTC to this refund process, Lifewatch finalized the letter and sent it out to customers obtained through the Worldwide defendants. Of these customers (all of whom were known to and disclosed to the FTC), approximately 0.68% requested and received refunds.[11] Those who did not request and receive a refund continued to enjoy the benefits of a medical alert system and service that undisputedly works. *Id*. As such, and at the very least, there are serious, triable issues of fact as to whether and what extent the limited subset of consumers who even heard the representations at issue actually relied on them.

Moreover, plaintiffs' entire theory of restitutionary damages is inherently flawed. As set forth in detail below, the flaws include but are not limited to: 1) there are no economic damages to consumers who received monitoring services for the same number of months they paid Lifewatch's service fees. Indeed, in cases cited by plaintiffs, consumers who received services were properly excluded from the restitution computation; 2) plaintiffs do not account for the portion of revenue obtained from customers originated through non-violative means, a figure which is measurable; 3) plaintiffs fail to account for the vast amounts of refunds and free, unreturned equipment already given to consumers; 4) there is no basis for plaintiffs' inclusion of revenue from defendant's sale of customer accounts to third parties as restitution damages given that the consumers paid those third parties, not Lifewatch; 5) there is insufficient evidence of violations in 2015 and 2016 (or 2017), after implementation of Lifewatch's improved quality

---

[11] JSAF 16

4

control program; and 6) plaintiffs have made no showing that they are able to trace specific assets or property in defendant's current possession to consumer payments, which is necessary for equitable restitution.

Accordingly, and as set forth in greater detail below, there are triable issues of fact as to liability and as to damages and thus an award of summary judgment with the imposition of monetary judgment and a permanent injunction cannot be issued.

## LEGAL ARGUMENTS

Lifewatch Inc. is a New York corporation that has, at all relevant times, provided emergency monitoring products and services to elderly, seriously ill, and disabled individuals. By simply pressing a button on a medical alert device, Lifewatch customers have immediate access to emergency services.[12]  Lifewatch provides this equipment -- which is ready to use upon arrival -- at no cost to the customers to ensure their immediate access to Lifewatch's services.  In addition to providing its customers free equipment, Lifewatch engages third-party monitoring companies to respond to emergency signals.[13]  Lifewatch does not peddle nostrums like hair-loss products[14] or cellulite cream;[15]  it provides life-saving equipment and services to protect its customers.[16]  Beginning in approximately 2012, Lifewatch began using outside sellers to originate customer accounts for Lifewatch.  The independent companies offered to sell these accounts to Lifewatch and other emergency monitoring companies.  The purchase agreements contained a provision obligating the companies to comply with all applicable state and federal

---

[12] Dkt. 296-1, paragraphs 1-3
[13] Dkt. 296-1, paragraphs 4-5
[14] *FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)
[15] *FTC v. Silueta Distribs.*, No. C 93-4141 SBA, 1995 U.S. Dist. LEXIS 22254 (N.D. Cal. Feb. 23, 1995)
[16] There are no allegations regarding the quality of equipment or monitoring services Lifewatch provided to consumers.

5

telemarketing laws. The independent sales companies warranted and represented to Lifewatch that applicable laws were followed.[17]

The core allegations in this suit pertain to and arise out of Lifewatch Inc.'s 2012 and 2013 business relationship with non-party entity, Worldwide Info Services (WWIS). In approximately 2012, the FTC and State Attorneys General made public their investigations into various telemarketing companies serving the emergency monitoring industry. Those investigations resulted in a number of civil enforcement actions taken by the FTC including *FTC and State of Florida, Office of the Attorney General, Department of Legal Affairs v Worldwide Info Services, Inc*. et al., United States District Court for the Middle District of Florida, 6:14-cv-8-ORL-28DAB. Among the companies investigated and sued were companies with whom Lifewatch had transacted business, i.e. WWIS (and its d/b/a entities). In March 2014, the FTC served Lifewatch with a CID and filed suit against it in June 2015. (R. Doc 1). Lifewatch's non-exclusive[18] relationship with WWIS was an unmitigated financial catastrophe. As a result of this relationship, Lifewatch sustained nearly ten million dollars in losses, refunded approximately three million dollars to customers, and effectively "gave away" to customers medical alert equipment with a retail value totaling approximately fourteen million dollars.[19] Moreover, in approximately April 2014, as a result of the allegations made by the FTC and the Florida Attorney General in the Florida enforcement proceedings filed against WWIS, Lifewatch voluntarily created a customer refund program to address WWIS's alleged violations to the extent they impacted existing Lifewatch customers. As part of this refund program, Lifewatch

---

[17] Dkt. 296-1, paragraphs. 11-12
[18] FTC-LW-09-1193-96 (Worldwide identifies its script for sales of Philips Lifeline medical alert devices (800 foot range, absolutely free, live operators are fully trained EMTs), not Lifewatch's devices. FTC-LW09-1202-1205 (WWIS identifies scripts for sales of Philips Lifeline medical alert devices and First Street medical alert devices); FTC-LW09-1300 (Communications between WWIS and First Street's Tim Hague, Jennifer Hancock, and Jo Hayden about getting paid for First Street sales).
[19] Dkt. 296-1, paragraphs 15-17

provided its customers with information about the WWIS enforcement litigation and offered and provided full refunds to customers who had purchased Lifewatch's products or services based on, *inter alia*, any of the allegedly false and misleading statements of the independent companies cited by the FTC and the Florida Attorney General in their enforcement litigation. Through this refund program, Lifewatch sent letters to its customers, and those who responded were issued a refund.[20]

Following its relationship with WWIS, Lifewatch entered into hundreds of purchase agreements with other outside sellers.[21] And, Lifewatch generated revenue as a result of accounts originated by these outside sellers.[22] Many of these outside sellers have affirmed under penalty of perjury that they have not engaged in the activity at issue in this case.[23] Many of these outside sellers have also affirmed under penalty of perjury that telemarketing was used in connection with either 0% or somewhere between 0% and 50% of the accounts sold to Lifewatch.[24] As is evident from the affidavits and profit and loss statements, Lifewatch spent significant money on non-outbound telemarketing and generated a sizeable and measurable portion of its customer pool through these efforts.[25] For instance, Lifewatch spent hundreds of thousands of dollars obtaining customers through television ads and through direct mail or opt-in leads from "opt-in" marketers like Robski, IPS Leads, Mocan Media, Novca, Bon Venture, etc. *Id.* Plaintiffs have presented evidence that a small percentage of Lifewatch's sellers engaged in

---

[20] JSAF 16, Dkt. 296-1, paragraphs 30-31
[21] JSAF 3
[22] JSAF 3
[23] JSAF 12, Exhibit E, the entities include: Agent Med Alert; American MD Today; Beltrami Caduceus; Better Be Healthy; Bevan Enterprises; Constant Connectivity; Deal Direct Marketing; Dennis Michael LLC.; Fresh Fruit & Marketing; G Energy; Guardian Card; InService; JAMP; Leads for SMA; Live Stress Free; Mayhem Innovations; MLA International; Music City Ventures; Nationwide Ventures; Payless; Prium Plans; Prodigy Consulting Group; Provative Options; Quality Services Network; Rescue Me; Rescue Medical Alert; S2 Ventures; SafeGuard Security; Senior Alert Specialist; Senior Assist Network; Senior Beneficial Network; Senior Benefit Specialists; Senior Medical Alert Systems LLC.; SHMS Marketing Solutions LLC.; Source One Consumer Solutions; Tele America Response Inc.; TMI; and Ultino Communications Group.
[24] JSAF, 1, Exhibit A,
[25] JSAF 2

some violative activities or made some of the representations at issue. But, that evidence is disputed[26] and there is either no evidence or countervailing evidence regarding many other outside sellers from whom Lifewatch obtained customer accounts[27]. Plaintiffs are simply conflating the marketing methods and the outside sellers in an effort to inaccurately portray Lifewatch's sales methods as homogeneous and as uniformly fraudulent over a five year period.

