## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS, | ) ) ) ) ) | Case No. 15cv5781 |
| Plaintiffs, | ) ) ) | Judge Gary Feinerman |
| v. | ) ) | |
| LIFEWATCH INC., a New York corporation, also d/b/a LIFEWATCH USA and MEDICAL ALARM SYSTEMS, | ) ) ) ) | |
| SAFE HOME SECURITY, INC., a Connecticut corporation, | ) ) ) | |
| MEDGUARD ALERT, INC., a Connecticut corporation, | ) ) ) | |
| EVAN SIRLIN, individually and as an officer or manager of Lifewatch Inc., | ) ) ) | |
| MITCHEL MAY, individually and as an officer or manager of Lifewatch Inc., and | ) ) ) | |
| DAVID ROMAN, individually and as an officer or manager of Lifewatch Inc., Safe Home Security, Inc., and MedGuard Alert, Inc. | ) ) ) ) | |
| Defendants. | ) ) | |

## EVAN SIRLIN'S
## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………………I-II

TABLE OF AUTHORITIES……………………………………………..…………III-IX

PRELIMINARY STATEMENT………………………………………………….1

LEGAL ARGUMENTS…………………………………………………………...1

Lifewatch………………………………………………………………………1

Evan Sirlin………………………………………………………………………4

LEGAL ARGUMENTS……………………………………………………….5

    1.  Individual Liability as to Sirlin……………………………………………5

    2.  Joint and Several Liability as to Sirlin……………………………………6

    3.  Permanent Injunctive Relief………………………………………………8

    4.  Alleged Deceptive Acts or Practices……………………………………...9

        A.  Plaintiffs' Conflation of the Outside Sellers………………………10

        B.  Materiality………………………………………………………11

        C.  Falsity……………………………………………………………...12

        D.  Dissemination and Reliance ……………………………………14

    5.  Alleged Violations of the TSR……………………………………...20

        A.  Section 310.3……………………………………………………20

Material Aspects of the Refund, Cancellation, Exchange or Repurchase Policies……..……….20

Affiliation, Endorsements, Sponsorships and False or Misleading Statements………………22

        B.  Alleged Violations of the TSR – Section 310.4 (a)(8)………………………24

        C.  Alleged Violations of 310.4(b)………………………………………25

        D.  Alleged Violations of 310.3(b), Alleged Assistance and Facilitation of TSR violations…………………………………………………………………26

I

6.  Equitable Monetary Relief……………………………………………………………27

Distinction Between Outside Sellers and Marketing Methods…………………………………27

Traceability………………………………………………………………………………………29

Refunds already Provided to Consumers…………………………………………………...29

Sales to Third Parties and Third Party Costs……………………………………………………31

Services Rendered………………………………………………………………………………32

Insufficient Evidence of Violations in 2015 and 2016…………………………………………..34

Distinction between PERS Customers…………………………………………………………...34

Inability to Pay Must be Considered……………………………………………………………35

CONCLUSION …………………………………………………………………………………36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameritas Variable Life Ins. Co. v. Roach*,
    411 F.3d 1328 (11th Cir. 2005) ....................................................................36

*Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*,
    2015 U.S. Dist. LEXIS 11560 (S.D. IN. Feb 2, 2015) ..........................19

*Burlington N. & Santa Fe Ry. v. United States*,
    556 U.S. 599, 129 S. Ct. 1870 (2009) .................................................7, 8

*CFTC v. Wilshire Inv. Mgmt. Corp.*,
    531 F.3d 1339 (11th Cir. 2008) ..............................................................31

*City of Gary v. Shafer*,
    2011 U.S. Dist. LEXIS 86710 (N.D. In. Aug. 5, 2011) ......................8

*Coastal Physician Servs., Inc. v. Ortiz*,
    764 So. 2d 7 (Fla. Dist. Ct. App. 1999) ............................................10

*Derby Indus. v. Chestnut Ridge Foam, Inc.*,
    202 F. Supp. 2d 818 (N.D. In. 2002) ................................................12

*DMJ Assocs., L.L.C. v. Capasso*,
    2015 U.S. Dist. LEXIS 177460 (E.D.N.Y. July 7, 2015) ......................7

*EEOC v. New Prime, Inc.*,
    2015 U.S. Dist. LEXIS 167496 ...........................................................19

*Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) .............................................................28

*FTC v. All Us Mktg. LLC*,
    2017 U.S. Dist. LEXIS 77291 (M.D. Fl. April 13, 2017) ....................25

*FTC v. Am. Standard Credit Sys., Inc.*,
    874 F. Supp. 1080 (C.D. Cal. 1994) ...................................................5

*FTC v. AMREP Corp.*,
    705 F. Supp. 119 (S.D.N.Y. 1988) .....................................................6

*FTC v. Amy Travel Serv.*,
    1988 U.S. Dist. LEXIS 13371 (N.D. Ill. Feb. 10, 1988) ......................1

*FTC v. Amy Travel Serv., Inc.*,
875 F.2d 564 (7th Cir. 1989) ..................................................................1, 5

*FTC v. Arlington Press, Inc.*,
1999 U.S. Dist. LEXIS 2055 (C.D. Cal. Jan 21, 1999) ........................21

*FTC v. Bronson Partners, LLC*,
2006 U.S. Dist. LEXIS 3315 (D.Conn. Jan 25, 2006) ..........................30

*FTC v. Bronson Partners*,
LLC, 654 F.3d 359 (2d. Cir. 2011) .......................................................31

*FTC v. Direct Mktg. Concepts, Inc.*,
569 F. Supp. 2d 285 (D. Mass. 2008) ...................................................11

*FTC v. Direct Mktg. Concepts, Inc.*,
648 F. Supp. 2d 202 (D. Mass. 2009) ..............................................35, 36

*FTC v. Equifin Int'l*,
1997 U.S. Dist. LEXIS 10288 (C.D. Cal. July 3, 1997) .......................15

*FTC v. Febre*,
128 F.3d 530 (7th Cir. 1997) ................................................................27

*FTC v. Five-Star Auto Club*,
97 F. Supp. 2d 502 (S.D.N.Y. 2000)......................................................29

*FTC v. Freecom Communs., Inc.*,
401 F.3d 1192 (10th Cir. 2005) ............................................................35

*FTC v. Gem Merch. Corp.*,
87 F.3d 466 (11th Cir. 1996) ..................................................................6

*FTC v. Glenn W. Turner*,
1983-1 ......................................................................................................5

*FTC v. Home Assure, LLC*,
2009 U.S. Dist. LEXIS 32055 (M.D. Fl. Apr. 16, 2009) ......................30

*FTC v. Inc21.com Corp.*,
475 Fed. Appx. 106 (9th Cir. 2012).......................................................30

*FTC v. Int'l Diamond Corp.*,
1983 U.S. Dist. LEXIS 11862 (N.D. Cal. Nov. 8, 1983).......................14

*FTC v. Ivy Capital, Inc.*,
2013 U.S. Dist. LEXIS 42369 (D. NV. March 26, 2013).......................21

IV

*FTC v. John Beck Amazing Profits, LLC*,
   888 F. Supp. 2d 1006 (C.D. Cal. 2012) ...................................................................9, 32

*FTC v. Johnson*,
   96 F. Supp. 3d 1110 (D. Nev. 2015) ............................................................................12

*FTC v. MacMillan, Inc.*,
   1983-2 ..........................................................................................................................5, 6

*FTC v. Magui Publishers, Inc.*,
   1991 WL 90895 (C.D. Cal. Mar. 28, 1991), aff'd, 9 F.3d 1551 (9th Cir. 1993) ....................34

*FTC v. Medical Billers Network, Inc.*,
   543 F. Supp. 2d 283 (S.D.N.Y. 2008)........................................................................5, 28

*FTC v. Nat'l Urological Group*,
   2008 U.S. Dist. LEXIS 44145 (N.D. Ga. June 4, 2008) ..............................................30

*FTC v. Netran Dev. Corp.*,
   2006 U.S. Dist. LEXIS 98308 (S.D. Fl. Jul. 7, 2006)..................................................29

*FTC v. Oks*,
   2007 U.S. Dist. LEXIS 82170 (N.D. Ill. Nov. 2, 2007).................................................28

*FTC v. Oks*,
   U.S. Dist. LEXIS 82170 (N.D. Ill. Nov. 2, 2007)..........................................................9

*FTC v. Publ'g Clearing House, Inc.*,
   104 F.3d 1168 (9th Cir. 1997) ......................................................................................5

*FTC v. Publrs. Bus. Servs.*
   No. 2:08-cv-00620-APG-GWF, 2017 U.S. Dist. LEXIS 14720 (D. Nev. Feb.
   1, 2017) ..................................................................................................................14, 15

*FTC v. QT, Inc.*,
   448 F. Supp. 2d 908 (N.D. Ill. Sept. 8, 2006) .............................................................31

*FTC v. Security Rare Coin & Bullion Corp.*,
   931 F.2d 1312 (8th Cir. 1991) .....................................................................................34

*FTC v. Seismic Entm't Prods.*,
   441 F. Supp. 2d 349 (D.N.H. 2006).............................................................................6

*FTC v. Solomon Trading Co., Inc.*,
   Civ. 91-1184-PXH-SMM, 1994 WL 421478 (D. Ariz. June 28, 1994) ................................33

*FTC v. Vacation Prop. Servs.*,
   2012 U.S. Dist. LEXIS 70213 (M.D. Fla. May 21, 2012)............................................26

*FTC v. Verity Int'l, Ltd.*,
    443 F.3d 48 ...........................................................................................27, 28, 30, 31, 32

*FTC v. Voc. Guides, Inc.*,
    2006 U.S. Dist. LEXIS 82308 (M.D. TN. Nov. 9, 2006) ..........................................9

*FTC v. Wash. Data Res.*,
    856 F. Supp. 2d 1247, 2012 U.S. Dist. LEXIS 56233 (M.D. Fl. Apr. 23, 2012) ...................23

*FTC v. Wetherill*,
    1993 WL 563621 (C.D. Cal. May 14, 1993) ..........................................................33

