UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 15cv5781 Judge Gary Feinerman |
| v. | ) ) | Magistrate Judge Jeffrey T. Gilbert |
| LIFEWATCH, INC., a New York corporation, also d/b/a LIFEWATCH USA and MEDICAL ALARM SYSTEMS, *et al.*, | ) ) ) ) | **DRAFT - 3/19/2018 10:57 AM** |
| Defendants. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY**

Defendants' Report from Kevin Flaherty (Dkt. 293-3) is not only limited to an issue that is legally irrelevant in this matter, but also is based almost entirely on unreliable estimates rather than actual data of various costs and revenues. Defendants' Supplemental Report from Mr. Flaherty (Dkt. 332-3) is equally unhelpful to the trier of fact, as largely only expresses disagreement with the legal standard for monetary relief, a subject Mr. Flaherty is not qualified to opine on. The Court should exclude Mr. Flaherty's testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1]

**I.      SUMMARY OF MR. FLAHERTY'S TESTIMONY**

In his initial report, Mr. Flaherty offers his opinion about the amount of Lifewatch's profit or loss in connection with certain telemarketing accounts. Mr. Flaherty began his analysis with what he describes as data "previously extracted by Lifewatch," consisting of 93,000

---

[1] Plaintiffs did not believe expert testimony would be necessary to fully resolve the issues in this matter, and thus opposed delaying the discovery schedule to accommodate such testimony. *See* Dkt. 235 at 2-3 (Joint Status Report). Defendants' expert reports confirmed Plaintiffs' view, and, accordingly, Plaintiffs do not intend to designate a rebuttal expert.

customer accounts that had been originated by five of the six companies related to Worldwide Info Services, Inc. (collectively, "Worldwide").[2] Dkt. 293-13 at 2. Mr. Flaherty then sought to determine how many refunds were provided by Defendants, not by examining actual data showing the actual refunds paid, but by assuming that refunds were sent any time the "last transaction date" for a particular customer account was no more than 30 days after the date an account was created. He drew this conclusion based on what he describes as Lifewatch's "policies and contracts with the customers," Dkt. 293-13 at 3, which he did not actually review. *See* Dkt. 293-13 at 12. Based on his model, Mr. Flaherty concludes that the total charges Worldwide customers paid to Lifewatch totaled $7.7 million, and that refunds were provided to 65,913 out of 93,752 Worldwide customers, for a total of nearly $3 million in refunds. *Id.* at 14.

Next, Mr. Flaherty computed the amount Lifewatch paid the telemarketers as commissions, again not by looking at actual payment records, which do exist, but by assuming that Lifewatch paid Worldwide $350 for every account that remained open for more than 90 days, and nothing if the account was open for less than 90 days. *See* Dkt. 293-13 at 3. Using this approach, Mr. Flaherty concluded that Lifewatch paid Worldwide just under $5 million in total. *Id.* at 14.

Mr. Flaherty then attempted to estimate the monitoring costs associated with each account, again not by looking at actual payment records, but by assuming that Lifewatch paid $10 per customer per month for customers paying $34.95 per month for their service, and $4.50 for customers paying less per month, presumably because such customers had ordered something less than a full medical alert system. *See id.* Using these estimates, Mr. Flaherty concluded that the total amount Lifewatch paid for monitoring Worldwide customers was slightly more than $1 million. *Id.*

---

[2] *See FTC v. Worldwide Info Services, Inc.*, No. 6:14-CV-8-ORL-28DAB (M.D. Fla. filed Jan. 6, 2014).

Finally, Mr. Flaherty attempted to estimate the loss he says Lifewatch incurred for equipment it sent to customers, but which the customers did not return. *Id.* at 4. Since every account showed an entry in the "last transaction date" column in the dataset, Mr. Flaherty assumed that every Worldwide customer had cancelled their service by the time the data was extracted.[3] *See* Dkt. 332-11 at 14 (Dep. Tr. at 51:13-23.) Then, based on his "discussions with management," Mr. Flaherty assumed that 50% of Worldwide customers did not return their medical alert devices after they cancelled their accounts, that the devices all cost $150, and thus the total loss from unreturned devices was approximately $7 million. Dkt. 293-13 at 15. Adding all these figures together, Mr. Flaherty concluded that Defendants incurred a net loss of $8.8 million on accounts originated by Worldwide. *Id.* at 15.

