UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,  )<br>STATE OF FLORIDA, OFFICE OF THE  )<br>ATTORNEY GENERAL, DEPARTMENT  )<br>OF LEGAL AFFAIRS,  )<br>  )<br>　　　　　Plaintiffs,  )<br>  )<br>　　v.  )<br>  )<br>LIFEWATCH INC., a New York corporation,  )<br>also d/b/a LIFEWATCH USA and MEDICAL  )<br>ALARM SYSTEMS,  )<br>  )<br>SAFE HOME SECURITY, INC., a  )<br>Connecticut corporation,  )<br>  )<br>MEDGUARD ALERT, INC., a Connecticut  )<br>corporation,  )<br>  )<br>EVAN SIRLIN, individually and as an officer  )<br>or manager of Lifewatch Inc.,  )<br>  )<br>MITCHEL MAY, individually and as an officer or  )<br>manager of Lifewatch Inc., and  )<br>  )<br>DAVID ROMAN, individually and as an officer  )<br>or manager of Lifewatch Inc., Safe Home Security,  )<br>Inc., and MedGuard Alert, Inc.  )<br>　　　　　Defendants.  )<br>　　　　　　　　　　　　　　　　　　　　　　　　) | Case No. 15cv5781<br><br>Judge Gary Feinerman |

**REPLY MEMORANDUM BY MITCHEL MAY IN FURTHER SUPPORT
OF HIS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Contents……………………………………………………………………….……….I

Table of Authorities………………………………………………………………..……….II-III

Mitchel May took Action to Reform Lifewatch's Practices and Curtail any Violative Conduct by the Outside Sellers………………………………………………...…………………………1

Summary Judgment as to the Deception Claims is Warranted……………………………………6

FDUTPA is Limited to Florida Residents………………………………………………...8

CONCLUSION……………………………………………………………………..10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Coastal Physician Servs., Inc. v. Ortiz*,
   764 So. 2d 7 (Fla. Dist. Ct. App. 1999) ................................................................................8

*Derby Indus. v. Chestnut Ridge Foam, Inc.*,
   202 F. Supp. 2d 818 (N.D. In. 2002) ....................................................................................6

*FTC v. Am. Standard Credit Sys.*,
   874 F. Supp. 1080 (C.D. Cal. 1994) .....................................................................................4

*FTC v. Amy Travel Serv.*,
   1988 U.S. Dist. LEXIS 13371 (N.D. Ill. Feb. 10, 1988) ...................................................1, 2

*FTC v. Amy Travel Serv., Inc.*,
   875 F.2d 564 (7th Cir. 1989) ........................................................................................1, 4, 5

*FTC v. Cyberspace.com, LLC*,
   2002 U.S. Dist LEXIS 25565, 2003-1 Trade Cas. (CCH) ¶ 73,960 (W.D.
   Wash. 2002), *aff'd*, 453 F.3d 1196 (9th Cir. 2006) ...............................................................4

*FTC v. Direct Mktg. Concepts, Inc.*,
   569 F. Supp. 2d 285 (D. Mass. 2008) ...................................................................................6

*FTC v. Johnson*,
   96 F. Supp. 3d 1110 (D. Nev. 2015) ....................................................................................6

*FTC v. LeadClick Media, Ltd. Liab. Co.*,
   838 F.3d 158 (2d Cir. 2016) ..................................................................................................5

*FTC v. Oks*,
   No. 05 C 5389, 2007 U.S. Dist. LEXIS 82170 (N.D. Ill. Nov. 2, 2007) ...........................4, 5

*FTC v. Vacation Prop. Servs.*,
   2012 U.S. Dist. LEXIS 70213 (M.D. Fla. May 21, 2012) ..............................................2, 4, 5

*In re J.B. Williams Co.*,
   68 F.T.C. 481 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967) ...................................................6

*Kraft, Inc. v. FTC*,
   970 F.2d 311 (7th Cir. 1992) .............................................................................................6, 7

*Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*,
   761 So. 2d 1256 (Fla. 3DCA 2000) ......................................................................................8

*Montgomery v. New Piper Aircraft*,
    209 F.R.D. 221 (S.D. Fla. 2001) ..................................................................................8, 9

*Novartis Corp. v. FTC*,
    223 F.3d 783, 343 U.S. App. D.C. 111 (D.C. Cir. 2000) ............................................6

