UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION and STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, <br><br> Plaintiffs, <br><br> vs. <br><br> LIFEWATCH INC., d/b/a LIFEWATCH USA, d/b/a MEDICAL ALARM SYSTEMS, SAFE HOME SECURITY, INC., MEDGUARD ALERT, INC., EVAN SIRLIN, MITCHEL MAY, and DAVID ROMAN, <br><br> Defendants. | 15 C 5781 <br><br> Judge Gary Feinerman |

**MEMORANDUM OPINION AND ORDER**

The Federal Trade Commission ("FTC") and the Attorney General of Florida brought this suit alleging violations of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41 *et seq.*, the Telemarketing Sales Rule, 16 C.F.R. pt. 310, and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.* Doc. 1. Earlier in the litigation, when Lifewatch Inc. and Evan Sirlin were the only defendants, the court granted Plaintiffs a preliminary injunction. Docs. 128-130 (reported at 176 F. Supp. 3d 757 (N.D. Ill. 2016)). Plaintiffs then filed an amended complaint that added four new defendants: Safe Home Security, Inc., Medguard Alert, Inc., Mitchel May, and David Roman. Doc. 165.

With discovery closed and a bench trial set for November 13, 2018, Plaintiffs and the four new defendants cross-move for summary judgment. Docs. 241, 292, 295. Additionally, Defendants move to strike several of Plaintiffs' exhibits and parts of Plaintiffs' summary judgment brief, Doc. 333, and Plaintiffs move under Evidence Rule 702 to exclude the testimony

1

of Defendants' damages expert, Kevin Flaherty, Doc. 345. The summary judgment and Rule 702 motions are denied, and Defendants' motion to strike is denied as moot.

## Background

This opinion assumes familiarity with the court's preliminary injunction opinion, which sets out the basic contours of this case. Other pertinent facts are set forth in the Discussion section below.

## Discussion

### I. Cross-Motions for Summary Judgment

#### A. Factual Disputes

When considering Plaintiffs' summary judgment motion, the facts are viewed in the light most favorable to Defendants, and when considering Defendants' motions, the facts are viewed in the light most favorable to Plaintiffs. *See Cogswell v. CitiFinancial Mortg. Co.*, 624 F.3d 395, 398 (7th Cir. 2010) ("When the district court decides cross-motions for summary judgment, … we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made … .") (internal quotation marks omitted). Because the parties' Local Rule 56.1 submissions reveal genuine disputes as to nearly every material fact, the court cannot grant summary judgment to any party. The following three examples—which concern (1) whether Defendants engaged in illegal telemarketing and, if so, to what extent; (2) which Defendants can be held liable; and (3) the appropriate remedy in the event a violation is found—illustrate the point.

#### 1. Defendants' Referral Representation

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Plaintiffs allege that Defendants violated this provision by,

among other things, falsely telling consumers that they could receive a medical alert device for free "because someone [they] kn[ew], typically [a] doctor, a friend, or a family member," either already purchased the device for them or referred them to Defendants. Doc. 242 at 20-21 (citing Doc. 244 at ¶ 9). Defendants make no serious attempt to argue that this representation—which will be called the "referral representation"—was not false. Rather, without citation or explanation, they assert that "in view of the equipment being free for the consumer, the … statement is not *actionably* false or *material*." Doc. 294 at 26-27 (emphasis added); Doc. 296 at 20. Defendants have thus forfeited any argument that the referral representation was not false. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … ."); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff] waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to [the defendant's] motion for summary judgment.").

Even putting aside forfeiture, any argument that the referral representation was not false would fail on the merits. That the device was "free" (meaning that consumers were charged only a monthly fee for the medical alert monitoring service so long as they returned the device upon cancellation) does not make it any less false that the consumers had been referred by doctors, friends, or family members. Likewise, that the device was free does not make it any less false that it was free *because* the consumer had been referred or someone else had already purchased the device for her.