Further, plaintiffs are mischaracterizing internal emails to suggest that Lifewatch was somehow assisting and facilitating violations during the period between the WWIS shutdown and the issuance of the preliminary injunction in this case.[28] But, a plain review of the emails reveals that Lifewatch was vigilantly reviewing audiotapes and then communicating (sometimes aggressively) *en masse* with outside sellers to ensure that incorrect or inaccurate statements were not made. And, Lifewatch was terminating outside sellers that failed to comply. [29]

## 1. Alleged Deceptive Acts or Practices

Plaintiffs argue that defendants made material misrepresentations to consumers in violation of Section 5(a) of the FTC Act (and the FDUTPA[30]). (R. Doc. 243, p. 12). As set forth in the Amended Complaint, plaintiffs allege that defendants -- through their outside sellers -- made the following misrepresentations in contravention of the FTC Act: 1) A friend, family member, health care provider, or other acquaintance of the consumer referred the consumer to Defendants, or purchased the medical alert system for the consumer; 2) Defendants' medical alert system is endorsed by reputable organizations, including, but not limited to, the American

---

[26] Opposition to Plaintiffs' Statement of Facts, 9-21.
[27] JSAF 3, 4, 8, 9, 10, 11, 12
[28] Opposition to Plaintiffs' Statement of Facts, 66
[29] JSAF 13
[30] FDUPTA's applicability is limited to Florida consumers. *Coastal Physician Servs., Inc. v. Ortiz*, 764 So. 2d 7 (Fla. Dist. Ct. App. 1999); *Stein v. Marquis Yachts, LLC*, 2015 U.S. Dist. LEXIS 35088 (S.D. Fla. Mar. 20, 2015). Further, to hold an individual officer liable under FDUTPA, plaintiffs must show that the individual was a "direct participant in the improper dealings." *North American Clearing, Inc. v. Brokerage Computer Systems, Inc.*, 666 F.Supp.2d 1299, 1311 (M.D. Fla. 2009) (quoting *KC Leisure, Inc. v. Haber*, 972 So.2d 1069, 1074 (Fla. 5th DCA 2008)); *TemPay, Inc. v. Biltres Staffing* 945 F. Supp. 2d 1331, 1346 (M.D. Fla. 2013).

Heart Association, the American Diabetes Association, the National Institute on Aging, the AARP, the American Red Cross, and/or health care providers; 3) Consumers will not be charged the first monitoring fee until they have received and activated the medical alert system; 4) Consumers may cancel the monitoring service at any time without any further financial obligation. (R. Doc. 165). Plaintiffs' argument must be rejected.

### A.  Plaintiffs' Conflation of the Outside Sellers

Plaintiffs are conflating all outside sellers across all five years in arguing that defendants engaged in deceptive practices. There is simply no legal or logical support for plaintiffs' argument that because a particular outside seller made a particular representation in, for instance, 2013, that representation must be imputed to a different outside seller originating different customers in 2013 or during a different time period (e.g. 2016). Indeed, many Lifewatch customers were originated from outside sellers who have not been shown to have made the alleged misrepresentations or to have engaged in violative conduct.[31] And, many outside sellers signed affidavits under penalty of perjury indicating they did not engage in the allegedly violative conduct.[32] Accordingly, there is no basis to treat Lifewatch's practices as unvarying from 2012 through 2016 and to lump together all outside sellers over a five year period.

Indeed, after the WWIS shutdown, Lifewatch worked to implement several effective measures to make sure its customer accounts were properly procured. Sarai Baker, testified that outside sellers signed Purchase Agreements with Lifewatch warranting that they do not and will not violate any state or federal telemarketing laws, or any other laws in originating customer accounts. The outside sellers provided affidavits affirming, among other things, that they strictly comply with all state and federal telemarketing laws and will not make misrepresentations about

---

[31] Opposition to Plaintiffs' Statement of Facts, 9-21. JSAF 8-
[32] Exhibit E

the products or services marketed by them. And, the primary responsibility of Lifewatch

employee, Lauren Vandewater, has been to request and listen to audio-recordings in order to

ensure the outside sellers are acting in a manner consistent with their contractual obligations. [33]

Additionally, Lifewatch circulated do-not-call information to all of the outside sellers. Lifewatch

also provided the outside sellers with information about the attributes of the products and

services that it offers and the terms and conditions pursuant to which it will provide fulfillment.

Notwithstanding plaintiffs' mischaracterizations, the evidence shows that Lifewatch

communicated with outside sellers to ensure misrepresentations were not being made and that

Lifewatch terminated outside sellers who did not follow their guidelines.[34]

### B. Materiality

Plaintiffs acknowledge that "an act or practice is deceptive if it involves a material

misrepresentation or omission that is likely to mislead consumers acting reasonably under the

circumstances." Id. at p. 12. It is well-settled that information is material where it "concerns the

purpose, safety, efficacy, or cost, of the product or service." *FTC v. Direct Mktg. Concepts, Inc.*,

569 F. Supp. 2d 285, 308 (D. Mass. 2008) (citing *Novartis Corp. v. FTC*, 223 F.3d 783, 786, 343

U.S. App. D.C. 111 (D.C. Cir. 2000) (quoting *FTC Policy Statement on Deception*); *In re J.B.*

*Williams Co.*, 68 F.T.C. 481, 546 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967)). *FTC v. Johnson*,

96 F. Supp. 3d 1110, 1119-21 (D. Nev. 2015). Further, a district court can rule that the

representations made were not false, misleading, or material. *See Derby Indus. v. Chestnut*

*Ridge Foam, Inc.*, 202 F. Supp. 2d 818 (N.D. In. 2002) (finding, in the context of the Lanham

Act, that representations regarding the testing of mattresses were neither literally false, nor

misleading, and that plaintiff had not shown the representations to be material to reasonable

---

[33] Dkt. 87-3 at 2-3, Vandewater Declaration, (describing quality control process).
[34] JSAF 13

customers); *Pfizer, Inc. v. Miles, Inc.*, 868 F. Supp. 437, 446 (D. Conn. 1994) (holding that claims that defendant's drug was less expensive than plaintiff's were not misleading even where the drugs were not bioequivalent).

Here, the Court can rule that because statement number two (regarding endorsements) plainly has no bearing on the purpose, safety, efficacy, or cost of the product or service, it is not material. In any event, as set forth below, monitoring devices and monitoring services substantially similar to those offered by Lifewatch have been endorsed by a number of organizations to protect older adults and infirm people.

### C. Falsity

Statements two, three, and four are not false and can be substantiated. With respect to statement two, medical alert systems have been endorsed by reputable organizations and health care providers.[35] In their motion papers, plaintiffs also argue that Lifewatch's "telemarketers represented that consumers could cancel the service at any time without any further financial obligation, but that was false because canceling consumers had to either ship the medical alert device back to Defendants at a substantial cost or pay a $400 fee." (R. Doc. 243, p. 2). But, there is no evidence that outside sellers stated "there would be no further financial obligations."[36] Further, plaintiffs improperly conflate all outside sellers over a five year period. Record evidence shows: 1) Lifewatch sent out a costly medical alert device to each customer and only charged the customer for monthly monitoring (i.e. the device itself was free to the consumer);[37] 2) Lifewatch often cancelled accounts upon request and refunded customers without charging for

---

[35] https://www.aarp.org/health/doctors-hospitals/info-11-2010/medical_alert_systems.html ; https://www.aarp.org/caregiving/home-care/info-2017/medic-alert-systems-options.html ; https://www.nia.nih.gov/health/aging-place-growing-old-home ; https://www.redcrossstore.org/dp.aspx?pgid=609
[36] Opposition to Plaintiffs' Statement of Facts, 21-24. Moreover, there is evidence that consumers were explicitly told they had to ship back the equipment. See, PX2, Atts F, G, (telemarketer indicates customer has to ship back the unit and if the customer cancels the service but keeps the equipment, customer will be charged for the equipment.)
[37] JSAF 6

the equipment or receiving its equipment;[38] and 3) Lifewatch often sent shipping labels to customers (upon request) so they would not have to pay for return shipping.[39]

Plaintiffs also argue "consumers were told that they could test the device first and that they would not be billed until the monitoring service was activated; that, too, was false because defendants charged consumers credit cards almost immediately." Again, plaintiffs improperly conflate all outside sellers throughout a five year period. Lifewatch's consumers were charged in conjunction with receiving the medical alert systems, which are always active and ready to be used, upon being shipped, because Lifewatch engages monitoring centers for each customer before the devices are shipped. And, customers were told they would be charged "today."[40] And, after the WWIS shutdown, Lifewatch implemented a quality control program wherein, among other things, there is explicit verification that the customer understands they are going to be charged immediately.[41]

In any event, and as explained in more detail below, to the extent there was some inconsistency with regard to the return shipping practice or policy, revenue forfeiture is not the appropriate remedy when a customer received and enjoyed the benefits of working equipment and services.