*FTC v. Wilcox*,
    9 Fla. L. Weekly Fed. D 791 (U.S. S.D. Fla. 1995).................................................32

*FTC v. Wilcox*,
    926 F. Supp. 1091 (S.D. Fla. 1995) .....................................................................32

*FTC v. World Travel Vacation Brokers, Inc.*,
    861 F.2d 1020 (7th Cir. 1988) ............................................................................14

*FTC v. Zamani*,
    2011 U.S. Dist. LEXIS 60913 (C.D. Cal. June 6, 2011) ..........................................31

*George & Co., LLC v. Imagination Entm't Ltd.*,
    575 F.3d 383 (4th Cir. 2009) ..............................................................................18

*Great-West Life and Annuity Ins. Co. v Knudson*,
    534 U.S. 204 (2002)..........................................................................................29

*In re J.B. Williams Co.*,
    68 F.T.C. 481 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967)....................................12

*KC Leisure, Inc. v. Haber*,
    972 So.2d 1069 (Fla. 5th DCA 2008) ..................................................................10

*Lary v. Trinity Physician Fin. & Ins. Servs.*,
    780 F.3d 1101 (11th Cir. 2015) ...........................................................................8

*Loeffel Steel Prods. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ...................................................................19

*Luis v. United States*,
    136 S. Ct. 1083 (2016).......................................................................................29

*Marr v. Bank of America, N.A.*,
    662 F.3d 963, 2011 U.S. App. LEXIS 24134, 2011 WL 6091806 (7th Cir.
    Dec. 6, 2011)....................................................................................................18

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) .................................................................28

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010).........................................................................................8

*North American Clearing, Inc. v. Brokerage Computer Systems, Inc.*,
   666 F.Supp.2d 1299 (M.D. Fla. 2009).....................................................10

*Novartis Corp. v. FTC*,
   223 F.3d 783, 343 U.S. App. D.C. 111 (D.C. Cir. 2000) .......................12

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*,
   714 F.3d 161 (4th Cir. 2013) .......................................................................7

*Peterson v. Vill. of Downers Grove*,
   2016 U.S. Dist. LEXIS 13867 (N.D. Ill. Feb 4, 2016) ...........................8

*Pfizer, Inc. v. Miles, Inc.*,
   868 F. Supp. 437 (D. Conn. 1994)............................................................12

*Runge v. Stanley Fastening Sys., L.P.*,
   2011 U.S. Dist. LEXIS 147924 .................................................................18

*SEC v. Downe*,
   969 F. Supp. 149 (S.D.N.Y. 1997) .............................................................7

*SEC v. Falbo*,
   14 F. Supp. 2d 508 (S.D.N.Y. 1998).........................................................7

*SEC v. Huffman*,
   996 F.2d 800 (5th Cir. 1993) ....................................................................35

*SEC v. McGinn*,
   No. 10-CV-457, 2010 U.S. Dist. LEXIS 147486 (N.D.N.Y. Dec. 15, 2010).........................35

*SEC v. McNamee*,
   481 F.3d 451 (7th Cir. 2007) ....................................................................33

*SEC v. Opulentica*,
   479 F. Supp. 2d 319, 2007 U.S. Dist. LEXIS 20783 (S.D.N.Y. March 22, 2007) .........................6

*SEC v. Platinum Inv. Corp.*,
   2006 U.S. Dist. LEXIS 67460 (S.D.N.Y. Sept. 20, 2006).......................7

*SEC v. Warren*,
   534 F.3d 1368 (11th Cir. 2008) ................................................................36

*Sereboff v. Mid Atl. Med. Servs.*,
   547 U.S. 356, 126 S. Ct. 1869 (2006)........................................................................29

*Std. Iron Works v. ArcelorMittal (In re Steel Antitrust Litig.)*,
   2015 U.S. Dist. LEXIS 119652 (N. D. Ill. Sep. 9, 2015) .......................................19

*Stein v. Marquis Yachts, LLC*,
   No. 14-24756-CIV, 2015 U.S. Dist. LEXIS 35088 (S.D. Fla. Mar. 20, 2015) .....................10

*Susman v. Lincoln American Corp.*,
   578 F. Supp. 1041 (N.D. Ill. 1984) ......................................................................19

*TemPay, Inc. v. Biltres Staffing of Tampa Bay, Ltd. Liab. Co.*,
   945 F. Supp. 2d 1331 (M.D. Fla. 2013)...............................................................10

*Tri Cnty. Wholesale Distribs. v. Labatt USA Operating Co.*,
   LLC, 112 F. Supp. 3d 639 (S.D. OH. 2015)........................................................19

*United States v. Articles of Drug*,
   1986 U.S. Dist. LEXIS 27300 (D. NE. Aro. 2, 1986) ...........................................9

*United States v. Christian*,
   673 F.3d 702 (7th Cir. 2012) .............................................................................19

*United States v. Conn*,
   297 F.3d 548 (7th Cir. 2002) .............................................................................19

*United States v. Dish Network LLC*,
   256 F. Supp. 3d 810 (C.D. Ill. 2017) ............................................................25, 35

*United States v. Fenzl*,
   670 F.3d 778 (7th Cir. 2012) .............................................................................19

*United States v. NCR Corp.*,
   960 F. Supp. 2d 793 (E.D. Wisc. 2013)................................................................6

*United States v. Peden*,
   872 F.2d 1303 (7th Cir. 1989) ...........................................................................35

*United States v. Peoples*,
   250 F.3d 630 (8th Cir. 2001) .............................................................................19

*United States v. Rostoff*,
   164 F.3d 63 (1st Cir. 1999)................................................................................35

*Vasquez v. Superior Court*,
   4 Cal. 3d 800, 94 Cal. Rptr. 796, 484 P.2d 964 (1971) .......................................14

*Worsham v. Travel Options, Inc.*,
   2016 U.S. Dist. LEXIS 118774 (D. Md. 2016) ....................................................24

**Statutes**

Federal Trade Commission Act § 5 ......................................................................5, 35

FTC Act ...........................................................................................................1, 5, 6

FTC Act Section 5(a) .............................................................................................10

FTC Act Section 13(b) ...........................................................................................35

FTCA ..................................................................................................................8, 29

FTCA Section 13(a) ...............................................................................................36

Lanham Act .............................................................................................................12

Evan Sirlin ("Sirlin"), by and through counsel, submits this memorandum of law in opposition to Plaintiffs' Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Plaintiffs' motion must be denied. An individual may only be held liable for corporate acts after: a) the corporate defendant is found liable under the FTC Act, and after b) the individual is found to have participated in the violative acts or it is determined that he had authority to control the corporate defendant and he knew about the violative acts or practices,[1] but "fail[ed] to act"[2] to stop them.

Here, plaintiffs argue that Lifewatch is liable for violative acts and practices (in connection with sales practices by its outside sellers) and that Sirlin should be held individually and then jointly and severally liable at the summary judgment stage. This argument must be rejected. For the reasons stated herein and in Lifewatch Inc.'s memorandum of law, Lifewatch is not liable under the FTC Act, and consequently neither is Sirlin. Furthermore, following a Share Purchase Agreement in May 2013 Sirlin had no authority to manage or control the actions of Lifewatch. As such, there can be no imposition of individual liability under the FTC Act at the summary judgment stage. Nor can Sirlin be held individually liable under the Telemarketing Sales Rule or under FDUTPA.

## LEGAL ARGUMENTS

### Lifewatch

Lifewatch Inc. is a New York corporation that has, at all relevant times, provided emergency monitoring products and services to elderly, seriously ill, and disabled individuals. By simply pressing a button on a medical alert device, Lifewatch customers have immediate

---

[1] *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 574 (7th Cir. 1989).
[2] *FTC v. Amy Travel Serv.,* 1988 U.S. Dist. LEXIS 13371, at *52 (N.D. Ill. Feb. 10, 1988).

access to emergency services.[3]   Lifewatch provides this equipment -- which is ready to use upon arrival -- at no cost to the customers to ensure their immediate access to Lifewatch's services.  In addition to providing its customers free equipment, Lifewatch engages third-party monitoring companies to respond to emergency signals.[4] Lifewatch provides life-saving equipment and services to protect its customers.[5]  Beginning in approximately 2012, Lifewatch began using outside sellers to originate customer accounts for Lifewatch.  The independent companies offered to sell these accounts to Lifewatch and other emergency monitoring companies.  The purchase agreements contained a provision obligating the companies to comply with all applicable state and federal telemarketing laws.  The independent sales companies warranted and represented to Lifewatch that applicable laws were followed.[6]

The core allegations in this suit pertain to and arise out of Lifewatch Inc.'s 2012 and 2013 business relationship with non-party entity, Worldwide Info Services (WWIS).  In approximately 2012, the FTC and State Attorneys General made public their investigations into various telemarketing companies serving the emergency monitoring industry. Those investigations resulted in a number of civil enforcement actions taken by the FTC including *FTC and State of Florida, Office of the Attorney General, Department of Legal Affairs v Worldwide Info Services, Inc.* et al., United States District Court for the Middle District of Florida, 6:14-cv-8-ORL-28DAB.  Among the companies investigated and sued were companies with whom Lifewatch had transacted business, i.e. WWIS (and its d/b/a entities).  In March 2014, the FTC served Lifewatch with a CID and filed suit against it in June 2015.  (R. Doc 1).  As a result of its

---

[3] Dkt. 296-1, paragraphs 1-3
[4] Dkt. 296-1, paragraphs 4-5
[5] There are no allegations regarding the quality of equipment or monitoring services Lifewatch provided to consumers.
[6] Dkt. 296-1, paragraphs. 11-12

relationship with WWIS, Lifewatch sustained nearly ten million dollars in losses, refunded approximately three million dollars to customers, and effectively "gave away" to customers medical alert equipment with a retail value totaling approximately fourteen million dollars.[7] Moreover, in approximately April 2014, as a result of the allegations made by the FTC and the Florida Attorney General in the Florida enforcement proceedings filed against WWIS, Lifewatch voluntarily created a customer refund program to address WWIS's alleged violations to the extent they impacted existing Lifewatch customers. As part of this refund program, Lifewatch provided its customers with information about the WWIS enforcement litigation and offered and provided full refunds to customers who had purchased Lifewatch's products or services based on, *inter alia*, any of the allegedly false and misleading statements of the independent companies cited by the FTC and the Florida Attorney General in their enforcement litigation. Through this refund program, Lifewatch sent letters to its customers, and those who responded were issued a refund.[8]