When deposed, Mr. Flaherty was unable to offer an explanation as to why Defendants would have continued to employ Worldwide given the monumental losses they were supposedly creating for Defendants, at least according to his own calculations. *See* Dkt. 332-11 at 9 (Dep. Tr. at 30:10-20), Mr. Flaherty also was aware of no evidence indicating that Worldwide sales were less profitable for Defendants than any other telemarketer or type of marketing. *See id.* at 9 (Dep. Tr. at 31:817.)

## II. ARGUMENT

A party offering expert testimony must show that the expert is qualified, and that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

---

[3] This interpretation of the data did not consider that tens of thousands of the customers were still active with Lifewatch as of the date the underlying reports were run, and that tens of thousands of others had been sold to competitors like Connect America and Phillips Lifeline. Thus, it is clear that the "last transaction date" did not always reflect cancellation. *See* Dkt. 332-11 at 14 (Dep. Tr. at 51:13-23.)

3

Fed. R. Evid. 702. In sum, an expert must be qualified, reliably apply reliable principles and methods to sufficient facts or data, and render an opinion that is helpful to the trier of fact. In *Daubert*, the Supreme Court held that courts must act as gatekeepers to exclude unqualified, unreliable, or unhelpful expert testimony. 509 U.S. at 597. *See Kumho Tire Company v. Carmichael*, 526 U.S. 137, 141 (1999) (clarifying that the "'gatekeeping' obligation" applies not only to "scientific" testimony, but "testimony "based on 'technical' and 'other specialized' knowledge"). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

### A. Mr. Flaherty's Testimony in His Initial Report is Neither Relevant Nor Reliable.

#### 1. Mr. Flaherty's Testimony is Not Helpful to the Trier of Fact.

To be admissible, expert testimony must concern a relevant issue in the litigation. "Expert testimony is inadmissible if it is not helpful to the trier of fact." *Hartman v. EBSCO Ind., Inc.*, 758 F.3d 810, 819 (7th Cir. 2014). *See Kljacic v. Whirlpool Corp.*, No. 15-CV-5980, 2017 U.S. Dist. LEXIS 70784, at *30 (N.D. Ill. May 9, 2017) (excluding expert opinion where it would be unhelpful; "This requirement 'goes primarily to relevance.'") (quoting *Daubert*, 509 U.S. at 591).

Defendants' expert report was, by design, intended to determine whether "Lifewatch made a profit or loss" on the Worldwide accounts. Dkt. 293-13 at 2. But the profitability of Defendants' telemarketing scheme has no bearing on Defendants' liability in this matter or the appropriate amount of monetary relief. The proper measure of equitable monetary relief is the full amount lost by consumers, not defendants' net profits. *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997). *See also FTC v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009) ("consumer loss is a

4

common measure for civil sanctions in … direct FTC actions); *Amy Travel*, 875 F.2d 564, 571 (7th Cir. 1989) (affirming restitution award for violation of FTC Act); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988) (restitution "appropriate remedy" for violation of FTC Act). Because the entire focus of the report is irrelevant to any issue in this matter, the Court should exclude it.

### 2. Mr. Flaherty's Testimony Lacks a Sufficient Factual Basis and Is Not the Product of Reliable Principles and Methods.