*OCE Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.*,
    760 So. 2d 1037 (Fla. Dist. Ct. App. 2000) ..................................................................8

*Renaissance Cruises, Inc. v. Glassman*,
    738 So. 2d 436 (Fla. Dist. Ct. App. 1999) ..................................................................8, 9

**Statutes**

Federal Trade Commission Act ...........................................................................................6

FTC Act .....................................................................................................................1, 2, 3

Lanham Act............................................................................................................................6

Unfair Trade Act ...................................................................................................................8

Defendant, Mitchel May, by and through counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and NDIL Local Rule 56.1, submits the following memorandum in further support of his Motion for Summary Judgment. In support of this Motion, Defendant adopts and incorporates by reference arguments made in opposition to the FTC's Motion for Preliminary Injunction, and Defendant relies upon all prior proceedings and filings, including, but not limited to Defendants' Joint Statement of Additional Facts ("JSAF") (Dkt. 332) and Defendants' Response to Plaintiffs' Statement of Material Facts (Dkt. 331).

**<u>Mitchel May took Action to Reform Lifewatch's Practices and Curtail any Violative Conduct by the Outside Sellers</u>**

Notwithstanding the documentary evidence,[1] plaintiffs argue that "importantly…May never took action to stop the…practices [or] sever relationships with telemarketers…" (Dkt. 323, p. 5). Plaintiffs use the word "importantly" because they recognize that an employee cannot be held liable solely because he has knowledge of allegedly violative conduct. Rather, an individual may only be held liable for corporate acts after: a) the corporate defendant is found liable under the FTC Act, and after b) the individual is found to have participated in the violative acts or it is determined that he had authority to control the corporate defendant and he knew about the violative acts or practices,[2] but "fail[ed] to act"[3] to stop them.

Plaintiffs point to PSMF 90 and argue that May knew about "Lifewatch's legal problems…before he joined Lifewatch." (Dkt. 323, p. 27). But, as set forth in defendants' opposition to the PSMF, May did not, contrary to plaintiffs' assertion, testify that he knew about regulatory actions prior to his joining. Rather, the cited testimony indicates that he knew about a

---

[1] JSAF 13, JSAF 18.
[2] *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 574 (7th Cir. 1989).
[3] *FTC v. Amy Travel Serv.,* 1988 U.S. Dist. LEXIS 13371, at *52 (N.D. Ill. Feb. 10, 1988).

1

prior regulatory action after or upon joining. In any event, knowledge about "legal problems" prior to joining Lifewatch is insufficient to impose liability. After May joined Lifewatch, which already had an established business relationship with outside seller, Worldwide Info Services[4] (WWIS), May was instrumental in refining Lifewatch's quality control program.[5] This quality control program was effective in policing the outside sellers and in ensuring that violative practices were not used in originating customers for Lifewatch. Thus, May used his limited authority[6] within the Lifewatch organization to help articulate Lifewatch's compliance guidelines and to ensure Lifewatch employees terminated any outside sellers who deviated from Lifewatch's guidelines or otherwise engaged in violative practices.

The evidence shows that after May's involvement, Lifewatch was not ignoring or dismissing consumer complaints or otherwise turning a blind-eye. Rather, the Lifewatch employees May and others assigned to quality control (e.g. Lauren Vandewater and Sarai Baker) were vigorously policing -- and, if need be terminating -- the outside sellers.[7] Insofar as May was aware of any violative conduct by the outside sellers, it was in conjunction with the quality control program. Indeed, May consistently took affirmative action and asserted (e.g. "shut them down") that non-compliant outside sellers should be terminated.[8] As such, there can be no imposition of individual liability under the FTC Act. Nor can May be held individually liable under the Telemarketing Sales Rule or under FDUTPA.

Plaintiffs cannot sustain their burden simply by showing that an individual defendant knew about a violative act. Rather, plaintiffs must show "awareness plus failure to act." *FTC v.*

---

[4] The core allegations in this suit pertain to and arise out of Lifewatch Inc.'s 2012 and 2013 business relationship with non-party entity, Worldwide Info Services.
[5] Dkt. 296-2; JSAF 13, JSAF 18.
[6] See PX 98, Sirlin Deposition Testimony; pp.95-96; Dkt. 332-9, paragraph 9.
[7] JSAF 13 and 18.
[8] Id.