As to the latter point, Defendants' Local Rule 56.1(b)(3)(B) response fails to create a genuine dispute regarding Plaintiffs' Local Rule 56.1(a)(3) assertion that "[n]o friend, family

3

member, health care provider, or acquaintance paid for a device or referred consumers to Defendants." Doc. 331 at ¶ 10. Plaintiffs' assertion is supported by the cited portions of the record, even without considering the exhibits that Defendants have moved to strike. And the record materials Defendants cite do not controvert Plaintiffs' assertion; the facts that one of Defendants' telemarketing scripts included a question seeking referrals, Doc. 23-1 at 235, and that the FTC adduced declarations from only fourteen Lifewatch customers, Doc. 332-7 at ¶ 2, say nothing about whether consumers told they were referred to Defendants had in fact been referred, much less whether they were receiving a free device as a result.

Contrary to Defendants' submission, the fact that the device was free for all consumers does not make the referral representation immaterial. "A claim is considered material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992) (internal quotation marks omitted). A reasonable consumer would likely be influenced by a referral from a trusted source like a doctor, friend, or family member, and that is particularly so on the version of the representation in which that source has already paid for the device. Moreover, the record supports the proposition that consumers were in fact influenced by the representation. Doc. 24-21 at ¶¶ 3, 10 (consumer averring that she "was pressured into purchasing the device because [she] was told it was already paid for by somebody else"); Doc. 24-26 at ¶ 3 (consumer averring that she enrolled in the medical alert service because she assumed that the device was a Mother's Day gift after being told a loved one had purchased it for her).

The referral representation's material falsity, however, does not end the matter. Although Plaintiffs adduce evidence demonstrating that the representation was sometimes made, the parties vigorously and genuinely dispute its prevalence in Defendants' telemarketing activities as

4

a whole. True, Plaintiffs present numerous examples of calls in which Defendants' telemarketers made the representation. Doc. 244 at ¶ 9 (citing consumer declarations and transcripts of recorded calls). Defendants, however, put forward affidavits from dozens of their telemarketers denying that they made the representation, as well as telemarketing scripts and call transcripts that do not contain the representation. Doc. 331 at ¶ 9.

Plaintiffs retort that those affidavits are too "unsubstantiated" and "conclusory" to create a genuine fact dispute. Doc. 348 at 7. The court will grant the point as to some of the affidavits' averments. *E.g.*, Doc. 332-5 at 38 (¶ 20) ("G Energy Solutions complies with all state and federal laws."); *see King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (holding that the plaintiff's averment that "I worked a sufficient number of hours to qualify for FMLA" was a "bare legal conclusion" that "falls far short of creating a triable issue of fact"). But the affidavits also aver specific details of the telemarketers' relationship with Defendants—such as Lifewatch's requirement that the telemarketers "do not indicate that Lifewatch's products were purchased for the prospective customer by a friend or family member," backed up by a weekly request for recordings to verify compliance, *e.g.*, Doc. 332-5 at 37 (¶¶ 11-12)—and deny engaging in specific practices such as robocalling, *e.g.*, *id.* at 38 (¶ 16). That is enough to create a genuine fact dispute on the prevalence of Defendants' use of the referral representation. *See McKinney v. Office of the Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) ("[T]he [district] court was wrong to discount McKinney's testimony as 'self-serving, speculative, and conclusory.' Our cases for at least the past fifteen years teach that [s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment.") (some internal quotation marks omitted); *United States v. Funds in the Amount of $100,120.00*, 730 F.3d 711, 718 (7th Cir. 2013) (holding that an affidavit that "does much more than merely parrot the

5

applicable legal standard" was sufficiently specific to create a fact issue); *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 175 (7th Cir. 2011) (holding that deposition testimony containing "a fair amount of detail" precluded summary judgment).

Thus, reading the summary judgment record in the light most favorable to Defendants, Plaintiffs can at best establish isolated violations of section 5(a) through use of the referral representation. A critical issue under section 5(a), though, is whether the violations were widespread. Plaintiffs seek a permanent injunction "ban[ning] Defendants from telemarketing and from any further involvement in the medical alert industry," along with consumer redress in the form of a nine-figure monetary award. Doc. 242 at 42-43; Doc. 348 at 19-21. That is strong medicine, and whether it is warranted depends in part on whether the misconduct it seeks to remedy was widespread.