### D. Dissemination and Reliance

It has been held that requiring a showing of individual reliance for each consumer in FTC enforcement actions "would thwart effective prosecutions of large consumer redress actions." *FTC v. Publrs. Bus. Servs*. No. 2:08-cv-00620-APG-GWF, 2017 U.S. Dist. LEXIS 14720 (D. Nev. Feb. 1, 2017). To that end, courts have imposed a rebuttable presumption of individual

---

[38] JSAF 7
[39] JSAF 17
[40] JSAF 10; Dkt. 296-5, p. 82 (live transfer to ensure "that the customer understands they're going to be charged immediately.")
[41] Id., JSAF 13

reliance once the FTC has proved defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased defendant's products. A rationale for this rebuttable presumption was explained in *FTC v. Int'l Diamond Corp.*, 1983 U.S. Dist. LEXIS 11862, at * 17-18 (N.D. Cal. Nov. 8, 1983), where the court cited to *Vasquez v. Superior Court*, 4 Cal. 3d 800, 94 Cal. Rptr. 796, 484 P.2d 964 (1971), which stated: "…Consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all." In the case at bar, record evidence demonstrates that many customers (particularly after the WWIS shutdown) were originated by outside sellers that cannot be shown to have uttered the misrepresentations at issue.[42] In other words, scripts and representations within those scripts were not, by any means, uniform and standardized such that it can be said customers were exposed to the "same dubious practice."

Plaintiffs rely on *FTC v. World Travel Vacation Brokers, Inc*., 861 F.2d 1020 (7th Cir. 1988), where defendants' uniform advertisement of a $29 airfare package to their customers was adjudged to be widely disseminated. Unlike that case, where the accused advertising was singular, uniform, and standardized in nature during a finite period of time, in the case at bar, Lifewatch used hundreds of outside sellers from 2012 through 2016.[43] And, those outside sellers used a wide variety of means and methods and scripts in originating customers.[44] Indeed, a subset of Lifewatch customers were unquestionably originated from outside sellers who have not been shown to have made the alleged misrepresentations at issue.[45] In *FTC v. Publrs. Bus. Servs*. No. 2:08-cv-00620-APG-GWF, 2017 U.S. Dist. LEXIS 14720 (D. Nev. Feb. 1, 2017), the court only found wide dissemination in the telemarketing context specifically because defendants

---

[42] JSAF 3
[43] JSAF 3
[44] JSAF 1
[45] See, e.g. Exhibit C, Schedule A.

13

made 25 million calls and they were unable to point to evidence that their telemarketers had different or varying sales pitches. Similarly, in *FTC v. Equifin Int'l,* 1997 U.S. Dist. LEXIS 10288 (C.D. Cal. July 3, 1997), the court granted an injunction after finding that the sales presentations included "standardized" misrepresentations traceable to the sales at issue. In the case at bar, however, there is ample evidence showing different sales pitches and different means and methods of customer origination by different outside sellers.[46] *Id.* at * 12-13.

So, even if, *arguendo*, an alleged misrepresentation was made to a particular subset of customers obtained by a particular outside seller at a particular time, it does not follow that -- as the plaintiffs want the court to believe -- an alleged misrepresentation was widely disseminated among the customer base during a five year period. Plaintiffs' own evidence supports defendants' argument. For instance, in PSMF 58, plaintiffs cite to sales scripts used by a subset of outside sellers. But, a plain review (as pointed out in the opposition to plaintiffs' statement of facts) reveals that the scripts are different and that, in any event, the alleged misrepresentations at issue were *not* included. By way of example, the scripts plaintiffs attribute to TMI and Senior Medical Alert: do not mention an endorsement; explicitly indicate that the equipment itself is provided at no cost but that the consumer pays the monthly monitoring fee; do not mention that the device has been purchased by a friend or family member; do not indicate that consumers must activate before they are charged; and do not indicate customers may cancel the monitoring service at any time without any further financial obligation. Indeed, affidavits by David Reilly of TMI and Blake Ladenheim of Senior Medical Alert indicate that the misrepresentations at

---

[46] JSAF 1, 2, 7, 8, 9, 10, 11

issue in this case were not made in connection with originating customer accounts for Lifewatch.[47]

Many of the phone call transcripts also illustrate the point that the alleged misrepresentations were not widely disseminated and were confined to only a few outside sellers during a limited time period. By way of example, in PX1, Attachment AA, the telemarketer does not mention an endorsement; explicitly indicates that the equipment itself is provided at no cost but that the consumer pays the monthly monitoring fee and would be charged for a failure to return the equipment after cancellation; does not mention that the device has been purchased by a friend or family member; and does not indicate that the consumer must activate before he is charged. Similarly, in PX1, Attachment ZZ and PX2, Attachments A-G, and PX3 the telemarketer does not mention an endorsement; explicitly indicates that the equipment itself is provided at no cost but that the consumer pays the monthly monitoring fee; does not mention that the device has been purchased by a friend or family member; and does not indicate that the consumer must activate before she is charged. And, in PX2, Attachments F and G, the telemarketer explicitly indicates that the customer has to ship back the unit and the telemarketer indicates that if the customer cancels the service but keeps the equipment, the customer will be charged for the equipment.

Plaintiffs rely on consumer affidavits. But, of the disclosed individuals, only 14 actually appeared in Lifewatch's customer data base (i.e. 0.02%).[48] Of the 14, the following individuals admittedly did not purchase the products and services as a result of *any* alleged misrepresentations: Robert Braver, Joaquin Miller, Paul Deloca, Barry Gates, Lord Fetherston,

---

[47] Exhibit C. Further, in order determine the percentage of revenue attributable to, for instance, TMI, one could use the schedule annexed to Kevin Flaherty's report at Exhibit C.
[48] JSAF 15

Claude Westbrook,[49] and Diana Mey. Of the remaining 7, the following individuals[50] declared they were told about another customer's interaction with an outside seller: Donna Girard, Karen McCourt, and Susan Rivard. Of the remaining 4, Florence Holley and Merrilyn Gassman ordered the products and services not because of any of the alleged misrepresentations at issue, but only because they purportedly heard some variation of Life Alert's tagline "Help I've Fallen and I Can't Get Up" (which is not at issue in the case) and thought they were ordering Life Alert products. That leaves 2 customers, Hilda Daniel and Joan Cattie who indicated they purchased the device after hearing the "friend or family member" representation. Billing records show these accounts were sold in May 8, 2013 and May 11, 2013 by WWIS (or its d/b/a).[51] The internal emails sent after the WWIS shutdown (identified in PMSF 39 and 66) show that Lifewatch attentively addressed all customer complaints directly with the outside sellers. These emails -- which showed Lifewatch had a robust quality control program -- are insufficient for plaintiffs to meet their burden to demonstrate wide dissemination of actionable misrepresentations after the WWIS shutdown, particularly in view of evidence that outside sellers were terminated if Lifewatch suspected they may have deviated from Lifewatch's guidelines.[52]

Showing wide dissemination by WWIS will depend upon the testimony of Joseph Settecase, Michael Hilgar, and Roderic Boling, all of whom successfully avoided subpoena service in this case. And, even if *arguendo*, plaintiff can show a particular representation was disseminated among customers originated by WWIS, it does not follow that plaintiff can show

---

[49] Indeed, consumer Claude Westbrook indicates he purchased the service, not because of any alleged misrepresentations, but because he was sick and needed it. (PX 62). Similarly, at PX 69 Patricia Felker indicates that after she was told the unit was free but the consumer had to pay a monthly service charge, she purchased the service for her mother because she is 86 and it was the right time.

[50] Each of whom is linked to a customer obtained through WWIS.