After its relationship with WWIS, Lifewatch entered into hundreds of purchase agreements with other outside sellers.[9] And, Lifewatch generated revenue as a result of accounts originated by these outside sellers.[10] Many of these outside sellers have affirmed under penalty of perjury that they have not engaged in the activity at issue in this case.[11] Many of these outside sellers have also affirmed under penalty of perjury[12] that telemarketing was used in connection with either 0% or somewhere between 0% and 50% of the accounts sold to Lifewatch.[13] Plaintiffs have presented evidence that a small percentage of Lifewatch's sellers

---

[7] Dkt. 296-1, paragraphs 15-17
[8] JSAF 16, Dkt. 296-1, paragraphs 30-31
[9] JSAF 3
[10] JSAF 3
[11] Exhibit E.
[12] Exhibit A
[13] JSAF 12

engaged in some violative activities or made some of the representations at issue.  But, that evidence is disputed[14] and there is either no evidence or countervailing evidence regarding many other outside sellers from whom Lifewatch obtained customer accounts[15].  Plaintiffs are simply conflating the marketing methods and the outside sellers in an effort to inaccurately portray Lifewatch's sales methods as homogeneous and as uniformly fraudulent over a five year period.

**Evan Sirlin**

Evan Sirlin has never had an individual ownership interest in MedGuard.[16]  Rather pursuant to a May 31, 2013 Share Purchase Agreement, 125 shares (out of 1250) in MedGuard Alert Inc. were optioned to the Sirlin Family Trust (of which Sirlin is the executor, administrator, or trustee).[17]  Nor does Sirlin own an individual interest in Lifewatch. Rather, the Sirlin Family Trust, owns 10% in Lifewatch.[18]  On May 31, 2013, Sirlin sold his share in Lifewatch.[19] Thereafter Sirlin ceased having the authority to make executive decisions or otherwise manage Lifewatch's operations.[20]

**LEGAL ARGUMENTS**

1. **Individual Liability as to Sirlin**

As set forth in *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 574 (7th Cir. 1989) individual liability for corporate acts or practices may be imposed only if, after the corporate

---

[14] Opposition to Plaintiffs' Statement of Facts, 9-21.
[15] JSAF 3, 4, 8, 9, 10, 11, 12
[16] Dkt. 296-4.
[17] Id.
[18] Id.
[19] Dkt 299-3, pages 95-97.
[20] Dkt 299-3, pages 95-97.

4

defendant is found liable under the FTC Act, the individual defendant is found to have: (1) participated in the underlying violative acts or had authority to control the corporate defendant and (2) knew of the violative acts or practices.  In order to hold an individual liable for restitution as a result of corporate misconduct, plaintiffs must show (1) the individual had knowledge that the corporation engaged in dishonest or fraudulent conduct, (2) that the misrepresentations were the type upon which a reasonable and prudent person would rely, and (3) that consumer injury resulted*." FTC v. Publ'g Clearing House, Inc*., 104 F.3d 1168, 1170–71 (9th Cir. 1997) quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994).  The knowledge requirement is satisfied by "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Amy Travel,* 875 F.2d at 574; *Med. Billers Network, Inc.* 543 F. Supp. 2d at 320.  Further, an "unfair or deceptive" trade practice under Section 5 does not equate to being "dishonest or fraudulent" pursuant to Section 19.  In order to establish liability under Section 19, the FTC must prove that the act or practice was one which a reasonable man would have known under the circumstances was dishonest or fraudulent. 15 U.S.C. § 57b(a)(2). Courts have held that this standard requires scienter. *See FTC v. Glenn W. Turner*, 1983-1 Trade Cas. (CCH) para 65,244 (M.D. Fla. 1982); *FTC v. MacMillan, Inc*., 1983-2 Trade Cas. (CCH) para 65,553 (N.D. Ill. 1983). The individual defendant must have had the specific intent to defraud, or at least engaged in conduct "reasonably calculated to deceive persons of ordinary prudence and comprehension." *FTC v. MacMillan, Inc*. at para. 68,757; *FTC v. AMREP Corp.*, 705 F. Supp. 119, 127 (S.D.N.Y. 1988).

The record evidence demonstrates that, at least subsequent to the 2013 Share Purchase Agreement, Sirlin lacked the requisite authority to control to be held individually liable under the

FTC Act. Thereafter Sirlin ceased having the authority to make executive decisions (including hiring and firing) regarding Lifewatch's operations, and his role was limited to occasionally providing advice.[21] Sirlin's knowledge of customer complaints or compliance issues with Lifewatch's outside sellers was within the context of Lifewatch's quality control program, which curtailed violative practices.[22]

### 2. Joint and Several Liability as to Sirlin

Joint and several liability can only be imposed on the individual defendants in this case after a finding that each defendant "repeatedly participated in the wrongful acts and each defendant's acts materially contributed to the losses suffered." *FTC v. Gem Merch. Corp.,* 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. Seismic Entm't Prods*., 441 F. Supp. 2d 349 (D.N.H. 2006). Further, courts have declined to impose joint and several liability where defendants have differing levels of culpability. *See United States v. NCR Corp.*, 960 F. Supp. 2d 793, 797 (E.D. Wisc. 2013) ("[W]hile it would be unjust to hold a defendant liable for the entire harm sustained by the plaintiff when such defendant caused only a portion of it . . . Whether or not responsible parties are jointly and severally liable also takes on greater significance when the level of culpability of those responsible for the harm differs.") *SEC v. Opulentica,* 479 F. Supp. 2d 319, 330, 2007 U.S. Dist. LEXIS 20783, *28 (S.D.N.Y. March 22, 2007) involved a fraudulent scheme in which the defendants made false statements on the Internet and in newspapers to encourage people to invest in the company, lied to investors in stating that funds were insured, and used investors' money for his personal benefit. The court declined to impose joint and several liability on a defendant who filed fraudulent debit statements with the bank and a police report, but had no contact with investors, did not prepare any of the offering materials or website

---

[21] Id.
[22] JSAF 13

6

content, and made only one deposit of investor funds because he "was a much smaller beneficiary of the fraudulent scheme with a correspondingly smaller role." *See also SEC v. Platinum Inv. Corp.*, 2006 U.S. Dist. LEXIS 67460 at * 16 (S.D.N.Y. Sept. 20, 2006) (declining to impose joint and several liability where the defendant was a "small player in the fraud"); *SEC v. Falbo*, 14 F. Supp. 2d 508, 527 (S.D.N.Y. 1998) (refusing joint and several liability where the SEC failed to present evidence that tippee derived any financial benefit from the illegal trading of anyone he tipped); *SEC v. Downe*, 969 F. Supp. 149, 158 (S.D.N.Y. 1997) (same).

As the Supreme Court explained in *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 614, 129 S. Ct. 1870, 1881 (2009), the court can consider whether the harm is capable of apportionment such that joint and several liability is inappropriate. The court explained that apportionment is proper when "there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A(1)(b), p 434 (1963-1964)(hereinafter Restatement). The evidence supporting apportionment need not be precise; there must simply be "facts contained in the record reasonably support[ing] the apportionment of liability." *DMJ Assocs., L.L.C. v. Capasso*, 2015 U.S. Dist. LEXIS 177460, *73-74 (E.D.N.Y. July 7, 2015) (quoting *Burlington* 556 U.S. 599, 610-612); *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, (4th Cir. 2013) ("a reasonable basis for apportionment need not be mathematically precise, and may be based on the simplest of considerations.") (internal quotations omitted). In *Burlington* and subsequent cases, the courts have apportioned damages based on the time period in which defendants' conduct occurred, and ownership existed, and on the estimated maximum contribution of each party's activities to the alleged harm. *Burlington*, 556.U.S. 599, 616. In *City of Gary v. Shafer*, 2011 U.S. Dist. LEXIS 86710 (N.D. In. Aug. 5, 2011) the court determined that damages could and should be apportioned where defendant's

contribution to the harm was *de minimis* and was limited to a specific time period (3.95% of the total time period over which the harm occurred).

In the case at bar, joint and several liability is not appropriate as to Sirlin because as described in detail above, his role -- insofar as he had one, which defendant denies -- in the alleged "fraudulent scheme" was limited to the time prior to May 2013, when he ceased having any authority or control of Lifewatch. Further, because Sirlin's involvement in the alleged scheme, if any, ended on a date certain, any damages directly attributable to Sirlin can be calculated with reasonable certainty.

Accordingly, the court can find that apportionment, not joint and several liability, is appropriate.

### 3. Permanent Injunctive Relief

The imposition of a permanent injunction is an extraordinary remedy. *Peterson v. Vill. of Downers Grove*, 2016 U.S. Dist. LEXIS 13867 at * 9 (N.D. Ill. Feb 4, 2016) ("It should be emphasized, however, that injunctive relief is an 'extraordinary remedy,' whether the injunction is permanent or temporary") ((citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)). Courts have been reluctant to impose permanent injunctions even in FTCA and TCPA cases, where permanent injunctions are authorized by statute. *See, e.g., Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101 (11th Cir. 2015) (upholding denial of permanent injunction in TCPA case because plaintiff had not demonstrated likelihood of future harm or inadequate remedy at law). Even where the Court grants injunctive relief, the prohibitions on the defendant's activities must be reasonable. *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1012 (C.D. Cal. 2012) ("Fencing-in provisions must bear a reasonable relation to the unlawful practices found to exist.") (internal quotations omitted). Permanently banning

defendants' from legally participating in the industry is overbroad and inappropriate under the circumstances. *See FTC v. Voc. Guides, Inc.,* 2006 U.S. Dist. LEXIS 82308 at * (M.D. TN. Nov. 9, 2006) (declining to modify a permanent injunction to include a lifetime ban on telemarketing as overbroad); *United States v. Articles of Drug*, 1986 U.S. Dist. LEXIS 27300 at * 34 (D. NE. Aro. 2, 1986). (holding that an order banning defendant from marketing any drug product without prior consent of the Food and Drug Administration was overbroad). Moreover, a plain review of plaintiffs' brief reveals that it has inadequately addressed the requirements of a permanent injunction -- irreparable injury, inadequacy of remedies at law, a balance of the hardships weighing in plaintiff's favor and the granting of an injunction will not harm the public interest. See *FTC v. Oks*, U.S. Dist. LEXIS 82170, at *17-18 (N.D. Ill. Nov. 2, 2007) (denying the FTC's motion for a permanent injunction for failure to adequately address these factors).