Even if it had addressed a relevant issue, Mr. Flaherty's opinion is unreliable because it is based on insufficient—and often incorrect—facts and data. "Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). An opinion based on "unsupported facts" should be excluded. *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 744 (N.D. Ill. 1997); *see also Miniasian v. Standard Charterd Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). An expert's opinion should be barred where the expert's report "amounts to 'cherry-picking the facts he considered to render his opinion.'" *LeClercq v. Lockformer Co.*, No. 00 C 7164, 2005 U.S. Dist. LEXIS 7602, at *15 (N.D. Ill. Apr. 28, 2005) (quoting *Holden Metal & Aluminum Works v. Wismarq Corp.*, No. 00 C 191, 2003 U.S. Dist. LEXIS 5247, at *6 (N.D. Ill. Apr. 2, 2003)).

Mr. Flaherty offered no rationale for limiting his review of Defendants' telemarketing operation to Worldwide. *See* Dkt. 332-11 at 6 (Dep. Tr. at 20:17–21:6). Defendants' illegal telemarketing scheme was not limited to its work with Worldwide. In fact, Mr. Flaherty testified that Lifewatch employed "hundreds of telemarketers" just since the beginning of 2013. *See* Dkt. 332-11 at 10 (Dep. Tr. at 34:16).[4] Mr. Flaherty also does not explain why he did not examine

---

[4] *See also* Dkt. 332-3 at 4-6 (Supplemental Expert Report listing 187 telemarketers since 2013).

5

the bulk of Defendants' financial data, other than that Defendants did not provide him with such data.[5] Even in his limited review of Worldwide data, Mr. Flaherty did not examine most of the relevant available data. Specifically, Mr. Flaherty built a model based on vague estimates provided by Defendants, despite the fact that Defendants had actual data as to those same costs, that Mr. Flaherty either did not ask for or simply ignored. "An expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful." *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014).

Moreover, as described below, in virtually every respect, Mr. Flaherty's estimates result in an opinion several orders of magnitude more favorable to Defendants than if he had used actual data. Thus, even if his opinion had addressed an issue that were relevant in this litigation, his opinion should be excluded. When an expert estimating lost profits "premises his opinions on an assumption, the assumption must be reliable." *Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 C 3977, 2011 U.S. Dist. LEXIS 10337, at *7 (N.D. Ill. Feb. 3, 2011) (Feinerman, J.). And if the actual data conflicts with the assumptions the expert made, then the assumption is unreliable and the opinion should be excluded. *Id.* (citing *In re TMI Litig.*, 193 F.3d at 697); *see Newkirk v. ConAgra Foods, Inc.*, 727 F. Supp. 2d 1006, 1037 n.8 (E.D. Wash. 2010), *aff'd* 438 F. App'x 607 (9th Cir. 2011) (excluding opinion where "evidence in the record directly refutes [the expert's] claim").

In short, there was no reason for Mr. Flaherty to create a model in the first place – Lifewatch has actual data that he either did not ask for or just ignored. For example, Lifewatch kept financial records that included the number of payments made by each customer, the amount paid to the telemarketer for each account, and whether a customer had cancelled or received a

---

[5] Mr. Flaherty did not even include all of the Worldwide companies, simply omitting U.S. Affiliates, to which Lifewatch paid more than $5 million. *See* Dkt. 66 at 13 (Lifewatch paid US Affiliates $1.52 million in 2012); Dkt. 332-3 at 4 (US Affiliates paid $3.57 million by Defendants in 2013).

refund. Indeed, Lifewatch produced this very data to the *Worldwide* Receiver and Plaintiffs shortly after the *Worldwide* case was filed. *See* PX 103, Al-Najjar Supp. Dec. ¶ 2 & Att. A. Comparing that data to the projections shows that Mr. Flaherty substantially overstated cancellations and overstated refunds by several multiples. *See id.* at Att. A. In fact, Lifewatch's own financial records show the total amount of refunds, plus chargebacks, and related fees for all Lifewatch sales regardless of source for this period totaled only $1.9 million, substantially less than the $3 million Mr. Flaherty attributed just to Worldwide sales. *See* Dkt. 66 at 8 (Lifewatch 2012 Profit & Loss statement: total refunds, chargebacks, and other adjustments $329,833.05); Dkt. 66 at 16 (Lifewatch 2013 Profit & Loss statement: total refunds, chargebacks, and other adjustments $1,557,909.22). Moreover, while the commission rate paid to Worldwide may have varied over time, it never was as high as the $350 that Mr. Flaherty assumed. *See* Dkt. 255 at 3 (contractual "insertion order" sent to Worldwide with commission of $75, plus $25 if customer made payment after fourth month); *id.* at 158 (insertion order sent to Worldwide with commission of $140 if customer retained 90 days, plus $30 if customer made payment after fourth month). Mr. Flaherty did not review, or apparently even ask for, the contracts that actually set out the commission rate. Dkt. 332-11 at 11 (Dep. Tr. at 38:22-40:4).[6]