*Amy Travel Serv.,* 1988 U.S. Dist. LEXIS 13371, at *52 (N.D. Ill. Feb. 10, 1988). On the issue of "awareness plus failure to act," *FTC v. Vacation Prop. Servs.,* 2012 U.S. Dist. LEXIS 70213 (M.D. Fla. May 21, 2012) is instructive. In that case, defendants marketed and sold timeshare advertising services to consumers through telephone solicitations. During the calls, defendants informed consumers that defendants: (1) had located a buyer or would quickly sell the consumer's timeshare, and (2) would refund their fee if the timeshare did not sell or if the consumer requested rescission within seven days. Consumers claimed these representations were false or misleading and that defendants refused to refund the fee. In evaluating whether to award summary judgment to the FTC and impose individual liability under the FTC Act on defendant's president and sole shareholder, Albert Wilson, the court explained that the FTC had not "conclusively shown Wilson's knowledge of, and failure to control, the telemarketers' misrepresentations." The court reasoned:

> Wilson averred that employees were required to follow a script, and he randomly monitored calls to ensure their compliance. Any telemarketer who made inappropriate statements, including false or misleading representations regarding the presence of a buyer or the time in which a sale would occur, would be immediately reprimanded or fired. A former employee confirmed this, testifying that "it was always a big no-no to ever say we had a buyer." Because there are genuine issues of material fact as to Wilson's knowledge and control over the telemarketers' representations, summary judgment is improper. Id. at * 14.

In other words, the court did not find that Wilson's knowledge of problem telemarketers leads inexorably to the conclusion that Wilson is individually liable. This is because Wilson put in place mechanisms to ensure telemarketers were being policed and that they would be reprimanded or terminated if misrepresentations were overheard during random call monitoring. Id.

3

In the case at bar, May used his limited authority to ensure that Lifewatch actively policed the outside sellers and that the outside sellers were terminated if call monitoring or customer complaints indicated non-compliance with Lifewatch's guidelines.[9] May was integral in implementing the quality control program.[10] And, it was within this context (i.e. fixing the problem and addressing any issues pertaining to TSR violations and misrepresentations), that May was made aware of issues with outside sellers.

*Vacation Prop. Servs.* can be compared with *FTC v. Oks*, No. 05 C 5389, 2007 U.S. Dist. LEXIS 82170 (N.D. Ill. Nov. 2, 2007), where the court found individual liability because corporate principal Oleg Oks "instructed the telemarketers to tell consumers they were approved for the credit card and computer offers, obtained the contact information of the targeted consumers, signed paychecks, handed out scripts for the telemarketers to read, heard telemarketers carrying on the deceptive acts and practices while in the office, and was informed by telemarketers that consumers complained about not receiving credit cards or merchandise." Indeed, there is ample case law standing for the proposition that in determining whether an individual defendant had knowledge of the underlying corporate fraud courts must look to whether the individual played an active role in developing deceptive materials used to market to consumers, such as telemarketing scripts. *See, e.g., FTC v. Cyberspace.com, LLC,* 2002 U.S. Dist LEXIS 25565 at *17-19, 2003-1 Trade Cas. (CCH) ¶ 73,960 (W.D. Wash. 2002), *aff'd*, 453 F.3d 1196 (9th Cir. 2006); *FTC v. Amy Travel*, 875 F.2d 564, 574 (7th Cir. 1989) (developing

---

[9] JSAF 13; 18. The following outside sellers were terminated in 2014 and 2015 for failing to comply with Lifewatch's guidelines: Ariston Marketing, Colonial Group, Constant Connection, First Choice Marketing, InterFace, Inc., Call Center Partnership, Mayhem Innovations, Payless Solutions, Premium Marketing, Prium Plans, Security Alert, Senior Alert Systems, Sterling Sales of Virginia, United Life Care of Georgia, Virtue Point Marketing, Music City Ventures, Provative, Quality Services Network, S2 Ventures, VP Enterprises Group, TMI, Nationwide, Telecommunications America, Total Security Vision.
[10] Dkt. 332-7, Exhibit G, Baker Declaration at paragraphs 4-9; Dkt. 332-9, Exhibit I, May Declaration, paragraph 10-12, JSAF 13; JSAF 18.

telemarketing scripts); *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994) (developing deceptive marketing materials). Here, there is no evidence that May played a role in developing deceptive materials.