A permanent injunction is appropriate under section 13(b) of the FTC Act—which provides, in pertinent part, that the FTC "may seek, and after proper proof, the court may issue, a permanent injunction," 15 U.S.C. § 53(b)—only if Plaintiffs can demonstrate that violations are likely to recur. *See United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir. 1987) ("In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief.") (internal quotation marks omitted). Factors pertinent to determining the likelihood of future violations include "the isolated or recurrent nature of the infraction," "the gravity of harm caused by the offense," and "the extent of the defendant's participation"—all of which implicate the prevalence of the violations. *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982). Similarly, monetary redress tied to consumer loss is available under section 13(b) only to the extent there is loss to redress, and thus any calculation must account for the scope of the violations. *See FTC v. Febre*,

128 F.3d 530, 536-37 (7th Cir. 1997) (explaining that consumer redress under section 13(b) "is meant to place the deceived consumer in the same position he would have occupied had the seller not induced him to enter into the transaction" and to "prevent[] the defendant from being unjustly enriched by his fraud"); *see also FTC v. Trudeau*, 579 F.3d 754, 772 (7th Cir. 2009) (noting that "as a prerequisite to basing sanctions on consumer loss [rather than the defendant's profits], courts often require a finding that the defendants were engaged in a pattern or practice" of misconduct "as opposed to isolated instances") (internal quotation marks omitted).

What is more, Plaintiffs' theory of consumer reliance—which they acknowledge is an essential aspect of their section 5(a) claim, Doc. 242 at 22—depends on a rebuttable presumption triggered only if the misrepresentations "were widely disseminated." *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) ("[O]nce the FTC shows (1) that a reasonably prudent person would rely on the deceptive advertisements, (2) that these advertisements were widely disseminated, and (3) that consumers purchased the product, the burden then shifts to the defendants to prove that the representations were not relied upon by the consumers.") (brackets and internal quotation marks omitted). Accordingly, the genuine dispute of fact on the prevalence of Defendants' use of the referral representation impacts not only whether Plaintiffs are entitled to an injunctive or consumer redress remedy, but also whether Defendants are liable in the first place. *See McGregor v. Chierico*, 206 F.3d 1378, 1387-88 (11th Cir. 2000) (affirming an award of consumer redress "in the amount of gross sales" where the defendant failed to rebut the presumption that consumers relied on widely disseminated misrepresentations, "taint[ing] [their] purchasing decisions"); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993) (explaining that "proof of individual reliance by each purchasing consumer is not needed" for consumer redress under section 13(b) because consumers who

7

purchase a product are presumed to rely on widely disseminated material misrepresentations); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1315-16 (8th Cir. 1991) (holding that this presumption can satisfy the "reliance requirement" for consumer redress under section 13(b)).

### 2. Individual Defendants' Knowledge of the Alleged Misrepresentations

A requirement for individual liability under the FTC Act is that the defendant knew or should have known about the deceptive practices. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 636 (7th Cir. 2005). Plaintiffs "may fulfill the knowledge requirement with evidence that the individuals had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Ibid*. (internal quotation marks omitted). The facts on this issue are genuinely disputed.

For example, May argues that he cannot be held individually liable because he did not know about any of Lifewatch's alleged misrepresentations. Doc. 296 at 23; *see* Doc. 296-1 at ¶ 24 (asserting that May never had "knowledge or awareness" of Lifewatch's "engaging in dishonest, fraudulent, unfair, deceptive, or violative conduct as alleged in the Amended Complaint"); Doc. 296-13 at ¶¶ 18-19 (May listing the alleged misrepresentations and averring that he is "unaware of those specific statements having been made in connection with selling Lifewatch's services"). Plaintiffs, by contrast, adduce evidence sufficient to allow a reasonable factfinder to conclude that May had actual knowledge of the misrepresentations. Doc. 244 at ¶ 91 (asserting that "May knows that Defendants' telemarketers have engaged in deceptive acts and practices," and citing numerous emails in support); Doc. 267 at 105 (email from May dated May 14, 2013, forwarding an earlier email relating complaints that telemarketers are "telling

8

[consumers] that a family member ordered the unit for them, so the unit is free"); Doc. 257 at 94-95 (email from Sarai Baker dated June 6, 2013, forwarding to May an earlier email noting that a customer was "told the same things as previous accounts," including that "a family member paid 400 for unit").