[51] Billing records also show that Ms. Cattie disputed having received the equipment and then later admitted she had received the equipment. Baker Affidavit, Exhibit G, Att. 1, LW-FTC-1450 through 1454

[52] JSAF 13, Baker Affidavit, Exhibit G, para 7 (detailing termination); Dkt. 296-5, pp. 86-87 (testifying about same)

the representation was widely disseminated by multiple outside sellers across Lifewatch's

customer base. Indeed, as set forth above, record evidence shows the opposite.[53]

Even if plaintiffs have met their burden with respect to wide dissemination -- which

defendants contend they have not -- rebuttable presumptions are not impenetrable barriers to

trial. *See e.g., Marr v. Bank of America, N.A.*, 662 F.3d 963, 2011 U.S. App. LEXIS 24134, 2011

WL 6091806 (7th Cir. Dec. 6, 2011). To defeat summary judgment, defendants can present

evidence to create a genuine issue of material fact as to whether consumers relied upon the

alleged misrepresentations. *Runge v. Stanley Fastening Sys., L.P.*, 2011 U.S. Dist. LEXIS

147924 ("even if the rebuttable presumption applies, Plaintiffs will live to fight another day if

genuine issues of material fact remain after application of the presumption."). Here, evidence

shows that when Lifewatch was first served with the Civil Investigative Demand ("CID") by the

FTC, Lifewatch sent the FTC drafts of a proposed letter to consumers that offered a full refund

for any customer who felt they had been deceived by the misrepresentations at issue in this case.

After sending the draft letter to the FTC and looping-in the FTC to this refund process,

Lifewatch finalized the letter and sent it out to customers obtained through WWIS. The letters

made consumers aware of each of the alleged misrepresentations. The letters then instructed

consumers that if they had relied on any of the alleged misrepresentations in purchasing the

products, they could receive a full refund by simply calling the phone number provided.[54]

Thus, the letter did not simply offer a refund, it specifically asked consumers whether or not they

relied upon the alleged misrepresentations. The vast majority of consumers who received these

letters did not call for a refund, evincing a lack of reliance on the representations. This is strong

evidence not only that consumers were satisfied with their products, but also that 1) consumers

---

[53] Nor does it allow for an extrapolation about broad customer reliance. *See, e.g. George & Co., LLC v. Imagination Entm't Ltd.,* 575 F.3d 383 (4th Cir. 2009) (holding *de minimis* examples of consumer reliance to be insufficient).
[54] JSAF 16

17

were not misled by the alleged misrepresentations; or 2) consumers did not rely on the representations in deciding to purchase the products.   As such, and at the very least, there is a fact issue as to whether there was consumer reliance upon the alleged misrepresentations by consumers who heard the misrepresentations.

To the extent plaintiffs are arguing evidence of elevated chargeback rates or customer attrition shows reliance, plaintiffs cannot simply rely on a statement by Chris Hendrikson of Lifewatch's competitor VRI (which has also been embroiled in litigation with Lifewatch).[55]  Mr. Henrikson has not been proffered as an expert witness, and thus his testimony is necessarily limited to that of a lay witness.[56]  In any event, the evidence shows that Lifewatch's chargeback rates varied from outside seller to outside seller and from year to year.

Additionally, and for the reasons discussed above, plaintiffs cannot show violations of the FDUPTA, which, like Section 5 of the FTC Act,  requires both that the representations were likely to mislead customers acting reasonably under the circumstances and that the misrepresentations were material.  *FTC v. Student Aid Ctr., Inc.*, No. 16-21843-CIV, 2016 U.S. Dist. LEXIS 173658, *18 (S.D. Fla. Dec. 14, 2016).

## 2. Alleged Violations of the TSR

Plaintiffs argue that various provisions of the Telemarketing Sales Rule were violated. Plaintiffs' argument must be rejected.

### A. Agency

In order to hold defendants liable for the acts of the outside sellers, plaintiffs need to establish a principle/agency relationship between Lifewatch and ***each*** of the outside sellers. The Restatement defines agency as a "fiduciary relationship that arises when one person (a

---

[55] Exhibit B, Sirlin Affidavit
[56] A motion to strike is being filed contemporaneously herewith.  Additionally, contrary to plaintiffs' characterization, Mr. Hendrickson's statement does not address or speak to "industry averages."

'principal') manifests assent to another person (an 'agent') that the agent shall act on the

principal's behalf and subject to the principal's control, and the agent manifests assent or

otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). The determination

of whether agency exists is a factual issue. *See Spitz v. Proven Winners of North America LLC*,

759 F.3d 724 (7th Cir. 2014); *Chemtool, Inc. v. Lubrication Technologies, Inc.,* 148 F.3d 742,

746 (7th Cir. 1998).

The record evidence shows Lifewatch authorized outside sales companies to originate

customer accounts for sale to Lifewatch -- and any others -- through practices that were

compliant with state and federal laws.[57] As such, there can be no agency finding. See, e.g.

*Kristensen v. Credit Payment Servs. Inc*., 2015 U.S. Dist. LEXIS 96036 (D. Nev. July 20, 2015)

("Here, other than the mere fact that Click Media may have known that AC Referral used texts to

generate leads, it is undisputed that Click Media had almost no input or control regarding the

content, means of transmission, or methods used by AC Referral to carry out its texting

campaign. Other than the most basic parameters contained in their insertion orders, e.g. AC

Referral had to comply with relevant laws, Click Media did not control the instrumentalities,

tools, or offices of AC Referral. Plaintiffs'… argument thus fails."). Moreover, there can be no

agency finding where, as the record evidence shows in the case at bar, the outside sales

companies sold customer accounts to both Lifewatch and its competitors.[58] *See e.g. Makaron v.*

*GE Sec. Mfg*., 2015 U.S. Dist. LEXIS 75240, *19 (C.D. Cal. May 18, 2015) (Granting summary

judgment and holding "there is no evidence that UTCFSA controlled or directed the marketing

---

[57] Dkt. 296-2, Exhibit A, pp. 1-4: "Whereas the Seller is engaged in the business of entering into contracts for its own account with customers for a wide variety of products and services, including selling medical alert systems and related plans (the Contracts) and selling such Contracts for its own account to various purchasers, including but not limited to the Company;" "Seller shall use its best efforts to originate contracts for its own account and to offer to sell Contracts for the Products to the Company and to others on a non-exclusive basis at prices and terms to be mutually agreed upon from time to time."). Indeed, the outside sellers explicitly warranted and covenanted that they would not sell customer accounts that originated through violative telemarketing practices.
[58] JSAF 5

campaigns of its authorized dealers, much less the specific marketing campaigns that targeted Plaintiffs in this case. In fact, it would be unreasonable to hold that UTCFSA controlled how its authorized dealers sold their products, given that the authorized dealers could and did sell security products from other brands and manufacturers.)

*Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 937-939 (7th Cir. 2016) is instructive. In that case, a hearing aid company authorized a telemarketer to send 100 faxed advertisements within a 20 mile radius of Terre Haute, Indiana. The telemarketer sent almost 5,000 faxed advertisements across Indiana, Illinois, and Ohio. The Seventh Circuit determined that defendant was not liable for faxes sent outside the 20-mile radius because the marketing company was not acting as the owner's agent in sending the out-of-state faxes as there was no express actual authority, no implied actual authority, and no apparent authority to send the faxes outside the 20-mile radius.

As set forth in the Vandewater and Baker declarations and as described through testimony during the preliminary injunction hearing, Lifewatch implemented a quality control program, wherein, *inter alia*, Lifewatch randomly selected between 25 and 40 customer accounts purchased by Lifewatch from outside sellers during the preceding week and then directed the outside sellers to provide audiotapes of calls associated with the randomly selected customer accounts. Lifewatch then listened to the audiotapes to determine if they were non-compliant with Lifewatch's guidelines. Lifewatch terminated outside sellers for failing to comply.[59] Consistent with *Bridgeview Health Care Ctr., Ltd.,* to the extent any of Lifewatch's dozens of outside sellers exceeded the scope of their limited authority, they were not acting as agents.

Here, plaintiffs have conflated all of the outside sellers and made the unsupported, broad-brush allegation that "Lifewatch's telemarketers acted on Lifewatch's behalf." Even if,

---

[59] JSAF 13

*arguendo*, evidence shows WWIS was an agent, there is insufficient evidence to support a finding as a matter of law that Lifewatch had a principal/agent relationship with each of the hundreds of outside sellers from which it purchased customer accounts, especially in view of the outside seller affidavits, which indicate that defendant does not review, approve, dictate, draft, or control telemarketing scripts.[60]

## B. Section 310.3

Plaintiffs argue that defendants violated three specific provisions of Section 310.3 (16 C.F.R. §§ 310.3(a)(2)(iv), (a)(2)(vii), and (a)(4)). Again, while plaintiffs acknowledge there were a multitude of outside sellers, plaintiffs are improperly conflating all of the outside sellers in an effort to inaccurately portray the conduct at issue as homogeneous and unvarying from 2012 to 2016. Evidence of a TSR violation by WWIS in 2012 is not evidence of, by way of example, a TSR violation by InService America in 2014 or Live Stress Free in 2015 (who originated customer accounts and from whom Lifewatch obtained customer accounts). And, indeed, annexed affidavits from entities such as, among many others, InService America and Live Stress Free refute plaintiffs' broad-brush allegations about pervasive TSR violations.