Here, the same facts that militate against an imposition of individual liability similarly militate against the imposition of a permanent ban.

### 4. Alleged Deceptive Acts or Practices

Again, before individual liability can be imposed, the court must determine that there is underlying corporate liability. Given the genuine issues of material fact, there is no basis to impose corporate liability at the summary judgment stage.

Plaintiffs argue that defendants made material misrepresentations to consumers in violation of Section 5(a) of the FTC Act (and the FDUTPA[23]). (R. Doc. 243, p. 12). As set forth

---

[23] FDUPTA's applicability is limited to Florida consumers. *Coastal Physician Servs., Inc. v. Ortiz*, 764 So. 2d 7 (Fla. Dist. Ct. App. 1999); *Stein v. Marquis Yachts, LLC*, No. 14-24756-CIV, 2015 U.S. Dist. LEXIS 35088 (S.D. Fla. Mar. 20, 2015). Further, to hold an individual officer liable under FDUTPA, plaintiffs must show that the individual was a "direct participant in the improper dealings." *North American Clearing, Inc. v. Brokerage Computer Systems, Inc.*, 666 F.Supp.2d 1299, 1311 (M.D. Fla. 2009) (quoting *KC Leisure, Inc. v. Haber*, 972 So.2d 1069, 1074 (Fla. 5th DCA 2008)); *TemPay, Inc. v. Biltres Staffing of Tampa Bay, Ltd. Liab. Co.*, 945 F. Supp. 2d 1331, 1346 (M.D. Fla. 2013).

in the Amended Complaint, plaintiffs allege that defendants -- through their outside sellers -- made the following misrepresentations in contravention of the FTC Act: 1) A friend, family member, health care provider, or other acquaintance of the consumer referred the consumer to Defendants, or purchased the medical alert system for the consumer; 2) Defendants' medical alert system is endorsed by reputable organizations, including, but not limited to, the American Heart Association, the American Diabetes Association, the National Institute on Aging, the AARP, the American Red Cross, and/or health care providers; 3) Consumers will not be charged the first monitoring fee until they have received and activated the medical alert system; 4) Consumers may cancel the monitoring service at any time without any further financial obligation. (R. Doc. 165). Plaintiffs' argument must be rejected.

## A.    Plaintiffs' Conflation of the Outside Sellers

Plaintiffs are conflating all outside sellers across all five years in arguing that defendants engaged in deceptive practices. There is simply no legal or logical support for plaintiffs' argument that because a particular outside seller made a particular representation in, for instance, 2013, that representation must be imputed to a different outside seller originating different customers in 2013 or during a different time period (e.g. 2016). Indeed, many Lifewatch customers were originated from outside sellers who have not been shown to have made the alleged misrepresentations or to have engaged in violative conduct. And, many outside sellers signed affidavits under penalty of perjury indicating they did not engage in the allegedly violative conduct. Accordingly, there is no basis to treat Lifewatch's practices as unvarying from 2012 through 2016 and to lump together all outside sellers over a five year period.

Indeed, after the WWIS shutdown, Lifewatch worked to implement several effective measures to make sure its customer accounts were properly procured. Sarai Baker, testified that

10

outside sellers signed Purchase Agreements with Lifewatch warranting that they do not and will not violate any state or federal telemarketing laws, or any other laws in originating customer accounts. The outside sellers provided affidavits affirming, among other things, that they strictly comply with all state and federal telemarketing laws and will not make misrepresentations about the products or services marketed by them. And, the primary responsibility of Lifewatch employee, Lauren Vandewater, has been to request and listen to audio-recordings in order to ensure the outside sellers are acting in a manner consistent with their contractual obligations. Additionally, Lifewatch circulated do-not-call information to all of the outside sellers.[24] Lifewatch also provided the outside sellers with information about the attributes of the products and services that it offers and the terms and conditions pursuant to which it will provide fulfillment. Notwithstanding plaintiffs' mischaracterizations, the evidence shows that Lifewatch communicated with outside sellers to ensure misrepresentations were not being made and that Lifewatch terminated outside sellers who did not follow their guidelines.

## B. Materiality

Plaintiffs acknowledge that "an act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances." Id. at p. 12. It is well-settled that information is material where it "concerns the purpose, safety, efficacy, or cost, of the product or service." *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 308 (D. Mass. 2008) (citing *Novartis Corp. v. FTC*, 223 F.3d 783, 786, 343 U.S. App. D.C. 111 (D.C. Cir. 2000) (quoting *FTC Policy Statement on Deception*); *In re J.B. Williams Co.*, 68 F.T.C. 481, 546 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967)). *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1119-21 (D. Nev. 2015). Further, a district court can rule that the

---

[24] Dkt. 87-3 at 2-3.

representations made were not false, misleading, or material. *See Derby Indus. v. Chestnut Ridge Foam, Inc.*, 202 F. Supp. 2d 818 (N.D. In. 2002) (finding, in the context of the Lanham Act, that representations regarding the testing of mattresses were neither literally false, nor misleading, and that plaintiff had not shown the representations to be material to reasonable customers); *Pfizer, Inc. v. Miles, Inc.*, 868 F. Supp. 437, 446 (D. Conn. 1994) (holding that claims that defendant's drug was less expensive than plaintiff's were not misleading even where the drugs were not bioequivalent).

Here, the Court can rule that because statement number two (regarding endorsements) plainly has no bearing on the purpose, safety, efficacy, or cost of the product or service, it is not material. In any event, as set forth in detail during the preliminary injunction briefings and the hearing, monitoring devices and monitoring services substantially similar to those offered by Lifewatch have been endorsed by a number of organizations to protect older adults and infirm people.

## C.     Falsity

Statements two, three, and four are not false and can be substantiated. With respect to statement two, medical alert systems have been endorsed by reputable organizations and health care providers.[25] In their motion papers, plaintiffs also argue that Lifewatch's "telemarketers represented that consumers could cancel the service at any time without any further financial obligation, but that was false because canceling consumers had to either ship the medical alert device back to Defendants at a substantial cost or pay a $400 fee." (R. Doc. 243, p. 2). But,

---

[25] https://www.aarp.org/health/doctors-hospitals/info-11-2010/medical_alert_systems.html ;
https://www.aarp.org/caregiving/home-care/info-2017/medic-alert-systems-options.html ;
https://www.nia.nih.gov/health/aging-place-growing-old-home ; https://www.redcrossstore.org/dp.aspx?pgid=609

there is no evidence that outside sellers stated there would be no further "financial obligations.[26]" Further, plaintiffs improperly conflate all outside sellers over a five year period. Record evidence shows: 1) Lifewatch sent out a costly medical alert device to each customer and only charged the customer for monthly monitoring (i.e. the device itself was free to the consumer)[27]; 2) Lifewatch often cancelled accounts upon request and refunded customers without charging for the equipment or receiving its equipment[28]; and 3) Lifewatch often sent shipping labels to customers (upon request) so they would not have to pay for return shipping[29].

Plaintiffs also argue "consumers were told that they could test the device first and that they would not be billed until the monitoring service was activated; that, too, was false because defendants charged consumers credit cards almost immediately." Again, plaintiffs improperly conflate all outside sellers throughout a five year period. Lifewatch's consumers were charged in conjunction with receiving the medical alert systems, which are always active and ready to be used, upon being shipped, because Lifewatch engages monitoring centers for each customer before the devices are shipped. And, after the WWIS shutdown, Lifewatch implemented a quality control program wherein, among other things, there is explicit verification that the customer understands they are going to be charged immediately. [30]

In any event, to the extent there was some inconsistency with regard to the return shipping practice or policy, revenue forfeiture is not the appropriate remedy when a customer received and enjoyed the benefits of working equipment and services.

---

[26] Opposition to plaintiff's statement of facts, 21-24. Moreover, there is evidence that consumers were explicitly told they had to ship back the equipment. See PX2, Atts. F, G.
[27] JSAF 6
[28] JSAF 7
[29] JSAF 17
[30] JSAF 13

### D. Dissemination and Reliance

It has been held that requiring a showing of individual reliance for each consumer in FTC enforcement actions "would thwart effective prosecutions of large consumer redress actions." *FTC v. Publrs. Bus. Servs*. No. 2:08-cv-00620-APG-GWF, 2017 U.S. Dist. LEXIS 14720 (D. Nev. Feb. 1, 2017). To that end, courts have imposed a rebuttable presumption of individual reliance once the FTC has proved defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased defendant's products. A rationale for this rebuttable presumption was explained in *FTC v. Int'l Diamond Corp.*, 1983 U.S. Dist. LEXIS 11862, at * 17-18 (N.D. Cal. Nov. 8, 1983), where the court cited to *Vasquez v. Superior Court*, 4 Cal. 3d 800, 94 Cal. Rptr. 796, 484 P.2d 964 (1971), which stated: "...Consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all." In the case at bar, record evidence demonstrates that many customers (particularly after the WWIS shutdown) were originated by outside sellers that cannot be shown to have uttered the misrepresentations at issue.[31] In other words, scripts and representations within those scripts were not, by any means, uniform and standardized such that it can be said customers were exposed to the "same dubious practice."