Surprisingly, while Mr. Flaherty grossly *overstated* the commission rate that applied to Worldwide, actual Lifewatch payment records show that he massively *understated* the total amount paid to Worldwide. Lifewatch's financial statements, which Mr. Flaherty relied on in other respects in his reports, show that Defendants' net payments to Worldwide were at least $22.8 million, not $5 million as Mr. Flaherty predicted. *See* Dkt. 66 at 12-13 (2012 Lifewatch

---

[6] In fact, not one of the contractual insertion orders Defendants produced for the telemarketers Mr. Flaherty identified in his Supplemental Report for the entire period 2013-2016, Dkt. 332-3 at 4-6, provided for a commission as high as $350, the rate Mr. Flaherty assumed for his model. *See* Dkt. 274-277, PX 97, Al-Najjar Atts. E-10-13 (FTC-LW16-7638-7960).

7

Profit & Loss Statement); Dkt. 332-3 at 4. Mr. Flaherty never consulted these documents, explaining in his deposition that he would not know how to interpret them. *See* Dkt. 332-11 at 9-11 (Dep. Tr. At 32:16-33:9, 34:2-34:12, 34:22-35:5, 36:6-37:25). In other words, although Mr. Flaherty overstated the commission Lifewatch paid Worldwide for each deal by two to three times, he simultaneously understated the amount Defendants actually paid Worldwide by more than four times.

The remainder of Mr. Flaherty's report is similarly flawed by his failure to consult relevant records. For example, he estimates monthly monitoring costs as $10 per customer per month based on his "conversation" with Defendant Sirlin. Dkt. 293-3 at 3. "An assumption based on the internal projections of the expert's sponsor lacks the reliability demanded by Rule 702." *Victory Records,* 2011 U.S. Dist. LEXIS 10337, at **7-8 (citing *Zenith Elecs. Corp. v. WH-TV Broad Corp.*, 395 F.3d 416, 420 (7th Cir. 2005)). But Sirlin himself testified before this court at the preliminary injunction hearing that monthly monitoring costs were $3.50 (Tr. of 12/14/15 Preliminary Injunction hearing at 148:18), and the contract Mr. Flaherty listed as having reviewed for his report with Security Partners sets monitoring costs at no more than $4.25. *See* Dkt. 293-6 at 16.

Finally, Mr. Flaherty's opinion that Defendants "lost" $7.03 million (with a retail value of $14 million) in equipment never returned by Lifewatch customers obtained through Worldwide relies on "discussions with management," Dkt. 296-12 at 4, 15, while again ignoring Lifewatch's own financial records. These show that the total value of equipment not returned from <u>all</u> Lifewatch customers for this time period, regardless of sales source, was barely $150,000. *See* Dkt. 66 at 8 (Lifewatch Profit & Loss statement for 2012 showing total

8

equipment not returned as 50,018.13); Dkt. 66 at 16 (Lifewatch Profit & Loss statement for 2013 showing total equipment not returned as $101,157.70).

Because Mr. Flaherty based his opinion on estimates and conversations with Defendants that are not based on, and sometimes conflict with, actual data, his opinion is unreliable and this Court should exclude it.