Further, in *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 574 (7th Cir. 1989), the court only imposed individual liability after finding that individual defendants "McCann and Weiland designed and on a day-to-day basis oversaw the sales operation with the clear purpose of inducing consumer purchases of their vacation passports. Having written the deceptive scripts, McCann and Weiland certainly knew of the material misrepresentations and omissions upon which the scripts were based." Critically, the court indicated that in determining whether to impose a finding of individual liability, it was important to consider any efforts by individual defendants to solve problems with misrepresentations and consumer dissatisfaction. Ultimately, the court accepted the Magistrate's conclusions that the individual defendants' efforts (which were carefully considered) were grossly inadequate to "stem the tide" of violative conduct and consumer dissatisfaction. *Id*. at 575.

Similarly, in *FTC v. LeadClick Media, Ltd. Liab. Co.,* 838 F.3d 158, 169-70 (2d Cir. 2016), the court cited *Amy Travel Serv*. with regard to the standard for imposition of individual liability, and explained:

> A defendant directly participates in deception when it engages in deceptive acts or practices that are injurious to customers with at least some knowledge of the deception. Similarly, a defendant who knows of another's deceptive practices and has the authority to control those deceptive acts or practices***, but allows the deception to proceed***, may be held liable for engaging in a deceptive practice injurious to consumers.

In the case at bar, clear evidence shows that May took concrete and affirmative steps to address the problems associated with outside sellers. He did not just sit idly by and "allow the deception to proceed." *Id*. Rather, the evidence shows that in stark contrast to the individual

5

defendants in *Oks* and *Amy Travel Serv., Inc.,* May did everything within his power and authority at Lifewatch to ensure that insofar as there was violative telemarketing, it was identified and appropriately handled. May's averments about taking affirmative steps to prevent and eliminate violative conduct are not conclusory but are supported by the evidence.[11] PSMF 90, 91, 92, and 93, which plaintiffs cite in opposition to May's motion have been refuted. (See Dkt. 331, pp. 183-192). And, the sample of emails and *inter alia*, declarations of the outside sellers, May, Vandewater, and Baker show that there is no basis for imposition of individual liability as to May.[12]

**<u>Summary Judgment as to the Deception Claims is Warranted</u>**

As set forth in defendants' moving papers, information is material where it "concerns the purpose, safety, efficacy, or cost, of the product or service." *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 308 (D. Mass. 2008) (citing *Novartis Corp. v. FTC*, 223 F.3d 783, 786, 343 U.S. App. D.C. 111 (D.C. Cir. 2000) (quoting *FTC Policy Statement on Deception*); *In re J.B. Williams Co.*, 68 F.T.C. 481, 546 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967)). *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1119-21 (D. Nev. 2015). And, inasmuch as the representations are either not actionably false or, in any event, do not concern the purpose, safety, efficacy, or cost of the product or service, the court can rule that the representations made were not false, misleading, or material. *See Derby Indus. v. Chestnut Ridge Foam, Inc.*, 202 F. Supp. 2d 818 (N.D. In. 2002) (finding, in the context of the Lanham Act, that representations regarding the testing of mattresses were neither literally false, nor misleading, and that plaintiff had not shown the representations to be material to reasonable customers).

---

[11] JSAF 13; JSAF 18.
[12] JSAF 13; JSAF 18.

6

In their opposition brief, plaintiffs cite *Kraft, Inc. v. FTC, 970 F.2d 311 (7th Cir. 1992)* for the proposition that plaintiffs are entitled to a presumption of materiality in this case. But, *Kraft* does not stand for this proposition. Rather, in *Kraft*, the court reviewed a cease and desist order of the Federal Trade Commission, which found that petitioner violated the Federal Trade Commission Act, and the court indicated:

> *the Commission* is entitled to apply, *within reason*, a presumption of materiality, and it does so with three types of claims: (1) express claims; (2) implied claims where there is evidence that the seller intended to make the claim; and (3) claims that *significantly* involve health, safety, or other areas with which reasonable consumers would be concerned. Absent one of these situations, the Commission examines the record and makes a finding of materiality or immateriality. *Kraft, Inc.*, supra at 322-323 (internal cites omitted; emphasis added).