This genuine factual dispute precludes summary judgment for or against May on personal knowledge grounds, and similar disputes preclude summary judgment for or against Sirlin and Roman.

### 3. Equitable Monetary Relief

Plaintiffs seek as equitable monetary relief more than $100 million in consumer loss—calculated as Defendants' telemarketing-derived revenues, less chargebacks or refunds paid to consumers. Doc. 348 at 19-21. Even setting aside the parties' disagreement over whether Plaintiffs' proposed formula is the appropriate measure of equitable monetary relief under the circumstances, the correct inputs cannot be determined as a matter of law from the summary judgment record.

Plaintiffs' Local Rule 56.1(a)(3) statement, citing emails that attach tax returns and sales receipts, asserts that Defendants' revenue from selling medical alert services totaled some $151 million from 2011 through 2016. Doc. 244 at ¶ 106. However, as Defendants note, Doc. 331 at ¶ 106, Plaintiffs' assertion is not supported by the cited portions of the record. The materials are designated by Bates number without any indication where in the record they can be found. Doc. 244 at ¶ 106. Because the materials are all in the set labeled "FTC-LW16" and Plaintiffs have given no indication to the contrary, the court assumes that if the documents are in the record at all, they are in Exhibit 97, Attachment E, which contains thousands of pages of selections from that set. Doc. 251 at ¶ 9; Docs. 259-278.

9

Plaintiffs refer to documents FTC-LW16-1152, -1155, -3747, and -4888 to support their assertions about Defendants' 2011 and 2013 revenues, but three of those documents are not in Attachment E, which skips from -1135 to -1172 and from -4865 to -4976. Doc. 261 at 78-79; Doc. 271 at 153-54. The fourth document, FTC-LW16-3747, is an email that contains no financial information and does not appear to be accompanied by its five attachments. Doc. 270 at 56. Plaintiffs also point to that email and what they claim is one of the attachments, FTC-LW16-3730, to support their assertion about Lifewatch's 2012 revenues. Doc. 244 at ¶ 106. But the tax return at -3730 is unsigned, Doc. 270 at 55, and may well be a draft. It is unclear whether the document is one of the attachments to the email at -3747 and, if so, which attachment it is; one of the possible files includes "Draft" in its name. *Id*. at 56.

The story is much the same for 2014 and 2015. Plaintiffs rely on unsigned tax returns, including one that appears to have been attached to an email requesting a signature. Doc. 273 at 182-83, 232-33. Plaintiffs cite FTC-LW16-7499 to -7501 for Lifewatch's and Medguard's 2016 revenues and FTC-LW16-7502 to -7508 for Medguard's 2014 and 2015 revenues, Doc. 244 at ¶ 106, but the corresponding pages are the middle of a "Telemarketing Services Agreement," Doc. 274 at 74-84, not monthly sales receipts.

Thus, even if Plaintiffs' proposed formula is the appropriate measure of equitable monetary relief, the court cannot determine from the summary judgment record the appropriate amount that would be due if Defendants are held liable.

### B.     FDUTPA's Scope

Defendants seek summary judgment on one issue that does not implicate a factual dispute: whether FDUTPA is limited to transactions involving Florida consumers. Defendants argue that FDUTPA is so limited, Doc. 294 at 38; Doc. 296 at 30-31; Doc. 328 at 17 n.30;

10

Doc. 330 at 19 n.23, while Plaintiffs maintain that FDUTPA protects Florida as well as non-Florida residents, Doc. 323 at 36.

Where, as here, there is no controlling authority from the Seventh Circuit on a question of state law, this court's task "is to apply state substantive law, as … the highest court of the state would apply it." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634-35 (7th Cir. 2007). Absent authority from the state supreme court, this court must follow decisions from the state intermediate appellate court, unless "there are persuasive indications that the highest court of the state would decide the case differently." *Commonwealth Ins. Co. v. Stone Container Corp.*, 323 F.3d 507, 509 (7th Cir. 2003) (internal quotation marks omitted). The Florida Supreme Court has not addressed whether and, if so, to what extent FDUTPA protects non-Florida residents, and Florida's intermediate appellate courts are split on the question. *See Ohio State Troopers Ass'n v. Point Blank Enters.*, 2018 WL 3109632, at *4 (S.D. Fla. Apr. 5, 2018) (citing cases). Under these circumstances, this court must make "a judicial assessment" about how the state's highest court would resolve the conflict. *See Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002).