### Material Aspects of the Refund, Cancellation, Exchange or Repurchase Policies

Plaintiffs appear to be arguing that defendants violated 16 C.F.R. § 310.3(a)(2)(iv) (prohibition against misrepresenting any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies) because consumers were told they "could cancel at any time without further financial obligation." (R. Doc. 243, p. 21). But, as set forth in response to the statement of facts, the evidence shows that many outside sellers did not make any representations pertaining to shipping, or they explicitly said that equipment needed to be

---

[60] Exhibit E.

returned.[61]  Record evidence also shows: 1) Lifewatch sent out a costly medical alert device to each customer and only charged the customer for monthly monitoring (i.e. the device itself was free to the consumer); 2) Lifewatch often cancelled accounts upon request and refunded customers who had not returned the equipment without charging for the equipment; and 3) Lifewatch often sent shipping labels to customers (upon request) so they would not have to pay for return shipping.[62]

The language of the TSR is clear that it only prohibits a seller or telemarketer from misrepresenting "any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies."  16 CFR § 310.3(2)(iv).  The statute imposes no affirmative obligation on the part of a seller to inform a consumer regarding which party will pay for return shipping.  Indeed, the FTC's own website gives examples of violations of this section: "For example, the TSR prohibits you from claiming that 'our policy is to make our customers happy — if at any time you're not absolutely delighted, just send the merchandise back,' if there are time limits, restocking charges, or other important restrictions on the return of the goods."[63] These examples involve only affirmative misrepresentations and false statements regarding time limits or charges associated with a refund.   Relying on the text of the statute, courts have found violations of the TSR when telemarketers made misleading affirmative statements concerning their refund policies.  *See e.g.*, *FTC v. Ivy Capital, Inc.*, 2013 U.S. Dist. LEXIS 42369, 2013 at * 15 (D. NV. March 26, 2013) (finding a violation of the TSR where telemarketers told consumers that they could get a refund if the applied within three days of purchase but then threatened and intimidated consumers or redirected them to a disconnected number until the three-day return window passed);  *FTC v. Arlington Press, Inc.*, 1999 U.S. Dist. LEXIS 2055, *11-12 (C.D. Cal.

---

[61] Opposition to Statement of Facts, 21
[62] JSAF 6, 7, 17
[63] https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule

Jan 21, 1999) (finding a violation of the TSR where telemarketers told callers they could get a refund at any time when, in reality, refunds were only available after 90 days when several conditions were met). Again, in the case at bar, evidence shows that outside sellers were silent regarding the return policy and made no representations that Lifewatch would pay for shipping on returns. Neither the text of the statute nor the examples provided by the FTC prohibit silence with regard to who bears the cost of returning the items in order to get the refund. Nor can plaintiffs identify any cases in which a court has held a company liable for simply remaining silent regarding who would bear the cost of return shipping in order to obtain a refund.

### <u>Affiliation, Endorsements, Sponsorships and False or Misleading Statements</u>

Plaintiffs allege defendants violated Section 2.VII of the Telemarketing Sales Rule by misrepresenting that their product was "endorsed by" various organizations. The language of the TSR is clear that it only prohibits a seller or telemarketer from misrepresenting "a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity…" The terms "affiliation," "endorsement," and "sponsorship" are not defined by the statute. However, a company seeking clarification on how to comply with the TSR could go to the FTC's website[64] which gives examples of violations of this section: "For example, you cannot falsely claim that you're a member of the Better Business Bureau or the local chamber of commerce, or that you're affiliated with the local police or some national charity. Neither can you create the impression in a consumer's mind that the postal permit number displayed on a mail solicitation is a sign that the U.S. Postal Service has approved a promotion. In addition, sellers and telemarketers cannot falsely claim or create the impression in a consumer's mind that they are related to or affiliated with a company with which the consumer usually does business."

---

[64] https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#affiliations

Based on the plain meaning of "endorsement" affiliation" and "sponsorship" as well as the examples provided by the FTC themselves, the representations made by many of defendant's sellers are not prohibited by the TSR.

Scripts used by many outside sellers provided: "our device is trusted by hospitals and health care professionals" or "recommended by hospitals and health care professionals."[65] Nowhere in those scripts do the outside sellers represent they are affiliated with, or that the products or services are endorsed or sponsored by the government or any organization. Nor did the outside sellers who used these scripts represent that they were members of any organization or government entity, or that they were affiliated with any company with which the consumer did business. Some of the scripts that were used by certain outside sellers did not identify any specific organization at all, but rather referred generally to "hospitals and healthcare professionals" that trusted the device. An endorsement, affiliation, or sponsorship necessarily requires an endorsing or sponsoring entity, which is not present in many of the scripts used by the outside sellers. *See FTC v. Wash. Data Res.*, 2012 U.S. Dist. LEXIS 56233 at *68 (M.D. Fl. Apr. 23, 2012) (dismissing claims under Section 2.VII of the TSR and finding that a postcard advertising a "government bailout program" did not constitute a misrepresentation of affiliation.). The FTC seeks to broaden the scope of the statute beyond the plain meaning of its terms (as clarified by its own website) to try to encompass the representations in this case.

As set forth in detail above, even if, arguendo, an alleged misrepresentation was uttered to a particular subset of customers obtained by a particular outside seller at a particular time, it does not follow that -- as the plaintiffs want the court to believe -- an alleged misrepresentation was uttered by all outside sellers throughout a five year period.

---

[65] JSAF 9

## C.  Alleged Violations of the TSR – Section 310.4 (a)(8)

16 C.F.R. § 310.4(a)(8) provides that the following is violative of the TSR: "failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call; provided that it shall not be a violation to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller or charitable organization on behalf of which a telemarketing call is placed, and the seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours."  The record evidence does not support plaintiffs' argument that all of defendants' telemarketers "spoofed" numbers.  And, indeed annexed affidavits indicate that there was no call spoofing by many of the outside sellers.  Further, plaintiffs rely on declarations by some individuals who received calls from "local numbers" as evidence that the "local numbers" were necessarily "spoofed."  But, caller identification information is not necessarily "spoofed" simply by virtue of the caller identification displaying a local number.   As set forth in the opposition to the statement of facts, plaintiffs rely on statements that are contradicted by other evidence and on affidavits that -- contrary to plaintiffs' assertions -- do not even pertain to the spoofing issue.[66]  Finally, plaintiffs fail to show -- as they must -- that defendants did not *transmit* the caller ID information.  See *Worsham v. Travel Options, Inc.*, 2016 U.S. Dist. LEXIS 118774, *23-24 (D. Md. 2016) (holding that that allegations of spoofing failed and explaining difference between transmitting information and information being captured by caller identification).

---

[66] See, e.g. PX95

### D. Alleged Violations of 310.4(b)

Plaintiffs argue that defendants caused their telemarketers to initiate outbound calls to: individuals on the DNC, individuals who previously stated they wished not to receive outbound calls from defendants, and individuals who did not provide express agreement. Plaintiffs have not, however, come forward with evidence sufficient to prevail on summary judgment.