Plaintiffs rely on *FTC v. World Travel Vacation Brokers, Inc*., 861 F.2d 1020 (7th Cir. 1988), where defendants' uniform advertisement of a $29 airfare package to their customers was adjudged to be widely disseminated. Unlike that case, where the accused advertising was singular, uniform, and standardized in nature during a finite period of time, in the case at bar, Lifewatch used hundreds of outside sellers from 2012 through 2016.[32] And, those outside sellers

---

[31] JSAF 42
[32] JSAF 3

used a wide variety of means and methods and scripts in originating customers.[33]  Indeed, a subset of Lifewatch customers were unquestionably originated from outside sellers who have not been shown to have made the alleged misrepresentations at issue.[34]  In *FTC v. Publrs. Bus. Servs*. No. 2:08-cv-00620-APG-GWF, 2017 U.S. Dist. LEXIS 14720 (D. Nev. Feb. 1, 2017), the court only found wide dissemination in the telemarketing context specifically because defendants made 25 million calls and they were unable to point to evidence that their telemarketers had different or varying sales pitches.  Similarly, in *FTC v. Equifin Int'l,* 1997 U.S. Dist. LEXIS 10288 (C.D. Cal. July 3, 1997), the court granted an injunction after finding that the sales presentations included "standardized" misrepresentations traceable to the sales at issue.  In the case at bar, however, there is ample evidence showing different sales pitches and different means and methods of customer origination by different outside sellers.[35]  *Id*. at * 12-13.

So, even if, *arguendo*, an alleged misrepresentation was made to a particular subset of customers obtained by a particular outside seller at a particular time, it does not follow that -- as the plaintiffs want the court to believe -- an alleged misrepresentation was widely disseminated among the customer base during a five-year period.  Plaintiffs' own evidence supports defendants' argument.  For instance, in PSMF 58, plaintiffs cite to sales scripts used by a subset of outside sellers.  But, a plain review reveals that the scripts are different and that, in any event, the alleged misrepresentations at issue were ***not*** included.  By way of example, the scripts plaintiffs attribute to TMI and Senior Medical Alert: do not mention an endorsement; explicitly indicate that the equipment itself is provided at no cost but that the consumer pays the monthly monitoring fee; do not mention that the device has been purchased by a friend or family member;

---

[33] JSAF 1
[34] JSAF 45
[35] JSAF 1, 2, 7, 8, 9, 10, 11

do not indicate that consumers must activate before they are charged; and do not indicate customers may cancel the monitoring service at any time without any further financial obligation. Indeed, affidavits by David Reilly of TMI and Blake Ladenheim of Senior Medical Alert indicate that the misrepresentations at issue in this case were not made in connection with originating customer accounts for Lifewatch.[36]

Many of the phone call transcripts also illustrate the point that the alleged misrepresentations were not widely disseminated and were confined to only a few outside sellers during a limited time period. By way of example, in PX1, Attachment AA, the telemarketer does not mention an endorsement; explicitly indicates that the equipment itself is provided at no cost but that the consumer pays the monthly monitoring fee and would be charged for a failure to return the equipment after cancellation; does not mention that the device has been purchased by a friend or family member; and does not indicate that the consumer must activate before he is charged. Similarly, in PX1, Attachment ZZ and PX2, Attachments A-G, and PX3 the telemarketer does not mention an endorsement; explicitly indicates that the equipment itself is provided at no cost but that the consumer pays the monthly monitoring fee; does not mention that the device has been purchased by a friend or family member; and does not indicate that the consumer must activate before she is charged. And, in PX2, Attachments F and G, the telemarketer explicitly indicates that the customer has to ship back the unit and the telemarketer indicates that if the customer cancels the service but keeps the equipment, the customer will be charged for the equipment.

---

[36] Exhibit E; In order determine the percentage of revenue attributable to, for instance, TMI, one could use the schedule annexed to Kevin Flaherty's supplemental report.

Plaintiffs rely on consumer affidavits. But, of the disclosed individuals, only 14 actually appeared in Lifewatch's customer data base (i.e. 0.02%).[37] This is not a representative sample for a number of reasons. Of the 14, the following individuals admittedly did not purchase the products and services as a result of *any* alleged misrepresentations: Robert Braver, Joaquin Miller, Paul Deloca, Barry Gates, Lord Fetherston, Claude Westbrook,[38] and Diana Mey. Of the remaining 7, the following individuals[39] declared they were told about another customer's interaction with an outside seller: Donna Girard, Karen McCourt, and Susan Rivard. Of the remaining 4, Florence Holley and Merrilyn Gassman ordered the products and services not because of any of the alleged misrepresentations at issue, but only because they purportedly heard some variation of Life Alert's tagline "Help I've Fallen and I Can't Get Up" (which is not at issue in the case) and thought they were ordering Life Alert products. That leaves 2 customers, Hilda Daniel and Joan Cattie who indicated they purchased the device after hearing the "friend or family member" representation. Billing records show these accounts were sold in May 8, 2013 and May 11, 2013 by WWIS (or its d/b/a).[40] The internal emails sent after the WWIS shutdown (identified in PMSF 39 and 66) show that Lifewatch attentively addressed all customer complaints directly with the outside sellers. These emails -- which showed Lifewatch had a robust quality control program -- are insufficient for plaintiffs to meet their burden to demonstrate wide dissemination of actionable misrepresentations after the WWIS shutdown,

---

[37] JSAF 15

[38] Indeed, consumer Claude Westbrook indicates he purchased the service, not because of any alleged misrepresentations, but because he was sick and needed it. (PX 62). Similarly, at PX 69 Patricia Felker indicates that after she was told the unit was free but the consumer had to pay a monthly service charge, she purchased the service for her mother because she is 86 and it was the right time.

[39] All of whom are linked to customers obtained through WWIS.

[40] Billing records also show that Ms. Cattie disputed having received the equipment and then later admitted she had received the equipment

particularly in view of evidence that outside sellers were terminated if Lifewatch suspected they may have deviated from Lifewatch's guidelines.[41]

Showing wide dissemination by WWIS will depend upon the testimony of Joseph Settecase, Michael Hilgar, and Roderic Boling, all of whom successfully avoided subpoena service in this case. And, even if *arguendo*, plaintiff can show a particular representation was disseminated among customers originated by WWIS, it does not follow that plaintiff can show the representation was widely disseminated by multiple outside sellers across Lifewatch's customer base. Indeed, as set forth above, record evidence shows the opposite.[42]

Even if plaintiffs have met their burden with respect to wide dissemination -- which defendants contend they have not -- rebuttable presumptions are not impenetrable barriers to trial. *See e.g., Marr v. Bank of America, N.A.*, 662 F.3d 963, 2011 U.S. App. LEXIS 24134, 2011 WL 6091806 (7th Cir. Dec. 6, 2011). To defeat summary judgment, defendants can present evidence to create a genuine issue of material fact as to whether consumers relied upon the alleged misrepresentations. *Runge v. Stanley Fastening Sys., L.P.*, 2011 U.S. Dist. LEXIS 147924 ("even if the rebuttable presumption applies, Plaintiffs will live to fight another day if genuine issues of material fact remain after application of the presumption."). Here, evidence shows that when Lifewatch was first served with the Civil Investigative Demand ("CID") by the FTC, Lifewatch sent the FTC drafts of a proposed letter to consumers that offered a full refund for any customer who felt they had been deceived by the misrepresentations at issue in this case. After sending the draft letter to the FTC and looping-in the FTC to this refund process, Lifewatch finalized the letter and sent it out to customers obtained through WWIS. The letters

---

[41] JSAF 52, Exhibit G, Baker Aff. at paragraph 7 (detailing termination); Dkt. 296-5, pp. 86-87 (testifying about same).
[42] Nor does it allow for an extrapolation about broad customer reliance. *See, e.g. George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383 (4th Cir. 2009) (holding *de minimis* examples of consumer reliance to be insufficient).

made consumers aware of each of the alleged misrepresentations. *Id.* The letters then instructed consumers that if they had relied on any of the alleged misrepresentations in purchasing the products, they could receive a full refund by simply calling the phone number provided.[43]

Thus, the letter did not simply offer a refund, it specifically asked consumers whether or not they relied upon the alleged misrepresentations. The vast majority of consumers who received these letters did not call for a refund, evincing a lack of reliance on the representations. This is strong evidence not only that consumers were satisfied with their products, but also that 1) consumers were not misled by the alleged misrepresentations; or 2) consumers did not rely on the representations in deciding to purchase the products. As such, and at the very least, there is a fact issue as to whether there was consumer reliance upon the alleged misrepresentations by consumers who heard the misrepresentations.

To the extent plaintiffs are arguing evidence of elevated chargeback rates or customer attrition shows reliance, plaintiffs cannot simply rely on a statement by Chris Hendrikson of Lifewatch's competitor VRI (which has also been embroiled in litigation with Lifewatch).[44] Mr. Henrikson has not been proffered as an expert witness, and thus his testimony is necessarily limited to that of a lay witness.[45] In any event, the evidence shows that Lifewatch's chargeback rates varied from outside seller to outside seller and from year to year.

---

[43] JSAF 16

[44] Exhibit B, paragraph 8.

[45] Rule 701 of the Federal Rules of Evidence provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determine a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." In other words, "lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012) (citing Fed. R. Evid. 701 advisory committee's note (2000 amends.). As such, lay testimony is not admissible when the "witness's reasoning process [is] not that of an average person in everyday life'" but, rather, relies on the witness's'' considerable specialized training[,] . . . experience, and knowledge." *United States v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012) (internal quotations omitted). That means lay testimony is not admissible to "'provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events.'" *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) (quoting *United States v. Peoples*, 250 F.3d 630, 641 (8th

Additionally, and for the reasons discussed above, plaintiffs cannot show violations of the FDUPTA, which, like Section 5 of the FTC Act, requires both that the representations were likely to mislead customers acting reasonably under the circumstances and that the misrepresentations were material. *FTC v. Student Aid Ctr., Inc.*, No. 16-21843-CIV, 2016 U.S. Dist. LEXIS 173658, *18 (S.D. Fla. Dec. 14, 2016).