### B. Defendants' Expert's Supplemental Report is an Inadmissible Legal Opinion.

The Supplemental Expert Report of Mr. Flaherty adds nothing to his original opinion, other than introduce documents Defendants had failed to provide Plaintiffs in discovery, and to offer the legal argument that Plaintiffs' estimate of total consumer harm should take into account the monitoring services Defendants claim to have provided for their victims.[7] This is not a proper expert opinion. Mr. Flaherty is not a lawyer and has no legal expertise. Dkt. 332-11 at 14 (Dep. Tr. at 51:8-12). Accordingly, his opinion is inadmissible not only because it is not an appropriate issue for expert testimony, but because even if it were, he would be unqualified to offer it. *See Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (citing *U.S. v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996) ("The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). *See also LaPlayita Cicero, Inc. v. Town of Cicero*, No. 11-cv-1702, 2017 U.S. Dist. LEXIS 44868, at **33-34 (N.D. Ill. Mar. 28, 2017) (citations omitted) (barring testimony because "[e]xpert witnesses are generally prohibited from offering legal opinion testimony" and "even if such legal opinion testimony were permissible as a general matter,"

---

[7] The Supplemental Report includes a summary of Defendants' payments to 187 telemarketers from 2013 to 2016, showing total payments of approximately $58 million, and $14.5 million in payments to Worldwide in just 2013. Dkt. 332-3 at 4. Mr. Flaherty makes no attempt to explain the obvious contradiction with his initial report, which concluded that Defendants paid Worldwide less than $5 million combined in 2012 and 2013. *See* Dkt. 296-12 at 14.

9

witness was "unqualified to give such testimony because she is not, and does not purport to be, a legal expert."). Moreover, while Mr. Flaherty couched his conclusion by saying he was opining on the concept of "economic damages,"[8] the courts have uniformly held, as described above in Section II.A.1., that the measure of equitable monetary relief for violations of the FTC Act and FDUTPA is the full amount paid by consumers, and are not entitled to a reduction in the amount of restitution awarded, based on any services provided to consumers. *See McGregor v. Chierico*, 206 F.3d 1378, 1388-89 (11th Cir. 2000) (affirming full refunds to consumers even when they may have received a useful product; "the central issue here is whether the seller's misrepresentations tainted the customer's purchasing decisions."); *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1019 (C.D. Cal. 2012) ( "Defendants' liability should not be reduced to account for consumers who received some form of benefit.").

### III. CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion to exclude the testimony of Kevin Flaherty.

Dated: March 19, 2018  /s/David A. O'Toole
DAVID A. O'TOOLE
SAMANTHA GORDON
Federal Trade Commission, Midwest Region
230 South Dearborn Street, Suite 3030
Chicago, Illinois 60604
Telephone: (312) 960-5634
Facsimile: (312) 960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION
PAMELA JO BONDI
Attorney General
State of Florida

---

[8] In fact, at Mr. Flaherty's deposition, Defendants conceded that determining what constitutes an "economic damage" is a legal question. *See* Dkt. 332-11 at 16 (Dep. Tr. at 57:7-11, 57:15-19) (Defense counsel objecting to questions about whether certain costs would be considered economic damages because it "calls for a legal conclusion.").

10

/s/Denise Beamer
DENISE BEAMER
Assistant Attorney General
Florida Bar # 69369
Office of the Attorney General
Consumer Protection Division
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone: (407) 245-0833
Facsimile: (407) 245-0365

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL

## CERTIFICATE OF SERVICE

      I, David A. O'Toole, hereby certify that on March 19, 2018, I electronically filed **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY,** with the Court using the CM/ECF system, which will automatically send copies to any attorney of record in the case.

                                        Respectfully Submitted,

                                        /s/ David A. O'Toole
                                        DAVID A. O'TOOLE
                                        Federal Trade Commission
                                        230 South Dearborn Street, Suite 3030
                                        Chicago, Illinois 60604
                                        Telephone: (312) 960-5634
                                        Facsimile: (312) 960-5600
                                        email: dotoole@ftc.gov