To be clear, the court in *Kraft* did not hold that the FTC is always entitled to a presumption of materiality when, as plaintiffs argue: "representations are express, deliberately implied, or involved health, safety or other areas…" (Dkt. 323, p. 17). Even if such a presumption applies, which defendant submits it does not, record evidence shows that when Lifewatch was first served with the Civil Investigative Demand ("CID") by the FTC, Lifewatch sent the FTC drafts of a proposed letter to consumers that offered a full refund for any customer who felt they had been deceived by the misrepresentations at issue in this case. After sending the draft letter to the FTC and looping-in the FTC to this refund process, Lifewatch finalized the letter and sent it out to customers obtained through WWIS. The letters made consumers aware of each of the alleged misrepresentations. The letters then instructed consumers that if they had relied on any of the alleged misrepresentations in purchasing the products, they could receive a

7

full refund by simply calling the phone number provided.[13] Thus, the letter did not simply offer a refund, it specifically asked consumers whether or not they relied upon the alleged misrepresentations. The vast majority of consumers who received these letters did not call for a refund, evincing a lack of reliance on the representations. This is strong evidence not only that consumers were satisfied with their products, but also that the alleged misrepresentations were not material. Furthermore, while there is insufficient evidence of "wide dissemination" of misrepresentations among the hundreds of outside sellers, the *de minimis* refund requests in response to the refund letter shows that consumers were not misled and did not rely on the alleged misrepresentations.

**FDUTPA is Limited to Florida Residents**

Plaintiffs have characterized *Coastal Physician Servs., Inc. v. Ortiz*, 764 So. 2d 7 (Fla. Dist. Ct. App. 1999) -- which held that FDUTPA applies to Florida residents, not out-of-state residents -- as an outlier. But, in *OCE Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.,* 760 So. 2d 1037, 1042 (Fla. Dist. Ct. App. 2000), the court similarly held "only in-state consumers can pursue a valid claim under the Unfair Trade Act." Moreover, in *Montgomery v. New Piper Aircraft,* 209 F.R.D. 221 (S.D. Fla. 2001), the court explained the holding in *Renaissance Cruises, Inc. v. Glassman*, 738 So. 2d 436 (Fla. Dist. Ct. App. 1999), which plaintiffs cite here. Specifically, in support of its ruling that the commerce clause -- which prevents a state from legislating beyond its borders -- precludes FDUTPA from applying to out-of-state claimants, the *Montgomery* court explained:

> *Renaissance* involved a cruise line's alleged deceptive practices in collecting excessive port charges. Passengers made payment for their cruises to Renaissance in Broward County. The Court found that common injury occurred in Florida making Florida law appropriate for resolving putative class members' claims… The Florida Third District

---

[13] JSAF 16, Dkt. 296-2; Baker Affidavit, paragraphs 8-15; Dkt. 296-4, Exhibit B.

> Court of Appeals in *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General,* 761 So. 2d 1256 (Fla. 3DCA 2000) declined to follow… *Renaissance.* The Third District held that FDUTPA could apply to persons residing outside the State of Florida "where the allegations…reflect that the offending conduct occurred entirely within this state…" In the case before us now, it is undisputed that the alleged injuries did not take place "entirely within this state". Therefore, this Court finds no material differences in the opinions of the Florida District Courts of Appeal for the Second, Third and Fourth Districts as to the law applicable to the facts in this case… In *Renaissance*…even though the majority of class members were out-of-state residents, the commerce implicated by their claims was clearly instate commerce. As the Court has already discussed, in *Renaissance*, passengers' payment for their cruises "ultimately was made to appellant in Broward County" and "common injury occurred in Florida". Since the injury to each class member necessarily involved Florida commerce, not the commerce of their home states, the *Renaissance* decision is inapposite.
>
> *Montgomery*, supra at 227- 228 (S.D. Fla. 2001) (internal cites omitted).

In the case at bar, the alleged conduct and damages did not take place entirely within the state. Indeed, payments for monitoring services were made to Lifewatch in New York. Unlike in *Renaissance,* none of the defendants were located in Florida nor did they collect payments in Florida. While some of the outside sellers were located in Florida, other outside sellers were located outside of Florida. Accordingly, FDUPTA's applicability is limited to Florida consumers.

**CONCLUSION**

For the reasons set forth herein, defendant's motion for summary judgment must be granted in his favor.

DATED: March 19, 2018

**THE SULTZER LAW GROUP, P.C.**

By: /s/ Joseph Lipari
Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
85 Civic Center Plaza, Suite 104
Poughkeepsie, New York 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com

*Counsel for Defendant Mitchel May*