To support their view that FDUTPA protects only Florida residents, Defendants cite *Coastal Physician Services of Broward County, Inc. v. Ortiz*, 764 So. 2d 7 (Fla. 4th Dist. App. 1999), in which the Fourth District Court of Appeal disposed of the issue in two sentences: "Having reviewed the statutory provisions, we conclude that these acts are for the protection of in-state consumers from either in-state or out-of-state debt collectors. Other states can protect their own residents, as Florida itself does with regard to out-of-state collectors." *Id*. at 8 (citation omitted). In *Océ Printing Systems USA, Inc. v. Mailers Data Services, Inc.*, 760 So. 2d 1037 (Fla. 2d Dist. App. 2000), the Second District Court of Appeal followed *Coastal* without

11

engaging in any independent analysis. *See id*. at 1042 ("We agree that only in-state consumers can pursue a valid claim under [FDUTPA].").

*Coastal* and *Océ* are unpersuasive. As the Third District Court of Appeal correctly observed in *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*, 761 So. 2d 1256 (Fla. 3d Dist. App. 2000): "Conspicuously absent from [FDUTPA] … is any language which purports to confine the provisions of FDUTPA or limit the [state agency's] enforcement authority to commercial transactions involving only Florida residents." *Id*. at 1261. The Florida Supreme Court has consistently instructed courts not to read unwritten exceptions into an unambiguous statute. *See Davila v. State*, 75 So. 3d 192, 196 (Fla. 2011) (in declining to read a non-textual exception into a statute, reiterating that Florida courts "are without power to construe an unambiguous statute in a way which would extend, modify, or limit[] its express terms or its reasonable and obvious implications") (internal quotation marks omitted); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 775 (Fla. 2003) (rejecting the Fourth District's holding that FDUTPA is limited to cases involving a pattern of conduct, reasoning that this interpretation "contravene[d] the plain meaning" of the statute). *Coastal* and *Océ* violate this fundamental canon, while *Millennium* complies with it.

Moreover, interpreting FDUTPA to protect only Florida consumers cannot be reconciled with what the statute *does* say. FDUTPA provides that it "shall be construed liberally to promote [its stated] policies," which include "protect[ing] the consuming public and legitimate business enterprises from those who engage in … deceptive … acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202. Reinforcing the breadth of its writ, FDUTPA defines "[t]rade or commerce" as certain activities involving goods, services, property, or other "thing[s] of value, *wherever situated*." *Id*. § 501.203(8) (emphasis added). And the statute's "[e]nforcing

12

authority" depends on which state judicial circuit a violation "occurs in *or* affects," *id*. § 501.203(2) (emphasis added), which encompasses the situation where a violation "occurs in" Florida but "affects" non-Florida consumers. *See Mlynek v. Household Fin. Corp.*, 2000 WL 1310666, at *3-5 (N.D. Ill. Sept. 13, 2000) (rejecting *Coastal* and *Océ* in favor of *Millennium* in part because neither decision explains how, given the statutory text, "a Florida business whose agents are alleged to have [violated the statute] is not answerable to an out-of-state plaintiff").

Accordingly, FDUTPA extends to claims by non-Florida consumers so long as the defendant's conduct has a sufficient nexus to Florida. *See Millennium Commc'ns*, 761 So. 2d at 1260-62 (holding that FDUTPA "seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of [Florida] without limitation," and thus protects non-Florida consumers at least when "the offending conduct occurred entirely within" Florida); *Ohio State Troopers Ass'n*, 2018 WL 3109632, at *4 (holding that "sufficient connections with Florida … could justify application of the FDUTPA" where the plaintiffs alleged that the defendant "designed, manufactured, marketed, distributed, and labeled the [product] from its headquarters in Florida"); *Bank of Am., N.A. v. Zaskey*, 2016 WL 2897410, at *9 (S.D. Fla. May 18, 2016) ("It appears that all of the federal courts in the Southern District of Florida that have considered this issue have followed *Millennium* and held that FDUTPA applies to non-Florida residents if the offending conduct took place predominantly or entirely in Florida.") (citing cases) (internal quotation marks omitted); *Barnext Offshore, Ltd. v. Ferretti Grp. USA*, 2012 WL 1570057, at *6 (S.D. Fla. May 2, 2012) (noting that "nothing in *Millennium* suggests that the FDUTPA applies *only* when conduct occurs entirely within Florida"). There is no need at this point to draw the precise contours of the nexus requirement, for the record contains clear evidence of a Florida nexus for at least some of Defendants' alleged misconduct,