Despite the FTC's broad investigatory power, its access to the Do Not Call Registry (which requires a $17,000 payment and is accessible only to approved, registered users), and seizure of documents and equipment associated with WWIS' operations, plaintiffs have not produced competent evidence that specific numbers on the Do Not Call Registry were called. Hearsay and unsworn statements from individuals claiming to be on the Do Not Call Registry (but who have not even provided phone numbers) is insufficient to find violations. In *United States v. Dish Network LLC,* 256 F. Supp. 3d 810 (C.D. Ill. 2017), which plaintiffs cite extensively, plaintiffs actually came forward with evidence comparing and cross-referencing numbers on the Do Not Call Registry with numbers that were undisputedly called by defendants or their vendors. Plaintiffs have not done that here. Instead, they have come forward with declarations of individuals who claimed to be on the Do Not Call Registry. But, those declarations fail to include -- as they must -- specific averments that the individuals a) had no prior business relationship with the seller or telemarketer and b) had not requested information from the seller or telemarketer. This is a fatal flaw. The TSR does not make calls to numbers on the National Do Not Call Registry a *per se* violation. Rather, such calls only violate the rule if they are made without the express written consent of the person or an established business relationship with the person. *FTC v. All Us Mktg. LLC*, 2017 U.S. Dist. LEXIS 77291, *31-32 (M.D. Fl. 2017). Here, plaintiff's declarations are silent as to express written consent or

established business relationship notwithstanding the following evidence: 1) outside seller affidavits indicating DNC compliance;[67] 2) documents and testimony indicating calls were placed to individuals who provided information to leads brokers;[68] and 3) signed purchase agreements explicitly indicating DNC compliance. See *FTC v. Vacation Prop. Servs.*, 2012 U.S. Dist. LEXIS 70213 (M.D. Fla. 2012) (Noting that evidence of TSR violations included consumers specifically averring they had no prior relationship with defendant and had not requested information from defendant).[69] Indeed, WWIS subcontractor Joseph Settecase indicated that he got caller lists from, Roderic Boling and they "all appeared to have been purchased from lead brokers."[70]

Plaintiffs' argument that defendants violated 310.4 (b)(1)(iii)(A) hinges upon a mischaracterizations of the evidence. Specifically, plaintiffs incorrectly assert that defendants "acknowledged" their internal DNC list "only included customers who complained to defendants, not their telemarketers." (Dkt 243, p. 23). But, in fact, Lifewatch's Sarai Baker explicitly testified: "Lifewatch does circulate the internal Do Not Call List, *compiled in part by information from the outside sellers,* and will immediately terminate any seller if it is determined that they called someone on the DNC list."[71]

### E. Alleged Violations of 310.3(b), Alleged Assistance and Facilitation of TSR violations

In support of this allegation, plaintiffs point to a single 2012 "Telemarketing Services Agreement" and argue "this is more than enough to establish…assistance and support." (R. Doc. 243, p. 26, fn 28). But, as plaintiffs acknowledge, Lifewatch entered into hundreds of "Purchase

---

[67] Exhibit E
[68] JSAF 2
[69] 310.4(b)(1)(iii)(B) was revised in June 2016, i.e., after Lifewatch's relationship with WWIS and after the court entered a preliminary injunction against Lifewatch. There is no basis to apply this provision retroactively. This revised provision pertains to which party has the burden to demonstrate an existing business relationship.
[70] Dkt. 24-11, paragraphs 4 and 7.
[71] Dkt. 296-5, p. 86, Exhibit G, Baker Declaration; See also, Dkt. 22-2, p. 105 ("all call centers need to maintain an internal do not call list…all new internal do not call numbers need to be uploaded to Lifewatch weekly").

Agreements" with hundreds of different outside sellers well after the 2012 "Telemarketing

Services Agreement." Plaintiffs also argue that defendants provided scripts, provided access to

the CRM, provided verification support, and advanced money. However, a careful review of

plaintiff's script evidence at PSMF 59 reveals that it pertains to WWIS and those scripts were not

"misleading." Plaintiff's CRM evidence pertains only to WWIS and inaccurately fails to draw a

distinction between defendant's CRM and a separate outside portal that was used to populate the

CRM.[72] And, plaintiffs' evidence regarding advanced money support is disputed and, again,

only appears to pertain to two out of the hundreds of outside sellers.

### 3. Permanent Injunctive Relief

The imposition of a permanent injunction is an extraordinary remedy. *Peterson v. Vill. of*

*Downers Grove*, 2016 U.S. Dist. LEXIS 13867 at * 9 (N.D. Ill. Feb 4, 2016) ("It should be

emphasized, however, that injunctive relief is an 'extraordinary remedy,' whether the injunction

is permanent or temporary") ((citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139

(2010)). Courts have been reluctant to impose permanent injunctions even in FTCA and TCPA

cases, where permanent injunctions are authorized by statute. *See, e.g., Lary v. Trinity Physician*

*Fin. & Ins. Servs.*, 780 F.3d 1101 (11th Cir. 2015) (upholding denial of permanent injunction in

TCPA case because plaintiff had not demonstrated likelihood of future harm or inadequate

remedy at law). Even where the Court grants injunctive relief, the prohibitions on the

defendant's activities must be reasonable. *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp.

2d 1006, 1012 (C.D. Cal. 2012) ("Fencing-in provisions must bear a reasonable relation to the

unlawful practices found to exist.") (internal quotations omitted). Permanently banning

defendants' from legally participating in the industry is overbroad and inappropriate under the

circumstances. *See FTC v. Voc. Guides, Inc.,* 2006 U.S. Dist. LEXIS 82308 at * (M.D. TN.

---

[72] Dkt. 296-5, p. 81, (Baker testimony regarding CRM).

2006) (declining to modify a permanent injunction to include a lifetime ban on telemarketing as overbroad); *United States v. Articles of Drug*, 1986 U.S. Dist. LEXIS 27300 at * 34 (D. NE. 1986). (holding that an order banning defendant from marketing any drug product without prior consent of the FDA was overbroad).

Moreover, a plain review of plaintiffs' brief reveals that it has inadequately addressed the requirements of a permanent injunction -- irreparable injury, inadequacy of remedies at law, a balance of the hardships weighing in plaintiff's favor and the granting of an injunction will not harm the public interest. See *FTC v. Oks*, U.S. Dist. LEXIS 82170, at *17-18 (N.D. Ill. Nov. 2, 2007) (denying the FTC's motion for a permanent injunction for failure to adequately address these factors).

### 4. Equitable Monetary Relief

Plaintiffs' damages theory is fatally flawed in a number of respects. It has been held that the FTC must show that, as an initial matter, its equitable monetary relief calculations reasonably approximate net losses, and then the burden shifts to the defendants to show that those figures were inaccurate. *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997). But, as set forth in *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69-70, before the burden shifts there must be a degree of precision to the calculation, and the FTC's broad and widespread investigatory power gives it the capacity to estimate with the requisite degree of precision. The FTC's calculations here are not sufficient for the burden to shift. And, in the event the court finds that the burden does shift, defendants contend that the calculations are demonstrably inaccurate.

### Distinction Between Outside Sellers and Marketing Methods

Plaintiffs seek revenue forfeiture for 2012 through 2016 in connection with all customers originated by all outside sellers. But, because the FTC's damages calculation includes time

periods, sellers, and customers for which it cannot provide evidence of wrongdoing, it has not provided a reasonable approximation of consumers' net loss or defendant's allegedly unjust gains. It is axiomatic that damages must be directly connected to the defendant's wrongdoing. *See MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1164-1165 (7th Cir. 1983) (reversing damages award where there was insufficient evidence to determine whether lost profits were a result of lawful or unlawful conduct); *Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) ("Whatever latitude is afforded…as to proof of damages, however, is limited by the requirement that the damages awarded must be traced to…unlawful acts."). As there are glaring gaps in plaintiffs' proofs with respect to wrongdoing by particular outside sellers during certain time periods, plaintiffs cannot obtain wholesale revenue forfeiture for 5 years.

The FTC's inability to reconcile its damages estimate with the scripts and transcripts it has actually provided is fatal to its motion for summary judgment on damages. *See FTC v. Oks*, 2007 U.S. Dist. LEXIS 82170, *17 (N.D. Ill. Nov. 2, 2007) (denying summary judgment for the FTC on damages because the FTC failed to specify what amount of damages it sought for what precise time periods and failed to "specify precisely how that amount is calculated with proper evidentiary support for that specific time period."). *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69-70 (2d Cir. 2006) (remanding for further explanation of damages calculations because the district court never explained its basis for concluding that the overall sum collected through the billing system reasonably approximated the amount of unjustly obtained funds by failing to account for the fact that consumers were granted refunds during specific periods of defendant's alleged wrongdoing and because "the district court required no precision in the FTC's approximation even though precision could be had."); *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d

283, 325-326 (S.D.N.Y. 2008) (denying summary judgment on damages where the FTC did not provide evidence as to when specific companies began telemarketing for defendants, and thus could not provide a reasonable approximation of damages linked to different time periods of the defendant's wrongdoing).