## 5. Alleged Violations of the TSR

Plaintiffs argue that various provisions of the Telemarketing Sales Rule were violated. Plaintiffs' argument must be rejected.

## A. <u>Section 310.3</u>

Plaintiffs argue that defendants violated three specific provisions of Section 310.3 (16 C.F.R. §§ 310.3(a)(2)(iv), (a)(2)(vii), and (a)(4)). Again, while plaintiffs acknowledge there were a multitude of outside sellers used by Lifewatch, plaintiffs are improperly conflating all of Lifewatch's outside sellers in an effort to inaccurately portray the conduct at issue as homogeneous and unvarying from 2012 to 2016. Evidence of a TSR violation by WWIS in 2012 is not evidence of, by way of example, a TSR violation by InService America in 2014 or Live Stress Free in 2015 (who originated customer accounts and from whom Lifewatch obtained

---

Cir. 2001)). Establishing industry averages is the domain of expert, rather than lay witnesses because it requires specialized knowledge and training beyond that of the average person. *See e.g. Std. Iron Works v. ArcelorMittal (In re Steel Antitrust Litig.),* 2015 U.S. Dist. LEXIS 119652 at * 30 (N. D. Ill. Sep. 9, 2015) (expert used to calculate average index of demand for construction and automobile manufacturing); *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.,* 2015 U.S. Dist. LEXIS 11560 at * 13 (S.D. IN. Feb 2, 2015) (expert used to calculate the average market share of Volvo trucks in a specific region); *Susman v. Lincoln American Corp.,* 578 F. Supp. 1041, 1047 (N.D. Ill. 1984) (expert economists calculated industry averages to opine on the value of plaintiff's stock shares); *Tri Cnty. Wholesale Distribs. v. Labatt USA Operating Co*., LLC, 112 F. Supp. 3d 639, 655 (S.D. OH. 2015) (expert testimony was permitted to opine on the average capital structure in the beer distribution industry). Indeed, the specialized experience needed to calculate industry averages is such that courts have rejected expert testimony regarding industry averages as unreliable when based on speculation or faulty assumptions. *See e.g. Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794 (N.D. Ill. 2005) (rejecting expert testimony regarding lost profits where the plaintiff's expert calculated industry averages using business that were not comparable); *EEOC v. New Prime, Inc.*, 2015 U.S. Dist. LEXIS 167496 at ** 9-13 (W.D. Mo. Aug. 31, 2015) (rejecting expert calculations of the attrition rate in the trucking industry as speculative and unreliable)

customer accounts). And, indeed, annexed affidavits from entities such as, among many others, InService America and Live Stress Free refute plaintiffs' broad-brush allegations about pervasive TSR violations.

**Material Aspects of the Refund, Cancellation, Exchange or Repurchase Policies**

Plaintiffs appear to be arguing that defendants violated 16 C.F.R. § 310.3(a)(2)(iv) (prohibition against misrepresenting any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies) because consumers were told they "could cancel at any time without further financial obligation." (R. Doc. 243, p. 21). But, as set forth in response to the statement of facts, the evidence shows that many outside sellers did not make any representations pertaining to shipping, or they explicitly said that equipment needed to be returned. Record evidence also shows: 1) Lifewatch sent out a costly medical alert device to each customer and only charged the customer for monthly monitoring (i.e. the device itself was free to the consumer); 2) Lifewatch often cancelled accounts upon request and refunded customers who had not returned the equipment without charging for the equipment; and 3) Lifewatch often sent shipping labels to customers (upon request) so they would not have to pay for return shipping. The language of the TSR is clear that it only prohibits a seller or telemarketer from misrepresenting "any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies." 16 CFR § 310.3(2)(iv). The statute imposes no affirmative obligation on the part of a seller to inform a consumer regarding which party will pay for return shipping. Indeed, the FTC's own website gives examples of violations of this section: "For example, the TSR prohibits you from claiming that 'our policy is to make our customers happy — if at any time you're not absolutely delighted, just send the merchandise back,' if there are

time limits, restocking charges, or other important restrictions on the return of the goods."[46] These examples involve only affirmative misrepresentations and false statements regarding time limits or charges associated with a refund.   Relying on the text of the statute, courts have found violations of the TSR when telemarketers made misleading affirmative statements concerning their refund policies.  *See e.g.*, *FTC v. Ivy Capital, Inc.*, 2013 U.S. Dist. LEXIS 42369, 2013 at * 15 (D. NV. March 26, 2013) (finding a violation of the TSR where telemarketers told consumers that they could get a refund if the applied within three days of purchase but then threatened and intimidated consumers or redirected them to a disconnected number until the three-day return window passed);  *FTC v. Arlington Press, Inc.*, 1999 U.S. Dist. LEXIS 2055, *11-12 (C.D. Cal. Jan 21, 1999) (finding a violation of the TSR where telemarketers told callers they could get a refund at any time when, in reality, refunds were only available after 90 days when several conditions were met).  Again, in the case at bar, evidence shows that outside sellers were silent regarding the return policy and made no representations that Lifewatch would pay for shipping on returns.  Neither the text of the statute nor the examples provided by the FTC prohibit silence with regard to who bears the cost of returning the items in order to get the refund.   Nor can plaintiffs identify any cases in which a court has held a company liable for simply remaining silent regarding who would bear the cost of return shipping in order to obtain a refund.

**Affiliation, Endorsements, Sponsorships and False or Misleading Statements**

Plaintiffs allege defendants violated Section 2.VII of the Telemarketing Sales Rule by misrepresenting that their product was "endorsed by" various organizations.  The language of the TSR is clear that it only prohibits a seller or telemarketer from misrepresenting "a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government

---

[46] https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule

entity…"  The terms "affiliation," "endorsement," and "sponsorship" are not defined by the statute.   However, a company seeking clarification on how to comply with the TSR could go to the FTC's website[47] which gives examples of violations of this section:  "For example, you cannot falsely claim that you're a member of the Better Business Bureau or the local chamber of commerce, or that you're affiliated with the local police or some national charity. Neither can you create the impression in a consumer's mind that the postal permit number displayed on a mail solicitation is a sign that the U.S. Postal Service has approved a promotion. In addition, sellers and telemarketers cannot falsely claim or create the impression in a consumer's mind that they are related to or affiliated with a company with which the consumer usually does business." Based on the plain meaning of "endorsement" affiliation" and "sponsorship" as well as the examples provided by the FTC themselves, the representations made by many of defendant's sellers are not prohibited by the TSR.

Scripts used by many outside sellers provided: "our device is trusted by hospitals and health care professionals" or "recommended by hospitals and health care professionals." Nowhere in those scripts do the outside sellers represent they are affiliated with, or that the products or services are endorsed or sponsored by the government or any organization.  Nor did the outside sellers who used these scripts represent that they were members of any organization or government entity, or that they were affiliated with any company with which the consumer did business.  Some of the scripts that were used by certain outside sellers did not identify any specific organization at all, but rather referred generally to "hospitals and healthcare professionals" that trusted the device.   An endorsement, affiliation, or sponsorship necessarily

---

[47] https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#affiliations

requires an endorsing or sponsoring entity, which is not present in many of the scripts used by the outside sellers. *See FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1275, 2012 U.S. Dist. LEXIS 56233 at *68 (M.D. Fl. Apr. 23, 2012) (dismissing claims under Section 2.VII of the TSR and finding that a postcard advertising a "government bailout program" did not constitute a misrepresentation of affiliation.). The FTC seeks to broaden the scope of the statute beyond the plain meaning of its terms (as clarified by its own website) to try to encompass the representations in this case.

As set forth in detail above, even if, arguendo, an alleged misrepresentation was uttered to a particular subset of customers obtained by a particular outside seller at a particular time, it does not follow that -- as the plaintiffs want the court to believe -- an alleged misrepresentation was uttered by all outside sellers throughout a five year period. Again, plaintiffs' own evidence demonstrates this point.

### B. Alleged Violations of the TSR – Section 310.4 (a)(8)

16 C.F.R. § 310.4(a)(8) provides that the following is violative of the TSR: "failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call; provided that it shall not be a violation to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller or charitable organization on behalf of which a telemarketing call is placed, and the seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours." The record evidence does not support plaintiffs' argument that all of defendants' telemarketers "spoofed" numbers. And, indeed annexed affidavits indicate that there was no call spoofing by many of the outside sellers. Further, plaintiffs rely on declarations by

some individuals who received calls from "local numbers" as evidence that the "local numbers" were necessarily "spoofed." But, caller identification information is not necessarily "spoofed" simply by virtue of the caller identification displaying a local number. Plaintiffs also rely on statements that are contradicted by other evidence[48] and on affidavits that -- contrary to plaintiffs' assertions -- do not pertain to the spoofing issue.[49] Finally, plaintiffs fail to show that defendants did not *transmit* the caller ID information. See *Worsham v. Travel Options, Inc.*, 2016 U.S. Dist. LEXIS 118774, *23-24 (D. Md. 2016) (holding that that allegations of spoofing failed and explaining difference between transmitting information and information being captured by caller identification).