13

thus precluding summary judgment in their favor on the FDUTPA claim. *E.g.*, Doc. 244 at ¶ 58 (citing the declaration of a telemarketer who worked for multiple Florida call centers selling medical alert devices for Lifewatch, *see* Doc. 246 at ¶¶ 3-4, 7); *id.* at ¶ 69 (citing a December 8, 2016 email exchange discussing Lifewatch's application for a $50,000 security bond to solicit in Florida, *see* Doc. 273 at 226-27); Doc. 350 at 13 (May conceding that some of Defendants' telemarketers "were located in Florida").

## II.     Plaintiffs' Motion to Exclude Kevin Flaherty's Expert Testimony

Plaintiffs move under Evidence Rule 702 to exclude the testimony of Kevin Flaherty, Defendants' expert witness regarding monetary relief. Doc. 345. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert," *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotation marks omitted), and "has 'broad latitude' to determine how to evaluate expert testimony," *United States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). That latitude is particularly broad in a bench trial, where "the usual concerns of [Rule 702]—keeping unreliable expert testimony from the jury—are not present." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010); *see also United States v. Ozuna*, 561 F.3d 728, 737 (7th Cir. 2009) ("The purpose of *Daubert* [*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993),] was to require courts to serve as gatekeepers so that unreliable expert testimony does not carry too much weight with the jury. Judges, on the other hand, are less

14

likely to be swayed by experts with insufficient qualifications.") (citation omitted); *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("It is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different. Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened."). The expert's proponent bears the burden of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702. *See United States v. Saunders*, 826 F.3d 363, 368 (7th Cir. 2016); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Plaintiffs challenge Flaherty's opinions on three grounds: (1) they are irrelevant because they address Defendants' profits rather than consumer loss, Doc. 345-1 at 4-5; (2) they are based on unreliable data, *id*. at 5-9; and (3) his supplemental report, Doc. 332-3, contains legal opinions that are beyond his expertise, Doc. 345-1 at 9-10. Each fails to persuade.

First, Flaherty's opinions regarding Defendants' profits are relevant. It is true, as Plaintiffs note, that one "proper measure of equitable monetary relief [under section 13(b) of the FTC Act] is the full amount lost by consumers." Doc. 345-1 at 4; *see Febre*, 128 F.3d at 536 ("Courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers."). But another proper measure of equitable monetary relief is the defendant's profits. *See Trudeau*, 579 F.3d at 771 (noting that the Seventh Circuit has approved both consumer loss and the defendant's profits as appropriate measures of equitable monetary relief, and that "the circumstances of the case will dictate which is most appropriate"). Thus, Flaherty's opinions regarding Defendants' profits are relevant.

Second, Plaintiffs contend that Flaherty's opinion regarding Defendants' profits "is unreliable because it is based on insufficient—and often incorrect—facts and data." Doc. 345-1

at 5. Plaintiffs' critique of Flaherty's inputs goes to the weight of his testimony, not its admissibility. Because Plaintiffs do not seriously dispute the reliability of Flaherty's methodology, the question under Rule 702 is whether he "considered sufficient data to employ [that] methodology." *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (holding that the district court erroneously excluded expert testimony that "correctly employed a valid methodology" but that depended on an "input" that "was undoubtedly a rough estimate"). The "sufficient data" standard requires only that the expert use (1) "those kinds of facts or data on which experts in the field would reasonably rely" and (2) enough data for the method to work. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806-09 (7th Cir. 2013) (internal quotation marks omitted). A court misapplies this standard if it "unduly scrutinizes the quality of the expert's data" by questioning "the selection of data inputs to employ in a model" or by challenging the "reliability of data and assumptions." *Id.* at 806-08. So long as there is "a rational connection between the data and the opinion"—that is, so long as the expert uses a reliable method—"an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Id.* at 809.