**Traceability**

Equitable restitution is available only where plaintiff seeks the return of specific and identifiable money from particular funds within a defendant's possession, rather than from the defendant's assets generally. *Great-West Life and Annuity Ins. Co. v Knudson*, 534 U.S. 204, 214-15 (2002); *Sereboff v. Mid Atl. Med. Servs.,* 547 U.S. 356 (2006). In order for equitable restitution to be awarded properly by a court, the FTC must "establish[] that the funds [it] seek[s] are traceable and readily identifiable." *Alexander v Bosch Automotive Sys., Inc.*, 232 Fed. Appx. 491, 501 (6th Cir. 2007). Tracing is the process whereby a plaintiff follows particular money or property from his hands into the defendant's, and then specifically identifies it within the defendant's current possession. It is a necessary prerequisite before equitable restitution may be ordered because such relief restores the actual misappropriated money or property to its original owner. Unless a plaintiff is able to trace his specific assets or property into the defendant's current possession, equitable restitution may not be ordered. *Sonnenschein v. Reliance Ins. Co*., 353 F.2d 935, 936-38 (2d Cir. 1965). In *Sonnenschein*, plaintiff insurance companies sought to reclaim trust funds consisting of insurance premiums collected by an insurance agent and transferred to defendant debtors as security for loans and advances from the defendants' general assets. The subject trust funds were paid to the defendants prior to the litigation, commingled with other funds in their general account, and subsequently dissipated. The district court awarded the plaintiffs an equitable lien—another type of equitable restitution that requires

31

tracing—concluding that the plaintiffs had to show only that the trust funds "at some time passed into the hands of [the defendant]." The sole issue raised on appeal was whether the plaintiffs met their burden of tracing the insurance premiums at issue into the defendants' present assets, which would allow the equitable lien to be enforced. The Second Circuit held that the plaintiffs had not, and reversed the district court's award of equitable relief. In its analysis, the court discussed the "well established rule" that, in order for a plaintiff to satisfy its "tracing" burden, "[i]t is not enough… to show merely that the funds or property came into the [defendants'] hands." Rather, the plaintiff "must assume the burden of tracing the… property, and where it is alleged that such property has been converted into other property in the hands of the [defendants], the [plaintiff] has the burden of tracing the… property therein." The court refused to presume that the trust funds at issue still existed within the defendants' possession and held that, because the plaintiffs failed to trace the specific trust funds into the defendants' present assets, equitable relief could not be awarded. Id. at 937-938. In other words, unless a plaintiff can trace specific funds into the defendant's current possession, regardless of whether those funds flowed through the defendants' general account at some time in the past, equitable relief simply is unavailable.

This principle has been extended beyond the context of trusts and equitable liens. *See Luis v. United States*, 136 S. Ct. 1083, 1095 (2016) ("Courts use tracing rules in cases involving fraud, pension rights, bankruptcy, trusts, etc."). Courts apply this traceability requirement to limit restitution awards in FTCA cases to funds that could be specifically identified as properly belonging to consumers rather than to the defendant. In *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 66-67, 2006 U.S. App. LEXIS 8184, *47-48 (2d Cir. 2006) the court held that the proper award of damages under Section 13(b) of the FTCA is equitable restitution. Such an award allowed the FTC to recover only money or property in the defendant's possession that could "clearly be

traced" to money or property "identified as belonging in good conscience to the plaintiff." *Id.,* quoting *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002). *See also*, *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010) (holding that the district court properly imposed a constructive trust upon the fees that the owner paid to an attorney because the FTC presented substantial evidence that traced the custodial account funds to defendants' statutory violations); *FTC v. Netran Dev. Corp.,* 2006 U.S. Dist. LEXIS 98308, *15-16 (S.D. Fl. Jul. 7, 2006) (denying an asset freeze injunction on individual plaintiff's personal assets because there must be a nexus between those assets and the illegal gains akin to a tracing of assets," and the court found no such nexus); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 523 (S.D.N.Y. 2000) (declining to include funds from individual defendant's personal bank account being held in receivership in a restitution award for FCTA violations because the FTC had not traced any funds generated from the illegal scheme into this account).

In the case at bar, plaintiffs cannot fulfill this traceability requirement.

## Refunds already Provided to Consumers

As set forth in the annexed Flaherty reports[73], Lifewatch sustained nearly ten million dollars in losses, refunded approximately three million dollars to customers, and effectively "gave away" to customers medical alert equipment with a retail value totaling approximately fourteen million dollars.

It is well settled that the FTC's restitution calculation must include refunds provided by defendants to consumers. *See FTC v. Inc21.com Corp.,* 475 Fed. Appx. 106, 110 (9th Cir. 2012) ("The district court properly calculated the amount of restitution . . . by starting with the defendants' gross collections through local exchange carrier (LEC) billing, subtracting refunds paid by LECs and billing aggregators and subtracting payments by [] customers who actually

---

[73] Dkt. 296-12; Exhibit C; Exhibit K, p. 28.

purchased the defendants' services.") *FTC v. Home Assure, LLC*, 2009 U.S. Dist. LEXIS 32055, *10 (M.D. Fl. Apr. 16, 2009) ("the proper amount of restitution has been held to be the purchase price of the relevant product or business opportunity, less any refunds.") (quoting *FTC v. Nat'l Urological Group*, 2008 U.S. Dist. LEXIS 44145 (N.D. Ga. June 4, 2008); *FTC v. Bronson Partners, LLC*, 2006 U.S. Dist. LEXIS 3315, *5 (D.Conn. Jan 25, 2006) ("[A]ny monetary award may reflect benefits received by consumers and should be reduced by any refunds.").  A failure to properly reduce the restitution award by the amount refunded to consumers renders the FTC's damages calculation unreasonable and accepting such a calculation is reversible error. *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006) (remanding for a recalculation of damages where the district court failed to account for refunds granted to consumers by the defendant, and as a result the district court overestimated the unjust payments ultimately received by defendants); *FTC v. Zamani*, 2011 U.S. Dist. LEXIS 60913, *38 (C.D. Cal. June 6, 2011) ("[I]t is error to simply conclude that the total amount paid by consumers constitutes the defendant's unjust enrichment without accounting for refunds and actual services rendered." (internal quotation marks omitted).

Finally, plaintiffs seized assets and collected moneys from the WWIS defendants.[74] Insofar as amounts of the assets and moneys were used for consumer redress those amounts must offset any restitution damages awarded here.  See *United States v. McDaniel,* 398 F.3d 540, 555 (6th Cir. 2005) ("The restitution statutes do not permit victims to obtain multiple recoveries for the same loss.")

## Sales to Third Parties and Third Party Costs

The appropriate measure of restitution is the monies that flowed from the consumer to the defendant.  See *FTC v. Bronson Partners*, LLC, 654 F.3d 359, 369 (2d. Cir. 2011) ("[T]he

---

[74] FTC v WWIS, et al. United States District Court, Middle District of Florida (14-cv-008-CEM-DAB)

district court must take account of systematic divergences between the defendant's gain and the losses of the victims in calculating the remedial baseline . . ."); *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008) (concluding that the district court abused its discretion in awarding the full amount of customer losses and reiterating that the proper measurement is the amount that defendants wrongfully gained by their misrepresentations). Indeed, courts have clarified that where some of the consumer losses are diverted to a third party, restitution only includes monies that actually flowed from the consumer to the defendant itself. *FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. Sept. 8, 2006); *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68 (2d Cir. 2005). At issue on appeal in *Verity* was the correct measure of damages where the defendants only profited from their scheme after several middlemen, the phone companies, took their cuts for processing calls. 443 F.3d 48, 68. The Second Circuit found that the district court erred in including all of the money paid by consumers as a result of the scheme when the correct measure of restitution was only the money that actually flowed to the defendants. *Id.*

Similarly, here, defendants generated revenue by selling customer accounts to third party entities including Connect America, VRI, and Philips Lifeline.[75] Indeed, as plaintiffs assert, at least 43,501 customer accounts were sold by Lifewatch to third parties. For instance, at PX 94, Kenneth Gross of Connect America has indicated that $14,323,181 was paid to Lifewatch. In those instances, customers paid the third party entities, not Lifewatch, and that money never accrued to Lifewatch.[76] Accordingly, the amounts paid by the third party entities must be deducted from the revenue that is subject to forfeiture in connection with a restitution order.

---

[75] JSAF 20
[76] Exhibit K, Flaherty Deposition Transcript at p. 29.