### C. Alleged Violations of 310.4(b)

Plaintiffs argue that defendants caused their telemarketers to initiate outbound calls to: individuals on the DNC, individuals who previously stated they wished not to receive outbound calls from defendants, and individuals who did not provide express agreement. Plaintiffs have not, however, come forward with evidence sufficient to prevail on summary judgment. Despite the FTC's broad investigatory power, its access to the Do Not Call Registry (which requires a $17,000 payment and is accessible only to approved, registered users), and seizure of documents and equipment associated with WWIS' operations, plaintiffs have not produced competent evidence that specific numbers on the Do Not Call Registry were called. Hearsay and unsworn statements from individuals claiming to be on the Do Not Call Registry (but who have not even provided phone numbers) is insufficient to find violations. In *United States v. Dish Network LLC,* 256 F. Supp. 3d 810 (C.D. Ill. 2017), which plaintiffs cite extensively, plaintiffs actually came forward with evidence comparing and cross-referencing numbers on the

---

[48] PX91 and 93
[49] PX95

Do Not Call Registry with numbers that were undisputedly called by defendants or their vendors. Plaintiffs have not done that here. Instead, they have come forward with declarations of individuals who claimed to be on the Do Not Call Registry. But, those declarations fail to include -- as they must -- specific averments that the individuals a) had no prior business relationship with the seller or telemarketer and b) had not requested information from the seller or telemarketer. This is a fatal flaw. The TSR does not make calls to numbers on the National Do Not Call Registry a *per se* violation. Rather, such calls only violate the rule if they are made without the express written consent of the person or an established business relationship with the person. *FTC v. All Us Mktg. LLC*, 2017 U.S. Dist. LEXIS 77291, *31-32 (M.D. Fl. April 13, 2017). Here, plaintiff's declarations are silent as to express written consent or established business relationship notwithstanding the following evidence: 1) outside seller affidavits indicating DNC compliance; 2) documents and testimony indicating calls were placed to individuals who provided information to leads brokers; and 3) signed purchase agreements explicitly indicating DNC compliance. See *FTC v. Vacation Prop. Servs.*, 2012 U.S. Dist. LEXIS 70213 (M.D. Fla. May 21, 2012) (Noting that evidence of TSR violations included consumers specifically averring they had no prior relationship with defendant and had not requested information from defendant).[50]

Plaintiffs' argument that defendants violated 310.4 (b)(1)(iii)(A) hinges upon a mischaracterizations of the evidence. Specifically, plaintiffs incorrectly assert that defendants "acknowledged" their internal DNC list "only included customers who complained to defendants, not their telemarketers." (R. Doc. 243, p. 23). But, in fact, Lifewatch's Sarai Baker

---

[50] 310.4(b)(1)(iii)(B) was revised in June 2016, i.e., after Lifewatch's relationship with WWIS and after the court entered a preliminary injunction against Lifewatch. There is no basis to apply this provision retroactively. This revised provision pertains to which party has the burden to demonstrate an existing business relationship.

explicitly testified: "Lifewatch does circulate the internal Do Not Call List, *compiled in part by information from the outside sellers,* and will immediately terminate any seller if it is determined that they called someone on the DNC list." (R. Doc. 243, p. 86) (emphasis added).[51]

### D. Alleged Violations of 310.3(b), Alleged Assistance and Facilitation of TSR violations

In support of this allegation, plaintiffs point to a single 2012 "Telemarketing Services Agreement" and argue "this is more than enough to establish…assistance and support." (R. Doc. 243, p. 26, fn 28). But, as plaintiffs acknowledge, Lifewatch entered into hundreds of "Purchase Agreements" with hundreds of different outside sellers well after the 2012 "Telemarketing Services Agreement." Plaintiffs also argue that defendants provided scripts, provided access to the CRM, provided verification support, and advanced money. However, a review of plaintiff's script evidence reveals that it pertains only to WWIS.[52] Plaintiff's CRM evidence pertains only to WWIS and inaccurately fails to draw a distinction between defendant's CRM and a separate outside portal that was used to populate the CRM.[53] And, the "verification support" evidence is nothing more than a credit card confirmation script, which as explained during the preliminary injunction hearing, Lifewatch stopped. Plaintiff's evidence regarding advanced money support is disputed and, again, only appears to pertain to two out of the hundreds of outside sellers. As set forth in the opposition to the statement of facts, insufficient evidence has been adduced to hold Sirlin personally liable under the TSR.

### 6. Equitable Monetary Relief

Plaintiffs' damages theory is fatally flawed in a number of respects. It has been held that the FTC must show that, as an initial matter, its equitable monetary relief calculations reasonably

---

[51] See also, FTC-LW16-7961, Dkt. 22-2, p. 105
[52] PSMF 59.
[53] Dkt. 296-5, p. 81.

approximate net losses, and then the burden shifts to the defendants to show that those figures were inaccurate. *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997). But, as set forth in *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69-70, before the burden shifts there must be a degree of precision to the calculation, and the FTC's broad and widespread investigatory power gives it the capacity to estimate with the requisite degree of precision. The FTC's calculations here are not sufficient for the burden to shift. And, in the event the court finds that the burden does shift, defendants contend that the calculations are demonstrably inaccurate.

## Distinction Between Outside Sellers and Marketing Methods

Plaintiffs seek revenue forfeiture for 2012 through 2016 in connection with all customers originated by all outside sellers. But, because the FTC's damages calculation includes time periods, sellers, and customers for which it cannot provide evidence of wrongdoing, it has not provided a reasonable approximation of consumers' net loss or defendant's allegedly unjust gains. It is axiomatic that damages must be directly connected to the defendant's wrongdoing. *See MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1164-1165 (7th Cir. 1983) (reversing damages award where there was insufficient evidence to determine whether lost profits were a result of lawful or unlawful conduct); *Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) ("Whatever latitude is afforded…as to proof of damages, however, is limited by the requirement that the damages awarded must be traced to…unlawful acts."). As there are glaring gaps in plaintiffs' proofs with respect to wrongdoing by particular outside sellers during certain time periods, plaintiffs cannot obtain wholesale revenue forfeiture for 5 years.

The FTC's inability to reconcile its damages estimate with the scripts and transcripts it has actually provided is fatal to its motion for summary judgment on damages. *See FTC v. Oks*,

2007 U.S. Dist. LEXIS 82170, *17 (N.D. Ill. Nov. 2, 2007) (denying summary judgment for the FTC on damages because the FTC failed to specify what amount of damages it sought for what precise time periods and failed to "specify precisely how that amount is calculated with proper evidentiary support for that specific time period."). *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69-70 (2d Cir. 2006) (remanding for further explanation of damages calculations because the district court never explained its basis for concluding that the overall sum collected through the billing system reasonably approximated the amount of unjustly obtained funds" by failing to account for the fact that consumers were granted refunds during specific periods of defendant's alleged wrongdoing and  because "the district court required no precision in the FTC's approximation even though precision could be had."); *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 325-326 (S.D.N.Y. 2008) (denying summary judgment on damages where the FTC did not provide evidence as to when specific companies began telemarketing for defendants, and thus could not provide a reasonable approximation of damages linked to different time periods of the defendant's wrongdoing).

**<u>Traceability</u>**

Equitable restitution is available only where plaintiff seeks the return of specific and identifiable money from particular funds within a defendant's possession, rather than from the defendant's assets generally. *Great-West Life and Annuity Ins. Co. v Knudson*, 534 U.S. 204, 214-15 (2002); *Sereboff v. Mid Atl. Med. Servs.,* 547 U.S. 356, 126 S. Ct. 1869 (2006). *See also Luis v. United States*, 136 S. Ct. 1083, 1095 (2016) ("Courts use tracing rules in cases involving fraud, pension rights, bankruptcy, trusts, etc."). Courts apply this traceability requirement to limit restitution awards in FTCA cases to funds that could be specifically identified as properly belonging to consumers rather than to the defendant. *See FTC v. Netran Dev. Corp.,* 2006 U.S.

29

Dist. LEXIS 98308, *15-16 (S.D. Fl. Jul. 7, 2006) (denying an asset freeze injunction on individual plaintiff's personal assets because there must be a nexus between those assets and the illegal gains akin to a tracing of assets," and the court found no such nexus); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 523 (S.D.N.Y. 2000) (declining to include funds from individual defendant's personal bank account being held in receivership in a restitution award for FCTA violations because the FTC had not traced any funds generated from the illegal scheme into this account). In the case at bar, plaintiffs cannot fulfill this traceability requirement.

**Refunds already Provided to Consumers**

As set forth in the annexed Flaherty reports[54], Lifewatch sustained nearly ten million dollars in losses, refunded approximately three million dollars to customers, and effectively "gave away" to customers medical alert equipment with a retail value totaling approximately fourteen million dollars. Moreover, as a result of the allegations made by the FTC and the Florida Attorney General in the Florida enforcement proceedings filed against WWIS, Lifewatch voluntarily created a customer refund program to address WWIS's alleged violations to the extent they impacted existing Lifewatch customers. As part of this refund program, Lifewatch provided its customers with information about the WWIS enforcement litigation and offered and provided full refunds to customers who had purchased Lifewatch's products or services based on, *inter alia*, any of the allegedly false and misleading statements of the independent companies cited by the FTC and the Florida Attorney General in their enforcement litigation. Through this refund program, Lifewatch sent letters to its customers, and those who responded were issued a refund.

---

[54] Dkt. 296-12; Exhibit C.

It is well settled that the FTC's restitution calculation must include refunds provided by defendants to consumers. *See FTC v. Inc21.com Corp.,* 475 Fed. Appx. 106, 110 (9th Cir. 2012) ("The district court properly calculated the amount of restitution . . . by starting with the defendants' gross collections through local exchange carrier (LEC) billing, subtracting refunds paid by LECs and billing aggregators and subtracting payments by [] customers who actually purchased the defendants' services.") *FTC v. Home Assure, LLC*, 2009 U.S. Dist. LEXIS 32055, *10 (M.D. Fl. Apr. 16, 2009) ("the proper amount of restitution has been held to be the purchase price of the relevant product or business opportunity, less any refunds.") (quoting *FTC v. Nat'l Urological Group*, 2008 U.S. Dist. LEXIS 44145 (N.D. Ga. June 4, 2008); *FTC v. Bronson Partners, LLC*, 2006 U.S. Dist. LEXIS 3315, *5 (D.Conn. Jan 25, 2006) ("[A]ny monetary award may reflect benefits received by consumers and should be reduced by any refunds."). A failure to properly reduce the restitution award by the amount refunded to consumers renders the FTC's damages calculation unreasonable and accepting such a calculation is reversible error. *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006) (remanding for a recalculation of damages where the district court failed to account for refunds granted to consumers by the defendant, and as a result the district court overestimated the unjust payments ultimately received by defendants); *FTC v. Zamani*, 2011 U.S. Dist. LEXIS 60913, *38 (C.D. Cal. June 6, 2011) ("[I]t is error to simply conclude that the total amount paid by consumers constitutes the defendant's unjust enrichment without accounting for refunds and actual services rendered." (internal quotation marks omitted).