Plaintiffs' critique of Flaherty's inputs regarding Defendants' profits boils down to the submission that "there was no reason for Mr. Flaherty to create a model in the first place" because "Lifewatch has actual data that he either did not ask for or just ignored." Doc. 345-1 at 6. Flaherty counters that he rejected the data that Plaintiffs prefer because "Lifewatch indicated that the data was unreliable and incorrect" and because, in any event, he "independently determined there were serious inconsistencies and contradictions within the data." Doc. 355-3 at ¶ 8; *see also id.* at ¶¶ 6-12 (explaining the basis for each challenged input). In the end, this is a

16

dispute about "the selection of data inputs," and thus is a matter for cross-examination, not Rule 702 admissibility. *Manpower*, 732 F.3d at 807, 809.

Pressing the opposite result, Plaintiffs cite *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005), and *Victory Records, Inc. v. Virgin Records America, Inc.*, 2011 WL 382743 (N.D. Ill. Feb. 3, 2011), for the proposition that "an assumption based on the internal projections of the expert's sponsor" is not reliable, *id.* at *2. *Zenith* and *Victory* involved an expert's uncritical acceptance of the expert's proponent's internal projections about future results. *See Zenith*, 395 F.3d at 420; *Victory Records*, 2011 WL 382743, at *2 (noting also that "the proposed expert offered no basis … for concluding that Victory's internal projections provide an acceptable foundation for an expert's opinion in his field"). Here, by contrast, Flaherty is an accountant who reviewed Lifewatch's corporate documents and interviewed corporate employees about past transactions to assess the company's past performance. Doc. 355-1 at 2, 12; Doc. 355-3 at ¶¶ 2, 5-7. The types of documents and interviews that Flaherty considered fall well within "the kinds of data that accountants normally rely on," and are thus sufficient to satisfy Rule 702. *See Manpower*, 732 F.3d at 809 (rejecting a challenge to an accountant's use of interviews with managers as well as company documents and earnings projections); *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (rejecting a challenge to expert testimony by an accountant who relied on "financial information furnished by [the company] and assumptions given him by counsel"); *United States v. Schultz*, 2016 WL 7409911, at *5 (N.D. Ill. Dec. 22, 2016) ("Accountants can reasonably rely on witness interviews … .") (citing cases).

Third, Plaintiffs argue that Flaherty's supplemental report improperly gives a legal opinion regarding the appropriate remedy in the event liability is found. Doc. 345-1 at 9-10.

17

Although Flaherty's opinions about what, according to "industry practice," "any economic damage model must deduct" and the accompanying citation to case law, Doc. 355-2 at 3, push the boundaries of his expertise, the bulk of the supplemental report addresses Lifewatch's "commissions, chargebacks, and chargeback percentages" on a telemarketer-by-telemarketer basis and points out costs to Lifewatch and benefits to customers that Plaintiffs' proposed remedy fails to consider, *id.* at 2-3. These topics are well within Flaherty's competence as an accountant and damages expert. Given that this case will be tried to the bench, the precise contours of Flaherty's expertise are best determined at trial. *See K.C. S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016) ("Where a trial judge conducts a bench trial, the judge need not conduct a *Daubert* (or Rule 702) analysis before presentation of the evidence, even though he must determine admissibility at some point.").

Accordingly, Plaintiffs' motion to exclude Flaherty's expert testimony is denied. The fact that Flaherty's testimony survives Rule 702, however, does not guarantee that the court will agree with his opinion at trial. *See Ill. Liberty PAC v. Madigan*, __ F.3d __, 2018 WL 4354424, at *9 (7th Cir. Sept. 13, 2018) ("As the fact-finder, [the judge] was entitled to reject testimony that he found to be unpersuasive, even if its source was an expert witness."); *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) ("When expert testimony has been admitted under *Daubert*, the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.") (internal quotation marks omitted).

## Conclusion

The parties' summary judgment motions and Plaintiffs' Rule 702 motion are denied. Defendants' motion to strike is denied as moot, as the outcome of the summary judgment

motions would be the same regardless of whether the court considered or disregarded the portions of Plaintiffs' exhibits and briefs challenged by Defendants.

September 24, 2018

United States District Judge