Additionally, as in *Verity*, defendants only profited after several entities (e.g. monitoring companies) "took a cut." This "initial outlay" is set forth in the annexed Flaherty reports. Accordingly, these amounts must also be deducted.

**Services Rendered**

In *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1019 (C.D. Cal. 2012) the court explained that refunds and actual services rendered must be accounted for and subtracted in calculating damages. Similarly, in *FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) (Report and Recommendation adopted in full by *FTC v. Wilcox*, 9 Fla. L. Weekly Fed. D 791 (U.S. S.D. Fla. 1995)), the court explained that the appropriate measure of restitutionary damages was the amount consumers actually paid minus the costs of goods forwarded to consumers [or services rendered]. And, the court indicated that the FTC had the burden to parse out which portion of revenue reported on a tax return is attributable to violative conduct and to exclude amounts not attributable to violative conduct. *Id*. at *36-38.

It is undisputed that Lifewatch's customers had and have immediate access to emergency services upon receipt of the equipment. Lifewatch pays to ship this costly equipment -- which is ready to use upon arrival because Lifewatch has already paid a monitoring company before sending out the equipment -- at no cost to the customers to ensure their immediate access to Lifewatch's services. Mr. Sirlin testified about this sizeable, upfront customer "outlay" at the preliminary injunction hearing.[77] And, as set forth by expert Kevin Flaherty, there are no economic damages to consumers if consumers received monitoring services for the same number of months that they paid Lifewatch's service fees and enjoyed the benefit of free equipment shipped to them at no cost.[78] Other courts have significantly reduced damages when consumers

---

[77] (Dkt. 296-5, p. 148).
[78] Exhibit C.

36

are conferred even a minimal benefit from their dealings with a defendant.   Indeed, in *FTC v. Wetherill*, 1993 WL 563621 (C.D. Cal. May 14, 1993) and 1993 WL 264557 (C.D. Cal. June 10, 1993) defendants sold products such as cosmetics, perfume and cheap jewelry. 1993 WL 264557 at \*5. It was determined by default that such items were sold by false representations concerning prizes that would be awarded to purchasers. *Id*. at \*1-2. The FTC contended the appropriate remedy was the total amount of money sent by consumers to the defendants, $58,662,621. *Id*. at \*5. Even though "products received by the consumers have virtually no market value," the court awarded only a very small fraction of the relief sought by the Commission, namely the amount of the unjust enrichment, (which totaled about $3.7 million between the two opinions) because "the consumers did have use of the products and the present market value of the products in question cannot be measured." Id. at \*5-6.  *See also SEC v. McNamee*, 481 F.3d 451, 457-458 (7th Cir. 2007) (holding that the district court's grant of monetary relief for violation of § 5 of the Securities Act of 1933 was inappropriate because it required defendant to disgorge 100% of the proceeds of the stock sales despite the fact that not a single investor decided to return the stock for a refund of the purchase price); *FTC v. Solomon Trading Co., Inc*., 1994 WL 421478 at \*6 (D. Ariz. June 28, 1994) (value of artwork should be deducted from damages award against owner who falsely represented value of the art when selling it to consumers*); FTC v. Security Rare Coin & Bullion Corp*., 931 F.2d 1312, 1316 (8th Cir. 1991) (ordering monetary penalties in the amount of the "the difference between the amount paid for the property and its current market value" in a case involving deceptive marketing of rare coins);   *FTC v. Magui Publishers, Inc*., 1991 WL 90895 at \*12 (C.D. Cal. Mar. 28, 1991) (deducting from damages award the defendants' costs of producing falsely advertised Dali etchings and lithographs), aff'd, 9 F.3d 1551 (9th Cir. 1993).

**Insufficient Evidence of Violations in 2015 and 2016**

Plaintiffs argue that violations occurred up until August 2016. But, plaintiffs are apparently relying on PX 91, PX 95, and 96, which are disputed and refuted by, inter alia, the seller affidavits.[79] And, plaintiffs are apparently relying on PSMF 39, which include emails that show Lifewatch's quality control program was vigilant and working to deter violations by outside sellers.[80] In any event, a few emails (in 2015 and 2016) in which Lifewatch addresses customer complaints directly with the outside sellers is insufficient for plaintiffs to meet their burden to demonstrate TSR violations and wide dissemination of actionable (and relied upon) misrepresentations in 2015 and 2016, particularly in view of the evidence that outside sellers were immediately terminated if they deviated from Lifewatch's guidelines.

**Inability to Pay Must be Considered**

Plaintiffs seek equitable monetary relief under Section 13(b) of the FTC Act. A plain review of Section 13(b) indicates that the statute does not preclude consideration of a defendant's ability to pay in awarding an equitable remedy. And, unless a statute provides otherwise, restitution -- being an equitable remedy -- includes consideration of a defendant's ability to pay. *United States v. Rostoff,* 164 F.3d 63 (1st Cir. 1999); See *United States v. Peden*, 872 F.2d 1303 (7th Cir. 1989) (The district court was found to have abused its discretion in imposing the stated amount of restitution in that it did not take into consideration the defendant's ability to pay). Moreover, defendant's ability to pay is a required factor under 15 U.S.C. § 45(m)(1)(C), which defendants acknowledge is not cited by plaintiffs in their summary judgment brief. See *United States v. Dish Network LLC,* 256 F. Supp. 3d 810 (C.D. Ill. 2017) ("The court must consider defendant's ability to pay and its ability to continue operating when determining an appropriate

---

[79] Exhibit E.
[80] JSAF 13

civil penalty under § 5 of the Federal Trade Commission Act.").  And, the FTC unquestionably considers a defendant's ability to pay restitution when entering into settlements.  See, e.g. *FTC v. Freecom Communs., Inc.,* 401 F.3d 1192, 1198 (10th Cir. 2005).

Insofar as plaintiffs are proceeding under a disgorgement theory,[81] courts have also held that ability to pay is a relevant factor in determining whether to impose an order of disgorgement.  See, e.g. *SEC v. Huffman*, 996 F.2d 800 (5th Cir. 1993); *SEC v. McGinn*, 2010 U.S. Dist. LEXIS 147486 (N.D.N.Y. Dec. 15, 2010); *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) (finding that the ability to pay is one factor in imposing disgorgement) *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 218(D. Mass. 2009) (acknowledging that ability to pay may be a relevant factor in determining the amount of disgorgement under Section 13(a) of the FTCA).   Furthermore, when a relevant factor that should have been given significant weight is not considered it is an abuse of discretion.  *See, e.g. Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005).  Here, defendants have come forward with evidence indicating they have an inability to pay the amounts requested.[82]

## 5. Safe Harbor Affirmative Defense

Plaintiffs acknowledge that the TSR exempts sellers for DNC violations if, as a routine business practice, they have (1) established and implemented written procedures to comply with the DNC rules; (2) trained their personnel in those procedures; and (3) maintained an internal DNC list.  Notwithstanding defendants' evidence, plaintiffs have mischaracterized defendants'

---

[81] "A disappointed consumer who … sought a refund because the defendants' advertising had been misleading would not be making a claim of title or right to possession of particular funds, but rather would be pursuing a legal remedy for damages flowing from misleading representations. The funds given in payment for the product would have long since been commingled with other funds in the defendants' hands, and the consumer would be equivalent to a general creditor owed money damages for a wrong…The consumer would, in other words, be entitled to legal restitution, not equitable restitution. The doctrine of equitable restitution does not, therefore, fit the nature of the monetary remedy the FTC seeks. Disgorgement, on the other hand, does." *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 218 (D. Mass. 2009)
[82] Exhibits B, J, K.

safe harbor affirmative defense as meritless. (Dkt 243, p. 38). But, the purchase agreements and seller affidavits are evidence of written compliance procedures. Indeed, in their Statement of Facts, (PSMF 41, FTC-LW09-1236), plaintiffs acknowledge the detailed written compliance procedures. Further, Lifewatch maintained and distributed an internal DNC list and provided training.[83] As such, there are fact issues precluding summary judgment as to this affirmative defense.

## CONCLUSION

For the reasons set forth herein, plaintiffs' motion for summary judgment must be denied.


**THE SULTZER LAW GROUP, P.C.**

By: _____ /s/ Joseph Lipari
Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
85 Civic Center Plaza, Suite 104
Poughkeepsie, New York 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com

*Counsel for Defendant Lifewatch Inc.*

---

[83] JSAF 13 and 14

40