**Sales to Third Parties and Third Party Costs**

The appropriate measure of restitution is the monies that flowed from the consumer to the defendant. *See FTC v. Bronson Partners*, LLC, 654 F.3d 359, 369 (2d. Cir. 2011) ("[T]he

district court must take account of systematic divergences between the defendant's gain and the losses of the victims in calculating the remedial baseline . . .”); *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008) (concluding that the district court abused its discretion in awarding the full amount of customer losses and reiterating that the proper measurement is the amount that defendants wrongfully gained by their misrepresentations). Indeed, courts have clarified that where some of the consumer losses are diverted to a third party, restitution only includes monies that actually flowed from the consumer to the defendant itself. *FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. Sept. 8, 2006); *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68 (2d Cir. 2005). At issue on appeal in *Verity* was the correct measure of damages where the defendants only profited from their scheme after several middlemen, the phone companies, took their cuts for processing calls. 443 F.3d 48, 68. The Second Circuit found that the district court erred in including all of the money paid by consumers as a result of the scheme when the correct measure of restitution was only the money that actually flowed to the defendants. *Id.* Similarly, here, defendants generated revenue by selling customer accounts to third party entities including Connect America, VRI, and Philips Lifeline.[55] Indeed, as plaintiffs assert, at least 43,501 customer accounts were sold by Lifewatch to third parties. For instance, at PX 94, Kenneth Gross of Connect America has indicated that $14,323,181 was paid to Lifewatch. In those instances, customers paid the third party entities, not Lifewatch, and that money never accrued to Lifewatch.[56] Accordingly, the amounts paid by the third party entities must be deducted from the revenue that is subject to forfeiture in connection with a restitution order.

---

[55] JSAF 20
[56] Exhibit K, Flaherty Deposition Transcript at p. 29.

Additionally, as in *Verity*, defendants only profited after several entities (e.g. monitoring companies) "took a cut." This "initial outlay" is set forth in the annexed Flaherty reports. Accordingly, these amounts must also be deducted.

**Services Rendered**

In *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1019 (C.D. Cal. 2012) the court explained that refunds and actual services rendered must be accounted for and subtracted in calculating damages. Similarly, in *FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) (Report and Recommendation adopted in full by *FTC v. Wilcox*, 9 Fla. L. Weekly Fed. D 791 (U.S. S.D. Fla. 1995)), the court explained that the appropriate measure of restitutionary damages was the amount consumers actually paid minus the costs of goods forwarded to consumers [or services rendered]. And, the court indicated that the FTC had the burden to parse out which portion of revenue reported on a tax return is attributable to violative conduct and to exclude amounts not attributable to violative conduct. *Id*. at *36-38.

It is undisputed that Lifewatch's customers had and have immediate access to emergency services upon receipt of the equipment. Lifewatch pays to ship this costly equipment -- which is ready to use upon arrival because Lifewatch has already paid a monitoring company before sending out the equipment -- at no cost to the customers to ensure their immediate access to Lifewatch's services. Mr. Sirlin testified about this sizeable, upfront customer "outlay" at the preliminary injunction hearing. [57] And, as set forth by expert Kevin Flaherty, there are no economic damages to consumers if consumers received monitoring services for the same number of months that they paid Lifewatch's service fees and enjoyed the benefit of free equipment shipped to them at no cost. Other courts have significantly reduced damages when consumers

---

[57] Dkt. 296-5, p. 148.

are conferred even a minimal benefit from their dealings with a defendant. Indeed, in *FTC v. Wetherill*, 1993 WL 563621 (C.D. Cal. May 14, 1993) and 1993 WL 264557 (C.D. Cal. June 10, 1993) defendants sold products such as cosmetics, perfume and cheap jewelry. 1993 WL 264557 at *5. It was determined by default that such items were sold by false representations concerning prizes that would be awarded to purchasers. *Id*. at *1-2. The FTC contended the appropriate remedy was the total amount of money sent by consumers to the defendants, $58,662,621. *Id*. at *5. Even though "products received by the consumers have virtually no market value," the court awarded only a very small fraction of the relief sought by the Commission, namely the amount of the unjust enrichment, (which totaled about $3.7 million between the two opinions) because "the consumers did have use of the products and the present market value of the products in question cannot be measured." Id. at *5-6. *See also SEC v. McNamee*, 481 F.3d 451, 457-458 (7th Cir. 2007) (holding that the district court's grant of monetary relief for violation of § 5 of the Securities Act of 1933 was inappropriate because it required defendant to disgorge 100% of the proceeds of the stock sales despite the fact that not a single investor decided to return the stock for a refund of the purchase price); *FTC v. Solomon Trading Co., Inc*., Civ. 91-1184-PXH-SMM, 1994 WL 421478 at *6 (D. Ariz. June 28, 1994) (value of artwork should be deducted from damages award against owner who falsely represented value of the art when selling it to consumers*); FTC v. Security Rare Coin & Bullion Corp*., 931 F.2d 1312, 1316 (8th Cir. 1991) (ordering monetary penalties in the amount of the "the difference between the amount paid for the property and its current market value" in a case involving deceptive marketing of rare coins); *FTC v. Magui Publishers, Inc*., 1991 WL 90895 at *12 (C.D. Cal. Mar. 28, 1991) (deducting from damages award the defendants' costs of producing falsely advertised Dali etchings and lithographs), aff'd, 9 F.3d 1551 (9th Cir. 1993).

34

**Insufficient Evidence of Violations in 2015 and 2016**

Plaintiffs argue that violations occurred up until August 2016. But, plaintiffs are apparently relying on PX 91, PX 95, and 96, which are disputed and refuted by, among other things, the seller affidavits.[58] And, plaintiffs are apparently relying on PSMF 39, which include emails that show Lifewatch's quality control program was vigilant and working to deter violations by outside sellers.[59] In any event, a few emails in which Lifewatch addresses customer complaints directly with the outside sellers is insufficient for plaintiffs to meet their burden to demonstrate TSR violations and wide dissemination of actionable (and relied upon) misrepresentations in 2015 and 2016, particularly in view of evidence that outside sellers were immediately terminated if they deviated from Lifewatch's guidelines.

**Distinction between PERS Customers**

As discussed above, Sirlin's involvement in the conduct ended in May 2013. Consequently, plaintiffs' damages calculation as it pertains to Sirlin is inaccurate to the extent that it includes revenue attributable to customers obtained after that date. Moreover, evidence shows that a percentage of Lifewatch's consumers was acquired through means other than outbound telemarketing (at least 3.6% according to plaintiffs)[60].

**Inability to Pay Must be Considered**

Plaintiffs seek equitable monetary relief under Section 13(b) of the FTC Act. A plain review of Section 13(b) indicates that the statute does not preclude consideration of a defendant's ability to pay in awarding an equitable remedy. And, unless a statute provides otherwise, restitution -- being an equitable remedy -- includes consideration of a defendant's ability to pay.

---

[58] Exhibit E.
[59] JSAF 13
[60] Exhibit B.

35

*United States v. Rostoff,* 164 F.3d 63 (1st Cir. 1999); See *United States v. Peden*, 872 F.2d 1303

(7th Cir. 1989) (The district court was found to have abused its discretion in imposing the stated

amount of restitution in that it did not take into consideration the defendant's ability to pay).

Moreover, defendant's ability to pay is a required factor under 15 U.S.C. § 45(m)(1)(C), which

defendants acknowledge is not cited by plaintiffs in their summary judgment brief.  See *United*

*States v. Dish Network LLC,* 256 F. Supp. 3d 810 (C.D. Ill. 2017)  ("The court must consider

defendant's ability to pay and its ability to continue operating when determining an appropriate

civil penalty under § 5 of the Federal Trade Commission Act.").  And, the FTC unquestionably

considers a defendant's ability to pay restitution when entering into settlements.  See, e.g. *FTC v.*

*Freecom Communs., Inc.,* 401 F.3d 1192, 1198 (10th Cir. 2005).   Insofar as plaintiffs are

proceeding under a disgorgement theory,[61] courts have also held that ability to pay is a relevant

factor in determining whether to impose an order of disgorgement.  See, e.g. *SEC v. Huffman*,

996 F.2d 800 (5th Cir. 1993); *SEC v. McGinn*, No. 10-CV-457 (GLS/DRH), 2010 U.S. Dist.

LEXIS 147486 (N.D.N.Y. Dec. 15, 2010); *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008)

(finding that the ability to pay is one factor in imposing disgorgement) *FTC v. Direct Mktg.*

*Concepts, Inc.*, 648 F. Supp. 2d 202, 218(D. Mass. 2009) (acknowledging that ability to pay may

be a relevant factor in determining the amount of disgorgement under Section 13(a) of the

FTCA).   Furthermore, when a relevant factor that should have been given significant weight is

---

[61] "A disappointed consumer who … sought a refund because the defendants' advertising had been misleading would not be making a claim of title or right to possession of particular funds, but rather would be pursuing a legal remedy for damages flowing from misleading representations. The funds given in payment for the product would have long since been commingled with other funds in the defendants' hands, and the consumer would be equivalent to a general creditor owed money damages for a wrong…The consumer would, in other words, be entitled to legal restitution, not equitable restitution. The doctrine of equitable restitution does not, therefore, fit the nature of the monetary remedy the FTC seeks. Disgorgement, on the other hand, does." *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 218 (D. Mass. 2009)

not considered it is an abuse of discretion. *See, e.g. Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005).

Here, Sirlin has come forward with evidence indicating an inability to pay the amounts requested.[62]  This evidence should be considered by the court in evaluating whether and to what extent to award restitution.

## CONCLUSION

For the reasons set forth herein, plaintiffs' motion for summary judgment must be denied.

**THE SULTZER LAW GROUP, P.C.**

By:_____/s/ Joseph Lipari
Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
85 Civic Center Plaza, Suite 104
Poughkeepsie, New York 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com

*Counsel for Defendant Evan Sirlin*

---

[62] JSAF 21

37